# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate Of James C. Knipple (Dec.), et al. (see Exhibit A for a Full List of Plaintiffs), | Case No.: 13 CIV 9195 (KBF) [rel. 10 CIV 4518] |
| Plaintiffs, | **FILED UNDER SEAL CONTAINS CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER** |
| v. | |
| ISLAMIC REPUBLIC OF IRAN; BANK MARKAZI a/k/a CENTRAL BANK OF IRAN; BANCA UBAE SpA; CLEARSTREAM BANKING, S.A.; and JP MORGAN CHASE BANK, N.A., | **AMENDED COMPLAINT PURSUANT TO N.Y. C.P.L.R. 5225 AND 5227** |
| Defendants. | **Plaintiffs demand a trial by jury.** |

The Plaintiffs/Judgment Creditors listed on the attached Exhibit A ("Plaintiffs"), by their attorneys, allege the following claims based upon information and belief, except those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

## NATURE OF THE CLAIM

1.     Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine Barracks in Beirut, Lebanon. Plaintiffs include the representatives of the estates of the 241 American servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen.

2.     By means of this action, Plaintiffs seek to enforce judgments for compensatory damages that they secured against two defendants, the Islamic Republic of Iran ("Iran") and

231580.1

Iran's Ministry of Information and Security ("MOIS" and, collectively with Iran, the "Judgment Debtors"), in 2007.

3. Despite the Judgment Debtors' longstanding, determined efforts to evade collection of the Plaintiffs' judgments, and other judgments obtained by the victims of Iran's ongoing terror campaign, Plaintiffs succeeded in restraining approximately $ in bonds and cash nominally held by Iran's supposed "central bank," defendant Bank Markazi ("Markazi"). Plaintiffs obtained a judgment of turnover against Clearstream and others of approximately $1.9 billion of those assets (the "Original Assets") on July 9, 2013. The Plaintiffs recently discovered that Clearstream continues in possession and custody of additional assets of Markazi in the form of U.S. dollar denominated bonds that were restrained by Clearstream in 2008 when Plaintiffs caused the restraint of the Original Assets, and that Clearstream's correspondent bank in New York, JP Morgan Chase Bank NA ("JP Morgan"), holds the proceeds of those bonds in a U.S. dollar account of which Markazi is the sole beneficial owner. The Plaintiffs seek by this action to have those additional assets turned over to Plaintiffs in further satisfaction of their judgments.[1]

4. Plaintiffs easily satisfy all of the requirements for collecting a portion of their massive judgments against the Remaining Assets under federal and common law, including the Foreign Sovereign Immunities Act, 28 U.S.C. Section 1602 *et seq.* (the "FSIA") and Section 201 of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, Title II, §201(a), 116 Stat. 2337 (2002) ("TRIA").

5. Markazi's nominal ownership of the Remaining Assets poses no obstacle to collection because (a) TRIA permits collection of the Plaintiffs' judgments from assets of

---

[1] The assets described in the Peterson Writ of Execution, annexed hereto as Exhibit B, as well as the cash proceeds collected by Clearstream from bonds that comprised those assets and any interest accrued thereon since the assets were restrained in 2008, to the extent they remain in Clearstream's or JP Morgan's custody or possession, are hereinafter referred to as "Remaining Assets."

231580.1                                                                                                      2

agencies and instrumentalities of Iran like Markazi, and (b) Iran dominates and controls Markazi's actions, thereby rendering Markazi a mere alter ego of Iran that follows Iran's directions regarding matters ranging from monetary policy, to financing Iran's continuing acts of international terrorism and efforts to develop weapons of mass destruction ("WMDs"), to evading the enforcement of the Plaintiffs' judgments and other judgments secured by the victims of Iran's terrorism. Indeed, former Iranian President Mahmoud Ahmadinejad publicly and repeatedly boasted of his ability to control Markazi's actions, and other Iranian officials frequently acknowledge the bank's subjugation to Ahmadinejad's whims.

6. Clearstream's presence in this District, and the extensive commercial activity that took place here at the direction and through the agents of Iran and Markazi, to maintain the Remaining Assets for safekeeping, to transfer ownership of those securities and to make interest and principal payments to Markazi, leave no doubt that Markazi and its agents engaged in commercial activity in the United States in relation to the Remaining Assets. Likewise, the presence of Clearstream in this District and the intangible nature of the bonds and the proceeds thereof collected by Clearstream and maintained on deposit at JP Morgan in New York render Defendants' contentions that nothing exists here for Plaintiffs to levy against an exercise in sophistry.

7. Markazi's assertion that 28 U.S.C. Section 1611(b)(1) protects its assets from collection ignores Iran's waiver of any collection immunity otherwise applicable to its agencies and instrumentalities. In any event, Markazi cannot demonstrate that it utilized the Remaining Assets exclusively "for its own account," *i.e.*, solely in connection with legitimate central banking activity, a necessary condition to defeat collection under Section 1611(b)(1).

8.    To the contrary, the U.S. Departments of State and Treasury have recently taken the unprecedented step of designating Markazi as the first supposed central bank subject to restrictions under the Patriot Act's provisions related to jurisdictions of "primary money laundering concern." Markazi earned that designation by consistently assisting in Iran's financing of terrorism, efforts to promote nuclear weapons proliferation and evasion of U.S. and international sanctions.

9.    As the Treasury Department recognized in announcing the sanctions against Markazi, every transaction in which Markazi engages is inherently suspect, and Markazi has repeatedly demonstrated its willingness to lie and to deceive to advance Iran's illegal activities. Thus, the Remaining Assets are properly seen as the tools of Iran's ongoing violations of U.S. sanctions and international law, not – as Markazi suggests – as ordinary "foreign exchange reserves" maintained by a legitimate "central bank" "for its own account"

10.    Finally, the fraudulent conveyances in which Markazi engaged shortly before Plaintiffs succeeded in restraining the Remaining Assets provide no defense to Plaintiffs' right to levy those assets. Iran, Markazi, Clearstream and UBAE (the "Conspirators") jointly agreed in early 2008 to move the Remaining Assets and other Markazi assets from an account that Clearstream maintained in Markazi's name to a new customer account opened by UBAE at Clearstream to house Markazi's bonds (the "UBAE/Markazi Account").

11.    Those transfers bear numerous and obvious indicia of fraud. The transfers were made free of payment. The Conspirators embarked on their scheme to transfer the assets just as amendments to the FSIA facilitated the ability of terror victims to collect their judgments against rogue states such as Iran and as other international sanctions threatened Markazi's ability to act freely in the international banking system.

231580.1                                                           4

12.     Furthermore, inserting UBAE into the middle of Markazi's bond transactions served no legitimate business purpose.  UBAE is, by any measure, a small bank that can provide little of value to a massive financial institution like Markazi.  From Markazi's perspective, UBAE's sole value was its willingness to serve as a front for Markazi in connection with the bond transactions and thereby impede collection efforts by Iran's creditors and the ability of the U.S. and foreign governments to sanction Markazi and Iran.  Because UBAE was controlled by the regime of Libyan strongman Muammar Gaddafi when the Conspirators initiated their scheme, UBAE was uniquely suited for that role.

13.     Thus, to the extent that some significance attaches to whether Clearstream or UBAE is the proper garnishee in this action, the Court's equitable powers justify reversing Markazi's fraudulent conveyances of the Remaining Assets, restoring them to Markazi's Clearstream account and permitting Plaintiffs to levy those assets.

14.     Moreover, the foregoing facts easily establish Plaintiffs' right to the turnover of the Remaining Assets in the possession and control of JP Morgan and Clearstream.

15.     The Court should therefore provide some closure to Plaintiffs' decades-long quest to force Iran to account for its murderous acts on the morning of October 23, 1983 and order Defendants to surrender the Remaining Assets to Plaintiffs.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sections 1330, 1331, 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A, 1610, and TRIA.  This Court also has jurisdiction under 28 U.S.C. Section 1963 because Plaintiffs obtained their judgments in the United States District Court for the District of Columbia and subsequently registered their

judgments in the Southern District of New York.  This proceeding arises under Fed. R. Civ. P.

69(a), which incorporates the applicable law of the State of New York and the United States.

17.    This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4,

CPLR Sections 301 and 302, and 28 U.S.C. Sections 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A,

1610 and TRIA.

18.    As Plaintiffs particularize herein, Iran has explicitly and by implication waived any

right to immunity against suit and execution that Markazi and Iran's other agencies and

instrumentalities might otherwise enjoy from the claims that Plaintiffs assert.

19.    Iran and its alter ego, Markazi, engaged in substantial commercial activity inside

and outside of the United States in connection with their investments in the Remaining Assets,

individually and through the Banking Agent Defendants (*i.e.*, UBAE and Clearstream).

20.    In particular, Iran, Markazi and the Banking Agent Defendants engaged in

commercial activity in the United States by investing in bonds denominated in U.S. dollars,

which required participation of various United States financial institutions, including JP Morgan,

to make payments of interest and principal and to act as correspondent banks to receive and hold

U.S. dollar cash proceeds of the bonds for the benefit of Markazi.

21.    When they engaged in those activities, the Banking Agent Defendants operated

within the scope of their agency relationship with Iran and Markazi.  Moreover, the Banking

Agent Defendants engaged in that commercial activity in furtherance of the conspiracy with Iran

and Markazi that Plaintiffs describe in detail below.

22.    The actions that Markazi and Iran undertook with respect to the Remaining Assets

in Iran, including the investment decisions that they made regarding those bonds, had direct

effects in the United States, including the payment of substantial interest and principal to

Markazi through payment agents and correspondent banks in the United States, including JP Morgan and HSBC Bank.

23.    Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b), (d) and (f).

## PARTIES AND JUDGMENT DEBTORS

24.    Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine barracks in Beirut, Lebanon. Plaintiffs include the representatives of the estates of the 241 United States servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of the killed and injured servicemen. All Plaintiffs are United States Citizens residing in the United States, including the State of New York.

25.    Defendant and Judgment Debtor the Islamic Republic of Iran ("Iran") is a foreign sovereign and U.S. government-designated state sponsor of terrorism. The Plaintiffs secured judgments for compensatory and punitive damages against Iran for its role in the murderous Marine Barracks attack that killed and injured Plaintiffs.

26.    The United States Department of State first designated Iran as a state sponsor of terrorism in 1984 and has reiterated that designation every year since 2000 in its Country Reports on Terrorism.[2] Iran earned that ignominious designation by repeatedly providing support for acts of international terrorism. In addition to financing and lending non-monetary support to terrorist acts, Iran has also actively pursued the development of weapons of mass destruction ("WMD") in violation of international law.

27.    The Iranian Ministry of Information and Security ("MOIS") is a Judgment Debtor. MOIS serves as an intelligence organization for the Iranian government. MOIS acted as a conduit for Iran's provision of funds, training and weapons to Hezbollah, the terrorist

---

[2] *See* "State Sponsors of Terrorism," U.S. Department of State, August 18, 2011 (http://www.state.gov/s/ct/rls/crt/2010/170260.htm).

organization that assisted Iran in conducting the 1983 Beirut Marine Barracks bombing. Among other illicit conduct, MOIS provided explosives to Hezbollah and exercised operational control over Hezbollah's attack upon the Marine Barracks.

28. Defendant Bank Markazi, a/k/a the Central Bank of Iran ("Markazi"), describes itself as Iran's central bank. Markazi was formed under the laws of Iran and maintains its principal place of business in Iran, although it conducts its business operations world-wide, including in the United States.

29. At all relevant times, Markazi served as an agent and instrumentality and alter ego of Iran. Markazi engaged in all of the conduct and actions that Plaintiffs allege at the direction and for the benefit of Iran and as Iran's alter ego. Iran directed Markazi to engage in that conduct and supervised Markazi's performance of the tasks that Iran directed.

30. Because of Markazi's longstanding illegal and deceptive efforts to facilitate Iran's support for global terrorism and pursuit of nuclear and ballistic missile capabilities, the U.S. Departments of State and Treasury took the unprecedented step on November 21, 2011 of applying restrictions applicable to jurisdictions of "primary money laundering concern" to Markazi.[3] Markazi is the only purported central bank of a sovereign nation to be included within the scope of those restrictions.

31. As support for its designation of Markazi as a money launderer, the Department of Treasury found that Markazi and other state-owned Iranian banks "willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies." The Department of Treasury also emphasized that Markazi

---

[3] http://www.treasury.gov/press-center/press-releases/Documents/Iran311Finding.pdf .
http://www.nytimes.com/2011/11/22/world/middleeast/iran-stays-away-from-nuclear-talks.html

"provided financing to the UN-sanctioned Khatem al-Anbiya Constructions Headquarters for defense-related projects," *i.e.*, for Iran's nuclear proliferation program.

32.    Defendant Banca UBAE SpA ("UBAE") is a banking corporation organized under the laws of Italy that maintains its principal office in Rome, Italy.

33.    Working as the agent of Iran and Markazi, UBAE caused Clearstream to transfer the Remaining Assets held for safekeeping by affiliates of United States banks from Markazi's account at Clearstream to the new UBAE/Markazi Account at Clearstream.  While the Conspirators agreed that the UBAE/Markazi Account would not bear Markazi's name, UBAE opened that account exclusively for Markazi's benefit and at the direction of Markazi and Iran.

34.    UBAE undertook substantial efforts to assist in concealing Markazi's ownership interest in the Remaining Assets.  Until Italy's central bank seized control of UBAE in March of 2011 in conjunction with sanctions imposed upon the Libyan regime of the deceased strongman Muammar Gaddafi by the United Nations and the European Union, the Gaddafi regime controlled 67.55% of UBAE's stock.

35.    Among other claims, Plaintiffs assert fraudulent conveyance causes of action against UBAE related to its role as the transferee of Markazi's fraudulent conveyances.  As the transferee of those fraudulent conveyances, UBAE does not qualify as a necessary party.

36.    Defendant Clearstream Banking, S.A. ("Clearstream") is a banking corporation organized under the laws of Grand Duchy of Luxembourg.  Clearstream's web site declares that the company "offers its customers the possibility to use Clearstream Banking as a single point of access for the settlement and custody of internationally traded bonds and equities across 51 markets" and that "[m]ore than 1,100 [Clearstream] employees service customers in Europe, the Americas, Asia-Pacific, the Middle East and Africa from our operational centres in Luxembourg,

Germany and Singapore, as well as from representative offices in London, New York, Hong Kong, Dubai and Tokyo." Clearstream is doing business in the County of New York and maintains an office at 55 Broad Street, New York, New York.

37.     Working as the agent of Iran, Markazi, acting through UBAE and Clearstream, invested US dollars in bonds that required the services of JP Morgan and other United States banks and their affiliates acting as depositories, paying agents and cash correspondent banks and undertook substantial efforts to assist in concealing Markazi's ownership interest in the bonds that constituted the Remaining Assets.

38.     Defendant, JP Morgan is a banking association organized under the laws of the United States, and headquartered at 270 Park Avenue, New York, New York, with an office located at 4 New York Plaza, 15th Floor, New York, NY 10004, where it maintains a correspondent account in the name of Clearstream, in which cash proceeds of the bonds that constituted the Remaining Assets are held for the benefit of Markazi.

### THE FACTS AND CIRCUMSTANCES THAT DEMONSTRATE PLAINTIFFS' ENTITLEMENT TO RELIEF

**A.     Plaintiffs' Judgments against Iran for its Support of Murderous Terrorist Acts**

39.     Plaintiffs designated in Exhibit A as the "Peterson Judgment Creditors" hold an unsatisfied judgment for compensatory damages in the total amount of $2,656,944,877.00 against the Judgment Debtors, Iran and MOIS.  The United States District Court for the District of Columbia, in an action entitled, *Peterson v. Islamic Republic of Iran* (01-2094 and 01-2684(RCL)), entered the Peterson Judgment Creditors' judgment on September 7, 2007. Peterson Judgment Creditors registered their judgment in this Court pursuant to 28 U.S.C. Section 1963 under Docket No. 18 Misc. 302 on March 24, 2008.

40.   Plaintiffs designated in Exhibit A as the "Davis Judgment Creditors" hold an unsatisfied judgment for compensatory damages in the total amount of $486,918,005.00 and punitive damages in the total amount of $1,674,997,937.00 against the Judgment Debtors, Iran and MOIS.  The United States District Court for the District of Columbia, in an action entitled, *Davis v. Islamic Republic of Iran* (07cv1302(RCL)), entered the Davis Judgment Creditors' judgment on March 30, 2012.  Davis Judgment Creditors registered their judgment in this Court pursuant to 28 U.S.C. Section 1963 under Docket No. 13 Misc. 0046 on February 14, 2013.

41.   Plaintiffs designated in Exhibit A as the "Valore, Arnold, Spencer and Bonk Judgment Creditors" hold an unsatisfied consolidated judgment for compensatory damages in the total amount of $290,291,092.00 and punitive damages in the total amount of $1,000,000,000.00 against the Judgment Debtors, Iran and MOIS.  The United States District Court for the District of Columbia, in consolidated actions entitled, *Valore v. Islamic Republic of Iran* (03-cv-1959), *Arnold v. Islamic Republic of Iran* (06-cv-516), *Spencer v. Islamic Republic of Iran* (06-cv-750) and *Bonk v. Islamic Republic of Iran* (08-cv-1273), entered the Valore, Arnold, Spencer and Bonk Judgment Creditors' judgment on March 31, 2010.  Valore, Arnold, Spencer and Bonk Judgment Creditors registered their judgment in this Court pursuant to 28 U.S.C. Section 1963 under Docket No. 11 Misc. 00217-P1 on July 5, 2011.

42.   Plaintiffs designated in Exhibit A as the "Bland Judgment Creditors" hold an unsatisfied judgment for compensatory damages in the total amount of $227,805,908.00 and punitive damages in the total amount of $955,652,324.00 against the Judgment Debtors, Iran and MOIS.  The United States District Court for the District of Columbia, in an action entitled, *Bland v. Islamic Republic of Iran*, (05-cv-02124 (RCL)), entered the Bland Judgment Creditors' judgment on November 21, 2011.  Bland Judgment Creditors registered their judgment in this

Court pursuant to 28 U.S.C. Section 1963 under Docket No. 12 Misc. 373-P1 on November 13, 2012.

43. Plaintiffs designated in Exhibit A as the "Brown Judgment Creditors" hold an unsatisfied judgment for compensatory damages in the total amount of $183,281,294.00 and punitive damages in the total amount of $630,487,651.00 against the Judgment Debtors, Iran and MOIS. The United States District Court for the District of Columbia, in an action entitled, *Brown v. Islamic Republic of Iran*, (07-cv-00531(RCL)), entered the Brown Judgment Creditors' judgment on July 3, 2012. Brown Judgment Creditors registered their judgment in this Court pursuant to 28 U.S.C. Section 1963 under Docket No. 13 Misc. 113-P1 on March 28, 2013.[4]

44. As the United States District Court for the District of Columbia found before issuing the Judgment, MOIS, acting as Iran's agent, committed the Marine Barracks attack within the scope of that agency. A MOIS operative carried out the attack with the assistance of the Iranian-funded Hezbollah terrorist group by detonating powerful explosives at the Marine Barracks.

45. Plaintiffs' Judgments were based upon claims brought under 28 U.S.C. Section 1605(a)(7) and 1605A of the Foreign Sovereign Immunities Act ("FSIA").

**B. Plaintiffs' Successful Efforts to Prevent Defendants from Disposing of the Remaining Assets**

46. In response to a subpoena served in aid of Plaintiffs' efforts to collect upon their Judgment, Plaintiffs received a June 11, 2008 letter from the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). That letter stated that information available to OFAC demonstrated that "an Iranian government client" maintained an interest in bonds constituting the Original Assets with a face amount of $        that were held on

---

[4] The judgments held by the Plaintiffs are herein collectively referred to as the "Judgments."

231580.1                                                    12

Clearstream's books and "custodized in the United States" in a sub-custodial account with Citibank.

47.     In response to a later subpoena, Plaintiffs obtained additional information from OFAC concerning the Original Assets in an April 23, 2010 letter. That letter disclosed that the bonds constituting the Original Assets were "apparently owned by the Central Bank of Iran."

48.     On June 12, 2008, The Peterson Judgment Creditors obtained issuance of an Execution by the Clerk of this Court (the "First Execution") describing the bonds that constituted the Original Assets and filed it with the Office of the United States Marshal Service in this District for execution on the goods and chattels of Iran.

49.     That First Execution specifically identified the assets in the custody of Citibank and Clearstream that OFAC listed in its June 11, 2008 letter. The United States Marshal's Service served the First Execution on Clearstream on June 9, 2010 and on Citibank on June 13, 2008.

50.     On October 27, 2008, the United States Marshal's Service served Clearstream with an additional execution secured by the Peterson Judgment Creditors on the goods and chattels of Iran (the "Second Execution"), which also covered the Original Assets.

51.     Peterson Judgment Creditors served Clearstream with a restraining notice under CPLR Section 5222 on June 16, 2008 and with an amended restraining notice correcting a minor defect on June 23, 2008.

52.     By means of a July 13, 2009 Order, the Court extended the restraining notice served upon Clearstream. The restraining notice remains in effect pending further Order of the Court.

53.     At the time the First and Second Executions and restraining notices were served on Citibank and Clearstream, they had the effect of restraining the Original Assets as well as the

Remaining Assets that had been transferred from Markazi's Clearstream Account to the UBAE/Markazi Account, for the benefit of Markazi.

54. The Remaining Assets, bonds also denominated in U.S. Dollars, were sub-custodized by Clearstream in banks that are foreign branches or affiliates of United States banks located outside the United States. Correspondence discovered from UBAE indicates that Clearstream blocked the Remaining Assets of its own accord, allegedly upon learning that Iran was the beneficial owner thereof, after Plaintiffs served restraining notices in June, 2008.

55. In such correspondence, Clearstream notified UBAE that any bonds held for Iran's benefit that may involve the services of a U.S. financial institution or its foreign affiliate, and the proceeds thereof, would be blocked by Clearstream to avoid violation of the Iranian Transaction Regulations issued by the U.S. Treasury Department. Specifically, on June 5, 2009, Clearstream wrote to UBAE as follows:



56. The typical terms of the prospectuses of the bonds that constituted the Remaining

Assets are set forth in the prospectus for the bond issued by the United Kingdom bearing

International Securities Identification Number XS0171740961, which states in relevant part as

follows:

> Ownership of beneficial interests in the Global Notes will be limited to persons
> that have accounts with Euroclear, Clearstream, Luxembourg or DTC or
> persons that may hold interests through such accountholders. Beneficial
> interests in the Global Notes will be shown on, and transfers thereof will be
> effected only through, records maintained in book-entry form by Euroclear,
> Clearstream, Luxembourg or DTC and their accountholders, as applicable.

\* \* \*

> Payments shall be made in U.S. dollars by cheque drawn on a bank in New
> York City and mailed to the holder (or to the first named of joint holders) of
> such Notes at its address appearing in the Register. Upon application by the
> holder to the specified office of the Registrar before the Record Date, such
> payment may be made by transfer to a U.S. dollar account maintained by the
> payee with a bank in New York City.

\* \* \*

> Each of the persons shown in the records of Euroclear, Clearstream,
> Luxembourg or DTC as the holder of a Note represented by a Global Note
> must look solely to Euroclear, Clearstream, Luxembourg or DTC (as the case
> may be) for his share of each payment made by H.M. Treasury to the holder
> of such Global Note and in relation to all other rights arising under the Global
> Note, subject to and in accordance with the respective rules and procedures of
> Euroclear, Clearstream, Luxembourg or DTC (as the case maybe).

57. The bonds that constituted the Remaining Assets were held by Markazi in

book entry form through Clearstream. Clearstream was the holder of the notes or bonds in book

entries maintained by the issuers of the bonds or the depositories at which the bonds were

231580.1                                         15

immobilized. In accordance with the terms of the bonds, electronic funds transfer payment instructions given by the issuers of the bonds or their agents named Clearstream as the payment beneficiary, because Clearstream was the named holder of the notes or bonds on the books of the issuer and/or its agent making the payment. As required by the terms of the bonds, such U.S. dollar payment instructions named Clearstream's correspondent bank in the United States, JP Morgan, as the payment beneficiary's bank.

58.  As required by the terms of the bonds and because all of the bonds that constituted the Remaining Assets were denominated in U.S. dollars, transfers of bond income and redemptions to Clearstream for Bank Markazi's benefit passed through the United States Federal Reserve system to Clearstream's U.S. dollar correspondent bank, JP Morgan in New York, where Clearstream's correspondent account was credited with the amount received from the bond issuers. In the absence of the block Clearstream imposed effective in June, 2008, Clearstream would have credited the UBAE/Markazi Account with the amount received for Markazi's benefit in Clearstream's correspondent account at JP Morgan.

59.  In the absence of Clearstream's block of the Remaining Assets, UBAE, at Markazi's request, would have then instructed Clearstream to withdraw the U.S. dollar funds from the UBAE/Markazi Account. This would in turn have resulted in another transfer through the Federal Reserve system by debiting Clearstream's correspondent account at JP Morgan and crediting UBAE's correspondent account at HSBC Bank in New York.

60.  Because Clearstream blocked withdrawals of the Remaining Assets after June, 2008, the proceeds from the bonds that constituted the Remaining Assets received since then have remained credited to Clearstream's correspondent account at JP Morgan in New York.

61.     Beginning in June, 2008, Clearstream opened a sundry blocked account number ▮▮▮▮ to which Clearstream diverted and credited payments of interest and redemptions on the bonds in the amounts and on the dates set forth in the scheduled annexed hereto as Exhibit D. Since June, 2008, Clearstream has not credited any of these amounts to the UBAE/Markazi Account and UBAE and Markazi have no access to the funds held in account number 13675.

62.     Under the terms of Clearstream's agreement with UBAE as agent for Markazi regarding the UBAE/Markazi Account and under applicable law, including New York Uniform Commercial Code §8-504 and §8-505, Clearstream is obligated to secure payments of money due under the bonds from the issuers thereof and to hold the money as financial assets for the benefit of Markazi until Clearstream pays the money to UBAE as agent for Markazi.

63.     Because the proceeds of the bonds were blocked and never credited to the UBAE/Markazi Account, Clearstream's obligation with respect to the underlying financial asset that Clearstream was required to maintain on behalf of UBAE and Markazi remains outstanding. Clearstream is required to maintain sufficient financial assets to satisfy UBAE's and Markazi's security entitlements with respect to the Remaining Assets. The Remaining Assets in Clearstream's Account at JP Morgan constitute financial assets in which only Markazi has a beneficial interest. The credits made to Clearstream's correspondent account at JP Morgan Chase in New York for each payment or distribution received from issuers of the bonds are required to remain on Clearstream's books as a financial asset.

64.     The money received and held in Clearstream's correspondent account at JP Morgan in New York that corresponds to the payments listed in the schedule annexed hereto as Exhibit D, is a financial asset held by Clearstream for the benefit of UBAE acting as Markazi's agent.

231580.1                                              17

65.     Markazi is the sole beneficial owner of the Remaining Assets held by JP Morgan in the form of cash proceeds from the U.S. dollar denominated bonds that Clearstream had purchased for Markazi's benefit. The Remaining Assets held by JP Morgan are not the property of Clearstream.

66.     Since restrained by Clearstream, the bonds constituting the Remaining Assets have matured and Clearstream continues to hold a credit representing their cash proceeds frozen in account number       , having a balance of $            as of May 31, 2013.

## C.     President Obama's Executive Order 13599 Effective February 6, 2012

67.     Effective February 6, 2012 by way of Executive Order 13599 and pursuant to the powers vested in the President of the United States of America under the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) ("IEEPA"), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 1245 of the National Defense Authorization Act for Fiscal Year 2012 (Public Law 112-81) ("NDAA"), and section 301 of title 3, United States Code, the President, in light of the "deceptive practices of the Central Bank of Iran and other Iranian banks to conceal transactions of sanctioned parties, the deficiencies in Iran's anti-money laundering regime and the weaknesses in its implementation, and the continuing and unacceptable risk posed to the international financial system by Iran's activities" ordered, in pertinent part:

> a. *All property and interests in property of the Government of Iran, including the Central Bank of Iran*, that are in the United States, that hereafter come within the United States, *or that are or hereafter come within the possession or control of any United States person*, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

> b. *All property and interests in property of any Iranian financial institution, including the Central Bank of Iran*, that are in the United States, that hereafter come within the United States, *or that are or hereafter come*

*within the possession or control of any United States person*, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in.

68.    Section 7 of Executive Order 13599 further provides that "[f]or the purposes of this order: (a) the term "person" means an individual or entity; (b) the term "United States person" means any . . . entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), *or any person in the United States*.

69.    In executing Executive Order 13599 President Obama recognized that such actions were being taken to address a national emergency and that *no* prior notice to those who were to be affected by the order was necessary because doing so would render the Order ineffectual.

70.    As stated above Executive Order 13599 was made in part pursuant to the powers vested in the President under IEEPA.  Section 1702(a)(1)(B) of IEEPA specifically provides that the President may

investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national hereof has any interest *by any person*, or with respect to any property, *subject to the jurisdiction of the United States*.

71.    Consistent with IEEPA, Executive Order 13599 blocks *any property* within the possession or control of *any person subject to the jurisdiction of the United States* regardless of the property's location.

**D.    Clearstream Banking, S.A. and JP Morgan are  Persons in the United States for Purposes of Executive Order 13599**

72.    Clearstream Banking, S.A.'s predecessor, Cedel Bank, S.A., on April 24, 1996, pursuant to the International Banking Act ("IBA"), the Foreign Bank Supervision Enhancement Act of 1991, and Cedel's application thereunder, was approved to maintain a representative

office in the State of New York, which resulted in the issuance of a license from the New York

State Banking Department.

73.    Specifically, the "License to Maintain a Representative Office" granted to Cedel

Bank, S.A., was pursuant to Article V-B of New York Banking Law.  Section 221-a of New

York Banking Law, titled "Doing business without license prohibited", provides:

> No person, co-partnership, association, corporation or other entity shall establish,
> maintain or use one or more offices in this state as the representative of one or more
> foreign banking corporations unless the foreign banking corporation to be represented has
> first obtained a license from the superintendent of financial services . . . . Upon receipt of
> a license, the foreign banking corporation may establish one or more representative
> offices in this state . . . .

74.    Therefore, in order to obtain the license from the New York State Banking

Department, which subjects Clearstream to comply with New York Banking Law, Clearstream,

via its predecessor, availed itself of the laws and benefits of the State of New York.

75.    The license was then transferred to Clearstream and therefore, Clearstream has

continued to be present in New York, continued to avail itself of the laws and benefits of this

State, and is doing business in this state.

76.    Clearstream Banking, S.A., maintains its representative office in New York City

located at 55 Broad Street (formerly at 350 Madison Avenue), New York, New York.

77.    Clearstream, although a banking corporation duly organized under the laws of

Grand Duchy of Luxembourg, declares on its website that it "offers its customers the possibility

to use Clearstream Banking as a single point of access for the settlement and custody of

internationally traded bonds and equities across 51 markets" and that "[m]ore than 1,100

[Clearstream] employees service customers in Europe, the Americas, Asia-Pacific, the Middle

East and Africa from [their] operational centres in Luxembourg, Germany and Singapore, as

well as their representative offices in London, New York, Hong Kong, Dubai and Tokyo."

231580.1                                   20

78.   Clearstream's New York office "solicit[s] new customers and provid[es] customer support services"; "Manage[s] the acquisition and retention of [Clearstream] customers"; "Represent[s] Clearstream Banking to market participants and industry groups in the assigned regions"; has the express purpose to "increase Clearstream's market share"; and its "customer base ranges throughout all of North, South and Central America, as well as the Caribbean."

79.   Clearstream employees people permanently located in New York to promote Clearstream's interests.

80.   Clearstream maintains at least two bank accounts at Citibank, N.A., and one account with its correspondent bank JP Morgan Chase, all in New York City; its website lists a specific telephone and fax number and e-mail addresses for its New York office designated for "general customer support"; Clearstream's New York address and telephone number have been and continue to be published in various telephone directories, including YellowPages.com; and a search of public records through Lexis indicates that Clearstream has been issued a Federal Employer I.D. Number.

81.   Clearstream also conducts billions of dollars' worth of transactions in securities and notes involving payments in U.S. currency through Clearstream's custodial, cash and correspondent bank accounts with New York banks.

82.   In connection with Clearstream's omnibus account at Citibank, Citibank maintained bookkeeping records for "thousands" of Clearstream's customer accounts associated with the settlement of certain trades of assets in the "trillions" of dollars.

83.   On or about June 8, 2010, Plaintiffs commenced an action in the United States District Court for the Southern District of New York for turnover of the Original Assets entitled, *Peterson v. Islamic Republic of Iran*, bearing docket number 10 CIV 4518(KBF) (the "First

Action").  On July 9, 2013, the Court (Hon. Katherine B. Forrest) entered a final judgment in the First Action finding that it had general jurisdiction over Clearstream under C.P.L.R. §301 and awarding turnover of the Original Assets to the Plaintiffs.

84.    Clearstream's activities in New York make it subject to the jurisdiction of the courts in New York and therefore, unquestionably qualify it as a United States person under the Executive Order.

85.    JP Morgan is a banking association organized under the laws of the United States and therefore falls within the definition of a United States person under Section 7 of Executive Order 13599.  The Remaining Assets in the custody or possession of JP Morgan and Clearstream are blocked assets under Executive Order 13599.

## E.    Terrorism Risk Insurance Act ("TRIA")

86.    Section 201 of the Terrorism Risk Insurance Act, codified as a note to 28 U.S.C. Section 1610, states as follows:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

87.    Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA § 201(d)(4), 116 Stat. at 2340.

88.    The application of TRIA and 28 U.S.C. § 1610(g) obviates the need for Plaintiffs to overcome any presumption of separation between Iran as a judgment debtor and Markazi, because they specifically allow execution against Iran's agencies and instrumentalities.

89.    Markazi claims sole ownership of the Remaining Assets as part of its foreign currency reserves.

90.    Therefore, pursuant to TRIA and the Executive Order, which specifically blocks all property and interest in property of the Central Bank of Iran, Plaintiffs can seek to execute against assets of the Central Bank of Iran including the Remaining Assets in order to satisfy their judgment, as long as those assets are in the custody or possession of JP Morgan or Clearstream, both United States persons.

**F.    New York Law Allows Execution Against Markazi's Assets Held by Clearstream and JP Morgan**

91.    Rule 69(a) of the Federal Rules of Civil Procedure provides that "[t]he procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."

92.    Under New York judgment enforcement procedure, this Court may order Clearstream and JP Morgan to deliver any assets of Iran or Markazi in its possession or control to satisfy Plaintiffs' judgment. (C.P.L.R. 5225).

**G.    Order Under 28 U.S.C. §1610(c)**

93.    On February 27, 2012, this Court (Hon. Barbara S. Jones) issued an order pursuant to 28 U.S.C. §1610(c) directing the Clerk of this Court to issue a writ of execution on the Peterson Judgment Creditors' judgment with respect to the property and interests in property of Iran and Ministry of Information and Security and/or property or interests in property of Iran's agencies and instrumentalities, including, but not limited to Iranian financial institutions, including Bank Markazi, a/k/a the Central Bank of Iran ("Markazi"), held by United States persons, including, but not limited to Clearstream Banking, S.A. ("Clearstream"), including the

Remaining Assets, all of which have been blocked by reason of President Obama's Executive Order No. 13599 effective February 6, 2012 (a "1610(c) Order).

94.    The Peterson Judgment Creditors caused a writ of execution against such assets, including the Remaining Assets, to be issued by the Clerk of this Court on February 27, 2012 (the "Peterson Writ of Execution"). A copy of the Peterson Writ of Execution is annexed hereto as Exhibit B.

95.    The Peterson Writ of Execution was delivered to the United States Marshal's Service in the Southern District of New York on February 27, 2012.

96.    The United States Marshal levied on Clearstream by service of the Peterson Writ of Execution at Clearstream's office at 55 Broad Street, New York, New York on March 2, 2012. The United States Marshal filed a return of execution with the Clerk of the Court on or about July 30, 2012, certifying that he had "received no funds or property belonging to the judgment debtor."

97.    On October 2, 2013, this Court (Katherine B. Forrest) entered an Order extending the Peterson Writ of Execution and levy on Clearstream thereunder, *nunc pro tunc*, for a period expiring 90 days after the date of the Order.

98.    Each of the Plaintiffs designated in Exhibit A annexed hereto: (a) obtained 1610(c) Orders from this Court permitting execution against the Remaining Assets, (b) caused writs of execution covering the Remaining Assets to be issued by the Clerk of this Court pursuant to their respective 1610(c) Orders, (c) caused the United States Marshal of the Southern District of New York to serve such executions on Clearstream at 55 Broad Street, New York, New York within 90 days prior to the filing of this action or obtained Orders from this Court extending their executions and levies on Clearstream *nunc pro tunc* at least through the date this action

was filed. With respect to each such execution, the United States Marshal filed a return of execution with the Clerk of the Court, certifying that he had received no funds or property belonging to the Judgment Debtors.

99.  On April 9, 2014, this Court (Hon. Katherine B. Forrest) issued an order pursuant to 28 U.S.C.§1610(c) directing the Clerk of this Court to issue writs of execution on the Plaintiffs' judgments with respect to the property and interests in property of Iran and Ministry of Information and Security and/or property or interests in property of Iran's agencies and instrumentalities, including Markazi, held by JP Morgan, which have been blocked by reason of Executive Order 13599, including electronic funds transfers or other forms of payment received for the account of Clearstream originating from U.S. dollar distributions made by or on behalf of the issuers of the bonds in Exhibit D annexed hereto in the amounts and on the dates described therein.

100.  On April 10, 2014, the Clerk of this Court issued writs of execution to the Plaintiffs in accordance with the April 9, 2014 Order of this Court, and Plaintiffs delivered said writs of execution to the United States Marshal's Service in the Southern District of New York with instructions to levy on the Remaining Assets at JP Morgan. The Marshal's Service served the writs of execution on JP Morgan on April 24, 2014.

101.  None of the Remaining Assets have yet been turned over to the Marshal's Service or to the Plaintiffs.

**H.    Markazi Is Iran's Alter Ego**

102.  Plaintiffs may collect their Judgment under FSIA and TRIA against assets owned by Markazi because Markazi is an agency or instrumentality of Iran and Iran's alter ego.

103.  Iran controls Markazi to such an extent that Markazi maintains no independence or free will and, instead, operates as Iran's alter ego and surrogate.  The U.S. Department of Treasury recognizes Markazi's status as Iran's alter ego in § 535.433 of the U.S. Iranian Assets Control Regulations, which state, "The Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [*i.e.,* 31 C.F.R. Part 535]."

104.  Iran so extensively controls Markazi that a relationship of principal and agent exists between the two entities.  Iran owns Markazi and effectively controls its operations.  Thus, Markazi engaged in all of the activity that Plaintiffs allege at Iran's direction and for Iran's benefit.

105.  Markazi regularly and systematically conducts commercial transactions on behalf of Iran.  The funds that Markazi maintains in its own name actually belong entirely to the government of Iran.

106.  Iran exercises its control over Markazi by, among other means, dictating the appointment and actions of the bank's management.

107.  Markazi is ostensibly subject to Iran's 1972 Monetary and Banking Law ("MBL").  In practice, however, under the direction of Iranian President Mahmoud Ahmadinejad, Iran exercises day-to-day control over Markazi.  Iran issues direct orders to Markazi and controls its leadership, thereby eliminating Markazi's ability to operate independently from the Iranian government.

108.  The MBL provides for Markazi to be led by a Governor appointed for a five-year term by "Royal Decree," based upon the recommendation of the Minister of Finance and Economic Affairs and subject to approval by the cabinet.  That cabinet is now comprised of the

President of Iran and the country's ministers. The Governor is Markazi's highest executive and administrative authority and is responsible for conducting the bank's business in a proper manner.

109. Ahmadinejad's government ignored the MBL's mandatory five-year term for Markazi's Governor, thereby destroying any semblance of Markazi's independence from the government of Iran.

110. In August 2007, Ahmadinejad forced Markazi's then-Governor, Ebrahim Sheybani, to resign prior to the end of his term. In 2008, Ahmadinejad also pressured Sheybani's successor, Tahmasb Mazaheri, to resign before the end of his term. Notwithstanding Mazaheri's refusal to resign, Ahmadinejad replaced Mazaheri by presidential decree in violation of the MBL.

111. Moreover, Iran's cabinet regularly votes at its meetings to order Markazi to extend loans to Iran's government for specific purposes. For instance, on March 15, 2007, the 26th cabinet session of the first Ahmadinejad government ordered Markazi to lend 50 billion rials for marriage, medical treatment, education and housing loans. On April 20, 2007, the 27th cabinet session ordered Markazi to extend a loan of 150 billion rials for the same purposes.

112. Ahmadinejad's government also usurped Markazi's authority to make monetary policy decisions.

113. All major decisions about monetary policy are made directly by the Iranian government, often personally by the Iranian President, without consulting Markazi's Currency and Credit Council ("CCC"), the bank entity supposedly charged with those decisions.

114. Indeed, in August 2007, Ahmadinejad announced he had dissolved the CCC. Press reports stated that this action precipitated Sheybani's 2007 resignation as Markazi's Governor.

On July 14, 2009, the semi-official Mehr News Agency announced that the CCC had met for the first time in two years.

115.   Furthermore, in a speech that he delivered on April 16, 2008, Ahmadinejad described orders he had issued to Markazi regarding monetary policy.

116.   The setting of interest rates in Iran provides a telling illustration of Markazi's complete subservience to the Iranian government.  "Interest rates" is a term widely used in discussing Iranian policy, even though an elaborate ruse is used to present the "interest rates" as consistent with a strict interpretation of Islamic law, which bans the imposition or collection of interest.

117.   While running for the Presidency and during his time in office, Ahmadinejad insisted that interest rates be kept low, which he thought would reduce inflation – a viewpoint for which he has been harshly criticized by Iranian economists. To carry out his interest rate policies, Ahmadinejad usurped Markazi's apparent authority regarding interest rate issues by forcing the resignation of one Markazi Governor (Sheybani), dismissing another (Mazaheri), and ordering that the CCC be dissolved.

118.   As a result of the interest rate policies that Iran's President has dictated, Iran has maintained its interest rates well below the inflation rate, with the result that demand for loans is extremely high.  In practice, only individuals and businesses with political connections can obtain loans, a circumstance that facilitates government corruption and solidifies Ahmadinejad's vast power.

119.   The Iranian government's subjugation of Markazi has been widely recognized even in Iran, where many high-ranking officials have complained that Markazi lacks independence from the government.

120.  For example, in a 2006 interview that covered the Iranian government's Fourth Development Plan (a document setting out government economic goals and policies for the next five years), Iran's former Deputy Minister of Economic Affairs and Finance, Mohsen Safa'i-Farahani, praised the Plan because "[t]he Central Bank will be taken out of government control." According to Safa'i-Farahani, "In other words, this will put an end to the interference of the government's economic sectors, such as the Ministry of Finance and Economic Affairs, in the Central Bank."  Notably, Iran did not carry out the reforms envisaged in the 2006 Fourth Development Plan.

121.  A June 10, 2006 report in the newspaper *Siyasat-e Ruz* provides another example of Iran's complete dominion over Markazi.  According to that report, Markazi's then-Governor Sheybani "once again called for more independence for the Central Bank."  The article quoted Sheybani as stating, "An independent central bank can wisely outline and execute monetary policies; otherwise it must be a mere follower of the government."  After Sheybani resigned as Governor in August 2007, Iranian press reports stated that Markazi's loss of independence from the government, as evidenced by the dispute over interest rates, was the main factor in his resignation.

122.  Members of the Iranian Parliament (the Majlis) have also formally complained about Ahmadinejad's violations of law, citing Ahmadinejad for disregarding the provisions of Iranian law and ordering Markazi to transfer funds to government accounts.

123.  Ahmadinejad himself was not bashful in acknowledging his government's complete control of Markazi.  For example, he publicly boasted of giving direct "orders" to Markazi to take actions he deems appropriate.  The Iranian press has also quoted Ahmadinejad as stating, "I give the Bank Markazi permission" to use certain funds for a specific purpose.

124. In response to a question regarding what the relationship between the government and Markazi should be, Ahmadinejad has also stated: "Our constitutional law has made it clear. The flow of capital and money should be regulated by the government. This is the law, and the law of the country should therefore be executed."

## I. The Remaining Assets Are Subject to Execution in New York and Reflect Commercial Activity in the United States

125. Iran, through its agent and alter ego, Markazi, owns the Remaining Assets that are the subject of this action.

126. At the time that Plaintiffs obtained the First Execution, the Second Execution and the Peterson Writ of Execution, the Remaining Assets consisted of ▇ bonds worth roughly $▇

▇▇▇. All of the bonds were denominated in U.S. dollars and all were immobilized and held for safekeeping in the custody of foreign branches or affiliates of United States financial institutions. Those securities provided for the payment of periodic interest and the payment of principal at maturity through paying agents that are either United States banks or foreign branches or affiliates thereof.

127. In order for Markazi to receive interest and principal payments related to those bonds, the Defendant Agent Banks had to undertake substantial commercial activity in the United States as the agents for, and under the direction of, Markazi, through their respective cash correspondent banks, JP Morgan and HSBC Bank.

128. In or about January 2008, however, Markazi and Clearstream concluded that Clearstream risked U.S. government sanctions and that Markazi risked the potential seizure of its assets by Iran's judgment creditors if Clearstream continued to transact business in the United States directly on behalf of Markazi.

30

129. Accordingly, Iran, Markazi, Clearstream and UBAE (the "Conspirators") entered a tacit or spoken agreement to funnel Markazi's transactions in U.S. dollar denominated bonds through the UBAE/Markazi Account that UBAE opened at Clearstream exclusively for the purpose of conducting Markazi's business.

130. UBAE received substantial fees for serving as Markazi's agent in connection with the purchase and sale of those bonds. Typically, UBAE's fees amounted to

of the trades that Markazi made in the bonds. In addition, UBAE marked up the monthly fees that Clearstream charged UBAE by ____.

131. With the exception of hiding Markazi's participation in those trades, UBAE provided no service to Markazi in connection with the transactions. Markazi would have continued to conduct those transactions through its own Clearstream account in the absence of the Conspirators' concerns regarding the seizure and sanctions risks associated with continuing Markazi's direct ownership of a Clearstream account.

132. Once the Banking Agent Defendants implemented Markazi's bond purchases, various entities acting as Markazi's agents had to engage in substantial commercial activity in the United States to enable Markazi to receive interest and principal payments related to its investments. The bond prospectuses specifically provide that distributions are to be made by or on behalf of the issuers by payment in US dollars from a bank located in New York to an account maintained by the payee at a bank in New York.

133. Both before and after UBAE opened the UBAE/Markazi Account at Clearstream for the purpose of procuring payments of principal and interest on the bonds for Markazi's benefit, Clearstream – acting as Markazi's and UBAE's agent – would engage in commercial activity with United States banks and foreign affiliates thereof, acting as paying agents and

231580.1                                    31

depositories, by delivering payment instructions for periodic interest payments, maturity payments and sales proceeds to them.

134.  The terms of the bonds provided for payment of interest and principal in U.S. dollars to Clearstream's correspondent account in New York to be received by Clearstream in its capacity as agent for the beneficial owners – in this case – Markazi.

135.

136.  Prior to Clearstream imposing the block in June, 2008, Clearstream credited the amount of payments received on the bonds to the UBAE/Markazi Account.  Once Markazi or UBAE, acting on behalf of Markazi, requested a withdrawal, Clearstream acting as agent for Markazi and UBAE  instructed Clearstream's correspondent bank, JP Morgan in New York, to make electronic funds transfers to UBAE via UBAE's correspondent bank, HSBC Bank in New York.

137.  The Remaining Assets were issued by sovereigns or "supranationals" such as the European Investment Bank.

138.  Each bond was issued in the physical form of one or more global notes or in dematerialized form that was registered and deposited with a foreign affiliate of a United States bank acting as depository or sub-depository for Clearstream, who acted as depository.

139.  Owners of beneficial interests in the types of bonds that constituted the Remaining Assets typically are not entitled to receive physical certificates evidencing their interest.  Instead, the owner's interest is reflected in a book-entry in the records of the financial intermediary with which the owner has an account.

140.      All financial intermediaries are responsible for keeping account of their holdings on behalf of their customers.  Issuers of global notes typically appoint a fiscal or paying

agent to facilitate payments of interest and principal due under the bonds. The paying agents on the bonds in question were either United States financial institutions or foreign branches or affiliates thereof.

141.        Clearstream, acting as agent for Markazi and UBAE, instructed the issuers of the bonds and their paying agents to make payments of amounts due under the bonds to its correspondent account at JP Morgan in New York on the dates and in the amounts set forth on Exhibit D, annexed hereto.

142. JP Morgan received the payments described on Exhibit D annexed hereto on the dates set forth therein and has since held those amounts in Clearstream's account in New York for the benefit of Bank Markazi, and continues to hold same.

143. As agent for UBAE and Markazi, Clearstream is required to secure payments from the issuers of the bonds and, upon receipt, to in turn make those payments to UBAE and Markazi.

144. Beginning in June, 2008, Clearstream diverted the payments received from the issuers of the bonds described in Exhibit D annexed hereto, by crediting them to a sundry blocked account no. ▮▮▮ instead of to the UBAE/Markazi Account. As a consequence, Clearstream has not yet paid or credited the amounts received from issuers of the bonds described in Exhibit D annexed hereto, to UBAE or Markazi.

145. Clearstream diverted payments to the sundry blocked account no. ▮▮▮ on the ground that, had such payments been made for Markazi's benefit to the UBAE/Markazi Account, Clearstream would have violated Iranian Transaction Regulations, 31 C.F.R. Part 560, or would have procured the violation thereof by other Untied States persons, including JP Morgan, acting as Clearstream's correspondent bank, by exporting services for Markazi's benefit.

231580.1                                        33

146. Clearstream continues to hold the payments set forth in Exhibit D in its correspondent or other account at JP Morgan in New York as a financial asset of which Markazi is the sole beneficial owner. Neither Clearstream, UBAE, nor any person other than Markazi holds a beneficial interest in the Remaining Assets deposited at JP Morgan in New York.

147. The foregoing facts demonstrate that the Conspirators purposefully enlisted the services of multiple American banking and financial industry institutions and their foreign branches and affiliates by purchasing, selling, and securing and custodizing payments related to the bonds that constituted the Remaining Assets, all of which have matured and converted to cash.

148. Moreover, each of the Conspirators derived substantial immediate and prospective financial benefits by engaging in that commercial activity on behalf of Markazi in the United States, and both UBAE and Clearstream derive substantial revenue from international commerce.

**J.    Iran and Markazi Conspired with Clearstream and UBAE to Evade the U.S.'s Iranian Transactions Regulations and to Engage in Fraudulent Conveyances Designed to Evade Plaintiffs' Efforts to Collect Upon Their Judgment**

**1.    Iran, Markazi, Clearstream and UBAE Conspired to Hide Markazi's Ownership of the Remaining Assets**

149. Because of the widespread sanctions imposed upon Iran and Markazi by the international community, Iran and Markazi rely heavily upon a small group of financial institutions to assist them in laundering money and in conducting the financial activity related to Iran's substantial international sales of oil. This same financial network conducts money laundering in support of Iran's support for international terrorism and WMD acquisition and proliferation.

150. Through its loyalty to Iran in the face of mounting international sanctions related to the funding of terrorism and Iran's efforts to develop WMDs, Clearstream built a substantial

business relationship with Iran and Markazi. In May 1996, Markazi had only $

invested with Clearstream. In contrast, by 2008, the Markazi funds invested through Clearstream

totaled at least $

151. By that time, however, Clearstream faced increasing pressure from the U.S. government to discontinue its relationship with Markazi.

152. In addition, Iran, Markazi and Clearstream recognized in late 2007 that new federal legislation significantly increased the risk that the numerous victims of Iran's terrorist acts would seek to collect their judgments against Markazi, Iran's alter ego.

153. In December 2007, President George W. Bush vetoed a House of Representatives version of the National Defense Authorization Act for fiscal year 2008 that included legislative amendments that strengthened the rights of American victims of terrorism under the FSIA.

154. As the press widely reported at the time, President Bush vetoed H.R. 1585 because of his concern regarding the lack of clarity regarding the applicability of the legislation to the new government of the Republic of Iraq.

155. As a result, the House quickly acted to revise the Bill by adding a waiver provision that explicitly exempted Iraq from the new law's provisions. Again, the legislative compromise reached between the White House and the House received substantial press coverage.

156. On January 16, 2008, the House of Representatives first introduced H.R. 4986, the bill that Congress ultimately enacted as 28 U.S.C. Section 1605A and certain additional provisions of 28 U.S.C. Section 1610.

157. That bill amended the FSIA to provide judgment creditors of state sponsors of terrorism, such as Iran, greater enforcement rights. The new provisions of the FSIA allow judgment creditors to enforce their judgments against agencies or instrumentalities of the state

231580.1                                                35

sponsors of terrorism – including Markazi – without demonstrating that those entities functioned as the alter ego of the terrorist state.  Congress finally passed that bill on January 28, 2008, and President Bush signed it into law the same day.

158.  At the same time that the actions of Congress and President Bush's rare veto focused the press's attention upon these issues, international diplomats were debating the imposition of sanctions upon Iran at the United Nations.  As a result of Iran's intransigence, the United Nations' Security Council ultimately passed Resolution 1803 on March 3, 2008.  That Resolution imposed sanctions designed to deter Iran's efforts to proliferate nuclear weapons.

159.  These legislative developments and the simultaneous pressure that the U.S. government directed at Clearstream to cut its business ties with Markazi caused Clearstream to develop increased concern in late 2007 and early 2008 that the U.S. government or a creditor of Iran would seize Iranian assets held at Clearstream.  Clearstream's concern regarding those issues was intensified by its substantial presence in New York, where Clearstream maintains an office.  Clearstream's concern did not arise from a desire to advance the U.S. government's efforts to impede Markazi's money laundering, financing of Iran's illicit weapons program and funding of terrorism.  Rather, Clearstream desired to avoid the client relations problems associated with the seizure of Iranian assets by the U.S. government or a judgment creditor of Iran.

160.  At the same time, Iran, Markazi and their counsel were closely following the legislative developments in the United States, and were well aware of the impact of the FSIA amendments upon Iran's ability to hide assets from its judgment creditors.  Iran has long sought to protect its assets against efforts by victims of terrorism and others to collect upon substantial judgments secured against Iran and its agencies and instrumentalities by maneuvering Iran's

funds to evade collection and by defending the collection lawsuits brought by the victims of Iran's terrorism. Thus, Iran, Markazi and their American counsel recognized that the FSIA amendments were aimed largely against Iran and other state sponsors of terrorism.

161. Moreover, Iran has publicly stated through its state-owned news agency that it rejects the legitimacy of Plaintiffs' Judgment and continues to deny responsibility for Plaintiffs' losses. Thus, well before Iran and Markazi caused Markazi's bond holdings to be transferred to the new UBAE/Markazi Account at Clearstream, Iran and Markazi knew that Plaintiffs and other judgment creditors held large judgments against Iran that they might seek to satisfy against Markazi's assets.

162. As a result, Iran, Markazi and Clearstream decided in late 2007 and early 2008 to enlist UBAE in a conspiracy designed to permit Markazi to continue to invest through Clearstream in bonds denominated in U.S. dollars, including the Remaining Assets, while simultaneously providing Clearstream with the ability to claim that it no longer provided banking services to Markazi.

163. Consistent with their Agreement, the Conspirators attempted to accomplish that objective by hiding Markazi's continued ownership of all securities previously held in Markazi's Clearstream account by omitting from Clearstream's records any mention of Markazi's connection to the new UBAE/Markazi Account opened to hold Markazi's assets.

164. By inserting UBAE as a middleman, the Conspirators attempted to circumvent responsibility for performing customer due diligence, Know Your Customer and Anti-Money Laundering procedures and compliance with U.S. regulations that would have required disclosure of Markazi as the beneficial owner of the Remaining Assets to U.S. financial

institutions and their foreign branches and affiliates who unwittingly provided services in connection with the Remaining Assets for the benefit of Iran and Markazi.

165.  In addition, by implementing their scheme, the Conspirators intended to move the Markazi-owned Remaining Assets from an account in an intermediary bank doing business in New York (Clearstream) to an intermediary bank located outside New York (UBAE).

166.  By means of that ruse, the Conspirators hoped to place the Remaining Assets beyond the reach of creditors of Iran in the United States and to hinder, delay and defraud creditors of Iran by concealing its interest in those securities.

167.  The Banking Conspirators (*i.e.*, UBAE and Clearstream) agreed to participate in that conspiracy because they earned substantial immediate and prospective fees for performing banking services as the agents for Iran and Markazi.  Markazi serves as a substantial client of both institutions, and UBAE – a small bank with a limited client base – viewed Markazi as a rich potential source of revenue because Markazi handles vast sums for foreign investment and other purposes.

### 2.   The Conspirators Implement Their Scheme to Fraudulently Convey the Remaining Assets and Impede Collection Efforts by the Creditors of Iran and Its Agencies and Instrumentalities

168.  The Conspirators attempted to implement their scheme to immunize the assets of Iran and its agencies and instrumentalities from collection by U.S.-based creditors by having Markazi fraudulently convey the assets held in its name at Clearstream to the new UBAE/Markazi Account at Clearstream.

169.  On January 17, 2008, just one day after the introduction of H.R. 4986 in the House, Markazi contacted UBAE and instructed the bank to open a custodial account to hold the bonds then held in Markazi's Clearstream account.

170. Consistent with the Conspirators' agreement, UBAE sent an electronic message to Clearstream marked "URGENT" one day later that instructed Clearstream to open a new customer account for UBAE (*i.e.*, a custodial account for the benefit of UBAE's customer, Markazi).

171. Clearstream immediately opened the new customer account, nominally for UBAE. The Conspirators all recognized, however, that the new UBAE/Markazi Account would house Markazi's assets. For at least 25 years before January 18, 2008, UBAE had maintained only one proprietary account at Clearstream.

172. Pretending to be ignorant of Iran's interest in the bonds held in the account that Clearstream maintained on behalf of Markazi, Clearstream proceeded to induce U.S. financial institutions and their foreign branches and affiliates, acting as Clearstream's agents, to provide financial services for the benefit of Iran in violation of U.S. law, including the Iranian Transactions Regulations.

173. After the Conspirators had made the preliminary arrangements necessary to facilitate their scheme, they began to make the fraudulent conveyances designed to remove Markazi's assets from the reach of Plaintiffs and other creditors of Iran and its agents and instrumentalities.

174. Specifically, in or about February 2008, Markazi – acting as Iran's agent – instructed Clearstream to transfer bonds in the nominal amount of approximately

$███████ (including the Remaining Assets) from Markazi's Clearstream account to the UBAE/Markazi Account at Clearstream.

175. Those transfers included transactions by which Clearstream – acting at Markazi's direction – transferred Markazi's interest in the ██ bonds, including the ██ bonds constituting the

Remaining Assets, to the UBAE/Markazi Account. All of the bonds constituting the Remaining Assets were denominated in U.S. dollars.

176. Because these bonds were denominated in U.S. dollars, U.S. financial institutions or their foreign branches and affiliates would necessarily have provided custodial services for the benefit of Iran and acted either as paying agents, correspondent banks or custodial banks in violation of U.S. law.

177. No payment changed hands in connection with those transfers.

178. Markazi, Clearstream and UBAE communicated among each other on or about March 3, 2008 to reconcile their respective books and records concerning these transfers.

179. At all times, Markazi retained the beneficial ownership of the bonds transferred to the UBAE/Markazi Account and to the proceeds thereof.

180. ████████████████████ ██████████ ████████ ████████████
████████████████████████████████████████ ████████ leaves no doubt that
Clearstream knew that Markazi continued to own the securities transferred to the UBAE/Markazi Account. In that email, ██████████████████████████████████████████████████████

████████████████████████████████████████████████████.

181. An October 26, 2009 letter from UBAE to Clearstream also confirms Clearstream's knowledge of these facts. In that letter, UBAE confirmed that ██████████████████████

████████████████████████████████████████████████████████████████████

████████████ (Emphasis in original).

182. Moreover, the place of custody of the bonds did not change during the series of transfers. Hence, at all times, those bonds remained in the custody of foreign branches and affiliates of U.S. banks.

183. As a result, making the U.S. dollar interest and principal payments related to the Remaining Assets to Markazi necessarily required multiple American financial institutions, including HSBC Bank and JPMorgan in New York, to provide services for the benefit of Iran in violation of U.S. law.

184. These fraudulent conveyances served no legitimate financial or banking purpose. Rather, Iran and Markazi made the conveyances solely to disguise the true ownership of the bonds in hopes of protecting those assets from Iran's creditors, including Plaintiffs.

185. Despite Clearstream's knowledge of these facts, it stated in testimony delivered to this Court on July 27, 2008 and in numerous briefs and other documents that it had no knowledge of the identity of the beneficial owner of the Original Assets and avoided disclosing the existence of the Remaining Assets. Those repeated misrepresentations served to further the Conspirators' goal of hindering, delaying or defrauding Iran's creditors, including Plaintiffs.

186. Clearstream made those misrepresentations in furtherance of the Conspirators' plan and agreement and with the prior knowledge and consent of the other Conspirators. Clearstream's own writings confirm those facts. For example, Clearstream wrote to UBAE on June 27, 2008, confirming their plan to mislead this Court at the July 2008 hearing, stating:



187. In part, the Conspirators hid Markazi's continued status as the owner of the Remaining Assets to induce United States financial institutions and their foreign branches and affiliates to provide services for the benefit of Markazi, as agent for Iran, in violation of 31

C.F.R. Parts 204 and 410 and other applicable U.S. regulations. Because of the U.S. and international sanctions that Iran faces, Markazi could not have consummated its transactions in the Remaining Assets had the conspirators disclosed Markazi's ownership of those bonds, in part because neither Clearstream, JP Morgan, nor any other of the U.S. financial institutions or their foreign branches or affiliates providing services to Iran possessed an OFAC license to undertake those transactions.

188. In furtherance of the Conspirators' plan to insulate Markazi's assets from the reach of the creditors of Iran and its agencies and instrumentalities, the Conspirators arranged in or about June 2008 to transfer two U.S. dollar-denominated bonds with a face value of \$250 million to two financial institutions affiliated with U.S. financial institutions by means of multiple transactions completed, in part, within the Clearstream clearing system for total consideration of \$        .

189. Iran and Markazi implemented the fraudulent conveyance of the Remaining Assets to the UBAE/Markazi Account with actual intent to hinder, delay, or defraud Iran's creditors, including Plaintiffs.

190. By the time that Plaintiffs served their restraining notices and caused the First Execution to be served in June 2008, the UBAE/Markazi Account that the Conspirators agreed to establish at Clearstream held roughly \$        including the Remaining Assets that the Conspirators transferred into that account from Markazi's own Clearstream account in February 2008.

191. The proximity of the Conspirators' transfer of the Markazi assets to the passage of the 2008 amendments to the FSIA, the United Nations debate concerning the imposition of sanctions upon Iran, and the substantial publicity that accompanied those developments

231580.1                                                            42

demonstrates that the Conspirators engaged in that conduct in furtherance of their scheme to conceal Markazi's ownership of the Remaining Assets.

192.  Iran and its alter ego, Markazi, transferred the Remaining Assets with actual intent to hinder, delay, or defraud Iran's creditors, including Plaintiffs.  Markazi made those conveyances as the agent and alter ego of Iran.

193.  By completing the fraudulent conveyances, the Conspirators violated New York Debtor and Creditor Law Sections 273-a and 276.  Those violations of New York law require the piercing of any veil of separation between Markazi and Iran so that Plaintiffs can reach the Remaining Assets to satisfy the Judgment.

194.  As a result, the Court should set aside and annul the fraudulent conveyances of the Remaining Assets from Markazi's account at Clearstream to the UBAE/Markazi Account under New York Debtor and Creditor Law Section 278.  The Court can implement that remedy by directing Clearstream to make book entries in the respective accounts of Markazi and UBAE to annul the transfer.

**K.     The Remaining Assets are Not Immune From Execution Under the FSIA**

195.  Pursuant to 28 U.S.C. Section 1610(a)(7), the Remaining Assets are not immune from attachment in aid of execution, or from execution upon the Judgment entered in favor of Plaintiffs, because the Judgment relates to claims against the Judgment Debtors for which they are not immune under 28 U.S.C. Section 1605(a)(7) and/or Section 1605A.

196.  Pursuant to 28 U.S.C. Sections 1610(a)(1) and 1611(b), the Remaining Assets are not immune from attachment in aid of execution, or from execution upon the Judgment because Iran has waived any immunity that might otherwise apply to Markazi and Iran's other agencies

and instrumentalities, both explicitly or by implication, and because the immunity provided by the FSIA to legitimate central banks operating for their own account does not apply to Markazi.

197.  Iran expressly waived immunity from execution against assets of Markazi in the Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran, dated August 15, 1955.

198.  Markazi does not hold the Remaining Assets for its "own account," as the funds are not held for normal central banking functions.  In fact, Markazi holds those assets for Iran's benefit.

199.  Furthermore, contrary to representations that Markazi has made in the First Action, the Remaining Assets were not utilized by Markazi exclusively for foreign currency reserve purposes.

200.  To the contrary, no documents that Plaintiffs have obtained or that Defendants have cited suggest that the Remaining Assets were maintained in a designated foreign exchange reserve account.  Had Markazi utilized the Remaining Assets solely for foreign currency reserve purposes, the account records would reflect that exclusive use.

201.  In fact, Markazi does not segregate its foreign currency reserve funds from money that it: (a) maintains for the benefit of Iran and Iran's agencies and instrumentalities; (b) derives from its role as the commercial banker involved in Iran's sale of oil; or (c) utilizes to facilitate Iran's illicit efforts to develop WMDs and support international terrorism.  Thus, Markazi cannot demonstrate that any of the Remaining Assets were utilized for a legitimate central banking purpose.

202.  Markazi's inability to pledge any of the assets held in its Clearstream account confirms that it did not hold the Remaining Assets "for its own account."  On multiple occasions,

Markazi explicitly informed Clearstream that Markazi could not pledge any of its assets, even to secure a credit line for Markazi's purchase of securities.

203.  The immunity from execution provided to lawfully operated central banks by 28 U.S.C. Section 1611(b) also offers no protection for Markazi's funds because Markazi operates as a rogue financial institution, rather than a legitimate central bank.

204.  As the U.S. Department of Treasury has recognized, Markazi continually: (a) engages in illicit and deceptive practices to evade U.S. and international sanctions, to finance terrorism and to acquire and spread WMD technology; and (b) encourages Iranian state-owned banks to engage in those illicit practices.

205.  Indeed, on November 21, 2011, the U.S. Departments of State and Treasury announced the U.S. government had designated Iran a jurisdiction of "primary money laundering concern" under Section 311 of the USA Patriot Act.[5]  The State and Treasury Departments also announced that, for the first time, they had imposed the restrictions permitted by Section 311 upon a sovereign's supposed central bank, *i.e.,* Markazi.  The State and Treasury Departments took that extraordinary action as a result of Markazi's long history of engaging in illegal and deceptive actions to evade U.S. sanctions and to assist Iran's illicit conduct.  Plaintiffs have attached a copy of the U.S. Department of Treasury's findings ("Findings") supporting that designation as Exhibit C and incorporate the Findings herein by reference.

206.  On the same day that the U.S. government designated Iran and Markazi as money launderers, the British government also announced that British financial institutions would cut all financial ties with Iran's banks, including Markazi.  The British government's announcement

---

[5] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj

highlighted that its measures represented the "first time the British government has cut an entire country's banking sector off from the UK's financial sector."[6]

207.  Canada adopted similar measures sanctioning Iran and Markazi on the same day that the United States and Great Britain implemented their sanctions.[7]

208.  The U.S. Department of Treasury's November 18, 2011 Notice of Proposed Rulemaking regarding the designation of Iran a "jurisdiction of primary money laundering concern" highlights the scope of Iran's illicit conduct and the sharp distinctions between Markazi's actions and those of legitimate central banks.  The Department of Treasury Notice states:

> Prior regulations that have applied Section 311 special measures to jurisdictions of primary money laundering concern have not included the jurisdiction's central bank within the scope of the regulation.  However, in the case of the Islamic Republic of Iran, this inclusion is justified due to the deceptive practices [that Markazi] engages in and encourages among Iranian state-owned banks.  This behavior is discussed in the notice of finding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern published elsewhere today in the Federal Register [*i.e.*, the Findings annexed hereto as Exhibit C.]

209.  Similarly, the Department of Treasury's Findings highlight that Markazi's conduct bears no resemblance to the manner in which legitimate central banks conduct their operations.

The Findings state:

> As a result of the strengthened U.S. sanctions and similar measures taken by the United Nations and other members of the global community, Iran now faces significant barriers to conducting international transactions.  In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. This

---

[6] http://www.telegraph.co.uk/news/worldnews/middleeast/iran/8904713/Britain-to-cut-financial-ties-with-Iran-banks-George-Osborne-announces.html
[7] http://www.washingtonpost.com/world/middle-east/canada-joins-us-britain-to-impose-more-sanctions-on-iran-over-nuclear-program/2011/11/21/gIQAOvDfiN_story.html

> conduct puts any financial institution involved with Iranian entities at risk of unwittingly facilitating transactions related to terrorism, proliferation, or the evasion of U.S. and multilateral sanctions. Iranian financial institutions, including [Markazi], and other state-controlled entities, willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies around the world.[8]

210.   In announcing the adoption of the sanctions, Treasury Secretary Timothy Geithner also highlighted that Markazi's actions sharply contrast with the conduct of legitimate central banks.  Geithner emphasized that the adoption of the sanctions meant that, "[f]or the first time, we are identifying the entire Iranian banking sector – including [Markazi] – as a threat to governments or financial institutions that do business with Iranian banks."[9]

211.   Geithner also properly declared that *any* financial transaction involving Markazi presented grave risk of promoting Iran's illicit conduct.  He stated, "If you are a financial institution and you engage in any transaction involving [Markazi] or any other Iranian bank operating inside or outside Iran, you are at risk of supporting Iran's illicit activities:  its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions."

212.   Likewise, Geithner accurately emphasized that "[a]ny and every financial transaction with Iran poses grave risk of supporting" the same illicit activities and that "[f]inancial institutions around the world should think hard about the risks of doing business with Iran."

213.   In addition to the illicit activity highlighted by the Department of Treasury, Markazi's rogue conduct includes: (a) acting as the principal financier of the Iranian oil supply chain, which is controlled by and funds the efforts of Iran's Islamic Revolutionary Guard Corps

---

[8] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj
[9] http://www.treasury.gov/press-center/press-releases/Pages/tg1368.aspx

(IRGC) – a sponsor of global terrorism designated by the U.S. Department of Treasury on August 15, 2007 for its role in supporting terrorism and the acquisition and proliferation of WMD[10]; (b) acting as a financial facilitator for at least 22 state-owned Iranian financial institutions that help to fund the terrorist activities of the IRGC; and (c) providing financing to Khatam al-Anbiya ("KAA"), a massive IRGC-controlled conglomerate, which has been sanctioned by the United Nations, the U.S. government and the European Union ("EU") for its role in supporting Iran's WMD proliferation activities.[11]  Indeed, the U.N., the U.S. government, the EU, Canada, Japan and South Korea have designated KAA as a terrorist entity for its role in running Iran's nuclear and ballistic missile programs.[12]

214.  Because Markazi launders the funds that underwrite Iran's sponsorship of terrorism and efforts to acquire WMDs, Markazi plays perhaps the most essential role in those illegal activities.

215.  The extensive efforts that Markazi undertook to hide its ownership of the Remaining Assets and Iran's control over those assets also disqualify it from the benefits of any protections offered to normal central banks under 28 U.S.C. Section 1611(b).  A legitimate central bank would not engage in that type of willful deception, by which Markazi intended to defraud Plaintiffs and to obscure Iran's investment of funds utilized to sponsor terrorism and Iran's WMD acquisition program.

216.  Similarly, conspiring with Clearstream and UBAE to hide Iran's interest in the Remaining Assets in order to hinder the ability of Iran's creditors to collect their judgments and

---

[10] http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html On August 15, 2007, the U.S. Department of Treasury named the IRGC as a Specially Designated National ("SDN") for the IRGC's role in supporting global terrorism and proliferation of weapons of mass destruction. http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html
[11] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews_wsj
[12] U.S. Treasury, Executive Order 13382, October 25, 2007; UNSC Resolution 1929, June 9, 2010; EU Commission Regulation No. 532/2010.

to circumvent the sanctions imposed against Iran by the United States and other governments demonstrates that Markazi does not qualify as a central bank entitled to the protections of 28 U.S.C. Section 1611(b).

217.   The long history of efforts by Iran and Markazi to disguise their illicit activities as legitimate financial transactions further supports the conclusion that neither Iran nor Markazi can claim any entitlement to immunity from execution under the FSIA.   Iran and Markazi engage in that deception to circumvent U.S. and international sanctions designed to curtail Iran's sponsorship of global terrorism and WMD acquisition and proliferation.

218.   The ongoing participation of Iran and Markazi in those deceptive transactions confirms that: (a) Markazi continues to engage in widespread commercial activity in the United States despite our government's extensive efforts to sanction and discipline Markazi; and (b) Markazi is not a legitimate central bank.   That conduct also confirms Secretary Geithner's statement that any transaction involving Iran or Markazi is, by definition, suspect.

219.   In recent years, Iran's commercial activity in the United States has produced a number of enforcement actions against the banking institutions that facilitated Iran's activities. For example, in May 2004, the Federal Reserve fined UBS, Switzerland's largest bank, $100 million for sending U.S. dollars to Iran and other sanctioned nations and intentionally hiding the transactions by submitting false monthly reports to the Federal Reserve.

220.   Likewise, in December 2005, U.S. state and federal regulators fined the Dutch bank ABN Amro Bank NV $80 million for actions that included its Dubai branch's modification of payment instructions on wire transfers, letters of credit, and checks issued by Iran's Bank Melli and a Libyan bank in order to hide their involvement in the transactions and enable them to access the U.S. banking system.

221.  Iran has also used deceptive practices to hide the role played in financial transactions by the Islamic Republic of Iran Shipping Lines (IRISL), which was designated as a terrorist entity in September 2008 for its involvement in supporting Iran's missile programs.

222.  To evade those sanctions, IRISL has created an extensive network of front companies and corporate shells and changed the names of its ships.  As an August 29, 2011 *Wall Street Journal* article reported:[13]

> IRISL responded by camouflaging much of its fleet, reflagging and renaming scores of its blacklisted ships.  It parceled out some to newly minted affiliates and created shell companies abroad to serve as nominal owners.  Behind the scenes, IRISL retained control.
>
> The ships themselves remain easy to identify via their unique and permanent hull numbers, or IMO numbers, which the International Maritime Organization issues to all cargo vessels over 300 gross tonnage.  Treasury posts blacklisted or "blocked" IMO numbers on its website.  Treasury's blacklists are the basis for identifying the ships described in this article—all designated by Treasury for their links to IRISL.  But these numbers don't always appear on cargo-shipping documentation, as the Washington-based Wisconsin Project's Iran Watch noted in a report last year.  This can make it difficult for people to understand whom they're doing business with.
>
> This has sparked a game of whack-a-hull.  Treasury over the past year alone has added to its blacklist more than 100 additional IRISL-affiliated individuals, companies and ships, in places ranging from Germany to Malta, the United Arab Emirates, Singapore and Hong Kong.

223.  Executive Order 13599 had the effect of blocking the Remaining Assets in the possession or control of Clearstream and JP Morgan as of February 6, 2012 and continuing to the date hereof.

224.  By reason of the foregoing, the Remaining Assets are subject to execution or attachment in aid of execution in order to satisfy the Judgment pursuant to 28 U.S.C. §1610

---

[13] http://online.wsj.com/article/SB10001424053111904875404576529860210045514.html

(f)(1)(A), 28 U.S.C. §1610(g) and Section 201 of the Terrorism Risk Insurance Act of 2002, Pub.

L. No. 107-297, Title II, §201(a), 116 Stat. 2337 (2002) ("TRIA").

## FIRST COUNT
### (Declaratory Judgment Against Markazi)

225.  Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth

herein at length.

226.  Markazi is an agency or instrumentality of Iran, which controls Markazi to such an

extent that it has no independence or free will and is, instead, the alter ego of Iran.

227.  Markazi has also engaged in fraudulent conveyances in violation of New York

Debtor and Creditor Law Sections 273-a and 276, thereby requiring that any veil of separation

between Markazi and the Iran be pierced.

228.  Markazi claims that it is legally a separate entity from Iran and that it is a foreign

central bank entitled to the benefit of 28 U.S.C. Section 1611(b)(1).  Therefore, an actual

controversy exists between Plaintiffs and Markarzi.

229.  Crediting Markazi's claim that it maintains a separate existence from Iran would

work a profound fraud and injustice, violate public policy and defeat an important legislative

purpose because it would prevent Plaintiffs from enforcing the Judgment and furthering the

important U.S. policies expressed in the FSIA's provisions regarding state-sponsored terrorism.

Accordingly, recognizing Markazi's separate existence would: (a) prevent Plaintiffs from

receiving the damages awarded them as compensation for Iran's terrorist acts; and (b) thwart

Congress's purpose in enacting Section 1605(a)(7) and 1605A of the FSIA, which Congress

adopted to compensate American victims of terrorism and to deter future terrorist attacks against

American citizens.

230.  By reason of the foregoing, any presumption of separation between Markazi and Iran is rebutted.  Thus, Plaintiffs are entitled to a judgment pursuant to 28 U.S.C. Section 2201 declaring that: (a) Markazi is the agent and/or alter ego of Iran;(b) the Remaining Assets are beneficially owned by Iran, and are subject to execution for enforcement of Plaintiffs' Judgments; and (c) the Remaining Assets are not covered by 28 U.S.C. Section 1611(b)(1).

### SECOND COUNT
**(Against Iran, Markazi, Clearstream and UBAE for Rescission of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law Section 276(a))**

231.  Plaintiffs' repeat and reallege each of the foregoing paragraphs as if fully set forth herein at length.

232.  Defendants Iran, Markazi, Clearstream and UBAE (*i.e.,* the Conspirators) intentionally engaged in a conspiracy to make fraudulent conveyances designed to avoid Iran's debt to Plaintiffs and other creditors and to evade the U.S. Iranian Transactions Regulations and other laws.

233.  Plaintiffs suffered damages as a proximate result of the Conspirators' conspiracy and agreement.

234.  In furtherance of that conspiracy and agreement, the Conspirators committed numerous overt acts, including the transfers and conveyances in February and March 2008 of the Remaining Assets identified above from Markazi's account at Clearstream to the UBAE/Markazi Account at Clearstream.

235.  The foregoing transfers were made at the direction of Iran and with the active participation of UBAE and Clearstream as intermediaries.  Those transactions required the services of banks located in the United States that acted as the Conspirators' agents, including Clearstream, HSBC Bank and JP Morgan.  HSBC Bank and JPMorgan received their

instructions from UBAE and Clearstream in New York by mail, e-mail, fax, the SWIFT electronic banking system or other electronic communications.

236.  The foregoing transfers were made by Iran, through its agent, and/or alter ego, Markazi, in a deliberate attempt to stave off creditors by putting property in such a form and place that the creditors could not reach it.  Markazi made the fraudulent conveyances that Plaintiffs describe as the agent and/or alter ego of Iran and with the actual intent to hinder, delay, or defraud creditors, including Plaintiffs.

237.  Markazi made those fraudulent conveyances with the knowing and active assistance of Clearstream and UBAE, which acted in New York through their agent, Clearstream.

238.  The fraudulent conveyances from Markazi's account at Clearstream to the UBAE/Markazi Account that UBAE opened at Clearstream for Markazi's benefit did not affect the place of custody of the assets in Clearstream's accounts at United States banks or their foreign branches and affiliates and did not serve any type of financial, banking or other rational purpose other than to cloak the property with UBAE's name.  By performing those transactions, the Conspirators intended to impede the ability of Iran's judgment creditors to satisfy their judgments against Iran.

239.  All of those above-referenced conveyances involved the Judgment Debtors' assets and were made without fair consideration.

240.  At the time of the conveyances, the Judgment Debtors were indebted to Plaintiffs by virtue of the Judgments.

241.  The Judgments are final judgments rendered against the Judgment Debtors that remain unsatisfied.

242.  The Conspirators knew that the Judgment Debtors were indebted to Plaintiffs and other U.S. creditors prior to the fraudulent conveyances.

243.  Iran is the beneficial owner of the Remaining Assets notwithstanding any of the transfers and conveyances described above.

244.  Markazi's transfers of its property to the UBAE/Markazi Account constitute fraudulent transfers and conveyances that should be voided pursuant to NY Debtor & Creditor Law § 270 *et seq*.

245.  Iran, Markazi, Clearstream and UBAE caused the transfer of the Remaining Assets identified above with the actual intent to hinder, delay, or defraud Plaintiffs and other creditors of Iran.

246.  The fraudulent conveyances of the Remaining Assets from Markazi's account at Clearstream to the UBAE/Markazi Account should be set aside and annulled under New York Debtor and Creditor Law Section 278.

247.  By reason of the foregoing, Plaintiffs are entitled to an Order from the Court: (a) setting aside the conveyances by Markazi to UBAE; and/or (b) directing Clearstream to disregard the conveyances and to make book entries required to restore the Remaining Assets to the account of Markazi that is custodized at Clearstream.  That relief will permit Plaintiffs to levy upon Markazi's assets to satisfy their Judgments.

248.  Plaintiffs respectfully request that the Court enter a judgment: (a) rescinding all conveyances of the Remaining Assets from Markazi's account at Clearstream to the UBAE/Markazi Account; and (b)(i) disregarding the fraudulent conveyances and directing Clearstream to transfer all of the Remaining Assets directly to Plaintiffs or (b)(ii) directing Clearstream to disregard the conveyances and to make book entries required to restore the

Remaining Assets to the account of Markazi that is custodized at Clearstream, so that it can be levied upon to satisfy Plaintiffs' Judgments.

249.  By reason of the foregoing, Plaintiffs are entitled to an award of reasonable attorneys' fees against Markazi and Iran under New York Debtor and Creditor Law Section 276(a).

### THIRD COUNT
**(Against Iran, Markazi, Clearstream and UBAE for Rescission of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law Section 273-a)**

250.  Plaintiffs repeat and reallege each of the foregoing allegations as if set forth in full herein.

251.  At the time of the fraudulent conveyances that Plaintiffs describe above, the Judgment Debtors were indebted to some of the Plaintiffs by virtue of the Judgments and the Judgment Debtors were defendants in the actions in which the remaining Plaintiffs subsequently obtained their judgments.

252.  The Judgments are final judgments rendered against the Judgment Debtors.

253.  The Judgment Debtors have failed to satisfy the Judgments.

254.  The transfers and conveyances of the Remaining Assets by Iran through its agents were made without fair consideration.

255.  At the time of these conveyances, the Judgment Debtors were defendants in the action in which Plaintiffs obtained their Judgments.

256.  Iran is the beneficial owner of the Remaining Assets notwithstanding any of the transfers and conveyances described above.

257. By reason of the foregoing, New York Debtor and Creditor Law Section 273-a dictates that Markazi's conveyances of the Remaining Assets were fraudulent as to Plaintiffs without regard to the actual intent of Markazi, Iran or the Judgment Debtors.

258. By reason of the foregoing, Plaintiffs are entitled to an Order from the Court: (a) setting aside the conveyances of the Remaining Assets by Markazi to UBAE; and/or (b) an Order directing Clearstream (i) to disregard those conveyances and (ii) to make book entries required to restore the Remaining Assets to the account of Markazi that is custodized at Clearstream, so that Plaintiffs can levy upon them to satisfy Plaintiffs' Judgments.

### FOURTH COUNT
### (Against All Defendants for Turnover Pursuant to CPLR § 5225)

259. Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth in full herein.

260. Iran has an interest in the Remaining Assets held by Clearstream.

261. Section 5225(b) of the CPLR states:

**(b) Property not in the possession of judgment debtor.** Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

262. Plaintiffs' rights in the Remaining Assets are superior to the rights of JP Morgan, Clearstream and UBAE, who are mere stakeholders.

263. Pursuant to Fed. R. Civ. P. 69(a) and CPLR Section 5225, Plaintiffs hereby request that this Court enforce Plaintiffs' Judgment against Iran by an order conveying, assigning and

directing the payment to Plaintiffs of all rights, title and interest of Iran in the Remaining Assets as well as any proceeds from the Remaining Assets.

## FIFTH COUNT
### (Against All Defendants for Turnover Pursuant to CPLR § 5227)

264.  Plaintiffs repeat and reallege each of the preceding paragraphs as if set forth in full herein.

265.  By agreement and/or operation of law, JP Morgan, as sub-custodian of the Remaining Assets is obligated to Clearstream, as custodian of the Remaining Assets, who is in turn obligated to UBAE, who is in turn obligated to Markazi, the agent and alter ego of Iran, for payments of principal and interest made by the issuers of the Remaining Assets and for payments made in connection with the Remaining Assets.

266.  The Remaining Assets include bonds and/or notes that call for the issuers' payment of interest and principal in United States dollars to those owning an interest in the Remaining Assets on various fixed dates.  In addition, any cash held in the account frozen by Clearstream that currently holds the cash proceeds collected from the bonds that comprised the Remaining Assets is payable in U.S. dollars through JP Morgan as Clearstream's correspondent bank.  The cash proceeds of the bonds remain deposited at JP Morgan in New York in Clearstream's correspondent account.

267.  By reason of the foregoing, pursuant to CPLR Section 5227, Plaintiffs are entitled to a judgment: (a) requiring JP Morgan and/or Clearstream to pay to Plaintiffs the debt that JP Morgan owes to Clearstream and Clearstream in turn owes to or for the benefit of Markazi with respect to the Remaining Assets, upon maturity, or so much of those debts as is sufficient to satisfy the Judgments, and to execute and deliver any documents necessary to effect such payment; or (b) requiring JP Morgan and/or Clearstream to pay to Plaintiffs the sum of the total

indebtedness that JP Morgan owes to Clearstream and Clearstream in turn owes to or for the benefit of Markazi as agent for Iran, *i.e.,* the value of the Remaining Assets.

## SIXTH COUNT
### (Against all Defendants for Turnover Pursuant to TRIA)

268.  Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth herein.

269.  The Plaintiffs hold judgments for compensatory damages against the Judgment Debtors based on an act of terrorism or for which Iran is not immune under 28 U.S.C. §1605A or §1605(a)(7) (as such section was in effect on January 27, 2008).

270.  Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA § 201(d)(4), 116 Stat. at 2340.

271.  The Remaining Assets are beneficially owned by Markazi, which is an alter ego, agency or instrumentality of Iran.

272.  The Remaining Assets are in the possession or control of JP Morgan and/or Clearstream, both of which are United States persons as defined in Section 7 of Executive Order 13599.

273.  By reason of the foregoing, the Remaining Assets are blocked assets as defined in TRIA.

274.  Plaintiffs are therefore entitled to an order pursuant to TRIA, directing JP Morgan and/or Clearstream to turn over the Remaining Assets to Plaintiffs in partial satisfaction of the compensatory damages awarded in the Judgments.

## SEVENTH COUNT
**(Against Clearstream and Markazi for Rescission of Fraudulent Conveyance)**

275.  Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth herein at length.

276.  If and to the extent that any of the Remaining Assets are found to be located outside the United States, the Court has the power to set aside any conveyance made by Clearstream that resulted in removal of the Remaining Assets from the United States pursuant to New York Debtor and Creditor Law §§ 273-a, 276 and 278 and common law.

277.  Clearstream and Markazi had actual knowledge of the Peterson Plaintiffs' judgments and attempts to execute thereon as early as June 16, 2008 by virtue of a restraining notice the Peterson Plaintiffs served on Clearstream.

278.  The restraining notice had the effect of restraining Clearstream from transferring any of the Remaining Assets from its correspondent account at JP Morgan to a location beyond the reach of the Plaintiffs and the Court.

279.  At all times since March, 2008, Clearstream knew that Markazi beneficially owned the Remaining Assets.

280.  After June, 2008, any transfer of the Remaining Assets that Clearstream initiated from its correspondent account at JP Morgan to Luxembourg or any other location outside the United States, was made as agent for Markazi, with intent to hinder, delay or defraud the Plaintiffs and/or without fair consideration.

281.  Clearstream, as agent for Markazi, is in possession or control of the Remaining Assets even after any conveyance thereof from Clearstream's correspondent account at JP Morgan.  The Court has personal jurisdiction over Clearstream.

282.     By reason of the foregoing, the Court has the power to direct Clearstream and Markazi to take such actions as may be required to set aside any fraudulent conveyance of the Remaining Assets even after any conveyance thereof from Clearstream's correspondent account at JP Morgan in New York.

### EIGHTH COUNT
### (Against All Defendants for Equitable Relief Pursuant to
### Fed. R. Civ. P. 69(a) and Federal and State Common Law)

283.  Plaintiffs repeat and reallege each of the preceding paragraphs as if fully set forth herein.

284.  The Plaintiffs' writs of execution served on Clearstream and JP Morgan for enforcement of the Judgment against the Remaining Assets remain unsatisfied.  Therefore, Plaintiffs have exhausted their legal remedies.

285.  Pursuant to Fed. R. Civ. P. 69(a), federal and New York state common law, and the inherent equitable power of the Court, Plaintiffs are alternatively entitled as an alternative remedy – a Creditor's Bill to reach the equitable interest of the Judgment Debtors in the Remaining Assets.

286.  Assuming, *arguendo*, that enforcement of the Judgment against the Remaining Assets is unavailable through remedies at law, the Court should exercise its equitable powers in connection with a Creditor's Bill and otherwise.

287.  Plaintiffs are entitled to a declaration by the Court that the Judgment Debtors have an ownership interest in the Remaining Assets, including all cash proceeds from any payments of interest and principal on the bonds, that may be reached by the Plaintiffs to enforce the Judgment under the present circumstances.

288.  An objective weighing of the equities underlying the terrorism exception to the FSIA and TRIA, on the one hand, and those underlying any applicable legal remedies, on the other, compels the conclusion that the Court should use its equitable powers to allow Plaintiffs to reach the Remaining Assets to enforce the Judgments.

289.  Exercising the Court's discretion to apply a narrow exception to any legal remedies is reasonable and equitable here because, among other factors: (a) the Remaining Assets were readily traced by Clearstream, as evidenced by the testimony and documents put into evidence by Clearstream at the June 27, 2008 hearing and discovery produced by UBAE in this case; (b) Iran, a judgment debtor, intentionally disguised and/or secreted its identity as beneficial owner of the Remaining Assets to hinder, delay or defraud creditors; (c) Clearstream and UBAE knew, or should have known, that Markazi, as agent of Judgment Debtors, was the beneficial owner of the Remaining Assets; (d) the Judgment Debtors have intentionally deceived purchasers of the Remaining Assets to evade U.S. and international sanctions imposed because of Iran's long history of human rights violations, state sponsorship of terrorism against U.S. nationals,  and aggressive and illicit efforts to develop WMDs; (e) applying that exception will serve the important policy interests codified in the FSIA, which promotes compensation of the victims of terrorism and the punishment of rogue terrorist nations, while doing no damage to the policies of fostering finality and speed in securities transactions underlying U.C.C. Article 8.

290.  Moreover, applying a narrow exception in these circumstances is consistent with U.C.C. 8-112(e), which provides that "[a] creditor whose debtor is the owner of a . . . security entitlement is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the security entitlement <u>or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process</u>." [Emphasis added].

291.  Pursuant to the Court's equitable powers embodied in a Creditor's Bill and otherwise, the Plaintiffs are further entitled to an order directing Clearstream to cause the turnover to the Plaintiffs of the Remaining Assets as partial satisfaction of the Judgments.

**WHEREFORE**, the Plaintiffs respectfully demand a judgment entered in their favor and against Defendants as follows:

A.  An order conveying, assigning and directing the transfer to Plaintiffs of all rights, title and interest of Iran or Markazi in the Remaining Assets as well as the proceeds from the Remaining Assets;

B.  Damages against Markazi and the Judgment Debtors to the extent same are recoverable under the foregoing counts;

C.  the payment of Plaintiffs' attorneys' fees and expenses to the extent that Plaintiffs request same in the foregoing counts;

D.  interest at the legal rate;

E.  the equitable and declaratory relief that Plaintiffs request in each of the foregoing counts; and

F.  such other and further relief as the Court deems appropriate.

Dated: New York, New York,
         April 25, 2014

SALON MARROW DYCKMAN NEWMAN & BROUDY LLP

By: _____
      Liviu Vogel
      292 Madison Avenue, 6th Floor
      New York, NY  10017
      Tel:  (212) 661-7100

231580.1                                62

STONE BONNER & ROCCO LLP
James P. Bonner
Patrick L. Rocco
260 Madison Avenue, 17th Floor
New York, NY  10016
Tel: (212) 239-4340

*Attorneys for Plaintiffs/Judgment Creditors*