```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 20, 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
DEBORAH D. PETERSON et al.,                    :
                                               :
                    Plaintiffs,                :
                                               :
        -v-                                    :        13-cv-9195 (KBF)
                                               :
ISLAMIC REPUBLIC OF IRAN; BANK                 :
MARKAZI a/k/a CENTRAL BANK OF                  :        OPINION & ORDER
IRAN; BANCA UBAE SpA;                          :
CLEARSTREAM BANKING, S.A.; and JP              :
MORGAN CHASE BANK, N.A.,                       :
                                               :
                    Defendants.                :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On December 30, 2013, plaintiffs—judgment-creditors of the Islamic Republic

of Iran ("Iran") and the Iranian Ministry of Information and Security

("MOIS")—commenced the instant action against Iran, Bank Markazi a/k/a Central

Bank of Iran ("Bank Markazi" or "Markazi"), Banca UBAE S.p.A. ("UBAE"),

Clearstream Banking, S.A. ("Clearstream"), and JP Morgan Chase Bank, N.A.

("JPM").  (ECF No. 1.)[1]  Deborah Peterson, the first listed plaintiff, is just one of the

numerous plaintiffs who were victims, or are family members of victims, of the 1983

bombing of the U.S. Marine Barracks in Beirut, Lebanon.[2]  Each plaintiff group has

obtained a judgment against Iran and MOIS as sponsors of the Beirut bombing, in

---

[1] Plaintiffs filed an amended complaint, dated April 25, 2014, on July 24, 2014.  (ECF No. 104 ("Am. Compl.").)

[2] The full list of plaintiffs is set forth at Exhibit A to the Amended Complaint.

amounts ranging from more than $800 million to over $2 billion.  Each of the judgments has been duly registered in this district.  (See Am. Compl. ¶¶ 39-43.)

Plaintiffs assert the following claims in the Amended Complaint:

- Count One: against Bank Markazi for a declaratory judgment;

- Counts Two and Three: against all defendants except for JPM for rescission of fraudulent conveyances;

- Counts Four, Five, and Six: against all defendants for turnover;

- Count Seven: against Clearstream and Bank Markazi for rescission of fraudulent conveyance; and

- Count Eight: against all defendants for equitable relief.

Plaintiffs allege that Clearstream is in possession of assets valued at over $1.6 billion, representing proceeds of bonds beneficially owned by Bank Markazi. (See Am. Compl. ¶ 3; Declaration of Liviu Vogel dated July 11, 2014 ("Vogel Decl.") ¶ 3.)  According to plaintiffs, JPM in New York received the bond proceeds into one of its accounts, and these proceeds legally remain on deposit with JPM and are therefore subject to turnover.  Defendant JPM alleges that it never knew that any proceeds with which it credited Clearstream were connected to Bank Markazi, and that in any event the money is long gone and JPM has no role in this dispute. Clearstream argues that plaintiffs previously settled with Clearstream whatever claims they may have had as to these funds and the account against which they were credited, and that in all events, it does not maintain any of the funds with which JPM once credited it in New York—all funds have been transferred and all

client transactions relating to the proceeds are on Clearstream's books in Luxembourg.  Bank Markazi asserts that its account is with UBAE outside of the United States and that this Court therefore lacks jurisdiction over Bank Markazi under the Foreign Sovereign Immunities Act ("FSIA").  Finally, UBAE argues that it also previously entered into a settlement releasing the instant claims, and that while it holds an account for Bank Markazi's benefit with Clearstream, such account is maintained in Luxembourg, and this Court lacks any basis for personal jurisdiction over UBAE in this district.

Before the Court are motions by each defendant for dismissal.  While the parties raise numerous arguments, there is really little complexity to this matter: plaintiffs released the instant claims against Clearstream and UBAE, there is nothing left in the Clearstream account at JPM for JPM to "turn over," and this Court lacks subject-matter jurisdiction over Bank Markazi as to assets located abroad.  Accordingly, as set forth below, defendants' motions are GRANTED.

I.      FACTUAL BACKGROUND

Plaintiffs have substantial outstanding judgments against Iran and MOIS. They have been pursuing collection on those judgments in this and other courts in various jurisdictions since those judgments were obtained.  This action arises from these ongoing collection efforts.

In June 2008, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") responded to a subpoena served in connection with plaintiffs' efforts to collect on their judgments against Iran.  (Am. Compl. ¶ 46.)  OFAC's

response indicated that "an Iranian government client" maintained an interest in bonds with a face amount of $2,003,000,000.  (Id.)  Referred to as the "Original Assets" in this litigation, the subject bonds were held on Clearstream's books and records and maintained in a sub-custodial account with Citibank.[3]  (See id.)  Subsequent information provided by OFAC in April 2010 indicated that the subject bonds were "apparently owned by the Central Bank of Iran."  (Id. ¶ 47.)  Plaintiffs sought and obtained turnover of the Original Assets (amounting to approximately $1.75 billion) in a judgment entered by this Court on July 9, 2013, and affirmed by the Second Circuit on July 9, 2014.

The instant lawsuit relates specifically to additional assets plaintiffs allege are also present in New York, referred to here as the "Remaining Assets."  Plaintiffs assert that the Remaining Assets amount to over $1.6 billion in proceeds attributable to bonds (the "Remaining Bonds") which Bank Markazi maintained with Clearstream and which Clearstream had in turn sub-custodized with JPM in New York.  (See Am. Compl. ¶ 3.)  The parties do not contest that the Remaining Assets exist in approximately the amount alleged, that Bank Markazi is the Central Bank of Iran, that it was also the beneficial owner of the Remaining Bonds and is

---

[3] The Peterson Judgment Creditors immediately sought and obtained issuance of an Execution upon these bonds (the "First Execution"); a Second Execution was served on Clearstream on October 27, 2008.  (See Am. Compl. ¶¶ 48, 50.)  Plaintiffs served Clearstream with a restraining notice in June 2008; that restraining notice was extended in July 2009 and remains in effect.  (See id. ¶¶ 51, 52.)  The effect of the First and Second Executions and restraining notices was to restrain the Original Assets.  (See id. ¶ 53.)  Plaintiffs obtained a turnover order as to the Original Assets in 2013, affirmed by the Second Circuit on July 9, 2014.  See Peterson v. Islamic Republic of Iran, No. 10 CIV. 4518 KBF, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013) ("Peterson I"), recons. denied, 2013 WL 2246790 (S.D.N.Y. May 20, 2013); Peterson v. Islamic Republic of Iran, 758 F.3d 185 (2d Cir. 2014).

now the beneficial owner of the Remaining Assets.  Finally, the parties do not dispute that UBAE has an account with Clearstream in Luxembourg which it maintains for Bank Markazi.[4]  The parties vigorously dispute whether the Remaining Assets are in a Clearstream account maintained by JPM in New York; whether the Remaining Assets are anything more than book entries maintained by Clearstream in Luxembourg; and finally, whether if, once JPM credited Clearstream with the Remaining Assets (which occurred at various times) Clearstream did in fact manage to transfer them from New York to Luxembourg via book entry, it should now be required to reverse those entries.  The mechanics of the actions relating to the Remaining Assets are as follows:

Prior to February 2012, approximately $1.4 billion in proceeds relating to the Remaining Bonds was paid to JPM and JPM in turn credited that amount to Clearstream.  Approximately $104 million was later also transferred in the same manner.  (See Vogel Decl. ¶ 12.)  The banking transactions occurred in various steps.  As an initial matter, the Remaining Bonds were issued by sovereigns such as the European Investment Bank.  (Am. Compl. ¶ 137.)  Owners of beneficial interests in the types of bonds that constituted the Remaining Assets generally do not receive physical certificates evidencing their interest.  (Id. ¶ 139.)  Rather, the owner's interest is reflected in book-entry form.  (Id.)

---

[4] Plaintiffs allege that Clearstream, Bank Markazi, and UBAE agreed to transfer the Remaining Assets from Bank Markazi to UBAE prior to changes in U.S. law which restricted the movement and transfer of Iranian assets.  According to plaintiffs, Clearstream opened an account for UBAE in Luxembourg for this purpose.  (See Am. Compl. ¶¶ 10-11.)

The prospectuses for the Remaining Bonds required Clearstream, as custodian for its customers who held the beneficial interests in those bonds, to accept payment of interest and redemption proceeds into an account at a bank located in New York.  (Vogel Decl. ¶ 3(a).)  The prospectus for one of the Remaining Bonds states:

> Beneficial interests in the Global Notes will be shown on, and transfers thereof will be effected only through, records maintained in book-entry form by . . . Clearstream, Luxembourg . . . .

> Payments shall be made in U.S. dollars by cheque drawn on a bank in New York City and mailed to the holder . . . .

> Each of the persons in the records of . . . Clearstream, Luxembourg . . . as the holder of a Note represented by a Global Note must look solely to . . . Clearstream, Luxembourg . . . for his share of each payment made by H.M. Treasury to the holder of such Global Note and in relation to all other rights arising under the Global Note . . . .

(Id. ¶ 38.)

Clearstream maintains an account at JPM into which it receives funds on behalf of numerous clients; over the course of a four-year period spanning from 2008 into 2012, proceeds relating to the Remaining Bonds went into this account.  (See Declaration of Gauthier Jonckheere dated August 5, 2014 ("Jonckheere Decl.") ¶ 4.)

On January 17, 2008, Markazi opened an account with UBAE to act as its custodial bank in connection with its securities positions at Clearstream.  (See Vogel Decl. ¶ 19.)  The next day, UBAE sent an "URGENT" electronic message to Clearstream instructing it to open a new account in UBAE's name.[5]  (Id.)

---

[5] Prior to this instruction, UBAE had maintained a single account with Clearstream which it had opened in 1973.  (Vogel Decl. ¶ 19.)

Clearstream opened account no. 13061 for UBAE that same day.  (Id.)  Thereafter, Markazi instructed Clearstream to transfer $4.6 billion in securities from its account at Clearstream to UBAE's 13061 account.[6]  (Id.)  Among the assets transferred in this manner were those which are the subject of the instant lawsuit. (Id.)

On June 16, 2008, plaintiffs served a restraining notice on Clearstream, which should have had the effect of preventing Clearstream from transferring any property in which Bank Markazi had an interest out of the United States.  (See Am. Compl. ¶¶ 51, 53.)

On June 5, 2009, Clearstream informed UBAE that, due to laws passed in the United States, it could no longer process transactions for bonds held on behalf of Iran using the services of a U.S. person—that is, JPM.  (Vogel Decl. ¶ 29.) Clearstream stated that, as a result, it had opened up a "sundry blocked account 13675" and that this account would hold cash payments received by Clearstream in connection with the Markazi securities it held.  (See id.)

Thereafter, Clearstream credited the 13675 account with proceeds relating to the Remaining Bonds—totaling $1,683,184,679.47 as of May 2013.  (See id. ¶ 32.)  It is evident from records produced by Clearstream that these proceeds are denominated in U.S. dollars.  (See id.)  No party disputes that in the absence of the

---

[6] Plaintiffs assert that such transfer was made free of any payment by UBAE.  (See Am. Compl. ¶ 11; Vogel Decl. ¶ 19.)  As UBAE does not contest that the securities in the UBAE account are held for Markazi's benefit (see UBAE's Objections and Responses to Plaintiffs' Interrogatories ¶ 8, Vogel Decl. Ex. 25), the existence of payment or other form of consideration is irrelevant to the instant motions.

block that Clearstream had imposed, Clearstream would have credited UBAE's 13061 account with the same proceeds.  But nor can any party dispute that this is counterfactual; proceeds from the Remaining Bonds were never credited to the 13061 account and were instead credited and blocked in the 13675 account.  No party disputes that neither UBAE nor Markazi has received any of these funds and that Clearstream's obligation with respect to the underlying financial assets associated with the Remaining Bonds remains outstanding.  (See id. ¶ 42.)

UBAE is organized under the laws of Italy and operates principally as a trade bank.  (Declaration of Mario Sabato dated July 18, 2014 ("Sabato Decl.") ¶ 2.)  As of December 2013, when this lawsuit was first filed,[7] UBAE did not transact business, have customers, advertise, solicit business, or market services in New York or anywhere else in the United States.  (Id. ¶ 3.)  As of that date, it did not have any employees, officers, or directors in the United States.  (Id.)  UBAE was not listed on any U.S. stock exchange.  (Id.)  Until 2009, UBAE had maintained an account with HSBC in New York and used that account to facilitate international transactions or money transfers for itself and its customers.  (Id. ¶ 5.)  This HSBC account was one of the bases for this Court's determination in Peterson I that UBAE was amenable to jurisdiction.  See Peterson, 2013 WL 1155576, at *16-18; Peterson, 2013 WL 2246790, at *6.  The HSBC account was closed on September 25, 2009.  (Sabato

---

[7] Personal jurisdiction is determined as of the date the original complaint was served.  See Indymac Mortgage Holdings, Inc. v. Reyad, 167 F. Supp. 2d 222, 232 (D. Conn. 2001) ("It is well established that jurisdiction is to be determined by examining the conduct of the defendants as of the time of service of the complaint." (quoting Greene v. Sha-Na-Na, 637 F. Supp. 591, 595 (D. Conn. 1986)) (internal quotation marks omitted)); see also Ginsberg v. Gov't Properties Trust, Inc., No. 07 CIV. 365 CSHECF, 2007 WL 2981683, at *6 (S.D.N.Y. Oct. 11, 2007).

Decl. ¶ 6.)  None of the transactions at issue in the Amended Complaint occurred

via the HSBC account.  (<u>Id.</u> ¶ 5.)  All of UBAE's acts in relation to the Remaining

Bonds and Remaining Assets have occurred with Clearstream in Luxembourg.  (<u>Id.</u>)

On January 23, 2012, UBAE opened a correspondent account with JPM in

New York.  (<u>Id.</u> ¶ 6.)  None of the transactions at issue in the instant lawsuit went

through that account.  (<u>Id.</u>)

## II.   DISCUSSION

Clearstream and UBAE seek dismissal on the basis that plaintiffs' claims

were released as part of separate settlements in connection the <u>Peterson I</u> litigation.

They are correct.  While the settlement agreements entered into between plaintiffs

and these two parties differ in certain respects, the ultimate result is the same:

plaintiffs' claims here are foreclosed.  As to UBAE, plaintiffs released it from any

action save a turnover action.  Since the Remaining Assets are no longer in this

district, turnover is not an available remedy.  As to Clearstream, plaintiffs entered

into a covenant not to sue with regard to any assets in the 13675 account; they may

only sue for turnover and a ministerial action in connection therewith—which is far

from the claims pursued here.

A. <u>Clearstream</u>

On October 23, 2013,[8] Clearstream and the plaintiffs settled all claims, with a limited exception discussed below.  The Clearstream Settlement Agreement contains the following WHEREAS clauses:

> WHEREAS, on June 16, 2008, Citibank moved for an order to show cause why the Restraints should not be vacated, and on June 27, 2008, the Court vacated the Restraints with respect to certain Assets nominally valued at approximately $250,000,000 that were no longer in the possession of Citibank (the "Transferred Assets"), but left the Restraints in place with respect to assets valued at approximately $1,750,000,000 (the "Restrained Assets"); and
>
> . . .
>
> WHEREAS, on June 8, 2010, the Peterson Plaintiffs filed a complaint . . . seeking, <u>inter alia</u>, turnover of the Restrained Assets . . .
>
> ...
>
> WHEREAS, certain Plaintiffs have asserted claims in <u>Peterson</u> for avoidance or damages against Clearstream with regard to the Transferred Assets, including, but not limited to, claims for fraudulent conveyance, tortious interference with the collection of a money judgment, and prima facie tort (the "Peterson Direct Claims"); and
>
> ...
>
> WHEREAS, on February 28, 2013, the Court issued an Opinion and Order that, <u>inter alia</u>, granted the Turnover Motion . . .

(<u>See</u> Settlement Agreement ("Clearstream Agr.") at 1-2, Vogel Decl. Ex. 6.)

The Clearstream Settlement Agreement also recited the then-pending appeal to the Second Circuit of the Court's February 28 Opinion & Order (as well the

---

[8] The Clearstream Settlement Agreement was signed earlier, but it became effective on October 23, 2013, after being ratified by a specified number of plaintiffs.  (Memorandum of Law in Support of Clearstream's Motion to Dismiss the Amended Complaint at 2 n.1, ECF No. 98.)

Court's denial of a motion for reconsideration).  (<u>Id.</u> at 2-3.)  The final WHEREAS clause states:

> WHEREAS, Plaintiffs and Clearstream wish to resolve all of the disputes and claims between them for good and valuable consideration . . .

(<u>Id.</u> at 3.)

Paragraph 1 of the Agreement contains provisions relating to the termination of the litigation to which the Agreement referred in the WHEREAS clauses.  (<u>See id.</u> ¶ 1.)  Paragraph 2 of the Agreement is entitled "Ratification By Plaintiffs and Covenant Not To Sue."  (<u>See id.</u> ¶ 2.)  This section consists of a series of provisions reciting that each plaintiff is to execute a "Ratification Agreement."  By executing a Ratification Agreement, each plaintiff "ratifies and agrees to be legally bound by the terms" of the Clearstream Settlement Agreement.  (<u>Id.</u> ¶ 2(i).)  (The UBAE Settlement Agreement contains no equivalent procedure.[9])  In addition, each plaintiff agrees not to sue Clearstream in law or in equity for any claims other than certain defined "Direct Claims."  (<u>See id.</u> ¶ 2(ii).)  The covenant not to sue concerns enumerated "Covered Subjects."  The Covered Subjects include claims in the <u>Peterson I</u> litigation, and:

> (b) any account maintained at Clearstream . . . by or in the name of or under the control of any Iranian Entity . . . or any account maintained at Clearstream or at any Clearstream Affiliate by or in the name of or under the control of UBAE, including but not limited to, accounts numbered . . . 13061 . . . 13675 . . . (each an "Account") or any asset or

---

[9] The UBAE Settlement Agreement states that it "is entered into by and among the judgment creditors in the actions listed on Annex A (the 'Plaintiffs'), by their attorneys."  (Confidential Settlement Agreement ("UBAE Agr.") at 1, Declaration of John J. Zefutie, Jr. dated July 22, 2014 ("Zefutie Decl.") Ex. 2.)

interest held in an Account in the name of an Iranian Entity (an "Iranian Asset"); [as well as]

(c)  any transfer or other action taken by or at the direction of any Clearstream Party, Citibank, or any Iranian Entity, including any transfer or other action in any account, including a securities account or cash account or omnibus account or correspondent account maintained in Clearstream's name or under its control, that in any way relates to any Account or any Iranian Asset.

(Id. ¶ 2(ii)(b), (c).)  Paragraph 2 further provides that each plaintiff, independently or through counsel, performed "an independent inquiry as to the facts and law upon which the Actions are based" and "nevertheless wishes to resolve any dispute or claim with the Clearstream Parties," and such resolution will be unaffected by later discovery of any new facts.  (Id. ¶ 2(iii).)  The key issue here is whether this broad covenant encompasses the claims in the instant action.  This is resolved by reference to the carve-out provision contained in paragraph 4 of the Agreement. That paragraph provides:

> **Garnishee Actions**.  Notwithstanding the provisions of paragraph 2 of this Agreement, the Covenant shall not bar any action or proceeding regarding (a) the rights and obligations arising under this Agreement, or (b) efforts to recover any asset or property of any kind, including proceeds thereof, that is held by or in the name, or under the control, or for the benefit of, Bank Markazi or Iran . . . in an action against a Clearstream Party **solely** in its capacity as a garnishee (a "Garnishee Action.")  Such a Garnishee Action may include, without limitation, an action in which a Clearstream Party is named solely for the purpose of seeking an order directing that a Clearstream Party perform an act that will have the effect of reversing a transfer between other parties that is found to have been a fraudulent transfer under any legal or equitable theory, **provided however** that such a Garnishee Action shall not seek an award of damages against a Clearstream Party.

(Id. ¶ 4 (emphasis in original).)

12

Plaintiffs argue that the Clearstream Settlement Agreement specifically carves the claims against Clearstream in the instant action out of the settlement. Paragraph 4 carves out one type of claim—a "Garnishee Action." As defined in that Agreement, such an action could include a request for an order that Clearstream take an action to reverse a transfer between other parties that is found to have been a fraudulent conveyance. This provision does not allow plaintiffs to bring a fraudulent conveyance or equitable action.[10] Indeed, the wording with respect to the fraudulent conveyance action is in the past tense—indicating that a Garnishee Action, with the requested order, would follow a prior determination of fraudulent conveyance. Accordingly, the claims plaintiffs assert against Clearstream in Counts Two, Three, Seven, and Eight must be dismissed for this reason alone.[11]

The turnover claims against Clearstream—asserted in Counts Four, Five, and Six—also fail. As a matter of law, a turnover action must be brought against a party who is "in possession or custody" of money or other personal property in which a creditor has an interest. See N.Y. C.P.L.R. § 5225; Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Commerce, 990 N.E.2d 114, 116-17 (N.Y. 2013). It is a classic in rem action. See RCA Corp. v. Tucker, 696 F. Supp. 845, 851 n.4 (E.D.N.Y. 1988) ("[T]urnover proceedings . . . are in fact actions in rem."). The Court may not direct an entity to "turn over" assets that are not in its actual

---

[10] Count Eight asserts a claim for equitable relief.

[11] Notably, the language regarding plaintiffs' ability to seek an order directing Clearstream to reverse a transfer refers to a fraudulent conveyance found between "other parties." In the instant lawsuit, plaintiffs seek to assert fraudulent conveyance claims against Clearstream itself.

possession or custody, even if the assets may be said to be within its "control."  See Commonwealth of N. Mariana Islands, 990 N.E.2d at 116-17.  An action which seeks an order granting relief with regard to potential assets, including to reverse transfers which would result in the presence of assets, is not a turnover action.

In the instant case, the records before the Court are clear: JPM received proceeds relating to the Remaining Bonds, which it credited to a Clearstream account at JPM.  Whether it should have or should not have, Clearstream in turn credited amounts attributable to the Remaining Bonds to the UBAE/Bank Markazi account in Luxembourg.  The JPM records are clear that whatever happened to the proceeds, they are gone.  There are numerous days in which the Clearstream account at JPM showed a zero or a negative balance.  (See Jonckheere Decl. ¶ 5.) As a matter of law, there is no asset in this jurisdiction to "turn over."  Could this Court require Clearstream to reverse its own transfer?  Not under the Settlement Agreement; such an action is not the type of action as to "others" anticipated by paragraph 4 of the Clearstream Settlement Agreement.

Plaintiffs have a slightly more nuanced argument with regard to proceeds which JPM received on Clearstream's behalf subsequent to issuance of Executive Order ("E.O.") 13599 on February 5, 2012.[12]  Section 1 of that E.O. states, in relevant part:

> (a) All property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including

---

[12] The E.O went into effect on February 6, 2012.

any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

(b) All property and interests in property of any Iranian financial institution, including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

Exec. Order. No. 13599, 77 Fed. Reg. 6659, 6659 (2012).

There is no dispute that $104 million of the Remaining Proceeds was credited by JPM to Clearstream subsequent to the issuance of this Executive Order. It may be, therefore, that when Clearstream received that $104 million, which related to interests of Iran (via its central bank, Bank Markazi), it should not have credited account 13675 outside of the United States, and that in so doing it violated this Executive Order. However, plaintiffs have no private right of action for a violation of this Executive Order. Section 12 of the E.O. explicitly states that it does not "create any right or benefit, substantive or procedural, enforceable at law or in equity" against any person. Exec. Order. No. 13599, 77 Fed. Reg. at 6661. The Second Circuit has also held that "Executive Orders cannot be enforced privately unless they were intended by the executive to create a private right of action." Zhang v. Slattery, 55 F.3d 732, 748 (2d Cir. 1995) (citations omitted). In any event, an action to enforce E.O. 13599 is not a type of action anticipated by paragraph 4 of the Clearstream Settlement Agreement. The Agreement is unambiguous that plaintiffs released all claims to accounts 13061 and 13675 except for a Garnishee Action. A claim as to a violation of the E.O. is not that.

Plaintiffs also assert that because of the existence of E.O. 13599, the book entries Clearstream made on its Luxembourg books for the benefit of UBAE and Bank Markazi are void; and—the argument goes—since they are "void," that $104 million is, as a matter of law, deemed to be within Clearstream's JPM account in New York.  Plaintiffs refer to 31 C.F.R. § 560.212(a), which provides that transfers of blocked property shall be deemed null and void.[13]  However, if a transferor meets certain requirements set forth in subpart (d) of that section, they are not null and void.  See id. § 560.212(d).[14]

Whether plaintiffs may sue for a declaration that such transfers are void, or sue based on the assumption that such transfers are void, is irrelevant to the outcome of this motion because the covenant not to sue encompasses such claims. In effect, plaintiffs want to assert an action against Clearstream in two steps: (1) seek a declaration that any transfer made to UBAE's account in Luxembourg is void, and (2) once the transfer is deemed void, the assets would revert to the United States and be subject to turnover.  The first of these two steps is necessary—and it is foreclosed by the covenant not to sue.  The first step directly implicates the

---

[13] 31 C.F.R. § 560.212(a) states:

> Any transfer after the effective date that is in violation of any provision of this part or of any regulation, order, directive, ruling, instruction, or license issued pursuant to this part, and that involves any property or interest in property blocked pursuant to § 560.211, is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interests.

[14] In accordance with § 560.212(d), JPM sent a letter to OFAC "reporting its limited knowledge of the circumstances underlying the transfer of the Blocked Proceeds out of Clearstream's operating account on October 15, 2012, and explaining why [JPM] could not have known that that transfer may have been subject to Iranian sanctions regulations."  (Jonckheere Decl. ¶ 14.)  As of December 12, 2014, OFAC has not responded to JPM's letter.

transfer into account 13675—the very account as to which plaintiffs agreed not to sue. (See Clearstream Agr. ¶ 2(ii)(b).)  The Direct Claims which are released are those concerning account 13675.  Moreover, paragraph 2(ii)(c) of the Clearstream Settlement Agreement explicitly grants a release concerning "any transfer or other action taken by or at the direction of any Clearstream Party . . . including any transfer or other action in any account . . . maintained in Clearstream's name or under its control, that in any way relates to any Account or any Iranian Asset." (Id. ¶ 2(ii)(c).)

To the extent plaintiffs seek to simply assert, without any legal declaration, that a Clearstream transfer violated § 560.212 and the Court may assume that is correct, that is wishful thinking.  To establish how the transfer occurred, to what it related and where it occurred as a matter of law, are all aspects of what would need to be reviewed in connection with such a legal/judicial determination.  Plaintiffs released their right to seek such a declaration.  Only after a legal determination has been made that Clearstream in fact violated E.O. 13599 could such a Garnishee Action be ripe.  As it stands, the number of steps to arrive at the point at which Clearstream would have to unwind—or be deemed to unwind—any transfer are many and are outside of the scope of the carve-out provision.

In addition, insofar as plaintiffs' claim would then be one for damages against Clearstream—for violating the E.O. and removing the $104 million from this jurisdiction—plaintiffs specifically settled that claim as well.  In this regard, paragraph 4 of the Clearstream Settlement Agreement states, "provided however

that such a Garnishee Action shall not seek an award of damages against a Clearstream Party." (Clearstream Agr. ¶ 4.)

Following full briefing and oral argument on this motion, plaintiffs raised a new argument with regard to the Clearstream Settlement Agreement: that certain plaintiffs herein have not signed the required Ratification Agreements. This argument is clearly an afterthought and is without merit. Counsel for all plaintiffs signed the Clearstream Settlement Agreement. As of the date of this Opinion & Order, plaintiffs have informed Clearstream that they have received Ratification Agreements from 93% of all plaintiffs. (See Letter from Liviu Vogel dated October 2, 2014, ECF No. 150.) Counsel for plaintiffs and Clearstream have both represented to the Court that while all plaintiffs have not yet executed the Ratification Agreements, none of them has declined to do so. (See Letter from Karen E. Wagner dated September 29, 2014, ECF No. 140; Stipulation and Order at 3 ("[C]ounsel for plaintiffs has represented and warranted to Clearstream that no Plaintiff . . . has indicated that he or she does not intend to execute a Ratification Agreement."), ECF No. 552 in 10-cv-4518.) Several months have passed since the last letter on this subject, and the Court has not received any different information. Receipt of fully executed Ratification Agreements appears to be a matter of logistics. It is clear is that the parties to the Clearstream Settlement Agreement are proceeding on the assumption that the Agreement is binding—though the instant dispute indicates a difference of view as to scope. Plaintiffs have not so much as suggested that a single plaintiff has refused to sign the Ratification Agreement, and

it is undisputed that the percentage of Ratification Agreements which needed to have been received in order for the settlement to become effective has been received.

      B.    <u>UBAE</u>

Plaintiffs settled with UBAE on November 28, 2013.  The UBAE Settlement Agreement does not contain a provision for separate ratification; it was entered into by counsel on behalf of their respective clients.  The Agreement was effective upon execution.

The UBAE Settlement Agreement also contains a series of WHEREAS clauses.  Importantly, it specifically acknowledges that "the Parties agree that certain assets remain in an account at Clearstream in a UBAE customer account, that are beneficially owned by Bank Markazi (the 'Remaining Assets')."  (UBAE Agr. at 2.)  In this Agreement, plaintiffs agreed to release:

> UBAE and all of its past, present, and future affiliates, owners, directors, members, officers, employees, law firms, attorneys, predecessors, successors, beneficiaries, assigns, agents, and representatives from any and all liability, claims, causes of action, suits, judgments, costs, expenses, attorneys' fees, or other incidental or consequential damages of any kind, whether known or unknown, arising out of or related to the Plaintiffs' Direct Claims against UBAE, except for the obligations stated in this Settlement Agreement.

(<u>Id.</u> ¶ 1.)  There is no dispute that Bank Markazi constitutes a "beneficiary" of UBAE.  Plaintiffs have made that assertion repeatedly.  (<u>See, e.g.</u>, Am. Compl. ¶ 12 ("UBAE's sole value was its willingness to serve as a front for Markazi."); <u>id.</u> ¶ 33 ("UBAE opened [the UBAE/Markazi Account] exclusively for Markazi's benefit and at the direction of Markazi and Iran.").)  Thus, the release encompasses Bank Markazi to the same extent that it does UBAE.  Moreover, in the UBAE Settlement

Agreement, plaintiffs further agreed that "any future claim against UBAE for the Remaining Assets shall be limited to turnover only, and Plaintiffs waive all other claims against UBAE for any damages regarding the Remaining Assets whether arising in contract, tort, equity, or otherwise." (UBAE Agr. ¶ 5.)

The instant lawsuit contains numerous claims not purporting to be turnover: Count One seeks a declaratory judgment; Counts Two, Three, and Seven seek rescission of fraudulent conveyances;[15] Count Eight seeks equitable relief. These counts are explicitly barred by the UBAE Settlement Agreement. Only Counts Four through Six are denominated as turnover claims.

As a matter of law, a turnover action is one in which an asset is both within the jurisdiction of the Court[16] and in the possession or custody of the party against whom turnover is sought. There is no assertion that UBAE maintains any bank account within this Court's jurisdiction into which any of the Remaining Assets

---

[15] Plaintiffs have entitled these counts as claims for "rescission" for fraudulent conveyance, presumably to try and fit within paragraph 4 of the Clearstream Settlement Agreement (which allows for a claim that Clearstream take an action to reverse a transfer). Rescission is a remedy, not an independent cause of action. See Zola v. Gordon, 685 F. Supp. 354, 374 (S.D.N.Y. 1988). Read liberally, these counts instead assert claims for fraudulent conveyance. Such an action is not a "Garnishee Action" as defined in paragraph 4. As explained above, the "action" that plaintiffs may seek to require Clearstream to take under paragraph 4 must follow a separate judicial determination of fraudulent conveyance. (See Clearstream Agr. ¶ 4 (permitting an action to direct a Clearstream Party to "perform an act that will have the effect of reversing a transfer between other parties that is found to have been a fraudulent transfer").)

[16] The fact that "turnover actions" are carved out of the UBAE Settlement Agreement cannot eliminate the requirement that sufficient facts support this Court's subject-matter jurisdiction. As discussed in Section II.C infra with regard to the FSIA, the fact that the Remaining Assets are credited to an account located in Luxembourg places those assets outside of the reach of the FSIA. See 28 U.S.C. § 1609; EM Ltd. v. Republic of Argentina, 695 F.3d 201, 208 (2d Cir. 2012), aff'd sub nom., Republic of Argentina v. NML Capital, Ltd., 134 S. Ct. 2250 (2014); Aurelius Capital Partners, LP v. Republic of Argentina, 584 F.3d 120, 130 (2d Cir. 2009). The same fact—a lack of assets in this jurisdiction—is a basis for dismissal of the turnover claims against UBAE.

were deposited or against which they were credited.  The facts in this regard are quite clear: whatever account UBAE maintains for Bank Markazi is in Luxembourg.  Thus, any Remaining Assets which it may possess or as to which it has rights or an interest, are in Luxembourg.  Plaintiffs' assertions to the contrary are without merit and without basis in fact.  Thus, on this basis alone, UBAE is dismissed from this lawsuit.

      C.    <u>Bank Markazi</u>

      Plaintiffs seek a variety of relief against Bank Markazi.  As discussed above, the release that plaintiffs provided to UBAE covers Bank Markazi (as UBAE's beneficiary).  Thus, plaintiffs' claims must be dismissed as to Bank Markazi for this reason alone.

      But perhaps more importantly, this Court lacks subject-matter jurisdiction over Bank Markazi.  It is undisputed that Bank Markazi is the Central Bank of Iran.  Thus, the Court's subject-matter jurisdiction must be found within the FSIA.  One fact alone disposes of claims against Bank Markazi: it does not maintain the assets that plaintiffs seek in the United States.  The evidence in the record is clear that any assets in which Bank Markazi has an interest, and which are at issue in this action, are in Luxembourg.  The FSIA does not allow for attachment of property outside of the United States.  <u>See</u> 28 U.S.C. § 1609 ("[T]he property <u>in the United States</u> of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." (emphasis added)); <u>Republic of Argentina</u>, 695 F.3d at 208 ("We recognize that a district court sitting in

Manhattan does not have the power to attach Argentinian property in foreign countries."); Aurelius, 584 F.3d at 130 ("[T]he property that is subject to attachment and execution must be property in the United States of a foreign state." (internal quotation marks omitted)).  Accordingly, the Court cannot entertain the instant claims against Bank Markazi.

       D.    <u>JPM</u>

Plaintiffs assert claims against JPM in Counts Four through Six for turnover and in Count Eight for equitable relief.  JPM has proffered records which make it clear that it has no assets in which Bank Markazi has an interest.  (<u>See</u> Jonckheere Decl. ¶¶ 5-11, 13 & Exs. A, B, C.)  Indeed, in their complaint, plaintiffs acknowledge this fact in all practical respects by referring to the fact that Clearstream credited the 13675 account with the Remaining Assets.  (<u>See</u> Am. Compl. ¶ 61, 66.) Plaintiffs assert that if one accepts the legal proposition that Clearstream's transfer of such proceeds out of its account with JPM was in violation of E.O. 13599, then any such transfer is void, and therefore JPM still has the assets.  This is fiction.  If the transaction is ever, in some other action, found to be void, that will be at some future point in time.  As matters stand now, there is simply nothing for JPM to turn over.

Plaintiffs spend a significant amount of briefing on whether, as a matter of law, Clearstream's account at JPM must be deemed to have within it the Remaining Assets.  The rather intricate way in which plaintiffs assert this could be so is creative—but mind numbing.  The reality is far simpler: JPM simply lacks that as

to which plaintiffs seek turnover.  JPM must therefore be dismissed—and this

Court need not reach the series of banking law and U.C.C.–related questions which

plaintiffs raise.[17]

III.     CONCLUSION

For the reasons set forth above, defendants' motions are GRANTED.

Plaintiffs' motion for writs of execution is DENIED as moot, and this action is

dismissed.  The Clerk of Court is directed to terminate the motions at ECF Nos. 97,

109, and 116, and to terminate this action.

SO ORDERED.

Dated:     New York, New York
           February 19, 2015

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge

---

[17] Further, it is undisputed that JPM does not have an account for UBAE or Bank Markazi.  The account at issue is in Clearstream's name and the evidence is unrebutted that Clearstream uses the account into which the Remaining Assets were credited in its own name as a general-purpose account.  So far as JPM is concerned, as a matter of law, any assets it may have in an account for Clearstream are Clearstream's and no one else's.  See NML Capital, Ltd. v. Banco Cent. de la Republica Argentina, 652 F.3d 172, 192 (2d Cir. 2011) ("'[U]nder fundamental banking law principles, a positive balance in a bank account reflects a debt from the bank to the depositor' and no one else." (citation omitted)).  Further, for funds to be considered those of a foreign central bank, they must be in the name of the foreign central bank.  Cf. id.  Finally, the law is clear that a judgment creditor may not reach assets in which a judgment debtor has no legal interest.  See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 83 (2d Cir. 2002).  If a judgment debtor cannot assign or transfer an asset, then a creditor of the judgment debtor may not enforce a judgment against such asset.  See Bass v. Bass, 140 A.D.2d 251, 253 (N.Y. App. Div. 1988).