## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON, Personal
Representative of the Estate of James C. Knipple
(Dec.), *et al.*,

                    Plaintiffs,

          v.

ISLAMIC REPUBLIC OF IRAN; BANK
MARKAZI a/k/a CENTRAL BANK OF IRAN;
BANCA UBAE SpA; CLEARSTREAM
BANKING, S.A.; and JP MORGAN CHASE
BANK, N.A.,

                    Defendants.

13-cv-9195 (LAP)

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION

SALON MARROW DYCKMAN NEWMAN
   & BROUDY LLC
Liviu Vogel (lvogel@salonmarrow.com)
10 East 40th Street
New York, New York 10016
(646) 843-1909

FLEISCHMAN BONNER & ROCCO LLP
James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
81 Main Street, Suite 515
White Plains, New York 10601
(914) 278-5100

*Counsel for Plaintiffs*

<u>TABLE OF CONTENTS</u>

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Plaintiffs' Judgments Arise from Iran's State-Sponsored Terrorism.. . . . . . . . . . 4

      B.    The Defendants and Their Scheme to Move
           U.S. Dollars Through New York for Markazi. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Defendants' Defiance of Restraints and U.S. Sanctions
           in the Midst of Plaintiffs' Collection Efforts in *Peterson I*. . . . . . . . . . . . . . . . 6

      D.    The *Peterson I* Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      E.    This Litigation and Congress' Amendment of § 8772.. . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.     THE SUMMARY JUDGMENT STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.    PLAINTIFFS ARE ENTITLED TO A JUDGMENT RECALLING THE BOND
      PROCEEDS TO NEW YORK AND ORDERING THE TURNOVER OF THOSE ASSETS. . . . . . . . 10

      A.    Section 8772's Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    The UCC Indirect System of Securities Holdings. . . . . . . . . . . . . . . . . . . . . . . . 11

      C.    No Material Issue of Fact or Disputed Question of Law
           Exists with Respect to Any Element of Plaintiffs' § 8772 Claim. . . . . . . . . . . . . 14

           1.    Plaintiffs Hold Unsatisfied Terrorism-Related Judgments. . . . . . . . . . . 14

           2.    Clearstream Is a Foreign Securities
               Intermediary Doing Business in the U.S.. . . . . . . . . . . . . . . . . . . . . . . . . 14

               a.    Clearstream Is a Foreign Securities Intermediary. . . . . . . . . . . 14

               b.    Clearstream Is Doing Business in the U.S.. . . . . . . . . . . . . . . . . 14

           3.    The Bond Proceeds Are the
               Financial Assets § 8772(b)(2) Describes. . . . . . . . . . . . . . . . . . . . . . . . . 17

       4.      Clearstream Is Holding the Bond Proceeds. . . . . . . . . . . . . . . . . . . . . . 18

       5.      Markazi Holds "Equitable Title to, or
               a Beneficial Interest in" the Bond Proceeds. . . . . . . . . . . . . . . . . . . . . . 18

       6.      The Bond Proceeds Are Equal in Value to a Financial
               Asset of Markazi That Clearstream or a Related
               Intermediary Holds Abroad. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       7.      The Bond Proceeds Would Be Blocked
               Assets If They Were Located in the U.S. . . . . . . . . . . . . . . . . . . . . . . . . 21

       8.      No Other Entity Holds a Constitutionally
               Protected Interest in the Bond Proceeds. . . . . . . . . . . . . . . . . . . . . . . . . 22

    D.      Once the Bond Proceeds Are Returned to the U.S. Pursuant
         to § 8772, Plaintiffs Are Entitled to Turnover of Those Assets. . . . . . . . . . . . . . 22

    E.      The Contention That § 8772 Violates Markazi's Supposed
         Due Process Rights Presents No Obstacle to Plaintiffs' Claim. . . . . . . . . . . . . . 23

    F.      Even a Successful Personal Jurisdiction Defense by Clearstream
         Would Not Impede Plaintiffs' § 8772 Claim Against Markazi. . . . . . . . . . . . . . . 23

III.   NO MATERIAL QUESTION OF FACT EXISTS CONCERNING THE COURT'S
      POWER TO EXERCISE PERSONAL JURISDICTION OVER CLEARSTREAM AND MARKAZI. . . . 24

    A.      Plaintiffs Need Only Demonstrate that Exercising Personal
         Jurisdiction Over Clearstream Satisfies the Constitutional
         Due Process Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    B.      In Light of Clearstream's Extensive, Relevant Conduct in
         New York, No Due Process Obstacle Exists to Exercising
         Personal Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       1.      The Fundamental Jurisdictional Due Process Requirements. . . . . . . . . . 25

       2.      The Extensive Connections Between Clearstream's
               In-Forum Conduct and This Litigation Easily Satisfy
               the Due Process Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

a.    Because This Case Arises Out of and Relates to Clearstream's New York Contacts, Clearstream Could Easily Foresee Being Haled Into Court Here. . . . . . . . . . 27

b.    The Due Process Reasonableness Factors Further Support the Court's Ability to Exercise Specific Jurisdiction Over Clearstream. . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C.    The FSIA Provides the Court With Personal Jurisdiction Over Markazi. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.    Section 8772 Provides an Exception to Sovereign Immunity and Plaintiffs Properly Served Markazi with Process. . . . . . . . . . . . . . . 35

2.    Even if Markazi Possessed Jurisdictional Due Process Rights, the Extensive Actions That Markazi Orchestrated in New York Would Provide a Basis for Personal Jurisdiction. . . . . . . . 35

IV.    IN THE ALTERNATIVE, THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION REQUIRING DEFENDANTS TO RETURN THE BOND PROCEEDS TO NEW YORK. . . . . . . . . . 36

A.    The Preliminary Injunction Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.    Markazi's Efforts to Evade the Court's Authority to Adjudicate This Action Justifies the Injunctive Relief Plaintiffs Seek. . . . . . . . . . . . . . . . . . 37

1.    Markazi's Collateral Attacks on This Court's Authority to Adjudicate Plaintiffs' Claims Threaten Them with Irreparable Injury. . . 37

2.    The Likelihood of Success and Public Interest Factors Also Support Granting the Injunction Plaintiffs Seek. . . . . . . . . . . . . . . . 39

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

<u>**TABLE OF AUTHORITIES**</u>

***Cases***

*Alfandary v. Nikko Asset Mgmt. Co.*,
337 F. Supp. 3d 343 (S.D.N.Y. 2018) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Amaranth Nat. Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013). . . . . . . . . . . 25

*American Electric Power Co. v. Connecticut*,
131 S. Ct. 2527 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31-32

*Bank Markazi v. Peterson*,
140 S. Ct. 813 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Banque Worms v. BankAmerica Int'l*,
77 N.Y.2d 362 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Bryant v. Finnish Nat'l Airlines*,
15 N.Y.2d 426 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 34

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 33

*Chew v. Dietrich*,
143 F.3d 24 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Chloe v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 31, 35

*Cisneros v. Alpine Ridge Group*,
    508 U.S. 10 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

*COR Clearing, Ltd. Liab. Co. v. Calissio Res. Grp., Inc.*,
    2017 U.S. Dist. LEXIS 183405 (D. Neb. Nov. 6, 2017),
    *aff'd*, 918 F.3d 579 (8th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

*COR Clearing, LLC v. Calissio Res. Grp., Inc.*,
    918 F.3d 579 (8th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

*CutCo Indus. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Dardana Ltd. v. A.O. Yugoskneftegaz*,
    317 F.3d 202 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Del Dietrich v. Bauer*,
    2000 U.S. Dist. LEXIS 11729 (S.D.N.Y. Aug. 9, 2000). . . . . . . . . . . . . . . . . . . . 16

*Drye v. U.S.*,
    528 U.S. 49 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Eades v. Kennedy, PC Law Offices*,
    799 F.3d 161 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 31

*Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*,
    609 F.3d 111 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Feit & Drexler, Inc.*,
    760 F.2d 406 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

*Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*,
    582 F.3d 393 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*FTC v. Moses*,
    913 F.3d 297 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Glob. Relief Found., Inc. v. O'Neill*,
    315 F.3d 748 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gucci Am. v. Bank of China*,
    768 F.3d 122 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gucci Am., Inc. v. Weixing Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Int'l Controls Corp. v. Vesco*,
    490 F.2d 1334 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Inter-Regional Fin. Grp., Inc. v. Hashemi*,
    562 F.2d 152 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Itek Corp. v. First Nat'l Bank*,
    730 F.2d 19 (1st Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33

*Kenemore v. Roy*,
    690 F.3d 639 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kopec v. City of Elmhurst*,
    193 F.3d 894 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Koehler v. Bank of Bermuda Ltd.*,
    12 N.Y.3d 533 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Laufer v. Ostrow*,
    55 N.Y.2d 305 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Licci v. Lebanese Canadian Bank*,
    732 F.3d 161 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32, 33

*Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 30, 32

*McGraw-Hill Global Educ. Holdings, LLC v. Mathrani*,
    295 F. Supp. 3d 404 (S.D.N.Y. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*New York v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39

*Nursing Home & Hosp. Union No. 434 v. Sky Vue Terrace, Inc.*,
    759 F.2d 1094 (3d Cir. 1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

*Ochoa v. J.B. Martin & Sons Farms*,
    287 F.3d 1182 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 34

*Pearson Educ., Inc. v. Labos*,
    2019 U.S. Dist. LEXIS 72342 (S.D.N.Y. Apr. 23, 2019). . . . . . . . . . . . . . . . . . . .  37

*Peterson v. Islamic Republic of Iran*,
    963 F.3d 192, 2020 U.S. App. Lexis 19747 (2d Cir. 2020).. . . . . . . . . . . . . . . . . . *passim*

*Peterson v. Islamic Republic of Iran*,
    876 F.3d 63 (2d Cir. 2017)), *vacated and remanded sub nom.*,
    *Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020), *aff'd in part,*
    *vacated in part and remanded, Peterson v. Islamic Republic of Iran*,
    963 F.3d 192 (2d Cir. 2020).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Peterson v. Islamic Republic of Iran*,
    758 F.3d 185 (2d Cir. 2014), *aff'd sub nom.*,
    *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). . . . . . . . . . . . . . . . . . . . . . . *passim*

*Peterson v. Islamic Republic of Iran*,
    2013 U.S. Dist. LEXIS 40470 (S.D.N.Y. Mar. 13, 2013),
    *reconsideration denied*, 2013 U.S. Dist. LEXIS 73852 (S.D.N.Y.
    May 20, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom.*,
    *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). . . . . . . . . . . . . . . . . . . . . . 5, 29

*Peterson v. Islamic Republic of Iran*,
    2013 U.S. Dist. LEXIS 73852 (S.D.N.Y. May 20, 2013),
    *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom.*,
    *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). . . . . . . . . . . . . . . . . . . . . . 5, 22

*Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.*,
    621 F.2d 683 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Public Administrator of New York County v. Royal Bank of Canada*,
    19 N.Y.2d 127 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rockwell Int'l Sys., Inc. v. Citibank, N.A.*,
    719 F.2d 583 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*SEC v. Credit Bancorp, Ltd.*,
    386 F.3d 438 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Seitz v. Republic First Bank*,
    512 B.R. 194 (E.D. Pa. Bankr. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*,
    916 F.3d 143 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

*United States v. Craft*,
    535 U.S. 274 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States ex rel. Kraus v. Wells Fargo & Co.*,
    943 F.3d 588 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 37

*Wiwa v. Royal Dutch Petroleum Co.*,
    226 F.3d 88 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

### Statutes, Rules and Regulations

22 U.S.C. § 8772. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 564. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 566(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1330(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

28 U.S.C. § 1330(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

28 U.S.C. § 1603(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1605(a)(7) (repealed 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14, 34, 40

28 U.S.C. § 1605A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14, 34, 40

28 U.S.C. § 1608. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

50 U.S.C. § 1702(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

National Defense Authorization Act for Fiscal Year 2020,
    Pub. L. No. 116-120 (S.1790), § 1226
    (codified as amendment to 22 U.S.C. § 8772). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Terrorism Risk Insurance Act of 2001,
    Pub. L. No. 107-297 (H.R. 3210), § 201
    (codified as 28 U.S.C. § 1610 (note)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40

N.Y. U.C.C. § 8-102. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

N.Y. U.C.C. § 8-102(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

N.Y. U.C.C. § 8-102(a)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18, 19

N.Y. U.C.C. § 8-102(a)(14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.Y. U.C.C. § 8-102(a)(17). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

N.Y. U.C.C. § 8-102, Official Comment ¶ 17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

N.Y. U.C.C. § 8-503(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17, 22

N.Y. U.C.C. § 8-503(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

N.Y. U.C.C. § 8-503(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

N.Y. U.C.C. § 8-505(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.Y. U.C.C. § 8-505(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.Y. U.C.C. § 8-505, cmt. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

N.Y. U.C.C. § 8-506. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.Y. U.C.C. § 8-507. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

N.Y. U.C.C. § 8-508. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Civ. P. 4(k)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fed R. Civ. P. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 69. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

N.Y. CPLR § 5225. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

N.Y. CPLR § 5227. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

N.Y. CPLR § 5230. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

N.Y. CPLR § 5232(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

31 C.F.R. § 501.603. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

31 C.F.R. § 535.433. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

31 C.F.R. § 560.204 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

31 C.F.R. § 560.206 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

31 C.F.R. § 560.410 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

### *Additional Authorities*

Amicus Brief of Institute of International Bankers et al. in
*Strauss v. Credit Lyonnais*, No. 19-865 (L) (2d Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . 28

Executive Order 13599—Blocking Property of the
Government of Iran and Iranian Financial Institutions,
77 Fed. Reg. 6659 (Feb. 5, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

7A W. Hawkland, *Uniform Commercial Code Series* § 8-101:01 (2002). . . . . . . . . . . . . . . . . . 11

Iranian Transaction Regulations, 77 Fed. Reg. 64,664 (Oct. 22, 2012). . . . . . . . . . . . . . . . . . . 29

Plaintiffs Deborah Peterson et al. respectfully submit this memorandum of law in support of their motions for summary judgment, or, in the alternative, for a preliminary injunction requiring defendants Bank Markazi and Clearstream Banking, S.A. to return to New York the roughly $1.68 billion in Markazi-owned bond proceeds (the "Bond Proceeds") that Plaintiffs seek to collect to prevent the dissipation of those assets during this action's pendency.

## PRELIMINARY STATEMENT

By means of this motion, Plaintiffs seek a modicum of justice for Iran's slaughter of 241 U.S. military peacekeepers in Beirut, Lebanon in October 1983. Plaintiffs commenced litigation against Iran in 2003 and began securing their judgments in 2007. Even before 2007, Iran and its financial institution enablers—including defendants Clearstream and Banca UBAE, S.p.A.—were doing everything in their power to insulate Iran from the financial consequences of its terrorism. By enacting amendments to the Foreign Sovereign Immunities Act ("FSIA") and adopting and amending 22 U.S.C. § 8772, Congress has attempted to provide victims of terrorism with legal claims and a practical means for overcoming Iran's judgment evasion.

In a previous action involving the same Defendants and many of the same plaintiffs, the Supreme Court ultimately affirmed this Court's ruling granting summary judgment to the plaintiffs pursuant to § 8772. *See Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). This case involves essentially the same facts as *Bank Markazi*, except that the Bond Proceeds are currently located in Luxembourg, rather than New York. Congress' recent amendment of § 8772 renders that sole distinction irrelevant. The amendment empowers the Court to require Defendants to return the Bond Proceeds to the U.S. and then to surrender them to Plaintiffs.

Since Congress amended § 8772, the parties have submitted briefs regarding the statutory changes to the Supreme Court and the Second Circuit. That briefing reveals that, as in *Bank*

*Markazi*, no fair question exists that Plaintiffs satisfy the elements that amended § 8772 requires for Plaintiffs to execute against the Bond Proceeds.  Thus, Markazi and Clearstream apparently will challenge turnover based principally upon contentions that § 8772 violates Markazi's due process rights and that the Court cannot exercise personal jurisdiction over Clearstream.

Those arguments are meritless.  Markazi has asserted that the § 8772 amendments violate the Fifth Amendment's Due Process Clause because Congress purportedly decided the outcome of this case, rather than supplying a new legislative standard.  In *Bank Markazi,* the Supreme Court rejected an indistinguishable argument when Markazi claimed that making § 8772 retroactive violated separation-of-powers principles.  Uniform precedent dictates that Congress can enact retroactive legislation that impacts the outcome of pending matters.  Those decisions also consistently hold that no due process violation exists where—as is unquestionably true here—retroactive legislation bears a rational relationship to a legitimate legislative purpose.

To defeat Clearstream's due process challenge to the Court's jurisdiction, Plaintiffs need only demonstrate (a) "minimum contacts" between Clearstream's relevant conduct and the U.S. and (b) that exercising jurisdiction is reasonable.  The minimum contacts requirement can be satisfied by even a single action demonstrating that Clearstream availed itself of the privilege of doing business in the U.S. and that this litigation "arises out of or relates to" that conduct.

Clearstream's relevant U.S. conduct was anything but minimal.  Rather, Clearstream's New York operations constitute an essential element of its massive global securities business. Those New York operations involve passing *billions* of dollars through the New York banking system *each business day*.  Moreover, Clearstream's New York-based conduct—including passing the $1.68 billion in Bond Proceeds through its U.S. dollar ("USD") correspondent banking account at JPMorgan in this State (the "NY Account")—satisfies § 8772's "doing

business in the United States" requirement.  *See* 22 U.S.C. § 8772(a)(1)(A).  Clearstream cannot cite any case that remotely supports rejecting jurisdiction on due process grounds where a defendant's in-forum conduct provides a necessary element of a plaintiff's claim.

The due process reasonableness factors bolster the conclusion that Clearstream has no colorable constitutional defense.  Clearstream processed massive transfers of U.S. dollars in New York, post-9/11, for a country that has long targeted Americans for terrorist attacks and which has featured on the State Department's very short list of state sponsors of terrorism since 1984.  Clearstream provided those services in violation of sanctions the U.S. government imposed upon Iran and Markazi to counteract Iran's money laundering, nuclear proliferation, and sponsorship of terrorism.  In the Supreme Court's words, Clearstream can hardly claim surprise at being "haled into court" in New York in these circumstances.

If the Court finds that a factual issue precludes summary judgment, Plaintiffs still satisfy the elements required to obtain a preliminary injunction requiring Markazi and Clearstream to return the Bond Proceeds to the U.S. to prevent their dissipation during the course of this action.  Iran, which has defaulted, and Markazi, Iran's equivalent under § 8772, have evaded the judgments of Plaintiffs and other victims of Iranian terrorism for decades.  Moreover, years after Plaintiffs commenced this turnover action, Markazi initiated judicial proceedings in Luxembourg that seek to bar compliance with any order from this Court requiring Clearstream to return the Bond Proceeds to New York.  Given the high likelihood that Plaintiffs will prevail in this action and the irreparable harm that blocking Plaintiffs from collecting the Bond Proceeds will impose, the Court should remedy Markazi's collateral attack on this Court's authority to adjudicate this action by issuing the injunction Plaintiffs request.

3

THE RELEVANT FACTS

**A.  Plaintiffs' Judgments Arise from Iran's State-Sponsored Terrorism**

Plaintiffs are the representatives of 241 American servicemen killed in Iran's 1983 bombing of the Marine Barracks in Beirut, Lebanon, survivors of that attack, and family of the killed and injured servicemen.  *See* Statement of Material Facts ("SMF") at ¶ 14.  In five separate actions consolidating other cases, Plaintiffs secured $3.845 billion in compensatory damages judgments against Iran under two FSIA provisions that authorize claims against state sponsors of terrorism, 28 U.S.C. §§ 1605(a)(7) (repealed 2008) and 1605A.  SMF at ¶ 15.  The uncollected balance of Plaintiffs' judgments, including interest, exceeds $4.2 billion.  *Id.* at ¶ 16.

**B.  The Defendants and Their Scheme to Move
    U.S. Dollars Through New York for Markazi**

Markazi is Iran's central bank.  *Id.* at ¶ 23.  Markazi therefore qualifies as an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b).  *See Weininger v. Castro,* 462 F. Supp. 2d 457, 498 (S.D.N.Y. 2006); 31 C.F.R. § 535.433.

Markazi's pervasive efforts to facilitate Iran's nuclear program, support for terrorism, and sanctions violations have caused the U.S. government to bar U.S. persons from dealing with Markazi and to subject Markazi to restrictions applicable to jurisdictions of "primary money laundering concern."  SMF at ¶ 24.  No other central bank has suffered that sanction.  *Id.* at ¶ 25.

Clearstream, a Luxembourg entity, is one of the world's largest securities depositories and settlement firms.  *Id.* at ¶¶ 27-29.  At least until 2012, Clearstream passed billions of USD through the U.S. financial system for Iran and Markazi.  *Id.* at ¶¶ 55-56, 70-76, 78, 81-83.  Every business day, Clearstream processes billions of dollars in payments in New York for clients.  *Id.* at ¶¶ 36-37.  Clearstream maintains office space and staff in Manhattan.  *Id.* at ¶¶ 40-42, 48-51.

4

In 2008, UBAE, a small bank then controlled by Libya's Gaddafi regime, began processing bond payments, including the Bond Proceeds, for Markazi.  *Id.* at ¶ 60.  Markazi enlisted UBAE after the Department of Treasury's ("Treasury") Office of Foreign Assets Control ("OFAC") requested that Clearstream stop providing services for Markazi in the U.S.  *Id.* at ¶¶ 57, 59.  UBAE opened a Clearstream account (the "UBAE/Markazi Account") to house assets that Markazi previously held in its own Clearstream account, including the bonds that generated: (a) the roughly $1.75 billion in proceeds (the "*Peterson I* Assets") that were the subject of certain Plaintiffs' successful collection efforts in *Peterson v. Islamic Republic of Iran*, 10 Civ. 4518 (KBF); and (b) the $1.68 billion in Bond Proceeds at issue here.  SMF at ¶¶ 62-63, 65, 68.[1]

Markazi has *repeatedly* described itself in briefs and affidavits as the sole owner of the bonds held in the UBAE/Markazi Account and their proceeds.  *Id.* at ¶¶ 85-86; *Peterson*, 2013 U.S. Dist. LEXIS 40470, at *101-02 n.10.  In January 2014, Treasury fined Clearstream $152 million for hiding Markazi's ownership of the *Peterson I* Assets.  SMF at ¶ 83.

Clearstream and UBAE served as Markazi's "securities intermediaries" for the *Peterson I* Assets and the Bond Proceeds.  *Id.* at ¶¶ 75-76.  As a result, Clearstream and UBAE functioned as Markazi's agent and had to follow its directions.  *Peterson,* 2013 U.S. Dist. LEXIS 40470, at *122 ("Clearstream's only role with regard to the [*Peterson I*] Assets is as the agent of Bank Markazi."); N.Y. U.C.C. ("UCC") §§ 8-102(a)(14), 8-503(a), 8-506, 8-508.

Foreign securities intermediaries like Clearstream and UBAE frequently use USD "correspondent accounts" at other financial institutions to process USD payments.  SMF at

---

[1] *Peterson v. Islamic Republic of Iran*, 2013 U.S. Dist. LEXIS 40470 (S.D.N.Y. Mar. 13, 2013), *reconsideration denied*, 2013 U.S. Dist. LEXIS 73852 (S.D.N.Y. May 20, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014) ("*Peterson I*"), *aff'd*, *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).

5

¶¶ 34-36.  Clearstream used the NY Account at JPMorgan as a USD correspondent account.  *Id.*

at ¶¶ 34-35.  Between July 8, 2008 and October 15, 2012, Clearstream collected 62 payments of

Bond Proceeds totaling $1.68 billion for Markazi in the NY Account.  *Id.* at ¶ 78.

### C.  Defendants' Defiance of Restraints and U.S. Sanctions in the Midst of Plaintiffs' Collection Efforts in *Peterson I*

In 2008, certain Plaintiffs learned from subpoena responses served by OFAC that

Clearstream possessed assets that Markazi owned.  *Id.* at ¶ 17.  Those Plaintiffs immediately

served Clearstream with Restraining Notices (the "Restraints") pursuant to CPLR § 5222.  *Id.* at

¶ 18.  The Restraints barred Clearstream from "mak[ing] or suffer[ing] any sale, assignment or

transfer of, or any interference with" any property in which Markazi held any "interest."  CPLR

§ 5222(b); *see* SMF at ¶ 19.  The Restraints remained in effect throughout the time Clearstream

collected the Bond Proceeds.  SMF at ¶ 20.

The U.S. government has also strictly sanctioned Iran and Markazi throughout this

action.  The Iranian Transaction Regulations (the "ITRs") barred Clearstream, UBAE and other

financial institutions from providing *any* "services" to Iran in the U.S.  31 C.F.R. §§ 560.204,

206, 410 (2008).  Clearstream is the subject of an ongoing criminal investigation regarding the

financial services it provided for Markazi despite the ITR restrictions.  SMF at ¶ 52.

Normally, after Clearstream received the Bond Proceeds in New York, it would have

credited the USD to the UBAE/Markazi Account.  *Id.* at ¶ 71.  By 2008, however, Clearstream

recognized that the Restraints and the ITRs prohibited Clearstream from providing that financial

service to Markazi.  *Id.* at ¶ 73; 31 C.F.R. §§ 560.204, 206, 410 (2008).  Nevertheless,

Clearstream continued to collect interest and principal payments in the U.S. for Markazi's

benefit in violation of the ITRs.  *Id.* at ¶ 78.  Clearstream also violated the ITRs and the

6

Restraints by crediting those assets to a "sundry" blocked account (the "Blocked Account") in Luxembourg that Clearstream created solely to reflect those book entries.  *Id*. at ¶ 74.

On February 6, 2012, President Obama issued Executive Order 13599 ("EO-13599"), which "blocked" "[a]ll property and interests in property of … [Markazi] that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person …"  EO-13599, §§ 1(a) and (b); SMF at ¶ 80. As a result, those assets could not "be transferred, paid, exported, withdrawn, or otherwise dealt in" by any financial institution.  EO-13599, §§ 1(a) and (b); SMF at ¶ 80.

Even after the President signed EO-13599, Clearstream collected $104.25 million of the Bond Proceeds and credited them to the Blocked Account.  SMF at ¶ 81.  Once EO-13599 blocked assets in which Markazi held *any* interest, 31 C.F.R. § 501.603 required Clearstream to report to OFAC that Clearstream held such assets.  Clearstream never filed that report.

**D.  The *Peterson I* Action**

In 2008, certain Plaintiffs commenced efforts to collect the *Peterson I* Assets.  After eight years of staunch resistance by Defendants, those Plaintiffs and other judgment creditors of Iran secured turnover of those assets, which Clearstream had held in a Citibank account in New York. *See id.* at ¶ 68-69.  The plaintiffs prevailed based upon 22 U.S.C. § 8772, a statute that Congress enacted in 2012 to address the *Peterson I* Assets.  *See Bank Markazi*, 136 S. Ct. at 1329.

**E.  This Litigation and Congress' Amendment of § 8772**

On February 27, 2012, certain Plaintiffs obtained a writ of execution with respect to the Bond Proceeds, which the U.S. Marshal levied upon at Clearstream's New York office on March 2, 2012.  SMF at ¶ 21.  On October 2, 2013, this Court granted Plaintiffs' motion to extend the writ and levy against Clearstream *nunc pro tunc* from May 30, 2012.  *Id.* at ¶ 22.  Plaintiffs

commenced this turnover proceeding on December 30, 2013, and filed the operative Amended Complaint on April 25, 2014. *Id.* at ¶¶ 1-2.[2]

This Court (Forrest, J.) dismissed the Amended Complaint.  The Second Circuit vacated multiple elements of that decision.[3]  *Peterson II,* 876 F.3d at 79-84, 89-96.  With respect to the releases certain Plaintiffs had signed to end the participation of Clearstream and UBAE in *Peterson I*, the Second Circuit held that: (a) no Plaintiffs had released any claims against Markazi; (b) a question of fact existed concerning whether any Plaintiffs had released any claims against UBAE that they are pursuing here; and (c) the Plaintiffs who had not participated in *Peterson I* had not released any claims against Clearstream.  *Id.* at 79-84.

The Second Circuit also reversed the district court's dismissal of Plaintiffs' turnover claims on subject matter jurisdiction grounds.  The court found that, although the Bond Proceeds are located in Luxembourg, where Clearstream holds a "right to payment" belonging to Markazi, the FSIA did not immunize those assets from collection.  *Id.* at 86, 89-96.  The court held that *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009) could permit the district court to require Clearstream to return the Bond Proceeds to New York if the district court found on remand that it could exercise personal jurisdiction over Clearstream.  *Peterson II,* 876 F.3d at 89-94.

---

[2]  Judgment creditors enforce money judgments in federal court by obtaining writs of execution and following substantive state collection law.  Fed. R. Civ. P. 69; CPLR § 5230.  In New York, to collect judgment debtors' interests in personal property held by third-party garnishees, judgment creditors deliver executions to the U.S. Marshal, who levies upon property by serving the garnishees.  CPLR § 5232(a); *see* 28 U.S.C. §§ 564, 566(c).  When garnishees contest executions and decline to deliver property to the Marshal, judgment creditors can seek turnover orders pursuant to, among other provisions, CPLR §§ 5225 and 5227.

[3] *Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017) ("*Peterson II*"), *vacated and remanded*, 140 S. Ct. 813 (2020), *aff'd in part, vacated in part and remanded*, 963 F.3d 192 (2d Cir. 2020) ("*Peterson III*").

After the Second Circuit denied rehearing motions, Defendants filed petitions for *certiorari.* SMF at ¶ 4.[4] The Supreme Court requested the views of the Solicitor General regarding the petitions. *Id.* at ¶ 10. When the government finally responded 14 months later, the Solicitor General recommended that the Court deny the petitions based upon anticipated amendments to § 8772 that would directly impact this litigation. *Id.* at ¶ 11. Just a few days later, Congress passed those amendments as part of the National Defense Authorization Act of 2020 (the "2020 NDAA"), and the President signed them into law. *Id.* at ¶ 12.

The Solicitor General then changed the government's position and recommended that the Court grant *certiorari,* vacate *Peterson II,* and remand for further proceedings. *Id.* at ¶ 13. The Supreme Court adopted that recommendation by issuing a "GVR Order" and remanded the case to the Second Circuit "for further consideration in light of the [2020 NDAA]." *Id.*[5]

After the Second Circuit considered briefing and argument regarding the GVR Order's impact, the court adopted a hybrid approach between reinstating *Peterson II* and following Defendants' recommendation of holding the *Koehler*-related issues in abeyance pending the outcome of the § 8772 claim. *Peterson III*, 2020 U.S. App. LEXIS 19747, at *7-8. Specifically, *Peterson III* reinstated *Peterson II's* holdings concerning: (a) the releases; (b) the location and

---

[4] Based upon a declaration of Clearstream's Luxembourg counsel stating that a Luxembourg court order freezing the Bond Proceeds (the "Luxembourg Freeze Order") that other victims of Iranian terrorism had secured would remain intact for "at least three years," the Defendants secured a stay of the Second Circuit mandate during the pendency of their *certiorari* petitions. SMF at ¶¶ 5-6. Despite that assurance, Markazi succeeded in undoing the Luxembourg Freeze Order just over two years later, on April 1, 2020. *Id.* at ¶ 7. Markazi is now pursuing judicial efforts in Luxembourg to prevent this Court from awarding any relief to Plaintiffs. *Id.* at ¶ 8.

[5] GVR orders are common Supreme Court procedural mechanisms that permit lower courts to grant further consideration to issues and do not suggest that the lower courts erred in their previous rulings. *See, e.g., Kenemore v. Roy*, 690 F.3d 639, 642 (5th Cir. 2012).

nature of the Bond Proceeds that Clearstream possesses; and (c) subject matter jurisdiction. *Peterson III,* at *6-8.  The court remanded to permit this Court to consider the § 8772 claim in the first instance while also authorizing this Court to adjudicate the *Koehler* issues, *if* doing so proves necessary to the Court's resolution of this matter.  *Id.* at *7-8.

ARGUMENT

## I.    THE SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party satisfies the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "'may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"  *FTC v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (citation omitted).  Only a "genuine" dispute over a "material" fact, that is, one "that might affect the outcome of the suit under the governing law," can "properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Moreover, while the court must credit nonmoving parties' evidence and draw reasonable inferences in their favor, "'[c]onclusory allegations or denials' … 'are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  *Moses,* 913 F.3d at 305 (citation omitted).

## II.   PLAINTIFFS ARE ENTITLED TO A JUDGMENT RECALLING THE BOND PROCEEDS TO NEW YORK AND ORDERING THE TURNOVER OF THOSE ASSETS

### A.  Section 8772's Requirements

To recall the Bond Proceeds to New York pursuant to § 8772 and then execute against those assets, Plaintiffs must prove that: (1) they hold terrorism-related judgments against Iran

10

(§ 8772(a)(1)(C)); (2) Clearstream is a "foreign securities intermediary doing business in the United States" (§ 8772(a)(1)(A)); (3) the Bond Proceeds are the "financial assets" at issue in this litigation (§ 8772(b)(2)); (4) Clearstream is holding those financial assets (§ 8772(a)(1)(A)); (5) Markazi holds "equitable title to, or a beneficial interest in" the Bond Proceeds (§ 8772(a)(2)); (6) the Bond Proceeds are "equal in value to a financial asset of" Markazi that Clearstream or UBAE is holding abroad (§ 8772(a)(1)(C)); (7) the Bond Proceeds would be blocked assets if Clearstream were holding them in the U.S. (§ 8772(a)(1)(B)); and (8) no other entity holds a constitutionally protected interest in the Bond Proceeds (§ 8772(a)(2)).

The statute also preempts *any* other law that would otherwise impede Plaintiffs' claim. 22 U.S.C. §8772(a)(1) ("Subject to paragraph (2), notwithstanding any other provision of law, including any provision of law relating to sovereign immunity, and preempting any inconsistent provision of State law …"); *see also*, *e.g.*, *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) (the Courts of Appeals have regularly interpreted indistinguishable "notwithstanding" provisions to "'supersede all other laws'") (citation omitted).  In addition, the statute applies "without regard to concerns relating to international comity."  22 U.S.C. § 8772(a)(1)(C).

### B.  The UCC Indirect System of Securities Holdings

Article 8 of the UCC outlines the rights and responsibilities of "securities intermediaries" that hold "financial assets" on behalf of "entitlement holders" that own those assets.  *See* UCC § 8-102; *see also, e.g., SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438, 447 (2d Cir. 2004); 7A W. Hawkland, *Uniform Commercial Code Series* § 8-101:01 (2002).  The UCC implements "an indirect holding system in which participants track transactions as 'book entries,' rather than physically trading certificates, bonds, and other securities instruments." *COR Clearing, LLC v. Calissio Res. Grp., Inc.*, 918 F.3d 579, 582 (8th Cir. 2019).

11

UCC Article 8 defines several terms relevant in interpreting § 8772:

- A "**financial asset**" includes (i) a security, (ii) any obligation of a person or any interest in a person or in property that is, or is of a type, dealt in or traded on financial markets, or "which is recognized in any area in which it is issued or dealt in as a medium for investment," or (iii) any property that a securities intermediary holds "for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset."  UCC § 8-102(a)(9).  "As context requires, the term means either the interest itself or the means by which a person's claim to it is evidenced, including . . . a security entitlement."  *Id.*  Under 22 U.S.C. § 8772(d)(2), a financial asset also includes cash.

- An "**entitlement holder**" is "a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary."  UCC § 8-102(a)(7).

- A "**security entitlement**" is "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5" of Article 8.  UCC § 8-102(a)(17).  *See also* UCC § 8-102, Official Comment ¶ 17 ("'Security entitlement means the rights and property interest of a person who holds securities or other financial assets through a securities intermediary.  A security entitlement is both a package of personal rights against the securities intermediary and an interest in the property held by the securities intermediary.").

- A "**securities intermediary**" includes "(i) a clearing corporation; or (ii) a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  UCC § 8-102(a)(14).

Clearstream acted as a securities intermediary in connection with the financial assets (the Bond Proceeds) that it collected for Markazi.  SMF at ¶ 76; *Seitz v. Republic First Bank*, 512 B.R. 194, 204 n.17 (E.D. Pa. Bankr. 2014) (stock sale proceeds held by a securities intermediary are financial assets); UCC § 8-102(a)(14).  As a securities intermediary, Clearstream had to follow Markazi's instructions regarding its bonds and the Bond Proceeds.  UCC § 8-506.

While Clearstream still holds the Bond Proceeds, the UCC vests Markazi with all significant ownership rights in those financial assets.  Under UCC § 8-503(b), Markazi maintains "a pro rata property interest in all interests" in the Bond Proceeds held for Markazi's benefit at

every level of securities intermediary.  Moreover, subject to the Restraints, the ITRs and EO-13599, only Markazi could sell any interest in its bonds or the Bond Proceeds.  UCC § 8-507.  Under § 8772(a)(2)(A), any custodial interest that Clearstream or UBAE has in the Bond Proceeds poses no obstacle to Plaintiffs' ability to execute against those assets.

UCC § 8-505(a) required Clearstream to secure for Markazi any "payment or distribution made by the issuer of a financial asset."  In addition, UCC § 8-505(b) and the account agreement for the UBAE/Markazi Account required Clearstream and UBAE to transfer those payments to their immediate entitlement holders.[6]

UCC § 8-503(c) dictates that Markazi can exercise its ownership rights only against its immediate intermediary, UBAE.  Intermediaries, however, hold assets solely as custodians for ultimate owners like Markazi.  UCC § 8-503(a) ("all interests in [a] financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holders [and] are not property of the securities intermediary").  Thus, Clearstream's obligation to pay only its immediate entitlement holder, UBAE, did not transform UBAE into the Bond Proceeds' owner.  *See, e.g.*, *COR Clearing*, 918 F.3d at 586 (broker "simply acted as pass-through agents of the buyers in receiving and distributing" dividend credits); SMF at ¶ 77 (Federal Reserve publication stating that beneficial ownership does not vary although the upper-tier intermediary (Clearstream) may record the lower-tier intermediary (UBAE) as owner).

---

[6] *See COR Clearing, Ltd. Liab. Co. v. Calissio Res. Grp., Inc.*, 2017 U.S. Dist. LEXIS 183405, at *23 (D. Neb. Nov. 6, 2017) ("the securities intermediary must treat the entitlement holder as 'entitled to the financial asset,' and ensure that the entitlement holder 'receives all of the economic and corporate rights that comprise the financial asset'") (citations omitted), *aff'd*, 918 F.3d 579 (8th Cir. 2019); UCC § 8-505, cmt. 1 (intermediaries must "pass[] through" any economic benefit of owning securities to entitlement holders); SMF at ¶ 30.

13

### C.  No Material Issue of Fact or Disputed Question of Law Exists with Respect to Any Element of Plaintiffs' § 8772 Claim

#### 1.  Plaintiffs Hold Unsatisfied Terrorism-Related Judgments

As § 8772(a)(1)(C) requires, all Plaintiffs hold unsatisfied compensatory damages judgments against Iran that they secured under the FSIA's terrorism exceptions to sovereign immunity (28 U.S.C. §§ 1605(a)(7) (repealed) and 1605A).  *See* SMF at ¶ 15.  The unsatisfied amount of those judgments exceeds $4.2 billion.  *Id.* at ¶ 16.

#### 2.  Clearstream Is a Foreign Securities Intermediary Doing Business in the U.S.

##### a.  Clearstream Is a Foreign Securities Intermediary

Clearstream is a *société anonyme* (an entity with certain characteristics of a corporation) formed under Luxembourg law.  *Id.* at ¶ 27.  Moreover, Markazi has repeatedly admitted that Clearstream served as Markazi's securities intermediary with respect to the Bond Proceeds.  *Id.* at ¶ 90.

The Clearstream customer agreements with Markazi and UBAE also outline Clearstream's securities intermediary role.  *Id.* at ¶ 30.  In addition, Clearstream's website states that it holds securities accounts for its customers as part of its normal operations.  *Id.* at ¶ 92.[7]

##### b.  Clearstream Is Doing Business in the U.S.

No material question of fact exists regarding whether Clearstream is doing business in the U.S., as § 8772(a)(1)(A) requires.  Since 1996, Clearstream and its predecessor have been

---

[7] UBAE opened the UBAE/Markazi Account by completing a securities account application that incorporated Clearstream's General Terms and Conditions.  *Id.* at ¶¶ 62-63.  Before Markazi, Clearstream, and UBAE transferred the bonds that produced the Bond Proceeds into the UBAE/Markazi Account in February 2008, UBAE confirmed to Markazi in writing that Clearstream's General Terms and Conditions governed the UBAE/Markazi Account and Markazi's new account at UBAE.  *Id.* at ¶ 64.

licensed by New York banking regulators to do business as a foreign representative office.  SMF at ¶ 44.  The U.S. Federal Reserve Board of Governors also has authorized Clearstream to perform functions related to its securities intermediary business in the U.S.  *Id.* at ¶ 46.

Clearstream currently maintains its New York office in Manhattan, at 1155 Avenue of the Americas, 19th Floor.  *Id.* at ¶ 41.  During Plaintiffs' efforts to enforce their judgments, Clearstream has leased offices in three other prestigious Manhattan buildings.  *Id.* at ¶ 42.  Clearstream has acknowledged to the U.S. government that its New York representative office is a "resident of the United States" and has authorized that office "to accept service of legal process" for Clearstream "from the Secretary of the Treasury or the Attorney General of the United States pursuant to Section 5318(k) of title 31, United States Code."  *Id.* at ¶ 43.

Clearstream processes 170 million securities transactions annually, which requires it to pass hundreds of billions of USD through its two USD correspondent accounts in New York.  *Id.* at ¶¶ 32, 36-37.  Each business day, Clearstream passes $7-9 billion through just the NY Account that Clearstream has maintained at JPMorgan for over 25 years.  *Id.* at ¶¶ 35, 37.  Clearstream holds client assets worth €14 trillion in its custody, including billions in USD assets that are sub-custodied in Clearstream's New York account at Citibank.  *Id.* at ¶¶ 33, 38, 68-69.  Clearstream also maintains separate payroll and operating accounts at Citibank in New York.  *Id.* at ¶ 39.

In 2009, Clearstream employed 13 English-speaking individuals in New York to service Clearstream's clients throughout North America.  *Id.* at ¶¶ 47-49.  Those New York employees include experienced financial services industry professionals with university degrees, all of whom maintained separate 212 area code telephone and fax numbers.  *Id.* at ¶¶ 48-49.  All of Clearstream's New York sales staff are explicitly charged with responsibility for increasing Clearstream's market share in the region.  *Id.* at ¶ 50.

15

This substantial economic activity unquestionably constitutes "doing business in the United States." *See* 22 U.S.C. § 8772(a)(1)(A).  Indeed, courts have consistently found that banks that operate agencies, branches, or departments in New York are doing business here.  *See, e.g., Public Administrator of New York County v. Royal Bank of Canada*, 19 N.Y.2d 127, 131-32 (1967) (foreign bank was doing business in New York via its New York branch); *Del Dietrich v. Bauer,* 2000 U.S. Dist. LEXIS 11729, at *11-12 (S.D.N.Y. Aug. 9, 2000) (same).

Precedent concerning the "doing business" test New York courts formerly employed to assess general jurisdiction under CPLR § 301 bolster the conclusion that Clearstream's conduct satisfies § 8772(a)(1)(A).  For example, in *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000), the Second Circuit held that companies satisfy that test if they do "business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" (Citation omitted).[8]  *Wiwa* further held that both the Second Circuit and "the New York courts have focused on a traditional set of indicia" to determine whether foreign corporations are "doing business" in New York, including: "[i] whether the company has an office in the state, [ii] whether it has any bank accounts or other property in the state, [iii] whether it has a phone listing in the state, [iv] whether it does public relations work there, and [v] whether it has individuals permanently located in the state to promote its interests."  *Id.* at 98.

Clearstream satisfies all five of those criteria.  *Id.*; SMF at ¶¶ 34-43, 48-51.[9]

---

[8] *Wiwa* and other New York general jurisdiction cases have been abrogated by Supreme Court decisions such as *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), which have adopted an "at home" test for general jurisdiction, not New York's former "doing business" standard.  *Daimler* and similar cases do not impact, however, what constitutes "doing business" under § 8772.

[9]  Other courts found that companies were doing business in New York in circumstances involving far less in-state activity than Clearstream undertook.  *See, e.g.*, *Laufer v. Ostrow*, 55 N.Y.2d 305, 309-13 (1982) (although foreign corporation did not maintain an office, bank account, property, or telephone number in New York, it was doing business there because New

16

Accordingly, no material question of fact exists regarding whether Clearstream fulfills § 8772(a)(1)(A)'s doing business requirement.

### 3.   The Bond Proceeds Are the Financial Assets § 8772(b)(2) Describes

No factual dispute exists concerning whether the Bond Proceeds are the "financial assets" at issue in this litigation. *See* 22 U.S.C. § 8772(b)(2). Indeed, Congress specifically identified the Bond Proceeds as the "financial assets" that are the subject of § 8772. *Id.*

The decisions in *Peterson I* confirm that the Bond Proceeds are "financial assets" that satisfy § 8772(b)(2). Like the Bond Proceeds, the *Peterson I* Assets were interest and principal payments on bonds that Markazi beneficially owned. *See Bank Markazi*, 136 S. Ct. at 1321; *Peterson I,* 758 F.3d at 188. The finding that those assets qualified as "financial assets" was a necessary element of the § 8772 claim the Second Circuit and Supreme Court sustained. *Bank Markazi,* 136 S. Ct. at 1325 n.20; *Peterson I,* 758 F.3d at 189.

The UCC also confirms that the Bond Proceeds—interest and principal payments produced by Markazi-owned bonds—qualify as "financial assets." Clearstream was required to collect those payments for Markazi and to forward them to Markazi's agent, UBAE. SMF at ¶ 30; *see also* UCC §§ 505(a)-(b). Under its Account Agreement with Markazi, UBAE was required to pay the Bond Proceeds to Markazi. SMF at ¶¶ 30, 64.

The Bond Proceeds thus fall within two categories of property that the UCC defines as financial assets. First, the Bond Proceeds are both "an obligation of a person" (*i.e.,*

---

York-based employees solicited and serviced customer accounts); *Bryant v. Finnish Nat'l Airlines*, 15 N.Y.2d 426, 432 (1965) (foreign airline was doing business in New York although it did not operate any flights to or from New York or even make any reservations here because it maintained a New York office and bank account and employed three full-time and four part-time employees here who performed public relations and publicity work).

Clearstream's obligation to UBAE and Markazi) and an "interest … in property" (*i.e.,* Markazi's interest in the Bond Proceeds) that "is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment." UCC § 8-102(a)(9).  In countless transactions executed every trading day, investors purchase and sell the right to receive principal and interest payments on bonds and other securities.

Second, the Bond Proceeds are property "held by a securities intermediary [Clearstream] for another person [UBAE and Markazi] in a securities account" that Clearstream "has expressly agreed" will "be treated as a financial asset." *Id.*; *see, e.g., Peterson III*, 2020 U.S. App. LEXIS 19747, at *6-7 (the Bond Proceeds are a "right to payment" Clearstream holds); *COR Clearing,* 2017 U.S. Dist. LEXIS 183405, at *30 (right to receive a dividend payment is a financial asset).

In addition, § 8772(d)(2) expands the UCC definition of "financial asset" to include "cash."  Clearstream and UBAE have referred to the Bond Proceeds as "cash."  SMF at ¶ 91.

### 4.   Clearstream Is Holding the Bond Proceeds

No dispute exists that Clearstream holds the Bond Proceeds in the Blocked Account.  *See Peterson III*, 2020 U.S. App. LEXIS 19747, at *6-7; 22 U.S.C. § 8772(a)(1)(A); SMF at ¶ 82.

### 5.   Markazi Holds "Equitable Title to, or a Beneficial Interest in" the Bond Proceeds

Defendants have repeatedly admitted that Markazi is the Bond Proceeds' sole beneficial owner.  SMF at ¶¶ 85-89.  Those admissions are consistent with the necessary finding in *Peterson I* that Markazi was the beneficial owner of the proceeds of other bonds once held in the UBAE/Markazi Account.  *See Bank Markazi,* 136 S. Ct. at 1321, 1325 n.20; *Peterson I,* 758 F.3d at 192; *see also* UCC §§ 8-503(b), 8-505(a) and 8-505(b) (guaranteeing that Markazi receives *all* financial benefits of its bonds); SMF at ¶ 30 (Clearstream Customer Agreement protected

Markazi's right to receive all financial benefits of the assets Clearstream held).

### 6. The Bond Proceeds Are Equal in Value to a Financial Asset of Markazi That Clearstream or a Related Intermediary Holds Abroad

No question of fact exists concerning § 8772(a)(1)(C), which requires that the Bond Proceeds be "equal in value to a financial asset of" Markazi that Clearstream "or a related intermediary holds abroad." The Bond Proceeds total $1.68 billion and qualify as financial assets. *See* Point II.C.3. Clearstream admitted, and the Second Circuit ruled, that Clearstream holds those assets. *Peterson III*, 2020 U.S. App. Lexis 19747, at *6-7; SMF at ¶ 78.

Markazi is the owner of a financial asset of equal value to the asset Clearstream holds abroad. *See* UCC § 8-102(a)(9) ("As context requires, the term [financial asset] means either the interest itself or the means by which a person's claim to it is evidenced, including a … security entitlement."). Under 22 U.S.C. § 8772(a)(2), the Bond Proceeds qualify as "financial asset[s] of" Markazi if it holds a beneficial ownership interest in those assets. *See also Bank Markazi*, 136 S. Ct. at 1321, 1325 n.20; *Peterson I,* 758 F.3d at 192. Because § 8772(a)(2) comprehensively addresses the ownership interests that qualify as the "assets of" Markazi, no need exists for the Court to consider any other source of law regarding that issue. *See, e.g., American Electric Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011) ("The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue.") (citation omitted).

As Plaintiffs demonstrate in Point II.C.5., Markazi is the beneficial owner of the Bond Proceeds. It thus holds a financial asset, *i.e.,* an "interest … in property" that "is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment." *See* UCC § 8-102(9). Indeed, in the absence of the ITRs,

19

the Restraints, and EO-13599, Markazi could easily sell its interest in those assets in the financial markets.  Hence, no material question of fact exists concerning this element of § 8772(a)(1)(C).

Even absent § 8772(a)(1)(C)'s instruction that beneficial ownership determines the Bond Proceeds' ownership, precedent would dictate that result.  When federal statutes implicate state property law considerations, courts consider state law only to ascertain "the nature of any interests in or rights to property that an entity may have."  *Export-Import Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010).  Federal law then determines whether those rights and interests are "sufficient to trigger application of the [federal statute]."  *Id.* Accordingly, federal law controls what interest suffices to constitute the "assets of" Markazi.[10]

Federal precedent holds that beneficial ownership, not possession or formal title, determines an asset's ownership.[11]  Thus, even to the extent the Court finds that § 8772(a)(2) alone does not conclusively dictate that the Bond Proceeds are "assets of" Markazi, these precedents independently compel that conclusion.  *See Bank Markazi,* 136 S. Ct. at 1325 n.20.

The financial asset that UBAE recorded on its books for Markazi also qualifies as "a financial asset of" Markazi (a) that is equivalent in value to the Bond Proceeds and (b) that an intermediary "related" to Clearstream holds abroad.  22 U.S.C. § 8772(a)(2).  As Clearstream

---

[10] *E.g.*, *U.S. v. Craft*, 535 U.S. 274, 278 (2002) (whether state-created property rights satisfy a federal statute's substantive standard is "ultimately a question of federal law"); *Drye v. U.S.*, 528 U.S. 49, 52 (1999) (courts must "look to state law for delineation of the taxpayer's rights or interests, but … leave to federal law the determination whether those rights or interests constitute 'property' or 'rights to property' within the meaning of [the federal statute]").

[11] *See, e.g., Glob. Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 752-54 (7th Cir. 2002) (while federal law permits blocking "'property in which any foreign country or a national thereof has any interest,'" government could block assets in which American corporation held exclusive legal title because "[t]he function of the IEEPA strongly suggests that beneficial rather than legal interests matter") (quoting 50 U.S.C. § 1702(a)(1)(B)); *Holy Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003) (same).

20

received the Bond Proceeds, UBAE recorded equivalent credits to Markazi's account on UBAE's books.  SMF at ¶ 79.  The right to payment that Markazi holds against UBAE qualifies as a "financial asset of" Markazi for the same reasons the equivalent right to payment is a "financial asset of" Markazi in Clearstream's hands.  Moreover, given Clearstream's obligation to follow UBAE's directions and act on UBAE's behalf (UCC §§ 505, 506), the agency relationship between those entities satisfies § 8772(a)(2)'s "related intermediary" standard.[12]

### 7.  The Bond Proceeds Would Be Blocked Assets If They Were Located in the U.S.

While Plaintiffs believe that the Bond Proceeds qualify as blocked assets, even while located in Luxembourg, for present purposes Plaintiffs need only demonstrate that no material question of fact exists regarding whether the Bond Proceeds would be blocked if they were located in the U.S.  *See* 22 U.S.C. § 8772(a)(1)(B).  EO-13599 blocks: "[a]ll property and interests in property of … [Markazi] that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch."  EO-13599, §§ 1(a) and (b).  Because Markazi is the Bond Proceeds' sole beneficial owner (*see* Point II.C.5., *supra*), those assets unquestionably would be blocked if they were located in the U.S.  *See Bank Markazi*, 136 S. Ct. at 1321, 1325 n.20 (proceeds of Markazi bonds held in the UBAE/Markazi account were blocked assets in Citibank's hands in New York); *Peterson I,* 758 F.3d at 188-89; UCC § 8-503(b) (Markazi maintains an interest in all assets that Clearstream holds on Markazi's behalf).

---

[12] *See, e.g., ABM Indus. Grps., LLC v. Int'l Union, Local 30, 30A, 30B*, 2020 U.S. App. LEXIS 23894, at *6 (2d Cir. July 29, 2020) ("'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'") (citation omitted).

**8.  No Other Entity Holds a Constitutionally
    Protected Interest in the Bond Proceeds**

Plaintiffs also satisfy § 8772(a)(2), which provides that they can execute against the Bond Proceeds only to the extent that no entity other than Markazi holds a constitutionally protected interest in those assets.  22 U.S.C. § 8772(a)(2).  The UCC dictates that neither Clearstream nor UBAE holds any ownership interest in the Bond Proceeds.  *See* UCC § 8-503(a).  Section 8772 also specifically provides that any "custodial interest" that Clearstream or UBAE has in the Bond Proceeds poses no obstacle to turnover.  22 U.S.C. § 8772(a)(2)(A).  Moreover, *Bank Markazi* and *Peterson I* foreclose any argument that Plaintiffs fail to satisfy § 8772(a)(2).  *See Bank Markazi,* 136 S. Ct. at 1325 n.20; *Peterson I,* 758 F.3d at 192.

**D.  Once the Bond Proceeds Are Returned to the U.S. Pursuant
    to § 8772, Plaintiffs Are Entitled to Turnover of Those Assets**

As the *Peterson I* decisions demonstrate, once Plaintiffs satisfy § 8772's elements, the statute entitles them to execute against those assets because it preempts any state law that would otherwise pose an obstacle to execution.  *See Peterson*, 2013 U.S. Dist. LEXIS 73852, at *45 (rejecting state law challenges to execution because "§ 8772(a)(1) specifically preempts state law that would be inconsistent with execution against" the bond proceeds).  In any event, even if Plaintiffs had to demonstrate their entitlement to turnover under New York law, the Bond Proceeds in Clearstream's hands are subject to execution under CPLR § 5225(b), which would entitle Plaintiffs to execute against any "money or other personal property in which [Markazi] has an interest."  *Id.*; *see also, e.g.,* 11 Weinstein, Korn & Miller, *New York Civil Practice*, ¶ 5225.09 at 52-379 (2004) (under CPLR § 5225(b), "[i]t is not necessary that the judgment debtor have legal title to the property; a beneficial interest is sufficient").

22

**E.  The Contention That § 8772 Violates Markazi's Supposed
Due Process Rights Presents No Obstacle to Plaintiffs' Claim**

In Supreme Court and Second Circuit briefing, Markazi has suggested that § 8772 suffers

constitutional due process infirmities that Markazi elected not to raise in *Peterson I*.  But

Markazi did not and cannot point to any precedent that supports its supposed epiphany.  On the

contrary, Markazi's recycled contention that Congress *decided* this matter—rather than adopting

a new governing standard for the courts to apply—fares no better as a due process argument than

it did when Markazi packaged the same assertion as a supposed separation-of-powers violation

in *Bank Markazi*.  *See Bank Markazi*, 136 S. Ct. at 1322-29.[13]

The due process argument also ignores that, "[s]o long as retroactive application of [a

statutory] change is rationally related to a legitimate legislative purpose, the constraints of due

process have been honored."  *Kopec v. City of Elmhurst*, 193 F.3d 894, 903 (7th Cir. 1999).

Section 8772, which Congress enacted to sanction Iran's terrorism (*see* 22 U.S.C. § 8772(a)(2)),

advances a compelling legislative purpose.  As in *Bank Markazi,* therefore, Markazi's ironic

effort to clothe itself in constitutional protections provides no defense to Plaintiffs' claim.

**F.  Even a Successful Personal Jurisdiction Defense by Clearstream
Would Not Impede Plaintiffs' § 8772 Claim Against Markazi**

While Markazi will likely defy an order to turn over the Bond Proceeds, Plaintiffs'

§ 8772 claim against Markazi requires no proof of the Court's power to exercise jurisdiction over

Clearstream.  Rather, the Court could order Markazi to instruct Clearstream to return the Bond

---

[13] While the Court need not address whether the Due Process Clause protects Markazi, precedent
dictates that controlled instrumentalities of foreign sovereigns, like Markazi, lack any
constitutional rights.  *See, e.g., United States ex rel. Kraus v. Wells Fargo & Co.,* 943 F.3d 588,
596 (2d Cir. 2019) (central banks are instrumentalities of their sovereign states); *Frontera Res.
Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 399-400 (2d Cir. 2009)
(instrumentalities have no due process rights when they function as agents of the sovereign).

Proceeds to New York pursuant to a U.S. government-issued license authorizing that step.[14]

OFAC has issued licenses permitting financial institutions to process the transfer of Iranian

assets to judgment creditors, including in *Peterson I*.  SMF at ¶ 84.

Awarding that relief against Markazi will be no empty gesture because it would put

Clearstream, UBAE and other financial institutions on notice that they would subject themselves

to enormous liability by assisting Markazi to evade this Court's ruling.[15]  Thus, because a USD

transaction as large as moving the Bond Proceeds could not be achieved without banking

institutions located in the U.S. (*see* p. 28, *supra*), even a judgment issued against Markazi alone

would significantly advance Plaintiffs' efforts to collect the Bond Proceeds.

III.   **NO MATERIAL QUESTION OF FACT EXISTS CONCERNING THE COURT'S
       POWER TO EXERCISE PERSONAL JURISDICTION OVER CLEARSTREAM AND MARKAZI**

   A.  **Plaintiffs Need Only Demonstrate that Exercising Personal Jurisdiction
        Over Clearstream Satisfies the Constitutional Due Process Requirements**

Absent a specific federal statute providing for nationwide service of process, plaintiffs

normally establish that defendants are subject to personal jurisdiction by showing that exercising

jurisdiction is appropriate under state law and the Due Process Clause.  *See, e.g., Eades v.*

*Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015).  Here, however, § 8772 broadly

---

[14] *See, e.g., Gucci Am. v. Bank of China*, 768 F.3d 122, 129 (2d Cir. 2014) ("personal jurisdiction over the *defendants*, not the Bank, is all that was needed for the district court to restrain the defendants' assets pending trial") (citing *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under [the party's] control, whether the property be within or without the United States.")); *see* SMF at ¶ 84.

[15] *Gucci,* 768 F.3d at 130 ("once a district court issues a preliminary asset freeze order enjoining parties over whom it has jurisdiction, that injunction 'automatically forbids others — who are not directly enjoined but who act 'in active concert or participation' with an enjoined party — from assisting in [its] violation'") (citations omitted).

preempts any state law that would impede Plaintiffs' recovery.  *See* 22 U.S.C. § 8772(a)(1); *see also Cisneros,* 508 U.S. at 18.  Thus, Plaintiffs need only demonstrate that due process principles permit the Court to exercise jurisdiction over Clearstream.  *See, e.g., In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008) (where a federal statute authorizes nationwide service, personal jurisdiction extends "to the limit permitted by the Due Process Clause of the Fifth Amendment"), *aff'd*, 730 F.3d 170 (2d Cir. 2013).

Even absent § 8772(a)(1)'s preemptive effect, personal jurisdiction here would extend to the Due Process Clause's limits under Fed. R. Civ. P. 4(k)(2).  That rule authorizes personal jurisdiction in federal question cases where: "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2); *see, e.g., Dardana Ltd. v. A.O. Yuganskneftegaz,* 317 F.3d 202, 207 (2d Cir. 2003).

## B. In Light of Clearstream's Extensive, Relevant Conduct in New York, No Due Process Obstacle Exists to Exercising Personal Jurisdiction

### 1. The Fundamental Jurisdictional Due Process Requirements

For purposes of this motion, the Court need only consider whether it may exercise "specific" personal jurisdiction over Clearstream.  Specific jurisdiction "'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'"  *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 n.9 (2d Cir. 2012) ("*Licci I*") (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Courts frequently divide the due process analysis into two components: the "'minimum contacts' inquiry and the 'reasonableness' inquiry."  *Licci I,* 673 F.3d at 60.  Other cases break

the due process test into three parts: (1) whether the defendant "'purposefully availed itself of the privilege of conducting activities within the forum State or … purposefully directed its conduct into the forum State'"; (2) whether "'the plaintiff's claim … arise[s] out of or relate[s] to the defendant's forum conduct'"; and (3) whether exercising jurisdiction is "'reasonable under the circumstances.'"  *United States Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*, 916 F.3d 143, 150 (2d Cir. 2019) (citation omitted).  Moreover, the Second Circuit has emphasized the disjunctive nature of the "arise out of or relate to" requirement.  *E.g., Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 167 (2d Cir. 2010) (the constitutional "nexus requirement … merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum"); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (certain contacts, while not directly giving rise to a claim, certainly "relate[d] to" it, and were therefore relevant to the specific jurisdiction analysis).

As the *minimum* contacts formulation suggests, due process does not demand extensive connections between a defendant and the forum.  The Second Circuit has summarized the minimum contacts inquiry as hinging on whether "'the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there.'" *Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci III*") (citation omitted); *accord, e.g., Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018).  Even a single, low-dollar-amount connection between a defendant and the forum may provide the requisite minimum contacts with respect to claims involving extensive misconduct elsewhere.  *E.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n.18 (1985) ("So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction.") (citation omitted); *accord, e.g., Chloe,* 616 F.3d at 171-72.

26

Where the minimum contacts prong of the due process test is satisfied, "jurisdiction is favored," and defendants can negate that preference only by making "'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  *Chloe*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477).  Factors relevant to the reasonableness inquiry include: (1) any burdens that proceeding in the forum state will impose on defendants; (2) the forum state's interests; (3) plaintiffs' interests in securing relief; (4) the judicial system's interest in promoting efficient claim resolution; and (5) states' shared interest in furthering beneficial policies.  *E.g., United States Bank*, 916 F.3d at 151 n.5; *Chloe*, 616 F.3d at 164-65.

Moreover, where the reasonableness factors strongly favor exercising jurisdiction, courts demand a lesser showing with respect to the minimum contacts prong.  *E.g., Burger King*, 471 U.S. at 477 ("These considerations sometimes serve to establish the reasonableness  of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."); *accord, e.g., Ochoa v. J.B. Martin & Sons Farms*, 287 F.3d 1182, 1188 n.2 (9th Cir. 2002) ("Jurisdiction may be established with a lesser showing of minimum contacts 'if considerations of reasonableness dictate.'") (citation omitted).

### 2.   The Extensive Connections Between Clearstream's In-Forum Conduct and This Litigation Easily Satisfy the Due Process Requirements

#### a.   Because This Case Arises Out of and Relates to Clearstream's New York Contacts, Clearstream Could Easily Foresee Being Haled Into Court Here

This action and Plaintiffs' § 8772 claim are inextricably linked to Clearstream's extensive, continuous New York contacts.  Indeed, as Plaintiffs discuss in Point II.C.2., *supra*, the business operations that Clearstream undertakes in New York provide an essential element of Plaintiffs' § 8772 claim.  22 U.S.C. § 8772(a)(1)(A) (the Bond Proceeds must be "held by or for a foreign securities intermediary *doing business in the United States*") (emphasis added).

The close ties between this litigation and Clearstream's New York conduct are strengthened by the fact that Clearstream could not have served as Markazi's securities intermediary without maintaining a New York correspondent account (to receive the Bond Proceeds) and a New York depository account (to hold the other Markazi bonds at issue in *Peterson I*).  SMF at ¶¶ 69-70.  Markazi has testified that it purchased USD-denominated bonds like the securities that produced the Bond Proceeds to "maintain the value" of Iran's foreign exchange reserves.  *Id.* at ¶ 56.  Markazi could not generate the USD that it required for that purpose without passing payments through New York.[16]

Indeed, Markazi elected to invest in the USD-denominated bonds that produced the Bond Proceeds although their payment terms *required* Clearstream to collect interest and principal *in New York*.  SMF at ¶ 70.  Clearstream collected *$1.68 billion* in Bond Proceeds in the NY Account at the direction of Markazi, the owner of those assets, and UBAE, Markazi's agent.  *Id.* at ¶ 78.  Thereafter, Clearstream debited the NY Account located at one of New York's largest financial institutions (JPMorgan) to credit the Bond Proceeds in accordance with the account agreements established among Clearstream, UBAE and Markazi in 2008.  *Id.* at ¶¶ 62-64, 78-79.

Steps Clearstream took to facilitate moving the Bond Proceeds smoothly through the New York banking system further tie this litigation to Clearstream's in-state conduct.  In particular, Clearstream transferred Markazi's bonds into the newly opened UBAE/Markazi Account from Markazi's pre-existing Clearstream account.  SMF at ¶¶ 62, 65.  Clearstream's

---

[16] *See, e.g., Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991) (large-value transfers of USD must pass through the U.S., and New York banking enterprises participate in nearly all such transactions); Decl. of Liviu Vogel at ¶ 86 and Ex. 62 (Amicus Brief of Institute of International Bankers et al. in *Strauss v. Credit Lyonnais*, No. 19-865 (L) (2d Cir.) at 12 ("Dollar-denominated payments, wherever they originate and wherever their ultimate destination, generally 'clear' in the United States, through a U.S. bank.")).

interposition of another securities intermediary between itself and Markazi facilitated moving the Bond Proceeds surreptitiously through New York by hiding Markazi's beneficial ownership of the funds from JPMorgan and other New York-based financial institutions. *See Peterson,* 2013 U.S. Dist. LEXIS 40470, at *133 (the Defendants utilized UBAE as an additional securities intermediary to serve as "a layer in the sandwich built to try and interfere with execution"); SMF at ¶¶ 58, 67 (shortly before Defendants opened the UBAE/Markazi Account, world governments accelerated efforts to sanction Iran, and Congress passed FSIA amendments that put Markazi's funds at enhanced risk of execution by judgment creditors).

The fact that Clearstream's use of the NY Account to process Bond Payments violated the Restraints, the ITRs and EO-13599 also ties Clearstream's U.S.-based conduct to this action. *See* 31 C.F.R. §§ 560.204, 206, 410 (2008); EO-13599, §§ 1(a) and (b); SMF at ¶¶ 18-20, 52, 73, 81; pp. 6-7, *supra.* By subverting those restrictions and passing the Bond Proceeds through the NY Account, Clearstream frustrated Plaintiffs' collection efforts and undermined the U.S. government's policy of sanctioning Iran and Markazi for sponsoring terrorism, laundering money and promoting nuclear proliferation.[17]

The scope and nature of Clearstream's New York operations also justify finding adequate contacts to support personal jurisdiction. Clearstream maintains a substantial New York physical presence, employs staff here, and conducts *billions of dollars* in transactions through New York accounts *every business day.* SMF at ¶¶ 34-43, 47-51. Clearstream conducts those operations

---

[17] *See, e.g.,* Iranian Transaction Regulations, 77 Fed. Reg. 64,664 (Oct. 22, 2012) ("Background" section explaining that the ITRs and EO-13599 are part of the government's efforts to combat "a national emergency with respect to the actions and policies of the Government of Iran, including its support for international terrorism, its efforts to undermine the Middle East peace process, and its efforts to acquire weapons of mass destruction and the means to deliver them").

pursuant to a license and authorization it secured from the New York Department of Financial Services and the Federal Reserve Bank. *Id.* at ¶¶ 44, 46; *see* pp. 28, *supra.* Moreover, it certified that its New York office is a U.S. resident and has consented to service of process in New York, including via service on the Superintendent of Financial Services. *Id.* at ¶¶ 43, 45.

Assessing the "'totality of the circumstances,'" as the Court must, these facts easily establish the minimum contacts with the U.S. required to support jurisdiction over Clearstream. *See, e.g., Licci I,* 673 F.3d at 62 (citation omitted); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("'the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper'") (citation omitted). Even standing alone, Clearstream's in-forum maintenance of the staff, bank accounts, facilities and other business arrangements necessary to conduct its New York operations demonstrates that Clearstream availed itself of the privilege of doing business here and that this litigation arises out of or relates to Clearstream's New York conduct. *See, e.g., United States Bank,* 916 F.3d at 151-52 (bank was subject to jurisdiction in Indiana where, among other ties to the state, the plaintiff's contract theory required the bank to take steps there to remedy a breach); *Alfandary v. Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d 343, 363 (S.D.N.Y. 2018) (minimum contacts satisfied where defendant "was directly involved [in] the scheme that caused Plaintiffs' harm—a scheme that could not have been successfully executed without taking certain actions in the United States").

Moreover, under § 8772(a)(1)(A), the fact that Clearstream is "doing business" in New York provides a necessary element of Plaintiffs' claim. *See* Point II.C.2.b., *supra.* Research has uncovered *no decision* where a court rejected personal jurisdiction on due process grounds although a defendant's in-forum conduct satisfied a statutorily prescribed element of a claim.

In fact, the Second Circuit has found the minimum contacts requirement satisfied in cases

involving far less extensive and relevant in-forum conduct than Clearstream undertook here.  For example, in *Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998), the Second Circuit held that a Rhode Island court could exercise personal jurisdiction over the German owner of a yacht in connection with claims brought by the executrix of a crewman lost overboard during the vessel's return trip from Bermuda.  *Id.* at 30.  The court found the minimum contacts requirement satisfied because the German defendant's agent recruited the decedent in Rhode Island, the owner intended to return there with certain crew members, and the yacht had been repaired and used exclusively in the U.S. for several months before the voyage.  *Id.*  Those contacts do not remotely approach the breadth and depth of Clearstream's New York ties.

Likewise, in *Chloe,* the Second Circuit found that the New York courts could exercise personal jurisdiction over an employee of a corporate defendant that sold *one* $1200 counterfeit handbag in the state.  616 F.3d at 165 ("the single act of an out-of-state defendant employee shipping an item into New York, combined with his employer's extensive business activity involving New York, gives rise to personal jurisdiction over the employee").  Notably, *Chloe* found the minimum contacts test satisfied although: (a) the plaintiff's counsel orchestrated the sole New York sale while investigating the infringing activity; (b) an Illinois merchant purchased the overwhelming majority of the plaintiff's counterfeit handbags; and (c) the employer's other relevant New York contacts consisted of maintaining a sales website and completing fifty-two sales of *other companies'* merchandise in New York.  *Id.* at 163, 167, 170-73.[18]

---

[18] *Many* other Second Circuit decisions have found the minimum contacts test satisfied by far less significant in-forum conduct than Clearstream's extensive, relevant New York activity.  *See, e.g., Eades*, 799 F.3d at 168-69 (specific jurisdiction appropriate where defendant mailed one debt collection notice, engaged in one debt collection phone call, and mailed a summons and complaint to the forum); *Bank Brussels,* 305 F.3d at 127-28 (although law firm's maintenance of an apartment in New York, faxing of newsletters to the state, and past work for New York clients

The Second Circuit's ruling in *Licci III,* 732 F.3d at 161, also forecloses Clearstream's due process arguments because, in multiple respects, Clearstream's New York conduct exceeds the actions the Second Circuit found sufficient to support personal jurisdiction.  *Licci III* held that the minimum contacts requirement was satisfied where defendant Lebanese Canadian Bank ("LCB") used a third-party correspondent account in New York to transfer funds to a supposed charity in Lebanon that served as a front for the terrorist group Hizballah.  *Id.* at 173 ("repeated use of the correspondent account—and hence New York's banking system—as an instrument to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry").  The court reached that conclusion although, in contrast to Clearstream, LCB maintained "no branches, offices, or employees in the United States."  *Licci I,* 673 F.3d at 56.  Moreover, the $1.68 billion that Clearstream collected for Markazi in New York dwarfs the "several million dollars" in transfers that LCB made in *Licci III.*  732 F.3d at 171.

The Supreme Court has also found the due process minimum contacts test satisfied in cases presenting far less extensive in-forum conduct than the actions Clearstream undertook in New York.  For example, in *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770 (1984), the Court concluded that a New Hampshire court could exercise specific jurisdiction in a libel case brought by a New York resident against a magazine publisher incorporated in Ohio and headquartered in

---

did not "directly give[] rise to the plaintiff's [legal malpractice] cause of action," those contacts satisfied the minimum contacts requirement because they helped the firm cultivate its business and, thus, "relate[d] to" the plaintiff's claim); *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 95 (S.D.N.Y. 2015) (personal jurisdiction existed over a foreign bank that "deliberately thrust[] itself into the New York financial market by establishing a New York office and a correspondent account with a New York bank to repeatedly facilitate the transfer of money from its clients' bank accounts in the United States to their accounts abroad" because the bank "purposely chose[] to do business in New York and has availed itself of the myriad benefits that come with establishing a presence in the United States' premier financial center") (internal quotes omitted).

California.  *Id.* at 772, 781.  The Court ruled that the publisher's actions satisfied the permissive minimum contacts test although the only relevant New Hampshire conduct was the defendant's distribution of "a small portion of" its magazine's copies there and that the plaintiff therefore "suffered … a small proportion of her total claimed injury within the State."  *Id.* at 773, 775.

These precedents demonstrate that Clearstream's contacts with New York defy the label "minimum."  It was easily foreseeable that Clearstream would be "haled into court" to surrender the assets of a state sponsor of terrorism that targeted and murdered 241 American servicemen and then utilized Clearstream's services to pass $1.68 billion through the New York banking system while simultaneously evading terrorism-related judgments.  *See Licci III,* 732 F.3d at 170; *Charles Schwab,* 883 F.3d at 82.  That conclusion is all the more obvious because Clearstream was a party in *Peterson I,* paid a $152 million OFAC fine for its conduct with respect to the UBAE/Markazi Account, and is currently the subject of a criminal investigation in this district related to the Bond Proceeds.  SMF at ¶¶ 52, 68, 83.

While Plaintiffs need not establish that New York state law supports jurisdiction over Clearstream, the due process standard and CPLR § 302(a)(1)'s specific jurisdiction test closely parallel one another.  *See, e.g., Licci III,* 732 F.3d at 168-69 (§ 302(a)(1) is satisfied where the defendant transacts business in the state and the plaintiff's claim "is not completely unmoored from" the in-state conduct).  Thus, as many of the foregoing decisions demonstrate, the same facts that negate Clearstream's supposed due process defense also defeat any § 302(a)(1) argument it could theoretically raise.  *See id.* at 169 (§ 302(a)(1) was satisfied because LCB used the New York-based correspondent account to pass dollars to an alleged terrorist organization in Lebanon); *Eades*, 799 F.3d at 168; *Chloe*, 616 F.3d at 169-71.

33

### b.  The Due Process Reasonableness Factors Further Support the Court's Ability to Exercise Specific Jurisdiction Over Clearstream

The second step of the due process analysis—the reasonableness inquiry—also fully supports exercising jurisdiction over Clearstream.  In fact, the reasonableness factors weigh so heavily in Plaintiffs' favor that subjecting Clearstream to jurisdiction would be appropriate "upon a lesser showing of minimum contact than would otherwise be required."  *Burger King*, 471 U.S. at 477; *accord, e.g., Ochoa,* 287 F.3d at 1188 n.2.

Applying that principle to the Clearstream jurisdictional analysis is appropriate because Congress has acted repeatedly to provide victims of Iranian terrorism with a means of recovering for the carnage that Iran has caused, thereby demonstrating the important public policies that those statutes serve.  *See, e.g.,* 28 U.S.C. §1605(a)(7) (repealed and replaced by 28 U.S.C. § 1605A); 28 U.S.C. § 1610 (note) (TRIA); 22 U.S.C. § 8772.  Indeed, Congress adopted both TRIA and § 8772 to combat Iran's determined, and largely successful, efforts to evade the billions of dollars in terrorism-related judgments it has accrued.[19]

Furthermore, each due process reasonableness factor strongly supports exercising jurisdiction over Clearstream.  (1) Clearstream will experience no burden associated with proceeding in New York, where it has maintained a representative office for decades, continues to conduct substantial operations, faces an ongoing criminal investigation, and has retained multiple large law firms as counsel.  SMF at ¶¶ 40-42, 47-54.  (2) New York maintains a substantial interest in preventing the use of the state's banking system to pass money to Iranian

---

[19] *See* 22 U.S.C. § 8772(a)(2) (Congress adopted § 8772 "to ensure that Iran is held accountable for paying the judgments described in paragraph (1) and in furtherance of the broader goals of this Act to sanction Iran"); *see also Bank Markazi*, 136 S. Ct. at 1318 ("To place beyond dispute the availability of some of the Executive Order No. 13599-blocked assets for satisfaction of judgments rendered in terrorism cases, Congress passed the statute at issue here.").

entities and in facilitating the collection of terrorism-related judgments.  (3) Plaintiffs possess

weighty interests in obtaining relief for their injuries and justice for their deceased loved ones.

(4) *Peterson I* demonstrates that no obstacle exists to resolving this action efficiently in New

York.  (5) New York, the U.S., and America's allies share strong interests in preventing terror

financing.  *See, e.g., Licci III*, 732 F.3d at 173-74 (jurisdiction was reasonable although LCB

maintained no New York presence because of the substantial interests that the plaintiffs

possessed in vindicating their rights and that New York had in preventing the use of its banking

system for terror financing); *Chloe,* 616 F.3d at 172-73 (exercising jurisdiction over a California

resident who played a role in his employer's sale of a single counterfeit handbag in New York

was reasonable even though that sale was orchestrated by the plaintiff manufacturer's counsel).

### C.  The FSIA Provides the Court With Personal Jurisdiction Over Markazi

#### 1.  Section 8772 Provides an Exception to Sovereign Immunity and Plaintiffs Properly Served Markazi with Process

As the Supreme Court held in *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1053-54

(2019), if an exception to sovereign immunity exists, "the FSIA provides subject-matter

jurisdiction in federal district courts" under 28 U.S.C. § 1330(a) and "personal jurisdiction

'where service has been made under section [28 U.S.C.] § 1608'" (quoting 28 U.S.C. § 1330(b)).

Here, § 8772(a)(1) specifically denies Iran and Markazi sovereign immunity in this action.

Plaintiffs also properly served Iran and Markazi in compliance with § 1608.  SMF at ¶ 3.

#### 2.  Even if Markazi Possessed Jurisdictional Due Process Rights, the Extensive Actions That Markazi Orchestrated in New York Would Provide a Basis for Personal Jurisdiction

For present purposes, the Court need not determine whether Markazi, an Iranian

instrumentality, possesses constitutional rights.  *See* note 13, *supra.*  UBAE and Clearstream

acted at the direction of their principal, Markazi.  Hence, even if the Due Process Clause applied to Markazi, it would be subject to personal jurisdiction for the same reasons as Clearstream. *E.g., CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (agent's actions are attributable to the principal for jurisdictional purposes where the agent "acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal") (citation omitted); *McGraw-Hill Global Educ. Holdings, LLC v. Mathrani*, 295 F. Supp. 3d 404, 412 (S.D.N.Y. 2017).  In addition, the due process reasonableness considerations support personal jurisdiction over Markazi for the same reasons they bolster the case for subjecting Clearstream to jurisdiction.  *See* Point III.B.2.b., *supra*.

IV. **IN THE ALTERNATIVE, THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION REQUIRING DEFENDANTS TO RETURN THE BOND PROCEEDS TO NEW YORK**

A. **The Preliminary Injunction Standard**

Even if the Court determines that a material factual issue precludes summary judgment, the Court should issue a preliminary injunction requiring Markazi and Clearstream to return the Bond Proceeds to New York in order to protect the Court's ability to provide Plaintiffs with meaningful relief in this longstanding action.  To secure a preliminary injunction, the moving party "must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest."  *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citation and internal quotations omitted); *accord, e.g., Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

**B. Markazi's Efforts to Evade the Court's Authority to Adjudicate This Action Justifies the Injunctive Relief Plaintiffs Seek**

**1. Markazi's Collateral Attacks on This Court's Authority to Adjudicate Plaintiffs' Claims Threaten Them with Irreparable Injury**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Pearson Educ., Inc. v. Labos*, 2019 U.S. Dist. LEXIS 72342, at *15 (S.D.N.Y. Apr. 23, 2019) (citation and internal quotations omitted). Plaintiffs satisfy this requirement by establishing a threat that a defendant will frustrate the plaintiffs' ability to obtain a damages remedy in the absence of injunctive relief. *See, e.g., In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) ("even where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by 'transfer[ring its assets] out of the jurisdiction'") (quoting *Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)).

Courts have long recognized that the impediments plaintiffs face to collecting judgments from Iran justify injunctive relief preserving the collectability of Iranian assets.[20] Here, Plaintiffs do not merely face a theoretical threat to their ability to satisfy their judgments. Rather, aided by financial intermediaries like Clearstream and UBAE, Iran has defied orders of the U.S. courts and evaded Plaintiffs' judgments for 13 years. SMF at ¶¶ 18-20, 73, 78, 80-81.

---

[20] *E.g., Itek Corp. v. First Nat'l Bank*, 730 F.2d 19, 22-23 (1st Cir. 1984) (affirming injunction preventing bank from making letter-of-credit payments to Iranian entity because, in light of the poor political relations between the U.S. and Iran, the theoretically adequate money damages claimed by the plaintiff were likely uncollectible); *Rockwell Int'l Sys., Inc. v. Citibank, N.A.*, 719 F.2d 583, 586-88 (2d Cir. 1983) (rejecting argument that the theoretical availability of a damages claim against Iran in another forum defeated a finding that the plaintiff would suffer irreparable injury if Iran were allowed to collect on a letter of credit issued by an American bank).

Moreover, years after Plaintiffs commenced this case, Markazi initiated an action in Luxembourg seeking an order *requiring* Clearstream *to defy* any ruling of this Court that instructs Clearstream to return the Bond Proceeds to New York until the Luxembourg courts bless that decision.  SMF at ¶ 8.  Plaintiffs understand that a Luxembourg court will address Markazi's request in November 2020.  *Id.* at ¶ 9.

Markazi's inappropriate collateral attack on this Court's authority gravely threatens Plaintiffs' ability to obtain any relief in this longstanding action.  The Luxembourg courts have no appellate jurisdiction over this Court's rulings.  In fact, § 8772(a)(1)(C) states that Plaintiffs may obtain relief from this Court "without regard to concerns relating to international comity."

In these circumstances, a mere asset freeze will not protect Plaintiffs from the irreparable injury that Markazi's attack upon this Court's authority to adjudicate this action threatens.  By flouting its obligation to pay terrorism-related judgments for decades, the Iranian government has demonstrated its absolute disregard for the rulings of American courts.  Thus, every reason exists to expect that Markazi will continue to pursue efforts to impede the Court's ability to provide Plaintiffs with relief for as long as the Bond Proceeds remain abroad.

To address those efforts to end-run the Court's authority and to preserve the possibility that Plaintiffs can obtain the relief § 8772 authorizes, the Court should order Clearstream and Markazi to return the Bond Proceeds to the U.S. and to preserve them pending the outcome of Plaintiffs' claims.[21]  Second Circuit decisions affirm indistinguishable injunctions where defendants' actions posed comparable threats to plaintiffs' ability to collect judgments absent

---

[21] In connection with that injunction, Plaintiffs will stipulate that the movement of the Bond Proceeds to New York is without prejudice to any defense that the Defendants may have possessed had those assets remained in Luxembourg.

equitable relief.  *See, e.g., Feit & Drexler,* 760 F.2d at 412-13, 416 (where defendant hid assets to frustrate trustee's ability to collect a judgment, court had power to order defendant to transfer her property located in Switzerland to her attorney "to prevent [the defendant] from making uncollectible any judgment the Trustee may eventually obtain against her"); *Inter-Regional Fin. Grp., Inc. v. Hashemi,* 562 F.2d 152, 154 (2d Cir. 1977) (affirming injunction requiring defendant "to bring the [stock] certificates into the State of Connecticut from their locations in other states, and indeed, even in other countries" where the "plaintiff would suffer irreparable harm unless the order as sought by plaintiff was entered").

### 2.  The Likelihood of Success and Public Interest Factors Also Support Granting the Injunction Plaintiffs Seek

Even to the extent the Court finds that a material issue of fact exists with respect to Plaintiffs' summary judgment motion, Plaintiffs' arguments establish that the likelihood of success and public interest prongs of the preliminary injunction standard favor granting the injunctive relief they request.  While Plaintiffs believe that no obstacle to their summary judgment motion exists, at a minimum, their arguments demonstrate sufficiently serious questions going to the merits of their claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in their favor.  *Actavis PLC*, 787 F.3d at 650.

A foreign court order barring the relief § 8772 authorizes would threaten Plaintiffs' ability to collect the Bond Proceeds and their long-outstanding judgments.  That hardship significantly outweighs any inconvenience that Iran, a terrorist state that murdered Plaintiffs' family members, and Markazi, its wholly owned central bank, will suffer as a result of the

equitable relief Plaintiffs seek.[22]  Moreover, Markazi's supposed hardship is purely a product of

its own making since it unilaterally decided to launch a collateral attack on the Court's authority.

      Similarly, no doubt exists that granting the injunction Plaintiffs seek will serve the public

interest.  Congress has acted repeatedly to facilitate the collection of judgments from state

sponsors of terrorism and their agencies and instrumentalities, including by enacting legislation

specific to this litigation.  *See* 28 U.S.C. §1605(a)(7) (repealed and replaced by 28 U.S.C.

§ 1605A); 28 U.S.C. § 1610 (note); 22 U.S.C. § 8772.  Clearstream and Markazi can cite no

countervailing public interest consideration weighing in favor of permitting Markazi to continue

its collateral attack on this Court's ability to adjudicate this action.

CONCLUSION

      For the reasons set forth above, the Court should grant Plaintiffs turnover and summary

judgment, or, in the alternative, issue a preliminary injunction requiring Clearstream and

Markazi to return the Bond Proceeds to New York to protect the Court's ability to adjudicate this

action and prevent the dissipation of those assets.

Dated:  August 12, 2020             Respectfully submitted,

                                     */s/ Liviu Vogel*

                          Liviu Vogel (LVogel@salonmarrow.com)
                          Salon Marrow Dyckman Newman & Broudy LLC
                          10 East 40th Street
                          New York, New York 10016
                          (646) 843-1909

---

[22] *See, e.g., Nursing Home & Hosp. Union No. 434 v. Sky Vue Terrace, Inc.,* 759 F.2d 1094, 1099 (3d Cir. 1985) (balance of hardships favored asset-freeze injunction where dissipation of the defendant's assets could render a judgment in plaintiff's favor "meaningless" absent equitable relief); *Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1347 (2d Cir. 1974) (balance of hardships favored injunction barring corporation's sale of airplane where the "sale might well result in the dissipation of an important asset, leaving little for [the plaintiff] to recapture if it should eventually succeed in this lawsuit").

FLEISCHMAN BONNER & ROCCO LLP
James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
81 Main Street, Suite 515
White Plains, New York 10601
(914) 278-5100

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

Susan M. Davies, an attorney duly licensed to practice law before the Courts of the State of New York, and this Court, certifies under penalties of perjury pursuant to 28 U.S.C. § 1746 as follows:

On August 12, 2020 at 1:07 p.m. I served true and correct copies of the foregoing Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment or, in the Alternative, a Preliminary Injunction dated August 12, 2020 on counsel of record for Defendants Bank Markazi, Clearstream Banking, S.A., and Banca UBAE, S.p.A. by a secure electronic file transfer using "SendThisFile" transmitted to the following e-mail addresses:

dluke@jaffeandasher.com; rkry@mololamken.com; ben.kaminetzky@davispolk.com; brendan.mooney@davispolk.com; ucolella@czlaw.com; jzefutie@czlaw.com.

In an email message sent to the same e-mail addresses at 2:11 p.m. on August 12, 2020, I notified counsel of the electronic file transfer and asked them to notify me that day if they required a paper copy of the memorandum of law to be mailed to them. No counsel requested that a paper copy be mailed to him.

I certify under penalties of perjury pursuant to 28 U.S.C. § 1786 that the foregoing is true and correct.

Executed on August 13, 2020.

Susan M. Davies