# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT NEW YORK

<table>
<tr>
<td>

DEBORAH D. PETERSON,
Personal Representative of the Estate
of James C. Knipple (Dec.), *et al.*,

                            Plaintiffs,

         v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

                         Defendants.

</td>
<td>

Case No. 13 Civ. 9195 (LAP)


**Exhibits 13, 14, 16, 17, 39, 41, 44-55,
57, 63, 66, 69, 71, 72, 75 and 81 hereto
FILED UNDER SEAL**

<u>**DECLARATION OF LIVIU VOGEL**</u>

</td>
</tr>
</table>

Liviu Vogel, an attorney duly licensed to practice law before the Courts of the State of New York, and this Court, declares under penalties of perjury pursuant to 28 U.S.C. § 1746 as follows:

      1.      I am a member of the firm of Salon Marrow Dyckman Newman & Broudy LLC.  I have served as co-counsel for Plaintiffs since the inception of this action.  I also served as co-counsel for the plaintiffs in *Peterson, et al. v. Islamic Republic of Iran, Bank Markazi a/k/a Central Bank of Iran, Banca UBAE SpA, Citibank, N.A. and Clearstream Banking, S.A.*, S.D.N.Y. 10-cv-4518 (KBF) (the "*Peterson I* Litigation").  I make this declaration in support of Plaintiffs' Motion for Summary Judgment or, in the Alternative, for a Preliminary Injunction against Defendants Bank Markazi ("Markazi") and Clearstream Banking, S.A. ("Clearstream").

1

297460_2

2.      I make this declaration based upon my personal knowledge of facts and events, or upon my review of public records and/or documents obtained in discovery from the Defendants in this action and in the *Peterson I* Litigation, true and correct copies of which are exhibits hereto.

3.      Plaintiffs seek to satisfy their terrorism related judgments against the Defendant the Islamic Republic of Iran ("Iran") and Iran's Ministry of Information and Security (collectively with Iran, the "Judgment Debtors") by obtaining turnover of $1.68 billion in bond proceeds that are the property of Defendant Markazi—Iran's central bank—and are "represented as a positive account balance in a 'sundry blocked account'" at Defendant Clearstream in Luxembourg (the "Bond Proceeds"). *See Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 96 (2d Cir. 2017) ("*Peterson II*").

THE PLAINTIFFS AND THEIR PARTIALLY UNSATISFIED JUDGMENTS AGAINST IRAN

4.      Plaintiffs are the victims of the deadly Iran-sponsored 1983 terrorist bombing of the U.S. Marine barracks in Beirut, Lebanon.  They include the representatives of the estates of the 241 United States servicemen killed in that attack, many survivors of the bombing, and the family members, heirs and representatives of those killed and injured in the attack.  Plaintiffs have secured judgments against the Judgment Debtors, as state sponsors of terrorism, pursuant to 28 U.S.C. § 1605(a)(7) (which was repealed in 2008) and 28 U.S.C. § 1605A. [1]  In aggregate, Plaintiffs' judgments awarded $3,845,241,176 in compensatory damages against the Judgment

---

[1] The Plaintiffs comprise five separate groups, who litigated their underlying claims against Iran in separate actions.  The groups are referred to herein individually as the "Peterson Judgment Creditors," "Davis Judgment Creditors," "Valore Judgment Creditors," "Bland Judgment Creditors," and "Brown Judgment Creditors."

Debtors, of which $4,211,242,811 including accrued post-judgment interest remains uncollected.

**Peterson Judgment Creditors**

5.     On May 30, 2003, the United States District Court for the District of Columbia issued an opinion, in the consolidated action styled *Peterson v. Islamic Republic of Iran,* D.C. 01-cv-2094 (RCL) (the "Peterson Action"), finding that (a) the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the murder of the 241 American servicemen at the United States Marine barracks in Beirut, Lebanon on October 23, 1983 and (b) the surviving family members suffered and would continue to suffer mental anguish and loss of society.  A true and correct copy of the May 30, 2003 Memorandum and Order, which is a public record, is attached hereto as **Exhibit 1**.

6.     On September 7, 2007, the court in the Peterson Action entered a default judgment pursuant to 28 U.S.C. § 1605(a)(7) against the Judgment Debtors, jointly and severally (the "Peterson Judgment").  The Peterson Judgment awarded the Peterson Judgment Creditors economic and compensatory damages totaling $2,656,944,877.  A true and correct copy of the Peterson Judgment, which is a public record, is attached hereto as **Exhibit 2**.  As set forth in detail below (*see* ¶¶ 59 and 83), the Peterson Judgment has been partially satisfied, but remains unsatisfied in the amount of $3,431,296,039 including accrued post-judgment interest.

7.     On March 24, 2008, the Peterson Judgment was registered in this District pursuant to 28 U.S.C. § 1963, under case number M18-302, judgment number 080472.

3

297460_2

**Davis Judgment Creditors**

8.      On March 30, 2012, the United States District Court for the District of Columbia entered a Memorandum and Opinion containing findings of fact and conclusions of law (the "Davis Memorandum and Opinion") and a separate default judgment pursuant to 28 U.S.C. § 1605A against the Judgment Debtors, jointly and severally, in the consolidated action styled *Davis v. Islamic Republic of Iran,* D.C. 07-cv-1302 (RCL) (the "Davis Judgment").  The Davis Judgment awarded the Davis Judgment Creditors economic and compensatory damages totaling $486,918,005.  True and correct copies of the Davis Memorandum and Opinion and the Davis Judgment, which are public records, are attached hereto as **Exhibits 3** and **4**, respectively.  The Davis Judgment has been partially satisfied, but remains unsatisfied in the amount of $305,473,062 including accrued post judgment interest.

9.      On February 14, 2013, the Davis Judgment was registered in this District pursuant to 28 U.S.C. § 1963, under case number 13-mc-46.

**Valore Judgment Creditors**

10.      On March 31, 2010, the United States District Court for the District of Columbia entered a Memorandum and Opinion containing findings of fact and conclusions of law (the "Valore Memorandum and Opinion") and a separate default judgment pursuant to 28 U.S.C. § 1605A against the Judgment Debtors, jointly and severally, in the consolidated action styled *Valore v. Islamic Republic of Iran,* D.C. 03-cv-1959 (RCL), 06-cv-516 (RCL), 06-cv-750 (RCL) and 08-cv-1273 (RCL) (the "Valore Judgment").  The Valore Judgment awarded the Valore Judgment Creditors economic

4

and compensatory damages totaling $290,291,092.  True and correct copies of the Valore

Memorandum and Opinion and the Valore Judgment, which are public records, are

attached hereto as **Exhibit 5** and **6**, respectively. The Valore Judgment has been partially

satisfied, but remains unsatisfied in the amount of $186,851,896 plus interest that

continues to accrue.

11.    On July 5, 2011, the Valore Judgment was registered in this District

pursuant to 28 U.S.C. § 1963, under case number 11-mc-217P1.

**Bland Judgment Creditors**

12.    On December 21, 2011, the United States District Court for the District of

Columbia entered a Memorandum and Opinion containing findings of fact and

conclusions of law (the "Bland Memorandum and Opinion") and a separate default

judgment pursuant to 28 U.S.C. § 1605A against the Judgment Debtors, jointly and

severally, in the action styled *Bland v. Islamic Republic of Iran,* D.C. 05-cv-2124 (RCL)

(the "Bland Judgment").  The Bland Judgment awarded the Bland Judgment Creditors

economic and compensatory damages totaling $277,805,908.  True and correct copies of

the Bland Memorandum and Opinion and the Bland Judgment, which are public records,

are attached hereto as **Exhibit 7** and **8**, respectively.  The Bland Judgment has been

partially satisfied, but remains unsatisfied in the amount of $172,610,844 including

accrued post-judgment interest.

13.    On November 13, 2012, the Bland Judgment was registered in this District

pursuant to 28 U.S.C. § 1963, under case number 12-mc-373-P1.

**Brown Judgment Creditors**

5

297460_2

14.     On July 3, 2012, the United States District Court for the District of Columbia entered a Memorandum and Opinion containing findings of fact and conclusions of law (the "Brown Memorandum and Opinion") and a separate default judgment pursuant to 28 U.S.C. § 1605A against the Judgment Debtors, jointly and severally, in the action styled *Brown v. Islamic Republic of Iran,* D.C. 08-cv-531 (RCL) (the "Brown Judgment").  The Brown Judgment awarded the Brown Judgment Creditors economic and compensatory damages totaling $183,281,294.  True and correct copies of the Brown Memorandum and Opinion and the Brown Judgment, which are public records, are attached hereto as **Exhibit 9** and **10**, respectively.  The Brown Judgment has been partially satisfied, but remains unsatisfied in the amount of $115,010,968 including accrued post-judgment interest.

15.     On March 28, 2013, the Brown Judgment was registered in this District pursuant to 28 U.S.C. § 1963, under case number 13-mc-113-P1.

### PROCEDURAL HISTORY OF THIS ACTION

16.     Plaintiffs commenced this turnover action against Iran, Markazi, Clearstream, and Banca UBAE, SpA ("UBAE") by filing a complaint under seal on December 30, 2013.  On April 25, 2014, Plaintiffs filed an amended complaint under seal, adding JPMorgan Chase Bank, N.A. ("JPMorgan") as a defendant.

17.     Plaintiffs served Iran and Markazi with the summons and initial complaint, and the amended complaint, in accordance with the requirements of 28 U.S.C. §1608.  True and correct copies of proofs of such service are attached hereto as **Exhibit 11**.

6

297460_2

18.     Defendants Clearstream and UBAE executed waivers of service of the summons and complaint, true and correct copies of which are annexed hereto at **Exhibit 12**.

19.     Prior to commencing this action, each of the Plaintiff judgment creditor groups had:  (a) obtained orders from this Court pursuant to 28 U.S.C. § 1610(c) permitting execution against the Bond Proceeds, (b) caused writs of execution covering the Bond Proceeds to be issued by the Clerk of this Court pursuant to their respective 1610(c) Orders, (c) caused the United States Marshal of the Southern District of New York to serve such executions on Clearstream at 55 Broad Street, New York, New York within 90 days prior to the filing of this action or obtained Orders from this Court extending their executions and levies on Clearstream *nunc pro tunc* at least through the date this action was filed.  With respect to each such execution, the United States Marshal filed a return of execution with the Clerk of this Court, certifying that he had received no funds or property belonging to the Judgment Debtors.  Copies of such Orders, writs of execution and Marshal's return of execution are annexed hereto at **Exhibit 13** for the Peterson Judgment Creditors, **Exhibit 14** for the Davis Judgment Creditors; **Exhibit 15** for the Valore Judgment Creditors; **Exhibit 16** for the Bland Judgment Creditors, and **Exhibit 17** for the Brown Judgment Creditors.

20.     Defendant Iran defaulted.  Defendants Clearstream, Markazi and UBAE moved to dismiss the Amended Complaint.  UBAE simultaneously moved for partial summary judgment and JPMorgan moved for summary judgment.  On February 15, 2015, this Court (Forrest, J.) granted Defendants' motions.  *See Peterson v. Islamic Republic of Iran*, 2015 U.S. Dist. LEXIS 20640 (S.D.N.Y. Feb. 15, 2015).

21.     Plaintiffs appealed and on November 21, 2017, the Second Circuit granted Plaintiffs' appeal in part, vacated Judge Forrest's decision in part, and remanded for further proceedings before this Court.  *See Peterson v. Islamic Republic of Iran*, 876 F.2d 63 (2d Cir. 2017) ("*Peterson II*").  Clearstream and UBAE petitioned for panel rehearing and rehearing *en banc*, which motions the Second Circuit denied on February 7, 2018.

22.     Markazi and Clearstream then moved to stay the Second Circuit's mandate pending the disposition of their petitions for writs of certiorari in the U.S. Supreme Court. In support of its motion, Clearstream publicly filed a declaration by its Luxembourg counsel, Philippe Dupont of Arendt & Medernach S.A., a true and correct copy of which is attached hereto at **Exhibit 18**.  In his declaration executed on February 26, 2018, Mr. Dupont disclosed the existence of legal proceedings pending in Luxembourg against Clearstream in which other judgment creditors of Iran seek turnover of the Bond Proceeds at issue in this action.  *See* Exhibit 18 at ¶ 2.  Mr. Dupont stated that seizure writs served on Clearstream in those Luxembourg proceedings "prohibit Clearstream or any other party from transferring or dissipating" the Bond Proceeds.  *See id.* at ¶ 3. Mr. Dupont further stated:  "Based on the actions' procedural status and my extensive personal experience as a Luxembourg attorney, I believe that it will almost certainly take at least three years for the Luxembourg proceedings targeting the assets at issue in this litigation to conclude and for the corresponding seizure writs to be lifted."  *See id.* at ¶ 4. On March 1, 2018, the Second Circuit granted Markazi's and Clearstream's motions to stay its mandate.

23.     Early in May 2018, Markazi, Clearstream and UBAE filed petitions for writs of certiorari in the U.S. Supreme Court.  On October 1, 2018, the Supreme Court

invited the Solicitor General of the United States to file a brief expressing the views of

the United States on the issues raised in Markazi's and Clearstream's petitions.  The

Solicitor General responded to that invitation 14 months later, on December 9, 2019.  A

true and correct copy of the Solicitor General's amicus brief in *Clearstream Banking S.A.*

*v. Peterson*, No. 17-1529 and *Bank Markazi v. Peterson*, No. 17-1534 is attached hereto

at **Exhibit 19**.  The Solicitor General's brief noted the recent passage by the Senate and

House of Representatives of bills to amend 22 U.S.C. § 8772 such that it would apply to

the Bond Proceeds at issue in this litigation.  *See* Exhibit 19 at 19-20.  The Solicitor

General expressed the view that certiorari should be denied because of the pending

legislation and other procedural and jurisdictional issues yet to be ruled on by the trial

court.  *See id*. at 20.

24.     On December 20, 2019, the Solicitor General filed a supplemental amicus

brief in *Clearstream Banking S.A. v. Peterson*, No. 17-1529 and *Bank Markazi v.*

*Peterson*, No. 17-1534, a true and correct copy of which is annexed hereto at **Exhibit 20**.

In this supplemental brief, the Solicitor General expressed the view that in light of the

December 20, 2019 enactment of the National Defense Authorization Act for Fiscal Year

2020 ("NDAA") amending 22 U.S.C. § 8772 "it would be appropriate to grant these two

certiorari petitions, vacate the judgment below, and remand for further consideration in

light of the NDAA."  *See* Exhibit 20 at 2.

25.     On January 13, 2020, the U.S. Supreme Court issued judgments granting

Markazi's, Clearstream's and UBAE's petitions, vacating the Second Circuit's judgment

below, and remanding to the Second Circuit "for further consideration in light of the

National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-__(S. 1790).

True and correct copies of the three Supreme Court judgments are attached at **Exhibit 21**.

26.     Upon remand, the Second Circuit ordered each party to submit supplemental briefing "addressing the effects, if any, of the National Defense Authorization Act for Fiscal Year 2020 on our determination of the issues in this case as instructed by the Supreme Court in *Clearstream Banking S.A. v. Peterson*, 2020 WL 129504 (U.S. Jan. 13, 2020)."  On June 22, 2020, the Second Circuit affirmed in part and vacated in part its *Peterson II* decision (*Peterson v. Islamic Republic of Iran*, 876 F.2d 63 (2d Cir. 2017)), and remanded to this Court "to address the issues before it pertaining to the NDAA, personal jurisdiction, and, consistent with this opinion, any other matters necessary to the resolution of this case."  *Peterson v. Islamic Republic of Iran*, 963 F.3d 192, 2020 U.S. App. LEXIS 19747, at *8 (2d Cir. June 22, 2020) ("*Peterson III*").

### THE DEFENDANTS

**Defendant Iran**

27.     Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405(j) since January 19, 1984, and is therefore a "terrorist party" as defined by the Terrorism Risk Insurance Act of 2002 ("TRIA") § 20l(d)(4), 116 Stat. at 2340.  Attached hereto as **Exhibit 22** is a true and correct copy of the webpage at https://www.state.gov/state-sponsors-of-terrorism/ which was retrieved from the official website of the U.S. Department of State on August 8, 2020.

**Defendant Markazi**

28.     In the *Peterson I* Litigation, Markazi filed under seal an English translation of an October 17, 2010 affidavit sworn to the Director of Markazi's Legal Studies and Researches Department, Mr. Gholamhossein Arabieh, (the "Arabieh Affidavit"), a true and correct copy of which is attached hereto as **Exhibit 23**.  The Arabieh Affidavit attests to Markazi's status as the Central Bank of the Islamic Republic of Iran (*see* Exhibit 23 at ¶¶ 1, 8); and the fact that Markazi was established under the Banking and Monetary Act of Iran of May 27, 1960 and commenced operations in August 1960 (*id*. at ¶ 9).

29.     Effective November 25, 2011, the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") designated Iran as "a jurisdiction of primary money laundering concern."  76 Fed. Reg. 72878-72885.  That designation was renewed on November 14, 2019 and resulting rules promulgated by FinCEN continue in effect today.  *See* 84 Fed. Reg. 59302-59313 and 31 C.F.R. § 1010.661.  A true and correct copy of the U.S. Department of Treasury's findings supporting the November 21, 2011 designation (which was retrieved from the official government website of the U.S. Department of Treasury on August 8, 2020) is attached hereto at **Exhibit 24**.  Included among Treasury's 2011 findings are the facts that:  (a) "Iranian financial institutions, including the Central Bank of Iran [*i.e*., Markazi], and other state-controlled entities, willingly engage in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies around the world" (Exhibit 24 at 17); and (b) Markazi "transfers funds to designated [money-laundering] Iranian bank branches outside Iran via non-Iranian foreign banks, often involving

11

deliberate attempts on its part to conceal that the recipient is a designated [money-laundering] Iranian bank.  In some cases, this activity involves book-to-book transfers and the use of accounts at intermediary banks that hold accounts for [Markazi] and designated banks." (*id.* at 18-19).  As explained below, Markazi engaged in this type of conduct with respect to the Bond Proceeds that are the subject of this action and the assets that were the subject of the *Peterson I* Litigation.

30.     The US Department of Treasury noted that the designation of a central bank as a jurisdiction of primary money-laundering concern was unique to Markazi:

> Prior regulations that have applied Section 311 special measures to jurisdictions of primary money laundering concern have not included the jurisdiction's central bank within the scope of the regulation.  However, in the case of the Islamic Republic of Iran, this inclusion is justified due to the deceptive practices the Central Bank of Iran engages in and encourages among Iranian state-owned banks. This behavior is discussed in the notice of finding that the Islamic Republic of Iran is a jurisdiction of primary money laundering concern published elsewhere today in the Federal Register.

*See* Exhibit 24 at p. 16, n. 30.

31.     As explained in an informational memorandum dated January 4, 2012 prepared by the law firm Davis Polk & Wardell LLP (a true and correct copy of which is attached as **Exhibit 25**) the effect of FinCEN's November 25, 2011 designation of Iran as "a jurisdiction of primary money laundering concern" was, among other things; (a) to "prohibit U.S. financial institutions from opening or maintaining correspondent and payable-through accounts for Iranian financial institutions, including the Central Bank of Iran, Bank Markazi, and require U.S. financial institutions to undertake measures to avoid providing their correspondents with services benefiting Iranian financial institutions;" and (b) to block all property and interests in property of Iranian financial institutions,

including Markazi, that are within the U.S. or within the possession or control of a U.S. person.  *See* Exhibit 25 at 1.

32.     On September 20, 2019, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Markazi under Executive Order 13224 as a Specially Designated National for its role in providing billions of dollars to the Islamic Revolutionary Guards, its Quds Force and its terrorist proxy, Hizballah.  That designation continues in place to the present day.  Its effect is that all property and interests in property of Markazi that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC.  A true and correct copy of the U.S. Department of Treasury's September 20, 2019 press release:  "Treasury Sanctions Iran's Central Bank and National Development Fund," which was retrieved on August 8, 2020 from the webpage at https://home.treasury.gov/news/press-releases/sm780 on the U.S. Department of Treasury's official website is attached hereto at **Exhibit 26.**

**Defendant Clearstream**

***Clearstream is a Luxembourg Entity***

33.     According to its articles of association (a true and correct copy of which are attached hereto as **Exhibit 27**, having been retrieved from Clearstream's webpage https://www.clearstream.com/clearstream-en/about-clearstream/company-governance on Clearstream's website on August 8, 2020), Clearstream is "a public limited company (société anonyme)" formed under Luxembourg law with its registered office in the city of Luxembourg, in the Grand Duchy of Luxembourg.  *See* Exhibit 27 at 5.  According to

Ballantine's Law Dictionary (2010) a société anonyme is "[a]n association the liability of the members of which is limited" similar to a corporation.

34.     According to its webpage at https://www.clearstream.com/clearstream-en/about-clearstream/who-we-are/legal-information (a true and correct copy of which was retrieved from Clearstream's website on August 8, 2020 and is attached hereto as **Exhibit 28**), Clearstream is a "[p]ublic limited liability company registered in the G.D. of Luxembourg."  Clearstream's registered address is 42 Avenue JF Kennedy, L-1855 Luxembourg in the Grand Duchy of Luxembourg.  *See* Exhibit 28.

### *Clearstream is a Securities Intermediary*

35.     In prior proceedings in this action, Clearstream filed under seal a declaration by its Head of Operations, Mathias Papenfuß, dated August 1, 2014 (the "Papenfuß Declaration"), attesting to various facts about Clearstream's operations in Luxembourg and New York, and its use of a correspondent account at JPMorgan in New York.  A true and correct copy of the Papenfuß Declaration including the exhibits thereto is attached hereto as **Exhibit 29.**  According to the Papenfuß Declaration, "Clearstream acts as a securities intermediary for its customers in Luxembourg."  *See* Exhibit 29 at ¶ 2.

36.     Attached hereto at **Exhibit 30** is a true and correct copy of the Clearstream webpage at https://www.clearstream.com/ci/dispatch/en/listcontent/ci_nav/2_custody/ 010_over/page0_art_over.htm?tea that was retrieved from Clearstream's official website on August 21, 2012.  In providing an "overview" of Clearstream's "asset services," the webpage states:  "Clearstream provides custody services for Eurobonds and securities instruments in 52 domestic markets around the world."

14

37.     Clearstream is one of the largest international securities intermediaries in the world and boasts its status as "a global player at the forefront of our industry." According to its webpage at https://www.clearstream.com/clearstream-en/about-clearstream/who-we-are (a true and correct copy of which was retrieved from Clearstream's website on August 7, 2020 and is attached hereto as **Exhibit 31**), "Clearstream is a leading European supplier of post-trading services …[that] ensures that cash and securities are promptly and effectively delivered between trading parties.  It also manages, safekeeps and administers the securities that it holds on behalf of its customers. Over 300,000 domestic and internationally traded bonds, equities and investment funds are currently deposited with Clearstream.  Clearstream maintains relationships with customers in over 110 countries.  Its global network extends across 58 domestic markets. Backed by flexible securities lending and collateral management services, Clearstream offers one of the most comprehensive international securities services available, settling more than 250,000 transactions daily."

38.     According to Clearstream's webpage at https://www.clearstream.com/clearstream-en/about-clearstream/50-years (a true and correct copy of which was retrieved from Clearstream's website on August 8, 2020 and is attached hereto as **Exhibit 32**), Clearstream holds "assets under custody worth around €14 trillion;" "operates an international central securities depository (ICSD) as well as the Luxembourg and German central securities depositories (CSDs);" "process[es] 170 million settlement transactions annually;"  "does business in 58 markets worldwide plus the international market," has over 2,400 employees and "ha[s] evolved to become a global player at the forefront of our industry." *See* Exhibit 32.

15

***Clearstream Does Business In New York***

39.     Clearstream has done extensive business in New York continuously since at least 1996.

40.     In the *Peterson I* Litigation, Clearstream filed in this Court a declaration by the Director of its New York office, Michael Barrett, dated September 10, 2009 (the "Barrett Declaration"), attesting to various facts about Clearstream's presence and business activities in New York.  A true and correct copy of the Barrett Declaration, together with the exhibits thereto, is attached hereto as **Exhibit 33.**  According to the Barrett Declaration, Clearstream maintains a representative office in New York pursuant to an order and license issued to Clearstream's predecessor entity—Cedel Bank S.A.— by, respectively, the U.S. Federal Reserve Board of Governors on April 24, 1996 and the N.Y. State Banking Department on May 1, 1996.  *See* Exhibit 33 at ¶ 2 and Barrett Exhibits 1 and 2.

41.     In the *Peterson I* Litigation, Clearstream filed in this Court a declaration by the Co-Heads of its New York office, Acelina Ducey and Bruce Sim, dated October 24, 2012 (the Ducey and Sim Declaration"), confirming that the facts set forth in the Barrett Declaration concerning Clearstream's presence and business activities in New York continued to be accurate except that Clearstream now employed ten sales and customer support officers in New York.  A true and correct copy of the Ducey and Sim Declaration, is attached hereto as **Exhibit 34.**

42.     According to Clearstream's webpage at https://www.clearstream.com/ clearstream-en/about-clearstream/who-we-are/office-locations (a true and correct copy of which was retrieved from Clearstream's website on August 8, 2020 and is attached hereto

16

297460_2

as **Exhibit 35**), Clearstream's New York office is currently located at 1155 Avenue of the Americas, 19th Floor, New York, New York.  Clearstream previously maintained offices at One World Trade Center, New York, New York, 55 Broad Street, New York, New York, and 350 Madison Avenue, New York, New York.  *See* Exhibit 33 at Barrett Exhibit 2, Exhibit 72.

43.     Article V-B of the N.Y. Banking Law governs the licensing of representative offices of foreign financial institutions.  Section 221-a of New York Banking Law, titled "Doing business without license prohibited," provides that:

> 1.  No person, co-partnership, association, corporation or other entity shall establish, maintain or use one or more offices in this state as the representative of one or more foreign banking corporations unless the foreign banking corporation to be represented has first obtained a license from the superintendent of financial services . . . . 2.  Upon receipt of a license, the foreign banking corporation may establish one or more representative offices in this state . . . .

N.Y. Banking Law § 221-a (2020).

44.     New York Banking Law conditions the granting of a license to maintain a representative office on the New York superintendent of financial services finding that: "the financial responsibility, experience, character, and general fitness of the foreign banking corporation and its representative are such as to command the confidence of the community and to warrant belief that the representative will operate honestly, fairly, and efficiently within the purpose and intent of this article."  N.Y. Banking Law § 221-d (2020).

45.     In order to obtain the license to maintain a representative office in New York, a foreign financial institution is required under Section 221-c of N.Y. Banking Law to:  "appoint the [N.Y.] superintendent [of financial services] or his or her successor as

297460_2

agent for service of process in connection with any action or proceeding against the foreign banking corporation relating to any cause of action which may arise out of a transaction with its representative office, with the same force and effect as if it were a domestic corporation and had been lawfully served with process in this state."  N.Y. Banking Law § 221-c (2020).

46.     Pursuant to the USA Patriot Act of 2001 (Pub. L. 107-56), any foreign financial institution that maintains a correspondent account with any U.S. bank or securities broker-dealer is required to certify to the United States government that "a person who resides in the United States …is authorized to accept service of legal process for records regarding the correspondent account."  31 U.S.C. § 5318(k).  As described below, Clearstream maintains two correspondent accounts in New York.  Attached hereto as **Exhibit 36** is a true and correct copy of a webpage at

https://www.clearstream.com/resource/blob/1318736/50a8a84360db291fef94500ab04a82a0/us-patriotcertification-cbl-data.pdf that was retrieved from Clearstream's website on August 9, 2020.  Exhibit 36 reflects Clearstream's December 16, 2019 certification that: "Clearstream Banking S.A., New York Representative Office, is a resident of the United States at the following street address: 1155 Avenue of the Americas, 19th floor, New York, NY 10036, and is authorized to accept service of legal process on behalf of Foreign Bank from the Secretary of the Treasury or the Attorney General of the United States pursuant to Section 5318(k) of title 31, United States Code."  *See* Exhibit 36 at ¶ F.

47.     New York Banking Law permits the representative office of a foreign financial institution to conduct all of the following activities:

> solicitation of loans and in connection therewith, assembly of credit information, making of property inspections and appraisals, securing of title information, preparation of applications for loans including making recommendations with respect to action thereon, solicitation of investors to purchase loans from the bank, the search for such investors to contract with the bank for the servicing of such loans; solicitation of new business and conduct of research.

N.Y. Banking Law § 221-a(3)(2020).  Other activities may be conducted with the

prior written approval of the N.Y. superintendent of financial services.  *Id.*

48.      The U.S. Federal Reserve Board of Governors' April 24, 1996 order

authorizes Clearstream's New York office to perform functions "relating to [its] business

as a provider of clearing, settlement and custody services for institutional customers,

including marketing and promotional activities, providing technical assistance to [its]

customers in North and South America, answering customer inquiries, and engaging in

research." *See* Exhibit 33 at Barrett Exhibit 1.

49.      According to the Barrett Declaration, as of September 2009, the customer

base of Clearstream's New York office covered all of North America, as well as South

and Central America and the Caribbean.  *See* Exhibit 33 at ¶ 5

50.      According to the Barrett Declaration, as of September 2009, Clearstream

had 13 employees in its New York office.  *See* Exhibit 33 at ¶ 5.  These included a Senior

Expert-Sales employee whose responsibilities included achieving business plans for the

regions; providing leadership and guidance to the other New York employees;

participating in all customer facing activities in the region; increasing Clearstream's

market share; and adhering to Clearstream's best practice and customer care standards;

and whose authority included co-signing and approval of checks on Clearstream's behalf

and full access to regional and global management information systems data.  *See* Exhibit

33 at Barrett Exhibit 3.  Minimum qualifications for the position of Senior Expert-Sales
were the ability to speak English, and either a university degree in economics or finance,
or 15-20 years of prior professional experience.  *See id*.  Employees in the less senior
Expert-Sales positions in Clearstream's New York office were required to be able to
speak English, and either have a university degree or 10-15 years of prior professional
experience.  *See id*.

51.     According to the Barrett Declaration, as of September 2009, Clearstream's
New York office staff also included a Senior Expert Customer Service Manager Head of
Unit, whose responsibilities included adherence of corporate policy and regulations to the
Anti-Money Laundering Act and Bank Secrecy Act; providing leadership and guidance
to the other New York employees; participating in all customer facing activities in the
region; increasing Clearstream's market share; and adhering to Clearstream's best
practice and customer care standards; and whose authority included co-signing and
approval of checks on Clearstream's behalf and full access to regional and global
management information systems data.  *See* Exhibit 33 at Barrett Exhibit 4.  Minimum
qualifications for the position of Senior Expert Customer Service Manager Head of Unit
were the ability to speak English, and either a university degree in economics or finance,
or 15-20 years of prior professional experience.  *See id*.  Employees in the less senior
Staff—Customer Services, Americas positions in Clearstream's New York office were
required to be able to speak English, and either have a university degree or appropriate
prior professional experience.  *See id*.  Their key responsibilities included "[a]dvis[ing]
customers on the day-to-day use of all Clearstream Banking products and services;" and
"[p]rovid[ing] support services for customers on all settlement (core and cross-border

20

297460_2

transactions), cash securities lending & borrowing, credit facilities, information and custody administration issues, monitor all complex, complicated and pending enquiries that cannot be resolved or answered directly." *See id*. The Staff—Administration, Americas position in Clearstream's New York office required English fluency and a university degree or appropriate professional experience. *See id*. Key responsibilities included "[e]nsur[ing] that accounting entries from each office are coded correctly and allocated to the appropriate cost centre;" and serving as "regional liaison" with Clearstream's Human Resources, Insurance and Accounting units in Head Office. *See id*.

52.     On June 16, 23 and 24, 2008, an associate from my firm, William J Cortellessa, visited Clearstream's New York office, then located on the 23rd Floor of 350 Madison Avenue, New York for the purpose of serving restraining notices and a subpoena duces tecum on Clearstream on behalf of the Peterson Judgment Creditors.  On August 14, 2009, Mr. Cortellessa swore to an affidavit attesting to the fact that he visited Clearstream's office on those three occasions, detailing what he observed during those visits and authenticating a printout of a webpage that he had retrieved from Clearstream's official website on June 16, 2008 (the "Cortellessa Affidavit").  A true and correct copy of the Cortellessa Affidavit together with Exhibit A thereto, is attached hereto at **Exhibit 37**.

53.     According to the Cortellessa Affidavit, on June 16, 2008, while visiting the 23rd Floor of 350 Madison Avenue, Mr. Cortellesa observed that:  (a) the office had a reception area, (b) there were six to eight employees sitting at desks in an open area at the center of the office, (c) each employee had their own computer and telephone at their desk; and (d) surrounding the open area were several perimeter offices.  *See* Exhibit 37 at

21

297460_2

¶¶ 7-8.  While at Clearstream's New York office on June 16, 2008, Mr. Cortellessa met a woman who identified herself as Precy Lopez and told him that she was Michael Barrett's personal assistant and was authorized to accept service on behalf of Clearstream.  *See id.* at ¶ 10.

54.     According to the Cortellessa Affidavit, Exhibit A thereto ("Cortellessa Exhibit A") is a true copy of a webpage Mr. Cortellessa retrieved from Clearstream's website at http://www.clearstream.com/ci/dispatch/en/kir/ci_nav/2_custody/200_ contacts/040_rm_re on June 16, 2008.  *See* Exhibit 37.  It contains a telephone and fax directory listing the names of 11 employees in Clearstream's New York office at 350 Madison Avenue, New York, New York, each with a separate 212 area code telephone number and fax number and an email address with the domain name "@clearstream.com."  *See* Exhibit 37 at Cortellessa Exhibit A.

55.     Attached hereto as **Exhibit 38** is a true and correct copy of a webpage retrieved from Clearstream's website at http://www.clearstream.com/ci/dispatch/en /kir/ci_nav/6_customers/020_contact/040_rm_region/010_americas on August 14, 2009. It contains a telephone and fax directory listing the names of 13 employees in Clearstream's New York office, each with a separate 212 telephone number and fax number.  I have not subsequently been able to locate a directory of Clearstream's New York office staff on the Clearstream website.

56.     In prior proceedings in this action, Defendant JPMorgan filed under seal a declaration by its Vice President responsible for Clearstream's U.S. dollar cash correspondent account at JPMorgan in New York (the "NY Account"), Gauthier Jonckheere, dated August 5, 2014 (the "Jonckheere Declaration"), attesting to various

facts about Clearstream's use of the NY Account.  A true and correct copy of the Jonckheere Declaration is attached hereto at **Exhibit 39**.  According to the Jonckheere Declaration, Clearstream has maintained the NY Account for more than 25 years and uses it to "send and receive hundreds of bond-related payments each day that may, typically, total many billions of dollars."  *See* Exhibit 39 at ¶ 4.

57.     According to the Pappenfuß Declaration, which was filed by Clearstream in prior proceedings in this action (*see* ¶ 35 above), Clearstream uses the NY Account "as a deposit account for many types of U.S. dollar payments to Clearstream" and "to pay its current U.S. dollar obligations."  *See* Exhibit 29 at ¶¶ 2, 4.  "Each business day, approximately $7-$9 billion flows into the [NY Account], and each business day a roughly equal sum flows out."  *See id*. at ¶ 5.

58.     According to Clearstream's webpage at https://www.clearstream.com/clearstream-en/products-and-services/market-coverage/americas/united-states-of-america/general-information-u-s-a--1279596 (a true and correct copy of which was retrieved from Clearstream's website on August 8, 2020 and is attached hereto as **Exhibit 40**), in addition to the NY Account at JPMorgan, Clearstream maintains a U.S. dollar cash correspondent account at Citibank, N.A. in New York.

59.     Clearstream also maintains a custodial account at Citibank, N.A. at 399 Park Avenue, Level B Vault, New York, New York.  *See* Exhibit 40.  The $1.8 billion worth of Eurodollar bonds that were the subject of the *Peterson I* Litigation were held in this account, and ultimately turned over to the Peterson Judgment Creditors by Citibank, N.A. in the *Peterson I* Litigation.  In the *Peterson I* Litigation, Defendant Citibank, N.A. filed under seal in this Court an affidavit sworn to on June 16, 2008 by a Managing

297460_2

Director of Citigroup's Global Transactions Services Business, Mary Fenoglio, a true and correct copy of which is attached hereto at **Exhibit 41**.  Ms. Fenoglio attested to her familiarity with Clearstream's custodial account at Citibank, N.A., which she described as "an 'omnibus' account in which the transactions and assets of thousands of Clearstream account holders are combined."  *See* Exhibit 41 at ¶¶ 2, 3.

60.     According to the Barrett Declaration, Clearstream has an operating account at Citibank, N.A. that its New York office uses to pay vendors and local bills, and a payroll account at Citibank, N.A. that is controlled by Clearstream in Luxembourg. *See* Exhibit 33 at ¶ 6.

61.     Throughout this litigation, Clearstream's counsel of record before this Court, the Second Circuit and the U.S. Supreme Court have been attorneys from the New York office of Davis Polk & Wardwell L.L.P.  Clearstream's counsel of record in the *Peterson I* Litigation were, successively, attorneys from the Washinfton, D.C. and New York offices of White & Case LLP, then the New York office Davis Polk & Wardwell LLP.

62.     In March 2014, the Peterson Judgment Creditors received a grand jury subpoena from the United States Attorney for this District seeking documents related to any property of Iran or its instrumentalities (including Markazi) in the possession or control of Clearstream, and any services or acts undertaken by Clearstream for the benefit of Iran or its instrumentalities (including Markazi).  A true and correct copy of the grand jury subpoena which is dated March 27, 2014 is attached hereto at **Exhibit 42**.  In its 2019 annual report available on its website (https://www.clearstream.com/resource/blob/1317802/f7953188907a2dccca8fa078ff0a39

4d/gdb-annual-report-data.pdf), Clearstream's parent company, Deutsche Borse, states

that, "[o]n 2 April 2014, Clearstream Banking S.A. was informed that the United States

Attorney for the Southern District of New York has opened a grand jury investigation

against Clearstream Banking S.A. due to Clearstream Banking S.A.'s conduct with

respect to Iran and other countries subject to US sanction laws. Clearstream Banking S.A.

is cooperating with the US attorney."  A true and correct copy of the relevant page from

Deutsche Borse's 2019 annual report retrieved from its website on August 9, 2020, is

annexed hereto as **Exhibit 43**.

### Defendant UBAE

63.    In 2007, UBAE was a small bank then controlled by Libya's corrupt

Qaddafi regime.  Annexed hereto as **Exhibit 80** are true and correct copies of a relevant

pages from UBAE's 2007 annual report retrieved from its website on August 11, 2020,

indicating that Libyan Foreign Bank, a Libyan government owned bank, owned 49.93%

of the shares of UBAE; and an article from the New York Times dated March 24, 2011

entitled *Shady Dealings Helped Qaddafi Build Fortune and Regime* ("Libya's banks

apparently collected lucrative fees by helping Iran launder huge sums of money in recent

years in violation of international sanctions on Tehran . . . .").

### THE DEFENDANTS' CONCEALMENT OF MARKAZI'S INTEREST IN THE BONDS

64.    Through discovery taken in connection with the *Peterson I* Litigation,

Peterson Judgment Creditors uncovered an arrangement among Markazi, Clearstream and

UBAE to engage in money-laundering and evade U.S. sanctions on Iran and Markazi by

concealing Markazi's ownership of financial assets custodized at Clearstream.  This was

297460_2

the same type of conduct that resulted in the U.S. Department of Treasury's FinCEN

designating Iran as "a jurisdiction of primary money laundering concern" effective

November 25, 2011.

65.     Attached hereto at **Exhibit 44** is a true and correct certified copy of a

June 11, 2008 letter OFAC sent in a confidential response to a subpoena served in aid of

the Peterson Judgment Creditors' efforts to collect upon the Peterson Judgment (the

"OFAC Letter").  The OFAC Letter disclosed that "an Iranian government client" (*i.e.*,

Markazi) maintained an interest in certain Eurodollar bonds[2] valued at approximately

$1.8 billion USD held on Clearstream's books under account number 80726.  *See* Exhibit

44 at ¶¶ 1, 3.  The OFAC Letter disclosed that the bonds were sub-custodized for

Clearstream at Citibank, N.A. ("Citibank") in New York.  *See id*. at ¶ 2. The OFAC

Letter disclosed that the bonds were originally held in "the Iranian client's account at

Clearstream," which was account number 80726, but in February and March 2008, "were

transferred 'free of payment' (i.e., with no corresponding incoming payment instruction)

from the Iranian client's account at Clearstream to another Clearstream client's account at

Clearstream."  *See id*. at ¶¶ 2, 5. The cash proceeds of these $1.8 billion in Eurodollar

bonds sub-custodied at Citibank in New York became the subject of the *Peterson I*

Litigation, and are referred to herein as the "*Peterson I* Assets."

---

[2]  As explained by Ali Ashar Massoumi, Head of Markazi's Foreign Exchange Negotiable
Securities Section (see Exhibit 45), "'Eurodollar bonds' … are USD denominated debt instruments issued
by debtors who have no seat in U.S.  According to the U.S. Federal Reserve, about two-thirds of U.S.
currency was held abroad in Eurodollars by the 1990s."  *See* Exhibit 76 at ¶ 17.  According to Mr.
Massoumi, Markazi invested Iran's foreign currency reserves in Eurodollar bonds "issued by supra-
nationals and top-rated sovereigns or explicitly guaranteed by such sovereigns."  *See id*. at ¶¶ 12, 13.

66.     In the *Peterson I* Litigation, Markazi filed under seal an English translation of an October 17, 2010 affidavit sworn to by its Head of Foreign Exchange Negotiable Securities Section, Mr. Ali Asghar Massoumi, (the "Massoumi Affidavit"), a true and correct copy of which is attached hereto as **Exhibit 45**.  In the Massoumi Affidavit, Mr. Massoumi attested to having worked at Markazi since May 1989, having been involved in Markazi's transactions in Eurodollar bonds since 1993, and having been "personally involved in [Markazi's] negotiations with Clearstream and [Defendant UBAE] between September 2007 and February 2008."  *See* Exhibit 45 at ¶¶ 4-5. According to the Massoumi Affidavit, between December 1994 and early 2008, Markazi maintained a "custody account 80726 with Clearstream" (*i.e.*, the "Iranian client's account" identified in the OFAC Letter) in which it held Eurodollar bonds it had purchased for its own account with Iran's foreign currency reserves, including the *Peterson I* Assets specifically identified in the OFAC Letter.  *See id.* at ¶¶ 6-14, 18, 19, 26, 30.

67.     According to the Massoumi Affidavit, "as early as late 2007, well before [a] November 2008 change in the U.S. regulations [that prohibited Iranian banks from having direct dealings with U.S. financial institutions],[3] Clearstream informed Bank Markazi that it was being pressured by OFAC not to do business of any kind with Bank Markazi.  As a result of that pressure, Bank Markazi had a very short period of time in

---

[3]  The change in U.S. regulations to which Mr. Massoumi refers was OFAC's

the first months of 2008 to shift [the holdings in custody account 80726] away from Clearstream and to another custodial agent." *See id*. at ¶¶ 20-22.[4]

68.     According to the Massoumi Affidavit, to avoid the appearance that Clearstream was doing business with Markazi, Clearstream, Markazi and UBAE engaged in "negotiations" (*see* Exhibit 45 at ¶¶ 5, 18-22) that resulted in the following actions being taken by Markazi, Clearstream and UBAE within a short period of time:  (a) at Markazi's request, UBAE opened accounts on its books for Markazi, including a USD account and a custody account number 1000006 (*id*. at ¶¶ 23-25); (b) on January 18, 2008 UBAE opened a corresponding custody "account 13601" at Clearstream (hereafter referred to as the "UBAE/Markazi Account") (*id*. at ¶¶ 25-26 and Exhibit 5); (c) beginning in February, at Markazi's instruction, Clearstream transferred the Eurodollar bonds in Markazi's custody account 80726 (including but not limited to the *Peterson I* Assets) into the new UBAE/Markazi Account at Clearstream.  *See* Exhibit 45 at ¶ 26.  These transfers were the "transfer[s] 'free of payment' (i.e., with no corresponding incoming payment instruction)" referenced in the OFAC Letter.  *See* Exhibit 44 at ¶ 3.

--------

[4] On January 16, 2008, just two days before the UBAE/Markazi Account was opened, the House of Representatives first introduced H.R. 4986, the bill that Congress ultimately enacted as 28 U.S.C. Section 1605A and certain additional provisions of 28 U.S.C. Section 1610.  That bill amended the Foreign Sovereign Immunities Act ("FSIA") to provide judgment creditors of state sponsors of terrorism, such as Iran, greater enforcement rights.  The new provisions of the FSIA allow judgment creditors to enforce their judgments against agencies or instrumentalities of the state sponsors of terrorism – including Markazi – without demonstrating that those entities functioned as the alter ego of the terrorist state.  Congress finally passed that bill on January 28, 2008, and President Bush signed it into law the same day.  At the same time, international diplomats were debating the imposition of sanctions upon Iran at the United Nations.  As a result of Iran's intransigence, the United Nations' Security Council ultimately passed Resolution 1803 on March 3, 2008.  That Resolution imposed sanctions designed to deter Iran's efforts to proliferate nuclear weapons.

69. Clearstream's Executive Vice President, Mark Gem testified under oath at an evidentiary hearing in the *Peterson I* Litigation on June 27, 2008. A true and correct copy of relevant excerpts of Mr. Gem's testimony, some of which Clearstream subsequently designated as confidential, is attached hereto at **Exhibit 46**. Mr. Gem testified that he was a corporate officer and a member of Clearstream's Executive Committee. *See* Exhibit 46 at 6:12 - 7:6. He also testified that prior to January 18, 2008, UBAE had held only one proprietary account at Clearstream to hold investments owned by UBAE, which was opened in 1973. In contrast, the new custody account number 13061 (UBAE/Markazi Account) opened for UBAE was "designed to hold the interests of third parties." *See* Exhibit 46 at 32:3 – 33:13.

70. Documents obtained by the Peterson Judgment Creditors from Clearstream in discovery in the *Peterson I* Litigation corroborate Mr. Massoumi's testimony that, "[i]n February 2008, in several traunches, Bank Markazi transferred the [*Peterson I* Assets] from its custody account 80726 with Clearstream to [the UBAE/Markazi Account] . . . [and] UBAE in turn credited Bank Markazi's custody account 1000006 held with UBAE with the transferred bonds." *See* Exhibit 45 at ¶ 26. These documents *also* show that Markazi simultaneously transferred the Eurodollar Bonds that eventually yielded the Bond Proceeds that are the subject of this action (the "Remaining Bonds"), from its custody account 80726 to the UBAE/Markazi Account and that UBAE in turn credited the transferred bonds to Markazi's custody account 1000006. In a series of faxes in February 2008, Markazi instructed Clearstream to transfer from its account 80726 securities having a value in excess of $4.6 billion free of payment to UBAE's new customer account number 13061 at Clearstream. True and correct copies of

29

297460_2

the faxes secured in discovery from Clearstream, are attached hereto as **Exhibit 47**.  On

March 3, 2008, in a string of emails, UBAE confirmed receipt of the transfer by email to

Markazi attaching a list of the securities.  Markazi replied to both UBAE and three

Clearstream employees noting the list of securities received in its new account at UBAE

(no. 1000006) was missing three securities and that Markazi expects the balance of its

custody account 1000006 to be $4,627,000.00 according to a statement received from

Clearstream.  A true and correct copy of the email string is attached hereto as **Exhibit 48.**

The securities identified in the email string include the *Peterson 1* Assets as well as the

Remaining Bonds.  The email string indicates Clearstream knew that Markazi was the

beneficial owner of all the securities that had been transferred to UBAE's new customer

account at Clearstream.

71.     Thus, financial assets of equivalent value to the bonds held at Clearstream

in the UBAE/Markazi Account (No. 13061), including the Remaining Bonds, were in

turn credited by UBAE, acting as an intermediary bank, to a custody account it held in

Rome, Italy in the name of Markazi (No. 1000006).  In a letter from UBAE to Markazi

dated February19, 2008, Markazi confirmed that, UBAE is to serve as "intermediary for

your bonds related activities . . . [and that UBAE] has an analogous account with

Clearstream."  UBAE's monthly charges to Markazi were agreed to be the same as

Clearstream charged to UBAE plus a 15% fee (negotiated down to 10% per Markazi's

letter to UBAE dated June 10, 2008.  And, UBAE and Markazi agreed that Clearstream's

General Terms and Conditions were to apply to Markazi's account number 1000006 at

UBAE.  True and correct copies of UBAE's letter dated February 19, 2008, counter-

signed by Markazi, and Markazi's letters dated June 10, 2008 and September 25, 2008

297460_2

are attached hereto as **Exhibit 49**. The UBAE/Markazi Account was also governed by
Clearstream's General Terms and Conditions. *See* the UBAE/Markazi account opening
confirmation dated January 18, 2008 produced by Clearstream during the June 27, 2008
hearing in *Peterson I* Litigation, a true and correct copy of which is attached hereto as
**Exhibit 50**. On February 20, 2008, UBAE sent an email to Markazi attaching a copy of
Clearstream's General Terms and Conditions, stating, "as per your request I attached
herewith the terms and conditions we received from Clearstream S.A. Luxembourg." A
true and correct copy of the February 20, 2008 email and attached General Terms and
Conditions, which was produced by UBAE under a Hague Convention discovery request
in *Peterson I*, is annexed hereto as **Exhibit 81**.

72.     As the Massoumi Affidavit indicates, the purpose of these transfers was to
enable Markazi (and Iran) to continue to "have indirect access to [U.S.] dollar services"
from Clearstream notwithstanding U.S. sanctions prohibiting "Iranian access to U.S.
dollar markets." *See* Exhibit 45 at ¶¶ 12-13, 20-22. Notwithstanding their transfer from
Markazi's custody account 80726 at Clearstream to the UBAE/Markazi Account at
Clearstream, according to Mr. Massoumi, Markazi's Head of Foreign Exchange, Markazi
remained "the sole beneficial owner" of the Eurodollar bonds. *See id.* at ¶ 7. *See also id.*
at ¶ 30 ("Today, no party other than Bank Markazi has a legitimate interest in the
…assets in the [UBAE/Markazi] Account.").

73.     As the OFAC Letter stated, these "free of payment" transfers of
Eurodollar bonds from Markazi's custody account 80726 at Clearstream to the
UBAE/Markazi Account at Clearstream "reflect[ed] a change in the custodial status of
the assets without reflecting a change in beneficial ownership." *See* Exhibit 44 at ¶ 3.

297460_2

74.     Notwithstanding that Clearstream knew that Markazi was the beneficial owner of the bonds in the UBAE/Markazi Account, Clearstream failed to inform JPMorgan that its continuing receipt of payments on the Remaining Bonds would violate the prohibition against exportation of services to Iran in violation of 31 C.F.R. § 560.204 of the Iranian Transactions and Sanctions Regulations.  Clearstream's intent to hide this information is reflected in Clearstream's letter to UBAE dated November 11, 2009 annexed hereto as **Exhibit 51**, stating in relevant part that, "you should be aware that the Plaintiffs in the *Peterson* litigation seek to discover all of the communications between us, which due to the continuing character of the discovery, would include your letter of October 26, 2009."  UBAE had confirmed in its October 26, 2009 letter to Clearstream that, "[t]he securities . . . were originally received on February 22 and 28, 2008, into UBAE's customer account [13061] free of payment as they were transferred from account no. 80726 [Markazi's account at Clearstream], which was registered in your books in the name of the current beneficial owner of the assets.  Those same securities were administered by Clearstream for the same beneficial owner [i.e., Markazi] in the period preceding above mentioned transfer of those assets to UBAE."  A copy of the October 26, 2009 letter is annexed hereto as **Exhibit 52**.  After the October 26, 2009 letter, when Clearstream unquestionably knew that Markazi beneficially owned the bonds, Clearstream caused redemption payments on twelve of the bonds to be transferred through the U.S. Federal Reserve and JP Morgan in the sum of $739,000,000.00, plus interest payments totaling $53,699,080.96, without informing the Plaintiffs or JP Morgan of Markazi's interest therein. *See* Exhibit 66 (schedule of "Cash movement of 13675 and Cash movement related to it since Septembre 2007") described below at ¶ 89.

### Plaintiffs Restrain Markazi's Assets in the UBAE/Markazi Account

75.     Upon learning from the OFAC Letter that Clearstream was in possession of Eurodollar bonds in which "an Iranian governmental client … has a beneficial ownership," (*see* Exhibit 44 at ¶ 1), counsel for the Peterson Judgment Creditors (including myself) caused a Restraining Notice dated June 16, 2008, and an Amended Restraining Notice dated June 20, 2008, to be served on Clearstream in New York on June 16, 2008 and June 23, 2008, respectively (the "Restraints").  True and correct copies of the Restraints, together with proofs of service of same on Clearstream, are attached at **Exhibit 54** hereto.  The Restraints barred Clearstream from "mak[ing] or suffer[ing] any sale, assignment or transfer of, or any interference with" any property in which Markazi held any "interest."  *See* Exhibit 54.  The Restraints froze the Eurodollar bonds beneficially owned by Markazi that were custodied in the UBAE/Markazi Account at Clearstream.

76.     According to Clearstream's Head of Operations, Mathias Papenfuß (*see* above at ¶ 35 and Exhibit 29), "[i]n July 2008, Clearstream blocked UBAE's custodial account [*i.e.*, the UBAE/Markazi Account], in order to ensure compliance with possible applicable sanctions laws, because the security entitlements reflected in the account were alleged to be held by UBAE for Bank Markazi."  *See* Exhibit 29 (Papenfuß Declaration) at ¶ 12-13.

77.     Documents obtained by the Peterson Judgment Creditors from UBAE in discovery requests made pursuant to the Hague Convention corroborate Mr. Pappenfuß's testimony that Clearstream blocked the UBAE/Markazi Account.  Among those documents is a letter from Clearstream to UBAE dated June 5, 2009, a true and correct

33

297460_2

copy of which is annexed hereto as **Exhibit 55**.  The letter informed UBAE that
Clearstream cannot process transactions for bonds held on behalf of Iran that involve
services of U.S. persons, including JP Morgan, because doing so would violate U.S.
Iranian Transaction Regulations (31 CFR Part 560).  The letter indicates that Clearstream
opened a "sundry blocked account 13675" for the purpose of depositing and blocking
cash payments received for the benefit of Iran on account of such bonds.  The two bonds
described in the letter are among the Remaining Bonds identified in the February 27,
2012 Writ of Execution served by the Peterson Plaintiffs on Clearstream.  *See* Exhibit 72.
The letter also indicates that income payments from issuers of the bonds described
involved entities deemed "to be U.S. persons or affiliates of U.S. persons in the
performance of their functions [including]  . . . JP Morgan Chase Bank, N.A. (an entity
located in the United States), as cash correspondent bank . . . ."  *See* Exhibit 55.

78.     In response to Plaintiffs' discovery demands in the *Peterson I* Litigation,
Clearstream produced a statement for sundry blocked account 13675 (also referencing the
then blocked UBAE/Markazi Account number 13061) as of May 31, 2013, showing a
balance of $1,683,184,679.47.  A true and correct copy of the statement for the sundry
blocked account 13675 dated May 31, 2013 is annexed hereto as **Exhibit 56**.
Documents produced by UBAE in discovery in *Peterson I* indicate that UBAE similarly
credited the then blocked Bond Proceeds to Markazi's account at UBAE in concert with
Clearstream's crediting its sundry blocked account 13675.  Annexed hereto as **Exhibit 57**
are true and correct copies of a letter from UBAE to Markazi dated July 23, 2008, stating
in part as follows:

297460_2

Following meetings we had in Tehran, please note that Clearstream informed us having opened two new sub-accounts where cash blocked relating to your securities has been lodged.

As for this block we have opened two new positions for your credit the first is related to cash (coupons and matured securities) deposited with US depositories and US affiliates [the Petrson I Assets] with the balance of $316,125,000.00 and the second to cash (coupons and matured securities) in US dollars deposited in Europe [the Remaining Bonds] with the balance of $545,289,404.19.

Annexed hereto as **Exhibit 58** are true and correct copies of sample Telex messages from UBAE to Markazi all dated after Clearstream blocked the *Peterson I* Assets, Remaining Bonds and Bond Proceeds, reporting interest and redemption payments as they were received by Clearstream through its JPMorgan account in New York.  Each Telex repeats the following statement:

FOLLOWING THE RECENT CONVERSATION HELD WITH OUR HEAD OF FINANCE HERE WE WANT TO SHOW YOU THE PAYMENTS MADE IN RECENT PAST THAT INCURRED IN BLOCKED POSITION FROM THE BEGINNING 16 JUNE 2008

79.     In the *Peterson 1* Litigation, this Court entered an Order dated June 23, 2009 (a true and correct copy of which is attached at **Exhibit 59** hereto), that continued the effect of the Restraints until further order of the Court.  The June 23, 2009 order states that:  "The [R]estraints will remain in place until the Court has determined whether Clearstream is, or could be made, a proper garnishee, assuming a fraudulent conveyance could be shown by Plaintiffs."  The Restraints remain in effect today.

**EXECUTIVE ORDER 13599**

80.     On February 6, 2012, President Obama issued Executive Order 13599 Blocking Property of the Government of Iran and Iranian Financial Institutions ("EO 13599"), a true and correct copy of which is attached hereto at **Exhibit 60**.  EO 13599

35

297460_2

"blocked" "[a]ll property and interests in property of … [Markazi] that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch." *See* Exhibit 60 at §§ 1(a) and (b).  Such assets cannot "be transferred, paid, exported, withdrawn, or otherwise dealt in" by any financial institution.  *See id.* at §§ 1(a) and (b).

### THE *PETERSON I* ASSETS AND THE *PETERSON I* LITIGATION

81.     On June 8, 2010, the Peterson Judgment Creditors commenced the *Peterson I* Litigation in this Court by filing under seal a complaint seeking turnover of the *Peterson I* Assets:  *i.e.*, the $1.8 billion in Eurodollar bonds owned by Markazi, held through the UBAE/Markazi Account at Clearstream, and sub-custodized in Clearstream's depositary account at Citibank in New York.  The Peterson Judgment Creditors initially sought turnover pursuant to N.Y. CPLR §§ 5225 and 5227, and Section 201(a) of TRIA.

82.     During the pendency of the *Peterson I* Litigation, on August 10, 2012 the Iran Threat Reduction and Syrian Human Rights Act of 2012 became law.  Section 502 of that statute (which was codified at 22 U.S.C. § 8772) specifically addressed the *Peterson I* Assets.

83.     The Peterson Judgment Creditors ultimately prevailed in obtaining turnover of the *Peterson I* Assets by Citibank based on Section 8772.  *See Bank Markazi v. Peterson*, 136 S. Ct. at 1310 (2016).

84.     On January 22, 2014, the United States Department of Treasury assessed a $152 million fine against Clearstream because of Clearstream's participation in efforts to hide the identity of Markazi as the beneficial owner of the *Peterson I* Assets and the

consequent violation of United States sanctions prohibiting the exportation of services to Iran (31 C.F.R. § 560.204 of the Iranian Transactions and Sanctions Regulations). The facts underlying the reason for the fine are contained in the Settlement Agreement between The Treasury Department and Clearstream dated January 22, 2014, a true and correct copy of which is attached as **Exhibit 61**.

### THE HISTORY OF BOND PROCEEDS AT ISSUE IN THIS ACTION

85. Counsel for the Peterson Judgment Creditors (including myself) determined from discovery obtained from Clearstream in the *Peterson I* Litigation that Clearstream had transferred other Eurodollar bonds not sub-custodied in the United States (the "Remaining Bonds") in addition to the *Peterson I* Assets from Markazi's custody account 80726 to the UBAE/Markazi Account in early 2008, and that Clearstream had used a correspondent account in the U.S. to collect US dollar payments of interest and return of principal on the Remaining Bonds for Markazi's benefit.

86. Because all of the Remaining Bonds are denominated in U.S. dollars, transfers of bond income and redemptions to Clearstream for Bank Markazi's benefit necessarily passed through the United States Federal Reserve system to Clearstream's then only U.S. dollar correspondent bank, JP Morgan Chase Bank, where Clearstream's correspondent account was credited with the amount received from the bond issuers. *See*, Amicus Brief of Institute of International Bankers et al. in *Strauss v. Credit Lyonnais*, No. 19-865 (L) (2d Cir.), a true and copy of which is attached hereto as **Exhibit 62**, at 12 ("Dollar-denominated payments, wherever they originate and wherever their ultimate destination, generally 'clear' in the United States, through a U.S. bank."). In the absence

of the block Clearstream imposed effective July 8, 2008, Clearstream would have credited the custodial account of UBAE (13061) with the amount received for Bank Markazi's benefit in Clearstream's correspondent account at JP Morgan.

87.     In the normal course of events, UBAE, at Markazi's request, would have then instructed Clearstream to withdraw the U.S. dollar funds.  This would in turn have resulted in another transfer through the Federal Reserve by debiting Clearstream's correspondent account at JP Morgan and crediting UBAE's correspondent account at HSBC in New York.  For example, before Clearstream's block, such withdrawals of proceeds received from issuers of the Remaining Bonds listed on the Writ of Execution (but since sold or paid to Markazi and no longer in Clearstream's possession) are evidenced by documents UBAE produced, copies of which are annexed hereto as **Exhibit 63**.  UBAE's HSBC correspondent account statement for each transfer received from Clearstream on account of the relevant Remaining Bonds in Exhibit 63 shows that the transfer was received from "JP Morgan Chase Bank."

88.     The Remaining Bonds were held in book entry form under the indirect holding system.  Under the indirect holding system, a single global note representing the bond is custodized at a central depositary and interests therein are held by investors indirectly through a chain of securities intermediaries.  Each securities intermediary only knows or is concerned with the identity of its immediate account holder, who itself may be another intermediary that in turn holds an account for the investor.  Thus, any electronic funds transfer payment instructions, given by the issuers of the bonds would name Clearstream as the payment beneficiary (payee), because Clearstream is the only account holder known to the issuer making the payment.  Such U.S. dollar payment

instructions would name Clearstream's correspondent bank in the United States, JP

Morgan, as the payee's bank.

89.     The foregoing is illustrated by the terms of the prospectuses of the

Remaining Bonds.  For example, the prospectus for one of the Remaining Bonds issued

by the United Kingdom (ISIN XS0171740961), a copy of which is annexed hereto as

**Exhibit 64**, states in relevant part as follows:

> Ownership of beneficial interests in the Global Notes will be limited to persons that have accounts with Euroclear, Clearstream, Luxembourg or DTC or persons that may hold interests through such accountholders. Beneficial interests in the Global Notes will be shown on, and transfers thereof will be effected only through, records maintained in book-entry form by Euroclear, Clearstream, Luxembourg or DTC and their accountholders, as applicable.
>
> * * *
>
> Payments shall be made in U.S. dollars by cheque drawn on a bank in New York City and mailed to the holder (or to the first named of joint holders) of such Notes at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar before the Record Date, such payment may be made by transfer to a U.S. dollar account maintained by the payee with a bank in New York City.
>
> * * *
>
> Each of the persons shown in the records of Euroclear, Clearstream, Luxembourg or DTC as the holder of a Note represented by a Global Note must look solely to Euroclear, Clearstream, Luxembourg or DTC (as the case may be) for his share of each payment made by H.M. Treasury to the holder of such Global Note and in relation to all other rights arising under the Global Note, subject to and in accordance with the respective rules and procedures of Euroclear, Clearstream, Luxembourg or DTC (as the case maybe).

*See* Exhibit 64 at pp. 2 and 17.  The foregoing provisions are typical of those appearing in

the prospectuses for the other Remaining Bonds.  Relevant pages of the prospectuses for

bonds Plaintiffs were able to locate (ISIN's: XS0274548287, p.56; XS0173960641, pp.

297460_2

29-30; XS0188161052, p. 5; XS0190900561, pp. 22 and 47; XS0217627685, pp. 22 and 47; XS0221682239, p. 38; and XS0233408102, p. 47) are annexed hereto as **Exhibit 65**.

90.     Annexed hereto as **Exhibit 66** is a schedule Clearstream produced in discovery entitled, "Cash movement of 13675 and Cash movement related to it since Septembre 2007." The schedule summarizes Clearstream's crediting the sundry blocked account 13675 with all interest and redemption payments received from issuers of the Remaining Bonds after July 8, 2008. The total as of May 31, 2013 on the last page of the schedule (line 192, column N) is $1,683,184,679.47, exactly matching the statement balance shown in Exhibit 56 annexed hereto. Column D of the schedule indicates whether the entry is a debit or credit to the account. Column G gives the date of the transaction, and Column J lists the U.S. dollar amount of each transaction. Column K entitled "Linked isin code" lists the International Securities Identification Number ("ISIN") of the bond. Clearstream failed to provide ISIN's for each debit and credit entry on the schedule.[5] The report filed with OFAC by JPMrgan on August 4, 2014, annexes a "Bond Transaction Chart" showing the Bond Proceeds collected in Clearstream's New York correspondent account, shows that on October 15, 2012, Clearstream received in its JP Morgan account the sums of $645,033,000 and $27,413,902.50 U.S. dollars as payments on bond XS50225513703. *See* Exhibit 75, p. 22, lines 91 and 92. In its "Cash Movement" schedule with respect to the sundry blocked account 13675, Clearstream has

---

[5] By comparing the face amount of the bond described in credit entries representing redemptions and interest payments in column L and the corresponding transaction date in column G with the maturity dates and face amount of the Remaining Bonds listed in Exhibit 1 of the Writ of Execution (Exhibit 72), I was able to determine the ISIN's for all entries representing interest and redemption payments from the bond issuers and created a summary of Clearstream's schedule with the corresponding ISIN's, a copy of which is annexed hereto as **Exhibit 53**.

a corresponding credit entry with respect to the same bond in the sum of $100,000,000.00 and $4,250,000.00 to the sundry blocked account number 13675 in Luxembourg on that same day, October 15, 2012.  *See* Exhibit 66 at lines 175 and 177.  The transfers of Bond Proceeds on October 1, 2012 occurred after the effective date of EO 13599.

91.    In his declaration dated August 1, 2014, Mathias Papenfuß, admitted that, "Clearstream use[d] its cash correspondent account at JPMorgan . . . as a deposit account for . . . the deposit of U.S. dollar payments on the security entitlements at issue in this litigation which were held by Clearstream outside of the United States . . . ." *See* Exhibit 29 at ¶ 2.

92.    Because the proceeds of the Remaining Bonds were blocked and never credited to UBAE's customer account 13061, Clearstream's obligation with respect to the underlying financial asset that Clearstream was required to maintain on behalf of UBAE and Markazi remains outstanding.   Clearstream is required to maintain sufficient financial assets to satisfy UBAE's and Markazi's security entitlements.   U.C.C. §8-504(a) states that, "[a]  securities intermediary shall promptly obtain and thereafter maintain a financial asset in a quantity corresponding to the aggregate of all security entitlements it has established in favor of its entitlement holders with respect to that financial asset."   "'Security entitlement' means the rights and property interest of the entitlement holder with respect to a financial asset specified in Part 5."  Among the rights and property interests of an entitlement holder is the right to obtain payment from its security intermediary [Clearstream] for the payment or distribution made by the issuer of a financial asset [*i.e*., the Remaining Bonds] if the payment or distribution is received by the securities intermediary.  *See*, U.C.C. §8-503(c) and §8-505(b).  U.C.C. §8-504 makes

297460_2

clear that until Clearstream performs its obligations to UBAE and Markazi to pay over

any payment or distribution that Clearstream received from the issuers of the Remaining

Bonds, UBAE's and Markazi's security entitlements continue to exist, thereby requiring

Clearstream to hold a corresponding financial asset sufficient to satisfy those security

entitlements.  A financial asset is defined broadly enough to include cash received by

electronic funds transfer at Clearstream's correspondent bank from issuers of securities

held by Clearstream for Markazi's benefit.  U.C.C. §8-102 (a)(9) defines "financial asset"

in relevant part to mean:

> (ii)   an obligation of a person or a share, participation, or
> other interest in a person or in property or an enterprise of a
> person, which is, or is of a type, dealt in or traded on financial
> markets, or which is recognized in any area in which it is issued or
> dealt in as a medium for investment; or

> (iii)  any property that is held by a securities
> intermediary for another person in a securities account if the
> securities intermediary has expressly agreed with the other person
> that the property is to be treated as a financial asset under this
> Article.

U.C.C. §8-503(a) states that, "[f]inancial assets are held by the securities intermediary

[Clearstream] for the entitlement holders [Markazi], are not property of the securities

intermediary [Clearstream], and are not subject to claims of creditors of the securities

intermediary [Clearstream], except as otherwise provided in Section 8-511 [which is not

relevant here]."  Because no securities intermediary owns the financial asset - here cash

credited to Clearstream's correspondent account at JP Morgan and in turn credited by

Clearstream to the sundry blocked account no, 13675 - neither Clearstream nor UBAE

42

own the financial asset held by Clearstream.  Only the beneficial owner of the financial

asset - here Markazi - has a property interest in the financial asset.  U.C.C. §8-503(b).

93.     Consistent with the U.C.C. definitions set forth above, Markazi claims

sole beneficial interest in all bonds credited to the customer account number 1000006 that

are also credited to the UBAE/Markazi Account and the sundry blocked account 13675,

which include the Remaining Bonds.  *See* Massoumi Declaration, Exhibit 45, at ¶ 30,

stating that, "[t]oday, no party other than Bank Markazi has a legitimate interest in the

Restrained Securities or in the Assets in the Account."[6]  UBAE provided a written

response to interrogatories in the *Peterson I* Litigation stating in response to interrogatory

number 8 that, "to the best of UBAE's knowledge, all of the assets that Clearstream

currently holds in [the sundry blocked account] 13675 are beneficially owned by Bank

Markazi."  A copy of UBAE's interrogatory responses dated November 28, 2013, is

annexed hereto as **Exhibit 69**.  In correspondence exchanged between Clearstream and

UBAE after the assets were restrained Clearstream admitted that Markazi was the

beneficial owner of the securities held in both: (1) Markazi's account at Clearstream

(No. 80726), and (2) the UBAE/Markazi Account (No. 13061).  A letter from UBAE to

Clearstream, dated October 26, 2009, states in relevant part as follows:

---

[6] Markazi repeatedly admitted its beneficial ownership of the assets in the UBAE/Markazi
Account in Memorandum of Law In Support of its Motion to Dismiss the Amended Complaint for Lack of
Subject Matter Jurisdiction dated May 11, 2011 filed in the *Peterson I* Litigation, a copy of which is
annexed hereto as **Exhibit 68** at pp. 1, 5, 9, 10, 36 ("Over $1.75 billion in securities belonging to Bank
Markazi ... are frozen in a custodial omnibus account at [Citibank]."); ("The Restrained Securities are the
property of Bank Markazi, the Central Bank of Iran."); ("The aggregate value of the remaining bond
instruments - i. e., the Restrained Securities that are the property of Bank Markazi and the subject of this
Turnover Action - is thus  $1.753billion."); ("The Restrained Securities are the property of a Foreign
Central Bank .... "); ("[T]he Restrained Securities are presumed to be the property of Bank Markazi.");
("[T]he Restrained Securities are prima facie the property of a third party, Bank Markazi . . . ").

The securities that are now under OFAC's scrutiny were originally received on February 22 and 28, 2008, into UBAE's customer account free of payment as they were transferred from account number 80726, which was registered in your books in the name of the current beneficial owner of the assets [i.e., Markazi]. Those same securities were administered by Clearstream for the same beneficial owner in the period preceding above mentioned transfer of those assets to UBAE.

It is evident that <u>Clearstream, as it was and it is obliged to under existing banking regulations, has always known the identity of the beneficial owner of assets</u>.

See Exhibit 51. [Emphasis original]. In a letter to UBAE, dated November 11, 2009, Clearstream replied in part as follows:

Third, as to the beneficial owner of the securities held in your customer account with us and which you state are subject to OFAC "scrutiny," we only learned through your letter of October 26, 2009 that the current beneficial owner is the same as the holder of account no. 80726 in our books. Indeed, we asked you for this information as early as our e-mail communication of June 16, 2008, to which you never responded.[7]

See Exhibit 52.

94.    Clearstream's Head of Operations, Mathias Papenfuß (*see* Exhibit 29), has confirmed that after Clearstream froze the UBAE/Markazi Account in July 2008—apparently in response to the Peterson Judgment Creditors' Restraints —"payments of principal and interest continued to be made on [the Remaining Bonds]" and "Clearstream continued to credit corresponding interest and principal payments to the Blocked Account." *See* Exhibit 29 (Papenfuß Declaration) at ¶ 14. According to the Papenfuß

---

[7] As an aside, Clearstream had full knowledge as early as March 3, 2008, that Markazi continued to be the beneficial owner of the bonds after they were transferred to UBAE's customer account number 13061. See, ¶ 70 above and Exhibit 48.

Declaration:  "As of May 31, 2013, the Blocked Account had a balance of $1,683,184,679.47."  *See id.* at ¶ 15.

95.    The Clerk of the United States District Court, Southern District of New York issued a Writ of Execution, dated October 17, 2008 as to Markazi's interest in assets held in account number 80726 at Clearstream, which were levied upon by the United States Marshal at Clearstream Banking S.A. on October 27, 2008.  Those actions had the effect of restraining Markazi's assets at Clearstream under CPLR §5232(a).  True and correct copies of the October 17, 2008 writ of execution and the return of service by the United States Marshal evidencing this levy are annexed hereto as **Exhibit 71.**

96.    On February 27, 2012, the Clerk of this Court issued to the Peterson Judgment Creditors a writ of execution as to the Remaining Bonds (identified specifically therein by International Securities Identification Numbers, issuer, maturity date, interest rate and face amount), which writ of execution was levied upon by the United States Marshal at Clearstream's office at 55 Broad Street, New York, New York on March 2, 2012.[8]  True and correct copies of the February 27, 2012 writ of execution and the return of service by the United States Marshal evidencing this levy are annexed hereto as **Exhibit 72.**[9]

---

[8] The other Plaintiffs also caused executions against the Remaining Bonds to be served upon Clearstream after obtaining orders pursuant to 28 U.S.C. §1610(c) authorizing execution

[9] Exhibit 1 to the Writ of Execution is a copy of the list sent by UBAE to Markazi by email on March 3, 2008 (Exhibit 72), with all but the Remaining Bonds redacted.

297460_2

97.     On October 2, 2013, this Court issued under seal an order extending the February 27, 2012 writ of execution and levy against Clearstream with respect to the Remaining Bonds *nunc pro tunc* from May 30, 2012 until December 31, 2013.  A true and correct copy of the October 2, 2013 order is attached hereto at **Exhibit 73.**

### AMENDMENT OF SECTION 8772 BY THE NDAA

98.     In December, 2019, Congress passed amendments to §8772 as part of the National Defense Authorization Act of 2020, Pub. L. No. 116-120 (S.1790) (the "2020 NDAA"), and the President signed them into law.  A true and correct copy of Section 8772 marked to show the changes effectuated by Section 1226 of the NDAA is attached hereto as **Exhibit 74**.

99.     JPMorgan filed a report with OFAC as required by 31 C.F.R. §501.603 about its unwitting potential violation of the Iranian Transactions and Sanctions Regulations and EO 13599 by providing services for the benefit of Markazi, and explaining that it had not been informed of the identity of Clearstream's bondholders.  A true and correct copy of JPMorgan's report to OFAC dated August 4, 2014 is annexed hereto as **Exhibit 75**.

100.     Annexed hereto as **Exhibit 76**, is a true and correct copy of Legal Responses by N.Y. Federal Reserve Bank to European Union Clearing and Settlement Legal Certainty Group Questionnaire dated March 6, 2006.

101.     OFAC has previously issued licenses to banks to process the transfer of Iranian assets to judgment creditors, including a license issued in *Peterson 1* on July 24, 2013, a true and correct copy of which is annexed hereto as **Exhibit 77**.

102.     Annexed hereto as **Exhibit 78** is a true and correct copy of the Declaration of Francois Moyse dated February 25, 2020.  Mr. Moise is an attorney licensed to practice law in Luxembourg who was appointed to enforce a judgment entered on October 16, 2012 and related judgments entered against Iran and others by this District in *Havlish v. Bin Laden et al.*, Case No. 1:03-cv-09848-GBD.  Mr. Moyse obtained an asset freeze order in Luxembourg with respect to Markazi's assets held at Clearstream, including the Bond Proceeds in the UBAE/Markazi Account at issue in the instant action. Mr. Moyse describes the various proceedings commenced by Markazi in Luxembourg to lift the asset freeze order and his belief that, if the freeze order is lifted, Markazi "doubtless will immediately dissipate the assets." *See* Exhibit 78 at p. 2.  The Luxembourg court was expected to rule on April 1, 2020.

103.     The Luxembourg court issued its decision on April 1, 2020, which resulted in the lifting of the asset freeze.  Annexed hereto as **Exhibit 79** is a copy of the Luxembourg court's decision dated April 1, 2020 in French and an English translation. An English translation of a press release from the Luxembourg Attorney General dated April 13, 2020, a copy of which is annexed hereto as **Exhibit 67**, indicates that the April 1, 2020 court decision is not final and is likely to be the subject of an appeal.

104.     Annexed hereto as **Exhibit 70** is a copy of a letter from Clearstream's counsel in this case filed with the Court on August 7, 2020 (ECF 221), stating in part:

> Bank Markazi has initiated, on the merits, two sets of declaratory proceedings [in Luxembourg]. In those proceedings, Bank Markazi requests that Clearstream be forbidden from complying with an order directing transfer of the assets to the United States without first obtaining a decision from the Luxembourg courts that the order should be recognized in Luxembourg. Bank Markazi also previously sought a provisional order directing, as a temporary measure, that Clearstream be forbidden to transfer assets to the United States until a decision is handed down

on the merits of the declaratory proceedings. A hearing in the declaratory proceedings is currently scheduled for the end of November 2020, but Bank Markazi anticipates that a decision on the merits would be handed down only sometime after that.

I have obtained a copy of Markazi's complaint of January 17, 2018 in the pending Luxembourg proceedings, which is being translated from French to English, and will supplement this declaration as soon as the translation is received.  Upon information and belief, Markazi's complaint seeks an order compelling Clearstream to transfer the funds to a bank in Germany.

105.   There has been no prior request for the relief requested herein.

I declare under penalties of perjury pursuant to 28 U.S.C. § 1786 that the foregoing is true and correct.

Executed on August 12, 2020.

Liviu Vogel

48

297460_2

CERTIFICATE OF SERVICE

Susan M. Davies, an attorney duly licensed to practice law before the Courts of the State of New York, and this Court, certifies under penalties of perjury pursuant to 28 U.S.C. § 1746 as follows:

On August 12, 2020 at 1:07 p.m. I served true and correct copies of the foregoing Declaration of Liviu Vogel executed on August 12, 2020 together with Exhibits 1-81 thereto on counsel of record for Defendants Bank Markazi, Clearstream Banking, S.A., and Banca UBAE, S.p.A. by a secure electronic file transfer using "SendThisFile" transmitted to the following e-mail addresses:

dluke@jaffeandasher.com; rkry@mololamken.com; ben.kaminetzky@davispolk.com; brendan.mooney@davispolk.com; ucolella@czlaw.com; jzefutie@czlaw.com.

In an email message sent to the same e-mail addresses at 2:11 p.m. on August 12, 2020, I notified counsel of the electronic file transfer and asked them to notify me that day if they required a paper copy of the declaration and exhibits to be mailed to them.  No counsel requested that a paper copy be mailed to him.

I certify under penalties of perjury pursuant to 28 U.S.C. § 1786 that the foregoing is true and correct.

Executed on August 13, 2020.

Susan M. Davies