### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

DEBORAH D. PETERSON, *et al.*,

     Plaintiffs,

  v.

ISLAMIC REPUBLIC OF IRAN; BANK
MARKAZI a/k/a CENTRAL BANK OF
IRAN; BANCA UBAE SpA;
CLEARSTREAM BANKING, S.A.; and
JP MORGAN CHASE BANK, N.A.,

     Defendants.

Case No. 13-cv-9195 (LAP)

### BANK MARKAZI'S MEMORANDUM OF LAW IN SUPPORT OF ITS
### MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION
### FOR SUMMARY JUDGMENT AND A PRELIMINARY INJUNCTION

Donald F. Luke
JAFFE & ASHER LLP
600 Third Avenue
New York, New York  10016
(212) 687-3000

Robert K. Kry
Lauren M. Weinstein
MOLOLAMKEN LLP
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
(202) 556-2000
rkry@mololamken.com

Lisa W. Bohl (*pro hac vice* forthcoming)
MOLOLAMKEN LLP
300 N. LaSalle St.
Chicago, Illinois  60654
(312) 450-6700

*Attorneys for Defendant Bank Markazi*

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.     The Luxembourg Assets ........................................................................................... 3

II.    Prior Proceedings ...................................................................................................... 5

       A.     *Peterson I* ..................................................................................................... 5

       B.     *Peterson II* ................................................................................................... 7

       C.     Luxembourg Proceedings ............................................................................. 9

ARGUMENT ...................................................................................................................... 10

I.     Plaintiffs' Turnover Action Should Be Dismissed ................................................ 10

       A.     The Luxembourg Assets Are Immune from Execution ............................... 11

              1.     Bank Markazi Is Entitled to Due Process ....................................... 12

              2.     Section 8772 Violates Bank Markazi's Due Process Rights by
                     Permitting Seizure of Assets with No Meaningful Connection
                     to the United States ........................................................................ 14

              3.     Section 8772 Violates Bank Markazi's Due Process Rights by
                     Depriving Bank Markazi of a Neutral Decisionmaker .................... 20

       B.     The Court Lacks Jurisdiction over Claims Against Bank Markazi .............. 23

              1.     The Court Lacks Subject-Matter Jurisdiction over Bank Markazi ........... 23

              2.     The Court Lacks Personal Jurisdiction over Bank Markazi .................... 25

              3.     The Absence of Jurisdiction over Bank Markazi Requires
                     Dismissal of This Turnover Action ................................................ 28

       C.     The Turnover Action Violates the Treaty of Amity ............................. 30

II.    Plaintiffs Are Not Entitled to Summary Judgment ........................................... 31

III.   Plaintiffs Are Not Entitled to a Preliminary Injunction ...................................... 33

       A.     Plaintiffs' Injunction Would Infringe Bank Markazi's Immunity ...................... 33

B.    Plaintiffs Have Not Shown a Clear Likelihood of Success on the Merits ............ 34

C.    Plaintiffs Have Not Shown They Will Suffer Irreparable Harm ......................... 35

D.    A Preliminary Injunction Is Not in the Public Interest ......................................... 37

CONCLUSION ................................................................................................................. 39

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157 (2d Cir. 1998)..............................25

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981)............................................................15

*Am. Charities for Reasonable Fundraising Regul., Inc. v. Pinellas County*,
    221 F.3d 1211 (11th Cir. 2000) ........................................................16

*Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247 (1992)..........................................................24

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ...............................23

*Autotech Techs. LP v. Integral Rsch. & Dev. Corp.*, 499 F.3d 737 (7th Cir. 2007).....................11

*In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305 (S.D. Fla. 2010) ...................19

*Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016) ..........................................................7, 23

*Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020) ...........................................................9

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) .......................................18

*Beacon Enters., Inc. v. Menzies*, 715 F.2d 757 (2d Cir. 1983) .......................................32

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017)........................................................34

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773 (2017) .......................................26

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401 (2d Cir. 2011).......................................34

*Calcote v. Tex. Pac. Coal & Oil Co.*, 157 F.2d 216 (5th Cir. 1946)...........................................30

*Califano v. Sanders*, 430 U.S. 99 (1977) .......................................................24

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).................................................20, 21, 22

*Certain Iranian Assets (Iran v. U.S.)*, No. 164,
    Judgment on Preliminary Objections (I.C.J. Feb. 13, 2019)......................................31

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018)...................................19

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016)...........................................20

*Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002) ...................................11

*Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139, 2018 WL 1353290
 (S.D.N.Y. Mar. 15, 2018) ................................................................16

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.
 v. Pemex – Exploración y Producción*, 832 F.3d 92 (2d Cir. 2016).......................................12

*D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1971)........................................21

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ..........................................................20, 26

*DCP Farms v. Yeutter*, 957 F.2d 1183 (5th Cir. 1992).....................................................21

*In re DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.*,
 953 F.3d 890 (6th Cir. 2020) .............................................................25

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)........................................................13

*EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78 (2d Cir. 2015) .....................14

*Epperson v. Ent. Express, Inc.*, 242 F.3d 100 (2d Cir. 2001) ............................................28

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998)........................................14

*First Inv. Corp. of Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*,
 703 F.3d 742 (5th Cir. 2012) .............................................................12

*First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba*,
 462 U.S. 611 (1983)................................................................12, 13

*Fort Bend County v. Davis*, 139 S. Ct. 1843 (2019).......................................................24

*Francolino v. Kuhlman*, 365 F.3d 137 (2d Cir. 2004) .....................................................22

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) ..........................................36

*Friedman v. Bloomberg L.P.*, 884 F.3d 83 (2d Cir. 2017) ................................................11

*Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*,
 582 F.3d 393 (2d Cir. 2009)...........................................................12, 13, 14

*Gater Assets Ltd. v. AO Gazsnabtranzit*, 413 F. Supp. 3d 304 (S.D.N.Y. 2019) .........................14

*Gen. Dynamics U.K. Ltd. v. Libya*, No. 16 Misc. 412, 2017 WL 945639
 (S.D.N.Y. Feb. 27, 2017)................................................................34

*Glencore AG v. Bharat Aluminum Co.*, No. 10 Civ. 5251, 2010 WL 4323264
 (S.D.N.Y. Nov. 1, 2010) ................................................................27

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567 (2004) ..........................................25

iv

*GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805 (D.C. Cir. 2012)................................12

*Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143 (1934)......................15

*Havlish v. bin Laden*, No. 03 Civ 9848, Dkt. 504 (S.D.N.Y. Apr. 7, 2020)................................37

*Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94 (2d Cir. 2000) ........................33

*Hilton v. Guyot*, 159 U.S. 113 (1895)........................................................38

*John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235 (S.D.N.Y. 1995)........................37

*Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978)....................................21

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) ................................................15

*Lawrence v. Wilder Richman Sec. Corp.*, 417 F. App'x 11 (2d Cir. 2010)....................36

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ........................13

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262,
    2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ........................20

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) ............17, 18, 19, 26

*McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578 (8th Cir. 1981) ........................15

*Metro. Life Ins. Co. v. Ward*, 470 U.S. 869 (1985)........................................12

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) ............33, 34

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157
    (2d Cir. 1999)........................................................31

*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989) ........................25

*Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555 (2d Cir. 2020) ........................10, 11, 23

*Pascarella v. Sandals Resort Int'l, Ltd.*, No. 19 Civ 2543, 2020 WL 1048943
    (S.D.N.Y. Mar. 4, 2020) ........................20

*Peacock v. Thomas*, 516 U.S. 349 (1996)........................................28

*Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010) ........................11

*Peterson v. Islamic Republic of Iran*, 758 F.3d 185 (2d Cir. 2014)........................7, 31

*Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017)........................7, 8, 16

*Peterson v. Islamic Republic of Iran*, 963 F.3d 192 (2d Cir. 2020)............................................9

*Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518, 2013 WL 1155576
    (S.D.N.Y. Mar. 13, 2013) ..................................................... *passim*

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...........................................15, 16

*Pillsbury Co. v. FTC*, 354 F.2d 952 (5th Cir. 1966).....................................................21

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576
    (D.C. Cir. 2020) ..................................................................34

*Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102 (1968)....................30

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996) .........16

*Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416, 2011 WL 4634172
    (S.D.N.Y. Oct. 4, 2011) ........................................................33

*Raia v. Pompeo*, No. 20 Civ. 1083, 2020 WL 1921573 (E.D.N.Y. Apr. 21, 2020) .....37

*Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014) ..................................23

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) ........................................29

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) .........11

*Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145 (2013)..........................................24

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ...........................................................27, 28

*Sheerbonnet, Ltd. v. Am. Express Bank, Ltd.*, 951 F. Supp. 403 (S.D.N.Y. 1995)......30

*In re Shulman Transp. Enters., Inc.*, 744 F.2d 293 (2d Cir. 1984)..............................20

*Soo Line R.R. Co. v. Overton*, 992 F.2d 640 (7th Cir. 1993)......................................16

*Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226 (2d Cir. 1995)..................33

*Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010)............................18

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27 (2d Cir. 1995)..................34

*United States v. Funds Held for Wetterer*, 210 F.3d 96 (2d Cir. 2000)........................13

*United States v. Webster Record Corp.*, 192 F. Supp. 104 (S.D.N.Y. 1961) ..............30

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003)..................................................15

*Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, No. 18 Civ. 1876,
    2020 WL 4586729 (S.D.N.Y. Aug. 10, 2020) ............................................................. 17, 18, 19

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983) ....................................................... 26

*Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016) ..................................... 26, 27

*Ward v. Village of Monroeville*, 409 U.S. 57 (1972) ....................................................................... 20

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const. amend. V ................................................................................................................ *passim*

U.S. Const. amend. XIV ............................................................................................................ *passim*

22 U.S.C. § 8772 ........................................................................................................................ *passim*

22 U.S.C. § 8772(a) ............................................................................................................................ 6

22 U.S.C. § 8772(a)(1) .............................................................................................................. *passim*

22 U.S.C. § 8772(a)(1)(A) ............................................................................................................... 16

22 U.S.C. § 8772(a)(1)(B) ............................................................................................................... 16

22 U.S.C. § 8772(a)(1)(C) ................................................................................................................. 9

22 U.S.C. § 8772(a)(2) ................................................................................................................ 8, 21

22 U.S.C. § 8772(b) ..................................................................................................................... 6, 38

22 U.S.C. § 8772(b)(2) ................................................................................................................ 8, 20

22 U.S.C. § 8772(d)(3) .......................................................................................................... 9, 13, 21

28 U.S.C. § 1330(a) .................................................................................................................... 24, 26

28 U.S.C. § 1330(b) .................................................................................................................... 25, 26

28 U.S.C. § 1603(b) ......................................................................................................................... 11

28 U.S.C. § 1604 .............................................................................................................................. 23

28 U.S.C. §§ 1605-1607 ................................................................................................................... 24

28 U.S.C. § 1609 .............................................................................................................................. 23

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 .................. *passim*

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 ............................36

Iran Threat Reduction and Syria Human Rights Act of 2012,
    Pub. L. No. 112-158, 126 Stat. 1214 ...........................................................................6

National Defense Authorization Act for Fiscal Year 2020,
    Pub. L. No. 116-92, § 1226, 133 Stat. 1198, 1645 (2019) ..................................8, 10

Fed. R. Civ. P. 19 .................................................................................................29, 30

Fed. R. Civ. P. 19(a)(1)(B) ..........................................................................................29

Fed. R. Civ. P. 19(b) ...................................................................................................29

Fed. R. Civ. P. 56(d) ...................................................................................................33

N.Y. C.P.L.R. 5301-5309 ............................................................................................35

### OTHER AUTHORITIES

Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran,
    Aug. 15, 1955, arts. III-IV, 8 U.S.T. 899, 902-04 ..........................................30, 31

Executive Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012) ...................................36

Michael R. Pompeo, U.S. Dep't of State, *Remarks to the Media* (Oct. 3, 2018) .........................31

Kate Ackley, *Rival Groups of Terror Victims Square Off*, Roll Call, May 22, 2012 ....................6

Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth
    Amendment Due Process*, 105 Harv. L. Rev. 1217 (1991).....................................15

Daniel Fisher, *How One Lawyer Convinced Congress To Help Him Win
    $2 Billion from Iran*, Forbes, Apr. 22, 2016 ........................................................6

Gibson Dunn, *Amendment to Foreign Sovereign Immunities Act Makes It Easier for
    Victims To Recover Damages from State Sponsors of Terrorism* (Jan. 28, 2008) ......................6

William D. Hawkland *et al.*, *Uniform Commercial Code Series* (2013).........................................4

Julie Triedman, *Can U.S. Lawyers Make Iran Pay for 1983 Bombing?*,
    Am. Law., Oct. 28, 2013................................................................................6

U.C.C. § 8-112(c) & cmt. 3 .........................................................................................4

Uniform Foreign-Country Money Judgments Recognition Act
(Unif. L. Comm'n 2005)........................................................................................36

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*
(3d ed. rev. 2020)................................................................................................30

Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign
Nations*, 88 Fordham L. Rev. 633 (2019) .......................................................14, 23

## **INTRODUCTION**

Four years ago, plaintiffs succeeded in executing against nearly $2 billion of assets in New York in which Bank Markazi had an interest.   Facing insurmountable obstacles of sovereign immunity, separate juridical status, and indirect ownership under the Uniform Commercial Code, plaintiffs drafted and then aggressively lobbied Congress to enact extraordinary legislation that effectively dictated the outcome of their case by singling out the proceeding by docket number and systematically eliminating each of Bank Markazi's defenses.

Plaintiffs now seek to outdo even that unprecedented feat.   Plaintiffs once again persuaded Congress to enact bespoke legislation to dictate the outcome of their specific case. But unlike the assets in the prior case, the funds here are not even located in the United States. Rather, they are held *in Luxembourg* by a *Luxembourg custodian*.  Plaintiffs' latest collection effort thus defies not only all traditional norms of legislative and judicial action, but also any sensible conception of the appropriate territorial scope of United States law.

The Court should reject this latest effort.   For one thing, the Luxembourg assets are immune from execution.  Plaintiffs' sole basis for overcoming immunity is Congress's recent amendments to 22 U.S.C. § 8772.  But that statute is unconstitutional because it violates Bank Markazi's due process rights in multiple respects.

First, the statute purports to apply United States law to a dispute with no jurisdictionally sufficient connection to the United States.  This case involves proceeds from bonds issued by foreign sovereigns and supranationals that are held by a Luxembourg clearing agency in a Luxembourg account.  Plaintiffs' sole theory for a U.S. nexus is that *Clearstream* used a correspondent account in New York to process the principal and interest payments on the bonds. But that theory provides no basis for depriving *Bank Markazi* of its property interests.  Bank

Markazi had no control over Clearstream's correspondent account and no role whatsoever in deciding how Clearstream processed the principal and interest payments on the bonds.

Section 8772 also violates Bank Markazi's due process rights by denying it a neutral decisionmaker.  Plaintiffs are trying to seize property in which Bank Markazi has an interest on the basis of legislation that plaintiffs themselves drafted and lobbied Congress to enact for the avowed purpose of dictating the outcome of this proceeding.  Due process requires cases to be decided by neutral judges, not instructions from Congress – much less instructions that Congress prescribed at the behest of the opposing party in the litigation.

Even if this Court had authority over the Luxembourg assets, it would still lack jurisdiction over Bank Markazi, an indispensable party in this turnover action.  The Court lacks subject-matter jurisdiction over Bank Markazi because the Foreign Sovereign Immunities Act is the exclusive source of jurisdiction over claims against foreign sovereigns; that statute by its terms does not apply; and nothing in § 8772 either expands the FSIA's jurisdictional grant or creates a new source of jurisdiction for claims against sovereigns.

The Court also lacks personal jurisdiction over Bank Markazi.  Whatever connection Bank Markazi may have to Clearstream's correspondent account is irrelevant for specific jurisdiction purposes because it does not arise out of the underlying controversy.  That controversy is the 1983 bombing of the U.S. Marine barracks in Beirut, not the turnover action plaintiffs filed in an effort to collect on their claims.  In any case, the Court lacks personal jurisdiction over Bank Markazi for the same reason due process prohibits applying § 8772 to this dispute – the case has no reasonable connection to the United States.

Those defects require dismissal.  At a minimum, they preclude summary judgment.  There are plenty of issues on which there are at least genuine disputes of fact, including Bank

Markazi's lack of any nexus to the United States in connection with the bond proceeds at issue, as well as plaintiffs' role in procuring the legislation that allegedly resolves the case in their favor.

Finally, the Court should deny plaintiffs' request for a preliminary injunction. Plaintiffs totally ignore the heightened standards that apply to injunctions that would alter rather than maintain the status quo. Plaintiffs manufacture irreparable harm by misstating the relief Bank Markazi is seeking in the related Luxembourg proceedings. And plaintiffs distort the public interest by wholly disregarding the compelling Luxembourg interests in this case. Any of those defects is grounds to deny the injunction plaintiffs seek.

## BACKGROUND

### I. THE LUXEMBOURG ASSETS

Bank Markazi is the Central Bank of the Islamic Republic of Iran. Arabieh Aff. ¶8 (Kry Decl. Ex. A). Under Iranian law, it is a distinct legal entity separate from the Iranian government, with all the attributes of an autonomous juridical person. *Id.* ¶13. Bank Markazi has financial and administrative independence from the Iranian government, and is governed by Iran's generally applicable corporate law. *Id.* ¶14. Bank Markazi has the customary powers of a separate corporation, including the right to sue and be sued and to own and sell property in its own name. *Id.* ¶15. Bank Markazi is managed by an Executive Board, a Supervisory Board, and other management organs constituted pursuant to Iranian law. *Id.* ¶¶16-26.

Bank Markazi often invests in bonds issued by foreign sovereigns or supranational entities. Massoumi Aff. ¶¶12-13 (Kry Decl. Ex. B). In 1994, Bank Markazi opened an account with Clearstream Banking, S.A., in Luxembourg. *Id.* ¶¶15, 19. Clearstream dominates the market for so-called "Eurodollar" bonds – debt instruments issued by foreign sovereigns or other entities that have no seat in the United States but which are denominated in U.S. dollars. *Id.* ¶17.

This case involves proceeds from several U.S.-dollar-denominated bonds issued by foreign sovereigns or supranational entities.  Vogel Decl. Exs. 53, 72.  Until 2008, Bank Markazi held its securities entitlements in those bonds directly in its own account at Clearstream in Luxembourg.  Massoumi Aff. ¶¶ 19-21.  U.S. regulators, however, began pressuring Clearstream to stop doing business with Bank Markazi.  *Id.* ¶ 22.  As a result, Bank Markazi transferred its securities entitlements free of payment to an Italian bank, Banca UBAE SpA, which then held them in its own account at Clearstream in Luxembourg.  *Id.* ¶¶ 23-28.  UBAE became the legal owner, although Bank Markazi retained an indirect beneficial interest through its own account at UBAE.  *Id.* ¶¶ 26, 30; *see* U.C.C. § 8-112(c) & cmt. 3 (Kry Decl. Ex. C); 7A William D. Hawkland *et al.*, *Uniform Commercial Code Series* § 8-112:01 (2013) (Kry Decl. Ex. D).  As the bonds paid interest and matured, Clearstream credited the interest and principal payments to UBAE's account in Luxembourg, and later to a separate sundry account Clearstream set up in Luxembourg specifically to hold the bond proceeds.  Vogel Decl. Exs. 53, 55, 56.

Clearstream processed those payments through a correspondent account it maintained at JPMorgan in New York.  Vogel Decl. Ex. 75.  Bank Markazi had no control over those correspondent banking arrangements.  As Bank Markazi's former Head of its Foreign Exchange Negotiable Securities Section explains:  "Bank Markazi had no control over Clearstream's correspondent bank accounts, no access to Clearstream's correspondent accounts, and no role in managing or operating those correspondent accounts."  Massoumi Supp. Decl. ¶ 4.  "Bank Markazi had no right to demand that Clearstream use a particular correspondent bank account to process payments on a bond."  *Id.*  "Bank Markazi had [no] business telling Clearstream what correspondent banks to use, as [its] sole concern was whether [its] account with Clearstream was credited with the interest or principal on a bond when due."  *Id.*  In purchasing a bond, moreover,

Bank Markazi did not "inquir[e] into . . . what correspondent banks would be used to process the principal or interest payments on the bonds." *Id.* ¶ 5. Bank Markazi "did not consider that it was Bank Markazi's business to know or ask about those matters." *Id.*

The documentary evidence confirms that testimony. Clearstream's General Terms and Conditions state only that Clearstream will "collect . . . cash amounts distributable or payable in respect of the principal of, [or] premium or interest on . . . securities deposited by the Customer" and "credit[ ] [them] to the relevant Customer account." Vogel Decl. Ex. 81 art. 20. They say nothing about ***how*** Clearstream will process those payments or what correspondent banks it might use. *Id.* And they give no control to customers over how Clearstream processes those payments. *Id.* Similarly, while certain bond prospectuses indicate that issuers may make principal or interest payments ***from*** a U.S. bank, they do not dictate how a securities intermediary like Clearstream processes those payments. Vogel Decl. Ex. 64 § 5(a), Ex. 65 at 4.

## II.   PRIOR PROCEEDINGS

### A.   *Peterson I*

Plaintiffs hold default judgments against the Iranian government that award total compensatory damages of over $3.8 billion. Vogel Decl. Exs. 1-10. The judgments all relate to the October 23, 1983, bombing of the U.S. Marine barracks in Beirut, Lebanon, by Hezbollah, an organization that allegedly received support from the Iranian government. *Id.* Bank Markazi is not a party to any of the judgments, was not named as a defendant in any of the underlying actions, and is not alleged to have played any role whatsoever in the 1983 bombing. *Id.*

In June 2008, plaintiffs sought to satisfy a portion of their judgments by executing against $1.75 billion in bonds that Clearstream held at Citibank in New York for the ultimate benefit of Bank Markazi. *See Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518, 2013 WL 1155576, at *2, 5 (S.D.N.Y. Mar. 13, 2013) ("*Peterson I*"). Bank Markazi defended against that action on

the ground that the assets were entitled to sovereign immunity, that Bank Markazi was a juridically separate entity not liable for debts of the Iranian government, and that Bank Markazi was not the direct legal owner of the assets.  *Id.* at *19-26.

While those proceedings were unfolding, Congress enacted the Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, 126 Stat. 1214 (codified as amended at 22 U.S.C. § 8772).  Section 502 of that statute singled out *Peterson I* by name and docket number and purported to subject the assets in that proceeding to execution notwithstanding each of Bank Markazi's defenses.  22 U.S.C. § 8772(a)-(b).

According to press reports, that legislation was "[d]rafted" by plaintiffs' counsel in this case.  Julie Triedman, *Can U.S. Lawyers Make Iran Pay for 1983 Bombing?*, Am. Law., Oct. 28, 2013 (Kry Decl. Ex. E).  A "Peterson lobbyist" then "pressed lawmakers to add [the] provision to a new Iran sanctions bill."  *Id.*; *see also* Kate Ackley, *Rival Groups of Terror Victims Square Off*, Roll Call, May 22, 2012 (Kry Decl. Ex. F) (plaintiffs' representatives "have been lobbying for months for wording that they say would help them and other victims gain access to the pot of money"); Daniel Fisher, *How One Lawyer Convinced Congress To Help Him Win $2 Billion from Iran*, Forbes, Apr. 22, 2016 (Kry Decl. Ex. G) ("It took more than a decade of . . . heavy lobbying in Congress to obtain [the] special legislation . . . .").  Plaintiffs' counsel have also successfully lobbied Congress to enact other legislation, including the 2008 amendments to the Foreign Sovereign Immunities Act that expanded the terrorism exception.  *See* Kry Decl. Ex. G (plaintiffs' counsel "prodded Congress to pass the laws that facilitated his case against Iran and says he helped write at least one of them"); Gibson Dunn, *Amendment to Foreign Sovereign Immunities Act Makes It Easier for Victims To Recover Damages from State Sponsors of*

*Terrorism* (Jan. 28, 2008) (Kry Decl. Ex. H) (plaintiffs' law firm "successfully lobbied for enactment of this provision").

Relying heavily on that new legislation, this Court ordered turnover of the assets. *See Peterson I*, 2013 WL 1155576, at *28-34. The Second Circuit affirmed. *See Peterson v. Islamic Republic of Iran*, 758 F.3d 185 (2d Cir. 2014). The Supreme Court granted certiorari to review Bank Markazi's separation-of-powers challenge, but ultimately affirmed in a 6 to 2 decision. *See Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).

**B.    *Peterson II***

On December 30, 2013, while the *Peterson I* litigation was ongoing, plaintiffs commenced this action ("*Peterson II*") seeking the turnover of other bond proceeds that Clearstream held for the benefit of Bank Markazi. Dkt. 1. On February 20, 2015, this Court granted Bank Markazi's motion to dismiss. Dkt. 166. The Court held that "[t]he evidence in the record is clear that any assets in which Bank Markazi has an interest, and which are at issue in this action, are in Luxembourg." *Id.* at 21. And "[t]he FSIA does not allow for attachment of property outside of the United States." *Id.*

The Second Circuit affirmed in part and vacated in part. *See Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017). Plaintiffs argued that the assets were located in New York because Clearstream used its correspondent account at JPMorgan to process principal and interest payments. *Id.* at 84. The Second Circuit disagreed. "Clearstream's correspondent account at JPMorgan was a general 'operating account,' used to service transactions on behalf of many customers who are not parties to this litigation." *Id.* at 85 (citation omitted). "[N]o cash attributable to the Markazi-owned bond proceeds was transferred from Clearstream's correspondent account at JPMorgan to Markazi or UBAE." *Id.* Instead, "cash flowed into the Clearstream correspondent account at JPMorgan, which was then used to meet other customers'

demands," and "Markazi was made whole by . . . the recordation of an equivalent right to payment in Luxembourg."  *Id.* at 86.  "[T]he assets at issue are, therefore, . . . located in Luxembourg."  *Id.* at 87.  Despite that ruling, the court held that plaintiffs could seek turnover of the assets ***even though*** they were in Luxembourg because, in its view, the Foreign Sovereign Immunities Act does not apply to assets outside the country.  *Id.* at 87-95.

Bank Markazi sought Supreme Court review.  The Solicitor General filed a brief for the United States that largely concurred in Bank Markazi's position on the merits.  Vogel Decl. Ex. 19.  The United States agreed that the Second Circuit's denial of immunity was "flawed."  *Id.* at 11.  Every other court of appeals to have addressed the issue, it noted, "treated the presence of the disputed foreign sovereign property ***in the United States*** as a prerequisite to attachment or execution in U.S. courts."  *Id.* at 12.

Congress then enacted the National Defense Authorization Act for Fiscal Year 2020 ("NDAA"), Pub. L. No. 116-92, 133 Stat. 1198 (2019).  In Section 1226, Congress – presumably once again at the behest of plaintiffs' counsel – amended 22 U.S.C. § 8772 to authorize the seizure of these assets too.  133 Stat. at 1645.  The statute singles out the assets "identified in and the subject of proceedings in the United States District Court for the Southern District of New York in Peterson et al. v. Islamic Republic of Iran et al., Case No. 13 Civ. 9195 (LAP)."  22 U.S.C. § 8772(b)(2).  To permit seizure, the Court need only find that "Iran holds equitable title to, or the beneficial interest in, the assets" and that "no other person possesses a constitutionally protected interest."  *Id.* § 8772(a)(2).  The statute applies "notwithstanding any other provision of law, including any provision of law relating to sovereign immunity."  *Id.* § 8772(a)(1).  It "preempt[s] any inconsistent provision of State law."  *Id.*  It abrogates any distinction between

Bank Markazi and the government of Iran.  *Id.* § 8772(a)(1)(C), (d)(3).  And it applies "without regard to concerns relating to international comity."  *Id.* § 8772(a)(1).

The Supreme Court then granted, vacated, and remanded the Second Circuit's decision for further proceedings in light of that new statute.  *See Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020).  On remand, the Second Circuit reinstated the portion of its opinion concluding that the assets are located in Luxembourg.  *See Peterson v. Islamic Republic of Iran*, 963 F.3d 192, 196 (2d Cir. 2020) ("[T]he assets at issue are . . . located in Luxembourg.").  The Second Circuit then remanded to this Court.  *Id.*

### C.    Luxembourg Proceedings

As those proceedings were unfolding in the United States, the same assets have also been the subject of multiple proceedings in Luxembourg.  U.S. plaintiffs have attempted to seize the assets on at least five occasions.  The Luxembourg courts have rejected every attempt.

On January 14, 2016, a group of 102 plaintiffs including Tara Bane and Fiona Havlish tried to attach the assets.  On April 1, 2020, the Luxembourg Court of Appeal vacated the restraints on the basis of a Luxembourg statute that prohibits attachment of assets held by a financial clearing agency like Clearstream.  Gaicio Decl. ¶ 2 & Ex. A.

On March 22, 2017, Stephen Flatow tried to attach the same assets.  On July 10, 2019, the Court of Appeal rejected the attachment.  Gaicio Decl. ¶ 3 & Ex. B.  Also on March 22, 2017, Arline Duker and Leonard Eisenfeld tried to attach the assets.  On July 10, 2019, the Court of Appeal rejected that attempt.  Gaicio Decl. ¶ 4 & Ex. C.  On December 18, 2019, Stephen Flatow served yet another attachment.  On June 30, 2020, a Luxembourg court rejected the attachment.  Gaicio Decl. ¶ 5 & Ex. D.  Finally, on March 27, 2020, a group of 201 plaintiffs including Alice Hoglan tried to attach the assets.  On May 13, 2020, a Luxembourg court rejected that attachment too.  Gaicio Decl. ¶ 6 & Ex. E.

While attempting unsuccessfully to attach the assets, U.S. plaintiffs have also tried to persuade Luxembourg courts to recognize their terrorism judgments against Iran and Iranian entities.   On March 22, 2016, the 102 Bane/Havlish plaintiffs brought a proceeding in Luxembourg to recognize a terrorism judgment they obtained in the United States against Iran and various agencies or instrumentalities – a judgment that, unlike the ones here, actually named Bank Markazi as a defendant.  Gaicio Decl. ¶7 & Ex. F.  On March 27, 2019, the Luxembourg court dismissed the action, holding that Bank Markazi was entitled to sovereign immunity.  *Id.*

After Congress enacted the NDAA, Bank Markazi brought a declaratory action against Clearstream in March 2020.   Gaicio Decl.  ¶8.   That declaratory action sought an order prohibiting Clearstream from complying with an order directing it to transfer the Luxembourg assets to the United States without first obtaining recognition of that order in Luxembourg.  *Id.* The initial declaratory action related only to the *Peterson* proceedings.  *Id.*  After learning that the Havlish and Hoglan plaintiffs had obtained their own writs of execution against the same assets, however, Bank Markazi brought a second declaratory action in June 2020, which was similar to the first one but applied to other cases as well.  *Id.* ¶9.

## ARGUMENT

### I.   PLAINTIFFS' TURNOVER ACTION SHOULD BE DISMISSED

Plaintiffs' turnover action should be dismissed because the Luxembourg assets are immune from seizure and because this Court lacks both subject-matter and personal jurisdiction over Bank Markazi.  "A defendant seeking sovereign immunity bears the burden of establishing a prima facie case that it is a foreign sovereign. . . .  Once the defendant makes that showing, the burden shifts to the plaintiff to make an initial showing that an enumerated exception to sovereign immunity applies."  *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 559-60 (2d Cir. 2020).  Similarly, "[t]he plaintiff bears the burden of demonstrating that the court has personal

jurisdiction over each defendant." *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 90 (2d Cir. 2017). "The district court may look to evidence outside the pleadings . . . in determining facts relevant to jurisdiction." *Pablo Star*, 961 F.3d at 560.

Those same standards apply to disputes over asset immunity. "[B]ecause jurisdiction must be shown affirmatively, this Court must refrain from drawing inferences favorable to the parties asserting jurisdiction . . . . The Court can resolve disputed factual issues by reference to evidence outside of the pleadings." *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518, 2013 WL 1155576, at *20 (S.D.N.Y. Mar. 13, 2013) (asset immunity under TRIA and § 8772). Plaintiffs fail to show any basis for seizing the Luxembourg assets or asserting jurisdiction over Bank Markazi under those standards.

### A.    The Luxembourg Assets Are Immune from Execution

Plaintiffs acknowledge that "[Bank] Markazi . . . qualifies as an 'agency or instrumentality of a foreign state.'" Pls. Mem. at 4; *see* Arabieh Aff. ¶¶ 8-9; 28 U.S.C. § 1603(b). Moreover, there is no dispute that Bank Markazi has at least a beneficial interest in the assets at issue – plaintiffs claim that Bank Markazi is the ***owner*** of the assets. Pls. SMF ¶¶ 85-89. The assets are therefore immune from seizure unless an exception to immunity applies.

None does. For thirty-five years, courts of appeals consistently held that sovereign assets outside the United States are absolutely immune from execution. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1131-32 (9th Cir. 2010) ("Iran's rights to payment . . . are not 'property in the United States' and are [therefore] immune from execution."); *Autotech Techs. LP v. Integral Rsch. & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007); *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992). When the Second Circuit took a different

view in its now-vacated decision in this case, the United States explicitly rejected its interpretation as "flawed."  Vogel Decl. Ex. 19 at 11.

Plaintiffs do not seek to reargue those issues at this stage.  Instead, they claim that Congress changed the result by enacting the recent amendments to 22 U.S.C. § 8772.  Pls. Mem. at 10-11.  Section 8772, however, is unconstitutional because it violates Bank Markazi's due process rights in multiple respects.  The statute therefore cannot provide the exception to immunity on which plaintiffs rely.

### 1.    *Bank Markazi Is Entitled to Due Process*

As an initial matter, Bank Markazi is entitled to the full protections of the Due Process Clauses of the Fifth and Fourteenth Amendments.  Those Clauses protect all "persons."  U.S. Const. amends. V, XIV.  That term includes artificial entities such as corporations.  *See, e.g.*, *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 881 n.9 (1985).

That term also includes juridically separate sovereign instrumentalities.  The Second Circuit has held that foreign sovereigns themselves are not "persons" entitled to due process.  *See Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*, 582 F.3d 393, 398-400 (2d Cir. 2009).  But the Supreme Court has made clear that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  *First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) ("*Bancec*").  And "*Bancec*'s analytic framework is also applicable when the question is whether the instrumentality should have due process rights."  *Frontera*, 582 F.3d at 400; *see also Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex – Exploración y Producción*, 832 F.3d 92, 103-04 (2d Cir. 2016); *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 815-17 (D.C. Cir. 2012); *First Inv. Corp. of Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 752-55 (5th Cir. 2012).

Here, the uncontradicted evidence makes clear that Bank Markazi is juridically separate from the Iranian government. "Bank Markazi was established as a distinct legal entity separate from the Government of Iran and has all the attributes of an autonomous juridical person." Arabieh Aff. ¶13. "Bank Markazi enjoys both financial and administrative autonomy and is not subject to the administrative and management rules and controls applicable to the public sector in Iran." *Id.* ¶14. "As an independent legal entity, Bank Markazi can exercise the usual powers associated with a company," including the right to sue and be sued and to own property in its own name. *Id.* ¶15. Bank Markazi also has governance structures typical of a separate juridical entity. *Id.* ¶¶16-26. And Bank Markazi purchases and sells securities in its own name, just like other separate juridical entities that perform investment functions. Massoumi Aff. ¶13. Bank Markazi is thus a separate juridical entity entitled to due process under *Frontera*.

To be sure, when Congress enacted §8772, it defined "Iran" to include "the central bank or monetary authority of that Government." 22 U.S.C. §8772(d)(3). But whatever relevance that provision has for statutory purposes, it has no bearing on Bank Markazi's due process claims. "[I]t is not for Congress to make the final determination of [an entity's] status as a Government entity for purposes of determining . . . constitutional rights . . . ." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995).

*Bancec* itself permits a court to disregard an instrumentality's separate status when an alter ego relationship exists. 462 U.S. at 628-30. But veil-piercing is a "rare exception" applicable only in "exceptional circumstances." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Courts are "extremely reluctant to disregard corporate form." *United States v. Funds Held for Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000).

13

Plaintiffs have not even attempted to make an evidentiary showing that meets that demanding standard.  Plaintiffs *alleged* alter ego status in their complaint.  Am. Compl. ¶¶ 102-124 (Dkt. 102).  But where a defendant makes an evidentiary showing refuting jurisdiction, plaintiffs cannot rest on the pleadings.  They must respond with *admissible evidence*.  *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998).  Plaintiffs have not done that.  In any case, none of their allegations suggests that the Iranian government "exercises significant and repeated control over the instrumentality's day-to-day operations" – the "touchstone inquiry for 'extensive control.'"  *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 91 (2d Cir. 2015).  For that reason, the Court must decide these motions on the premise that Bank Markazi is a separate juridical entity.

Even if Bank Markazi were an alter ego of the Iranian government, it would still have a substantial due process claim.  Recent scholarship calls *Frontera* into question and shows that there is considerable historical support for treating foreign sovereigns as "persons" entitled to due process.  *See* Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign Nations*, 88 Fordham L. Rev. 633, 676-79 (2019); *Gater Assets Ltd. v. AO Gazsnabtranzit*, 413 F. Supp. 3d 304, 313-14 & n.2 (S.D.N.Y. 2019) (Preska, J.), *appeal pending*, No. 19-3550 (2d Cir. docketed Oct. 29, 2019).  Bank Markazi therefore maintains that it is entitled to due process regardless of its relationship with the Iranian government.

        **2.**        ***Section 8772 Violates Bank Markazi's Due Process Rights by Permitting Seizure of Assets with No Meaningful Connection to the United States***

Section 8772 violates Bank Markazi's due process rights in multiple respects.  For one thing, the statute purports to authorize the seizure of assets in which Bank Markazi has an interest without any meaningful connection to the United States.  That extraterritorial overreach violates fundamental due process principles.

The Due Process Clause prohibits the application of a forum state's law where the state lacks "a 'significant contact or significant aggregation of contacts' to the claims asserted." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985).  The Constitution thus "limits the power of a forum state to apply its substantive law to factual and legal situations with which it has little or no contact."  *McCluney v. Joseph Schlitz Brewing Co.*, 649 F.2d 578, 580 (8th Cir. 1981), *aff'd*, 454 U.S. 1071 (1981); *see also Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 149 (1934) (application of Mississippi law to Tennessee contract would improperly "extend the effect of [Mississippi's] laws beyond its borders").

Those principles apply to federal law under the Fifth Amendment no less than state law under the Fourteenth.  *See Lauritzen v. Larsen*, 345 U.S. 571, 590-91 (1953) (refusing to apply federal law to Danish citizen for events on Danish ship); *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) ("[I]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair."); Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1223 (1991) ("[T]he Fifth Amendment limits extraterritorial application of substantive federal law.").  Those due process limitations on the extraterritorial application of substantive law are "closely linked" to the due process limitations on the exercise of personal jurisdiction over a foreign defendant.  *McCluney*, 649 F.2d at 581; *see also Allstate Ins. Co. v. Hague*, 449 U.S. 302, 317 n.23 (1981) (inquiries "are often closely related and to a substantial degree depend upon similar considerations").

In *Shutts*, for example, the Supreme Court held that Kansas lacked a sufficient connection to claims of out-of-state class members for royalty payments on out-of-state natural gas leases.

472 U.S. at 819-23.  Because Kansas lacked "'a significant contact or significant aggregation of contacts' to the claims," the "application of Kansas law . . . exceed[ed] constitutional limits." *Id.* at 821; *see also Am. Charities for Reasonable Fundraising Regul., Inc. v. Pinellas County*, 221 F.3d 1211, 1216-17 (11th Cir. 2000) (application of county ordinance violated due process because case involved only "abstract, indirect, and unaimed level of involvement"); *Soo Line R.R. Co. v. Overton*, 992 F.2d 640, 644-45 (7th Cir. 1993) ("casual and insignificant" contacts insufficient); *Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139, 2018 WL 1353290, at *8 (S.D.N.Y. Mar. 15, 2018); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 83 (S.D.N.Y. 1996).

Congress's recent amendments to 22 U.S.C. § 8772 fly in the face of those due process requirements.  The statute permits the seizure of overseas assets with no meaningful connection to the United States whatsoever.  By its terms, the statute applies to "a blocked asset . . . or an asset that would be blocked *if the asset were located in the United States*."  22 U.S.C. § 8772(a)(1)(B) (emphasis added).  Far from requiring an actual connection to the United States, that provision invites the Court to speculate about what the status of the assets would be *if*, hypothetically, they were located here.  And while the assets must be "held by or for a foreign securities intermediary doing business in the United States," *id.* § 8772(a)(1)(A), the statute requires no connection between that "business" and the foreign assets at all.

This controversy arises out of a 1983 bombing in Beirut, Lebanon.  Vogel Decl. Exs. 1-10.  The funds that plaintiffs seek to seize are proceeds from bonds issued by foreign sovereigns and supranationals.  Vogel Decl. Exs. 53, 72.  This Court and the Second Circuit have already determined that those funds are located in Luxembourg, not New York.  *See* Dkt. 166 at 21 ("The evidence in the record is clear that any assets in which Bank Markazi has an interest, and which are at issue in this action, are in Luxembourg."); *Peterson v. Islamic Republic of Iran*,

876 F.3d 63, 87 (2d Cir. 2017) ("[T]he assets at issue are . . . located in Luxembourg."), *reinstated*, 963 F.3d 192, 196 (2d Cir. 2020).   This case thus involves an unambiguously extraterritorial application of federal law.

Plaintiffs point to Clearstream's use of a New York correspondent account to process principal and interest payments.  Pls. Mem. at 28.  But the mere use of a correspondent account does not automatically bring assets within U.S. jurisdiction.   Instead, the Second Circuit looks to "both the frequency and deliberate nature of [the] use of [the] correspondent account." *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013).  "Deliberateness" depends on "(1) the defendant bank's level of control over the transfers, (2) the defendant bank's marketing of the correspondent account or encouragement of others to use it, (3) the necessity of the correspondent account to the alleged scheme, and (4) other conduct by which the bank projected itself into the New York market." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, No. 18 Civ. 1876, 2020 WL 4586729, at *12 (S.D.N.Y. Aug. 10, 2020).

None of those factors is present here.  There is no evidence that Bank Markazi had ***any*** "level of control" over Clearstream's correspondent account.  To the contrary, "Bank Markazi had no control over Clearstream's correspondent bank accounts, no access to Clearstream's correspondent accounts, and no role in managing or operating those correspondent accounts." Massoumi Supp. Decl. ¶4.  "Bank Markazi had no right to demand that Clearstream use a particular correspondent bank account to process payments on a bond." *Id.*  In purchasing a bond, moreover, Bank Markazi did not "inquir[e] into . . . what correspondent banks would be used to process the principal or interest payments on the bonds." *Id.* ¶5.  Bank Markazi "did not consider that it was Bank Markazi's business to know or ask about those matters." *Id.*

Clearstream's Terms and Conditions state that Clearstream will "collect" interest and principal payments and "credit[ ] [them] to the relevant Customer account."  Vogel Decl. Ex. 81 art. 20.  But they contain nothing that gives customers like Bank Markazi or UBAE any control over how Clearstream processes those payments.  *Id.*  Similarly, while certain bond prospectuses indicate that issuers may make payments *from* a U.S. bank, they do not restrict how a securities intermediary like Clearstream processes those payments.  Vogel Decl. Ex. 64 § 5(a), Ex. 65 at 4.

Plaintiffs assert that U.S. dollar wire transfers *necessarily* pass through New York.  Pls. Mem. at 28 & n.16.  The Second Circuit disagrees:  "In light of the widespread acceptance and availability of U.S. currency," a party can "process[ ] U.S.-dollar-denominated wire transfers . . . through correspondent accounts *anywhere in the world*."  *Licci*, 732 F.3d at 171 (emphasis added); *see also Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 724-25, 733 (S.D.N.Y. 2010) (foreign banks can "acquire U.S. currency . . . through correspondent banking relationships in other countries," as "U.S. dollars are easily obtained through correspondent banks worldwide").[1]

Plaintiffs thus fail to show that Bank Markazi exercised *any* control over Clearstream's use of its correspondent account.  That omission weighs decisively against finding any nexus to the United States.  *See Vasquez*, 2020 WL 4586729, at *13 (no jurisdiction where "there is no evidence that [the bank] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account"); *Tamam*, 677 F. Supp. 2d at 729 (no

---

[1] Plaintiffs' primary authority to the contrary is an amicus brief from an unrelated case.  Vogel Decl. Ex. 62 at 12.  Needless to say, amicus briefs are not evidence – particularly amicus briefs from other cases.  Plaintiffs also cite *Banque Worms v. BankAmerica International*, 77 N.Y.2d 362 (1991), but that case does not say that U.S. dollar payments necessarily pass through New York.  It says only that "[t]he CHIPS network handles 95% of the international transfers made in dollars" through New York banks.  *Id.* at 370.  That statistic is the average for *all* international U.S. dollar wire transfers, even though wire transfers that both originate and terminate outside the United States are presumably much less likely to clear through the United States than wire transfers that either originate or terminate here.

jurisdiction where "[t]he use of New York correspondent accounts plainly is not 'at the very root' of this action"); *In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1324 (S.D. Fla. 2010) (no jurisdiction where "an intermediary bank [rather than the defendant] designates the correspondent bank to receive funds"), *aff'd*, 439 F. App'x 840 (11th Cir. 2011).

None of the remaining *Vasquez* factors supports a finding of deliberateness either. There is no evidence that Bank Markazi engaged in any "marketing of the correspondent account or encouragement of others to use it." 2020 WL 4586729, at *12. There was no "necessity of the correspondent account to the alleged scheme" – the Second Circuit has already held that U.S. dollar transactions need not be processed through U.S. banks. *Licci*, 732 F.3d at 171. Finally, plaintiffs allege no "other conduct by which the bank projected itself into the New York market." *Vasquez*, 2020 WL 4586729, at *12; *see* Massoumi Aff. ¶12; Arabieh Aff. ¶6. And Bank Markazi is not alleged to have played any role whatsoever in the 1983 bombing in Lebanon that forms the basis for plaintiffs' claims. Vogel Decl. Exs. 1-10.[2]

Unable to show that ***Bank Markazi*** deliberately used Clearstream's U.S. correspondent account to process the bond proceeds, plaintiffs shift focus, urging that ***Clearstream's*** use of the account can be imputed to Bank Markazi under an "agency" theory. Pls. Mem. at 35-36. No evidence bears out that theory. To support jurisdiction, a purported agent must "act[] in [the forum] for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018). The defendant must "***[m]anag[e] or direct[]*** [the] agent's operations and activities" in

---

[2] In addition to deliberateness, courts also consider the "frequency" of transactions in assessing whether the use of a correspondent account establishes a sufficient nexus to the United States. *Licci*, 732 F.3d at 168. Here, plaintiffs identify only around one transaction per month on average (62 transactions over 51 months). Vogel Decl. Ex. 53. That modest frequency is hardly sufficient to outweigh the total lack of deliberateness so as to create an adequate U.S. nexus.

the forum.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2019 WL 1331830, at *9 (S.D.N.Y. Mar. 25, 2019).  The defendant must be the "***primary actor*** in the specific matter in question."  *Pascarella v. Sandals Resort Int'l, Ltd.*, No. 19 Civ. 2543, 2020 WL 1048943, at *4 (S.D.N.Y. Mar. 4, 2020) (emphasis added).

Plaintiffs make no such showing here.  To be sure, Clearstream may have acted as Bank Markazi's or UBAE's agent in holding their securities accounts in Luxembourg.  Vogel Decl. Ex. 81 art. 20.  But "the fact that one may be an agent for one purpose does not make him or her an agent for every purpose."  *Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014); *see also In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984).  Bank Markazi did not exercise any control over Clearstream's use of its correspondent account in New York.  Massoumi Supp. Decl. ¶¶ 4-5.  Absent such control, Clearstream's own use of its correspondent account is irrelevant to Bank Markazi's claim that § 8772 violates ***Bank Markazi's*** due process rights.

### 3. *Section 8772 Violates Bank Markazi's Due Process Rights by Depriving Bank Markazi of a Neutral Decisionmaker*

Section 8772 is also unconstitutional for a second reason:  The statute violates Bank Markazi's due process right to a neutral decisionmaker.  One of the fundamental requirements of due process is a "neutral and detached" decisionmaker.  *Ward v. Village of Monroeville*, 409 U.S. 57, 61-62 (1972); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 124 (2d Cir. 2016) ("[D]ue process requires a 'neutral and detached judge . . . .' ").  "Every procedure which would offer a possible temptation . . . not to hold the balance nice, clear and true . . . denies the [defendant] due process of law."  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 878 (2009).

Section 8772 violates those principles.  The statute did not merely alter background principles of applicable law.  It directed the Court to reach a particular outcome in this specific case.  The statute singles this case out by name and docket number in the U.S. Code.  22 U.S.C.

§ 8772(b)(2).   It systematically eliminates all the defenses Bank Markazi has asserted, from sovereign immunity to separate juridical status to international comity to indirect ownership.   *Id.* § 8772(a)(1), (d)(3).   The only "findings" the statute requires are makeweights: that Bank Markazi has a beneficial interest in the assets and that no one else has a non-custodial or constitutionally protected interest – issues that are foregone conclusions.   *Id.* § 8772(a)(2). Rather than merely alter the law this Court should apply, Congress has stepped into the shoes of the Court and decided the case itself.   Congress thereby denied Bank Markazi the neutral and detached decisionmaker that due process requires.

Courts have found due process violations from far less egregious interference.   In *Pillsbury Co. v. FTC*, 354 F.2d 952 (5th Cir. 1966), the Fifth Circuit found a due process violation where members of Congress asked probing questions and made forceful comments to agency officials at a committee hearing about a pending case.   *Id.* at 963-65.   The "right to the appearance of impartiality," the court held, "cannot be maintained unless those who exercise the judicial function are free from powerful external influences."   *Id.* at 964; *see also DCP Farms v. Yeutter*, 957 F.2d 1183, 1187-88 (5th Cir. 1992); *Koniag, Inc. v. Andrus*, 580 F.2d 601, 610-11 (D.C. Cir. 1978); *D.C. Fed'n of Civic Ass'ns v. Volpe,* 459 F.2d 1231, 1245-48 (D.C. Cir. 1971). If Congress violates due process merely by pressuring adjudicators through aggressive questioning at a committee hearing, it plainly does so by legislatively directing a court to reach a desired result in a specific pending case.

Plaintiffs' own role in procuring § 8772's enactment aggravates the violation.   Due process prohibits "a person with a personal stake in a particular case [from having] a significant and disproportionate influence in placing the judge on the case."   *Caperton*, 556 U.S. at 884.   In *Caperton*, for example, the Supreme Court found a due process violation where a party to

pending litigation spent $3 million on campaign contributions to secure the election of an appellate judge whom he hoped would rule in his favor.  *Id.* at 884-87.  "Just as no man is allowed to be a judge in his own cause," the Court explained, "similar fears of bias can arise when . . . a man chooses the judge in his own cause."  *Id.* at 886; *see also Francolino v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004) ("[A] criminal justice system in which the prosecutor alone is able to select the judge of his choice to preside at trial, even in limited types of cases, raises serious concerns about the appearance of partiality . . . .").

This case raises those same concerns.  Section 8772 was not the product of some deliberative legislative exercise.  Rather, Congress passed the statute because plaintiffs drafted the provision and then lobbied Congress to attach it to pending legislation.  Kry Decl. Ex. E (plaintiffs' counsel "[d]rafted" legislation and plaintiffs' lobbyist "pressed lawmakers" to enact it); Kry Decl. Ex. F (plaintiffs' representatives "lobb[ied] for months"); Kry Decl. G (citing "more than a decade of . . . heavy lobbying in Congress to obtain [the] special legislation" in an article titled "How One Lawyer Convinced Congress To Help Him Win $2 Billion from Iran").  Plaintiffs' role is clear beyond dispute with respect to the original version of § 8772.  Kry Decl. Exs. E, F, G.  And given their long track record of drafting and lobbying for other terrorism legislation, the Court can reasonably infer that plaintiffs and their representatives were instrumental in securing passage of this latest amendment too.  *See* Kry Decl. Exs. G, H.

If due process prohibits a party to litigation from making massive campaign contributions to secure the election of a judge who will rule in that party's favor, it also prohibits a party from achieving the same result by lobbying Congress to enact a statute instructing the judge to decide the case in its favor.  Either way, the party's manipulation of the judicial process denies its opponent the neutral and detached decisionmaker that due process requires.

Plaintiffs argue that the Supreme Court already decided these issues in *Peterson I*. Pls. Mem. at 23. But that case concerned only a separation-of-powers claim. *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1329 (2016). Those structural constraints are not the only constitutional principles at stake. *See* Wuerth, *supra*, at 652 ("Although Bank Markazi styled the argument in separation of powers terms, which is how the Court evaluated it, the argument could also have sounded in due process."). Because the prior appeal involved only the separation of powers, moreover, the Court did not focus on plaintiffs' role in drafting and lobbying for the legislation and the distinct constitutional concerns that involvement creates. The Court's earlier decision thus in no way precludes Bank Markazi's due process claim.

## B.      The Court Lacks Jurisdiction over Claims Against Bank Markazi

While the immunity of the Luxembourg assets is a sufficient basis to dismiss this action, the Court also lacks jurisdiction over Bank Markazi itself. Sovereign immunity protects not only sovereign assets from attachment and execution, but also sovereign entities themselves from jurisdiction and suit. *See* 28 U.S.C. §§ 1604, 1609; *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014) (noting "two kinds of immunity"). Because § 8772 is unconstitutional, it does not strip Bank Markazi of immunity any more than it strips the assets of immunity. But this Court lacks subject-matter and personal jurisdiction over Bank Markazi ***even if*** § 8772 is a valid statute. And because Bank Markazi is an indispensable party to this action, that defect requires dismissal of the entire suit.

### 1.      *The Court Lacks Subject-Matter Jurisdiction over Bank Markazi*

The Supreme Court and the Second Circuit have both repeatedly held that the Foreign Sovereign Immunities Act provides "the sole basis for obtaining jurisdiction over a foreign state in federal court." *Pablo Star*, 961 F.3d at 559; *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) ("[T]he text and structure of the FSIA demonstrate

Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts."). The FSIA confers subject-matter jurisdiction in § 1330(a): "The district courts shall have original jurisdiction . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). By its plain terms, that provision does not apply here.

Plaintiffs urge that this Court has subject-matter jurisdiction because 22 U.S.C. § 8772 creates an exception to immunity, and "if an exception to sovereign immunity exists, 'the FSIA provides subject-matter jurisdiction in federal district courts' under 28 U.S.C. § 1330(a)." Pls. Mem. at 35. That simply is not what § 1330(a) says. Section 1330(a) provides jurisdiction only where "the foreign state is not entitled to immunity either under *sections 1605-1607 of this title* or under *any applicable international agreement*." 28 U.S.C. § 1330(a) (emphasis added). Section 8772 is not among "sections 1605-1607 of this title" – it is an entirely separate provision in a different title of the U.S. Code. 22 U.S.C. § 8772. Nor is § 8772 an "international agreement." Section 8772 therefore cannot trigger subject-matter jurisdiction under § 1330(a).

Nor is § 8772 some independent, freestanding font of subject-matter jurisdiction. To create jurisdiction, a statute must "'clearly state[]' that [it] is jurisdictional; absent such a clear statement, . . . 'courts should treat the [statute] as nonjurisdictional in character.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013); *see also Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019) (statute must "clearly state[] that a [prescription] count[s] as jurisdictional"); *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 255 (1992) (provision must "specifically mention[] the federal courts"); *Califano v. Sanders*, 430 U.S. 99, 105 (1977) (statute "nowhere contains an explicit grant of jurisdiction").

Nothing in §8772 satisfies that clear-statement rule. The relevant provisions of the statute do not mention "jurisdiction" at all. 22 U.S.C. §8772. The statute does state that it applies "notwithstanding . . . any provision of law relating to sovereign immunity." *Id.* §8772(a)(1). But saying that a statute applies "notwithstanding" other provisions of law is not an ***affirmative grant*** of jurisdiction. Moreover, the statute refers to immunity only in connection with authorizing "execution or attachment in aid of execution" of certain assets. *Id.* That structure indicates that Congress was focused on the immunity of assets from execution, not the jurisdictional immunity of sovereigns from suit.

Section 8772 also does not supply jurisdiction for another reason. "It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004). A plaintiff therefore may not "amend a complaint so as to produce jurisdiction where none actually existed before." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831 (1989); *see also Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 161 (2d Cir. 1998) (plaintiff may not "amend its complaint to substitute a new cause of action over which there is subject-matter jurisdiction for one in which there is not"); *In re DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.*, 953 F.3d 890, 895-96 (6th Cir. 2020) (parties may not "'substitute new causes of action' to allege federal question jurisdiction" (collecting cases)). Section 8772 was not alleged as a basis for jurisdiction in the original complaint and did not even exist in its current form until years later. Dkt. 1. Plaintiffs cannot create federal jurisdiction by invoking that new statute partway through the litigation.

### 2.     *The Court Lacks Personal Jurisdiction over Bank Markazi*

The Court also lacks personal jurisdiction over Bank Markazi. Under §1330(b) of the FSIA, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over

which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  For the reasons above, § 1330(a) does not provide subject-matter jurisdiction.   Section 1330(b) therefore does not provide personal jurisdiction either.  *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) ("[I]f none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction.").  Moreover, nothing in § 8772 constitutes an affirmative grant of personal jurisdiction over foreign sovereigns.  The relevant provisions do not mention jurisdiction at all.

Even if a statutory basis for personal jurisdiction existed, asserting personal jurisdiction over Bank Markazi would violate due process.  The Due Process Clause prohibits a court from exercising jurisdiction unless the defendant has "minimum contacts" with the forum.  *Daimler*, 571 U.S. at 126.  Precedent distinguishes between two types of jurisdiction.  If the defendant's contacts with the forum are so extensive that the defendant is "at home" there, the court may exercise "general jurisdiction" over claims whether or not they relate to those contacts.  *Id.* at 127.  Plaintiffs do not allege that type of jurisdiction here.

The test for "specific jurisdiction" is more exacting.  "In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the **underlying controversy**, principally, [an] activity or an occurrence that takes place in the forum State."  *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (emphasis added); *see also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (similar).  In *Licci*, for example, the court found specific jurisdiction based on the defendant's "repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of Shahid, **in order to further Hizballah's terrorist goals**."  732 F.3d at 171 (emphasis added).  In

*Waldman*, by contrast, the court found no specific jurisdiction where the defendant's operations in the United States were unrelated to the underlying controversy and the defendant's alleged support of terrorism occurred abroad.  835 F.3d at 333, 335-44.

Plaintiffs show no contacts between Bank Markazi and the United States that relate to the "underlying controversy" here.  Bank Markazi was not a defendant in any of the underlying actions and is not alleged to have played any role in the Beirut bombing that forms the basis for plaintiffs' claims.  Vogel Decl. Exs. 1-10.  Bank Markazi's receipt of proceeds on its foreign sovereign and supranational bonds has no connection to plaintiffs' claims whatsoever.

Rather than show that Bank Markazi engaged in U.S. dollar transactions to support terrorism, plaintiffs allege only that Bank Markazi engaged in U.S. dollar transactions in connection with the funds they now want to seize.  Pls. Mem. at 27-33, 35-36.  But that is not enough.  A defendant's mere ownership of property in the forum state is not sufficient to support personal jurisdiction for claims unrelated to that property.  *See Shaffer v. Heitner*, 433 U.S. 186, 213 (1977) (mere "presence of appellants' property in Delaware" insufficient where "that property is not the subject matter of this litigation, nor is the underlying cause of action related to the property"); *Glencore AG v. Bharat Aluminum Co.*, No. 10 Civ. 5251, 2010 WL 4323264, at *5 (S.D.N.Y. Nov. 1, 2010) ("Where th[e] property which serves as the basis for jurisdiction 'is completely unrelated to the plaintiff's cause of action . . . the presence of the property alone' does not support jurisdiction.").  Plaintiffs cannot avoid *Shaffer* merely by bringing a turnover action against the property and then claiming that the turnover action itself is a new "underlying controversy" to which the defendant's jurisdictional contacts relate.[3]

---

[3] In a footnote, *Shaffer* states that, "[o]nce it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there would seem to be no unfairness in allowing an action to realize on that debt in a State where the defendant has property, whether or

Even if this turnover action itself were the relevant "underlying controversy," plaintiffs have not shown a sufficient connection to New York or the United States to support personal jurisdiction over Bank Markazi.  The Court lacks personal jurisdiction over Bank Markazi for the same reasons that due process precludes the Court from applying § 8772 to this dispute:  There is no sufficient connection between Bank Markazi and New York or the United States with respect to these bond proceeds to satisfy Bank Markazi's due process rights.

The funds that plaintiffs seek are proceeds from bonds issued by foreign sovereigns and supranationals.  Vogel Decl. Exs. 53, 72.  Although Clearstream may have processed principal and interest payments through its correspondent account in New York, there is no evidence that Bank Markazi had any control over those transactions.  *See* pp. 17-18, *supra*.  That absence of control precludes any finding that Bank Markazi had minimum contacts with New York or the United States, or any agency relationship with Clearstream with respect to those activities.  *See* pp. 18-20, *supra*.  The Court therefore lacks personal jurisdiction over Bank Markazi.

### 3. *The Absence of Jurisdiction over Bank Markazi Requires Dismissal of This Turnover Action*

Because this Court lacks subject-matter and personal jurisdiction over Bank Markazi, the claims against Bank Markazi cannot proceed.  Those jurisdictional defects also require further relief:  Because Bank Markazi is an indispensable party to this turnover action, the Court should dismiss the proceeding in its entirety.

---

not that State would have jurisdiction to determine the existence of the debt as an original matter."  433 U.S. at 210 n.36.  But that exception does not apply where a plaintiff seeks to enforce a judgment against a ***different*** party not named in the original judgment.  *See Peacock v. Thomas*, 516 U.S. 349, 357 (1996) (courts generally may not "exercise . . . ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment"); *Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001) (similar).  In any case, the *Shaffer* footnote provides for jurisdiction only in "a State where the defendant has property" – not a state that merely has some connection to property located overseas.  433 U.S. at 210 n.36.

Federal Rule of Civil Procedure 19 requires that a person be joined to an action if the person "claims an interest relating to the subject of the action" and the action may "impair or impede the person's ability to protect the interest."  Fed. R. Civ. P. 19(a)(1)(B).  If the person cannot be joined, the court must dismiss the action unless specific factors permit the action to proceed in that person's absence.  Fed. R. Civ. P. 19(b).

In *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), the Supreme Court applied that rule to a dispute over sovereign assets where the sovereign itself could not be joined. Victims of former Philippine President Ferdinand Marcos sought to attach assets at a bank, but the Republic of the Philippines also claimed an interest.  *Id.* at 857-58.  The bank filed an interpleader action, but the Republic asserted immunity from suit.  *Id.* at 859.  The Court held that the inability to join the Republic required dismissal of the suit.  Applying Rule 19, it held that "[a] case may not proceed when a required-entity sovereign is not amenable to suit."  *Id.* at 867.  "[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign."  *Id.*; *see also id.* at 870-72 (applying remaining factors).

*Pimentel* controls here.  This is an action to adjudicate rights in assets in which Bank Markazi has at least a beneficial interest.  Pls. SMF ¶¶ 85-89.  Bank Markazi is thus required to be joined.  Fed. R. Civ. P. 19(a)(1)(B).  But Bank Markazi cannot be joined, regardless of whether 22 U.S.C. § 8772 strips immunity from the assets, because there is no subject-matter or personal jurisdiction over Bank Markazi itself.  The Rule 19(b) factors analyzed in *Pimentel* all point the same way here.  553 U.S. at 865-72.  Just as in *Pimentel*, therefore, the Court must dismiss the action in its entirety.

Rule 19 reflects not just procedural niceties but fundamental mandates of due process. "The failure of the court to protect those not before it may amount to a violation of due process should the judgment in the action have the effect of destroying their rights." 7 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1602 (3d ed. rev. 2020). The rule seeks to prevent an "injustice" to the "constitutional[] rights of an outsider by proceeding with a particular case" in its absence. *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 123 (1968); *see also Calcote v. Tex. Pac. Coal & Oil Co.*, 157 F.2d 216, 224 (5th Cir. 1946). Proceeding with this turnover action in Bank Markazi's absence would thus conflict not only with Rule 19 but also with due process of law.

Even if the Court had authority to adjudicate the turnover action in Bank Markazi's absence, the Court's inability to exercise jurisdiction over Bank Markazi would have drastic consequences for the effectiveness of any relief. A judgment in Bank Markazi's absence would not bind Bank Markazi and would have no preclusive effects in future proceedings. *See Pimentel*, 553 U.S. at 871 ("[T]he Republic and the Commission would not be bound by the judgment in an action where they were not parties."); *Sheerbonnet, Ltd. v. Am. Express Bank, Ltd.*, 951 F. Supp. 403, 416 (S.D.N.Y. 1995) (Preska, J.) (claim preclusion inapplicable where company was not a party to earlier liquidation proceeding); *United States v. Webster Record Corp.*, 192 F. Supp. 104, 105 (S.D.N.Y. 1961) (similar).

## C.    The Turnover Action Violates the Treaty of Amity

The Court should also dismiss this turnover action for one final reason: Execution against the Luxembourg assets would violate Bank Markazi's rights under the Treaty of Amity, Economic Relations, and Consular Rights, U.S.-Iran, Aug. 15, 1955, 8 U.S.T. 899. Articles III and IV of that treaty require the United States to respect Bank Markazi's separate juridical status, to provide Bank Markazi with access to courts and administrative agencies on terms no less

favorable than those provided to other parties, to refrain from applying unreasonable or discriminatory measures, and to protect Bank Markazi's property as required by international law. *Id.* arts. III, IV, 8 U.S.T. at 902-04. Executing against the Luxembourg assets without regard to Bank Markazi's separate juridical status or other traditional legal principles would violate those treaty rights. *Cf. Certain Iranian Assets (Iran v. U.S.)*, No. 164, Judgment on Preliminary Objections (I.C.J. Feb. 13, 2019) (Kry Decl. Ex. I).[4]

## II.   PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT

Plaintiffs' motion for summary judgment should likewise be denied. The Second Circuit has "long recognized that summary judgment is a 'drastic device.'" *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999). The moving party "bears a heavy burden," and the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Id.* "If, in this generous light, a material issue is found to exist, summary judgment is improper, and the case must proceed to trial." *Id.* Plaintiffs have not met their heavy burden here.

Plaintiffs contend that there is no genuine dispute that they satisfy the statutory elements of § 8772. Pls. Mem. at 14-22. That should hardly be surprising, given that plaintiffs drafted and lobbied Congress to enact the original version of the statute, and presumably played a similar role with respect to the recent amendments – all for the purpose of dictating the outcome of their specific pending turnover actions. In those circumstances, it would be remarkable if plaintiffs could ***not*** satisfy the elements of the statute.

---

[4] The United States has announced its termination of the treaty. *See* Michael R. Pompeo, U.S. Dep't of State, *Remarks to the Media* (Oct. 3, 2018) (Kry Decl. Ex. J). Nonetheless, prior to that announcement of termination, plaintiffs restrained the Luxembourg assets in violation of Bank Markazi's treaty rights. The Second Circuit rejected similar treaty arguments in *Peterson*, 758 F.3d at 189-91, but Bank Markazi raises the arguments to preserve them for review.

Nonetheless, the Court should deny summary judgment for the same reasons it should dismiss this suit:  Section 8772 violates Bank Markazi's due process rights, and this Court lacks both subject-matter and personal jurisdiction over Bank Markazi.  Even if Bank Markazi's arguments on those issues do not compel dismissal as a matter of law, they are at least sufficient to create genuine disputes of fact that preclude summary judgment.

At a minimum, there are factual disputes over whether this controversy has a sufficient connection to New York and the United States to satisfy due process.  There is ample evidence that Bank Markazi had no control over Clearstream's correspondent account in New York and that there are no contacts between Bank Markazi and New York or the United States that arise out of the underlying controversy in this case.  Massoumi Supp. Decl. ¶¶4-5; Massoumi Aff. ¶12; Arabieh Aff. ¶6; Vogel Decl. Exs. 64-65, 81.  That evidence supports a decision in Bank Markazi's favor, either because applying §8772 to the Luxembourg assets violates due process or because exercising personal jurisdiction over Bank Markazi violates due process.  *See Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir. 1983) ("For a plaintiff to prevail on summary judgment when defendant contests personal jurisdiction, his burden is even greater; he must demonstrate that there is no genuine issue as to any material fact on the jurisdictional question."); pp. 14-20, 25-28, *supra*.

Similarly, there are at least genuine factual disputes over whether §8772 violates Bank Markazi's due process rights by denying Bank Markazi a neutral decisionmaker.  *See* pp. 20-23, *supra*.  The public record contains abundant evidence of plaintiffs' role in drafting and lobbying for §8772 and other terrorism legislation.  Kry Decl. Exs. E, F, G, H.  That evidence supports the reasonable inference that plaintiffs played a similar role with respect to the recent amendments to §8772.  At a minimum, the multiple public reports on those matters suggest that admissible

evidence is likely within the knowledge or possession of plaintiffs or their agents but can only be developed through discovery.  Kry Decl. ¶ 13.  The Court cannot grant summary judgment in those circumstances.  *See* Fed. R. Civ. P. 56(d); *Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery.").

Finally, to the extent plaintiffs contend that Bank Markazi has no due process rights because it is an alter ego of the Iranian government, there are plainly genuine disputes of fact on that question.  Arabieh Aff. ¶¶ 13-26.  Those disputes likewise preclude summary judgment.

## III.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

In the alternative to summary judgment, plaintiffs seek a preliminary injunction ordering Clearstream to bring the assets to the United States while the Court adjudicates this dispute.  "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  "[T]he preliminary injunction standard is a conjunctive test.  The plaintiff must satisfy ***all . . . elements of the test*** in order to establish his entitlement to the 'drastic and extraordinary remedy' of a preliminary injunction."  *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416, 2011 WL 4634172, at *2 (S.D.N.Y. Oct. 4, 2011) (emphasis added).  Plaintiffs cannot satisfy ***any*** of those elements.

### A.   Plaintiffs' Injunction Would Infringe Bank Markazi's Immunity

As a preliminary matter, the injunction plaintiffs seek would infringe Bank Markazi's immunity.  An order that would "force [a] foreign sovereign . . . to place some of [its] assets in the hands of the United States courts for an indefinite period" is equivalent to "an attachment of the property."  *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1229 (2d Cir. 1995);

*see also Gen. Dynamics U.K. Ltd. v. Libya*, No. 16 Misc. 412, 2017 WL 945639, at *1 (S.D.N.Y. Feb. 27, 2017) (preliminary injunction "would have the practical impact of an attachment").  The Court cannot order that extraordinary relief until it has considered the immunity arguments in Bank Markazi's motion to dismiss.

Even absent a request for injunctive relief, a court must "reach a decision about immunity as near to the outset of the case as is reasonably possible."  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1317 (2017); *see Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020).  Under the current briefing schedule, plaintiffs' motion for a preliminary injunction will be fully briefed before Bank Markazi's motion to dismiss.  Dkt. 220 ¶4.  The Court, however, cannot actually rule on the injunction before considering Bank Markazi's immunity arguments.

### B.    Plaintiffs Have Not Shown a Clear Likelihood of Success on the Merits

In any case, plaintiffs have not shown a likelihood of success on the merits under the heightened standard that applies to the injunction they seek.  Plaintiffs do not merely seek an injunction maintaining the status quo.  They seek a ***mandatory*** injunction directing a party to move assets to a different country.  "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a ***heightened legal standard*** by showing 'a ***clear or substantial*** likelihood of success on the merits.'"  *N. Am. Soccer League*, 883 F.3d at 37 (emphasis added). "The 'clear' or 'substantial' showing requirement . . . alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success."  *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (denying relief under heightened standard).

Plaintiffs do not even claim to have met that heightened standard.  They assert that they have shown "sufficiently serious questions going to the merits of their claims."  Pls. Mem. at 39.

But that is the standard for ordinary injunctions that maintain the status quo, not mandatory injunctions that would drastically alter it. Plaintiffs simply ignore the heightened standard that governs this sort of injunction.

Plaintiffs' likelihood of success is anything but "clear or substantial." Bank Markazi has put forth substantial challenges to plaintiffs' claims. Bank Markazi has shown serious doubts about the constitutionality of §8772. *See* pp. 11-23, *supra*. And Bank Markazi has made a strong showing that this Court lacks both subject-matter and personal jurisdiction over it. *See* pp. 23-31, *supra*. Those challenges require dismissal. But at a minimum, they preclude the "clear or substantial" likelihood of success plaintiffs need to justify mandatory injunctive relief.

### C.      Plaintiffs Have Not Shown They Will Suffer Irreparable Harm

Nor have plaintiffs shown irreparable harm. Plaintiffs claim they face irreparable harm because Bank Markazi has "initiated an action in Luxembourg seeking an order requiring Clearstream to defy any ruling of this Court" ordering turnover of the assets. Pls. Mem. at 38 (emphasis omitted). That is not a correct description of the Luxembourg proceedings. Bank Markazi's declaratory judgment actions merely seek an order prohibiting Clearstream from complying with an order to transfer assets to the United States *until the Luxembourg courts have recognized that order*. Gaicio Decl. ¶¶8-9.

A mere requirement that a party seek foreign recognition before enforcing an order in another country is not irreparable harm. Foreign recognition proceedings are not an "inappropriate collateral attack" or an attempt to exercise "appellate jurisdiction" over this Court's orders. Pls. Mem. at 38. They are a routine feature of cross-border litigation. This Court would not enforce a Luxembourg judgment in the United States without first deciding whether to recognize that judgment. *See* N.Y. C.P.L.R. 5301-5309. Nor would courts in any

other state.  *See, e.g.*, Uniform Foreign-Country Money Judgments Recognition Act (Unif. L. Comm'n 2005).  There is no reason to hold Luxembourg courts to any different standard.

This case involves ***assets in Luxembourg*** held by a ***Luxembourg custodian***.  It is hardly surprising that Luxembourg courts might want the opportunity to recognize a foreign order directing the disposition of those Luxembourg assets before the order is given effect in that country.  Compliance with ordinary and otherwise applicable legal processes is not "irreparable harm" that entitles a party to a mandatory injunction.  It is not legally cognizable "harm" at all. *See Lawrence v. Wilder Richman Sec. Corp.*, 417 F. App'x 11, 14 (2d Cir. 2010) (no injunction where party "suffers no legally cognizable injury at all, let alone irreparable injury"); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("[O]rdinary compliance costs are typically insufficient to constitute irreparable harm.").  The mandatory injunction that plaintiffs seek is an improper attempt to short-circuit a routine and utterly sensible legal process.

By contrast, transferring the assets from Luxembourg to the United States would threaten serious harm to Bank Markazi's interests.  Executive Order No. 13,599 purports to block property in which Bank Markazi has an interest that is "in the United States [or] that hereafter come[s] within the United States."  Executive Order No. 13,599, § 1(a), 77 Fed. Reg. 6659, 6659 (Feb. 5, 2012).  And the Terrorism Risk Insurance Act subjects "blocked assets" to execution. 28 U.S.C. § 1610 note § 201(a).  Transferring the assets to the United States could therefore expose them to blocking and execution even if the Court rules for Bank Markazi on the merits.

Plaintiffs offer to "stipulate that the movement of the Bond Proceeds to New York is without prejudice to any defense that the Defendants may have possessed had those assets remained in Luxembourg."  Pls. Mem. at 38 n.21.  But that stipulation obviously is not binding on the many other plaintiff groups that have also asserted claims against these assets.  *See, e.g.*,

36

*Havlish v. bin Laden*, No. 03 Civ. 9848, Dkt. 504 (S.D.N.Y. Apr. 7, 2020) (Kry Decl. Ex. K) (authorizing writ of execution against same assets).  Transferring the assets to the United States would thus threaten substantial prejudice to Bank Markazi notwithstanding plaintiffs' stipulation. Plaintiffs have not satisfied this element of the preliminary injunction standard either.

### D.       A Preliminary Injunction Is Not in the Public Interest

Finally, the mandatory injunction plaintiffs seek would undermine the public interest.  In considering the public interest, this Court should not limit its view to the interests of American plaintiffs.  Rather, where an injunction would have effects across national lines, courts properly consider the interests of the broader global public.  *See, e.g.*, *Raia v. Pompeo*, No. 20 Civ. 1083, 2020 WL 1921573, at *7 (E.D.N.Y. Apr. 21, 2020) (denying preliminary injunction because "interfere[nce] with the Hague Convention proceeding in Italy [is] something that is certainly not in the public interest"); *John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235, 249 (S.D.N.Y. 1995) (denying preliminary injunction based on Canadian public interests where dispute predominantly concerned Canadian parties and transactions).

The injunction plaintiffs seek would drastically undermine Luxembourg public interests. U.S. plaintiffs have tried to attach these same assets in Luxembourg on at least five occasions. The Luxembourg courts have rejected every one of those attempts as contrary to Luxembourg public policy.  Gaicio Decl. ¶¶2-6 & Exs. A-E.  Luxembourg courts have also refused to recognize judgments against Iranian entities that would violate their sovereign immunity.  Gaicio Decl. ¶7 & Ex. F.  The injunction that plaintiffs seek would circumvent the authority of the Luxembourg courts, improperly undermining those courts' ability to enforce Luxembourg public policies applicable to assets and parties within that country's own borders.

Plaintiffs urge that § 8772 directs this Court to permit seizure "without regard to concerns relating to international comity."  22 U.S.C. § 8772(a)(1).  But "comity" is a technical legal

concept that refers to "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  Section 8772's reference to "comity" therefore does not mean this Court must ignore the obvious international ramifications of its rulings altogether, even when those ramifications are relevant for other purposes, such as the public interest standard that governs injunctive relief.

Plaintiffs identify no countervailing public interests that justify granting an injunction. The only public interest they assert is that Congress enacted § 8772 and other statutes to facilitate plaintiffs' claims.  Pls. Mem. at 40.  But those statutes were the results of plaintiffs' own drafting and lobbying efforts.  Kry Decl. Exs. E, F, G, H.  Section 8772 in particular is the epitome of special-interest legislation – a statute that purports to dictate the outcome in a specific pending case.  22 U.S.C. § 8772(b).  Those statutes may confirm the importance that plaintiffs themselves attach to the legislation, but they are not a fair proxy for the ***public*** interest.

## **CONCLUSION**

Bank Markazi's motion to dismiss should be granted.  Plaintiffs' motions for summary judgment and for a preliminary injunction should be denied.


Dated:    September 11, 2020                    Respectfully submitted,
              New York, New York


                                                       /s/ Robert K. Kry
Donald F. Luke                                  Robert K. Kry
JAFFE & ASHER LLP                               Lauren M. Weinstein
600 Third Avenue                                MOLOLAMKEN LLP
New York, New York  10016                       600 New Hampshire Ave., N.W.
(212) 687-3000                                  Washington, D.C.  20037
                                                (202) 556-2000
                                                rkry@mololamken.com

                                                Lisa W. Bohl (*pro hac vice* forthcoming)
                                                MOLOLAMKEN LLP
                                                300 N. LaSalle St.
                                                Chicago, Illinois  60654
                                                (312) 450-6700

                    *Attorneys for Defendant Bank Markazi*