**EXHIBIT F**

Civil Judgment No. 2019TALCH01/00116
of March 27, 2019

---

Maître Fabio TREVISAN (case: 9)

---

[logo]

# GRAND DUCHY OF LUXEMBOURG

## DISTRICT COURT IN AND OF LUXEMBOURG

# AUTHENTIC COPY

## WE HENRI

*Grand Duke of Luxembourg*
*Duke of Nassau etc.*
*etc. etc.*

Let it be known that

## DISTRICT COURT IN AND OF LUXEMBOURG

first chamber, sitting in civil matters,
handed down the following judgment in the case listed in the docket
under the number 177266

<u>**Civil Judgment 2019TALCH01 / 00116**</u>

Public hearing on Wednesday, March 27, 2019.

<u>**Docket number 177266**</u>

**Composition:**
Thierry HOSCHEIT, First Vice-President,
Vanessa WERCOLLIER, First Judge,
Séverine LETTNER, Judge,
Luc WEBER, Clerk.

[signature]                    [signature]

**Between:**

I.   **The following persons acting on their own behalf as relatives and/or heirs of the victims who died in the September 11, 2001 attacks acting on their own behalf:**

1. **Ms. Tara BANE**, no known occupation, residing at 2114 North Crescent Boulevard Yardley, Pennsylvania 19067,
2. **Mr. Donald BANE,** no known occupation, residing at 1311 Fox Hole Road Wyoming, Delaware 19934,
3. **Ms. Christina BANE-HAYES,** no known occupation, residing at 1804 Oakdale Avenue Richmond, Virginia 23227,
4. **Mr. Gerald BINGHAM,** no known occupation, residing at 624 Kings Court, Plant City, Florida 33565,
5. **Ms. Krystyna BORYCZEWSKI,** no known occupation, residing at 460 Park Road. Parsippany, New Jersey 07054.
6. **Ms. Julia BORYCZEWSKI,** no known occupation, residing at 3110 Scenic Court, Denville, New Jersey 07834,
7. **Ms. Michèle BORYCZEWSKI,** no known occupation, residing at 192 Well Road, Greely, Pennsylvania 18425,
8. **Ms. Grace KNESKI,** no known occupation, residing at 95 Fieldfare Way, Charleston, South Carolina 29414,
9. **Mr. Richard A. CAPRONI,** no known occupation, residing at 1208 Ocean Parkway, Pine Ocean, Maryland 21811,
10. **Ms. Dolores CAPRONI,** no known occupation, residing at 1208 Ocean Parkway, Pine Ocean, Maryland 21811,
11. **Mr. Michael CAPRONI,** no known occupation, residing at 401 East 65* Street, New York, New York 10065,
12. **Ms. Lisa CAPRONI-BROWN,** no known occupation, residing at 1155 Warburton Avenue, Apt. 11-U Yonkers, New York 10701-1017,

13. **Ms. Alice CARPENETO,** no known occupation, residing at 656 8* Street, Bohemia, New York 11716,

14. **Mr. Stephen L. CARTLEDGE,** no known occupation, residing at 5282 Keel Way, Fort Pierce, Florida 34949,

15. **Ms. Michel le WRIGHT,** no known occupation, residing at 5106 Gaslight Lane, Culver City, California 90230,

16. **Ms. Clara CHIRCHIRILLO,** no known occupation, residing at 197 Crossroads Lakes Drive, Ponte Vedra Beach, Florida 32082,

17. **Ms. Livia CHIRCHIRILLO,** no known occupation, residing at 415 Beverly Road, Apt. 3R, Brooklyn, New York 11218,

18. **Ms. Catherine DEBLIECK,** no known occupation, residing at 2 Roving Road, Levittown, Pennsylvania 19056,

19. **Ms. Frances M. COFFEY,** no known occupation, heiress to **Daniel M. COFFEY,** residing at 20 Carriage Drive, Newburgh, New York 12550,

20. **Mr. Kevin M. COFFEY,** no known occupation, heir to **Daniel M. COFFEY,** residing at 20 Carriage Drive, Newburgh, New York 12550,

21. **Mr. Daniel D. COFFEY,** doctor, heir to **Daniel M. COFFEY,** 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

22. **Ms. Frances M. COFFEY,** no known occupation, heiress to **Jason COFFEY,** residing at 20 Carriage Drive, Newburgh, New York 12550,

23. **Mr. Kevin M, COFFEY,** no known occupation, heir to **Jason COFFEY,** residing at 20 Carriage Drive, Newburgh, New York 12550,

24. **Mr. Daniel D. COFFEY,** doctor, heir to **Jason COFFEY,** residing at 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

25. **Mr. Dwayne W. COLLMAN,** no known occupation, residing at 308 E. Orange Street, Yorkville, Illinois 60560,

26. **Mr. Brian COLLMAN,** no known occupation, residing at 1390 Vegas Valley Drive, Apt. 27, Las Vegas, Nevada 89169,

27. **Mr. Charles COLLMAN, no known occupation**, residing at 3687 Sweeten Creek Road, Apt. 3, Arden, North Carolina 28704,

28. **Ms. Brenda SORENSON,** no known occupation, residing at 401, 34* Street North, #78, St. Petersburg, Florida 33713,

29. **Ms. Loisanne DIEHL,** no known occupation, residing at 21 Morningside Court, Lakewood, New Jersey 08701,

30. **Ms. Anne Marie DORF,** no known occupation, residing at 15D Bulger Avenue, New Milford, New Jersey 07646,

31. **Mr. Joseph DORF,** no known occupation, residing at 540 Duke Road, New Milford, New Jersey 07646,

32. **Ms. Michel le DORF,** no known occupation, residing at 540 Duke Road, New Milford, New Jersey 07646,

33. **Mr. Robert DORF,** no known occupation, residing at 1291 Sanford Street, Port Charlotte, Florida 33953,

34. **Ms. Linda SAMMUT,** no known occupation, residing at 5 Second Street, Belford, New Jersey 07718,

35. **Ms. Corazon FERNANDEZ,** no known occupation, residing at 19 Windstar Drive, Little Egg Harbor, New Jersey 08087,

36. **Ms. Regina Maria MERWIN,** no known occupation, residing at 7613 Beechdale Road, Crestwood, Kentucky 40014,

37. **Ms. Grace PARKINSON-GODSHALK**, no known occupation, residing at 608 Countess Drive, Yardley, Pennsylvania 19067,

38. **Ms. Tina GRAZIOSO**, no known occupation, residing at 100 Bonnie Drive, North Middletown, New Jersey 07748,

39. **Mr. Jin LIU**, no known occupation, residing at 35 Woodstone Circle, Short Hills, New Jersey 07078,

40. **Mr. Alan GU,** no known occupation, residing at 35 Woodstone Circle, Short Hills, New Jersey 07078,

41. **Ms. Maureen HALVORSON**, no known occupation, residing at 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

42. **Ms. Maureen HALVORSON,** no known occupation, heiress to **James HALVORSON,** residing at 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

43. **Ms. Maureen HALVORSON**, no known occupation, heiress of William WILSON, residing at 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

44. **Ms. Fiona HAVLISH**, no known occupation, residing at P. O. Box 20488, Boulder, Colorado 30308,

45. **Mr. William HAVLISH**, no known occupation, residing at 6505 Indian Acres Trail, Tucker, Georgia 30084,

46. **Ms. Susan CONKLIN**, no known occupation, residing at 235 Starboard Point, Roswell, Georgia 30076,

47. **Mr. Hui-Chien CHEN,** no known occupation, residing at 179, Sec. 1 Fusing South Road, Da-An District, Taipei, Taiwan, R.O.C.,

48. **Mr. Haomin JIAN,** no known occupation, residing at 60-17 44th Avenue, Woodside, New York 11377,

49. **Ms. Fu Mei CHIEN,** no known occupation, residing at 8 Tallman Lane, Somerset, New Jersey 08873,

50. **Ms. Huichun JIAN,** no known occupation, residing at 48 Dong-Shin Street, 3rd Floor, Tao Yuan, Taiwan, R.O.C. 33048,

51. **Ms. Hui-Chuan JIAN,** no known occupation, residing at 151 Lin-Sen North Road, Jhongshan Dist., Taipei City 10454, Taiwan, R.O.C. 10454,

52. **Ms. Hui-Zon JIAN,** no known occupation, residing at No. 9, Alley 19, Lane 120, Sec. 2, Shatian Road, Daidu Township, Touchung County 432, Taiwan, R.O.C. 43242,

53. **Ms. Marie Ann PAPROCKI,** no known occupation, residing at 61 Lakeview Drive, Mahopac, New York 10541,

54. **Mr. Michael LOGUIDICE,** no known occupation, residing at 3152 Little Road #207, Trinity, Florida 34655,

3

55. **Ms. Theresann LOSTRANGIO,** no known occupation, residing at 325 Barnsbury Road, Langhorne, Pennsylvania 19047,

56. **Mr. Ralph S. MAERZ,** no known occupation, residing at 815 Via Del Sol, North Fort Myers, Florida 33903,

57. **Ms. Margaret MAURO,** no known occupation, residing at 3604 Green Garden Court, Antioch, Tennessee 37013,

58. **Mr. Ramon MELENDEZ,** no known occupation, residing at 435 Sabol Road, Stroudsburg, Pennsylvania 18360,

59. **Ms. Patricia MILANO,** no known occupation, residing at 221 Yale Boulevard, Shrewsbury, New Jersey 07702,

60. **Ms. Ivy MORENO,** no known occupation, residing at 1541 Seminole Street, First Floor, Bronx, New York 10461,

61. **Ms. JoAnne LOVETT,** no known occupation, residing at 17 Man O War Lane, Howell, New Jersey 07731,

62. **Mr. Martin PANIK,** no known occupation, residing at 1100 Blue Bail Road, P. O. Box 185, Mingoville, Pennsylvania 16856,

63. **Ms. Mary Lynn-Anna PANIK-STANLEY,** no known occupation, residing at 375 East Vine Street, LaRue, Ohio 43332,

64. **Ms. Christine PAPASSO,** no known occupation, residing at 5330 Arthur Kill Road, Staten Island, New York 10307,

65. **Ms. Patricia J. PERRY,** no known occupation, residing at 2934 East 28* Street, Kansas City, Missouri 64128,

66. **Mr. Rodney M. RATCHFORD,** no known occupation, residing at 412 Ingram Avenue, Oneonta, Alabama 35121,

67. **Ms. Marshae Ratchford,** known state, residing at 4327 Wyndham Park Circle, Decatur, Georgia 30034,

68. **Mr. Rodney RATCHFORD,** on behalf of **Ms. Maranda** G **RATCHFORD,** minor, residing at 412 Ingram Avenue Oneonta, Alabama 35121,

69. **Mr. Rodney MARQUEZ RATCHFORD,** no known occupation, residing at 2151 Beau Terra Drive W, Mobile, Alabama 36619,

70. **Ms. Judith REISS,** no known occupation, residing at 969 Princess Drive, Yardley, Pennsylvania 19067,

71. **Ms. Joanne RODAK GORI,** no known occupation, residing at 1383 Butternut Drive, Southampton, Pennsylvania 18966,

72. **Ms. Chelsea Nicole RODAK,** no known occupation, residing at 124 Rabbit Run Road, Sewell, New Jersey 08080,

73. **Ms. Joyce Ann RODAK,** no known occupation, on behalf of **Mr. Devon Marie RODAK,** minor, residing at 124 Rabbit Run Road, Sewell, New Jersey 08080,

74. **Ms. Joyce Ann RODAK,** no known occupation, residing at 124 Rabbit Run Road, Sewell, New Jersey 08080,

75. **Mr. John RODAK,** no known occupation, residing at 600 Pickering Road, Southampton, Pennsylvania 18966,

4

76. **Ms. Regina RODAK,** no known occupation, residing at 600 Pickering Road, Southampton, Pennsylvania 18966,

77. **Ms. Diane ROMERO,** no known occupation, residing at 5 Chatham Court, Matawan, New Jersey 07748,

78. **Ms. Loren ROSENTHAL,** no known occupation, residing at 91 Quarry Drive, Woodland Park, New Jersey 07424-4200,

79. **Ms. Helen ROSENTHAL,** no known occupation, residing at 225 West 83rd Street, Apt 4K, New York, New York 10024,

80. **Mr. Alexander ROWE,** no known occupation, residing at P. O. Box 237, XI1 Bryanston, Simonstown, South Africa 7995,

81. **Mr. Ed RUSSIN,** no known occupation, residing at 25 Regina Road, Morganville, New Jersey 07748,

82. **Ms. Gloria RUSSIN,** no known occupation, residing at 25 Regina Road, Morganville, New Jersey 0748,

83. **Mr. Barry RUSSIN,** no known occupation, residing at 3 York Road, Marlboro, New Jersey 07746,

84. **Mr. Expedito SANTILLAN,** no known occupation, residing at 1 Rockridge Court, Morris Plains, New Jersey 07748,

85. **Ms. Ester SANTILLAN,** no known occupation, residing at 1 Rockridge Court, Morris Plains, New Jersey 07748,

86. **Ms. Ellen SARACINI,** no known occupation, residing at 1460ather Circle He, Yardley, Pennsylvania 19067,

87. **Ms. Joanne RENZI,** no known occupation, residing at 5821 Ivy Branch Drive, Dublin, Ohio 43016,

88. **Mr. Paul SCHERTZER,** no known occupation, residing at 8 Annette Drive, Edison, New Jersey 08820,

89. **Mr. Ronald SLOAN,** no known occupation, residing at 301 Mission Street, 38-C, San Francisco, California 94105,

90. **Mr. Raymond Doyle SMITH,** no known occupation, residing at 75 Traymore Street, Apt. 2, Buffalo, New York 14216,

91. **Ms. Katherine SOULAS,** no known occupation, residing at 3 Beaver Creek Court, Far Hills, New Jersey 07931,

92. **Ms. Russa STEINER,** no known occupation, residing at 30 Paddock Drive, New Hope, Pennsylvania 18938,

93. **Mr. George STERGIOPOULOS,** no known occupation, residing at 184 Marvin Ridge Road, New Canaan, Connecticut 06840,

94. **Ms. Angela STERGIOPOULOS,** no known occupation, residing at 184 Marvin Ridge Road, New Canaan, Connecticut 06840,

95. **Ms. Sandra STRAUB,** no known occupation, residing with **Ms. Brianna L. Gomes,** 37849 Millwood Drive, Woodlake, California 93286,

96. **Ms. Joan E. TINO,** no known occupation, residing at 9 Howland Circle, West Caldwell, New Jersey 07006,

97. **Ms. Pamela SCHIELE,** no known occupation, residing at 2 Lowry Avenue, Wharton, **New** Jersey 07855,
98. **Ms. Christine BARTON PENCE,** no known occupation, residing at 721 S.E. lst Way, Apt. 210, Deerfield Beach, Florida 33441,
99. **Mr. Michael E. PAIGE,** no known occupation, heir to **Timothy Raymond WARD,** 2057 South Delia Lane, Anaheim, California 92802,
100. **Mr. Leonard ZEPLIN,** no known occupation, residing at 400 East 77th Street **New** York, **New** York 10021,
101. **Ms. Leona ZEPLIN,** no known occupation, residing at 400 East 77th Street, New York, **New** York 10021,
102. **Mr. Joslin ZEPLIN,** no known occupation, residing at 420 East 72nd Street, New York, **New** York 10021, P. O. Box 630260, Rockville, Utah 84763,

II. **The same parties as sub I as representatives and/or heirs of the successions (estates) of the victims who died in the September 11, 2001 attacks:**

1. **Estate of Donald J. HAVLISH, Jr.** represented by **Ms. Fiona HAVLISH,** no known occupation, residing at P.O. Box 20488, Boulder, Colorado 30308, and by **Ms. Susan CONKLIN,** no known occupation, residing at 235 Starboard Point, Roswell, Georgia 30076,
2. **Estate of Michael A. BANE,** represented by **Ms. Tara BANE,** no known occupation, residing at 2114 North Crescent Boulevard Yardley, Pennsylvania 19067,
3. **Estate of Martin BORYCZEWSKI, represented by Mrs. Krystyna BORYCZEWSKI,** no known occupation, residing at 460 Park Road, Parsippany, New Jersey 07054,
4. **Estate of Steven CAFD2RO,** represented by **Ms. Grace KNESKI,** no known occupation, residing at 95 Fieldfare Way, Charleston, South Carolina 29414,
5. **Estate of Richard M. CAPRONI, represented by Mr. Richard A. CAPRONI,** no known occupation, residing at 1208 Ocean Parkway, Ocean Pines, Maryland 21811,
6. **Estate of Peter CHIRCHIRILLO**, represented by **Ms. Clara CHIRCHIRILLO,** no known occupation, residing at 197 Crossroads Lakes Drive, Ponte Vedra Beach, Florida 32082,
7. **Estate of Jeffrey COALE,** represented by **Ms. Leslie BROWN,** no known occupation, residing at 927 Baltimore Annapolis Blvd, Sevema Park, Maryland 21146, whose heir is **Mr. William COALE,** deceased, whose estate is represented by **Ms. Leslie BROWN,** mentioned above,
8. **Estate of Daniel M. COFFEY,** represented by his heirs:
   ➢ **Ms. Frances M. COFFEY,** no known occupation, residing at 20 Carriage Drive, Newburgh, **New** York 12550,
   ➢ **Mr. Kevin M. COFFEY,** no known occupation, residing at 20 Carriage Drive, Newburgh, New York 12550,

> ➤ **Mr. Daniel D. COFFEY,** doctor, residing at 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

9. **Estate of Jason COFFEY,** represented by his heirs:
> ➤ **Ms. Frances M. COFFEY**, no known occupation, residing at 20 Carriage Drive, Newburgh, New York 12550,
> ➤ **Mr. Kevin M. COFFEY,** no known occupation, residing at 20 Carriage Drive, Newburgh, New York 12550,
> ➤ **Mr. Daniel D. COFFEY,** doctor, residing at 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

10. **Estate of Jeffrey COLLMAN,** represented by **Ms. Keith BRADKOWSKI,** no known occupation, residing at 814 Provence Avenue, Santa Maria, California 934458,

11. **Estate of Michael DIEHL,** represented by **Ms. Loisanne DIEHL,** no known occupation, residing at 21 Morningside Court, Lakewood, New Jersey 08701,

12. **Estate of Stephen DORF,** represented by **Ms. Linda SAMMUT,** no known occupation, residing at 5 Second Street, Belford, New Jersey 07718 and **Ms. Michelle DORF,** no known occupation, residing at 540 Duke Road, New Milford, New Jersey 07646,

13. **Estate of Judy FERNANDEZ,** represented by **Ms. Corazon FERNANDEZ,** no known occupation, residing at 19 Windstar Drive, Little Egg Harbor, New Jersey 08087,

14. **Estate of Ronald GAMBOA,** represented by **Ms. Regina Maria MERWIN,** no known occupation, residing at 7613 Beechdale Road, Crestwood, Kentucky 40014,

15. **Estate of William R. GODSHALK,** represented by **Ms. Grace PARKINSON-GODSHALK,** no known occupation, residing at 608 Countess Drive, Yardley, Pennsylvania 19067,

16. **Estate of John GRAZIOSO,** represented by **Ms. Tina GRAZIOSO,** no known occupation, residing at 100 Bonnie Drive, North Middletown, New Jersey 07748,

17. **Estate of Liming GU,** represented by **Mr. Jin LIU,** no known occupation, residing at 35 Woodstone Circle, Short Hills, New Jersey 07078,

18. **Estate of James D. HALVORSON,** represented by **Ms. Maureen HALVORSON,** no known occupation, residing at 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

19. **Estate of William HALVORSON,** represented by **Ms. Maureen HALVORSON,** no known occupation, residing at 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

20. **Estate of Denis LAVELLE,** represented by **Ms. Marie Ann PAPROCKI,** no known occupation, residing at 61 Lakeview Drive, Mahopac, New York 10541,

21. **Estate of Robert LEVINE,** represented by **Ms. Stephanie GIGLIO,** no known occupation, residing at 15, Hartsdale Lane, Coram, New York 11727, whose heir is: **Mr. Michael LOGUIDICE,** no known occupation, residing at 3152 Little Road #207, Trinity, Florida 34655,

22. **Estate of Joseph LOSTRANGIO,** represented by **Ms. Theresann LOSTRANGIO**, no known occupation, residing at 325 Barnsbury Road, Langhorne, Pennsylvania 19047,

23. **Estate of Dorothy MAURO,** represented by **Ms. Margaret MAURO**, no known occupation, residing at 3604 Green Garden Court, Antioch, Tennessee 37013,

24. **Estate of Mary MELENDEZ,** represented by **Mr. Ramon MELENDEZ**, no known occupation, residing at 435 Sabol Road, Stroudsburg, Pennsylvania 18360,

25. **Estate of Peter T. MILANO,** represented by **Ms. Patricia MILANO**, no known occupation, residing at 221 Yale Boulevard, Shrewsbury, New Jersey 07702,

26. **Estate of Yvette Nichole MORENO,** represented by **Ms. Ivy MORENO**, no known occupation, residing at 1541 Seminole Street, First Floor, Bronx, New York 10461,

27. **Estate of Brian NUNEZ,** represented by **Ms. JoAnne LOVETT**, no known occupation, residing at 17 Man O War Lane, Howell, New Jersey 07731,

28. **Estate of Philip Paul OGNIBENE,** represented by **Ms. Diane OGNDEENE,** no known occupation, residing at 30882 Sandy Ridge Drive, Lewes, Delaware 19958,

29. **Estate of Vincent A. OGNIBENE,** represented by **Ms. Diane OGNIBENE**, no known occupation, residing at 30882 Sandy Ridge Drive, Lewes, Delaware 19958,

30. **Estate of Salvatore T. PAPASSO,** represented by **Ms. Christine PAPASSO**, no known occupation, residing at 5330 Arthur Kill Road, Staten Island, New York 10307,

31. **Estate of John William PERRY**, represented by **Ms. Patricia J. PERRY,** no known occupation, residing at 2934 East 28th Street, Kansas City, Missouri 64128,

32. **Estate of Marsha Dianah RATCHFORD,** represented by **Mr. Rodney M. RATCHFORD**, no known occupation, residing at 412 Ingram Avenue, Oneonta, Alabama 35121,

33. **Estate of Joshua Scott REISS,** represented by **Ms. Judith REISS**, no known occupation, residing at 969 Princess Drive, Yardley, Pennsylvania 19067,

34. **Estate of John M. RODAK,** represented by **Ms. Joyce Ann RODAK**, no known occupation, residing at 124 Rabbit Run Road, Sewell, New Jersey 08080,

35. **Estate of Elvin ROMERO,** represented by **Ms. Diane ROMERO**, no known occupation, residing at 5 Chatham Court, Matawan, New Jersey 07748,

36. **Estate of Richard ROSENTHAL,** represented by **Ms. Loren ROSENTHAL**, no known occupation, residing at 91 Quarry Drive, Woodland Park, New Jersey 07424-4200,

37. **Estate of Maria Theresa SANTILLIAN,** represented by **Mr. Expedito SANTILLAN,** no known occupation, residing at 1 Rockridge Court, Morris Plains, New Jersey 07748,

38. **Estate of Victor SARACINI**, represented by **Ms. Ellen SARACINI**, no known occupation, residing at 1460 Heather Circle, Yardley, Pennsylvania 19067,
39. **Estate of Scott SCHERTZER**, represented by **Mr. Paul SCHERTZER**, no known occupation, residing at 8 Annette Drive, Edison, New Jersey 08820,
40. **Estate of Paul K. SLOAN**, represented by **Mr. Ronald SLOAN**, no known occupation, residing at 301 Mission Street, 38-C, San Francisco, California 94105,
41. **Estate of George Eric SMITH**, represented by **Mr. Raymond Doyle SMITH**, no known occupation, residing at 75 Traymore Street, Apt. 2, Buffalo, New York 14216,
42. **Estate of Timothy P. SOULAS**, represented by **Ms. Katherine SOULAS**, no known occupation, residing at 3 Beaver Creek Court, Far Hills, New Jersey 07931,
43. **Estate of William R. STEINER**, represented by **Ms. Russa STEINER**, no known occupation, residing at 30 Paddock Drive, New Hope, Pennsylvania 18938,
44. **Estate of Andrew STERGIOPOULOS**, represented by **Mr. George STERGIOPOULOS**, doctor, residing at 184 Marvin Ridge Road, New Canaan, Connecticut 06840,
45. **Estate of Edward W. STRAUB**, represented by **Ms. Sandra STRAUB**, no known occupation, residing at Mrs. Brianna L. Gomes, 37849 Millwood Drive, Woodlake, California 93286,
46. **Estate of Jennifer TINO,** represented by **Ms. Joan E. TINO**, no known occupation, residing at 9 Howland Circle, West Caldwell, New Jersey 07006,
47. **Estate of Jeanmarie WALLENDORF**, represented by **Ms. Christine BARTON PENCE**, no known occupation, residing at 721 S.E. lst Way, Apt. 210, Deerfield Beach, Florida 33441,
48. **Estate of Meta WALLER**, represented by **Mr. Chrislan FULER MANUEL**, no known occupation, residing at 161 Cornerstone Drive, South Windsor, Connecticut 92802,
49. **Estate of Timothy Raymond WARD**, represented by **Mr. Michael E. PAIGE**, no known occupation, residing at 2057 South Delia Lane, Anaheim, California 92802,
50. **Estate of Doyle Raymond WARD**, represented by **Ms. Brianna L. GOMES**, no known occupation, residing at 37849 Millwood Drive, Woodlake, California 93286,

**plaintiffs** under the terms of a writ by the substitute court bailiff Catherine NILLES of Luxembourg on March 22, 2016 and in terms of a resummons writ by the court bailiff Patrick KURDYBAN of Luxembourg on July 25, 2016,

represented by the limited liability company MOYSE BLESER S. à r. 1., based and with its head office in L-2680 Luxembourg, registered in the Trade and Companies Register of Luxembourg under number B 211295, represented for the purposes of these proceedings by Maître François MOYSE, trial lawyer, residing in Luxembourg,

**and:**

1. **the Islamic Republic of Iran**, represented by its Minister of Foreign Affairs, Mr. **Mohammad** Javad ZARIF, Ministry of Foreign Affairs, based at Imam Khomeini Street, Tehran, Iran,

2. **the Ayatollah Ali HOSSEINI-KHAMENEI,** former President of the Islamic Republic of Iran, no known occupation, represented by Minister of Foreign Affairs, Mohammad Javad ZARIF, Ministry of Foreign Affairs, residing at Imam Khomeini Street, Tehran, Iran,

3. **Mr. Ali Akbar HASHEMI RAFSANJANI**, former President of the Islamic Republic of Iran, no known occupation, represented by Minister of Foreign Affairs, Mohammad Javad ZARIF, Ministry of Foreign Affairs, residing at Imam Khomeini Street, Tehran, Iran,

4. **the Iranian Ministry of Information and Security,** represented by the Minister of Foreign Affairs, Mohammad Javad ZARIF, Ministry of Foreign Affairs, based at Imam Khomeini Street, Tehran, Iran,

5. **Islamic Revolutionary Guards Corps,** political organization, represented by the Minister of Foreign Affairs, Mohammad Javad ZARIF, Ministry of Foreign Affairs, based at Imam Khomeini Street, Tehran, Iran,

6. **HEZBOLLAH,** political organization, represented by the Minister of Foreign Affairs, Mohammed Javad ZARIF, Ministry of Foreign Affairs, based at Imam Khomeini Street Tehran, Iran,

7. **Iran's Ministry of Petroleum,** public organization, represented by its legal or statutory representative, based at Hafez Crossing, Taleghani Avenue Tehran, Iran,

8. **National Iranian Tanker Company,** a trading company, registered with the Tehran Register of Commerce, represented by its legal or statutory representative, based at 65 Shahid Atefï Street, Africa Expressway, Tehran, Iran,

9. **National Iranian Oil Company,** public organization, represented by its legal or statutory representative, based at Hafez Crossing, Taleghani Avenue Tehran, Iran,

10. **National Iranian Gas Company,** public organization, represented by its legal or statutory representative, based at National Iranian Gas Company Building, South Aban Street, Karimkhan Boulevard, P.O. Box 15875, Tehran, Iran,

11. **Iran Air,** public organization, represented by its legal or statutory representative, based at Iran Air H.Q., Mehrabad Airport, P.O. Box 13185-775, Tehran, Iran,

12. **National Iranian Petrochemical Company,** public organization, represented by its legal or statutory representative, based at 144 North, Sheikh Bahaie Avenue, P.O. Box 19395-6896, Tehran, Iran,

13. **Iran's Ministry of Economic Affairs and Finance,** public organization, represented by its Minister, based at Imam Khomeini Street Tehran, Iran,

14. **Iran's Ministry of Commerce,** public organization, represented by its Minister, based at 492 Valieasr Avenue, Tehran, Iran,

15. **Iran's Ministry of Defense and Logistics of the Armed Forces,** represented by its Minister, based at Ferdowsi Avenue, Sarhang Sakhaei Street, Tehran, Iran,

16. **Central Bank of the Islamic Republic of Iran,** represented by its legal or statutory representative, based at 144, Mirdamad Bd., Tehran, Iran,

**defendants** under the terms of the above-mentioned writs,

**sub 1-5 and sub 7-16,** represented by the limited partnership BONN STEICHEN & PARTNERS, based and with its head office at L-2370 Howald, 2 rue Peternelchen, Building C2, entered on list V of the Luxembourg Bar Association's Table, represented by its current manager, namely the limited liability company BONN STEICHEN & PARTNERS S.à.r.l, itself represented for the purposes of the proceedings by Maître Fabio TREVISAN, trial lawyer,

**sub 6,** resummoned, not appearing,

**in the presence of:**

**The State Prosecutor** of the District Court of Luxembourg, with its offices in the Judicial Precinct in Luxembourg.

**The Court:**

By court bailiff's writ of March 22, 2016, 102 named plaintiffs, acting on their own behalf as well as in their capacity as representatives or heirs of 50 named persons who died on September 11, 2001, served a summons on

1. the ISLAMIC REPUBLIC OF IRAN
2. the Ayatollah Ali HOSSEIM-KHAMENEI
3. Ali Akbar HASHEMIRAFSANJANI
4. the IRANIAN MINISTER OF INFORMATION AND SECURITY
5. the ISLAMIC REVOLUTIONARY GUARDS CORPS
6. the HEZBOLLAH organization
7. the IRANIAN MINISTRY OF OIL
8. the NATIONAL IRANIAN TANKER COMPANY
9. the NATIONAL IRANIAN OIL COMPANY
10. the NATIONAL IRANIAN GAS COMPANY
11. AIR IRAN
12. the NATIONAL IRANIAN PETROCHEMICAL COMPANY
13. IRAN'S MINISTRY OF ECONOMIC AFFAIRS AND FINANCES
14. IRAN'S MINISTRY OF COMMERCE
15. IRAN'S MINISTRY OF DEFENSE AND LOGISTICS OF THE ARMED FORCES
16. the CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN

to appear before the court of this head office in order to have it declared and ordered that it will be enforceable in Luxembourg and will produce its full and complete effects there as if it emanated from a Luxembourg court

- a judgment handed down on December 22, 2011 by the United States District Court of the Southern District of New York declaring the defendants liable for the damaging consequences of an attack committed on September 11, 2001
- a judgment handed down on October 3, 2012 by the United States District Court of the Southern District of New York setting the compensation amounts payable by the defendants to the plaintiffs by categories of damages and categories of victims
- a judgment handed down on October 12, 2012 by the United States District Court of the Southern District of New York ordering the defendants to pay
  - o property damage: 394,277,884 USD

- o physical injury/pain and suffering: 94,000,000 USD
- o psychological damage: 874,000,000 USD
- o punitive damages: 4,686,235,921 USD
- o legal interest on the sums allocated for pain and suffering and for psychological damage, for the total of USD 968,000,000
- a judgment handed down on September 12, 2013 by the United States District Court of The Southern District of New York making the judgments of December 22, 2011, October 3, 2012 and October 12, 2012 enforceable

The PLAINTIFFS are still asking each to be awarded procedural compensation of 5,000 euros and to have the defendants ordered to pay the expense of the proceedings, with a deduction to the benefit of their lawyer at the Constituted Court.

On this summons, only the defendant sub 16), the CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, appointed a lawyer to the Court as of May 3, 2016.

At the invitation of the court on May 26, 2016 and July 1, 2016, the PLAINTIFFS resummoned all of the defendants on the basis of Article 84 of the New Code of Civil Procedure according to the court bailiff's writ of July 25, 2016.

The costs of this resummons, as far as directed against the CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN must in any case remain at the expense of the PLAINTIFFS as being frustrated, since this party has already appointed a lawyer at the Court.

On this resummons, only the defendants sub 1) to sub 5) and sub 7) to sub 15) have appointed a lawyer to the Court as of August 22, 2016 (the NATIONAL IRANIAN TANKER COMPANY), August 31, 2016 (the IRANIAN STATE PARTIES), September 13, 2016 (AIR IRAN, the NATIONAL IRANIAN PETROCHEMICAL COMPANY and the NATIONAL IRANIAN GAS COMPANY) and October 3, 2016 (the NATIONAL IRANIAN OIL COMPANY).

Defendant sub 6) did not appoint a lawyer to the Court. The due process against it will be discussed below in the section dedicated to it.

13

At the invitation made by the court to the PLAINTIFFS dated June 5, 2018, the procedure was communicated to the Public Prosecutor's Office under Article 183 of the New Code of Civil Procedure.

At the hearing of November 21, 2018, the investigation was closed.

At the hearing of January 23, 2019, the reporting judge was heard in his oral report.

Maître François MOYSE, lawyer representing the limited liability company MOYSE BLESER, assisted by Maître Laurent HEISTEN, made the submissions for the plaintiffs.

Maître Fabio TREVISAN, lawyer representing the limited partnership BONN STEICHEN & PARTNERS, made the submissions for the defendants sub 1) to sub 5) and sub 7) to sub 16).

Dominique Peters, lead substitute, made the submissions for the Public Prosecutor's Office.

For the purposes of this judgment, the court intends to follow the logic of the parties who have grouped the fifteen appearing defendants into four groups to devote developments specific to each group. A specific section is dedicated by the court to the non-appearing defendant.

1. **The claim as directed against the ISLAMIC REPUBLIC OF IRAN** ........................ **18**
   1.1. **Jurisdictional immunity** ................................................................. **18**
      1.1.1. **Positions of the parties** .................................................... **18**
         1.1.1.1. **The CENTRAL BANK** ........................................... **18**
         1.1.1.2. **The PLAINTIFFS** ................................................ **22**
      1.1.2. **The court's assessment** ..................................................... **25**
         1.1.2.1. **Admissibility of the argument derived from the jurisdictional immunity: Impact of the interim proceedings** ................................ **26**
            1.1.2.1.1. **Admissibility *ratione temporis of* the argument derived from the jurisdictional immunity** .................................... **26**
            1.1.2.1.2. **Waiver of the argument derived from jurisdictional immunity** ................................................. **29**
         1.1.2.2. **The merits of the argument derived from the jurisdictional immunity: Benefit of jurisdictional immunity** ................................ **31**
            1.1.2.2.1. **General considerations on the basis of the rule of State immunity** .................................................................... **31**

**1.1.2.2.2.**     **The extent of jurisdictional immunity** ................................**34**

**1.1.2.2.2.1.**     **The nature of the review to be carried out by the enforcement judge** .........................................................**34**

**1.1.2.2.2.2.**     **Circumstances specific to the case** ..............................**37**

**1.1.2.2.2.3.**     **Derogation from jurisdictional immunity for acts that caused death, physical injury or property damage to private persons?** ...........................................................**45**

**1.1.2.2.2.4.**     **Derogation from jurisdictional immunity for acts of terrorism and for acts that violate a standard of *jus cogens*?** ...........................................................**52**

**1.1.2.2.3.**     **Impact of Article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms** ........................**54**

**1.2.**     **Conditions of the enforcement** ......................................................**59**

**2.**     **The claim as directed against the IRANIAN STATE PARTIES** ...............................**59**

**2.1.**     **Jurisdictional immunity** ...........................................................................**59**

**2.1.1.**     **Positions of the parties** .........................................................................**59**

**2.1.1.1.**     **The IRANIAN STATE PARTIES** ...................................**59**

**2.1.1.2.**     **The PLAINTIFFS** .........................................................**63**

**2.1.2.**     **The court's assessment** ........................................................................**67**

**2.1.2.1.**     **Admissibility of the argument derived from the jurisdictional immunity: Impact of the interim proceedings** ...................................**69**

**2.1.2.1.1.**     **Admissibility *ratione temporis* of the argument derived from the jurisdictional immunity** ......................................................**69**

**2.1.2.1.2.**     **Waiver of the argument derived from jurisdictional immunity** ........................................................................**72**

**2.1.2.2.**     **The merits of the argument derived from the jurisdictional immunity: Benefit of jurisdictional immunity** ..................................**74**

**2.1.2.2.1.**     **General considerations on the basis of the rule of State immunity** ........................................................................**74**

**2.1.2.2.2.**     **The extent of jurisdictional immunity** ...............................**74**

**2.1.2.2.2.1.**     **The nature of the review to be carried out by the enforcement judge** .........................................................**74**

**2.1.2.2.2.2.**     **Circumstances specific to the case** ..............................**74**

**2.1.2.2.2.3.**     **Derogation from jurisdictional immunity for acts that caused death, physical injury or property damage to private persons?** ...........................................................**82**

**2.1.2.2.2.4.**     **Derogation from jurisdictional immunity for acts of terrorism and for acts that violate a standard of *jus cogens*?** ...........................................................**88**

15

2.1.2.2.3.    Impact of Article *6* of the Convention for the Protection of Human Rights and Fundamental Freedoms ........................ 90

2.2.    Conditions of the enforcement ............................................................. 95

3.    The claim as directed against the IRANIAN PUBLIC ORGANIZATIONS ............ 95

3.1.    Positions of the parties ........................................................................ 96

3.1.1.    The IRANIAN PUBLIC ORGANIZATIONS ............................................. 96

3.1.1.1.    Lack of enforceability of US decisions in the United States ........... 96

3.1.1.2.    Lack of international jurisdiction of the US court ........................... 97

3.1.1.3.    Irregularity of the procedure ............................................................ 98

3.1.1.3.1.    Violation of the adversarial principle and the defense rights ........................................................................................ 98

3.1.1.3.2.    Violation of the right of access to the court .......................... 99

3.1.1.3.3.    Violation of the obligation to justify the judgments .......... 101

3.1.1.4.    Violation of the Luxembourg public order by the US judgments 102

3.1.2.    The PLAINTIFFS ............................................................................... 103

3.1.2.1.    Lack of enforceability of US decisions in the United States ........ 104

3.1.2.2.    Lack of international jurisdiction of the US court ........................ 106

3.1.2.3.    Irregularity of the procedure .......................................................... 106

3.1.2.3.1.    Violation of the adversarial principle and the defense rights ...................................................................................... 106

3.1.2.3.2.    Violation of the right of access to the court ........................ 108

3.1.2.3.3.    Violation of the obligation to justify the judgments .......... 108

3.1.2.4.    Violation of the Luxembourg public order by the US judgments 109

3.2.    The court's assessment ........................................................................ 110

3.2.1.    General observations ........................................................................ 110

3.2.1.1.    Legal analysis framework ............................................................... 110

3.2.1.2.    US Procedural context ................................................................... 113

3.2.2.    Review of arguments........................................................................ 116

3.2.2.1.    Admissibility: Enforceability of the US judgments ...................... 116

3.2.2.2.    Merits: Conditions of regularity of US judgments ...................... 119

3.2.2.2.1.    International jurisdiction of the US court ........................... 119

3.2.2.2.2.    Procedural public order: Irregularities of the procedure 120

3.2.2.2.2.1.    Service of the writ of summons ................................... 120

3.2.2.2.2.2.    Right of access to the court ........................................ 127

3.2.2.2.2.3.    Motivation of the judgments ....................................... 128

3.2.2.2.2.4.    Service of the judgments.............................................. 130

3.2.2.2.3.    Substantive public order: Punitive damages..................... 132

4.    The claim as directed against the NATIONAL IRANIAN TANKERS COMPANY ................................................................................................................................ 133

4.1.   Positions of the parties .......................................................................134

  4.1.1.   The NATIONAL IRANIAN TANKERS COMPANY............................134

    4.1.1.1.   Lack of enforceability of US decisions in the United States .........134

    4.1.1.2.   Lack of international jurisdiction of the US court ........................135

    4.1.1.3.   Irregularity of the procedure ..........................................................136

      4.1.1.3.1.   Violation of the adversarial principle and the defense rights ..................................................................................................136

      4.1.1.3.2.   Violation of the right of access to the court........................137

      4.1.1.3.3.   Violation of the obligation to justify the judgments ..........138

    4.1.1.4.   Violation of the Luxembourg public order by the US judgments140

4.2.   The PLAINTIFFS................................................................................141

    4.2.1.1.   Lack of enforceability of US decisions in the United States .........142

    4.2.1.2.   Lack of international jurisdiction of the US court ........................143

    4.2.1.3.   Irregularity of the procedure ..........................................................144

      4.2.1.3.1.   Violation of the adversarial principle and the defense rights ..................................................................................................144

      4.2.1.3.2.   Violation of the right of access to the court........................145

      4.2.1.3.3.   Violation of the obligation to justify the judgments ..........145

    4.2.1.4.   Violation of the Luxembourg public order by the US judgments146

4.3.   The court's assessment.......................................................................147

  4.3.1.   General observations ........................................................................147

    4.3.1.1.   Legal analysis framework................................................................147

    4.3.1.2.   US Procedural context ....................................................................147

  4.3.2.   Review of arguments........................................................................147

    4.3.2.1.   Admissibility: Enforceability of the US judgments.......................147

    4.3.2.2.   Merits: Conditions of regularity of US judgments........................150

      4.3.2.2.1.   International jurisdiction of the US court.............................150

      4.3.2.2.2.   Procedural public order: Irregularities of the procedure 150

        4.3.2.2.2.1.   Service of the writ of summons ...................................151

        4.3.2.2.2.2.   Right of access to the court..........................................156

        4.3.2.2.2.3.   Motivation of the judgments .......................................157

        4.3.2.2.2.4.   Service of the judgments...............................................159

    4.3.2.3.   Substantive public order: Punitive damages .................................161

5.   The claim as directed against the organization HEZBOLLAH ...............................163

6.   Counterclaims from the IRANIAN PUBLIC ORGANIZATOINS and the NATIONAL IRANIAN TANKER COMPANY ........................................................165

7.   Procedural compensation.......................................................................166

Pronouncement ...........................................................................................167

## 1. The claim as directed against the CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN

The CENTRAL BANK submits that the claim be dismissed by asserting the application of jurisdictional immunity and disputing that the enforcement conditions were met.

### 1.1. Jurisdictional immunity

### 1.1.1.   Positions of the parties

### 1.1.1.1.      The CENTRAL BANK

The CENTRAL BANK claims the benefit of jurisdiction immunity of sovereign States to argue that the District Court of Luxembourg would be incompetent to hear the enforcement application, if not that it should be declared inadmissible.

It explains that the immunity of sovereign States would be a universally accepted principle of customary international law, and in any case by the Luxembourg legal order, and would form an obstacle for State courts to hear legal actions directed against a beneficiary of that immunity insofar as the action would call into question acts carried out in the context of the exercise of public authority *(acta jure imperii),* and not acts of private management *(acta jure gestionis)*. Immunity would apply to acts performed in the exercise of public authority regardless of whether those acts are lawful or not, and it would be up to the PLAINTIFFS seeking to have the privilege of immunity waived to show that the act in question was not in the exercise of public authority but in private management.

As a central bank, which would constitute a branch of the sovereign State of the ISLAMIC REPUBLIC OF IRAN, carrying out acts related to the exercise of national sovereignty, it would benefit fully from this immunity.

The argument derived from the invocation of the privilege of immunity would have to be qualified as a plea in bar and as such could be raised at any time during the proceedings. Contrary to the assertions of the PLAINTIFFS, it would in any case have raised it at the threshold of the proceedings.

Nor can it be inferred from the interim action brought by it to combat a garnishment measure on its bank accounts with the S.A. CLEARSTREAM that it would have renounced the benefit of the immunity. Such a waiver should be certain, explicit and unequivocal, both in reference to the general rules governing the concept of waiver and by reference to international normative texts that resolve the issue of waiving the privilege of immunity. However, the action initiated by it and put forward by the PLAINTIFFS would not serve as waiver, whereas it would only have been aimed at urgently combating an illegal garnishment measure. In any event, it would

18

have taken care in connection with this interim action to insist on the benefit of its immunity. If this interim action were to be regarded as constituting a waiver of the jurisdictional immunity, it should be remembered that this waiver would apply only for the purposes of that interim action, and not for this enforcement action. Finally, the CENTRAL BANK argues that at this stage it should differentiate between immunity from jurisdiction and immunity from execution, in that a possible waiver of jurisdiction, i.e. the acceptance of a state court exercising its jurisdiction in relation to a sovereign entity of another state, would not imply acceptance on the part of that entity that measures of coercion be adopted.

Dealing with the issue of possible restrictions on the privilege of immunity, the CENTRAL BANK observes at the outset that the provision of US domestic law (Rule 28 U.S. Code §1605A(a) of the *United States Code)* relating to state sponsorship activities of terrorist acts that would restrict the privilege of immunity invoked by the PLAINTIFFS to have the privilege of immunity waived, would override jurisdiction immunity in a manner that is excessive and inconsistent with customary and conventional international law governing the immunity privilege. This provision of US law cannot thus be taken into account in order to waive the privilege before the Luxembourg judge.

The CENTRAL BANK goes on to note the issue of privilege restrictions, noting that if privilege and immunity is not intended to apply to commercial or private activities

of a sovereign state and its branches (and this by way of exception when privilege would be the principle), it should, however, be noted in this case that the original jurisdiction did not maintain that the CENTRAL BANK performed a commercial or private activity, but an activity in support of acts of terrorism (criticism that would be baseless), and that such activity would not fall within the scope of the derogation from the principle of immunity. The qualification of acts falling under this sovereignty would still necessarily result from the fact that the PLAINTIFFS themselves would proceed to a systematic assimilation between the CENTRAL BANK and the ISLAMIC REPUBLIC OF IRAN. The application for enforcement of a judgment on activities such as those alleged against it would thus fall within the privilege of immunity.

The CENTRAL BANK then argues that the PLAINTIFFS would erroneously refer to exception to the privilege of immunity based on the nature of the legal action in that it would seek to compensate physical injury or property damage such that this exception would be admitted under international law. While noting that in any event such an exception would not appear to be internationally established where physical injury or property damage is caused by an act of *jure imperii,* the CENTRAL BANK notes that the various texts which provide for

19

such a derogation require that the damage occurred in the territory of the court to which the matter is referred and that the agents of the sovereign entity were present at the time of the damaging act. This derogation would thus only make sense before the court before which the matter is brought on the merits, i.e. in the case of the US court, but not before the enforcement court, i.e. in the case of the Luxembourg court, so that this exception to the principle of immunity cannot be invoked before the latter, thus giving full application to the principle of privilege. In the same sense, the exception in question could not be invoked a second time before the Luxembourg court if it has already been invoked before the American trial judge. If the exception had to be applied before the enforcement judge, it would remain subject to the same conditions as those already stated, namely that the damage should have been caused and the agents of the sovereign entity should have been present in the territory of the enforcement judge. These conditions would clearly not be met in this case.

Insofar as it is necessary to refer to the application under US law of the exception to immunity derived from the fact that the action would seek compensation for physical injury or property damage, it should be noted that no act in connection with the torts could be attributed to the CENTRAL BANK or its agents as having been committed on the territory of the United States of America. The exception associated with the occurrence of physical injury or property damage could thus not be applicable before the US judge. The US judge would not have relied on this derogation from the principle of privilege, but on the derogation relating to state sponsorship of acts of terrorism, which would be exclusive in US law of the exception of the occurrence of physical injury or property damage, which should still lead to the exclusion in this case of any considerations derived from the latter exception. In the case where the Luxembourg enforcement judge should assess the privilege of immunity as if he had been the US judge on the merits, the CENTRAL BANK further argues that the conventional law to which Luxembourg has subscribed (Article 15 of the European Convention on State Immunity and its Additional Protocol, signed in Basel on May 16, 1972; Article 8 §4 United Nations Convention on Jurisdictional Immunities of States and Their Property adopted by United Nations General Assembly Resolution 59/38 dated December 2, 2004) would not allow a court to override the privilege of immunity in the event of default proceedings.

Finally, the CENTRAL BANK concludes that any deviation from the principle of immunity derived from developments based on the international liability of States should be ruled out, since the texts invoked by the PLAINTIFFS have remained at the draft stage and would refer only to the liability of the States among themselves, and not with regard to private persons.

To the extent that the PLAINTIFFS would assert a derogation from the privilege of immunity in the presence of particularly serious violations of the *jus cogens,* of human rights and humanitarian law, the CENTRAL BANK argues, while again insisting on the absence of participation on its part and its agents in acts that may fall under such actions, that public international law would not in the present state allow for an established custom in favor of such a derogation. The existence of such a derogation would be illogical, since it would involve an examination of the merits of the dispute to rule on the immunity, whereas the purpose of the latter would be precisely to prevent the jurisdiction of one State from assessing the conduct of another sovereign State. Thus, the right not to be tried would be independent of the alleged facts, both in terms of their legality and their seriousness.

Finally, any derogation from the privilege of immunity for reasons of fairness should be waived, whereas the judge should rule in law, and could only rule in fairness if there was a provision of express positive law allowing him to do so. Such permission would be non-existent in this case.

### 1.1.1.2.    The PLAINTIFFS

The PLAINTIFFS first point to what they consider to be an inconsistency in the arguments of the CENTRAL BANK in that it would show jurisdictional immunity in order to conclude that the court lacks jurisdiction while characterizing the plea as a plea to bar. The court notes that the PLAINTIFFS do not derive any legal consequences from their arguments, so there is no reason to rule otherwise.

The PLAINTIFFS, in defending their position that the jurisdictional immunity would be a plea to bar, argue that it would be a special plea to bar in that it would not depend on the plaintiff or the action, but on the defendant, and should as such be raised at the threshold of the proceedings. It cannot be admitted for reasons of logic and procedural economy that the defendant be allowed to invoke the jurisdictional immunity at any stage of the proceedings. On the contrary, the particular nature of the plea would require that it should only be raised *in limine litis.* However, the CENTRAL BANK would have failed to raise the argument relating to the threshold of the proceedings, since, following the garnishment carried out by them in Luxembourg against all the current defendants on the basis of the US judgments for which enforcement is being pursued in the context of these proceedings, the CENTRAL BANK would have referred the matter to the interim judge to have the cancellation of the garnishment pronounced, without, however, relying in this context on the argument of immunity, but invoking and discussing the substance of Luxembourg law to argue that the garnishment as it was applied against unavailable assets. The CENTRAL BANK would no longer be able to invoke the jurisdictional immunity for its benefit. In acting before the Interim Judge, who would have been dealing with the same dispute as the collegiate panel in these proceedings (these disputes would present the triple identity of parties, cause and purpose to concern the seizure of the CENTRAL BANK's property at S.A. CLEARSTREAM), the CENTRAL BANK would have further agreed to submit to the State jurisdiction of Luxembourg and would have thus waived jurisdictional immunity should it exist for its benefit. Customary law would allow such a waiver, which could be expressly and implicitly expressed. In the same context, the PLAINTIFFS further argue that the failure to appear before the (US) court ruling on the merits would serve as submission to the jurisdiction of that court and would entail consent on

the part of the CENTRAL BANK that the decision rendered should be made enforceable. The submission by the CENTRAL BANK to the Luxembourg state courts would still result from the fact that it would have acted against the seized third party, S.A. CLEARSTREAM, in order to be able to recover its assets.

On the content of the concept of jurisdictional immunity, the PLAINTIFFS argue that it would not be absolute and would suffer a number of exclusions in which the potential beneficiary of the immunity could not benefit from it.

This would be the case first of all for acts that caused death, physical injury or property damage to private persons outside the context of armed conflict, respectively in the event that the potential beneficiary of the immunity contributed through its actions to the death, physical injury or property damage to private persons outside the context of an armed conflict. In this context, the PLAINTIFFS state that the principles of public international law would impose an obligation on states to remedy the consequences of internationally unlawful acts and that there would be no such act to operate the otherwise accepted distinction between acts of *jure imperii,* that would allow states to invoke the jurisdictional immunity, and acts of *jure gestionis,* for which the jurisdictional immunity would be excluded. For internationally illegal acts, the jurisdiction immunity should always be waived in the interests of pacifying international relations. This rule would be enshrined in customary public international law, characterized by a universal and consistent practice supported by *Yopinio iuris* on the binding nature of the rule, which Luxembourg would not have objected to. Thus, the jurisdictional immunity would not apply for the damages caused to private persons before the courts of the place where the damage or the harmful event took place, without the presence of the State being held liable in the State of the court being required. The PLAINTIFFS argue that even if it were necessary to consider that the presence of the State sought in liability on the territory of the State on which the damaging event took place should be considered as a condition to stand in the way of jurisdictional immunity, this condition can only apply before the judge of the merits, and not before the enforcement judge.

In this case, the damaging event, namely the hijackings of airplanes and the attacks perpetrated with them dated September 11, 2001, would have taken place on American soil, so that the jurisdictional immunity would not apply before the American judge of the merits or as a knock-on effect before the Luxembourg enforcement judge.

The PLAINTIFFS argue secondly that the jurisdictional immunity cannot be invoked for acts of terrorism to which a State would have contributed. Terrorism would be a universally

condemned activity, would be fought by the States and would constitute an internationally unlawful act that could not be qualified as an act of *jure imperii.* States would therefore not be justified in availing themselves of the jurisdictional immunity in the event of their participation in an act of terrorism. Customary public international law, characterized by universal and consistent practice and *Yopinio iuris* would exclude the right to jurisdictional immunity for acts of terrorism.

In this case, the CENTRAL BANK was convicted of supporting acts of terrorism, so that it could not benefit from the jurisdictional immunity.

In the same vein, the PLAINTIFFS devote some arguments to the notion of *jure imperii* related to the concept of national sovereignty and which may benefit from the jurisdictional immunity, to argue that activities relating to public procurement, military activities, nationalization and public borrowing would not fall into this category, and that acts of terrorism and acts in support of terrorism would not fall into this category.

In this case, the CENTRAL BANK would have been condemned by the US court for acts in support of terrorism and therefore could not invoke the jurisdiction immunity for its own benefit.

The PLAINTIFFS devote in the fourth place, and in response to the argument of the CENTRAL BANK, a number of arguments to the question of jurisdictional immunity in relation to an act of violation of human rights to argue that the seriousness of an act would not be taken into account in the context of the assessment of the possibility of invoking jurisdictional immunity, but that only the nature of the act would be considered, and that there would therefore be no need to characterize a particular gravity of the acts alleged against the CENTRAL BANK in order to be able to stand in the way of the jurisdictional immunity.

In this case, the alleged acts would fall within the scope of those that caused death, physical injury or property damage to an individual, respectively those to be described as acts of terrorism, which would be sufficient to deny jurisdiction immunity to the CENTRAL BANK. Fifthly, the PLAINTIFFS invoke for their benefit the notion of equity, conceived as a rule of law that would reconcile conflicting rules and principles, to argue that the extent of jurisdictional immunity should be set in consideration of broad principles that govern international relations, including the principle that no State can cause death or harm to individuals who are not engaged in armed conflict under the regular armed forces, as well as the principle that acts of terrorism would be banned.

### 1.1.2. The court's assessment

The court finds that the CENTRAL BANK, while focusing its arguments on the notion of jurisdictional immunity, maintains that the immunity from jurisdiction and immunity from execution would fall under the same legal regime, but without drawing a legal conclusion from it. In any event, the argumentation of the CENTRAL BANK must be understood opposing the jurisdiction of this court to hear the application for enforcement, respectively as a factor in the admissibility of the enforcement application before this court because of the jurisdictional immunity of which it should benefit. In particular, the CENTRAL BANK does not argue that the enforcement application would participate in the forced execution procedure and should as such be examined under the immunity of execution. Nor does the CENTRAL BANK argue in the context of its argument devoted to jurisdictional immunity that the US jurisdiction of the merits would have wrongly ignored the jurisdictional immunity it would have enjoyed before that court (this argument is, however, developed within the framework of the argument devoted to the conditions of the enforcement and will be examined as long as necessary). The court will therefore consider in this context that the question of whether the CENTRAL BANK enjoys jurisdictional immunity which would be likely to stand in the way of the enforcement application.

To this end, the court first examines the effect of the interim procedure brought by the CENTRAL BANK and then, in the event that this review should result in the admissibility of the argument derived from the jurisdictional immunity, will assess its merits.

### 1.1.2.1. Admissibility of the argument derived from the jurisdictional immunity: Impact of the interim proceedings

It is recalled that by bailiff's writ of March 22, 2016, the current PLAINTIFFS summoned the current defendants for the purpose of having four judgments issued by a New York court declared enforceable in Luxembourg.

It is also an established fact in this case that following the writ of January 14, 2016, the current PLAINTIFFS have applied a garnishment against the current defendants at the S.A. CLEARSTREAM in order to obtain payment of the amounts allocated to them in the proceedings which took place before the New York court. The procedure for validating this garnishment is on the day of this judgment pending trial before the court of that seat.

Finally, it is an established fact in this case that following the writ of June 9, 2016, the CENTRAL BANK summoned the current PLAINTIFFS and the S.A. CLEARSTREAM to appear before the interim judge in to have the garnishment practiced by the current PLAINTIFFS declared unlawful. The current defendants, with the exclusion of the HEZBOLLAH organization, took part in these proceedings. By order of March 22, 2017, the Interim Judge declared the application inadmissible in light of the serious challenges that would have to be decided and which would be outside the assessment of the interim judge. This order was upheld by the Judgment of the Court of Appeal of January 10, 2018.

### 1.1.2.1.1. Admissibility *ratione temporis* of the argument derived from the jurisdictional immunity

**1/** The court would first like to point out that the fact that the CENTRAL BANK unduly combined the two different procedural techniques of the declining jurisdiction and the plea in bar is not likely to be consequential, since it is up to the court under Article 61 of the New Code of Civil Procedure to make the qualifications that the parties' arguments entail.

26

To the extent that there can be no doubt that the CENTRAL BANK has invoked the jurisdictional immunity for its own benefit, it is therefore up to the court to qualify this argument in the light of Luxembourg procedural law.

On this point, however, the court agrees with the position of the PLAINTIFFS to say that this argument in defense must be qualified as a plea in bar, the receipt of which leads to the inadmissibility of the claim.

**2/** The court does not, however, share the view of the PLAINTIFFS that this argument should be raised at the threshold of the proceedings. In Luxembourg procedural law, only nullity of deeds (Article 264 of the New Code of Civil Procedure) and declining of jurisdiction (Article 260 of the New Code of Civil Procedure; provided that they are not a matter of a public order rule) fall within the obligation of having to be raised at the threshold of the proceedings before any defense on the merits. No other positive law text or jurisprudential trend has extended this constraint for the purpose of a plea to bar. The arguments of legal logic and procedural efficiency developed by the PLAINTIFFS, which ultimately take into account the concern for the proper administration of justice, are such as to apply to all pleas to bar, and not only to those strictly personal to the defendant, but are not in the current state of Luxembourg procedural law such as to condition the admissibility of the plea based on jurisdiction immunity to its formulation at the threshold of the proceedings. (see in the same sense in French law JCL Civil Procedure, J. Théron., Book. 600-30, Defenses, No. 68; Encyclopedia Dalloz, Civil Procedure, C. Kessedjian, Immunity, No. 22).

The plea to bar derived from the non-compliance with jurisdictional immunity, in that the latter not only affects the jurisdictional competence of the judge but takes away his power to disqualify, is a matter of public order (Luxembourg District Court April 7, 2017, Commercial Judgment II No. 520/17, No. 132174 of the docket, cited in Annals of Luxembourg law, volume 27-28, 2017-2018, G. Friden and P. Kinsch, Luxembourg's practice of public international public law (2017)), and as such may be raised at any moment in the proceedings.

**3/** If it were to be admitted that the admissibility of the plea based on jurisdictional immunity is conditioned by its formulation at the threshold of the proceedings, it must be noted that this condition would be respected in this case. It is not disputed that, in the context of the submissions specific to the proceedings for enforcement of US decisions, the CENTRAL BANK invoked as a first argument that of jurisdictional immunity. It is in vain that the PLAINTIFFS argue that this proceeding would form an indivisible and inseparable whole with the proceedings in validation of the garnishment and the proceedings before the interim judge. On the contrary, it involves three distinctly separate proceedings, each with a separate purpose, case and parts.

It must be noted that, in the context of the interim proceedings, the CENTRAL BANK was the plaintiff in order to preserve the rights which it invoked for its benefit, and that in the context of this proceeding (as well as in the validation of the garnishment), it has the status of defendant to which the rights invoked by the PLAINTIFFS for their own benefit are applied. This finding alone is sufficient to rule out the existence of both an identity of parties (the respective qualities being different) as well as an identity of purpose (which are respectively the enforcement, the validation of the garnishment and the annulment of the garnishment) and an identity of cause (which are respectively compliance with the conditions enforced, the existence of a certain, liquid and payable claim documented by the US binding decisions and the violation of customary international public law and Luxembourg financial law) between the three proceedings.

While it is certain that these three proceedings are factually related in that they ultimately concern the same claim invoked by the PLAINTIFFS, this connection is not likely to cause them to lose their procedural autonomy and to have to induce procedural consequences in one proceeding depending on the attitude adopted, the pleadings held or the submission filed in another proceeding.

There are two other considerations to this.

On the one hand, jurisdictional immunity should not be confused with immunity of execution[1]. However, the interim proceedings, in that it tended to have the garnishment order quashed, was

---

[1] THE PLAINTIFFS agree that immunity from jurisdiction and immunity from execution are two different concepts, although in the context of the arguments devoted thereto, they are perverting the terms of a judgment of the Court of Cassation when they write that "in a judgment of February 2, 2012, the Luxembourg Court of Cassation confirmed that the exequatur does not constitute an act of execution and is therefore a matter of the jurisdiction immunity" (summary submissions of June 7, 2018, page 16, quote from the same ruling in bold). Reading the ruling of the Court of Cassation (February 2, 2012, No. 3712,

a measure of execution and could therefore only be inscribed in the context of the immunity of execution, whereas these proceedings relating to the enforcement of US decisions relates to the mere notion of jurisdictional immunity. Conduct adopted in the context of proceedings involving immunity from execution cannot have repercussions on other proceedings involving jurisdictional immunity.

On the other hand, these distinctions between jurisdictional immunity and immunity from execution and on the other hand on the merits brought by the current PLAINTIFFS and the interim proceeding brought by the CENTRAL BANK had been noted by the interim judge in his order of March 22, 2017 when he wrote on page 14 of his order that "*Since the garnishment was not authorized by a magistrate [a related motion of January 4, 2016, requesting the presidential authorization to seize, was rejected following a presidential order of January 5, 2016, on the grounds that the applicants had a title constituted by the American judgments] and the interim judge before whom the matter is currently brought as he had no jurisdiction to validate the garnishment, there is no need to take a position on the reservation invoked by the MARKAZI Bank regarding the privilege of immunity and jurisdiction it enjoys under the principle of customary international law, and this claim seeks instead to safeguard the rights of the MARKAZI Bank in the case where the seizure constituted an illegal act.*" Although the Court of Appeal in its decision did not deal with these issues, the legal situation was thus clear in such a way as to point to the absence of any impact of one proceeding on the other.

It follows from all the above arguments that the plea derived from the jurisdictional immunity of the CENTRAL BANK is admissible *rationae temporis.*

### 1.1.2.1.2.  Waiver of the argument derived from jurisdictional immunity

The parties agree, and the court agrees with this assessment, that the beneficiary of jurisdictional immunity may waive it. The court still holds that while such a waiver can obviously be express, it can also be tacit provided, in accordance with commonly accepted

---

No. 2951 of the register) reveals that the passage cited and highlighted by the PLAINTIFFS is in fact part of the means of cassation and constitutes the solution adopted by the Court of Appeal by the confirmation of the trial judges, without the Court of Cassation endorsing this assertion. It is limited to dismissing the appeal in cassation on the grounds that the plea presented only aimed to call into question the assessment by the judges on the merits of the scope of the waiver to invoke the jurisdictional immunity of the foreign State that is the author of the appeal in cassation.

principles, that it results from an act which necessarily implies a waiver and that the alleged author of the waiver performs this act voluntarily and with full knowledge of the facts, thus unequivocally demonstrating his intention to renounce.

**1/** These conditions are not met in this case by the CENTRAL BANK. Although it acted with full knowledge of the facts before the interim judge, this action cannot, however, be considered an act of waiving its jurisdictional immunity in the context of these proceedings. To reject the argument derived from the waiver, it is sufficient to recall that the enforcement proceedings and the interim proceeding differ by their parts, their purposes and their causes, just as they appeal for one to the mechanism of the jurisdictional immunity and for the other to the mechanism of the immunity of execution. The court further points out that in both proceedings, the CENTRAL BANK ultimately pursues the same purpose, namely to escape in Luxembourg from the consequences of the US judgments. While it is admissible for this purpose to claim jurisdiction immunity as a defendant in the context of enforcement proceedings, the invocation of this argument is not inconsistent with the use of legal remedies as a plaintiff in order to have the effects of the garnishment, that it considers to be unlawful, brought to an end. The fact that the CENTRAL BANK submitted itself as a plaintiff for the strict purposes of the interim proceedings before the jurisdictional authority of Luxembourg procedure and in this context invoked the application for its benefit of the legislation applicable to Luxembourg does not serve as tacit waiver of jurisdictional immunity in the context of these proceedings.

**2/** Nor can the failure of the CENTRAL BANK to appear before the US court be construed as a waiver of the jurisdictional immunity before that court, which would affect the benefit of the jurisdictional immunity before the court of that seat. While it can again be admitted that the failure to appear is the result of a deliberate decision (provided that the document initiating the proceedings has been validly brought to the knowledge of the defendant, which should be verified in the context of the examination of the conditions of exequatur), it must, however, also be admitted that this abstention alone does not indicate the intention of the CENTRAL BANK to waive jurisdictional immunity before this court.

It follows from the above that the CENTRAL BANK has waived for the purposes of these proceedings either through the argument derived from the jurisdiction immunity or jurisdiction immunity as such, provided that the conditions for it to benefit from it are met, which it is appropriate to verify in a second step.

**1.1.2.2.   The merits of the argument derived from the jurisdictional immunity:** Benefit of jurisdictional immunity

**1.1.2.2.1.     General considerations on the basis of the rule of State immunity**

**1/** The jurisdictional immunity is not enshrined in positive law, but is a matter of customary international law.

The status of international custom in Luxembourg law is described by one author as follows: (1) provided that it exists in international law, a customary rule will be recognized by the Luxembourg judge; (2) customary public international law directly applicable before the domestic judge; (3) the courts establish the existence of a customary rule by their own means, without referring to acts of the legislative or executive branch; (4) the establishment of the existence of a customary standard does not require, strictly speaking, that the party who invokes it should prove it: a customary rule is a rule of law, not a de facto element of the dispute (The role of international law in the Luxembourg legal order, Patrick Kinsch, Pas. 34, p.410). This author also cites a judgment of the Court of Appeal (February 11, 1999, Ann. Dr. Lux 10 (2000) 363, 369-370) who holds in a classic manner and not disputed by the parties to this proceeding that "*for the formation of an international customary rule, on the one hand, evidence is needed of a general, constant and uniform practice and, on the other hand, that of* opinio iuris sive necessitatis, *and the conscience of States to comply with a rule of law.*" In other words, the custom is identified if it has the character of consistently and uniformly practiced use, in the belief that this use is the law (Pierre Pescatore, Introduction to the Science of Law, Bruylant 2009, No. 106). This author adds that the custom does not present a single and clearly defined source of law, but rather is a set of customary phenomena that have this in common that they result, gradually and imperceptibly, from the diffuse social practice in a particular environment (op. cit., No. 58).

One French author writes that the whole difficulty, regarding the custom, is then, on the one hand, to be able to prove its existence, and, on the other hand, to delineate its precise outlines. For these purposes of identifying and determining the content of the custom, it is important to emphasize the fundamental importance of the judge (or the arbitrator). Indeed, when a judge recognizes the existence of a custom, he creates it at the same time; and it is sometimes permissible to ask where recognition ends and where the creation of the customary rule begins. There is an element of uncertainty and imprecision here (P.-M. Dupuy, Public International Law, Précis Dalloz, 9th ed., p. 350, No. 322).

The court holds at this stage that the custom is inherently changing and that in the absence of consecration in a written text of law, the rule of law which emerges from it is at any time likely to change in view of the evolution of legal, political, economic and social concepts. Important role players in these changes are the courts and tribunals, which cannot make a ruling on the content of the custom as described at some point by another court or by the authors of doctrine.

**2/** The court further notes that the matter of the judicial immunity of States has been the subject of two attempts at codification. The first step led to the European Convention on State Immunity and its Additional Protocol, signed in Basel on May 16, 1972, approved in Luxembourg by a law of June 8, 1984, which originally came into force on June 11, 1976 and is currently in force between eight states (Germany, Austria, Belgium, Cyprus, Luxembourg, the United Kingdom, the Netherlands, Switzerland). The second project led to the adoption of the United Nations Convention on Jurisdictional Immunities of States and Their Property by Resolution 59/38 of the United Nations General Assembly dated December 2, 2004. This convention has so far been ratified by 22 States, including the ISLAMIC REPUBLIC OF IRAN, but has not yet entered into force without ratification by at least 30 States.

Neither of these two conventions is intended to apply itself as a positive law in these proceedings.

32

**3/** The customary regime of jurisdictional immunity has evolved over the centuries from absolute immunity to relative immunity, this development being the manifestation of the decline of the national State and the emergence of the individual as an actor and subject of rights. The absolute scope of the jurisdictional immunity was first and foremost undermined by the distinction between acts of *jure imperii,* that open up the benefit of the jurisdiction immunity, and the acts of *jure gestionis,* that are exempt from the privilege of immunity. It can be admitted that this distinction is now part of the international custom. Only the demarcation between the two categories of acts is still open to discussion.

The scope of jurisdiction immunity is also discussed through other arguments. Without making an argument at this stage as to the state of the custom, the court points out that the two attempts to codify the system of jurisdictional immunity contain, in addition to the distinction between acts of *jure imperii* and acts of *jure gestionis,* a significant number of derogations from the jurisdictional immunity. The 1972 European Convention after addressing the procedural assumptions of the applicant or intervening State and the counterclaim (Article 1), contractual or unilateral consent (Article 2) and the state that concludes on the merits (Article 3) deals in Articles 4 and following with matters for which the jurisdictional immunity may be excluded: contractual obligation to be carried out in the territory of the State of the forum (Article 4), the employment contract carried out in the territory of the State of the forum (Article 5), participation in an organization established in the territory of the State of the forum (Article 6), the exercise of industrial, commercial or financial activity through an organization established in the territory of the State of the forum (Article 7), intellectual property rights protected in the State of the forum (Article 8), the right to a building located in the territory of the State of the forum (Article 9), the estate law (Article 10), the compensation of physical injury or property damage resulting from an act that occurred on the territory of the State of the forum while the perpetrator of the damage was present at the time of the incident (Article 11) and the arbitration (Article 12). Similarly, the 2004 United Nations Convention, after having waived the privilege of immunity in various procedural assumptions such as consent (Article 7), the applicant or intervening State (Article 8) and the counterclaim (Article 9), specifies that States cannot invoke immunity for disputes relating to commercial transactions (Article 10), employment contracts (Article 11), violations of a person's physical integrity or damage to property (Article 12), buildings, estates and trusts (Article 13), intellectual and industrial property rights (Article 14), participation in companies or other groups (Article 15), vessels owned or operated by the State (Article 16) and arbitration agreements (Article 17).

The authors also examine these derogations from State immunity more or less comprehensively (see, for example Hazel Fox & Philippa Web, The Law of State Immunity, Oxford University Press, 3rd edition; Edward Chukwuemeke Okeke, Jurisdictional Immunities of States and International Organizations, Oxford University Press, 2018).

These developments are not made at this stage to fix the content of the customary rule of jurisdiction, but on the one hand to confirm its now relative nature and on the other hand to emphasize its evolutionary and unstable nature.

### 1.1.2.2.2.  The extent of jurisdictional immunity
### 1.1.2.2.2.1.  The nature of the review to be carried out by the enforcement judge

**1/** The International Court of Justice in its judgment of February 3, 2012, Jurisdictional Immunity of the State, Germany v. Italy, Greece (intervenor), described as follows in points 125 to 130 the office of the enforcement judge called to weigh up the arguments derived from the immunity of jurisdiction:

> *125. The Court must then set out the way in which it conceives the issue of jurisdictional immunity applied to a judgment that rules not on the merits of an application against a foreign state, but on a request that a judgment already rendered by a foreign court to a third state be declared enforceable in the territory of the state of the judge before whom the matter is brought (an enforcement application). The difficulty arises from the fact that, in such cases, the judge is not called upon to issue a sentence directly to a foreign State on the grounds of jurisdictional immunity, but to make enforceable a sentence already handed down by the court of another State, which is supposed to have itself examined and applied the rules relating to the jurisdictional immunity of the defendant state.*

> *126. In this case, both Parties seem to have reasoned, in the arguments they exchanged, as if in such a case the court's respect for the jurisdiction of the third state depended simply on the respect of that immunity by the foreign court which rendered the judgment on the merits of the third state. In other words, both Parties appeared to make the question of whether or not the Florence Court of Appeal had disregarded German immunity from jurisdiction in declaring the Livadia judgment and the judgment of the Greek Court of Cassation enforceable depend on whether the latter decisions had themselves disregarded the immunity from jurisdiction that Germany had invoked as a defense in the legal actions brought against it in Greece.*

34

*127. Nothing presents a national court from verifying, before granting the enforcement, that the foreign judgment was not rendered in ignorance of the immunity of the defendant State. But, for the purposes of this case, the Court considers that it must approach the issue in a significantly different light. It considers that it is not necessary, in order to determine whether the Court of Appeal in Florence has misunderstood the immunity of Germany's jurisdiction, to rule on whether the Greek judicial decisions themselves violated this immunity - which it could not do, since it would rule, in doing so, on the rights and obligations of a State, Greece, which has not been a party to these proceedings (Monetary gold taken in Rome in 1943 (Italy v. France, United Kingdom and United States of America), preliminary question, judgment, C.I.J. Collection 1954, p. 32; East Timor (Portugal v. Australia), judgment, C.I.J. Collection 1995, p. 105, para. 34).*

*The relevant question, from the point of view of the Court and for the purposes of this case, is whether the Italian courts themselves respected the constitutionality of Germany's jurisdictional immunity in accepting the enforcement application, and not whether the Greek court that had rendered the judgment for which enforcement was sought, respected the jurisdictional immunity of Germany. In such a situation, the answers to these two questions may not necessarily coincide; it is only the first one that matters here to the Court.*

*128. When, as in this case, an application is brought before a court to grant the enforcement of a foreign judgment that has ruled against a third State, it is called upon to exercise its own jurisdiction with respect to the third State in question.* It is true that the purpose of the enforcement procedure is not to decide the merits of a dispute, but only to give enforceability to a judgment already rendered, on the territory of a State other than that of the judge who ruled on the merits. The role of the enforcement judge was therefore not to re-examine in all its aspects the merits of the case that was tried. The fact remains, however, that by granting or refusing the enforcement, it exercises a judicial power which results in giving the foreign judgment effects corresponding to those of a judgment rendered on the merits in the requested State. The proceedings brought before this judge must, therefore, be regarded as brought against the third State sentenced by the foreign judgment.

*129. In this regard, the Court notes that, according to Article 6, paragraph 2, of the United Nations Convention:*

35

> *"A proceeding before a court of a State shall be considered to have been instituted against another State if that other State:*
> *a) is named as a party to that proceeding; or*
> *b) is not named as a party to the proceeding but the proceeding in effect seeks to affect the property, rights, interests or activities of that other State."*

*Applied to an enforcement procedure, this definition implies that such a procedure must be regarded as directed against the State which has been sentenced by the foreign judgment. It is moreover why, in this case, Germany was admissible to oppose the decisions of the Florence Court of Appeal granting exequatur - albeit if it did so without success - and then to appeal against the confirming judgments.*

*130. It follows from the foregoing that the judge hearing an application for the enforcement of a foreign judgment sentencing a third State is obliged to consider whether the defendant State enjoys jurisdictional immunity, given the nature of the case that has been tried, before the courts of the State in which the enforcement proceedings were initiated. In other words, he must consider whether, in the event that he himself had been required to rule on the merits of a dispute identical to that decided by the foreign judgment, he would have been bound under international law to grant the defendant State immunity (see in this sense the Superior Court of Canada Kuwait Airways Corp. v. Iraq ([2010] RCS, 2, p. 571), as well as the U.K. Supreme Court NML Capital Limited v. Republic of Argentina ([2011] UKSC31).*

The court agrees with this analysis. As a result, the enforcement judge must make an independent assessment of the legal regime of the immunity of jurisdiction for the purposes of the proceedings that take place before him. Thus, he must not verify whether the US judge of the merits has properly applied his rule of domestic law depriving the foreign state and its emanations of the privilege of jurisdiction, but must check for the purposes of the enforcement procedure whether the circumstances of the case fall within one of the assumptions in which customary public international law provides that the foreign State cannot avail itself of the privilege of jurisdictional immunity, ruling "as if" he was to hear the application on the merits.

This control necessarily involves verification if the rule in the national law provision of the trial judge depriving the foreign State and its branches meets the criteria set for that purpose by a customary rule of international law. But the scope of analysis of the enforcement judge is not limited to the provision of national law specifically applied in the substantive procedure in order to justify the exclusion of jurisdictional immunity. On the contrary, the enforcement judge is called upon to verify the content of customary public international law in order to ascertain whether it contains an exception to the principle of the immunity of relevant jurisdiction in the case under review.

2/ The court specifies that this review by the enforcement judge is necessarily done outside of all considerations that predate his international jurisdiction in order to hear the merits of the case. The application of customary public international law on the argument derived from jurisdictional immunity must be done "as if" the enforcement judge has jurisdiction to hear the merits.

3/ The court further clarifies that the review to which the enforcement judge is subjected in the context of the argument derived from the jurisdiction immunity is done in relation to the particular circumstances of the case, but that it is not up to the enforcement judge, whether for the purposes of the examination of the enforcement application or for the prior review of jurisdictional immunity, to review or assess the merits of the case as weighed by the trial judge, neither with respect to the evidence of the facts nor with respect to the causal connection between the alleged facts and the damages suffered.

4/ In the eyes of the court, additional consideration must be taken into account in the context of assessing the scope of customary public international law regarding the jurisdictional immunity of States. The rule of the Jurisdictional Immunity of States is a rule of principle long enshrined in international custom, and the various adjustments that have been made over time are exceptions. As a result, the exceptions alleged in this litigation must be interpreted narrowly.

### 1.1.2.2.2.2. Circumstances specific to the case

To describe the facts of the case, the court refers to the developments in the document *Plaintiffs' proposed findings of fact and conclusions of law in support of motion for entry of judgment by default against sovereign defendants* registered on December 12, 2011 corresponding to the facts that were ultimately alleged against the defendants and the document of December 22, 2011 titled *Findings of fact and conclusions of law* signed by the judge {*United States District Judge)* George B. Daniels, who must be considered to indicate the facts

held against the defendants in a way that will incur liability. These two documents are, with a few exceptions, almost identical to the word[2]. In essence, they echo the facts and reproaches set out in the *Second Amended Complaint* of September 7, 2006 and the *Third Amended Complaint* of June 23, 2010.

The court disregards the developments contained in these documents insofar as they are not causally related to the events of September 11, 2001 and would therefore not be considered by the court if it had to consider the merits of the action against the defendants. Only the facts indicated in these two documents which are directly related to the facts of September 11, 2001 are relevant and taken into account in order to carry out the inspection in relation to the argument derived from the jurisdictional immunity.

These documents state that the September 11, 2001 attacks that formed the cause of the action of the PLAINTIFFS were committed by a terrorist network called AL QUAIDA and that the action tends to hold the defendants liable for the resulting losses, insofar as they directly and materially supported AL QUAIDA.

The documents attempt to describe the behavior and actions of the ISLAMIC REPUBLIC OF IRN since 1979 in connection with various attacks and organizations in that the ISLAMIC REPUBLIC OF IRAN has engaged from its creation in 1979 in a war against the United States of America through asymmetrical and unconventional means, including support for terrorist organizations, and has implemented this policy through its agents, ministries, services, agencies and companies {*officials, subdivisions, agencies and instrumentalities).*

---

[2] The differences are as follows:
- Addition to the *Findings of facts* of a § 61
- Addition to the *Findings of facts* of §§ 147 to 197
- Omission in the *Finding facts* of §15 4 of the *Proposed findings of facts*
- Reversal of §§ 273 and 274 with §g 275 and 276 in the *Findings of facts* (compared to §§ 222 and 223 on the one hand and §§ 224 and 225 on the other hand of the *Proposed findings of facts)*
- Omission in the *Conclusions of law* of §§ 12 to 14 of the *Proposed conclusions of law*
- Omission in the *Conclusions of law of* g § 39 to 46 of the *Proposed conclusions of law*

These differences do not affect the outcome of the dispute.

As part of the general explanations (section *Defendants; Proposed findings of fact,* §§ 1 to 64; *Findings of fact,* §§ 1 to 65), the CENTRAL BANK is described as performing essential quasi-governmental functions and as being entirely controlled by the government of the ISLAMIC REPUBLIC OF IRAN. The CENTRAL BANK is at the service of the Supreme Leader (position held by the Ayatollah Ali HOSSEINI-KHAMENEI), the ISLAMIC REVOLUTIONARY GUARDS CORPS and the IRANIAN MINISTRY OF INFORMATION AND SECURITY when it comes to implementing terrorist designs *(Proposed findings of fact,* 38; *Findings of fact,* §§ 38). The CENTRAL BANK has allowed the transfer of large sums of money in cash and through banking transactions to terrorist organizations such as HAMAS and HEZBOLLAH *(Proposed findings of fact,* §§ 55 and 56; *Findings of fact,* §§ 55 and 56). The CENTRAL BANK is responsible as a State agent or tool *(agents or instrumentalities)* for the actions of the ISLAMIC REPUBLIC OF IRAN *(Proposed findings of fact,* §§ 44; *Findings of fact,* §§ 44).

To the extent that the events of September 11, 2001 are attributed from an organizational point of view to the AL QUAIDA organization, the documents explain (section *Bridging of the Sunni-Shia Divide; Proposed findings of fact,* §§ 65 to 88; *Findings of fact,* §§ 66 to 89) the reasons and measures implemented to achieve cooperation between the Sunni organization AL QUAIDA and the Shiite Obedience State of the ISLAMIC REPUBLIC OF IRAN. These developments are not related to the facts of September 11, 2001.

The document then describes (section *Terrorist Attacks By the Iran-Hezbollah-al Qaeda Terrorist Alliance; Proposed findings of fact,* § § 89 to 114; *Findings of fact,* §§90toII5) a number of terrorist attacks attributed to the cooperation between the organizations Al QUAIDA and HEZBOLLAH, to the exclusion of the facts of September 11, 2001. It is only at point 114 of the *Proposed findings of fact,* point 115 respectively of the *Findings of fact,* that it is summarily accepted that the Iranian authorities facilitated the travel of members of the AL QUAIDA organization, including some of the perpetrators of September 11, 2001, to transit through Iran to and from Afghanistan where training camps were located.

Following points 114 and 115, respectively, the documents then explain (section *Iran and Terrorist Travel; Proposed findings of fact,* §§ 115 to 145; *Findings of fact,* §§ 116 to 146) in more detail on the issue of travel through Iran to Afghanistan to explain that at least 8, respectively between 8 and 10, of the 19 members of the terrorist commandos of September 11, 2001 passed through Iran. The document maintains on the one hand that travel to these training camps was essential to prepare for the terrorist attacks of September 11, 2001. It went on to explain that the Iranian authorities deliberately failed to stamp the passports of these persons in order to prevent any foreign State or service from being able to trace the movements of these persons, on pain of becoming suspicious, even though it was known that terrorist training camps were located in Afghanistan. The document goes on to explain that senior HEZBOLLAH officials organized and participated in some preparatory trips of several of the members of the September 11, 2001 terrorist commandos between cities in the Near and Middle East and that they helped these terrorists obtain passports and/or visas to enter the United States of America. The CENTRAL BANK is not mentioned in this context.

Only the document from Justice George B. Daniels then recounts (section *Testimony of Abolghasem Mesbahi; Findings of fact,* §§ 147 to 197) the biography of a witness and his involvement first in setting up the activities of support for terrorism of the ISLAMIC REPUBLIC OF IRAN and then in the revelation of these activities as a witness. The first part of these explanations (§§ 147 to 168) is unrelated to the facts of September 11, 2001. In the second part (§§ 169 to 180), it is explained that this witness was warned during the summer of 2001 by contacts that he still had within the Iranian government that a plan of attack against the United States of America was activated. Upon seeing the news about the attacks of September 11, 2001, he realized that he had been warned of them (§§ 169 to 180). These elements do not mention the CENTRAL BANK. The subsequent explanations (§§ 174 to 190) that none of the Western authorities contacted by this witness took it seriously is also unrelated to the facts of September 11, 2001. The same witness (§§ 191 to 197) further indicates that the ISLAMIC REPUBLIC OF IRAN had secretly purchased a flight simulator for the kind of aircraft that were hijacked to carry out the September 11, 2001 attacks. This simulator was installed near Tehran and was probably used for training terrorists. At least one of them stayed in Iran before the attacks. These elements do not mention the CENTRAL BANK.

The document then explains (section *Iran's Provision of Safe Haven to al Qaeda; Proposed findings of fact, §§ 146 to 153; Findings of fact,* §§ 198 to 205) the support provided by the ISLAMIC REPUBLIC OF IRAN to evacuate the parties responsible and combatants of the AL

40

QUAIDA organization in Afghanistan after that country was attacked by an international coalition following the attacks of September 11, 2001. These elements do not mention the CENTRAL BANK and are in any case after the attacks of September 11, 2001, so they are irrelevant to the liabilities in their regard.

Under other elements (section *Other findings; Proposed findings of fact,* §§ 154 to 158; *Findings of fact,* §§ 206 to 209), only the document *Proposed findings of fact* points out the assertion of a person involved according to whom the organization AL QUAIDA did not need help to carry out the attacks of September 11, 2001 would not be credible (§154). This point does not mention the CENTRAL BANK. The two documents go on to raise once again the will of the ISLAMIC REPUBLIC OF IRAN and its leaders to harm the United States of America (§ 155, respectively § 206). This is irrelevant to the facts of September 11, 2001. They then indicate the support provided by the ISLAMIC REPUBLIC OF IRAN to carry out the attacks by attending the assassination of a person in Afghanistan who would have supported retaliatory measures in Afghanistan after the execution of the attacks (§ 156, respectively § 207) and by ensuring the transport of terrorists and monetary funds across its territory (§ 157 to 158, § 208 to 209, respectively). These elements do not mention the CENTRAL BANK.

The documents then review the testimony of 8 witnesses *(Proposed findings of fact,* §§ 159 to 225; *Findings off act,* §§ 210 to 276).

According to the first witness (Dietrich L. Snell; §§ 159 to 162, respectively §§ 210 to 213), a substantial number of members of the September 11, 2001 commandos crossed through Iran to Afghanistan and Pakistan, and the Iranian authorities refrained from stamping their passports. Iran played an important role in facilitating the September 11, 2001 attacks. These elements do not mention the CENTRAL BANK,

For the second witness (Dr. Daniel L. Byman; §§ 163 to 172, respectively §§ 214 to 223), the assistance provided by the ISLAMIC REPUBLIC OF IRAN anticipated the attacks of September 11, 2001 through the ease of travel, the offer of refuge and training. The ISLAMIC REPUBLIC OF IRAN offered ease of travel to the perpetrators of the attacks. These elements do not mention the CENTRAL BANK. For the rest, this witness does not address the specific issue of the September 11, 2001 attacks.

For the third witness (Janice L. Kephart, §§ 173 to 186, respectively §§ 224 to 237), the ISLAMIC REPUBLIC OF IRAN allowed the perpetrators of the September 11, 2001 attacks to travel through its territory during the preparation of the attacks to reach Afghanistan or Pakistan, refrained from stamping their passports on these occasions and provided logistical support to organize international trips. These elements do not mention the CENTRAL BANK. The fourth witness (Dr. Patrick Clawson; §§ 187 to 191, respectively §§ 238 to 242) recalls in general terms that the ISLAMIC REPUBLIC OF IRAN supported the organization AL QUAIDA and puts the facts of September 11, 2001 in relation to the ease of travel and the granting of a safe haven. These elements do not mention the CENTRAL BANK. For the rest, this witness does not address the specific issue of the September 11, 2001 attacks.

For the fifth and sixth witnesses (Claire M. Lopez and Dr. Bruce D. Tefft; §§ 192 to 201, respectively §§ 243 to 252), the ISLAMIC REPUBLIC OF IRAN allowed between 8 and 14 of the perpetrators of the events of September 11, 2001 to obtain passports and visas for the United States of America. They say that the information for the summer months of 2001 on the brink of a major attack came from the Iranian authorities and that the IRANIAN MINISTRY OF INFORMATION AND SECURITY had acquired a flight simulator in preparation for the attacks of September 11, 2001. These elements do not mention the CENTRAL BANK.

The seventh witness (Dr. Ronen Berman, §§ 202 to 220, respectively §§ 253 to 271) discusses for the most part the general role played by the ISLAMIC REPUBLIC OF IRAN in relation to the development of terrorism. It is only in the end that he connects his knowledge with the attacks of September 11, 2001 to say that the ISLAMIC REPUBLIC OF IRAN provided ease of travel, means to obtain passports, visas and other transport documents to allow entry into the United States of America for the commission of the attacks. These elements do not mention the CENTRAL BANK.

The eighth witness (Kenneth Timmerman; §§ 221 to 225, respectively §§ 272 to 276) generally explains the historical evolution of the links between the ISLAMIC REPUBLIC OF IRAN and various organizations and explains in general that the officials of the ISLAMIC REPUBLIC

OF IRAN allowed the travel of members of the AL QUAIDA organization through Iran without stamping their passports, but without directly linking these facts to the perpetrators of the attacks. He echoes the explanations according to which a senior official of the HEZBOLLAH organization accompanied various members of the commandos of September 11, 2001 during trips between the Near and Middle East. These elements do not mention the CENTRAL BANK. For the rest, this witness does not address the specific issue of the September 11, 2001 attacks.

The documents finally address the legal conclusions *(Proposed Conclusions of Law,* §§ 1 to 46; *Conclusions of Law,* §§ 1 to 35).

They first address jurisdictional issues (section *The Court has Jurisdiction Over All Defendants and AU Claims;* §§ 2 to 16, respectively §§ 2 to 11). The document *Proposed Conclusions of Law Conclusions of Law* proposes to retain the jurisdiction of the US court for the benefit of US citizens on the basis of the US rule of law for States sponsoring terrorism introduced by the *Foreign Sovereign Immunities Act* (Rule 28 U.S. Code § 605A(a)), due to acts of extrajudicial killings and/or the provision of material support for these purposes and for the benefit of non-US citizens on the basis of rules of US law resulting from the *Alien Tort Claims Act* (Rule 28 U.S. Code §1350) and the *Non Commercial Tort Exception* deriving from the *Foreign Sovereign Immunities Act* (Rule 28 U.S. Code §1605 (a)(5)) (§§2 to 14). The document *Conclusions of Law* only maintain the jurisdiction of the US court for the benefit of US citizens on the basis of Rule 28 U.S. Code §1605A(a) (§§ 2 to 11).

The documents then resolve a procedural issue (§§ 15 to 16, respectively §§ 12 to par 3) which has no bearing on the issue to be resolved.

Under the question of liability (section *Defendants Are Liable for Damages to U.S. National Plaintiffs Under FISA § 1605A;* §§ 17 to 38, respectively §§ 14 to 35), the documents recall the legal requirements in US law (§§ 17 to 20, respectively §§ 14 to 17) and then describe what facts are required by the ISLAMIC REPUBLIC OF IRAN (§§ 21 to 23, respectively §§ 18 to 20) and the HEZBOLLAH organization (§§ 24 to 27, respectively §§ 21 to 24) are equivalent to material support within the meaning of the law: organization, financing, facilitation of travel and the training of perpetrators of the attacks, logistics consisting of the provision of services, money, accommodation, training, advice or assistance of experts, shelters, fake documents or identity documents and/or transportation facilities. At §§ 28 to 32, respectively §§ 25 to 29, the documents include facts after the attacks of September 11, 2001 which, in the eyes of this court, must be considered to be unrelated to them. At §§ 33 and 34, respectively, §§ 30 and 31 then demonstrate the causal link between the facts maintained against the defendants and the damages suffered as required by US law. These conclusions ultimately seek to retain the liability 1/ of the five ministries and of the ISLAMIC REVOLUTIONARY GUARDS CORPS as political subdivisions of the ISLAMIC REPUBLIC OF IRAN and legally identifying with it within the meaning of the FSIA legislation (§ 35, respectively § 32), *2*/ of the HEZBOLLAH organization, the four public bodies, the commercial enterprise and the CENTRAL BANK as having acted as agents or tools of the ISLAMIC REPUBLIC OF IRAN *(agents or instrumentalities)* and responsible in this regard as agents within the meaning of the FSIA legislation or as co-conspirators, helpers or assistants within the meaning of ATCA legislation (§ 36, respectively, § 33), 3/ of the two individual defendants (the Ayatollah Ali HOSSEINI-KHAMENEI and Ali Akbar HASHEMIRAFSANJANI) as officials of the ISLAMIC REPUBLIC OF IRAN having acted within the limitations of their missions and legally identifying in this regard with the ISLAMIC REPUBLIC OF IRAN so as to be liable as agents within the meaning of the FSIA legislation or as co-conspirators, helpers or assistants within the meaning of the ATCA legislation (§ 37, respectively § 34) and the ISLAMIC REPUBLIC OF IRAN (§ 38, respectively § 35).

The document *Proposed Conclusions of Law Conclusions of Law* still contains a section devoted to the liability of the defendants on the basis of the *Alien Tort Claims Act* with regard to persons who are not US citizens (§§ 39 to 46). This passage is of no interest to this litigation.

In summary, it must be remembered from these developments that the liability of the CENTRAL BANK is sought for damaging events committed on the territory of the United States of America (it being specified that both the acts alleged by the direct perpetrators of the

44

damage that are third parties to these proceedings and the damage itself are located in the United States of America). The liability of the CENTRAL BANK is sought

- in respect of its personal actions for permitting, tolerating or transferring money that ultimately benefits terrorist activities
- in its capacity as body of the ISLAMIC REPUBLIC OF IRAN to be responsible for the latter's actions insofar as, in the context of the general terrorist activities and in the particular context of the events of September 11, 2001, it has set up a transnational structure to support the commission on terrorist acts and where it has enabled the organization of terrorist travels and the concealment of terrorist travels to and from Afghanistan and Pakistan where training camps were located, as well as the organization of terrorist training camps and the provision of explosives.

The court notes that it is neither alleged nor established that any of these acts alleged against the CENTRAL BANK or the ISLAMIC REPUBLIC OF IRAN was carried out on the territory of the United States of America.


### 1.1.2.2.2.3.  Derogation from jurisdictional immunity for acts that caused death, physical injury or property damage to private persons?

The PLAINTIFFS argue that the custom of the Jurisdictional Immunity of States would have evolved in that it would not apply to acts that caused death, physical injury or property damage to private persons outside the context of an international armed conflict.

The court maintains at the outset that the PLAINTIFFS wisely add the clarification that the acts are carried out "outside the context of an international armed conflict", but that this clarification does not add anything in the context of this litigation. The precision is added wisely while the International Court of Justice ruled in its judgment of February 3, 2012, The State's Jurisdictional Immunity, "*that customary international law still requires the recognition of the State's immunity, whose armed forces or other bodies are accused of having committed harmful acts in the territory of another state during an armed conflict*" (No. 78). However, this clarification does not add anything to the debate, whereas in the context of these proceedings, it is not the acts of armed forces or, more generally, facts related to an armed conflict between States that are at issue.

The court states at this stage that it is an established fact in this case that there were acts in the case of September 11, 2001 that caused death, physical injury or property damage to private persons.

The question that needs to be answered is whether customary public international law reflects the existence of the derogation alleged by the PLAINTIFFS and in the affirmative whether the conditions of this derogation from the jurisdictional immunity of States are met in this case.

On the principle of the derogation from the jurisdictional immunity of States resulting from the existence of actions that caused death, physical injury or property damage to private persons, there is no divergence between the parties. The CENTRAL BANK admits that customary public international law contains such a derogation, attested by the two codifications of the matter of State immunities and the jurisprudence of international and national courts.

The parties discuss the conditions and the fulfilment of the conditions specific to this derogation.

To situate this discussion, the court would like to quote the provisions devoted to this derogation by the two codifications of the law on State immunities:

- Article 11 of the 1972 Convention: *"A Contracting State cannot claim immunity from the jurisdiction of a court of another Contracting State in proceedings which relate to redress for injury to the person or damage to tangible property, if the facts which occasioned the injury or damage occurred in the territory of the State of the forum, and if the author of the injury or damage was present in that territory at the time when those facts occurred"*

- Article 13 of the 2004 Convention: "...*a State cannot invoke immunity from jurisdiction before a court of another State which is otherwise competent in a proceeding which relates to pecuniary compensation for death or injury to the person, or damage to or loss of tangible property, caused by an act or omission which is alleged to be attributable to the State, if the act or omission occurred in whole or in part in the territory of that other State and if the author of the act or omission was present in that territory at the time of the act or omission.*"

Although none of these two conventions are in force at the present time, the Court considers that in light of their adoption procedure, which means that they have been approved by a considerable number of States without having any specific objections to the provisions concerned, they are of considerable importance, especially in view of the rules which are found therein, which are identical 30 years apart, and are likely to demonstrate *Vopinio iuris* about the content of these rules. The court still decides in this regard that the conventional rules as cited above necessarily constitute a global whole that achieves a certain balance between different considerations, so that, except in particular circumstances, they must be considered as a whole, without being able to be dissected in order to apply certain aspects of them separately from the others, otherwise said balance would be undermined.

- Does the derogation apply only to acts of *jure gestionis*, or indiscriminately to acts of *jure gestionis* and *jure imperii?*

The PLAINTIFFS argue that the derogation from the jurisdictional immunity by them would apply to both categories of acts, so that there would be no need to question the issue of what category the facts alleged against the CENTRAL BANK would fall under.

THE CENTRAL BANK, for its part, argues that the distinction should be made insofar as the derogation would only apply to acts of *jure gestionis,* and that the facts alleged against it would not fall into this category. It would still have to be inferred from the argument of the PLAINTIFFS that the CENTRAL BANK would identify with the ISLAMIC REPUBLIC OF IRAN that the facts alleged against it would necessarily be within a sphere of state sovereignty involving their characterization as acts of *jure imperii.*

47

The question of the distinction between the two categories of acts had been addressed by the International Court of Justice in the case of the State's Jurisdictional Immunity. In its judgment of December 3, 2012, the Court did not, however, respond directly to this question, although it wrote: "*The Court considers that it is not called upon, in the present case, to decide the question of whether there is, in customary international law, a 'territorial exception' to State immunity applicable to j*ure imperii *acts in general. It only has to rule on the acts committed, on the territory of the State of the forum, by the armed forces of a foreign State and other bodies of the state acting in cooperation with those forces in the context of an armed conflict*" (No. 65). Hazel FOX sees this as an implicit indication that the exception covers both categories of acts (op. cit., page 478). Edward Chukwuemeke OKEKE also considers that the exception does not distinguish between the two categories of acts (op. cit., page 123). The two codifications of the law of State immunities (Article 11 of the 1972 Convention and Article 12 of the 2004 Convention) do not include a limitation of the derogation from only the acts of *jure gestionis*. A study devoted to the 2004 Convention also notes that the intention in drafting the relevant provision was to give it a broad scope of application and to include the two categories of acts (The United Nations Convention on Jurisdictional Immunities of States and Their Property, Gerhard Hafner and Léonore Lange, French Directory of International Law 2004, pages 66 and following).

In the absence of elements to the contrary, the court considers it established that the derogation applies to all categories of State acts.

- Does the application of the derogation require that the harmful event should have been committed in the territory of the State of the forum?

The CENTRAL BANK asserts the existence of this condition in customary public international law and argues that it would not be fulfilled before the Luxembourg judge before whom the matter is currently brought, since the damaging event took place in the United States of America. In this sense, the derogation from jurisdictional immunity would open access to the forum of the place where the harmful event was performed, but could no longer apply before the enforcement judge.

The PLAINTIFFS object that this condition can only apply in the State of the forum to which the case on the merits was referred, but that it cannot be applied in relation to the territory of the State of the enforcement judge, since the latter would have to rule as if it were the trial judge . The enforcement judge should therefore rule as if it were the US judge and find that the condition relating to the place of performance of the harmful event on its territory is fulfilled.

Neither party disputes in principle the existence of this condition, which is intended, following the example of the condition discussed at the next point, to ensure a close link between the State of the forum and the harmful event. It is important, however, to clarify the scope of the question of which act, action or activity should be taken into account in considering whether this condition is met. There is indeed a fundamental difference between the consideration of the action of the direct perpetrator of the damage when the latter is not the potential beneficiary of the immunity of jurisdiction and the action of the potential beneficiary of the immunity of jurisdiction when it is not the direct perpetrator of the harmful event. While it may be that both the direct perpetrator of the harmful event and the potential beneficiary of the jurisdictional immunity acted in the territory of the State of the forum, it is just as well possible that the locations of the two actions differ, i.e. that the direct perpetrator acted on the territory of the State of the forum and the beneficiary of the jurisdiction immunity acted outside that territory, or conversely that the potential beneficiary of the immunity acted on the territory of the State of the forum but that the direct perpetrator of the damage acted outside that territory.

However, to the extent that the condition under review is justified in the establishment of a close link between the territory of the State of the forum and the activity of the State invoking the immunity of jurisdiction, the condition cannot be interpreted other than as requiring that the activity of the potential beneficiary of the jurisdictional immunity can be located in the territory of the State of the forum so that the derogation from the jurisdictional immunity can apply.

However, and at the risk of depriving this condition of any useful effect, it cannot be applied such as the CENTRAL BANK maintains as the applicant that there is a link between the territory of the State of the enforcement judge and the place of the act to be taken into account, in that the latter should have been committed in the territory of the State of the enforcement judge. Such a solution would be tantamount to depriving the decisions made at a meeting of a State on the basis of the derogation under review of any international circulation, whereas the act can in principle be located only in one place.

Nor, however, can the condition be applied, as the PLAINTIFFS argue, before only the trial judge, to the exclusion of the enforcement judge, or risk depriving him of any scope in the context of an enforcement application. There is no evidence put forward by the parties to distinguish between the trial judge and the enforcement judge.

This dilemma can only be resolved by maintaining that the enforcement judge should rule "as if" he were a trial judge and to verify, in order to decide on the benefit of the jurisdictional

immunity in his forum, whether the fact to be taken into account was committed in the territory of the State of the trial judge.

In this case, there is no doubt that the damaging event, i.e. the attacks of September 11, 2001, was committed on the territory of the United States of America. However, the proceedings before the US court did not tend to question the liability of the direct perpetrators of these attacks, but the liability of the CENTRAL BANK in that it would have facilitated by its actions and abstentions the execution of these attacks. However, the description of the facts provided in the context of the legal proceedings before the US court does not reveal any activity of the CENTRAL BANK on the territory of the United States of America, nor especially an activity of the CENTRAL BANK on the territory of the United States of America that could have helped to make the attacks possible or easier to carry out.

The condition is therefore not met.

- Does the application of the derogation require that the defendant State whose liability is sought, respectively its agents who are accused of the litigious facts, must have been present on the territory of the State of the forum?

The CENTRAL BANK maintains that it was not present in the territory of the United States of America and therefore could not carry out any of the acts of support alleged against it on the territory of the United States of America and that the perpetrators of the attacks of September 11, 2001 could not be qualified as its agents.

The PLAINTIFFS, for their part, argue that this condition is not included in customary public international law. It would suffice to note that the damaging event was committed in the territory of the State of the forum for the derogation to be applied. If such a condition were to exist, it could only be applied before the trial judge, not before the enforcement judge. The condition would in any case be met given the presence of the permanent representation of the ISLAMIC REPUBLIC OF IRAN to the United Nations in New York and an office of the ISLAMIC REPUBLIC OF IRAN in Washington, D.C.

The two codifications of the law of State immunities retain the condition of the presence of the defendant state in the territory of the State of the forum at the time of the damaging event.

The PLAINTIFFS oppose the laws of nine States that would not contain such a condition. The court notes, however, that this concerns a tiny minority of the nearly 200 current existing States on the globe and that only two of these laws (Israel and Japan) are after the 2004 United Nations Convention, while the others are prior to it (United States of America, Argentina, Australia, Canada, United Kingdom, South Africa, Singapore). The scope of these national laws is further reduced by the observation that Japan has ratified and participated in the 2004 Convention, thus questioning the relevance of their national laws in relation to both the content of international custom and *Yopinio iuris* which would delineate international custom by disregarding this condition.

The court further notes that the European Court of Human Rights has admitted that this condition is part of customary public international law (Judgment of November 21, 2001, Al-Adsani/United Kingdom, No. 35763/97, ECHR 2001-XI).

The necessities of restrictive application of exceptions to the principle of jurisdictional immunity and a coordinated application of the exception as contained in both conventions call for the inclusion of this condition in customary public international law. Moreover, it must be applied as requiring the presence of the State or its agents on the territory of the State of the forum at the time of the damaging event and in connection with the performance of the damaging event.

In this case, there is no allegation of any presence of the CENTRAL BANK on the territory of the United States of America as the State of the forum that can be linked to the damaging event. It is not enough for the applicants to report a general presence of the ISLAMIC REPUBLIC OF IRAN as a State and the supposed status of mere agent of the CENTRAL BANK for this condition to be met.

The condition is therefore not met.

51

It follows from the above that the PLAINTIFFS cannot report for their benefit the exception to jurisdictional immunity a result of the existence of acts that caused death, physical injury or property damage to private persons.

### 1.1.2.2.2.4.   Derogation from jurisdictional immunity for acts of terrorism and for acts that violate a standard of *jus cogens?*

The PLAINTIFFS argue that acts of terrorism would constitute serious acts that would be unanimously condemned around the world, and that they would constitute acts of *jure gestionis.* Such acts would incur the international liability of the State that committed or contributed to them and it would be the responsibility of all States to combat terrorism. Public international law would support the lifting of jurisdictional immunity against States that have participated in such acts. The laws of the United States of America and Canada would enshrine this approach to public international law in written law by depriving States that have sponsored terrorism of their immunity. The state of public international law, both with respect to the concept of the act of terrorism and with regard to the notion of acts committed in violation of the *jus cogens,* would not prohibit the courts from deviating from the rule of jurisdictional immunity to the detriment of states that have been responsible for such acts.

The CENTRAL BANK disputes the existence of the exemption invoked by the PLAINTIFFS. It argues that the ongoing jurisprudence of both the International Court of Justice and the European Court of Human Rights would maintain the jurisdictional immunity in cases involving acts of terrorism or violations of the *jus cogens.* The seriousness of the act alleged against the respondent State would have no bearing on the application of jurisdictional immunity.

Through their argument, the PLAINTIFFS assert the existence of an exception to the principle of jurisdictional immunity of States which would apply to the execution of particularly serious harmful acts in relation to their underlying motivation when it is due to a terrorist purpose, respectively in relation to the standard violated where the harmful act would infringe a higher right under *jus cogens.* In order to prosper in their argument, however, it was not sufficient for them to establish that public international law would not prohibit the jurisdictional immunity in such cases. On the contrary, it is up to them to establish positively that customary public international law has enshrined such a derogation. This evidence is not reported.

The PLAINTIFFS do not demonstrate any international practice that would apply a derogation from jurisdictional immunity with respect to acts of terrorism, except for the legislation of the

United States of America (which had to be amended several times to make it operational; see, Edward Chukwuemeke Okeke, Jurisdictional Immunities of States and International Organizations Oxford University Press, 2018, pages 144 and ss.) and of Canada. The doctrine characterizes this exception as controversial (see Okeke, op. cit., page 143) and speaks of "American anomaly" *("American Anomaly*", see. Okeke, op. cit., 148).

Conversely, the International Court of Justice denies the existence of a derogation from jurisdictional immunity because of the seriousness of the act (International Court of Justice, February 3, 2012, State Jurisdictional Immunity, Germany v. Italy, Greece (intervenor), No. 91: "*The Court concludes that, in the current state of customary international law, a State is not deprived of immunity for the sole reason that it is accused of serious violations of international law, human rights or international law of armed conflict*"). This conclusion also applies to acts classified as terrorist acts.

For the purposes of the examination of the defense derived from the immunity of jurisdiction, such acts are to be considered only under the sole characterization of acts which caused death, physical injury or property damage to private persons as considered above and on which the court has decided that the conditions of the derogation from the principle of jurisdictional immunity are not met.

With regard to acts constituting the violation of higher standards stemming from the *jus cogens,* the CENTRAL BANK rightly points out that the jurisprudence of international courts denies the existence of a derogation from the rule of jurisdictional immunity (International Court of Justice, February 3, 2012, State Jurisdictional Immunity, Germany v. Italy, Greece (intervenor), No. 97: "*Accordingly, the Court concludes that, even admitting that the actions brought before the Italian courts involved violations of the rules of* jus cogens, *the application of customary international law on the immunity of states was not affected").*

53

It follows from the foregoing that the PLAINTIFFS cannot report for their benefit the exception to jurisdictional immunity of acts of terrorism or acts violating a standard of *jus cogens.*

### 1.1.2.2.3. Impact of Article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms

The effectiveness of jurisdictional immunity is confronted with a general principle of the law enshrined in the Convention on the Protection of Human Rights and Fundamental Freedoms of November 4, 1950, which came into force on September 3, 1953, and which is currently in force between the 47 member states of the Council of Europe, including Luxembourg. Article 6 of this Convention enshrines in supranational positive law the right to a fair trial, including the right of every individual to have access to a court to have its civil rights and obligations decided (Jacques Velu and Rusen Ergec, European Convention on Human Rights, Bruylant, 2nd edition, 2014, No. 449 and following).

The fact that neither the ISLAMIC REPUBLIC OF IRAN as the Sate of origin of the CENTRAL BANK, nor the UNITED STATE OF AMERICA as the State of the firm on the substance and State of the residence and/or nationality of the PLAINTIFFS are parties to this convention does not affect the applicability and application of these principles before the court if it is a matter of principles of universal application that it is up to the States who adhere to this convention to comply with and to respect in any event.

The court finds that the interaction between the customary rule of international public law of the jurisdictional immunity protection States and international relations and the positive rule of law of the right of access to the court protecting the rights of individuals is not or little discussed in the cenacles of public international law. Thus, the landmark decision on jurisdictional immunity adopted by the International Court of Justice, to which both parties refer (judgment of February 3, 2012, State Jurisdictional Immunity, Germany v. Italy, Greece (intervenor)), does not elaborate on the issue. Only certain individual or dissenting opinions deal with them (see restrictively the individual opinion of Justice Bennouna and the dissenting opinion of Ad hoc Judge Gaja and more extensively the dissenting opinion of Justice Cancado Trindade and the dissenting opinion of Justice Yusuf; these opinions generally relate to the seriousness of the violation of the rule of law incurring the liability of the State concerned where appropriate; Justice Cancado Trindade resumed his developments in The Primacy of the Right of Access to Justice over the Undue Invocation of State Immunities in Face of

54

International Crimes, *Liber amoricum* Dean Spielmann, Essays in Honour of Dean Spielmann, pages 65). The European Court of Human Rights has been asked to examine the link between the two rules in order to assert the rule of jurisdictional immunity in general (see in particular Judgments of November 21, 2001, Al-Adsani/United Kingdom, No. 35763/97, ECHR 2001-XI, Fogarty/United Kingdom, No. 37112/97, ECHR 2001-XI and McElhinney/Ireland, **No.** 31253/96, ECHR 2001-XI on State immunity; Judgments of February 18, 1999 Waite and Kennedy/Germany, No. 26083/94, ECHR 1999-1 and Beer and Regan/Germany, No. 28934/95, February 18, 1999 in terms of the immunity of international organizations; for a doctrinal presentation, see Law of immunities and requirements of fair trial, Proceedings of the symposium of April 30, 2004, contribution of F. Sudre, The jurisprudence of the European Court of Human Rights, pages 21 to 24).

In doctrine, authors from the field of public international law generally do not address the issue (see in particular Hazel Fox & Philippa Web, The Law of State Immunity, Oxford University Press, 3rd edition; Edward Chukwuemeke Okeke, Jurisdictional Immunities of States and International Organizations, Oxford University Press, 2018). Authors dealing with the fundamental rights of persons examine the interaction between the two rules and criticize the approach adopted in this area by the European Court of Human Rights which would not sufficiently take into account the requirements for the protection of fundamental rights and the prerogatives and rights conferred on individuals by the Convention on the Protection of Human Rights and Fundamental Freedoms (see Law of immunities and requirements of fair trial, Proceedings of the symposium of April 30, 2004, contribution of F. Sudre, The jurisprudence of the European Court of Human Rights, pages 24 to 31; Mirjam Baldegger, Das Spannungsverhâltnis zwischen StaatenimmunitËt, diplomatischer Immunitât und Menschenrechten, Helbing Lichtenhahn Verlag Nomos Verlag, pages 145 and following; Burkhard Hess, The Private-Public Divide in International Dispute Resolution, Pocketbook of The Hague Academy of International Law, No. 216 and following; Sally El Sawah, The Immunities of States and International Organizations, Immunity and Unfair Trial, Larcier, 2012; Catherine Kessedjian, Immunity, in Encyclopedia Dalloz Civil Procedure, No. 116 and following, which considers, in relation to the issue of violations of the *jus cogens,* that "The joint dissenting opinion of Justices Rozakis and Caflisch, joined by four other judges [in the AI-Adsani/United Kingdom case decided by the European Court of Human Rights], shows the way forward").

The written rule of Article 6 of the Convention on the Protection of Human Rights and Fundamental Freedoms guaranteeing access to justice and the customary rule of the

55

jurisdictional immunity of states are two equal rules of value in international legal agency. These two rules conflict in that the right of access to justice recognized for the benefit of individuals constitutes a limit on the invocation of jurisdictional immunity for the benefit of States, and conversely in that the right to jurisdictional immunity recognized for the benefit of States constitutes a limit to the exercise of the right of access to justice benefiting individuals. As conflicting norms, they should be interpreted and applied in such a way as to reconcile them as much as possible in order to preserve the foundations and objectives of each of them (which are the pre-eminence of the law for the right of access to the court and respect for international law in order to promote comity and good relations between States, thanks to the respect for the sovereignty of another State, for jurisdictional immunity), in particular at the stage of the delimitation of their respective fields of application (see in this sense the dissenting opinion of Judge Loucaides in the Al-Adsani case decided by the European Court of Human Rights: "Any form of general immunity, whether is based on international law or national law, which a court applies in order to completely block a judicial decision on a civil right without balancing competing interests, namely those protected by the immunity in question and those which are concerned with the nature of the specific request which is the subject of the relevant procedure, can be interpreted as a disproportionate limitation to article 6 § 1 of the Convention that, by this reason, it violates. Courts should be able to measure competing interests if it has to grant immunity or to allow a judicial decision on a civil right, after reviewing the purpose of the proceedings.... According to me, there is incompatibility in all cases where the application of these immunities is automatic without the balancing of competing interests that I mentioned above"; See also Mirjam Baldegger, Das Spannungsverhâltnis zwischen Staatenimmunitat, diplomatischer Immunitât und Menschenrechten, Helbing Lichtenhahn Verlag Nomos Verlag, pages 260 and following).

In balancing the respective interests, the court is required to take into account, in addition to the reasons for the existence of the two conflicting principles, the particular circumstances of the cases as described above, and in particular the legal criterion used by the US court to rule out the application of jurisdictional immunity and to serves as basis for its international jurisdiction.

This criterion lies in a rule derived from the *Foreign Sovereign Immunities Act,* Rule 28 of the U.S. Code §1605A(a), generally referred to as *Terrorist Exception,* written as follows:

   *(a)In General*

   *(1)No immunity*

   *A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.* [sic]

   *(2)Claim heard - The court will hear a claim under this section if*

   *(A)*

   *(i)*

   *(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-monthperiod before the claim is filed under this section; or*

   *(II) in the case of an action that is refiled under this section by reason of section 1083(c) (2) (A) of the National Défense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a) (7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) was filed;*

57

*(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred*

    *(I) a national of the United States;*

    *(II)   a member of the armed forces; or*

    *(III)   otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and*

*(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or*

*(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.*

The court finds that this is an exorbitant rule of national law in international law that justifies both the international jurisdiction of the US courts and the derogation from the immunity of jurisdiction on the basis of the respondent State's characterization as a State sponsoring terrorism by act of executive power without requiring the specific commission of harmful acts on the territory of the United States of America and/or the presence of that State on the territory of the United States of America. While the Convention on the Protection of Human Rights and Fundamental Freedoms requires ensuring access to justice, it also requires that the fundamental procedural rights of each of the parties be respected.

The balance of all the interests involved therefore leads us to consider that the infringement of the right of access to the court of the PLAINTIFFS by the admission of jurisdictional immunity in favor of the CENTRAL BANK is not disproportionate.

The application should therefore be said to be inadmissible, as far as it is directed against the CENTRAL BANK.

### 1.2. Conditions of the enforcement

In view of the decision taken under the jurisdictional immunity, the review of the legal conditions laid down in the existence of the US decisions becomes moot

## 2. The claim as directed against the IRANIAN STATE PARTIES

For the purposes of developments, the ISLAMIC REPUBLIC OF IRAN, the Ayatollah Ali HOSSEINI-KHAMENEI, Ali Akbar HASHEMI RAFSANJANI, the IRANIAN MINISTRY OF INFORMATION AND SECURITY, THE ISLAMIC REVOLUTIONARY GUARDS CORPS, the IRANIAN MINISTRY OF OIL, the IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCES, the IRANIAN MINISTRY OF COMMERCE and the IRANIAN MINISTRY OF DEFENSE AND THE LOGISTICS OF THE ARMED FORCES are hereinafter collectively referred to as the IRANIAN STATE PARTIES.

Following the example of the CENTRAL BANK, the IRANIAN STATE PARTIES oppose the claim on the one hand by invoking jurisdictional immunity and by contesting on the other hand that the conditions for granting enforcement are met.

### 2.1. Jurisdictional immunity

### 2.1.1.   Positions of the parties

### 2.1.1.1.      The IRANIAN STATE PARTIES

The IRANIAN STATE PARTIES claim their benefit of jurisdiction immunity of sovereign States to argue that the District Court of Luxembourg would be incompetent to hear the enforcement application, if not that it should be declared inadmissible.

They explain that the immunity of sovereign States would be a universally accepted principle of customary international law, and in any case by the Luxembourg legal order, and would form an obstacle for State courts hearing legal actions directed against a beneficiary of that immunity insofar as the action would call into question acts carried out in the context of the exercise of public authority (*acta jure imperii*), and not acts of private management (*acta jure gestionis*). The immunity would apply to the acts carried out in the context of

It is a principle that the exercise of a legal action only degenerates into a fault if it constitutes an act of malice or bad faith or at least a gross error equivalent to tort or if the plaintiff acted with reprehensive levity. These conditions are not met in this case, whereas the PLAINTIFFS were able, without committing any fault, seek the enforcement in Luxembourg of judgments obtained abroad in order to execute them especially on the current or future, identified or unidentified assets of the defendants. There is no need in this context to focus only on the enforcement proceedings currently initiated by way of garnishment with S.A. CLEARSTREAM S.A.. The fact that this claim is dismissed with respect to the plaintiffs on the counterclaim because of the lack of international regularity of the enforcement judgments cannot constitute a fault on their part.

Beyond the finding of absence of fault on the part of the PLAINTIFFS, the court also notes with these that the plaintiffs on the counterclaim have not justified the loss that they claim to have suffered, since the costs incurred by other proceedings cannot give rise to compensation in the context of the present proceedings and that the plaintiffs on the counterclaim continue to fall to substantiate the alleged reputational damage.

The counterclaims are therefore to be rejected.


## 7.   Procedural compensation

The PLAINTIFFS seek the allocation of procedural compensation of 5,000 euros from the CENTRAL BANK, 5,000 euros from the IRANIAN STATE PARTIES, 5,000 euros from the IRANIAN PUBLIC ORGANIZATIONS and 5,000 euros from the NATIONAL IRANIAN TANKER COMPANY

THE CENTRAL BANK seeks the allocation of procedural compensation of 25,000 euros.

THE IRANIAN STATE PARTIES seek the allocation of total procedural compensation of 25,000 euros.

THE IRANIANS PUBLICS ORGANIZATION each seek the allocation of procedural compensation of 5,000 euros.

The NATIONAL IRANIAN TANKER COMPANY seeks the allocation of procedural compensation of 5,000 euros.

Procedure compensation cannot be allocated to the succumbing party. In addition, the application of Article 240 of the New Code of Civil Procedure falls to the discretion of the judge (Court of Cassation July 2, 2015, Judgment No. 60/15, JTL 2015, No. 42, page 166).

The PLAINTIFFS must therefore be dismissed of all their claims, as long as they succumb to all the defendants in their claims.

The defendants do not justify the unfairness that would require the application of article 240 of the New Code of Civil Procedure for their benefit. Their claims must be rejected.

# On these grounds:

the District Court in and of Luxembourg, the first chamber, sitting in civil matters, ruling in the presence of the parties on the report of the reporting judge, the Public Prosecutor's heard in its submissions,

declares the enforcement claim inadmissible as directed against the CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, the ISLAMIC REPUBLIC OF IRAN, the Ayatollah Ali HO S SEINI-KHAMENEI, Ali Akbar HASHEMI RAFSANJANI, the IRANIAN MINISTRY OF INFORMATION AND SECURITY, the ISLAMIC REVOLUTIONARY GUARDS CORPS, the IRANIAN MINISTRY OF OIL, the IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCES, the IRANIAN MINISTRY OF COMMERCE and the IRANIAN MINISTRY OF DEFENSE AND THE LOGISTICS OF THE ARMED FORCES, declares inadmissible the enforcement claim directed against the NATIONAL IRANIAN OIL COMPANY, the NATIONAL IRANIAN GAS COMPANY, IRAN AIR, the NATIONAL IRANIAN PETROCHEMICAL COMPANY, the NATIONAL IRANIAN TANKER COMPANY and the HEZBOLLAH organization as far as it concerns the Order of September 12, 2013,

declares unfounded the enforcement claim directed against the IRANIAN NATIONAL OIL COMPANY, the IRANIAN NATIONAL GAS COMPANY, AIR IRAN, the IRANIAN NATIONAL PETROCHEMICAL COMPANY, the IRANIAN NATIONAL TANKER COMPANY and the HEZBOLLAH organization as far as it concerns the Order of Judgment of December 22, 2011, the Memorandum Decision and Order of October 3, 2011 and the Order and Judgment of October 12, 2012,

dismissed the IRANIAN NATIONAL OIL COMPANY, the IRANIAN NATIONAL GAS COMPANY, AIR IRAN, the IRANIAN NATIONAL PETROCHEMICAL COMPANY and the IRANIAN NATIONAL TANKER COMPANY of their counterclaims,

dismisses the PLAINTIFFS as identified in the capacity of this judgment of their claims based on Article 240 of the New Code of Civil Procedure,

dismisses the CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, the ISLAMIC REPUBLIC OF IRAN, the Ayatollah Ali HOSSEINI-KHAMENEI, Ali Akbar HASHEMI RAFSANJANI, the IRANIAN MINISTRY OF INFORMATION AND SECURITY, the ISLAMIC REVOLUTIONARY GUARDS CORPS, the IRANIAN MINISTRY OF OIL, the IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCES, the IRANIAN MINISTRY OF COMMERCE and the IRANIAN MINISTRY OF DEFENSE AND THE LOGISTICS OF THE ARMED FORCES, the NATIONAL IRANIAN OIL COMPANY, the NATIONAL IRANIAN GAS COMPANY, IRAN AIR, the NATIONAL IRANIAN PETROCHEMICAL COMPANY, the NATIONAL IRANIAN TANKER COMPANY of their claims based on Article 240 of the New Code of Civil Procedure,

orders the PLAINTIFFS as identified in the capacity of this judgment to pay the costs and fees of the proceedings.

[signature]

[signature]

signed: HOSCHEIT, WEBER

Thus, judged and pronounced by the District Court in and of Luxembourg, first chamber sitting in **civil** matters, at the public hearing of March 27, 2019

where were present:

Thierry HOSCHEIT, First Vice-President,

Vanessa WERCOLLIER, First Judge,

Séverine LETTNER, Judge.

Luc WEBER, Clerk.

signed: HOSCHEIT, WEBER

————————————————

Order all court bailiffs, on this required, to implement this judgment.

To our Attorney General and to our State Prosecutors at the district courts to uphold it.

And to all commanders and officers of the police to lend a hand, when they are legally required to do so.

In faith of what this judgment was signed and sealed with the seal of the court.

For the first enforceable copy, issued on request to Maître Fabio TREVISAN, trial lawyer, agent of the sub parties. 1-5 and sub. 7-16.

Luxembourg, March 28, 2019.

The Chief Clerk of the Court, p.p.

[stamp:] DISTRICT COURT OF LUXEMBOURG
[signature]
FABER

170



TRANSPERFECT

City of New York, State of New York, County of New York

I, Jodeci Guzman, hereby certify that the document "**15 2019 03 27 Havlish exequatur decision**" is, to the best of my knowledge and belief, a true and accurate translation from French into English.

Jodeci Guzman
(Currently situated in the County of New York)

Sworn to before me remotely this
September 8, 2020

Signature, Notary Public
(Currently situated in the County of New York)

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
STATE PUBLIC YORK
OF NEW

Stamp, Notary Public

Jugement civil no 2019TALCH01/00116
du 27 mars 2019

Maître Fabio TREVISAN  (case : 9)



GRAND-DUCHÉ DE LUXEMBOURG

**TRIBUNAL D'ARRONDISSEMENT DE ET À LUXEMBOURG**

# GROSSE

## NOUS HENRI

*Grand-Duc de Luxembourg*
*Duc de Nassau*
*etc. etc. etc.*

Faisons savoir que

LE TRIBUNAL D'ARRONDISSEMENT DE ET À LUXEMBOURG

première chambre, siégeant en matière civile,
a rendu le jugement qui suit dans la cause inscrite au rôle
sous le numéro 177266

<u>Jugement civil 2019TALCH01 / 00116</u>

Audience publique du mercredi vingt-sept mars deux mille dix-neuf.

<u>Numéro 177266 du rôle</u>

**Composition :**
Thierry HOSCHEIT, premier vice-président,
Vanessa WERCOLLIER, premier juge,
Séverine LETTNER, juge,
Luc WEBER, greffier.

**E n t r e :**

I.     **Les personnes suivantes à titre de parents et/ou héritiers des victimes décédées lors des attentats du 11 septembre 2001 agissant en leur nom personnel :**

  1.   **Madame Tara BANE**, sans état connu, demeurant à 2114 North Crescent Boulevard Yardley, Pennsylvania 19067,

  2.   **Monsieur Donald BANE,** sans état connu, demeurant à 1311 Fox Hole Road Wyoming, Delaware 19934,

  3.   **Madame Christina BANE-HAYES**, sans état connu, demeurant à 1804 Oakdale Avenue Richmond, Virginia 23227,

  4.   **Monsieur Gerald BINGHAM**, sans état connu, demeurant à 624 Kings Court, Plant City, Florida 33565,

  5.   **Madame Krystyna BORYCZEWSKI**, sans état connu, demeurant à 460 Park Road, Parsippany, New Jersey 07054,

  6.   **Madame Julia BORYCZEWSKI**, sans état connu, demeurant à 3110 Scenic Court, Denville, New Jersey 07834,

  7.   **Madame Michele BORYCZEWSKI**, sans état connu, demeurant à 192 Well Road, Greely, Pennsylvania 18425,

  8.   **Madame Grace KNESKI**, sans état connu, demeurant à 95 Fieldfare Way, Charleston, South Carolina 29414,

  9.   **Monsieur Richard A. CAPRONI**, sans état connu, demeurant à 1208 Ocean Parkway, Ocean Pines, Maryland 21811,

  10.  **Madame Dolores CAPRONI**, sans état connu, demeurant à 1208 Ocean Parkway, Ocean Pines, Maryland 21811,

  11.  **Monsieur Michael CAPRONI**, sans état connu, demeurant à 401 East 65th Street, New York, New York 10065,

  12.  **Madame Lisa CAPRONI-BROWN**, sans état connu, demeurant à 1155 Warburton Avenue, Apt. 11-U Yonkers, New York 10701-1017,

1

13. **Madame Alice CARPENETO**, sans état connu, demeurant à 656 8th Street, Bohemia, New York 11716,

14. **Monsieur Stephen L. CARTLEDGE**, sans état connu, demeurant à 5282 Keel Way, Fort Pierce, Florida 34949,

15. **Madame Michelle WRIGHT**, sans état connu, demeurant à 5106 Gaslight Lane, Culver City, California 90230,

16. **Madame Clara CHIRCHIRILLO**, sans état connu, demeurant à 197 Crossroads Lakes Drive, Ponte Vedra Beach, Florida 32082,

17. **Madame Livia CHIRCHIRILLO**, sans état connu, demeurant à 415 Beverly Road, Apt. 3R, Brooklyn, New York 11218,

18. **Madame Catherine DEBLIECK**, sans état connu, demeurant à 2 Roving Road, Levittown, Pennsylvania 19056,

19. **Madame Frances M. COFFEY**, sans état connu, héritière de **Daniel M. COFFEY**, demeurant à 20 Carriage Drive, Newburgh, New York 12550,

20. **Monsieur Kevin M. COFFEY**, sans état connu, héritier de **Daniel M. COFFEY**, demeurant à 20 Carriage Drive, Newburgh, New York 12550,

21. **Monsieur Daniel D. COFFEY**, médecin, héritier de **Daniel M. COFFEY**, 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

22. **Madame Frances M. COFFEY**, sans état connu, héritière de **Jason COFFEY**, demeurant à 20 Carriage Drive, Newburgh, New York 12550,

23. **Monsieur Kevin M. COFFEY**, sans état connu, héritier de **Jason COFFEY**, demeurant à 20 Carriage Drive, Newburgh, New York 12550,

24. **Monsieur Daniel D. COFFEY**, médecin, héritier de **Jason COFFEY**, demeurant à 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

25. **Monsieur Dwayne W. COLLMAN**, sans état connu, demeurant à 308 E. Orange Street, Yorkville, Illinois 60560,

26. **Monsieur Brian COLLMAN**, sans état connu, demeurant à 1390 Vegas Valley Drive, Apt. 27, Las Vegas, Nevada 89169,

27. **Monsieur Charles COLLMAN**, sans état connu, demeurant à 3687 Sweeten Creek Road, Apt. 3, Arden, North Carolina 28704,

28. **Madame Brenda SORENSON**, sans état connu, demeurant à 401, 34th Street North, #78, St. Petersburg, Florida 33713,

29. **Madame Loisanne DIEHL**, sans état connu, demeurant à 21 Morningside Court, Lakewood, New Jersey 08701,

30. **Madame Anne Marie DORF**, sans état connu, demeurant à 15D Bulger Avenue, New Milford, New Jersey 07646,

31. **Monsieur Joseph DORF**, sans état connu, demeurant à 540 Duke Road, New Milford, New Jersey 07646,

32. **Madame Michelle DORF**, sans état connu, demeurant à 540 Duke Road, New Milford, New Jersey 07646,

33. **Monsieur Robert DORF**, sans état connu, demeurant à 1291 Sanford Street, Port Charlotte, Florida 33953,

2

34. **Madame Linda SAMMUT**, sans état connu, demeurant à 5 Second Street, Belford, New Jersey 07718,

35. **Madame Corazon FERNANDEZ**, sans état connu, demeurant à 19 Windstar Drive, Little Egg Harbor, New Jersey 08087,

36. **Madame Regina Maria MERWIN**, sans état connu, demeurant à 7613 Beechdale Road, Crestwood, Kentucky 40014,

37. **Madame Grace PARKINSON-GODSHALK**, sans état connu, demeurant à 608 Countess Drive, Yardley, Pennsylvania 19067,

38. **Madame Tina GRAZIOSO**, sans état connu, demeurant à 100 Bonnie Drive, North Middletown, New Jersey 07748,

39. **Monsieur Jin LIU**, sans état connu, demeurant à 35 Woodstone Circle, Short Hills, New Jersey 07078,

40. **Monsieur Alan GU**, sans état connu, demeurant à 35 Woodstone Circle, Short Hills, New Jersey 07078,

41. **Madame Maureen HALVORSON**, sans état connu, demeurant à 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

42. **Madame Maureen HALVORSON**, sans état connu, héritière de **James HALVORSON**, demeurant à 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

43. **Madame Maureen HALVORSON**, sans état connu, héritière de **William WILSON**, demeurant à 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

44. **Madame Fiona HAVLISH**, sans état connu, demeurant à P. O. Box 20488, Boulder, Colorado 30308,

45. **Monsieur William HAVLISH**, sans état connu, demeurant à 6505 Indian Acres Trail, Tucker, Georgia 30084,

46. **Madame Susan CONKLIN**, sans état connu, demeurant à 235 Starboard Point, Roswell, Georgia 30076,

47. **Monsieur Hui-Chien CHEN**, sans état connu, demeurant à 179, Sec. 1 Fusing South Road, Da-An District, Taipei, Taiwan, R.O.C.,

48. **Monsieur Haomin JIAN**, sans état connu, demeurant à 60-17 44th  Avenue, Woodside, New York 11377,

49. **Madame Fu Mei CHIEN**, sans état connu, demeurant à 8 Tallman Lane, Somerset, New Jersey 08873,

50. **Madame Huichun JIAN**, sans état connu, demeurant à 48 Dong-Shin Street, 3rd Floor, Tao Yuan, Taiwan, R.O.C. 33048,

51. **Madame Hui-Chuan JIAN**, sans état connu, demeurant à 151 Lin-Sen North Road, Jhongshan Dist., Taipei City 10454, Taiwan, R.O.C. 10454,

52. **Madame Hui-Zon JIAN**, sans état connu, demeurant à No. 9, Alley 19, Lane 120, Sec. 2, Shatian Road, Daidu Township, Touchung County 432, Taiwan, R.O.C. 43242,

53. **Madame Marie Ann PAPROCKI**, sans état connu, demeurant à 61 Lakeview Drive, Mahopac, New York 10541,

54. **Monsieur Michael LOGUIDICE**, sans état connu, demeurant à 3152 Little Road #207, Trinity, Florida 34655,

3

55. **Madame Theresann LOSTRANGIO**, sans état connu, demeurant à 325 Barnsbury Road, Langhorne, Pennsylvania 19047,

56. **Monsieur Ralph S. MAERZ**, sans état connu, demeurant à 815 Via Del Sol, North Fort Myers, Florida 33903,

57. **Madame Margaret MAURO**, sans état connu, demeurant à 3604 Green Garden Court, Antioch, Tennessee 37013,

58. **Monsieur Ramon MELENDEZ**, sans état connu, demeurant à 435 Sabol Road, Stroudsburg, Pennsylvania 18360,

59. **Madame Patricia MILANO**, sans état connu, demeurant à 221 Yale Boulevard, Shrewsbury, New Jersey 07702,

60. **Madame Ivy MORENO**, sans état connu, demeurant à 1541 Seminole Street, First Floor, Bronx, New York 10461,

61. **Madame JoAnne LOVETT**, sans état connu, demeurant à 17 Man O War Lane, Howell, New Jersey 07731,

62. **Monsieur Martin PANIK**, sans état connu, demeurant à 1100 Blue Ball Road, P. O. Box 185, Mingoville, Pennsylvania 16856,

63. **Madame Mary Lynn-Anna PANIK-STANLEY**, sans état connu, demeurant à 375 East Vine Street, LaRue, Ohio 43332,

64. **Madame Christine PAPASSO**, sans état connu, demeurant à 5330 Arthur Kill Road, Staten Island, New York 10307,

65. **Madame Patricia J. PERRY**, sans état connu, demeurant à 2934 East 28th Street, Kansas City, Missouri 64128,

66. **Monsieur Rodney M. RATCHFORD**, sans état connu, demeurant à 412 Ingram Avenue, Oneonta, Alabama 35121,

67. **Madame Marshae Ratchford**, sans état connu, demeurant à 4327 Wyndham Park Circle, Decatur, Georgia 30034,

68. **Monsieur Rodney RATCHFORD**, pour le compte de **Madame Maranda C. RATCHFORD**, mineure, demeurant à 412 Ingram Avenue Oneonta, Alabama 35121,

69. **Monsieur Rodney MARQUEZ RATCHFORD**, sans état connu, demeurant à 2151 Beau Terra Drive W, Mobile, Alabama 36619,

70. **Madame Judith REISS**, sans état connu, demeurant à 969 Princess Drive, Yardley, Pennsylvania 19067,

71. **Madame Joanne RODAK GORI**, sans état connu, demeurant à 1383 Butternut Drive, Southampton, Pennsylvania 18966,

72. **Madame Chelsea Nicole RODAK**, sans état connu, demeurant à 124 Rabbit Run Road, Sewell, New Jersey 08080,

73. **Madame Joyce Ann RODAK**, sans état connu, pour le compte de **Monsieur Devon Marie RODAK**, mineur, demeurant à 124 Rabbit Run Road, Sewell, New Jersey 08080,

74. **Madame Joyce Ann RODAK**, sans état connu, demeurant à 124 Rabbit Run Road, Sewell, New Jersey 08080,

75. **Monsieur John RODAK**, sans état connu, demeurant à 600 Pickering Road, Southampton, Pennsylvania 18966,

4

76. **Madame Regina RODAK**, sans état connu, demeurant à 600 Pickering Road, Southampton, Pennsylvania 18966,

77. **Madame Diane ROMERO**, sans état connu, demeurant à 5 Chatham Court, Matawan, New Jersey 07748,

78. **Madame Loren ROSENTHAL**, sans état connu, demeurant à 91 Quarry Drive, Woodland Park, New Jersey 07424-4200,

79. **Madame Helen ROSENTHAL**, sans état connu, demeurant à 225 West 83rd Street, Apt. 4K, New York, New York 10024,

80. **Monsieur Alexander ROWE**, sans état connu, demeurant à P. O. Box 237, X11 Bryanston, Simonstown, South Africa 7995,

81. **Monsieur Ed RUSSIN**, sans état connu, demeurant à 25 Regina Road, Morganville, New Jersey 07748,

82. **Madame Gloria RUSSIN**, sans état connu, demeurant à 25 Regina Road, Morganville, New Jersey 0748,

83. **Monsieur Barry RUSSIN**, sans état connu, demeurant à 3 York Road, Marlboro, New Jersey 07746,

84. **Monsieur Expedito SANTILLAN**, sans état connu, demeurant à 1 Rockridge Court, Morris Plains, New Jersey 07748,

85. **Madame Ester SANTILLAN**, sans état connu, demeurant à 1 Rockridge Court, Morris Plains, New Jersey 07748,

86. **Madame Ellen SARACINI**, sans état connu, demeurant à 1460 Heather Circle, Yardley, Pennsylvania 19067,

87. **Madame Joanne RENZI**, sans état connu, demeurant à 5821 Ivy Branch Drive, Dublin, Ohio 43016,

88. **Monsieur Paul SCHERTZER**, sans état connu, demeurant à 8 Annette Drive, Edison, New Jersey 08820,

89. **Monsieur Ronald SLOAN**, sans état connu, demeurant à 301 Mission Street, 38-C, San Francisco, California 94105,

90. **Monsieur Raymond Doyle SMITH**, sans état connu, demeurant à 75 Traymore Street, Apt. 2, Buffalo, New York 14216,

91. **Madame Katherine SOULAS**, sans état connu, demeurant à 3 Beaver Creek Court, Far Hills, New Jersey 07931,

92. **Madame Russa STEINER**, sans état connu, demeurant à 30 Paddock Drive, New Hope, Pennsylvania 18938,

93. **Monsieur George STERGIOPOULOS**, médecin, demeurant à 184 Marvin Ridge Road, New Canaan, Connecticut 06840,

94. **Madame Angela STERGIOPOULOS**, sans état connu, demeurant à 184 Marvin Ridge Road, New Canaan, Connecticut 06840,

95. **Madame Sandra STRAUB**, sans état connu, demeurant chez **Madame Brianna L. Gomes**, 37849 Millwood Drive, Woodlake, California 93286,

96. **Madame Joan E. TINO**, sans état connu, demeurant à 9 Howland Circle, West Caldwell, New Jersey 07006,

97. **Madame Pamela SCHIELE**, sans état connu, demeurant à 2 Lowry Avenue, Wharton, New Jersey 07855,

98. **Madame Christine BARTON PENCE**, sans état connu, demeurant à 721 S.E. 1st Way, Apt. 210, Deerfield Beach, Florida 33441,

99. **Monsieur Michael E. PAIGE**, sans état connu, héritier de **Timothy Raymond WARD**, 2057 South Della Lane, Anaheim, California 92802,

100.    **Monsieur Leonard ZEPLIN**, sans état connu, demeurant à 400 East 77th Street, New York, New York 10021,

101.    **Madame Leona ZEPLIN**, sans état connu, demeurant à 400 East 77th Street, New York, New York 10021,

102.    **Monsieur Joslin ZEPLIN**, sans état connu, demeurant à 420 East 72nd Street, New York, New York 10021, P. O. Box 630260, Rockville, Utah 84763,

II.    **Les mêmes parties que sub I en tant que représentants et/ou héritiers des successions (*estates*) des victimes décédées lors des attentats du 11 septembre 2001 à savoir :**

1. **Succession de Donald J. HAVLISH, Jr.** représentée par **Madame Fiona HAVLISH**, sans état connu, demeurant à P. O. Box 20488, Boulder, Colorado 30308, et par **Madame Susan CONKLIN**, sans état connu, demeurant à 235 Starboard Point, Roswell, Georgia 30076,

2. **Succession de Michael A. BANE**, représentée par **Madame Tara BANE**, sans état connu, demeurant à 2114 North Crescent Boulevard Yardley, Pennsylvania 19067,

3. **Succession de Martin BORYCZEWSKI**, représentée par **Madame Krystyna BORYCZEWSKI**, sans état connu, demeurant à 460 Park Road, Parsippany, New Jersey 07054,

4. **Succession de Steven CAFIERO**, représentée par **Madame Grace KNESKI**, sans état connu, demeurant à 95 Fieldfare Way, Charleston, South Carolina 29414,

5. **Succession de Richard M. CAPRONI**, représentée par **Monsieur Richard A. CAPRONI**, sans état connu, demeurant à 1208 Ocean Parkway, Ocean Pines, Maryland 21811,

6. **Succession de Peter CHIRCHIRILLO**, représentée par **Madame Clara CHIRCHIRILLO**, sans état connu, demeurant à 197 Crossroads Lakes Drive, Ponte Vedra Beach, Florida 32082,

7. **Succession de Jeffrey COALE**, représentée par **Madame Leslie BROWN**, sans état connu, demeurant à 927 Baltimore Annapolis Blvd, Severna Park, Maryland 21146, dont l'héritier est **Monsieur William COALE**, décédé, dont la succession est représentée par **Madame Leslie BROWN**, prequalifiée,

8. **Succession de Daniel M. COFFEY**, représenté par ses héritiers :
    ➢ **Madame Frances M. COFFEY**, sans état connu, demeurant à 20 Carriage Drive, Newburgh, New York 12550,
    ➢ **Monsieur Kevin M. COFFEY**, sans état connu, demeurant à 20 Carriage Drive, Newburgh, New York 12550,

6

> **Monsieur Daniel D. COFFEY**, médecin, demeurant à 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

9. **Succession de Jason COFFEY**, représentée par ses héritiers :
> **Madame Frances M. COFFEY,** sans état connu, demeurant à 20   Carriage Drive, Newburgh, New York 12550,
> **Monsieur Kevin M. COFFEY,** sans état connu, demeurant à 20 Carriage Drive, Newburgh, New York 12550,
> **Monsieur Daniel D. COFFEY,** médecin, demeurant à 43 Rainey Street, Apt. 2002, Austin, Texas 78701,

10. **Succession de Jeffrey COLLMAN,** représentée par **Madame Keith BRADKOWSKI,** sans état connu, demeurant à 814 Provence Avenue, Santa Maria, California 934458,

11. **Succession de Michael DIEHL,** représentée par **Madame Loisanne DIEHL,** sans état connu, demeurant à 21 Morningside Court, Lakewood, New Jersey 08701,

12. **Succession de Stephen DORF,** représentée par **Madame Linda SAMMUT,** sans état connu, demeurant à 5 Second Street, Belford, New Jersey 07718 et **Madame Michelle DORF,** sans état connu, demeurant à 540 Duke Road, New Milford, New Jersey 07646,

13. **Succession de Judy FERNANDEZ,** représentée par **Madame Corazon FERNANDEZ,** sans état connu, demeurant à 19 Windstar Drive, Little Egg Harbor, New Jersey 08087,

14. **Succession de Ronald GAMBOA,** représentée par **Madame Regina Maria MERWIN,** sans état connu, demeurant à 7613 Beechdale Road, Crestwood, Kentucky 40014,

15. **Succession de William R. GODSHALK,** représentée par **Madame Grace PARKINSON-GODSHALK,** sans état connu, demeurant à 608 Countess Drive, Yardley, Pennsylvania 19067,

16. **Succession de John GRAZIOSO,** représentée par **Madame Tina GRAZIOSO,** sans état connu, demeurant à 100 Bonnie Drive, North Middletown, New Jersey 07748,

17. **Succession de Liming GU,** représentée par **Monsieur Jin LIU,** sans état connu, demeurant à 35 Woodstone Circle, Short Hills, New Jersey 07078,

18. **Succession de James D. HALVORSON,** représentée par **Madame Maureen HALVORSON,** sans état connu, demeurant à 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

19. **Succession de William HALVORSON,** représentée par **Madame Maureen HALVORSON,** sans état connu, demeurant à 175 Huguenot Street, Apt. 702, New Rochelle, New York 10801,

20. **Succession de Denis LAVELLE,** représentée par **Madame Marie Ann PAPROCKI,** sans état connu, demeurant à 61 Lakeview Drive, Mahopac, New York 10541,

21. **Succession de Robert LEVINE,** représentée par **Madame Stephanie GIGLIO,** sans état connu, demeurant à 15, Hartsdale Lane, Coram, New York 11727, dont héritier

est : **Monsieur Michael LOGUIDICE**, sans état connu, demeurant à 3152 Little Road #207, Trinity, Florida 34655,

22. **Succession de Joseph LOSTRANGIO**, représentée par **Madame Theresann LOSTRANGIO**, sans état connu, demeurant à 325 Barnsbury Road, Langhorne, Pennsylvania 19047,

23. **Succession de Dorthy MAURO**, représentée par **Madame Margaret MAURO**, sans état connu, demeurant à 3604 Green Garden Court, Antioch, Tennessee 37013,

24. **Succession de Mary MELENDEZ**, représentée par **Monsieur Ramon MELENDEZ**, sans état connu, demeurant à 435 Sabol Road, Stroudsburg, Pennsylvania 18360,

25. **Succession de Peter T. MILANO**, représentée par **Madame Patricia MILANO**, sans état connu, demeurant à 221 Yale Boulevard, Shrewsbury, New Jersey 07702,

26. **Succession d'Yvette Nichole MORENO**, représentée par **Madame Ivy MORENO**, sans état connu, demeurant à 1541 Seminole Street, First Floor, Bronx, New York 10461,

27. **Succession de Brian NUNEZ**, représentée par **Madame JoAnne LOVETT**, sans état connu, demeurant à 17 Man O War Lane, Howell, New Jersey 07731,

28. **Succession de Philip Paul OGNIBENE**, représentée par **Madame Diane OGNIBENE**, sans état connu, demeurant à 30882 Sandy Ridge Drive, Lewes, Delaware 19958,

29. **Succession de Vincent A. OGNIBENE**, représentée par **Madame Diane OGNIBENE**, sans état connu, demeurant à 30882 Sandy Ridge Drive, Lewes, Delaware 19958,

30. **Succession de Salvatore T. PAPASSO**, représentée par **Madame Christine PAPASSO**, sans état connu, demeurant à 5330 Arthur Kill Road, Staten Island, New York 10307,

31. **Succession de John William PERRY**, représentée par **Madame Patricia J. PERRY**, sans état connu, demeurant à 2934 East 28th Street, Kansas City, Missouri 64128,

32. **Succession de Marsha Dianah RATCHFORD**, représentée par **Monsieur Rodney M. RATCHFORD**, sans état connu, demeurant à 412 Ingram Avenue, Oneonta, Alabama 35121,

33. **Succession de Joshua Scott REISS**, représentée par **Madame Judith REISS**, sans état connu, demeurant à 969 Princess Drive, Yardley, Pennsylvania 19067,

34. **Succession de John M. RODAK**, représentée par **Madame Joyce Ann RODAK**, sans état connu, demeurant à 124 Rabbit Run Road, Sewell, New Jersey 08080,

35. **Succession de Elvin ROMERO**, représentée par **Madame Diane ROMERO**, sans état connu, demeurant à 5 Chatham Court, Matawan, New Jersey 07748,

36. **Succession de Richard ROSENTHAL**, représentée par **Madame Loren ROSENTHAL**, sans état connu, demeurant à 91 Quarry Drive, Woodland Park, New Jersey 07424-4200,

37. **Succession de Maria Theresa SANTILLIAN**, représentée par **Monsieur Expedito SANTILLAN**, sans état connu, demeurant à 1 Rockridge Court, Morris Plains, New Jersey 07748,

8

38. **Succession de Victor SARACINI**, représentée par **Madame Ellen SARACINI**, sans état connu, demeurant à 1460 Heather Circle, Yardley, Pennsylvania 19067,

39. **Succession de Scott SCHERTZER**, représentée par **Monsieur Paul SCHERTZER**, sans état connu, demeurant à 8 Annette Drive, Edison, New Jersey 08820,

40. **Succession de Paul K. SLOAN**, représentée par **Monsieur Ronald SLOAN**, sans état connu, demeurant à 301 Mission Street, 38-C, San Francisco, California 94105,

41. **Succession de George Eric SMITH**, représentée par **Monsieur Raymond Doyle SMITH**, sans état connu, demeurant à 75 Traymore Street, Apt. 2, Buffalo, New York 14216,

42. **Succession de Timothy P. SOULAS**, représentée par **Madame Katherine SOULAS**, sans état connu, demeurant à 3 Beaver Creek Court, Far Hills, New Jersey 07931,

43. **Succession de William R. STEINER**, représentée par **Madame Russa STEINER**, sans état connu, demeurant à 30 Paddock Drive, New Hope, Pennsylvania 18938,

44. **Succession de Andrew STERGIOPOULOS**, représentée par **Monsieur George STERGIOPOULOS**, médecin, demeurant à 184 Marvin Ridge Road, New Canaan, Connecticut 06840,

45. **Succession de Edward W. STRAUB**, représentée par **Madame Sandra STRAUB**, sans état connu, demeurant chez **Madame Brianna L. Gomes**, 37849 Millwood Drive, Woodlake, California 93286,

46. **Succession de Jennifer TINO**, représentée par **Madame Joan E. TINO**, sans état connu, demeurant à 9 Howland Circle, West Caldwell, New Jersey 07006,

47. **Succession de Jeanmarie WALLENDORF**, représentée par **Madame Christine BARTON PENCE**, sans état connu, demeurant à 721 S.E. 1st Way, Apt. 210, Deerfield Beach, Florida 33441,

48. **Succession de Meta WALLER**, représentée par **Monsieur Chrislan FULER MANUEL**, sans état connu, demeurant à 161 Cornerstone Drive, South Windsor, Connecticut 92802,

49. **Succession de Timothy Raymond WARD**, représentée par **Monsieur Michael E. PAIGE**, sans état connu, demeurant à 2057 South Della Lane, Anaheim, California 92802,

50. **Succession de Doyle Raymond WARD**, représentée par **Madame Brianna L. GOMES**, sans état connu, demeurant à 37849 Millwood Drive, Woodlake, California 93286,

**parties demanderesses** aux termes d'un exploit de l'huissier de justice suppléant Catherine NILLES de Luxembourg du 22 mars 2016 et aux termes d'un exploit de réassignation de l'huissier de justice Patrick KURDYBAN de Luxembourg du 25 juillet 2016,

comparaissant par la société à responsabilité limitée MOYSE BLESER S. à r. l., établie et ayant son siège social à L-2680 Luxembourg, inscrite au Registre de Commerce et des Sociétés de Luxembourg sous le numéro B 211295, représentée aux fins de la présente procédure par Maître François MOYSE, avocat à la Cour, demeurant à Luxembourg,

9

et :

1. **la République Islamique d'Iran**, représentée par son Ministre des Affaires étrangères, Monsieur **Mohammad** Javad ZARIF, Ministère des Affaires étrangères, établi à Imam Khomeini Street, Téhéran, Iran,

2. **l'Ayatollah Ali HOSSEINI-KHAMENEI**, ancien Président de la République Islamique d'Iran, sans état connu, représenté par Monsieur le Ministre des Affaires étrangères, Mohammad Javad ZARIF, Ministère des Affaires étrangères, demeurant à Imam Khomeini Street, Téhéran, Iran,

3. **Monsieur Ali Akbar HASHEMI RAFSANJANI**, ancien Président de la République Islamique d'Iran, sans état connu, représenté par Monsieur le Ministre des Affaires étrangères, Mohammad Javad ZARIF, Ministère des Affaires étrangères, demeurant à Imam Khomeini Street, Téhéran, Iran,

4. **le Ministère Iranien de l'Information et de la Sécurité**, représenté par Monsieur le Ministre des Affaires étrangères, Mohammad Javad ZARIF, Ministère des Affaires étrangères, établi à Imam Khomeini Street, Téhéran, Iran,

5. **l'Organisation Islamique Corps des Gardes Révolutionnaires**, organisation politique, représentée par Monsieur le Ministre des Affaires étrangères, Mohammad Javad ZARIF, Ministère des Affaires étrangères, établi à Imam Khomeini Street, Téhéran, Iran,

6. **le HEZBOLLAH**, organisation politique, représenté par Monsieur le Ministre des Affaires étrangères, Mohammed Javad ZARIF, ministère des Affaires étrangères, établi à Imam Khomeini Street Téhéran, Iran,

7. **le Ministère Iranien du Pétrole**, organisme public, représenté par son représentant légal ou statutaire, établi à Hafez Crossing, Taleghani Avenue Téhéran, Iran,

8. **la Société Nationale Iranienne des Pétroliers**, société commerciale, enregistrée auprès du Registre de commerce de Téhéran, représentée par son représentant légal ou statutaire, établie à 65 Shahid Atefi Street, Africa Expressway, Téhéran, Iran,

9. **la Société Nationale Iranienne de Pétrole**, organisme public, représentée par son représentant légal ou statutaire, établie à Hafez Crossing, Taleghani Avenue Téhéran, Iran,

10. **la Société Nationale de Gaz Iranien**, organisme public, représentée par son représentant légal ou statutaire, établie à National Iranian Gas Company Building, South Aban Street, Karimkhan Boulevard, P.O. Box 15875, Téhéran, Iran,

11. **la Compagnie aérienne d'Iran**, organisme public, représentée par son représentant légal ou statutaire, établie à Iran Air H.Q., Mehrabad Airport, P.O. Box 13185-775, Téhéran, Iran,

10

12. **la Compagnie Nationale Iranienne Pétrochimique**, organisme public, représentée par son représentant légal ou statutaire, établie à 144, North, Sheikh Bahaie Avenue, P.O. Box 19395-6896, Téhéran, Iran,

13. **le Ministère Iranien des Affaires Economiques et des Finances**, organisme public, représenté par son Ministre, établi à Imam Khomeini Street Téhéran, Iran,

14. **le Ministère Iranien du Commerce**, organisme public, représenté par son Ministre, établi à 492, Valieasr Avenue, Tehran, Iran,

15. **le Ministère Iranien de la Défense et de la Logistique des Forces Armées**, représenté par son Ministre, établi Ferdowsi Avenue, Sarhang Sakhaei Street, Téhéran, Iran,

16. **la Banque Centrale de la République Islamique d'Iran**, organisme public, représentée par son représentant légal ou statutaire, établie à 144, Mirdamad Bd., Téhéran, Iran,

**parties défenderesses** aux termes des prédits exploits,

**sub 1-5 et sub 7-16**, comparaissant par la société en commandite simple BONN STEICHEN & PARTNERS, établie et ayant son siège social à L-2370 Howald, 2, rue Peternelchen, Immeuble C2, inscrite à la liste V du Tableau de l'Ordre des avocats du Barreau de Luxembourg, représentée par son gérant actuellement en fonctions à savoir la société à responsabilité limitée BONN STEICHEN & PARTNERS S.à r.l., elle-même représentée aux fins de la présente procédure par Maître Fabio TREVISAN, avocat à la Cour,

**sub 6**, réassignée, ne comparaissant pas,

**en présence de :**

**Monsieur le Procureur d'Etat** près le tribunal d'arrondissement de Luxembourg, ayant ses bureaux à la Cité Judiciaire à Luxembourg.

## Le Tribunal :

Par exploit d'huissier de justice du 22 mars 2016, 102 parties demanderesses nommément désignées, agissant tant en leur nom personnel qu'en leurs qualités de représentants ou d'héritiers de 50 personnes nommément désignées décédées le 11 septembre 2001, ont fait donner assignation à

1. la REPUBLIQUE ISLAMIQUE D'IRAN
2. l'Ayatollah Ali HOSSEINI-KHAMENEI
3. Ali Akbar HASHEMI RAFSANJANI
4. le MINISTERE IRANIEN DE L'INFORMATION ET DE LA SECURITE
5. l'ORGANISATION ISLAMIQUE CORPS DES GARDES REVOLUTIONNAIRES
6. l'organisation HEZBOLLAH
7. le MINISTERE IRANIEN DU PETROLE
8. la CORPORATION NATIONALE IRANIENNE DES PETROLIERS
9. la SOCIETE NATIONALE IRANIENNE DE PETROLE
10. la SOCIETE NATIONALE DE GAZ IRANIEN
11. la COMPAGNIE AERIENNE D'IRAN
12. la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE
13. le MINISTERE IRANIEN DES AFFAIRES ECONOMIQUES ET DES FINANCES
14. le MINISTERE IRANIEN DU COMMERCE
15. le MINISTERE IRANIEN DE LA DEFENSE ET DE LA LOGISTIQUE DES FORCES ARMEES
16. la BANQUE CENTRALE DE LA REPUBLIQUE ISLAMIQUE D'IRAN

à comparaître devant le tribunal de ce siège pour y voir dire et ordonner que seront exécutoires au Luxembourg et y produiront leurs pleins et entiers effets comme s'ils émanaient d'un tribunal luxembourgeois

- un jugement rendu le 22 décembre 2011 par le Tribunal de District des Etats-Unis d'Amérique du District Sud de l'Etat de New York déclarant les parties défenderesses responsables des suites dommageables d'un attentat commis le 11 septembre 2001

- un jugement rendu le 3 octobre 2012 par le Tribunal de District des Etats-Unis d'Amérique du District Sud de l'Etat de New York fixant les montants indemnitaires dus par les parties défenderesses aux parties demanderesses par catégories de dommages et par catégories de victimes

- un jugement rendu le 12 octobre 2012 par le Tribunal de District des Etats-Unis d'Amérique du District Sud de l'Etat de New York portant condamnation des parties défenderesses à payer

    o au titre de dommages matériels : 394.277.884.- USD

12

- o au titre des dommages corporels/pretium doloris : 94.000.000.- USD
- o au titre du dommage moral : 874.000.000.- USD
- o au titre des dommages-intérêts punitifs : 4.686.235.921.- USD
- o les intérêts légaux sur les sommes allouées au titre du pretium doloris et du dommage moral, soit sur le total de 968.000.000 USD
- un jugement rendu le 12 septembre 2013 par le Tribunal de District des Etats-Unis d'Amérique du District Sud de l'Etat de New York rendant exécutoire aux Etats-Unis d'Amérique les jugements des 22 décembre 2011, 3 octobre 2012 et 12 octobre 2012

Les PARTIES DEMANDERESSES demandent encore chacune à se voir allouer une indemnité de procédure de 5.000.- euros et à voir condamner les parties défenderesses aux frais de l'instance, avec distraction au profit de leur avocat à la Cour constitué.

Sur cette assignation, seule la partie défenderesse sub 16), la BANQUE CENTRALE DE LA REPUBLIQUE ISLAMIQUE D'IRAN, a constitué avocat à la Cour en date du 3 mai 2016.

Sur invitation du tribunal des 26 mai 2016 et 1er juillet 2016, les PARTIES DEMANDERESSES ont procédé à la réassignation de toutes les parties défenderesses sur base de l'article 84 du Nouveau Code de Procédure Civile suivant exploit d'huissier de justice du 25 juillet 2016.

Les frais de cette réassignation pour autant que dirigée contre la BANQUE CENTRALE DE LA REPUBLIQUE ISLAMIQUE D'IRAN doivent en tout état de cause rester à charge des PARTIES DEMANDERESSES comme étant frustratoires, cette partie ayant dores et déjà constitué avocat à la Cour.

Sur cette réassignation, seules les parties défenderesses sub 1) à sub 5) et sub 7) à sub 15) ont constitué avocat à la Cour en date respectivement des 22 août 2016 (la SOCIETE NATIONALE IRANIENNE DES PETROLIERS), 31 août 2016 (les PARTIES ETATIQUES IRANIENNES), 13 septembre 2016 (la COMPAGNIE AERIENNE D'IRAN, la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE et la SOCIETE NATIONALE DE GAZ IRANIEN) et 3 octobre 2016 (la SOCIETE NATIONALE IRANIENNE DE PETROLE).

La partie défenderesse sub 6) n'a pas constitué avocat à la Cour. La régularité de la procédure à son encontre sera examinée ci-dessous dans la section lui dédiée.

13

Sur invitation faite par le tribunal aux PARTIES DEMANDERESSES en date du 5 juin 2018, la procédure a été communiquée au Ministère public aux vœux de l'article 183 du Nouveau Code de Procédure Civile.

A l'audience du 21 novembre 2018, l'instruction a été clôturée.

A l'audience du 23 janvier 2019, le juge rapporteur a été entendu en son rapport oral.

Maître François MOYSE, avocat représentant la société à responsabilité limitée MOYSE BLESER, assisté de Maître Laurent HEISTEN, a conclu pour les parties demanderesses.

Maître Fabio TREVISAN, avocat représentant la société en commandite simple BONN STEICHEN & PARTNERS, a conclu pour les parties défenderesses sub 1) à sub 5) et sub 7) à sub 16).

Dominique Peters, substitut principal, a conclu pour le Ministère public.

Pour les besoins du présent jugement, le tribunal entend suivre la logique des parties qui ont regroupé les quinze parties défenderesses comparantes en quatre groupes pour y consacrer des développements propres à chaque groupe. Une section spécifique est dédiée par le tribunal à la partie défenderesse non comparante.

1.   **La demande en tant que dirigée contre la BANQUE CENTRALE DE LA REPUBLIQUE ISLAMIQUE D'IRAN**.................................................................................................................18

   1.1.   **Immunité de juridiction** ....................................................................................18

      1.1.1.   **Positions des parties**.....................................................................................18

         1.1.1.1.   **La BANQUE CENTRALE** ..............................................................18

         1.1.1.2.   **Les PARTIES DEMANDERESSES** ................................................22

      1.1.2.   **Appréciation du tribunal**...............................................................................25

         1.1.2.1.   **Recevabilité du moyen tiré de l'immunité de juridiction : Incidence de la procédure de référé**...................................................................................................26

            1.1.2.1.1.   **Recevabilité *ratione temporis* du moyen tiré de l'immunité de juridiction** .......26

            1.1.2.1.2.   **Renonciation au moyen tiré de l'immunité de juridiction** ................................29

         1.1.2.2.   **Bien-fondé du moyen tiré de l'immunité de juridiction : Bénéfice de l'immunité de juridiction** ........................................................................................................31

            1.1.2.2.1.   **Considérations générales sur les fondements de la règle de l'immunité des Etats** ...................................................................................................................31

1.1.2.2.2.   Etendue de l'immunité juridictionnelle ................................................ 34

1.1.2.2.2.1.   Nature du contrôle à opérer par le juge de l'exequatur ............................ 34

1.1.2.2.2.2.   Circonstances particulières de l'espèce .................................................... 37

1.1.2.2.2.3.   Dérogation à l'immunité de juridiction pour les actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées ? .................... 45

1.1.2.2.2.4.   Dérogation à l'immunité de juridiction pour les actes de terrorisme et pour les actes violant une norme de *jus cogens* ? .................................................................. 52

1.1.2.2.3.   Incidence de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales ........................................................................................ 54

1.2.   Conditions de l'exequatur ................................................................................ 59

2.   La demande en tant que dirigée contre les PARTIES ETATIQUES IRANIENNES ............... 59

2.1.   Immunité de juridiction ................................................................................ 59

2.1.1.   Positions des parties ......................................................................... 59

2.1.1.1.   Les PARTIES ETATIQUES IRANIENNES ........................................................ 59

2.1.1.2.   Les PARTIES DEMANDERESSES ................................................................ 63

2.1.2.   Appréciation du tribunal ...................................................................... 67

2.1.2.1.   Recevabilité du moyen tiré de l'immunité de juridiction : Incidence de la procédure de référé ............................................................................................... 69

2.1.2.1.1.   Recevabilité *ratione temporis* du moyen tiré de l'immunité de juridiction ...... 69

2.1.2.1.2.   Renonciation au moyen tiré de l'immunité de juridiction ............................. 72

2.1.2.2.   Bien-fondé du moyen tiré de l'immunité de juridiction : Bénéfice de l'immunité de juridiction ........................................................................................................ 74

2.1.2.2.1.   Considérations générales sur les fondements de la règle de l'immunité des Etats ...................................................................................................................... 74

2.1.2.2.2.   Etendue de l'immunité juridictionnelle .................................................... 74

2.1.2.2.2.1.   Nature du contrôle à opérer par le juge de l'exequatur ............................ 74

2.1.2.2.2.2.   Circonstances particulières de l'espèce .................................................... 74

2.1.2.2.2.3.   Dérogation à l'immunité de juridiction pour les actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées ? .................... 82

2.1.2.2.2.4.   Dérogation à l'immunité de juridiction pour les actes de terrorisme et pour les actes violant une norme de *jus cogens* ? .................................................................. 88

2.1.2.2.3.   Incidence de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales ........................................................................................ 90

2.2.   Conditions de l'exequatur ................................................................................ 95

3.   La demande en tant que dirigée contre les ORGANISMES PUBLICS IRANIENS ................. 95

3.1.   Positions des parties ......................................................................................... 96

15

3.1.1.    Les ORGANISMES PUBLICS IRANIENS ...................................................................96

3.1.1.1.    Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique ............................................................................................................................96

3.1.1.2.    Absence de compétence internationale du tribunal américain ...........................97

3.1.1.3.    Irrégularité de la procédure .................................................................................98

3.1.1.3.1.   Violation du principe du contradictoire et des droits de la défense.................98

3.1.1.3.2.   Violation du droit d'accès au juge ...................................................................99

3.1.1.3.3.   Violation de l'obligation de motiver les jugements ........................................101

3.1.1.4.    Violation de l'ordre public luxembourgeois par les jugements américains.......102

3.1.2.    Les PARTIES DEMANDERESSES..........................................................................103

3.1.2.1.    Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique ..........................................................................................................................104

3.1.2.2.    Absence de compétence internationale du tribunal américain .........................106

3.1.2.3.    Irrégularité de la procédure ...............................................................................106

3.1.2.3.1.   Violation du principe du contradictoire et des droits de la défense...............106

3.1.2.3.2.   Violation du droit d'accès au juge .................................................................108

3.1.2.3.3.   Violation de l'obligation de motiver les jugements ........................................108

3.1.2.4.    Violation de l'ordre public luxembourgeois par les jugements américains.......109

3.2.    Appréciation du tribunal ...........................................................................................110

3.2.1.    Observations générales ..........................................................................................110

3.2.1.1.    Cadre d'analyse juridique .................................................................................110

3.2.1.2.    Contexte procédural américain .........................................................................113

3.2.2.    Examen des moyens ...............................................................................................116

3.2.2.1.    Recevabilité : Caractère exécutoire des jugements américains .......................116

3.2.2.2.    Fond : Conditions de régularité des jugements américains ..............................119

3.2.2.2.1.   Compétence internationale du tribunal américain .........................................119

3.2.2.2.2.   Ordre public procédural : Irrégularités de la procédure.................................120

3.2.2.2.2.1.   Signification de l'acte introductif d'instance ............................................120

3.2.2.2.2.2.   Droit d'accès au juge ...............................................................................127

3.2.2.2.2.3.   Motivation des jugements.........................................................................128

3.2.2.2.2.4.   Signification des jugements ......................................................................130

3.2.2.2.3.   Ordre public substantiel : Dommages-intérêts punitifs .................................132

4.    La demande en tant que dirigée contre la SOCIETE NATIONALE IRANIENNE DES PETROLIERS..................................................................................................................................133

4.1.    Positions des parties .................................................................................................. 134

  4.1.1.    La SOCIETE NATIONALE IRANIENNE DES PETROLIERS................... 134

    4.1.1.1.    Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique ................................................................................................................ 134

    4.1.1.2.    Absence de compétence internationale du tribunal américain ...................... 135

    4.1.1.3.    Irrégularité de la procédure ...................................................................... 136

      4.1.1.3.1.    Violation du principe du contradictoire et des droits de la défense............... 136

      4.1.1.3.2.    Violation du droit d'accès au juge ................................................... 137

      4.1.1.3.3.    Violation de l'obligation de motiver les jugements ......................... 138

    4.1.1.4.    Violation de l'ordre public luxembourgeois par les jugements américains....... 140

  4.1.2.    Les PARTIES DEMANDERESSES....................................................................... 141

    4.1.2.1.    Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique ................................................................................................................ 142

    4.1.2.2.    Absence de compétence internationale du tribunal américain ...................... 143

    4.1.2.3.    Irrégularité de la procédure ...................................................................... 144

      4.1.2.3.1.    Violation du principe du contradictoire et des droits de la défense............... 144

      4.1.2.3.2.    Violation du droit d'accès au juge ................................................... 145

      4.1.2.3.3.    Violation de l'obligation de motiver les jugements ......................... 145

    4.1.2.4.    Violation de l'ordre public luxembourgeois par les jugements américains....... 146

4.2.    Appréciation du tribunal .......................................................................................... 147

  4.2.1.    Observations générales........................................................................................ 147

    4.2.1.1.    Cadre d'analyse juridique ......................................................................... 147

    4.2.1.2.    Contexte procédural américain ................................................................. 147

  4.2.2.    Examen des moyens .............................................................................................. 147

    4.2.2.1.    Recevabilité : Caractère exécutoire des jugements américains ...................... 147

    4.2.2.2.    Fond : Conditions de régularité des jugements américains ............................ 150

      4.2.2.2.1.    Compétence internationale du tribunal américain ......................... 150

      4.2.2.2.2.    Ordre public procédural : Irrégularités de la procédure................. 150

        4.2.2.2.2.1.    Signification de l'acte introductif d'instance ....................... 151

        4.2.2.2.2.2.    Droit d'accès au juge .......................................................... 156

        4.2.2.2.2.3.    Motivation des jugements.................................................... 157

        4.2.2.2.2.4.    Signification des jugements ................................................. 159

      4.2.2.2.3.    Ordre public substantiel : Dommages-intérêts punitifs .................. 161

5.    La demande en tant que dirigée contre l'organisation HEZBOLLAH ..................... 163

6.   Les demandes reconventionnelles des ORGANISMES PUBLICS IRANIENS et de la
SOCIETE NATIONALE IRANIENNE DES PETROLIERS .......................................................... 165

7.   Indemnités de procédure ................................................................................................ 166

Dispositif ...................................................................................................................................... 167

## 1.   La demande en tant que dirigée contre la BANQUE CENTRALE DE LA REPUBLIQUE ISLAMIQUE D'IRAN

La BANQUE CENTRALE conclut au rejet de la demande en y opposant l'immunité de juridiction et en contestant que les conditions de l'exequatur soient remplies.

### 1.1.Immunité de juridiction

### 1.1.1.   Positions des parties

### 1.1.1.1.La BANQUE CENTRALE

La BANQUE CENTRALE invoque à son profit l'immunité de juridiction des Etats souverains pour faire valoir que le tribunal d'arrondissement de Luxembourg serait incompétent pour connaître de la demande en exequatur, sinon que celle-ci devrait être déclarée irrecevable.

Elle explique que l'immunité des Etats souverains serait un principe de droit coutumier international universellement admis, et en tout cas par l'ordre juridique luxembourgeois, et formerait obstacle à ce que les juridictions étatiques connaissent d'actions en justice dirigées contre un bénéficiaire de cette immunité dans la mesure où l'action mettrait en cause des actes accomplis dans le cadre de l'exercice de la puissance publique (*acta jure imperii*), et non pas des actes de gestion privée (*acta jure gestionis*). L'immunité s'appliquerait aux actes accomplis dans le cadre de l'exercice de la puissance publique peu importe que ces actes soient licites ou non, et il appartiendrait aux PARTIES DEMANDERESSES qui entendent voir écarter le privilège de l'immunité de démontrer que l'acte en cause ne relèverait pas de l'exercice de la puissance publique mais de la gestion privée.

En tant que banque centrale, qui constituerait une émanation de l'Etat souverain de la REPUBLIQUE ISLAMIQUE D'IRAN, accomplissant des actes liés à l'exercice de la souveraineté nationale, elle bénéficierait pleinement de cette immunité.

18

Le moyen tiré de l'invocation du privilège de l'immunité serait à qualifier de fin de non-recevoir et pourrait à ce titre être soulevé à tout moment de la procédure. Contrairement aux assertions des PARTIES DEMANDERESSES, elle l'aurait de toute façon soulevé au seuil de l'instance.

On ne saurait pas non plus déduire de l'action en référé intentée par ses soins pour combattre une mesure de saisie-arrêt sur ses comptes bancaires auprès de la S.A. CLEARSTREAM qu'elle aurait renoncé au bénéfice de l'immunité. Une telle renonciation devrait être certaine, expresse et non-équivoque, tant par référence aux règles générales régissant la notion de renonciation que par référence aux textes normatifs internationaux qui règlent la question de la renonciation au privilège de l'immunité. Or, l'action introduite par ses soins mise en avant par les PARTIES DEMANDERESSES ne vaudrait pas renonciation, alors qu'elle n'aurait eu que pour but de combattre dans l'urgence une mesure de saisie-arrêt illégale. Elle aurait de toute façon pris soin dans le cadre de cette action en référé d'insister sur le bénéfice de son immunité. Si cette action en référé devait être considérée comme étant constitutive d'une renonciation à l'immunité de juridiction, il conviendrait de retenir que cette renonciation ne vaudrait que pour les besoins de cette action en référé, et non pas pour la présente action en exequatur. Enfin, la BANQUE CENTRALE fait valoir qu'il faudrait opérer à ce stade une différenciation entre immunité de juridiction et immunité d'exécution, en ce qu'une éventuelle renonciation à l'immunité de juridiction, i.e. l'acceptation qu'une juridiction étatique exerce sa juridiction à l'encontre d'une entité souveraine d'un autre Etat, n'impliquerait pas acceptation de la part de cette entité que des mesures de contrainte soient adoptées à son égard.

Traitant de la question d'éventuelles restrictions au privilège d'immunité, la BANQUE CENTRALE fait observer à titre liminaire que la disposition de droit national américain (règle 28 U.S. Code §1605A(a) du *United States Code*) relative aux activités étatiques de sponsoring d'actes de terrorisme emportant restriction du privilège d'immunité invoquée par les PARTIES DEMANDERESSES pour voir écarter le privilège de l'immunité dérogerait à l'immunité de juridiction de façon excessive et non-conforme au droit coutumier et conventionnel international régissant le privilège de l'immunité. Cette disposition de droit américain ne saurait ainsi être prise en considération pour écarter le privilège devant le juge luxembourgeois.

La BANQUE CENTRALE poursuit sur la question des restrictions au privilège en relevant que si le privilège de l'immunité n'a pas vocation à s'appliquer aux activités commerciales ou privées

19

d'un Etat souverain et de ses émanations (et ce par voie d'exception alors que le privilège serait le principe), il faudrait toutefois constater en l'espèce que la juridiction d'origine n'aurait pas retenu dans le chef de la BANQUE CENTRALE une activité commerciale ou privée, mais une activité de soutien à des actes de terrorisme (reproche qui serait sans fondement), et qu'une telle activité ne relèverait pas du champ d'application de la dérogation au principe de l'immunité. La qualification d'actes relevant de là souveraineté découlerait encore nécessairement de ce que les PARTIES DEMANDERESSES elles-mêmes procéderaient à une assimilation systématique entre la BANQUE CENTRALE et la REPUBLIQUE ISLAMIQUE D'IRAN. La demande en exequatur d'un jugement portant sur des activités telles que celles qui lui sont reprochées relèverait ainsi du privilège d'immunité.

La BANQUE CENTRALE soutient ensuite que les PARTIES DEMANDERESSES feraient à tort état de l'exception au privilège d'immunité tenant à la nature de l'action judiciaire en ce qu'elle tendrait à la réparation d'un préjudice corporel ou matériel tel que cette exception serait admise en droit international. Tout en relevant que de toute façon une telle exception ne semblerait pas internationalement établie lorsque le préjudice corporel ou matériel trouve son origine dans un acte *jure imperii*, la BANQUE CENTRALE relève que les différents textes qui prévoient une telle dérogation requièrent que le dommage se soit produit sur le territoire de la juridiction saisie et que les agents de l'entité souveraine y aient été présents au moment de l'acte dommageable. Cette dérogation ne donnerait ainsi un sens que devant la juridiction saisie du fond, i.e. en l'espèce la juridiction américaine, mais non pas devant la juridiction de l'exequatur, i.e. en l'espèce la juridiction luxembourgeoise, de sorte que cette exception au principe de l'immunité ne saurait être invoquée devant cette dernière, redonnant ainsi application pleine et entière au principe du privilège. Dans le même sens, l'exception en question ne pourrait pas être invoquée une deuxième fois devant la juridiction luxembourgeoise si elle a déjà été invoquée devant le juge du fond américain. S'il fallait appliquer l'exception devant le juge de l'exequatur, elle resterait soumise aux mêmes conditions que celles déjà énoncées, à savoir que le dommage devrait avoir été causé et les agents de l'entité souveraine auraient dû être présents sur le territoire du juge de l'exequatur. Ces conditions ne seraient manifestement pas remplies en ce qui concerne la présente affaire.

Pour autant qu'il faille se reporter à l'application que fait le droit américain de l'exception à l'immunité tirée de ce que l'action tendrait à la réparation d'un préjudice corporel ou matériel, il

20

conviendrait de constater qu'aucun acte en lien avec les actes dommageables ne pourrait être attribué à la BANQUE CENTRALE ou ses agents comme ayant été commis sur le territoire des Etats-Unis d'Amérique. L'exception liée à la survenance d'un préjudice corporel ou matériel n'aurait ainsi pas pu trouver à s'appliquer devant le juge américain. Le juge américain ne se serait d'ailleurs pas appuyé sur cette dérogation au principe du privilège, mais sur la dérogation tenant aux actes étatiques de sponsoring d'actes de terrorisme, qui serait exclusive en droit américain de l'exception tenant à la survenance d'un préjudice corporel ou matériel, ce qui devrait encore conduire à voir écarter dans le cadre du présent litige toutes considérations tirées de cette dernière exception. Dans l'hypothèse où le juge luxembourgeois de l'exequatur devrait apprécier le privilège de l'immunité comme s'il avait été le juge américain du fond, la BANQUE CENTRALE fait encore valoir que le droit conventionnel auquel a souscrit le Luxembourg (article 15 Convention européenne sur l'immunité des Etats et son Protocole additionnel, signée à Bâle le 16 mai 1972 ; article 8 § 4 Convention des Nations Unies sur les immunités juridictionnelles des États et de leurs biens adoptée par la résolution 59/38 de l'Assemblée générale des Nations Unies en date du 2 décembre 2004) ne permettrait pas à un tribunal de passer outre au privilège d'immunité en cas de procédure par défaut.

La BANQUE CENTRALE conclut enfin à voir écarter toute dérogation au principe de l'immunité tirée de développements basés sur la responsabilité internationale des Etats, dès lors que les textes invoqués par les PARTIES DEMANDERESSES seraient restés à l'état de projet et ne viseraient que la responsabilité des Etats entre eux, et non pas à l'égard de personnes privées.

Dans la mesure où les PARTIES DEMANDERESSES feraient valoir une dérogation au privilège de l'immunité en présence de violations particulièrement graves du *jus cogens*, des droits de l'Homme et du droit humanitaire, la BANQUE CENTRALE fait valoir, tout en insistant encore une fois sur l'absence de participation de sa part et de ses agents à des actes qui puissent relever de telles actions, que le droit international public ne permettrait pas en l'état actuel de dégager une coutume établie en faveur d'une telle dérogation. L'existence d'une telle dérogation serait illogique, puisqu'elle impliquerait l'examen du fond du litige pour statuer sur l'immunité, alors cependant que cette dernière aurait justement pour objectif de prévenir la juridiction relevant d'un Etat d'apprécier le comportement d'un autre Etat souverain. Ainsi, le droit de ne pas être jugé serait indépendant des faits reprochés, et ce tant en ce qui concerne leur licéité que leur gravité.

21

Enfin, toute dérogation au privilège d'immunité pour des considérations d'équité devrait être écartée, alors que le juge devrait statuer en droit, et ne pourrait statuer en équité qu'en présence d'une disposition de droit positif expresse lui permettant de ce faire. Pareille autorisation serait inexistante en l'espèce.

### 1.1.1.2. Les PARTIES DEMANDERESSES

Les PARTIES DEMANDERESSES relèvent en premier lieu ce qu'elles considèrent comme une incohérence dans les développements de la BANQUE CENTRALE en ce que celle-ci exhiberait de l'immunité de juridiction pour conclure à l'incompétence du tribunal tout en qualifiant le moyen de fin de non-recevoir. Le tribunal note que les PARTIES DEMANDERESSES ne tirent aucune conséquence juridique de leurs développements, de sorte qu'il n'y a pas lieu de s'y arrêter autrement.

Les PARTIES DEMANDERESSES, en défendant la position qu'il s'agirait en l'immunité de juridiction d'une fin de non-recevoir, font valoir qu'il s'agirait d'une fin de non-recevoir particulière en ce qu'elle ne tiendrait ni au demandeur ni à l'action, mais à la personne du défendeur, et devrait en tant que telle être soulevée au seuil de l'instance. Il ne saurait être admis pour des raisons de logique et d'économie procédurale que la partie défenderesse soit admise à invoquer l'immunité de juridiction à n'importe quel stade de la procédure. La nature particulière du moyen commanderait au contraire qu'il ne puisse être soulevé que *in limine litis*. Or, la BANQUE CENTRALE aurait négligé de soulever le moyen afférent au seuil de l'instance, dès lors que, suite à la saisie-arrêt pratiquée par leurs soins au Luxembourg à l'encontre de l'intégralité des actuelles parties défenderesses sur base des jugements américains dont l'exequatur est poursuivi dans le cadre de la présente instance, la BANQUE CENTRALE aurait saisi le juge des référés en vue de voir prononcer l'annulation de la saisie-arrêt, sans toutefois invoquer dans ce cadre le moyen tiré de son immunité, mais en invoquant et en discutant le fond du droit luxembourgeois pour arguer de la nullité de la saisie-arrêt comme frappant des avoirs indisponibles. La BANQUE CENTRALE ne pourrait plus par la suite invoquer l'immunité de juridiction à son profit. En agissant devant le juge des référés, qui aurait été saisi du même litige que la formation collégiale dans le cadre de la présente instance (ces litiges présenteraient la triple identité de parties, de cause et d'objet pour concerner la saisie des biens de la BANQUE CENTRALE auprès de la S.A. CLEARSTREAM), la BANQUE CENTRALE aurait encore

22

marqué son accord à se soumettre à la juridiction étatique du Luxembourg et aurait de ce fait renoncé à l'immunité de juridiction si elle devait exister à son profit. Le droit coutumier admettrait pareille renonciation, qui pourrait s'exprimer de façon aussi bien expresse qu'implicite. Dans le même cadre, les PARTIES DEMANDERESSES font encore valoir que le défaut de comparution devant le tribunal (américain) saisi du fond vaudrait soumission à la juridiction de ce tribunal et emporterait consentement de la part de la BANQUE CENTRALE à ce que la décision rendue soit revêtue de l'exequatur. La soumission par la BANQUE CENTRALE aux juridictions étatiques luxembourgeoises résulterait encore de ce qu'elle aurait agi contre le tiers saisi, la S.A. CLEARSTREAM, afin de pouvoir récupérer ses avoirs.

Sur le contenu de la notion d'immunité de juridiction, les PARTIES DEMANDERESSES font valoir que celle-ci ne serait pas absolue et souffrirait un certain nombre d'exclusions dans le cadre desquelles le bénéficiaire potentiel de l'immunité ne pourrait pas en tirer profit.

Il en serait ainsi tout d'abord pour les actes ayant causé le décès, un dommage corporel ou un préjudice matériel à des personnes privées en dehors du contexte d'un conflit armé, respectivement au cas où le bénéficiaire potentiel de l'immunité aurait contribué par ses agissements au décès, à un dommage corporel ou à un préjudice matériel à des personnes privées en dehors du contexte d'un conflit armé. Les PARTIES DEMANDERESSES exposent dans ce cadre que les principes du droit international public imposeraient une obligation aux Etats de réparer les conséquences des actes internationalement illicites et qu'il n'y aurait pas lieu en présence d'un tel acte d'opérer la distinction admise par ailleurs entre actes *jure imperii*, qui permettraient aux Etats d'invoquer l'immunité de juridiction, et les actes *jure gestionis*, pour lesquels l'immunité de juridiction serait exclue. Pour les actes internationalement illicites, l'immunité de juridiction devrait toujours être écartée dans un souci de pacification des relations internationales. Cette règle serait consacrée par le droit international public coutumier, caractérisé par une pratique universelle et cohérente soutenue par l'*opinio iuris* sur le caractère contraignant de la règle, à laquelle le Luxembourg ne se serait pas opposé. Ainsi, l'immunité de juridiction ne jouerait pas pour les dommages causés aux personnes privées devant les juridictions du lieu de production du dommage ou du fait dommageable, sans qu'une présence de l'Etat recherché en responsabilité dans l'Etat du for ne soit requise. Les PARTIES DEMANDERESSES soutiennent ensuite que même s'il fallait considérer que la présence de l'Etat recherché en responsabilité sur le territoire de l'Etat sur lequel a eu lieu

23

le fait dommageable devait être considérée comme condition pour former barrage à l'immunité de juridiction, cette condition ne saurait s'appliquer que devant le juge du fond, et non pas devant le juge de l'exequatur.

En l'espèce, le fait dommageable, à savoir les détournements d'avions et les attentats perpétrés avec ceux-ci en date du 11 septembre 2001 aurait eu lieu sur le sol américain, de sorte que l'immunité de juridiction ne jouerait ni devant le juge américain du fond ni par répercussion devant le juge luxembourgeois de l'exequatur.

Les PARTIES DEMANDERESSES plaident en second lieu que l'immunité de juridiction ne saurait être invoquée pour les actes de terrorisme auquel aurait contribué un Etat. Le terrorisme serait une activité universellement condamnée, serait combattu par les Etats et constituerait un acte internationalement illicite ne pouvant recevoir la qualification d'acte *jure imperii*. Les Etats ne seraient partant pas fondés à se prévaloir de l'immunité de juridiction en cas de participation de leur part à un acte de terrorisme. Le droit international public coutumier, caractérisé par une pratique universelle et cohérente et l'*opinio iuris* afférente, exclurait le droit à l'immunité de juridiction pour les actes de terrorisme.

En l'espèce, la BANQUE CENTRALE aurait été condamnée pour avoir soutenu des actes de terrorisme, de sorte qu'elle ne saurait bénéficier de l'immunité de juridiction.

Dans le même ordre d'idées, les PARTIES DEMANDERESSES consacrent quelques développements à la notion d'acte *jure imperii* liés à la notion de souveraineté nationale et qui peuvent bénéficier de l'immunité de juridiction, pour faire valoir que relèveraient de cette catégorie uniquement les activités tenant aux marchés publics, aux activités militaires, aux actes de nationalisation et aux emprunts publics, et que ne relèveraient pas de cette catégorie les actes de terrorisme et les actes de soutien au terrorisme.

En l'espèce, la BANQUE CENTRALE aurait été condamnée par la juridiction américaine pour des actes de soutien au terrorisme et ne pourrait dès lors invoquer à son profit l'immunité de juridiction.

Les PARTIES DEMANDERESSES consacrent en quatrième lieu, et en réponse à l'argumentaire de la BANQUE CENTRALE, un certain nombre de développements à la question de l'immunité de juridiction en relation avec un acte de violation des droits de l'homme pour soutenir que la

24

gravité d'un acte n'entrerait pas en considération dans le cadre de l'appréciation de la possibilité d'invoquer l'immunité de juridiction, mais que seule la nature de l'acte serait à considérer, et qu'il n'y aurait donc nul besoin de caractériser une gravité particulière des actes qui sont reprochés à la BANQUE CENTRALE pour pouvoir former obstacle à l'immunité de juridiction.

En l'espèce, les actes reprochés entreraient dans le cadre de ceux qui ont causé le décès, un dommage corporel ou un préjudice matériel à un individu, respectivement de ceux à qualifier d'actes de terrorisme, ce qui suffirait à refuser l'immunité de juridiction à la BANQUE CENTRALE.

En cinquième lieu, les PARTIES DEMANDERESSES invoquent à leur profit la notion d'équité, conçue comme règle de droit qui permettrait de concilier des règles et principes qui se trouvent en conflit, pour faire valoir que l'étendue de l'immunité de juridiction devrait être fixée en considération de grands principes qui régissent les relations internationales, dont le principe qu'aucun Etat ne saurait causer le décès ou un dommage à des particuliers qui ne sont pas engagés dans un conflit armé au titre des forces armées régulières, ainsi que le principe que les actes de terrorisme seraient bannis.

### 1.1.2.  Appréciation du tribunal

Le tribunal constate que la BANQUE CENTRALE, tout en axant ses développements sur la notion d'immunité de juridiction, soutient que l'immunité de juridiction et l'immunité d'exécution répondraient au même régime juridique, sans toutefois en tirer une conclusion juridique. En tout état de cause, l'argumentation de la BANQUE CENTRALE doit être comprise comme s'opposant à la compétence du présent tribunal pour connaître de la demande en exequatur, respectivement comme s'opposant à la recevabilité de la demande en exequatur devant le présent tribunal en raison de l'immunité de juridiction dont elle devrait bénéficier. La BANQUE CENTRALE ne soutient notamment pas que la demande en exequatur participerait à la procédure d'exécution forcée et devrait en tant que telle être examinée sous l'angle de l'immunité d'exécution. La BANQUE CENTRALE ne soutient pas non plus dans le cadre de ses développements consacrés à l'immunité de juridiction que la juridiction américaine du fond aurait à tort passé outre à l'immunité de juridiction dont elle aurait bénéficié devant cette juridiction (ce moyen est cependant développé dans le cadre des moyens consacrés aux conditions de l'exequatur et y sera examiné pour autant que de besoin). Le tribunal n'examinera partant dans le présent cadre que la question de savoir si

25

la BANQUE CENTRALE bénéficie d'une immunité de juridiction qui serait de nature à former obstacle à la demande en exequatur.

A cet effet, le tribunal examine en premier lieu l'incidence de la procédure de référé intentée par la BANQUE CENTRALE pour ensuite, au cas où cet examen devait aboutir à la recevabilité du moyen tiré de l'immunité de juridiction, en apprécier le bien-fondé.

### 1.1.2.1. Recevabilité du moyen tiré de l'immunité de juridiction : Incidence de la procédure de référé

Il est rappelé que par exploit d'huissier du 22 mars 2016, les actuelles PARTIES DEMANDERESSES ont donné assignation aux actuelles parties défenderesses aux fins de voir déclarer exécutoires au Luxembourg quatre jugements rendus par une juridiction de New York.

Il est par ailleurs constant en cause que suivant exploit d'huissier du 14 janvier 2016, les actuelles PARTIES DEMANDERESSES ont pratiqué saisie-arrêt à charge des actuelles parties défenderesses auprès de la S.A. CLEARSTREAM afin d'obtenir paiement des montants leurs alloués dans le cadre de la procédure qui s'est déroulée devant la juridiction de New York. La procédure de validation de cette saisie-arrêt se trouve au jour du présent jugement en instance d'instruction devant le tribunal de ce siège.

Il est enfin constant en cause que suivant exploit d'huissier du 9 juin 2016, la BANQUE CENTRALE a fait donner assignation aux actuelles PARTIES DEMANDERESSES et à la S.A. CLEARSTREAM à comparaître devant le juge des référés aux fins de voir constater l'illégalité de la saisie-arrêt pratiquée par les actuelles PARTIES DEMANDERESSES. A cette procédure sont intervenues les actuelles parties défenderesses, à l'exclusion de l'organisation HEZBOLLAH. Par ordonnance du 22 mars 2017, le juge des référés a déclaré la demande irrecevable au regard des contestations sérieuses qui seraient à trancher et qui échapperaient au pouvoir d'appréciation du juge des référés. Cette ordonnance a été confirmée par arrêt de la Cour d'appel du 10 janvier 2018.

### 1.1.2.1.1.  Recevabilité *ratione temporis* du moyen tiré de l'immunité de juridiction

1/ Le tribunal tient en premier lieu à souligner que la circonstance que la BANQUE CENTRALE ait indûment associé les deux techniques procédurales différentes que constituent le déclinatoire de compétence et la fin de non-recevoir n'est pas de nature à porter à conséquence, dès lors qu'il

26

appartient au tribunal en application de l'article 61 du Nouveau Code de Procédure Civile d'opérer les qualifications que les plaidoiries des parties comportent. Dans la mesure où il ne saurait faire de doute que la BANQUE CENTRALE a invoqué à son profit l'immunité de juridiction, il appartient dès lors au tribunal de qualifier ce moyen au regard du droit procédural luxembourgeois.

Or, sur ce point, le tribunal rejoint la position des PARTIES DEMANDERESSES pour dire que ce moyen de défense doit être qualifié en fin de non-recevoir dont l'accueil entraine l'irrecevabilité de la demande.

2/ Le tribunal ne partage toutefois pas le point de vue des PARTIES DEMANDERESSES consistant à soutenir que ce moyen devrait être soulevé au seuil de l'instance. En droit procédural luxembourgeois, seules les nullités d'actes (article 264 du Nouveau Code de Procédure Civile) et les déclinatoires de compétences (article 260 du Nouveau Code de Procédure Civile ; pour autant qu'ils ne relèvent pas d'une règle d'ordre public) relèvent de l'obligation de devoir être soulevés au seuil de l'instance avant toute défense au fond. Aucun autre texte de droit positif ni aucune tendance jurisprudentielle n'a étendu cette contrainte aux fins de non-recevoir. Les arguments de logique juridique et d'efficacité procédurale développés par les PARTIES DEMANDERESSES, qui tiennent en fin de compte au souci d'une bonne administration de la justice, sont de nature à trouver à s'appliquer à toutes les fins de non-recevoir, et non pas seulement à celles strictement personnelles à la partie défenderesse, mais ne sont pas en l'état actuel du droit procédural luxembourgeois de nature à conditionner la recevabilité du moyen tiré de l'immunité de juridiction à sa formulation au seuil de l'instance (voy. dans le même sens en droit français JCL Procédure civile, J. Théron., Fasc. 600-30, Moyens de défense, N° 68 ; Encyclopédie Dalloz, Procédure civile, C. Kessedjian, Immunités, N° 22).

La fin de non-recevoir tirée du non-respect d'une immunité de juridiction, en ce que cette dernière n'affecte pas seulement la compétence juridictionnelle du juge mais lui retire le pouvoir de juger, est d'ordre public (Tribunal d'arrondissement de Luxembourg 7 avril 2017, Jugement commercial II N° 520/17, N° 132174 du rôle, cité in Annales du droit luxembourgeois, volume 27-28, 2017-2018, G. Friden et P. Kinsch, La pratique luxembourgeoise en matière de droit public international public (2017)), et peut à ce titre être soulevée à tout moment de l'instance.

3/ Dût-on même admettre que la recevabilité du moyen tiré de l'immunité de juridiction soit conditionnée par sa formulation au seuil de l'instance, force serait de constater que cette condition

27

serait respecté en l'espèce. Il n'est en effet pas contesté que dans le cadre des écritures propres à l'instance tendant à l'exequatur des décisions américaines, la BANQUE CENTRALE a invoqué comme premier moyen celui tenant à l'immunité de juridiction. C'est vainement que les PARTIES DEMANDERESSES font valoir que cette instance formerait un tout indivisible et indissociable avec l'instance en validation de la saisie-arrêt et l'instance devant le juge des référés. Il s'agit au contraire de trois instance nettement séparées, ayant chacune un objet, une cause et des parties distincts.

Force est en effet de constater que dans le cadre de l'instance en référé, la BANQUE CENTRALE revêtait la qualité de partie demanderesse en vue de la préservation des droits qu'elle invoquait à son profit, et que dans le cadre de la présente instance (de même que dans celle en validation de la saisie-arrêt), elle revêt la qualité de partie défenderesse à laquelle sont opposés des droits que les PARTIES DEMANDERESSES invoquent à leur profit. Ce constat à lui seul suffit pour écarter l'existence tant d'une identité de parties (les qualités respectives étant différentes) que d'une identité d'objet (qui sont respectivement l'exequatur, la validation de la saisie-arrêt et l'annulation de la saisie-arrêt) et d'une identité de cause (qui sont respectivement le respect des conditions mises à l'exequatur, l'existence d'une créance certaine, liquide et exigible documentée par les décisions américaines rendues exécutoires et la violation de règles de droit international public coutumier et de droit financier luxembourgeois) entre les trois instances.

S'il est certain que ces trois instances sont factuellement liées en ce qu'elles concernent en fin de compte la même créance invoquée par les PARTIES DEMANDERESSES, cette connexité n'est toutefois pas de nature à leur faire perdre leur autonomie procédurale et à devoir induire dans une instance des conséquences procédurales en fonction de l'attitude adoptée, des plaidoiries tenues ou des écritures déposées dans une autre instance.

A cela s'ajoutent deux autres considérations.

D'une part, l'immunité de juridiction ne se confond pas avec l'immunité d'exécution[1]. Or, l'instance de référé, en ce qu'elle tendait à voir annuler la mesure de saisie-arrêt, s'attachait à une

---

[1] Les PARTIES DEMANDERESSES admettent que immunité de juridiction et immunité d'exécution constituent deux notions différentes, bien qu'elles pervertissent dans le cadre des développements y consacrés les termes d'un arrêt de la Cour de cassation lorsqu'elles écrivent que « dans un arrêt du 2 février 2012, la Cour de cassation luxembourgeoise a confirmé que 'l'exequatur ne constitue pas un acte d'exécution et relève de ce fait de l'immunité de juridiction' » (conclusions récapitulatives du 7 juin 2018, page 16, citation de l'arrêt même relevé en caractères gras). La lecture de

28

mesure d'exécution et ne pouvait partant s'inscrire que dans le cadre de l'immunité d'exécution, alors que la présente instance ayant trait à l'exequatur des décisions américaines se rattache à la seule notion d'immunité de juridiction. Un comportement adopté dans le cadre d'une instance mettant en cause l'immunité d'exécution ne saurait se répercuter sur une autre instance mettant en cause l'immunité de juridiction.

D'autre part, ces distinctions entre d'une part immunité de juridiction et immunité d'exécution et d'autre part instances au fond introduites par les actuelles PARTIES DEMANDERESSES et instance en référé introduite par la BANQUE CENTRALE avaient été relevées par le juge des référés en son ordonnance du 22 mars 2017 lorsqu'il a écrit en page 14 de son ordonnance que *« La saisie-arrêt n'ayant pas été autorisée par un magistrat [Une requête afférente du 4 janvier 2016, sollicitant l'autorisation présidentielle de saisir-arrêter avait été rejetée suivant ordonnance présidentielle du 5 janvier 2016, motif pris que les requérants disposaient d'un titre constitué par les jugements américains] et le juge des référés actuellement saisi n'étant pas compétent pour valider la saisie-arrêt, il n'y a pas lieu de prendre position par rapport à la réserve invoquée par la Banque MARKAZI concernant l'immunité de privilège et de juridiction dont elle bénéficie en vertu du principe de droit international coutumier, la présente demande tendant au contraire à sauvegarder les droits de la Banque MARKAZI dans l'hypothèse où la saisie-arrêt constituait un acte illégal ».* Bien que la Cour d'appel en son arrêt n'aborde pas ces questions, la situation juridique était de ce fait claire de façon à pointer vers l'absence de toute incidence d'une instance sur l'autre.

Il résulte de l'ensemble des développements qui précèdent que le moyen tiré de l'immunité de juridiction de la BANQUE CENTRALE est recevable *ratione temporis*.

### 1.1.2.1.2.  Renonciation au moyen tiré de l'immunité de juridiction

Les parties sont d'accord, et le tribunal souscrit à cette appréciation, pour dire que le bénéficiaire d'une immunité de juridiction peut y renoncer. Le tribunal retient encore que si pareille

---

l'arrêt de la Cour de cassation cité (2 février 2012, N° 3712, N° 2951 du registre) révèle en effet que le passage cité et mis en gras par les PARTIES DEMANDERESSES forme en réalité partie du moyen de cassation et constitue la solution adoptée par la Cour d'appel par confirmation des juges de première instance, sans que la Cour de cassation n'endosse cette affirmation. Celle-ci se limite à rejeter le pourvoi en cassation au motif que le moyen présenté ne tendait qu'à remettre en cause l'appréciation par les juges du fond de la portée de la renonciation à invoquer l'immunité de juridiction de l'Etat étranger auteur du pourvoi en cassation.

renonciation peut de toute évidence être expresse, elle peut aussi être tacite à condition, conformément aux principes communément admis, qu'elle résulte d'un acte qui implique nécessairement renonciation et que l'auteur supposé de la renonciation accomplit cet acte volontairement et en pleine connaissance de cause, manifestant ainsi de façon non équivoque son intention de renoncer.

**1/** Ces conditions ne sont pas remplies en l'espèce dans le chef de la BANQUE CENTRALE. Si elle a certes agi en pleine connaissance de cause devant le juge des référés, cette action ne saurait toutefois valoir acte de renonciation à son immunité de juridiction dans le cadre de la présente instance. Pour rejeter l'argument tiré de la renonciation, il suffit de rappeler que l'instance en exequatur et l'instance en référé diffèrent par leurs parties, leurs objets et leurs causes, de même qu'elles font appel pour l'une au mécanisme de l'immunité de juridiction et pour l'autre au mécanisme de l'immunité d'exécution. Le tribunal souligne encore que dans les deux instances, la BANQUE CENTRALE poursuit en fin de compte la même finalité, à savoir échapper au Luxembourg aux conséquences des jugements américains. Si elle est recevable à cet effet de faire état de l'immunité de juridiction en tant que partie défenderesse dans le cadre de l'instance en exequatur, l'invocation de ce moyen n'est pas incompatible avec le recours aux voies de droit en tant que partie demanderesse afin de voir mettre un terme aux effets de la saisie-arrêt qu'elle considère comme étant illégale. La circonstance que la BANQUE CENTRALE se soit soumise en tant que partie demanderesse pour les stricts besoins de la procédure de référé à l'autorité juridictionnelle du Luxembourg et ait invoqué dans ce cadre l'application à son profit de la législation applicable au Luxembourg ne vaut pas renonciation tacite à l'immunité de juridiction dans le cadre de la présente instance.

**2/** Le défaut de comparution par la BANQUE CENTRALE devant la juridiction américaine ne saurait pas non plus être interprété comme valant renonciation à l'immunité de juridiction devant cette juridiction qui se répercuterait sur le bénéfice de l'immunité de juridiction devant le tribunal de ce siège. Si on peut là encore admettre que le défaut de comparution procède d'une décision délibérée (pour autant que l'acte introductif d'instance ait été valablement porté à la connaissance de la partie défenderesse, ce qu'il convient de vérifier dans le cadre de l'examen des conditions d'exequatur), il faut cependant tout autant admettre que cette seule abstention ne dénote pas

l'intention de la BANQUE CENTRALE à vouloir renoncer à l'immunité de juridiction devant le présent tribunal.

Il résulte de ce qui précède que la BANQUE CENTRALE n'a renoncé pour les besoins de la présente instance ni au moyen tiré de l'immunité de juridiction ni à l'immunité de juridiction en tant que telle, pour autant que les conditions pour qu'elle puisse en bénéficier soient remplies, ce qu'il convient de vérifier dans un deuxième temps.

### 1.1.2.2. Bien-fondé du moyen tiré de l'immunité de juridiction : Bénéfice de l'immunité de juridiction

### 1.1.2.2.1. Considérations générales sur les fondements de la règle de l'immunité des Etats

**1/** L'immunité de juridiction ne se trouve pas inscrite dans le droit positif, mais relève du droit international coutumier.

Le statut de la coutume internationale en droit luxembourgeois est décrit par un auteur comme suit : 1° à condition qu'elle existe en droit international, une règle coutumière sera reconnue par le juge luxembourgeois ; 2° le droit international public coutumier est d'application directe devant le juge interne ; 3° les tribunaux constatent l'existence d'une règle coutumière par leurs propres moyens, sans se référer à des actes du pouvoir législatif ou du pouvoir exécutif ; 4° la constatation de l'existence d'une norme coutumière n'exige pas, à proprement parler, que la partie qui l'invoque en fasse la preuve : une règle coutumière est une règle de droit, et non un élément de fait du litige (Le rôle du droit international dans l'ordre juridique luxembourgeois, Patrick Kinsch, Pas. 34, p.410). Cet auteur cite encore un arrêt de la Cour d'appel (11 février 1999, Ann. Dr. Lux 10 (2000) 363, 369-370) qui retient de façon classique et non contestée par les parties à la présente instance que « *pour la formation d'une règle coutumière internationale, il faut d'une part la preuve d'une pratique générale, constante et uniforme et, d'autre part, celle de* l'opinio iuris sive necessitatis, *de la conscience des Etats de se conformer à une règle de droit* ». En d'autres termes, la coutume est identifiée si elle a le caractère d'un usage, constamment et uniformément pratiqué, dans la conviction que cet usage est le droit (Pierre Pescatore, Introduction à la science du droit, Bruylant 2009, N° 106). Cet auteur ajoute que la coutume ne présente pas une source de droit unique et nettement définie, mais qu'il s'agit plutôt d'un ensemble de phénomènes coutumiers qui ont ceci

de commun qu'ils résultent, progressivement et insensiblement, de la pratique sociale diffuse dans un milieu déterminé (op. cit., N° 58).

Un auteur français écrit que toute la difficulté, s'agissant de la coutume, consiste alors, d'une part, à arriver à en prouver l'existence, et, d'autre part, à en délimiter les contours précis. A ces fins d'identification et de détermination du contenu de la coutume, il importe d'insister sur l'importance fondamentale du juge (ou de l'arbitre). En effet, quand un juge reconnaît l'existence d'une coutume, il la crée par la même occasion ; et il est parfois permis de se demander où finit la reconnaissance et où commence la création de la règle coutumière. Il y a là un élément d'incertitude et d'imprécision (P.-M. Dupuy, Droit international public, Précis Dalloz, 9e éd., p. 350, n° 322).

Le tribunal retient à ce stade que la coutume est par essence changeante et qu'en l'absence de consécration dans un texte de droit écrit, la règle de droit qui s'en dégage est à tout moment susceptible de se modifier au regard notamment de l'évolution des concepts juridiques, politiques, économiques et sociaux. Des acteurs importants de ces mutations sont les cours et tribunaux, qui ne sauraient s'arrêter à la teneur de la coutume telle qu'elle est décrite à un moment donné par un autre tribunal ou par les auteurs de doctrine.

2/ Le tribunal relève encore que la matière de l'immunité juridictionnelle des Etats a fait l'objet de deux tentatives de codification. La première démarche a abouti à la Convention européenne sur l'immunité des Etats et son Protocole additionnel, signée à Bâle le 16 mai 1972, approuvée au Luxembourg par une loi du 8 juin 1984, entrée en vigueur initialement le 11 juin 1976 et en vigueur actuellement entre huit Etats (Allemagne, Autriche, Belgique, Chypre, Luxembourg, Royaume Uni, Pays-Bas, Suisse). Le deuxième projet a conduit à l'adoption de la Convention des Nations Unies sur les immunités juridictionnelles des États et de leurs biens par la résolution 59/38 de l'Assemblée générale des Nations Unies en date du 2 décembre 2004. Cette convention est à ce jour ratifiée par 22 Etats, dont la REPUBLIQUE ISLAMIQUE D'IRAN, mais n'est pas encore entrée en vigueur à défaut d'avoir fait l'objet de ratification par 30 Etats au moins.

Aucune de ces deux conventions n'a partant vocation à s'appliquer en tant que droit positif dans la présente instance.

32

**3/** Le régime coutumier de l'immunité de juridiction a évolué au fil des siècles d'une immunité absolue vers une immunité relative, cette évolution étant la manifestation du recul de l'Etat national et de l'émergence de l'individu comme acteur et sujet de droits. La portée absolue de l'immunité de juridiction a été entamée tout d'abord par la distinction entre les actes *jure imperii*, qui ouvrent le bénéfice de l'immunité de juridiction, et les actes *jure gestionis*, qui sont soustraits au privilège de l'immunité. On peut admettre que cette distinction fait aujourd'hui partie de la coutume internationale. Seule la délimitation entre les deux catégories d'actes donne encore lieu à discussion.

Le périmètre de l'immunité de juridiction est par ailleurs discuté à travers d'autres arguments. Sans en tirer argument à ce stade quant à l'état de la coutume, le tribunal signale que les deux tentatives de codification du régime de l'immunité de juridiction contiennent, outre la distinction entre les actes *jure imperii* et les actes *jure gestionis*, un nombre important de dérogations à l'immunité de juridiction. La convention européenne de 1972, après avoir abordé les hypothèses procédurales de l'Etat demandeur ou intervenant et de la demande reconventionnelle (article 1), du consentement contractuel ou unilatéral (article 2) et de l'Etat qui conclut au fond (article 3) traite en ses articles 4 et suivants des matières pour lesquelles l'immunité de juridiction peut être écartée : l'obligation contractuelle à exécuter sur le territoire de l'Etat du for (article 4), le contrat de travail exécuté sur le territoire de l'Etat du for (article 5), la prise de participation dans un organisme établi sur le territoire de l'Etat du for (article 6), l'exercice d'une activité industrielle, commerciale ou financière à travers un organisme établi sur le territoire de l'Etat du for (article 7), les droits de propriété intellectuels protégés dans l'Etat du for (article 8), le droit sur un immeuble situé sur le territoire de l'Etat du for (article 9), le droit successoral (article 10), la réparation d'un préjudice corporel ou matériel résultant d'un fait survenu sur le territoire de l'Etat du for alors que l'auteur du dommage y était présent au moment où ce fait est survenu (article 11) et l'arbitrage (article 12). De façon similaire, la convention des Nations Unies de 2004, après avoir écarté le privilège de l'immunité dans diverses hypothèses procédurales que sont le consentement (article 7), l'Etat demandeur ou intervenant (article 8) et la demande reconventionnelle (article 9), précise que les Etats ne peuvent pas invoquer l'immunité pour les contestations relatives aux transactions commerciales (article 10), aux contrats de travail (article 11), aux atteintes à l'intégrité physique d'une personne ou les dommages aux biens (article 12), aux immeubles, aux successions et aux trusts (article 13), aux droits de propriété intellectuelle et industrielle (article 14), à la participation

33

à des sociétés ou autres groupements (article 15), aux navires dont l'Etat est propriétaire ou exploitant (article 16) et aux accords d'arbitrage (article 17).

Les auteurs examinent aussi de façon plus ou moins exhaustive ces dérogations à l'immunité des Etats (voy. par exemple Hazel Fox & Philippa Web, The Law of State Immunity, Oxford University Press, 3e édition ; Edward Chukwuemeke Okeke, Juridictional Immunities of States and International Organizations, Oxford University Press, 2018).

Ces développements ne sont pas faits à ce stade pour fixer le contenu de la règle coutumière de l'immunité de juridiction, mais d'une part pour en confirmer la nature désormais relative et d'autre part pour en souligner le caractère évolutif et instable.

### 1.1.2.2.2.   Etendue de l'immunité juridictionnelle

### 1.1.2.2.2.1.Nature du contrôle à opérer par le juge de l'exequatur

1/ La Cour internationale de justice dans son arrêt du 3 février 2012, Immunités juridictionnelles de l'Etat, Allemagne c. Italie, Grèce (intervenant), décrit comme suit aux points 125 à 130 l'office du juge de l'exequatur appelé à toiser le moyen tiré de l'immunité de juridiction :

> *125. La Cour doit ensuite exposer la manière dont elle conçoit la question de l'immunité de juridiction appliquée à un jugement qui statue non pas sur le fond d'une demande dirigée contre un Etat étranger, mais sur une demande tendant à ce qu'un jugement déjà rendu par un tribunal étranger à l'égard d'un Etat tiers soit déclaré exécutoire sur le territoire de l'Etat du juge saisi (une demande d'exequatur). La difficulté provient de ce que, en pareils cas, le juge n'est pas appelé à prononcer directement une condamnation à l'égard d'un Etat étranger invoquant une immunité de juridiction, mais à rendre exécutoire une condamnation déjà prononcée par le tribunal d'un autre Etat, qui est supposé avoir examiné et appliqué lui-même les règles relatives à l'immunité de juridiction de l'Etat défendeur.*
>
> *126. En l'espèce, les deux Parties semblent avoir raisonné, dans les arguments qu'elles ont échangés, comme si dans une telle hypothèse le respect de l'immunité de juridiction de l'Etat tiers par le tribunal saisi de la demande d'exequatur dépendait simplement du respect de cette immunité par le tribunal étranger qui a rendu le jugement sur le fond à l'encontre de l'Etat tiers. En d'autres termes, les Parties ont paru l'une et l'autre faire dépendre la question de savoir si la Cour d'appel de Florence avait méconnu ou non l'immunité de juridiction de l'Allemagne en déclarant exécutoires le jugement de Livadia et l'arrêt de la*

34

*Cour de cassation grecque de celle de savoir si ces dernières décisions avaient elles-mêmes méconnu l'immunité de juridiction que l'Allemagne avait invoquée en défense dans les actions judiciaires intentées contre elle en Grèce.*

*127. Rien ne s'oppose à ce qu'une juridiction nationale vérifie, avant d'accorder l'exequatur, que le jugement étranger n'a pas été rendu en méconnaissance de l'immunité de l'Etat défendeur. Mais, pour les besoins de la présente affaire, la Cour estime devoir aborder la question sous un angle sensiblement différent. Elle considère qu'il n'est pas nécessaire, pour déterminer si la Cour d'appel de Florence a méconnu l'immunité de juridiction de l'Allemagne, de se prononcer sur la question de savoir si les décisions judiciaires grecques ont elles-mêmes violé cette immunité - ce qu'elle ne pourrait d'ailleurs pas faire, puisqu'elle se prononcerait, ce faisant, sur les droits et obligations d'un Etat, la Grèce, qui n'a pas la qualité de partie à la présente instance (Or monétaire pris à Rome en 1943 (Italie c. France, Royaume-Uni et Etats-Unis d'Amérique), question préliminaire, arrêt, C.I.J. Recueil 1954, p. 32 ; Timor oriental (Portugal c. Australie), arrêt, C.I.J. Recueil 1995, p. 105, par. 34).*

*La question pertinente, du point de vue de la Cour et pour les besoins de la présente affaire, est de savoir si les tribunaux italiens ont eux-mêmes respecté l'immunité de juridiction de l'Allemagne en accueillant la demande d'exequatur, et non celle de savoir si le tribunal grec ayant rendu le jugement dont l'exequatur était demandé a respecté l'immunité de juridiction de l'Allemagne. Dans une situation de ce genre, les réponses à ces deux questions peuvent ne pas nécessairement coïncider ; c'est seulement la première qui importe ici à la Cour.*

*128. Lorsqu'un tribunal est saisi, comme en l'espèce, d'une demande tendant à ce qu'il accorde l'exequatur d'un jugement étranger ayant statué à l'encontre d'un Etat tiers, il est appelé à exercer lui-même sa juridiction à l'égard de l'Etat tiers en question. Il est vrai que la procédure d'exequatur n'a pas pour objet de trancher le fond d'un litige, mais seulement de donner force exécutoire à un jugement déjà rendu, sur le territoire d'un Etat autre que celui du juge qui a statué au fond. Le juge de l'exequatur n'a donc pas pour rôle de réexaminer dans tous ses aspects le fond de l'affaire qui a été jugée. Il n'en reste pas moins que, en accordant ou en refusant l'exequatur, il exerce un pouvoir juridictionnel qui aboutit à donner au jugement étranger des effets correspondant à ceux d'un jugement rendu au fond*

35

*dans l'Etat requis. La procédure introduite devant ce juge doit, en conséquence, être regardée comme intentée contre l'Etat tiers condamné par le jugement étranger.*

*129. A cet égard, la Cour relève que, selon l'article 6, paragraphe 2, de la convention des Nations Unies :*

> *« Une procédure devant un tribunal d'un Etat est considérée comme étant intentée contre un autre Etat lorsque celui-ci :*
>
> *a) est cité comme partie à la procédure ; ou*
>
> *b) n'est pas cité comme partie à la procédure, mais que cette procédure vise en fait à porter atteinte aux biens, droits, intérêts ou activités de cet autre Etat. »*

*Appliquée à une procédure d'exequatur, cette définition implique qu'une telle procédure doit être regardée comme dirigée contre l'Etat qui a été condamné par le jugement étranger. C'est d'ailleurs bien pourquoi, en l'espèce, l'Allemagne était recevable à faire opposition aux décisions de la Cour d'appel de Florence accordant l'exequatur - quoiqu'elle l'ait fait sans succès - puis à se pourvoir en cassation contre les arrêts confirmatifs.*

*130. Il résulte de ce qui précède que le juge saisi d'une demande d'exequatur d'un jugement étranger condamnant un Etat tiers est tenu de se demander si l'Etat défendeur bénéficie d'une immunité de juridiction, compte tenu de la nature de l'affaire qui a été jugée, devant les tribunaux de l'Etat dans lequel la procédure d'exequatur a été engagée. En d'autres termes, il doit se demander si, dans le cas où il aurait été lui-même saisi au fond d'un litige identique à celui qui a été tranché par le jugement étranger, il aurait été tenu en vertu du droit international d'accorder l'immunité à l'Etat défendeur (voir en ce sens l'arrêt de la Cour suprême du Canada Kuwait Airways Corp. c. Irak ([2010] RCS, vol. 2, p. 571), ainsi que l'arrêt de la Cour suprême du Royaume-Uni NML Capital Limited c. République d'Argentine ([2011] UKSC 31).*

Le tribunal souscrit à cette analyse. Il en résulte que le juge de l'exequatur doit procéder à une appréciation autonome du régime juridique de l'immunité de juridiction pour les besoins de l'instance qui se déroule devant lui. Ainsi, il doit vérifier non pas si le juge américain du fond a correctement appliqué sa règle de droit national privant l'Etat étranger et ses émanations de l'immunité de juridiction, mais il doit vérifier pour les besoins de la procédure d'exequatur si les circonstances de l'espèce entrent dans une des hypothèses dans lesquelles le droit international public coutumier prévoit que l'Etat étranger ne puisse pas se prévaloir de l'immunité de juridiction,

en se situant « comme si » il était saisi de la demande au fond. Ce contrôle implique nécessairement la vérification si la règle figurant dans la disposition de droit national du juge du fond privant l'Etat étranger et ses émanations remplit les critères posés à cet effet par une règle de droit international coutumier. Mais le périmètre d'analyse du juge de l'exequatur n'est pas limité à la disposition de droit national spécifiquement appliquée dans la procédure du fond afin d'y justifier la mise à l'écart de l'immunité de juridiction. Le juge de l'exequatur est au contraire appelé à vérifier le contenu de l'intégralité du droit international public coutumier afin de vérifier si ce dernier ne recèle pas une exception au principe de l'immunité de juridiction pertinente dans le cas sous examen.

2/ Le tribunal précise que ce contrôle du juge de l'exequatur se fait nécessairement en dehors de toutes considérations tenant à sa compétence internationale pour connaître du fond de l'affaire. L'application du droit international public coutumier au moyen tiré de l'immunité de juridiction doit se faire « comme si » le juge de l'exequatur était compétent pour connaître du fond.

3/ Le tribunal précise encore que le contrôle auquel est astreint le juge de l'exequatur dans le cadre du moyen tiré de l'immunité de juridiction se fait par rapport aux circonstances particulières de l'espèce, mais qu'il n'appartient pas au juge de l'exequatur, que ce soit pour les besoins de l'examen de la demande d'exequatur ou pour l'examen préalable de l'immunité de juridiction, d'opérer une révision ou de porter une appréciation sur le fond du litige tel que toisé par le juge du fond, ni en ce qui concerne la preuve des faits ni en ce qui concerne le lien causal entre les faits reprochés et les dommages subis.

4/ Aux yeux du tribunal, une considération supplémentaire doit entrer en ligne de compte dans le cadre de l'appréciation de la portée du droit international public coutumier concernant l'immunité juridictionnelle des Etats. La règle de l'immunité de juridiction des Etats constitue une règle de principe consacrée depuis longtemps par la coutume internationale, et les différents aménagements qui y ont été apportés au fil du temps en constituent des exceptions. Par voie de conséquence, les exceptions alléguées dans le cadre du présent litige doivent recevoir une interprétation restrictive.

### 1.1.2.2.2.2. Circonstances particulières de l'espèce

Pour décrire les faits de l'espèce, le tribunal se réfère aux développements figurant dans le document *Plaintiff's proposed findings of fact and conclusions of law in support of motion for entry of judgement by default against sovereign defendants* enregistré le 12 décembre 2011

37

correspondant aux faits qui étaient reprochés en dernier lieu aux parties défenderesses et au document du 22 décembre 2011 intitulé *Findings of fact and conclusions of law* signé par le juge (*United States District Judge*) George B. Daniels qui doit être considéré comme indiquant les faits retenus à charge des parties défenderesses de nature à engager leur responsabilité. Ces deux documents sont à quelques exceptions près identiques au mot près[2]. Ils reprennent en substance les faits et reproches développés dans la *Second Amended Complaint* du 7 septembre 2006 et la *Third Amended Complaint* du 23 juin 2010.

Le tribunal fait abstraction des développements contenus dans ces documents pour autant qu'ils ne se trouvent pas en relation causale avec les faits du 11 septembre 2001 et ne seraient partant pas considérés par lui s'il avait à toiser le fond de l'action dirigée contre les parties défenderesses. Seuls les faits indiqués dans ces deux documents qui sont en relation directe avec les faits du 11 septembre 2001 sont pertinents et pris en considération pour opérer le contrôle par rapport au moyen tiré de l'immunité de juridiction.

Ces documents exposent que les attentats du 11 septembre 2001 qui forment la cause de l'action des PARTIES DEMANDERESSES ont été commis par un réseau terroriste dénommé AL QUAIDA et que l'action tend à rendre les parties défenderesses responsables des préjudices en découlant, dans la mesure où elles ont directement et matériellement apporté leur soutien à AL QUAIDA.

Les documents s'attellent à décrire les comportements et agissements de la REPUBLIQUE ISLAMIQUE D'IRAN depuis 1979 en relation avec divers attentats et organisations en ce que la REPUBLIQUE ISLAMIQUE D'IRAN s'est engagée à partir de sa création en 1979 dans une guerre larvée contre les Etats-Unis d'Amérique à travers des moyens asymétriques et non-conventionnels, dont le soutien à des organisations terroristes, et a mis cette politique en œuvre à

---

[2] Les différences sont les suivantes:
- Ajout dans les *Findings of facts* d'un § 61
- Ajout dans les *Findings of facts* des §§ 147 à 197
- Omission dans les *Finding of facts* du § 154 des *Proposed findings of facts*
- Inversion des §§ 273 et 274 avec les §§ 275 et 276 dans les *Findings of facts* (par rapport aux §§ 222 et 223 d'une part et les §§ 224 et 225 d'autre part des *Proposed findings of facts*)
- Omission dans les *Conclusions of law* des §§ 12 à 14 des *Proposed conclusions of law*
- Omission dans les *Conclusions of law* des §§ 39 à 46 des *Proposed conclusions of law*

Ces différences ne portent pas à conséquence sur l'issue du litige.

travers ses agents, ministères, services, agences et entreprises (*officials, subdivisions, agencies and instrumentalities*).

Dans le cadre des explications générales (section *Defendants ; Proposed findings of fact*, §§ 1 à 64 ; *Findings of fact*, §§ 1 à 65), la BANQUE CENTRALE est décrite comme exerçant des fonctions essentielles quasi-gouvernementales et comme étant entièrement contrôlée par le gouvernement de la RÉPUBLIQUE ISLAMIQUE D'IRAN. La BANQUE CENTRALE est au service du Guide Suprême (fonction revêtue par l'Ayatollah Ali HOSSEINI-KHAMENEI), de l'ORGANISATION ISLAMIQUE CORPS DES GARDES RÉVOLUTIONNAIRES et du MINISTÈRE IRANIEN DE L'INFORMATION ET DE LA SÉCURITÉ quand il s'agit de mettre en œuvre des dessins terroristes (*Proposed findings of fact*, §§ 38 ; *Findings of fact*, §§ 38). La BANQUE CENTRALE a permis le transfert d'importantes sommes d'argent en liquide et par opérations bancaires au profit des organisations terroristes comme le HAMAS et le HEZBOLLAH (*Proposed findings of fact*, §§ 55 et 56 ; *Findings of fact*, §§ 55 et 56). La BANQUE CENTRALE est responsable en tant qu'agent ou outil de l'Etat (*agents or instrumentalities*) des agissements mis à charge de la RÉPUBLIQUE ISLAMIQUE D'IRAN (*Proposed findings of fact*, §§ 44 ; *Findings of fact*, §§ 44).

Dans la mesure où les faits du 11 septembre 2001 sont attribués d'un point de vue organisationnel à l'organisation AL QUAIDA, les documents expliquent (section *Bridging of the Sunni-Shia Divide ; Proposed findings of fact*, §§ 65 à 88 ; *Findings of fact*, §§ 66 à 89) les raisons et les mesures mises en œuvre pour réaliser une coopération entre l'organisation sunnite qu'est l'organisation AL QUAIDA et l'Etat d'obédience shiite qu'est la RÉPUBLIQUE ISLAMIQUE D'IRAN. Ces développements ne sont pas mis en relation avec les faits du 11 septembre 2001.

Le document décrit ensuite (section *Terrorist Attacks By the Iran-Hizbollah-al Queda Terrorist Alliance ; Proposed findings of fact*, §§ 89 à 114 ; *Findings of fact*, §§ 90 à 115) un certain nombre d'attaques terroristes attribuées à la coopération entre les organisations Al QUAIDA et HEZBOLLAH, à l'exclusion des faits du 11 septembre 2001. Ce n'est qu'au point 114 des *Proposed findings of fact*, respectivement au point 115 des *Findings of fact*, qu'il est sommairement retenu que les autorités iraniennes ont facilité les voyages de membres de l'organisation AL QUAIDA, dont certains des auteurs des faits du 11 septembre 2001, pour

transiter à travers l'Iran à destination et au retour de l'Afghanistan où se sont trouvés des camps d'entraînement.

A la suite des points 114 respectivement 115, les documents expliquent ensuite (section *Iran and Terrorist Travel* ; *Proposed findings of fact*, §§ 115 à 145 ; *Findings of fact*, §§ 116 à 146) plus en détail la question des voyages à travers l'Iran vers l'Afghanistan pour expliquer que au moins 8, respectivement entre 8 et 10, des 19 membres des commandos terroristes du 11 septembre 2001 ont ainsi transité à travers l'Iran. Le document retient d'une part que les voyages vers ces camps d'entraînement étaient indispensables pour préparer les attaques terroristes du 11 septembre 2001. Il explique ensuite que les autorités iraniennes ont délibérément omis de tamponner les passeports de ces personnes afin d'empêcher tout Etat ou service étranger de pouvoir retracer les déplacements de ces personnes, sous peine de se rendre suspectes, alors qu'il était connu que des camps d'entraînement pour terroristes se situaient en Afghanistan. Le document explique ensuite que des hauts responsables de l'organisation HEZBOLLAH ont organisé et participé à certains voyages préparatoires de plusieurs des membres des commandos terroristes du 11 septembre 2001 entre des villes du Proche et du Moyen Orient et qu'ils ont aidé ces terroristes à se procurer des passeports et/ou des visas pour entrer aux Etats-Unis d'Amérique. La BANQUE CENTRALE n'est pas mentionnée dans ce cadre.

Seul le document émanant du juge George B. Daniels retrace ensuite (section *Testimony of Abolghasem Mesbahi ; Findings of fact*, §§ 147 à 197) la biographie d'un témoin et son implication d'abord dans la mise en place des activités de soutien au terrorisme de la REPUBLIQUE ISLAMIQUE D'IRAN et ensuite dans la révélation de ces activités comme témoin. Le premier volet de ces explications (§§ 147 à 168) est sans rapport avec les faits du 11 septembre 2001. Dans le deuxième volet (§§ 169 à 180), il est expliqué que ce témoin a été averti au courant de l'été 2001 par des contacts qu'il avait encore au sein du gouvernement iranien qu'un plan d'attaque contre les Etats-Unis d'Amérique a été activé. En voyant les informations sur les attaques du 11 septembre 2001, il a réalisé qu'il avait été averti de celles-ci (§§ 169 à 180). Ces éléments ne mentionnent pas la BANQUE CENTRALE. Les explications subséquentes (§§ 174 à 190) selon lesquelles aucune des autorités occidentales contactées par ce témoin ne l'ont pris au sérieux est aussi sans rapport avec les faits du 11 septembre 2001. Le même témoin (§§ 191 à 197) indique encore que la REPUBLIQUE ISLAMIQUE D'IRAN avait acheté en secret un simulateur de vol pour le genre

40

d'avions qui ont été détournés pour commettre les attentats du 11 septembre 2001. Ce simulateur a été installé près de Téhéran et a probablement été utilisé pour l'entraînement des terroristes. Au moins l'un d'eux a séjourné en Iran avant les attaques. Ces éléments ne mentionnent pas la BANQUE CENTRALE.

Le document explique ensuite (section *Iran's Provision of Save Haven to al Queda ; Proposed findings of fact, §§ 146 à 153 ; Findings of fact*, §§ 198 à 205) le support apporté par la REPUBLIQUE ISLAMIQUE D'IRAN pour évacuer les responsables et les combattants de l'organisation AL QUAIDA d'Afghanistan après que ce pays a été attaqué par une coalition internationale suite aux attentats du 11 septembre 2001. Ces éléments ne mentionnent pas la BANQUE CENTRALE et sont de toute façon postérieurs aux attentats du 11 septembre 2001, de sorte qu'ils sont sans pertinence sur les responsabilités à leur égard.

Au titre d'autres éléments (section *Other findings ; Proposed findings of fact*, §§ 154 à 158 ; *Findings of fact*, §§ 206 à 209), seul le document *Proposed findings of fact* souligne que l'affirmation d'une personne impliquée selon laquelle l'organisation AL QUAIDA n'aurait pas eu besoin d'aide pour perpétrer les attentats du 11 septembre 2001 ne serait pas crédible (§154). Ce point ne mentionne pas la BANQUE CENTRALE. Les deux documents poursuivent en relevant encore une fois la volonté de la REPUBLIQUE ISLAMIQUE D'IRAN et de ses dirigeants de nuire aux Etats-Unis d'Amérique (§ 155, respectivement § 206). Cet élément est sans rapport avec les faits du 11 septembre 2001. Ils indiquent ensuite le support fourni par la REPUBLIQUE ISLAMIQUE D'IRAN à l'exécution des attentats en assistant à l'assassinat d'une personne en Afghanistan qui aurait supporté des mesures de représailles en Afghanistan après l'exécution des attentats (§ 156, respectivement § 207) et en assurant le transport de terroristes et de fonds monétaires à travers son territoire (§§ 157 à 158, respectivement §§ 208 à 209). Ces éléments ne mentionnent pas la BANQUE CENTRALE.

Les documents passent ensuite en revue les dépositions de 8 témoins (*Proposed findings of fact*, §§ 159 à 225 ; *Findings of fact*, §§ 210 à 276).

D'après le premier témoin (Dietrich L. Snell ; §§ 159 à 162, respectivement §§ 210 à 213), un nombre substantiel de membres des commandos du 11 septembre 2001 ont traversé l'Iran pour se rendre en Afghanistan et au Pakistan et les autorités iraniennes se sont abstenues de tamponner

41

leurs passeports. L'Iran a joué un rôle important pour faciliter les attaques du 11 septembre 2001. Ces éléments ne mentionnent pas la BANQUE CENTRALE.

Pour le deuxième témoin (Dr. Daniel L. Byman ; §§ 163 à 172, respectivement §§ 214 à 223), l'assistance apportée par la REPUBLIQUE ISLAMIQUE D'IRAN anticipait les attaques du 11 septembre 2001 à travers les facilités de voyage, l'offre de refuge et l'entraînement. La REPUBLIQUE ISLAMIQUE D'IRAN a offert des facilités de voyage aux auteurs des attentats. Ces éléments ne mentionnent pas la BANQUE CENTRALE. Pour le reste, ce témoin n'aborde pas la question spécifique des attentats du 11 septembre 2001.

Pour le troisième témoin (Janice L. Kephart, §§ 173 à 186, respectivement §§ 224 à 237), la REPUBLIQUE ISLAMIQUE D'IRAN a permis aux auteurs des attentats du 11 septembre 2001 de voyager à travers son territoire au cours de la préparation des attentats pour rejoindre l'Afghanistan ou le Pakistan, s'est abstenue de tamponner leurs passeports à ces occasions et a fourni son support logistique pour organiser des voyages internationaux. Ces éléments ne mentionnent pas la BANQUE CENTRALE.

Le quatrième témoin (Dr. Patrick Clawson ; §§ 187 à 191, respectivement § 238 à 242) reprend en termes généraux que la REPUBLIQUE ISLAMIQUE D'IRAN a supporté l'organisation AL QUAIDA et met les faits du 11 septembre 2001 en rapport avec les facilités de voyage et l'octroi d'un refuge. Ces éléments ne mentionnent pas la BANQUE CENTRALE. Pour le reste, ce témoin n'aborde pas la question spécifique des attentats du 11 septembre 2001.

Pour les cinquième et sixième témoins (Claire M. Lopez et Dr. Bruce D. Tefft ; §§ 192 à 201, respectivement §§ 243 à 252), la REPUBLIQUE ISLAMIQUE D'IRAN a permis entre 8 et 14 des auteurs des faits du 11 septembre 2001 d'obtenir des passeports et des visas pour les Etats-Unis d'Amérique. Ils disent que l'information des mois d'été 2001 sur l'imminence d'une attaque d'envergure émanait des autorités iraniennes et que le MINISTERE IRANIEN DE L'INFORMATION ET DE LA SECURITE avait acquis un simulateur de vol en vue de préparer les attaques du 11 septembre 2001. Ces éléments ne mentionnent pas la BANQUE CENTRALE.

Le septième témoin (Dr. Ronen Berman, §§ 202 à 220, respectivement §§ 253 à 271) discute pour l'essentiel le rôle général joué par la REPUBLIQUE ISLAMIQUE D'IRAN en rapport avec le développement du terrorisme. Ce n'est qu'à la fin qu'il met ses connaissances en lien avec les

42

attentats du 11 septembre 2001 pour dire que la REPUBLIQUE ISLAMIQUE D'IRAN a fourni des facilités de voyage, des moyens pour obtenir des passeports, visas et autres documents de transport afin de permettre l'entrée aux Etats-Unis d'Amérique en vue de la perpétration des attentats. Ces éléments ne mentionnent pas la BANQUE CENTRALE.

Le huitième témoin (Kenneth Timmerman ; §§ 221 à 225, respectivement §§ 272 à 276) s'explique d'une façon générale sur l'évolution historique des liens entre la REPUBLIQUE ISLAMIQUE D'IRAN et différentes organisations et explique d'une façon générale que les agents de la REPUBLIQUE ISLAMIQUE D'IRAN permettaient le voyage de membres de l'organisation AL QUAIDA à travers l'Iran sans tamponner leurs passeports, mais sans mettre ces faits en lien direct avec les auteurs des attentats. Il reprend les explications selon lesquelles un haut responsable de l'organisation HEZBOLLAH a accompagné différents membres des commandos du 11 septembre 2001 lors de voyages entre le Proche et le Moyen Orient. Ces éléments ne mentionnent pas la BANQUE CENTRALE. Pour le reste, ce témoin n'aborde pas la question spécifique des attentats du 11 septembre 2001.

Les documents s'attachent enfin aux conclusions en droit (*Proposed Conclusions of Law*, §§ 1 à 46 ; *Conclusions of Law*, §§ 1 à 35).

Ils règlent dans un premier temps les questions de compétence (section *The Court has Jurisdiction Over All Defendants and All Claims* ; §§ 2 à 16, respectivement §§ 2 à 11). Le document *Proposed Conclusions of Law Conclusions of Law* propose de retenir la compétence du tribunal américain au profit des citoyens américains sur base de la règle de droit américain visant les Etats sponsorisant le terrorisme introduite par le *Foreign Sovereign Immunities Act* (règle 28 U.S. Code § 605A(a)), en raison d'actes de meurtres extrajudiciaires et/ou de la fourniture de support matériel à ces fins et au profit des citoyens non-américains sur base des règles de droit américain issues du *Alien Tort Claims Act* (règle 28 U.S. Code §1350) et de la *Non Commercial Tort Exception* dérivant du *Foreign Sovereign Immunities Act* (règle 28 U.S. Code §1605(a)(5)) (§§ 2 à 14). Le document *Conclusions of Law* ne retient que la compétence du tribunal américain au profit des citoyens américains sur base de la règle 28 U.S. Code §1605A(a) (§§ 2 à 11).

Les documents règlent ensuite une question de procédure (§§ 15 à 16, respectivement, §§ 12 à13) qui est sans incidence sur la question à régler.

Au titre de la question des responsabilités (section *Defendants Are Liable for Damages to U.S. National Plaintiffs Under FISA § 1605A* ; §§ 17 à 38, respectivement §§ 14 à 35), les documents rappellent les exigences légales en droit américain (§§ 17 à 20, respectivement §§ 14 à 17) et décrivent ensuite quels faits à charge de la REPUBLIQUE ISLAMIQUE D'IRAN (§§ 21 à 23, respectivement §§ 18 à 20) et de l'organisation HEZBOLLAH (§§ 24 à 27, respectivement §§ 21 à 24) équivalent à un support matériel au sens de la loi : organisation, financement, facilitation des voyages et de l'entraînement des auteurs des attentats, logistique consistant en la fourniture de services, d'argent, de logement, d'entraînement, d'avis ou d'assistance d'experts, de refuges, de faux documents ou pièces d'identité et/ou de facilités de transport. Aux §§ 28 à 32, respectivement aux §§ 25 à 29, les documents reprennent des faits postérieurs aux attentats du 11 septembre 2001 qui doivent aux yeux du tribunal de céans être considérés comme étant sans lien causal avec ces derniers. Les §§ 33 et 34, respectivement les §§ 30 et 31 démontrent ensuite le lien causal entre les faits retenus contre les parties défenderesses et les dommages subis tel que requis par le droit américain. Ces conclusions s'attachent finalement à retenir la responsabilité 1/ des cinq ministères et de l'ORGANISATION ISLAMIQUE CORPS DES GARDES REVOLUTIONNAIRES comme subdivisions politiques de la REPUBLIQUE ISLAMIQUE D'IRAN et s'identifiant légalement à celle-ci au sens de la législation FSIA (§ 35, respectivement § 32), 2/ de l'organisation HEZBOLLAH, des quatre organismes publiques, de l'entreprise commerciale et de la BANQUE CENTRALE comme ayant agi en tant qu'agents ou outils de la REPUBLIQUE ISLAMIQUE D'IRAN (*agents or instrumentalities*) et responsables à ce titre en tant qu'agents au sens de la législation FSIA ou comme coconspirateurs, aidants ou assistants au sens de la législation ATCA (§ 36, respectivement, § 33), 3/ des deux défendeurs personnes physiques (l'Ayatollah Ali HOSSEINI-KHAMENEI et Ali Akbar HASHEMI RAFSANJANI) comme étant des officiels de la REPUBLIQUE ISLAMIQUE D'IRAN ayant agi dans les limites de leurs missions et s'identifiant à ce titre légalement à la REPUBLIQUE ISLAMIQUE D'IRAN de sorte à être responsables en tant qu'agents au sens de la législation FSIA ou en tant que coconspirateurs, aidants ou assistants au sens de la législation ATCA (§ 37, respectivement § 34) et de la REPUBLIQUE ISLAMIQUE D'IRAN (§ 38, respectivement § 35).

Le document *Proposed Conclusions of Law Conclusions of Law* contient encore une partie consacrée à la responsabilité des parties défenderesses sur base de la législation du *Alien Tort*

*Claims Act* à l'égard des personnes qui ne sont pas citoyen(ne)s américain(e)s (§§ 39 à 46). Ce passage est sans intérêt pour le présent litige.

En résumé, il faut retenir de ces développements que la responsabilité de la BANQUE CENTRALE est recherchée pour des événements dommageables commis sur le territoire des Etats-Unis d'Amérique (étant précisé que tant les actes reprochés aux auteurs directs du dommage qui sont tiers à la présente procédure que le dommage lui-même sont localisés aux Etats-Unis d'Amérique). La responsabilité de la BANQUE CENTRALE est recherchée

- au titre de ses actes personnels pour avoir permis, toléré ou effectué des transfert d'argent ayant profité en fin de compte à des activités terroristes
- au titre de sa qualité d'organe de la REPUBLIQUE ISLAMIQUE D'IRAN pour être responsable des actes de cette dernière dans la mesure où, dans le cadre général d'activités terroristes et dans le cadre particulier des faits du 11 septembre 2001, elle a mis en place une structure transnationale servant de soutien à la commission d'actes de terrorisme et où elle a permis l'organisation de voyages de terroristes, l'occultation des voyages de terroristes vers et depuis l'Afghanistan et le Pakistan où se trouvaient des camps d'entrainement, l'organisation de camps d'entraînement de terroristes et la fourniture d'explosifs.

Le tribunal note qu'il n'est ni allégué ni établi qu'un seul de ces actes reprochés à la BANQUE CENTRALE ou à la REPUBLIQUE ISLAMIQUE D'IRAN ait été accompli sur le territoire des Etats-Unis d'Amérique.

### 1.1.2.2.2.3. Dérogation à l'immunité de juridiction pour les actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées ?

Les PARTIES DEMANDERESSES font valoir que la coutume de l'immunité de juridiction des Etats aurait évolué en ce sens qu'elle ne s'appliquerait pas aux actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées en dehors du contexte d'un conflit armé international.

Le tribunal retient à titre liminaire que les PARTIES DEMANDERESSES ajoutent à bon escient la précision qu'il s'agit des actes accomplis « en dehors du contexte d'un conflit armé international », mais que cette précision n'apporte rien dans le cadre du présent litige. La précision

45

est ajoutée à bon escient alors que la Cour internationale de justice a estimé dans son arrêt du 3 février 2012, Immunités juridictionnelles de l'Etat, « *que le droit international coutumier impose toujours de reconnaitre l'immunité à l'Etat dont les forces armées ou d'autres organes sont accusés d'avoir commis sur le territoire d'un autre Etat des actes dommageables au cours d'un conflit armé* » (N° 78). La précision n'apporte cependant rien au débat alors que dans le cadre de la présente procédure, ce ne sont pas des actes de forces armées ou plus généralement des faits liés à un conflit armé entre Etats qui sont en cause.

Le tribunal précise à ce stade qu'il est constant en cause qu'il y a eu en l'espèce en date du 11 septembre 2001 des actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées.

La question à laquelle il importe de répondre est celle de savoir si le droit international public coutumier reflète l'existence de la dérogation alléguée par les PARTIES DEMANDERESSES et dans l'affirmative si les conditions de cette dérogation à l'immunité juridictionnelle des Etats sont remplies en l'espèce.

Sur l'existence de principe de la dérogation à l'immunité juridictionnelle des Etats tirée de l'existence d'actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées, il n'y a pas de divergence entre les parties. La BANQUE CENTRALE admet que le droit international public coutumier recèle une telle dérogation, attestée par les deux codifications de la matière des immunités d'Etat et la jurisprudence des juridictions internationales et nationales.

Les parties discutent les conditions et la réalisation des conditions propres à cette dérogation.

Pour situer cette discussion, le tribunal tient à titre liminaire à citer les dispositions consacrées à cette dérogation par les deux codifications du droit des immunités d'Etat :

-   Article 11 de la convention de 1972 : « *Un Etat contractant ne peut invoquer l'immunité de juridiction devant un tribunal d'un autre Etat contractant lorsque la procédure a trait à la réparation d'un préjudice corporel ou matériel résultant d'un fait survenu sur le territoire de l'Etat du for et que l'auteur du dommage y était présent au moment où ce fait est survenu* »

46

- Article 13 de la convention de 2004 : « ... *un Etat ne peut invoquer l'immunité de juridiction devant un tribunal d'un autre Etat, compétent en l'espèce, dans une procédure se rapportant à une action en réparation pécuniaire en cas de décès ou d'atteinte à l'intégrité physique d'une personne, ou en cas de dommage ou de perte d'un bien corporel, dus à un acte ou à une omission prétendument attribuables à l'Etat, si cet acte ou cette omission se sont produits, en totalité ou en partie, sur le territoire de cet autre Etat et si l'auteur de l'acte ou de l'omission était présent sur ce territoire au moment de l'acte ou de l'omission* ».

Bien qu'aucune de ces deux conventions ne soit en vigueur à l'état actuel, le tribunal estime qu'au regard de leur procédure d'adoption, qui fait qu'elles ont été approuvées par un nombre considérable d'Etats sans qu'il n'y ait eu d'objections spécifiques aux dispositions visées, elles revêtent une importance considérable, surtout au regard des règles qui s'y retrouvent à l'identique à 30 années d'intervalle, et sont de nature à démontrer l'*opinio iuris* sur le contenu de ces règles. Le tribunal décide encore à cet égard que les règles conventionnelles telles que citées ci-dessus constituent nécessairement un ensemble global qui réalise un certain équilibre entre différentes considérations, de sorte que sauf circonstances particulières, elles doivent être considérées en leur ensemble, sans pouvoir être décortiquées pour en appliquer certains aspects en dehors des autres, sous peine de porter atteinte audit équilibre.

- Est-ce que la dérogation s'applique uniquement aux actes *jure gestionis*, ou indistinctement aux actes *jure gestionis* et *jure imperii* ?

Les PARTIES DEMANDERESSES soutiennent que la dérogation à l'immunité de juridiction par elles invoquée s'appliquerait aux deux catégories d'actes, de sorte qu'il n'y aurait pas lieu de s'interroger sur la question de savoir de quelle catégorie relèveraient les faits reprochés à la BANQUE CENTRALE.

La BANQUE CENTRALE pour sa part soutient que la distinction devrait être opérée dans la mesure où la dérogation ne jouerait que pour les actes *jure gestionis*, et que les faits qui lui sont reprochés ne relèveraient pas de cette catégorie. Il faudrait encore déduire de l'argument des PARTIES DEMANDERESSES selon lequel la BANQUE CENTRALE s'identifierait à la REPUBLIQUE ISLAMIQUE D'IRAN que les faits lui reprochés se situeraient nécessairement dans une sphère de souveraineté étatique impliquant leur qualification en tant qu'actes *jure imperii*.

47

La question de la distinction entre les deux catégories d'actes avait été abordée par la Cour internationale de justice dans l'affaire des Immunités juridictionnelles de l'Etat. Dans son arrêt du 3 décembre 2012, la Cour n'y répond cependant pas directement, alors qu'elle écrit que « *La Cour estime qu'elle n'est pas, en l'espèce, appelée à trancher la question de savoir s'il existe, en droit international coutumier, une « exception territoriale » à l'immunité de l'Etat applicable aux actes jure imperii en général. Il lui faut seulement se prononcer sur les actes commis, sur le territoire de l'Etat du for, par les forces armées d'un Etat étranger et d'autres organes de celui-ci agissant en coopération avec lesdites forces dans le cadre d'un conflit armé* » (N° 65). Hazel FOX y voit une indication implicite que l'exception couvre les deux catégories d'actes (op. cit., page 478). Edward Chukwuemeke OKEKE considère aussi que l'exception ne distingue pas entre les deux catégories d'actes (op. cit., page 123). Les deux codifications du droit des immunités d'Etat (article 11 de la convention de 1972 et l'article 12 de la convention de 2004) ne comprennent pas de limitation de la dérogation aux seuls actes *jure gestionis*. Une étude consacrée à la convention de 2004 retient aussi que l'intention lors de la rédaction de la disposition afférente était de lui conférer un champ d'application large et d'y inclure les deux catégories d'actes (La convention des Nations Unies sur les immunités juridictionnelles des États et de leurs biens, Gerhard Hafner et Léonore Lange, Annuaire français de droit international, 2004, pages 66 et suivants).

En l'absence d'éléments allant en sens contraire, le tribunal estime établi que la dérogation s'applique à toutes catégories d'actes des Etats.

- Est-ce que le jeu de la dérogation requiert que le fait dommageable ait été commis sur le territoire de l'Etat du for ?

La BANQUE CENTRALE affirme l'existence de cette condition en droit international public coutumier et soutient qu'elle ne serait pas remplie devant le juge luxembourgeois actuellement saisi, dès lors que le fait dommageable a eu lieu aux Etats-Unis d'Amérique. En ce sens, la dérogation à l'immunité juridictionnelle ouvrirait l'accès au for du lieu d'accomplissement de l'acte dommageable, mais ne pourrait plus jouer devant le juge de l'exequatur.

Les PARTIES DEMANDERESSES y opposent que cette condition ne saurait valoir que dans l'Etat du for saisi du fond du litige, mais qu'elle ne saurait trouver à s'appliquer par rapport au territoire de l'Etat du juge de l'exequatur, puisque celui-ci devrait statuer comme s'il était le juge

48

du fond. Le juge de l'exequatur devrait donc statuer comme s'il était le juge américain et constater que la condition tenant au lieu d'accomplissement de l'acte dommageable sur son territoire est remplie.

Aucune des parties ne conteste en principe l'existence de cette condition qui est destinée, à l'instar de celle examinée au point suivant, à assurer un lien étroit entre l'Etat du for et l'action dommageable. Il importe toutefois d'en préciser la portée quant à la question de savoir quel acte, action ou activité doit être pris en considération pour examiner si cette condition est remplie. Il existe en effet une différence fondamentale entre la prise en compte de l'acte de l'auteur direct du dommage lorsque celui-ci n'est pas le bénéficiaire potentiel de l'immunité de juridiction et l'acte du bénéficiaire potentiel de l'immunité de juridiction lorsqu'il n'est pas l'auteur direct du fait dommageable. S'il se peut que tant l'auteur direct du fait dommageable que le bénéficiaire potentiel de l'immunité de juridiction aient agi sur le territoire de l'Etat du for, il est tout aussi bien possible que les lieux de réalisation des deux actions se différencient, soit que l'auteur direct ait agi sur le territoire de l'Etat du for et le bénéficiaire de l'immunité de juridiction en dehors de ce territoire, soit à l'inverse que le bénéficiaire potentiel de l'immunité ait agi sur le territoire de l'Etat du for mais que l'auteur direct du dommage ait agi en dehors de ce territoire.

Or, dans la mesure où la condition sous examen trouve sa justification dans l'établissement d'un lien étroit entre le territoire de l'Etat du for et l'activité de l'Etat invoquant l'immunité de juridiction, la condition ne saurait être interprétée autrement que comme requérant que l'activité du bénéficiaire potentiel de l'immunité de juridiction puisse être localisée sur le territoire de l'Etat du for pour que la dérogation à l'immunité de juridiction puisse jouer.

Toutefois, et sous peine de priver cette condition de tout effet utile, elle ne saurait être appliquée tel que le soutient la BANQUE CENTRALE comme requérant qu'il existe un lien entre le territoire de l'Etat du juge de l'exequatur et le lieu de l'acte à prendre en considération, en ce que ce dernier devrait avoir été commis sur le territoire de l'Etat du juge de l'exequatur. Une telle solution reviendrait à priver de toute circulation internationale les décisions rendues à l'encontre d'un Etat sur base de la dérogation sous examen, alors que l'acte ne peut en principe être localisé qu'en un seul endroit.

La condition ne saurait cependant pas non plus être appliquée, tel que le soutiennent les PARTIES DEMANDERESSES, devant le seul juge saisi du fond, à l'exclusion du juge de l'exequatur, sous

49

peine de la priver de toute portée dans le cadre d'une demande en exequatur. Aucun élément avancé par les parties ne permet d'opérer à son égard une distinction entre le juge du fond et le juge de l'exequatur.

Ce dilemme ne peut être résolu qu'en retenant que le juge de l'exequatur statue « comme si » il était juge du fond et vérifie, afin de statuer sur le bénéfice de l'immunité de juridiction dans son for, si le fait à prendre en considération a été commis sur le territoire de l'Etat du juge du fond.

En l'espèce, il ne fait pas de doute que le fait dommageable, i.e. les attentats du 11 septembre 2001, a été commis sur le territoire des Etats-Unis d'Amérique. Toutefois, la procédure devant le tribunal américain ne tendait pas à mettre en cause la responsabilité des auteurs directs de ces attentats, mais la responsabilité de la BANQUE CENTRALE en ce que celle-ci aurait facilité par ses actes et/ou abstentions l'exécution de ces attentats. Or, la description des faits fournie dans le cadre de la procédure judiciaire devant le tribunal américain ne fait ressortir aucune activité de la BANQUE CENTRALE sur le territoire des Etats-Unis d'Amérique, ni surtout une activité de la BANQUE CENTRALE sur le territoire des Etats-Unis d'Amérique qui ait pu contribuer à rendre les attentats possibles ou plus faciles à réaliser.

La condition n'est partant pas remplie.

- Est-ce que le jeu de la dérogation requiert que l'Etat défendeur dont la responsabilité est recherchée, respectivement ses agents auxquels sont imputés les faits litigieux, doit avoir été présent sur le territoire de l'Etat du for ?

La BANQUE CENTRALE soutient qu'elle n'a pas été présente sur le territoire des Etats-Unis d'Amérique et ne pouvait donc poser aucun des actes de soutien qui lui sont reprochés sur le territoire des Etats-Unis d'Amérique et que les auteurs ayant perpétré les attentats du 11 septembre 2001 ne sauraient être qualifiés comme étant ses agents.

Les PARTIES DEMANDERESSES pour leur part plaident que cette condition n'est pas comprise dans le droit international public coutumier. Il suffirait de constater que le fait dommageable a été commis sur le territoire de l'Etat du for pour que la dérogation puisse jouer. Si une telle condition devait exister, elle ne pourrait trouver à s'appliquer que devant le juge du fond, et non pas devant le juge de l'exequatur. La condition serait en tout état de cause remplie compte tenu de la présence de la représentation permanente de la REPUBLIQUE ISLAMIQUE D'IRAN auprès des Nations

50

Unies à New York et d'un bureau de la REPUBLIQUE ISLAMIQUE D'IRAN à Washington, D.C..

Les deux codifications du droit des immunités d'Etat retiennent à l'identique la condition d'une présence de l'Etat défendeur sur le territoire de l'Etat du for au moment de l'acte dommageable.

Les PARTIES DEMANDERESSES y opposent les législations de neuf Etats qui ne renfermeraient pas pareille condition. Le tribunal note cependant d'une part qu'il s'agit là d'une infime minorité des presque 200 Etats existants à l'heure actuelle sur le globe terrestre et que seules deux de ces législations (Israël et Japon) sont postérieures à la convention des Nations Unies de 2004, alors que les autres y sont antérieures (Etats-Unis d'Amérique, Argentine, Australie, Canada, Royaume Uni, Afrique du Sud, Singapour). La portée de ces législations nationales est par ailleurs réduite par le constat que le Japon a ratifié la convention de 2004 et que le Royaume Uni y participe, mettant ainsi en doute la pertinence de leurs législations nationales au regard tant du contenu de la coutume internationale que de l'*opinio iuris* qui délimiterait la coutume internationale en faisant abstraction de cette condition.

Le tribunal note encore que la Cour européenne des droits de l'homme a admis que cette condition faisait partie du droit international public coutumier (Arrêt du 21 novembre 2001, Al-Adsani/Royaume-Uni, N° 35763/97, CEDH 2001-XI).

Les nécessités tenant à une application restrictive des exceptions au principe de l'immunité juridictionnelle et à une application coordonnée de l'exception telle que figurant dans les deux conventions appellent à devoir inclure cette condition dans le droit international public coutumier. Par ailleurs, elle doit être appliquée comme requérant la présence de l'Etat ou de ses agents sur le territoire de l'Etat du for à l'époque du fait dommageable et en rapport avec l'accomplissement du fait dommageable.

En l'espèce, il n'est allégué d'aucune présence de la BANQUE CENTRALE sur le territoire des Etats-Unis d'Amérique en tant qu'Etat du for qui puisse être mise en relation avec les faits dommageables. Il ne suffit pas aux demandeurs de faire état d'une présence générale de la REPUBLIQUE ISLAMIQUE D'IRAN en tant qu'Etat et de la supposée qualité de simple agent de la BANQUE CENTRALE pour que cette condition soit remplie.

La condition n'est partant pas remplie.

Il résulte de ce qui précède que les PARTIES DEMANDERESSES ne peuvent pas faire état à leur profit de l'exception à l'immunité de juridiction tirée de l'existence d'actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées.

### 1.1.2.2.2.4. Dérogation à l'immunité de juridiction pour les actes de terrorisme et pour les actes violant une norme de *jus cogens* ?

Les PARTIES DEMANDERESSES font valoir que des actes de terrorisme constitueraient des actes graves qui seraient unanimement condamnés à travers le monde, et qu'ils constitueraient des actes *jure gestionis*. De tels actes engageraient la responsabilité internationale de l'Etat les ayant commis ou y ayant contribué et il serait de la responsabilité de tous les Etats de combattre le terrorisme. Le droit international public serait favorable à la levée de l'immunité juridictionnelle à l'encontre des Etats qui ont participé à de tels actes. Les législations des Etats-Unis d'Amérique et du Canada couleraient dans le droit écrit cette approche du droit international public en privant de leur immunité les Etats qui ont sponsorisé le terrorisme. L'état du droit internationale public, tant en ce qui concerne la notion d'acte de terrorisme qu'en ce qui concerne la notion d'actes commis en violation du *jus cogens*, n'interdirait pas aux juridictions de déroger à la règle de l'immunité juridictionnelle au détriment des Etats qui se seraient rendus responsables de tels actes.

La BANQUE CENTRALE conteste l'existence de la dérogation invoquée par les PARTIES DEMANDERESSES. Elle développe que la jurisprudence constante tant de la Cour internationale de justice que de la Cour européenne des droits de l'homme maintiendrait l'immunité de juridiction dans les affaires mettant en cause des actes de terrorisme ou des violations du *jus cogens*. La gravité de l'acte reproché à l'Etat défendeur n'aurait aucune incidence sur l'application de l'immunité juridictionnelle.

Par leur moyen, les PARTIES DEMANDERESSES font valoir l'existence d'une exception au principe de l'immunité de juridiction des Etats qui tiendrait à l'exécution d'actes dommageables d'une particulière gravité au regard de leur motivation sous-jacente lorsque celle-ci tiendrait à un dessein terroriste, respectivement au regard de la norme enfreinte lorsque l'acte dommageable porterait atteinte à un droit supérieur ressortant du *jus cogens*. Pour prospérer dans leur argumentaire, il ne leur suffit cependant pas d'établir que le droit international public n'interdirait pas l'octroi de l'immunité juridictionnelle dans de tels cas de figure. Il leur appartient au contraire

d'établir positivement que le droit international public coutumier a consacré une telle dérogation. Cette preuve n'est pas rapportée.

Les PARTIES DEMANDERESSES ne démontrent en effet aucune pratique internationale qui ferait application d'une dérogation à l'immunité juridictionnelle en ce qui concerne les actes de terrorisme, à l'exception de la législation des Etats-Unis d'Amérique (qui a dû être amendée à plusieurs reprises pour la rendre opérationnelle ; voy, Edward Chukwuemeke Okeke, Juridictional Immunities of States and International Organizations, Oxford University Press, 2018, pages 144 et ss.) et du Canada. La doctrine qualifie cette exception comme étant controversée (voy. Okeke, op. cit., page 143) et parle de « anomalie américaine » (« *American Anomaly* », voy. Okeke, op. cit., 148).

A l'inverse, la Cour internationale de justice nie l'existence d'une dérogation à l'immunité de juridiction en raison de la gravité de l'acte (Cour internationale de justice, 3 février 2012, Immunités juridictionnelles de l'Etat, Allemagne c. Italie, Grèce (intervenant), N° 91 : « *La Cour conclut que, en l'état actuel du droit international coutumier, un Etat n'est pas privé de l'immunité pour la seule raison qu'il est accusé de violations graves du droit international, des droits de l'homme ou du droit international des conflits armés* »). Cette conclusion vaut aussi pour les actes qualifiés de terroristes.

Pour les besoins de l'examen du moyen de défense tiré de l'immunité de juridiction, de tels actes ne sont à considérer que sous la seule qualification d'actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées tels qu'envisagés ci-dessus et au regard desquels le tribunal a décidé que les conditions de la dérogation au principe de l'immunité juridictionnelle ne sont pas remplies.

Pour ce qui concerne les actes constitutifs de la violation de normes supérieures issues du *jus cogens*, c'est à bon droit que la BANQUE CENTRALE souligne que la jurisprudence des juridictions internationales nie l'existence d'une dérogation à la règle de l'immunité juridictionnelle (Cour internationale de justice, 3 février 2012, Immunités juridictionnelles de l'Etat, Allemagne c. Italie, Grèce (intervenant), N° 97 : « *En conséquence, la Cour conclut que, même en admettant que les actions intentées devant les juridictions italiennes mettaient en cause des violations de règles de* jus cogens, *l'application du droit international coutumier relatif à l'immunité des Etats ne s'en trouvait pas affectée* »).

53

Il résulte de ce qui précède que les PARTIES DEMANDERESSES ne peuvent pas faire état à leur profit de l'exception à l'immunité de juridiction tirée de l'accomplissement d'actes de terrorisme ou d'actes violant une norme de *jus cogens*.

### 1.1.2.2.3.   Incidence de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales

L'efficacité de l'immunité de juridiction est confrontée à un principe général du droit consacré par la Convention de sauvegarde des droits de l'homme et des libertés fondamentales du 4 novembre 1950, entrée en vigueur le 3 septembre 1953, et à ce jour en vigueur entre les 47 Etats membres du Conseil de l'Europe, dont le Luxembourg. L'article 6 de cette Convention consacre dans le droit positif supranational le droit au procès équitable, incluant le droit pour tout individu d'avoir accès à un tribunal pour voir statuer sur les contestations sur ses droits et obligations de caractère civil (Jacques Velu et Rusen Ergec, Convention européenne des droits de l'homme, Bruylant, 2e édition, 2014, N° 449 et suivants).

La circonstance que ni la REPUBLIQUE ISLAMIQUE D'IRAN en tant qu'Etat d'origine de la BANQUE CENTRALE, ni les ETATS-UNIS D'AMERIQUE en tant qu'Etat du for au fond et d'Etat de la résidence et/ou de la nationalité des PARTIES DEMANDERESSES ne soient parties à cette convention n'impacte pas sur l'applicabilité et l'application de ces principes devant le présent tribunal saisi de la demande en exequatur, dès lors qu'il s'agit de principes d'application universelle qu'il appartient aux organes des Etats membres à ladite convention de respecter et de faire respecter en tout état de cause.

Le tribunal constate que l'interaction entre la règle de droit international public coutumière de l'immunité de juridiction protectrice des Etats et des relations internationales et la règle de droit positif du droit d'accès au tribunal protectrice des droits des particuliers n'est pas ou peu thématisée dans les cénacles du droit international public. Ainsi, la décision phare en matière d'immunités juridictionnelles adoptée par la Cour internationale de justice, à laquelle se réfèrent les deux parties (arrêt du 3 février 2012, Immunités juridictionnelles de l'Etat, Allemagne c. Italie, Grèce (intervenant)), n'aborde pas la question. Seules certaines opinions individuelles ou dissidentes en traitent (voy. de façon limitée l'opinion individuelle de M. le juge Bennouna et l'opinion dissidente de M. le juge ad hoc Gaja et de façon plus extensive l'opinion dissidente de M. le juge Cancado Trindade et l'opinion dissidente de M. le juge Yusuf ; ces opinions opèrent en

54

règle générale un lien avec la gravité de la violation de la règle de droit induisant le cas échéant la responsabilité de l'Etat concerné ; M. le juge Cancado Trindade a repris ses développements in The Primacy of the Right of Access to Justice over the Undue Invocation of State Immunities in Face of International Crimes, *Liber amoricum* Dean Spielmann, Mélanges en l'honneur de/Essays in Honour of Dean Spielmann, pages 65). La Cour européenne des droits de l'homme a été amenée à examiner le lien entre les deux règles pour faire prévaloir en règle générale la règle de l'immunité de juridiction (voy. notamment Arrêts du 21 novembre 2001, Al-Adsani/Royaume-Uni, N° 35763/97, CEDH 2001-XI, Fogarty/Royaume-Uni, N° 37112/97, CEDH 2001-XI et McElhinney/Irlande, N° 31253/96, CEDH 2001-XI en matière d'immunité des Etats ; Arrêts du 18 février 1999 Waite et Kennedy/Allemagne, N° 26083/94, CEDH 1999-I et Beer et Regan/Allemagne, N° 28934/95, 18 février 1999 en matière d'immunité des organisations internationales ; pour une présentation doctrinale, voy. Droit des immunités et exigences du procès équitable, Actes du colloque du 30 avril 2004, contribution de F. Sudre, La jurisprudence de la Cour européenne des droits de l'homme, pages 21 à 24).

En doctrine, les auteurs ressortant du domaine du droit international public n'abordent en règle générale pas la question (voy. notamment Hazel Fox & Philippa Web, The Law of State Immunity, Oxford University Press, 3ᵉ édition ; Edward Chukwuemeke Okeke, Juridictional Immunities of States and International Organizations, Oxford University Press, 2018). Les auteurs traitant des droits fondamentaux des personnes examinent l'interaction entre les deux règles et critiquent l'approche adoptée en ce domaine par la Cour européenne des droits de l'homme qui ne tiendrait pas suffisamment compte des exigences de protection des droits fondamentaux et des prérogatives et des droits conférés aux particuliers par la Convention de sauvegarde des droits de l'homme et des libertés fondamentales (voy. Droit des immunités et exigences du procès équitable, Actes du colloque du 30 avril 2004, contribution de F. Sudre, La jurisprudence de la Cour européenne des droits de l'homme, pages 24 à 31 ; Mirjam Baldegger, Das Spannungsverhältnis zwischen Staatenimmunität, diplomatischer Immunität und Menschenrechten, Helbing Lichtenhahn Verlag Nomos Verlag, pages 145 et suivantes ; Burkhard Hess, The Private-Public Divide in International Dispute Resolution, Pocketbook of The Hague Academy of International Law, N° 216 et suivants ; Sally El Sawah, Les immunités des Etats et des organisations internationales, Immunités et procès inéquitable, Larcier, 2012 ; Catherine Kessedjian, Immunités, in Encyclopédie Dalloz Procédure civile, N° 116 et ss, qui estime, par rapport à la question des violations du *jus cogens*, que

55

« L'opinion dissidente commune des juges Rozakis et Caflisch à laquelle se sont ralliés quatre autres juges [dans l'affaire Al-Adsani/Royaume-Uni jugée par la Cour européenne des droits de l'homme], montre la voie à suivre »).

La règle écrite de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales garantissant l'accès à la justice et la règle coutumière de l'immunité de juridiction des Etats constituent deux règles d'égale valeur dans l'agencement juridique international. Ces deux règles entrent en conflit en ce que le droit d'accès à la justice reconnu au profit des particuliers constitue une limite à l'invocation de l'immunité juridictionnelle au profit des Etats, et en sens inverse en ce que le droit à l'immunité juridictionnelle reconnu au profit des Etats constitue une limite à l'exercice du droit d'accès à la justice profitant aux particuliers. En tant que normes conflictuelles, il convient de les interpréter et de les appliquer de façon à les concilier autant que faire se peut afin de préserver à chacune d'elles ses fondements et ses objectifs (qui sont la prééminence du droit pour le droit d'accès au tribunal et le respect du droit international afin de favoriser la courtoisie et les bonnes relations entre États, grâce au respect de la souveraineté d'un autre État, pour l'immunité juridictionnelle), notamment au stade de la délimitation de leurs champs d'application respectifs (voy. en ce sens l'opinion dissidente du juge Loucaides dans l'affaire Al-Adsani jugée par la Cour européenne des droits de l'homme : « Toute forme d'immunité générale, qu'elle repose sur le droit international ou le droit national, qu'un tribunal applique afin de faire totalement barrage à une décision judiciaire sur un droit de caractère civil sans mettre en balance les intérêts concurrents, à savoir ceux que protège l'immunité dont il s'agit et ceux tenant à la nature de la demande spécifique qui est l'objet de la procédure pertinente, s'analyse en une limitation disproportionnée à l'article 6 § 1 de la Convention que, par ce motif, elle enfreint. Les tribunaux devraient pouvoir mesurer les intérêts concurrents qu'il y a à accorder une immunité ou à permettre une décision judiciaire sur un droit de caractère civil, après examen de l'objet de la procédure. ... D'après moi, il y a incompatibilité dans tous les cas où l'application de ces immunités est automatique sans la mise en balance des intérêts concurrents que j'ai évoquée plus haut » ; voy. aussi Mirjam Baldegger, Das Spannungsverhältnis zwischen Staatenimmunität, diplomatischer Immunität und Menschenrechten, Helbing Lichtenhahn Verlag Nomos Verlag, pages 260 et suivantes).

Dans le cadre de cette mise en balance des intérêts respectifs, le tribunal est amené à tenir compte, outre des raisons qui fondent l'existence des deux principes en conflit, des circonstances particulières de l'espèce telles que décrites ci-dessus, et plus particulièrement du critère juridique retenu par le tribunal américain pour écarter l'immunité de juridiction et pour fonder sa compétence internationale.

Ce critère réside dans une règle issue du *Foreign Sovereign Immunities Act*, inscrite à la règle 28 U.S. Code §1605A(a), généralement qualifiée de *Terrorist Exception*, rédigée comme suit :

*(a) In General*

*(1) No immunity*

*A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.*

*(2) Claim heard - The court shall hear a claim under this section if*

*(A)*

*(i)*

*(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or*

*(II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and*

57

> *Related Programs Appropriations Act, 1997 (as contained in section 101(c) of*
> *division A of Public Law 104–208) was filed;*
>
> *(ii) the claimant or the victim was, at the time the act described in paragraph (1)*
> *occurred*
>
> > *(I) a national of the United States;*
> >
> > *(II) a member of the armed forces; or*
> >
> > *(III) otherwise an employee of the Government of the United States, or of an*
> > *individual performing a contract awarded by the United States Government,*
> > *acting within the scope of the employee's employment; and*
>
> *(iii) in a case in which the act occurred in the foreign state against which the claim*
> *has been brought, the claimant has afforded the foreign state a reasonable opportunity*
> *to arbitrate the claim in accordance with the accepted international rules of*
> *arbitration; or*
>
> *(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in*
> *the United States District Court for the District of Columbia.*

Le tribunal constate qu'il s'agit là d'une règle de droit national exorbitante du droit international qui justifie tant la compétence internationale des tribunaux américains que la dérogation à l'immunité de juridiction sur base de la qualification de l'Etat défendeur comme étant un Etat sponsorisant le terrorisme par acte du pouvoir exécutif sans requérir la commission spécifique d'actes dommageables sur le territoire des Etats-Unis d'Amérique et/ou la présence de cet Etat sur le territoire des Etats-Unis d'Amérique. Or, si la Convention de sauvegarde des droits de l'homme et des libertés fondamentales requiert de garantir l'accès à la justice, elle requiert tout autant que les droits procéduraux fondamentaux de chacune des parties soient respectés.

La mise en balance de l'ensemble des intérêts en présence amène dès lors à considérer que l'atteinte au droit d'accès au tribunal des PARTIES DEMANDERESSES par l'admission de l'immunité de juridiction au profit de la BANQUE CENTRALE n'est pas disproportionnée.

Il y a partant lieu de dire la demande irrecevable pour autant que dirigée contre la BANQUE CENTRALE.

### 1.2.Conditions de l'exequatur

Eu égard à la décision prise au titre de l'immunité de juridiction, l'examen des conditions juridiques posées à l'exequatur des décisions américaines devient sans objet.

## 2.  La demande en tant que dirigée contre les PARTIES ETATIQUES IRANIENNES

Pour les besoins des développements, la REPUBLIQUE ISLAMIQUE D'IRAN, l'Ayatollah Ali HOSSEINI-KHAMENEI, Ali Akbar HASHEMI RAFSANJANI, le MINISTERE IRANIEN DE L'INFORMATION ET DE LA SECURITE, l'ORGANISATION ISLAMIQUE CORPS DES GARDES REVOLUTIONNAIRES, le MINISTERE IRANIEN DU PETROLE, le MINISTERE IRANIEN DES AFFAIRES ECONOMIQUES ET DES FINANCES, le MINISTERE IRANIEN DU COMMERCE et le MINISTERE IRANIEN DE LA DEFENSE ET DE LA LOGISTIQUE DES FORCES ARMEES sont ici collectivement désignés par les PARTIES ETATIQUES IRANIENNES.

A l'instar de la BANQUE CENTRALE, LES PARTIES ETATIQUES IRANIENNES s'opposent à la demande en invoquant d'une part l'immunité juridictionnelle et en contestant d'autre part que les conditions pour l'octroi de l'exéquatur soient réunies.

### 2.1.Immunité de juridiction

### 2.1.1.  Positions des parties

### 2.1.1.1.Les PARTIES ETATIQUES IRANIENNES

Les PARTIES ETATIQUES IRANIENNES invoquent à leur profit l'immunité de juridiction des Etats souverains pour faire valoir que le tribunal d'arrondissement de Luxembourg serait incompétent pour connaître de la demande en exequatur, sinon que celle-ci devrait être déclarée irrecevable.

Elles expliquent que l'immunité des Etats souverains serait un principe de droit coutumier international universellement admis, et en tout cas par l'ordre juridique luxembourgeois, et formerait obstacle à ce que les juridictions étatiques connaissant d'actions en justice dirigées contre un bénéficiaire de cette immunité dans la mesure où l'action mettrait en cause des actes accomplis dans le cadre de l'exercice de la puissance publique (*acta jure imperii*), et non pas des actes de gestion privée (*acta jure gestionis*). L'immunité s'appliquerait aux actes accomplis dans le cadre

59

de l'exercice de la puissance publique peu importe que ces actes soient licites ou non, et il appartiendrait à la partie demanderesse qui entend voir écarter le privilège de l'immunité de juridiction de démontrer que l'acte en cause ne relèverait pas de l'exercice de la puissance publique mais de la gestion privée.

Tant l'Etat que ses ministères en tant qu'émanations de l'Etat et les chefs d'Etat et de gouvernement actuels et passés bénéficieraient pleinement de cette immunité.

Le moyen tiré de l'invocation du privilège de l'immunité aurait été soulevé dans leur premier corps de conclusions.

On ne saurait déduire de leur intervention volontaire dans l'action en référé intentée par la BANQUE CENTRALE pour combattre une mesure de saisie-arrêt sur les comptes bancaires de cette dernière auprès de la société CLEARSTRAM qu'elles auraient renoncé au bénéfice de l'immunité. Une telle renonciation devrait être certaine, expresse et non-équivoque, tant par référence aux règles générales régissant la notion de renonciation que par référence aux textes normatifs internationaux qui règlent la question de la renonciation au privilège de l'immunité. En suivant les développements exposés par la BANQUE CENTRALE pour contester toute renonciation dans son chef par cette dernière, les PARTIES ETATIQUES IRANIENNES soutiennent que cette action en tant que telle ne vaudrait pas renonciation, alors qu'elle n'aurait eu que pour but de combattre dans l'urgence une mesure de saisie-arrêt illégale. Elles auraient de toute façon pris soin dans le cadre de cette action en référé d'insister sur le bénéfice de leur immunité. Si cette action en référé devait être considérée comme étant constitutive d'une renonciation à l'immunité, il conviendrait de retenir que cette renonciation n'aurait valu que pour les besoins de cette action en référé, et non pas pour la présente action en exequatur. Enfin, les PARTIES ETATIQUES IRANIENNES font valoir qu'il faudrait opérer à ce stade une différenciation entre immunité de juridiction et immunité d'exécution, en ce qu'une éventuelle renonciation à l'immunité de juridiction, i.e. l'acceptation qu'une juridiction étatique exerce sa juridiction à l'encontre d'une entité souveraine d'un autre Etat, n'impliquerait pas acceptation de la part de cette entité que des mesures de contrainte soient adoptées à son égard.

Sur la question des restrictions au privilège de juridiction, les PARTIES ETATIQUES IRANIENNES relèvent que si le privilège de l'immunité n'a pas vocation à s'appliquer aux activités commerciales ou privées d'un Etat souverain et de ses émanations (et ce par voie

60

d'exception alors que le privilège serait le principe), il faudrait toutefois constater en l'espèce que la juridiction d'origine n'aurait pas retenu dans leur chef une activité commerciale ou privée, mais une activité de soutien à des actes de terrorisme (reproche qui serait sans fondement), et qu'une telle activité ne relèverait pas du champ d'application de la dérogation au principe de l'immunité. La demande en exequatur d'un jugement portant sur des actes tels que ceux qui leur sont reprochés relèverait ainsi du privilège d'immunité.

Les PARTIES ETATIQUES IRANIENNES soutiennent ensuite que les PARTIES DEMANDERESSES feraient à tort état de l'exception au privilège d'immunité tenant à la nature de l'action en ce qu'elle tendrait à la réparation d'un préjudice corporel ou matériel tel que cette exception serait admise en droit international (*tort exception*). Elles relèvent en premier lieu que la décision américaine n'aurait pas établi la compétence du juge américain sur base d'une telle règle dérogatoire, mais sur base d'une règle spécifique au droit américain faisant exception à l'immunité des Etats lorsque l'action prend appui sur des actes de soutien au terrorisme (*specific acts of state-sponsored terrorism*). Cette exception serait particulière au droit des Etats-Unis, ne se confondrait pas avec l'exception tirée de la responsabilité délictuelle et l'invocation de cette exception devant la juridiction américaine formerait obstacle à l'invocation de l'exception tirée des actes de gestion commerciale.

Tout en relevant ensuite que de toute façon une telle exception liée aux actes de responsabilité délictuelle ne semblerait pas internationalement établie lorsque le préjudice corporel ou matériel trouve son origine dans un acte de *jure imperii*, les PARTIES ETATIQUES IRANIENNES plaident d'une part que les différents textes qui prévoient une telle dérogation requièrent d'une part que le dommage ce soit produit sur le territoire de la juridiction saisie et d'autre part que les agents de l'entité souveraine y aient été présents au moment de l'acte dommageable. Cette dérogation ne donnerait ainsi un sens que devant la juridiction saisie du fond, i.e. en l'espèce la juridiction américaine, mais non pas devant la juridiction de l'exequatur, i.e. en l'espèce la juridiction luxembourgeoise, de sorte que cette exception au principe de l'immunité ne saurait être invoquée devant cette dernière, redonnant ainsi application pleine et entière au principe du privilège. Dans le même sens, l'exception en question ne pourrait pas être invoquée une deuxième fois devant la juridiction de l'exequatur luxembourgeoise si elle a déjà été invoquée devant le juge du fond américain. S'il fallait appliquer l'exception devant le juge de l'exequatur, elle resterait

soumise aux mêmes conditions, à savoir que le dommage devrait avoir été causé sur le territoire du juge de l'exequatur et les agents de l'entité souveraine auraient dû être présents sur le territoire du juge de l'exequatur. Ces conditions ne seraient manifestement pas remplies en ce qui concerne la présente affaire.

Pour autant qu'il faille se reporter à l'application que fait le droit américain de l'exception à l'immunité de juridiction tirée de la *tort exception*, il conviendrait de constater qu'aucun acte en lien avec les actes dommageables ne pourrait être attribué aux PARTIES ETATIQUES IRANIENNES ou à ses agents comme ayant été commis sur le territoire des Etats-Unis d'Amérique. L'exception liée à la survenance d'un préjudice corporel ou matériel n'aurait ainsi pas pu trouver à s'appliquer devant le juge américain. Le juge américain ne se serait d'ailleurs pas appuyé sur cette dérogation au principe du privilège, mais sur la dérogation tenant aux actes étatiques de sponsoring d'actes de terrorisme, qui serait exclusive en droit américain de l'exception tenant à la survenance d'un préjudice corporel ou matériel, ce qui devrait encore conduire à voir écarter dans le cadre du présent litige toutes considérations tirées de cette dernière exception. Dans l'hypothèse où le juge luxembourgeois de l'exequatur devrait apprécier le privilège d'immunité comme s'il avait été le juge américain du fond, les PARTIES ETATIQUES IRANIENNES font encore valoir que le droit conventionnel international auquel a souscrit le Luxembourg (article 15 Convention européenne sur l'immunité des Etats et son Protocole additionnel, signée à Bâle le 16 mai 1972 ; article 8 § 4 Convention des Nations Unies sur les immunités juridictionnelles des États et de leurs biens adoptée par la résolution 59/38 de l'Assemblée générale des Nations Unies en date du 2 décembre 2004) ne permettrait pas à un tribunal de passer outre au privilège d'immunité en cas de procédure par défaut..

Les PARTIES ETATIQUES IRANIENNES concluent enfin à voir écarter toute dérogation au principe de l'immunité tirée de développements basés sur la responsabilité internationale des Etats, dès lors que les textes invoqués par les PARTIES DEMANDERESSES seraient restés à l'état de projet et ne viseraient que la responsabilité des Etats entre eux, et non pas à l'égard de personnes privées.

Dans la mesure où les PARTIES DEMANDERESSES font valoir une dérogation au privilège de l'immunité en présence de violations particulièrement graves du *jus cogens*, des droits de l'Homme et du droit humanitaire, les PARTIES ETATIQUES IRANIENNES font valoir, tout en insistant

encore une fois sur l'absence de participation de leur part et de leurs agents à des actes qui puissent relever de telles actions, que le droit international public ne permettrait pas en l'état actuel de dégager une coutume établie en faveur d'une telle dérogation. L'existence d'une telle dérogation serait illogique, puisqu'elle impliquerait l'examen du fond du litige pour statuer sur l'immunité, alors cependant que celle-ci aurait justement pour objectif de prévenir la juridiction relevant d'un Etat d'apprécier le comportement d'un autre Etat souverain. Ainsi, le droit de ne pas être jugé serait indépendant des faits reprochés, et ce tant en ce qui concerne leur licéité que leur gravité.

Enfin, toute dérogation au privilège d'immunité pour des considérations d'équité devrait être écartée, alors que le juge devrait statuer en droit, et ne pourrait statuer en équité qu'en présence d'une disposition de droit positif expresse lui permettant de ce faire. Pareille autorisation serait inexistante en l'espèce.

### 2.1.1.2.Les PARTIES DEMANDERESSES

Les PARTIES DEMANDERESSES relèvent en premier lieu ce qu'elles considèrent comme une contradiction dans les développements des PARTIES ETATIQUES IRANIENNES en ce que celles-ci exhiberaient de l'immunité de juridiction pour conclure à l'incompétence du tribunal tout en qualifiant le moyen de fin de non-recevoir. Le tribunal note que les PARTIES DEMANDERESSES ne tirent aucune conséquence juridique de leurs développements, de sorte qu'il n'y a pas lieu de s'y arrêter autrement.

Les PARTIES DEMANDERESSES exposent ensuite qu'elles se sont vues notifier en date des 9 novembre 2016 et 26 juin 2017 des corps de conclusions qu'elles considéraient comme étant pris pour compte de la BANQUE CENTRALE et des PARTIES ETATIQUES IRANIENNES, et ce ne serait que par conclusions notifiées en date du 31 janvier 2018 que les parties défenderesses auraient pris des corps de conclusions séparés pour la BANQUE CENTRALE d'une part et les PARTIES ETATIQUES IRANIENNES d'autre part. Elles qualifient cette démarche de « manœuvre » qui devrait être qualifiée de déloyale et « risque de compromettre les droits de la défense des parties demanderesses, étant donné qu'elles ont construit leur défense sur l'idée que les actes antérieurs ont été présentés pour l'ensemble des parties défenderesses ». Au vu de ces éléments, elles estiment que « il y a lieu de mettre en cause la recevabilité des conclusions notifiées le 31 janvier 2018 pour la République Islamique d'Iran et *alii* ».

Les PARTIES DEMANDERESSES, en défendant la position qu'il s'agirait en l'immunité de juridiction d'une fin de non-recevoir, font valoir qu'il s'agirait d'une fin de non-recevoir particulière en ce qu'elle ne tiendrait ni au demandeur ni à l'action, mais à la personne du défendeur, et devrait en tant que telle être soulevée au seuil de l'instance. Il ne saurait être admis pour des raisons de logique et d'économie procédurale que la partie défenderesse soit admise à invoquer l'immunité de juridiction à n'importe quel stade de la procédure. La nature particulière du moyen commanderait au contraire qu'il ne puisse être soulevé que *in limine litis*. Or, les PARTIES ETATIQUES IRANIENNES auraient négligé de soulever le moyen afférent au seuil de l'instance, dès lors que, suite à la saisie-arrêt pratiquée par les soins des PARTIES DEMANDERESSES au Luxembourg à l'encontre de l'intégralité des actuelles parties défenderesses sur base des jugements américains dont l'exequatur est poursuivi dans le cadre de la présente instance, les PARTIES ETATIQUES IRANIENNES seraient volontairement intervenues dans l'instance par laquelle la BANQUE CENTRALE avait saisi le juge des référés en vue de voir prononcer l'annulation de la saisie-arrêt, sans toutefois invoquer dans ce cadre le seul moyen tiré de son immunité, mais en invoquant et en discutant le fond du droit luxembourgeois pour arguer de la nullité de la saisie-arrêt comme frappant des avoirs indisponibles. Les PARTIES ETATIQUES IRANIENNES ne pourraient plus par la suite invoquer l'immunité de juridiction à leur profit. En intervenant devant le juge des référés, qui aurait été saisi du même litige que la formation collégiale dans le cadre de la présente instance (ces litiges présenteraient la triple identité de parties, de cause et d'objet pour concerner la saisie des biens de la BANQUE CENTRALE auprès de la S.A. CLEARSTREAM), les PARTIES ETATIQUES IRANIENNES auraient encore marqué leur accord à se soumettre à la juridiction étatique du Luxembourg et auraient de ce fait renoncé à l'immunité de juridiction si elle devait exister à leur profit. Le droit coutumier admettrait pareille renonciation, qui pourrait s'exprimer de façon aussi bien expresse qu'implicite. Dans le même cadre, les PARTIES DEMANDERESSES font encore valoir que le défaut de comparution devant le tribunal (américain) saisi du fond vaudrait soumission à la juridiction de ce tribunal et emporterait consentement de la part des PARTIES ETATIQUES IRANIENNES à ce que la décision rendue soit revêtue de l'exequatur. La soumission par les PARTIES ETATIQUES IRANIENNES aux juridictions étatiques luxembourgeoises résulterait encore de ce qu'elles seraient intervenues dans l'action engagée par

la BANQUE CENTRALE contre le tiers saisi, la S.A. CLEARSTREAM, afin de pouvoir récupérer les avoirs saisis.

Sur le contenu de la notion d'immunité de juridiction, les PARTIES DEMANDERESSES font valoir que celle-ci ne serait pas absolue et souffrirait un certain nombre d'exclusions dans le cadre desquelles le bénéficiaire potentiel de l'immunité ne pourrait pas en tirer profit.

Il en serait ainsi tout d'abord pour les actes ayant causé le décès, un dommage corporel ou un préjudice matériel à des personnes privées en dehors du contexte d'un conflit armé, respectivement au cas où le bénéficiaire potentiel de l'immunité aurait contribué par ses agissements au décès, à un dommage corporel ou à un préjudice matériel à des personnes privées en dehors du contexte d'un conflit armé. Les PARTIES DEMANDERESSES exposent dans ce cadre que les principes du droit international public imposeraient une obligation aux Etats de réparer les conséquences de leurs actes internationalement illicites et qu'il n'y aurait pas lieu en présence d'un tel acte d'opérer la distinction admise par ailleurs entre actes *jure imperii*, qui permettraient aux Etats d'invoquer l'immunité de juridiction, et les actes *jure gestionis*, pour lesquels l'immunité de juridiction serait exclue. Pour les actes internationalement illicites, l'immunité de juridiction devrait toujours être écartée dans un souci de pacification des relations internationales. Cette règle serait consacrée par le droit international public coutumier, caractérisé par une pratique universelle et cohérente soutenue par l'*opinio iuris* sur le caractère contraignant de la règle, à laquelle le Luxembourg ne se serait pas opposé. Ainsi, l'immunité de juridiction ne jouerait pas pour les dommages causés aux personnes privées devant les juridictions du lieu de production du dommage ou du fait dommageable, sans qu'une présence de l'Etat recherché en responsabilité dans l'Etat du for ne soit requise. Les PARTIES DEMANDERESSES soutiennent ensuite que même s'il fallait considérer que la présence de l'Etat recherché en responsabilité sur le territoire de l'Etat sur lequel a eu lieu le fait dommageable devait être considérée comme condition pour former barrage à l'immunité de juridiction, cette condition ne saurait s'appliquer que devant le juge du fond, et non pas devant le juge de l'exequatur.

En l'espèce, le fait dommageable, à savoir les détournements d'avions et les attentats perpétrés avec ceux-ci en date du 11 septembre 2001, aurait eu lieu sur le sol américain, de sorte que l'immunité de juridiction ne jouerait ni devant le juge américain du fond ni par répercussion devant le juge luxembourgeois de l'exequatur.

Les PARTIES DEMANDERESSES plaident en second lieu que l'immunité de juridiction ne saurait être invoquée pour les actes de terrorisme auquel aurait contribué un Etat. Le terrorisme serait une activité universellement condamnée, serait combattu par les Etats et constituerait un acte internationalement illicite ne pouvant recevoir la qualification d'acte *jure imperii*. Les Etats ne seraient partant pas fondés à se prévaloir de l'immunité de juridiction en cas de participation de leur part à un acte de terrorisme. Le droit international public coutumier, caractérisé par une pratique universelle et cohérente et l'*opinio iuris* afférente, exclurait le droit à l'immunité de juridiction pour les actes de terrorisme.

En l'espèce, les PARTIES ETATIQUES IRANIENNES auraient été condamnées pour avoir soutenu des actes de terrorisme, de sorte qu'elles ne sauraient bénéficier de l'immunité de juridiction.

Dans le même ordre d'idées, les PARTIES DEMANDERESSES consacrent quelques développements à la notion d'acte *jure imperii* liés à la notion de souveraineté nationale et qui peuvent bénéficier de l'immunité de juridiction, pour faire valoir que relèveraient de cette catégorie uniquement les activités tenant aux marchés publics, aux activités militaires, aux actes de nationalisation et aux emprunts publics, et que ne relèveraient pas de cette catégorie les actes de terrorisme et les actes de soutien au terrorisme.

En l'espèce, les PARTIES ETATIQUES IRANIENNES auraient été condamnées par la juridiction américaine pour des actes de soutien au terrorisme et ne pourraient dès lors invoquer à leur profit l'immunité de juridiction.

Les PARTIES DEMANDERESSES consacrent en quatrième lieu, et en réponse à l'argumentaire des PARTIES ETATIQUES IRANIENNES, un certain nombre de développements à la question de l'immunité de juridiction en relation avec un acte de violation des droits de l'homme pour soutenir que la gravité d'un acte n'entrerait pas en considération dans le cadre de l'appréciation de la possibilité d'invoquer l'immunité de juridiction, mais que seule la nature de l'acte serait à considérer, et qu'il n'y aurait donc nul besoin de caractériser une gravité particulière des actes qui sont reprochés aux PARTIES ETATIQUES IRANIENNES pour pouvoir former obstacle à l'immunité de juridiction.

En l'espèce, les actes reprochés entreraient dans le cadre de ceux qui ont causé le décès, un dommage corporel ou un préjudice matériel à un individu, respectivement de ceux à qualifier d'actes de terrorisme, ce qui suffirait à refuser l'immunité de juridiction aux PARTIES ETATIQUES IRANIENNES.

En cinquième lieu, les PARTIES DEMANDERESSES invoquent à leur profit la notion d'équité, conçue comme règle de droit qui permettrait de concilier des règles et principes qui se trouvent en conflit, pour faire valoir que l'étendue de l'immunité de juridiction devrait être fixée en considération de grands principes qui régissent les relations internationales, dont le principe qu'aucun Etat ne saurait causer le décès ou un dommage à des particuliers qui ne sont pas engagés dans un conflit armé au titre des forces armées régulières, ainsi que le principe que les actes de terrorisme seraient bannis.

### 2.1.2. Appréciation du tribunal

1/ Dans un premier temps, il convient de statuer sur les développements par lesquels les PARTIES DEMANDERESSES considèrent que « il y a lieu de mettre en cause la recevabilité des conclusions notifiées le 31 janvier 2018 pour la République Islamique d'Iran et *alii* ». Bien que la formulation consistant à « mettre en cause la recevabilité des conclusions » n'est guère explicite ni usuelle, le tribunal considère pour les besoins de la cause que par ce biais les PARTIES DEMANDERESSES entendent contester la recevabilité desdites conclusions afin d'en voir écarter l'examen.

Cette prétention doit d'abord être écartée comme reposant sur une appréciation factuelle fausse. Les conclusions notifiées à l'avocat constitué pour les PARTIES DEMANDERESSES en dates des 9 novembre 2016 et 26 juin 2017 indiquaient expressément qu'elles étaient prises pour compte de la seule BANQUE CENTRALE. La circonstance que ces conclusions mentionnaient que les PARTIES ETATIQUES IRANIENNES comparaitraient par Maître Fabio TREVISAN est sans incidence à cet égard. Face à ces actes de procédures clairs et univoques, les PARTIES DEMANDERESSES ne peuvent valablement prétendre avoir été trompées et avoir pu admettre que les conclusions des 9 novembre 2016 et 26 juin 2017 étaient prises également pour les PARTIES ETATIQUES IRANIENNES.

Le moyen des PARTIES DEMANDERESSES doit encore être écarté pour défaut de motivation et de justification au regard de la notion d'atteinte à leurs droits, alors qu'elles n'établissent pas par ailleurs, au-delà de leur simple affirmation, dans quelle mesure une éventuelle méprise dans leur chef quant à l'identité et au nombre des parties défenderesses pour compte desquelles les conclusions des 9 novembre 2016 et 26 juin 2017 étaient notifiées, méprise qui aurait le cas échéant été provoquée par les parties défenderesses, aurait pu nuire ou autrement porter atteinte à leurs droits de la défense. Le caractère extensif et exhaustif des conclusions prises pour leur compte postérieurement au 31 janvier 2018 démontre au contraire qu'il n'y a pas eu pareille atteinte.

2/ Le tribunal constate que les PARTIES ETATIQUES IRANIENNES, tout en axant leurs développements sur la notion d'immunité de juridiction, soutiennent que l'immunité de juridiction et l'immunité d'exécution répondraient au même régime juridique, sans toutefois en tirer une conclusion juridique. En tout état de cause, l'argumentation des PARTIES ETATIQUES IRANIENNES doit être comprise comme s'opposant à la compétence du présent tribunal pour connaître de la demande en exequatur, respectivement comme s'opposant à la recevabilité de la demande en exequatur devant le présent tribunal en raison de l'immunité de juridiction dont elles devraient bénéficier. Les PARTIES ETATIQUES IRANIENNES ne soutiennent notamment pas que la demande en exequatur participerait à la procédure d'exécution forcée et devrait en tant que telle être examinée sous l'angle de l'immunité d'exécution. Les PARTIES ETATIQUES IRANIENNES ne soutiennent pas non plus dans le cadre de leurs développements consacrés à l'immunité de juridiction que la juridiction américaine du fond aurait à tort passé outre à l'immunité de juridiction dont elles auraient bénéficié devant cette juridiction (ce moyen est cependant développé dans le cadre des moyens consacrés aux conditions de l'exequatur et y sera examiné pour autant que de besoin). Le tribunal n'examinera partant dans le présent cadre que la question de savoir si les PARTIES ETATIQUES IRANIENNES bénéficient d'une immunité de juridiction qui serait de nature à former obstacle à la demande en exequatur.

A cet effet, le tribunal examine en premier lieu l'incidence de la procédure de référé intentée par la BANQUE CENTRALE à laquelle s'étaient jointes les PARTIES ETATIQUES IRANIENNES pour ensuite, au cas où cet examen devait aboutir à la recevabilité du moyen tiré de l'immunité de juridiction, en apprécier le bien-fondé.

### 2.1.2.1.Recevabilité du moyen tiré de l'immunité de juridiction : Incidence de la procédure de référé

Il est rappelé que par exploit d'huissier du 22 mars 2016, les actuelles PARTIES DEMANDERESSES ont donné assignation aux actuelles parties défenderesses aux fins de voir déclarer exécutoires au Luxembourg quatre jugements rendus par une juridiction de New York.

Il est par ailleurs constant en cause que suivant exploit d'huissier du 14 janvier 2016, les actuelles PARTIES DEMANDERESSES ont pratiqué saisie-arrêt à charge des actuelles parties défenderesses auprès de la S.A. CLEARSTREAM afin d'obtenir paiement des montants leurs alloués dans le cadre de la procédure qui s'est déroulée devant la juridiction de New York. La procédure de validation de cette saisie-arrêt se trouve au jour du présent jugement en instance d'instruction devant le tribunal de ce siège.

Il est enfin constant en cause que suivant exploit d'huissier du 9 juin 2016, la BANQUE CENTRALE a fait donner assignation aux actuelles PARTIES DEMANDERESSES et à la S.A. CLEARSTREAM à comparaître devant le juge des référés aux fins de voir constater l'illégalité de la saisie-arrêt pratiquée par les actuelles PARTIES DEMANDERESSES. A cette procédure sont intervenues les actuelles parties défenderesses, dont les PARTIES ETATIQUES IRANIENNES, à l'exclusion de l'organisation HEZBOLLAH. Par ordonnance du 22 mars 2017, le juge des référés a déclaré la demande irrecevable au regard des contestations sérieuses qui seraient à trancher et qui échapperaient au pouvoir d'appréciation du juge des référés. Cette ordonnance a été confirmée par arrêt de la Cour d'appel du 10 janvier 2018.

### 2.1.2.1.1.  Recevabilité *ratione temporis* du moyen tiré de l'immunité de juridiction

1/ Le tribunal tient en premier lieu à souligner que la circonstance que les PARTIES ETATIQUES IRANIENNES aient indûment associé les deux techniques procédurales différentes que constituent le déclinatoire de compétence et la fin de non-recevoir n'est pas de nature à porter à conséquence, dès lors qu'il appartient au tribunal en exécution de l'article 61 du Nouveau Code de Procédure Civile d'opérer les qualifications que les plaidoiries des parties comportent. Dans la mesure où il ne saurait faire de doute que les PARTIES ETATIQUES IRANIENNES ont invoqué à leur profit l'immunité de juridiction, il appartient dès lors au tribunal de qualifier ce moyen au regard du droit procédural luxembourgeois.

Or, sur ce point, le tribunal rejoint la position des PARTIES DEMANDERESSES pour dire que ce moyen de défense doit être qualifié en fin de non-recevoir dont l'accueil entraine l'irrecevabilité de la demande.

2/ Le tribunal ne partage toutefois pas le point de vue des PARTIES DEMANDERESSES consistant à soutenir que ce moyen devrait être soulevé au seuil de l'instance. En droit procédural luxembourgeois, seules les nullités d'actes (article 264 du Nouveau Code de Procédure Civile) et les déclinatoires de compétences (article 260 du Nouveau Code de Procédure Civile ; pour autant qu'ils ne relèvent pas d'une règle d'ordre public) relèvent de l'obligation légale de devoir être soulevés au seuil de l'instance avant toute défense au fond. Aucun autre texte de droit positif ni aucune tendance jurisprudentielle n'a étendu cette restriction aux fins de non-recevoir. Les arguments de logique juridique et d'efficacité procédurale développés par les PARTIES DEMANDERESSES, qui tiennent en fin de compte au souci d'une bonne administration de la justice, sont de nature à trouver à s'appliquer à toutes les fins de non-recevoir, et non pas seulement à celles strictement personnelles à la partie défenderesse, mais ne sont pas en l'état actuel du droit procédural luxembourgeois de nature à conditionner la recevabilité du moyen tiré de l'immunité de juridiction à sa formulation au seuil de l'instance (voy. dans le même sens en droit français JCL Procédure civile, J. Théron., Fasc. 600-30, Moyens de défense, N° 68 ; Encyclopédie Dalloz, Procédure civile, C. Kessedjian, Immunités, N° 22).

La fin de non-recevoir tirée du non-respect d'une immunité de juridiction, en ce que cette dernière n'affecte pas seulement la compétence juridictionnelle du juge mais lui retire le pouvoir de juger, est d'ordre public (Tribunal d'arrondissement de Luxembourg 7 avril 2017, Jugement commercial II N° 520/17, N° 132174 du rôle, cité in Annales du droit luxembourgeois, volume 27-28, 2017-2018, G. Friden et P. Kinsch, La pratique luxembourgeoise en matière de droit public international public (2017)), et peut à ce titre être soulevée à tout moment de l'instance.

3/ Dût-on même admettre que la recevabilité du moyen tiré de l'immunité de juridiction soit conditionnée par sa formulation au seuil de l'instance, force serait de constater que cette condition serait respectée en l'espèce. Il n'est en effet pas contesté que dans le cadre des écritures propres à l'instance tendant à l'exequatur des décisions américaines, les PARTIES ETATIQUES IRANIENNES ont invoqué comme premier moyen celui tenant à l'immunité de juridiction. C'est vainement que les PARTIES DEMANDERESSES font valoir que cette instance formerait un tout

indivisible et indissociable avec l'instance en validation de la saisie-arrêt et l'instance devant le juge des référés. Il s'agit au contraire de trois instances nettement séparées, ayant chacune un objet, une cause et des parties distincts.

Force est en effet de constater que dans le cadre de l'instance en référé, les PARTIES ETATIQUES IRANIENNES revêtaient la qualité de parties intervenantes aux côtés de la BANQUE CENTRALE, agissant comme partie demanderesse, en vue de la préservation des droits que cette dernière invoquait à son profit, et que dans le cadre de la présente instance (de même que dans celle en validation de la saisie-arrêt), les PARTIES ETATIQUES IRANIENNES revêtent la qualité de parties défenderesses auxquelles sont opposés des droits que les PARTIES DEMANDERESSES invoquent à leur profit. Ce constat à lui seul suffit pour écarter l'existence tant d'une identité de parties (les qualités respectives étant différentes) que d'une identité d'objet (qui sont respectivement l'exequatur, la validation de la saisie-arrêt et l'annulation de la saisie-arrêt) et d'une identité de cause (qui sont respectivement le respect des conditions mises à l'exequatur, l'existence d'une créance certaine, liquide et exigible documentée par les décisions américaines rendues exécutoires et la violation de règles de droit international public coutumier et de droit financier luxembourgeois) entre les trois instances.

S'il est certain que ces trois instances sont factuellement liées en ce qu'elles concernent en fin de compte la même créance invoquée par les PARTIES DEMANDERESSES, cette connexité n'est toutefois pas de nature à leur faire perdre leur autonomie procédurale et à devoir induire dans une instance des conséquences procédurales en fonction de l'attitude adoptée, des plaidoiries tenues ou des écritures déposées dans une autre instance.

A cela s'ajoutent deux autres considérations.

D'une part, l'immunité de juridiction ne se confond pas avec l'immunité d'exécution[3]. Or, l'instance de référé, en ce qu'elle tendait à voir annuler la mesure de saisie-arrêt, s'attachait à une

---

[3] Les PARTIES DEMANDERESSES admettent que immunité de juridiction et immunité d'exécution constituent deux notions différentes, bien qu'elles pervertissent dans le cadre des développements y consacrés les termes d'un arrêt de la Cour de cassation lorsqu'elles écrivent que « dans un arrêt du 2 février 2012, la Cour de cassation luxembourgeoise a confirmé que 'l'exequatur ne constitue pas un acte d'exécution et relève de ce fait de l'immunité de juridiction' » (conclusions récapitulatives du 7 juin 2018, page 16, citation de l'arrêt même relevé en caractères gras). La lecture de l'arrêt de la Cour de cassation cité (2 février 2012, N° 3712, N° 2951 du registre) révèle que le passage cité et mis en gras par les PARTIES DEMANDERESSES forme partie du moyen de cassation et constitue la solution adoptée par la Cour d'appel par confirmation des juges de première instance, sans que la Cour de cassation n'endosse cette affirmation. Celle-ci se limite à rejeter le pourvoi en cassation au motif que le moyen présenté ne tendait qu'à remettre

mesure d'exécution et ne pouvait partant s'inscrire que dans le cadre de l'immunité d'exécution, alors que la présente instance ayant trait à l'exequatur des décisions américaines se rattache à la seule notion d'immunité de juridiction. Un comportement adopté dans le cadre d'une instance mettant en cause l'immunité d'exécution ne saurait se répercuter sur une autre instance mettant en cause l'immunité de juridiction.

D'autre part, ces distinctions entre d'une part immunité de juridiction et immunité d'exécution et d'autre part instances au fond introduites par les actuelles PARTIES DEMANDERESSES et instance en référé introduite par la BANQUE CENTRALE avaient été relevées par le juge des référés en son ordonnance du 22 mars 2017 lorsqu'il a écrit en page 14 de son ordonnance que « *La saisie-arrêt n'ayant pas été autorisée par un magistrat [Une requête afférente du 4 janvier 2016, sollicitant l'autorisation présidentielle de saisir-arrêter avait été rejetée suivant ordonnance présidentielle du 5 janvier 2016, motif pris que les requérants disposaient d'un titre constitué par les jugements américains] et le juge des référés actuellement saisi n'étant pas compétent pour valider la saisie-arrêt, il n'y a pas lieu de prendre position par rapport à la réserve invoquée par la Banque MARKAZI concernant l'immunité de privilège et de juridiction dont elle bénéficie en vertu du principe de droit international coutumier, la présente demande tendant au contraire à sauvegarder les droits de la Banque MARKAZI dans l'hypothèse où la saisie-arrêt constituait un acte illégal* ». Bien que la Cour d'appel en son arrêt n'aborde pas ces questions, la situation juridique était de ce fait claire de façon à pointer vers l'absence de toute incidence d'une instance sur l'autre.

Il résulte de l'ensemble des développements qui précèdent que le moyen tiré de l'immunité de juridiction des PARTIES ETATIQUES IRANIENNES est recevable *ratione temporis*.

### 2.1.2.1.2.   Renonciation au moyen tiré de l'immunité de juridiction

Les parties sont d'accord, et le tribunal souscrit à cette appréciation, pour dire que le bénéficiaire d'une immunité de juridiction peut y renoncer. Le tribunal retient encore que si pareille renonciation peut de toute évidence être expresse, elle peut aussi être tacite à condition, conformément aux principes communément admis, qu'elle résulte d'un acte qui implique

---

en cause l'appréciation par les juges du fond de la portée de la renonciation à invoquer l'immunité de juridiction de l'Etat étranger auteur du pourvoi en cassation.

nécessairement renonciation et que l'auteur supposé de la renonciation accomplit cet acte volontairement et en pleine connaissance de cause, manifestant ainsi de façon non équivoque son intention de renoncer.

1/ Ces conditions ne sont pas remplies en l'espèce dans le chef des PARTIES ETATIQUES IRANIENNES. Si elles ont certes agi en pleine connaissance de cause en intervenant dans l'instance qui s'était nouée devant le juge des référés, cette intervention volontaire ne saurait toutefois valoir acte de renonciation à leur immunité de juridiction dans le cadre de la présente instance. Pour rejeter l'argument tiré de la renonciation, il suffit de rappeler que l'instance en exequatur et l'instance en référé diffèrent par leurs parties, leurs objets et leurs causes, de même qu'elles font appel pour l'une au mécanisme de l'immunité de juridiction et pour l'autre au mécanisme de l'immunité d'exécution. Le tribunal souligne encore que dans les deux instances, les PARTIES ETATIQUES IRANIENNES poursuivent en fin de compte la même finalité, à savoir échapper au Luxembourg aux conséquences des jugements américains. Si elles sont recevables à cet effet de faire état de l'immunité de juridiction en tant que parties défenderesses dans le cadre de l'instance en exequatur, l'invocation de ce moyen n'est pas incompatible avec le recours aux voies de droit en tant que partie intervenant aux côtés de la partie demanderesse afin de voir mettre un terme aux effets de la saisie-arrêt. La circonstance que les PARTIES ETATIQUES IRANIENNES se soient soumises en tant que parties intervenantes pour les stricts besoins de la procédure de référé à l'autorité juridictionnelle du Luxembourg et aient soutenu dans ce cadre l'application à leur profit, respectivement au profit de la BANQUE CENTRALE, de la législation applicable au Luxembourg ne vaut pas renonciation tacite à l'immunité de juridiction dans le cadre de la présente instance.

2/ Le défaut de comparution par les PARTIES ETATIQUES IRANIENNES devant la juridiction américaine ne saurait pas non plus être interprété comme valant renonciation à l'immunité de juridiction devant cette juridiction qui se répercuterait sur le bénéfice de l'immunité de juridiction devant le tribunal de ce siège. Si on peut là encore admettre que le défaut de comparution procède d'une décision délibérée (pour autant que l'acte introductif d'instance ait été valablement porté à la connaissance des parties défenderesses, ce qu'il convient de vérifier dans le cadre de l'examen des conditions d'exequatur), il faut cependant tout autant admettre que cette seule abstention ne

73

dénote pas l'intention des PARTIES ETATIQUES IRANIENNES à vouloir renoncer à l'immunité de juridiction devant le présent tribunal.

Il résulte de ce qui précède que les PARTIES ETATIQUES IRANIENNES n'ont renoncé pour les besoins de la présente instance ni au moyen tiré de l'immunité de juridiction, ni à l'immunité de juridiction en tant que telle, pour autant que les conditions pour qu'elles puissent en bénéficier soient remplies, ce qu'il convient de vérifier dans un deuxième temps.

### 2.1.2.2. Bien-fondé du moyen tiré de l'immunité de juridiction : Bénéfice de l'immunité de juridiction

#### 2.1.2.2.1.   Considérations générales sur les fondements de la règle de l'immunité des Etats

Le tribunal renvoie pour les considérations générales sur les fondements de la règle de l'immunité des Etats au point 1.1.2.2.1. ci-dessus.

#### 2.1.2.2.2.   Etendue de l'immunité juridictionnelle

##### 2.1.2.2.2.1. Nature du contrôle à opérer par le juge de l'exequatur

Le tribunal renvoie pour la question de la nature du contrôle à opérer par le juge de l'exequatur au point 1.1.2.2.2.1. ci-dessus.

##### 2.1.2.2.2. Circonstances particulières de l'espèce

Pour décrire les faits de l'espèce, le tribunal se réfère aux développements figurant dans le document *Plaintiff's proposed findings of fact and conclusions of law in support of motion for entry of judgement by default against sovereign defendants* enregistré le 12 décembre 2011 correspondant aux faits qui étaient reprochés en dernier lieu aux parties défenderesses et au document du 22 décembre 2011 intitulé *Findings of fact and conclusions of law* signé par le juge (*United States District Judge*) George B. Daniels qui doit être considéré comme indiquant les faits retenus à charge des parties défenderesses de nature à engager leur responsabilité. Ces deux documents sont à quelques exceptions près identiques au mot près[4]. Ils reprennent en substance

---

[4] Les différences sont les suivantes:
- Ajout dans les *Findings of facts* d'un § 61
- Ajout dans les *Findings of facts* des §§ 147 à 197
- Omission dans les *Finding of facts* du § 154 des *Proposed findings of facts*

les faits et reproches développés dans la *Second Amended Complaint* du 7 septembre 2006 et la *Third Amended Complaint* du 23 juin 2010.

Le tribunal fait abstraction des développements contenus dans ces documents pour autant qu'ils ne se trouvent pas en relation causale avec les faits du 11 septembre 2001 et ne seraient partant pas considérés par lui s'il avait à toiser le fond de l'action dirigée contre les parties défenderesses. Seuls les faits indiqués dans ces deux documents qui sont en relation directe avec les faits du 11 septembre 2001 sont pertinents et pris en considération pour opérer le contrôle par rapport au moyen tiré de l'immunité de juridiction.

Ces documents exposent que les attentats du 11 septembre 2001 qui forment la cause de l'action des PARTIES DEMANDERESSES ont été commis par un réseau terroriste dénommé AL QUAIDA et que l'action tend à rendre les parties défenderesses responsables des préjudices en découlant, dans la mesure où elles ont directement et matériellement apporté leur soutien à AL QUAIDA.

Les documents (section *Defendants ; Proposed findings of fact*, §§ 1 à 64 ; *Findings of fact*, §§ 1 à 65) s'attellent à décrire les comportements et agissements de la REPUBLIQUE ISLAMIQUE D'IRAN depuis 1979 en relation avec divers attentats et organisations en ce que la REPUBLIQUE ISLAMIQUE D'IRAN s'est engagée à partir de sa création en 1979 dans une guerre larvée contre les Etats-Unis d'Amérique à travers des moyens asymétriques et non-conventionnels, dont le soutien à des organisations terroristes, et a mis cette politique en œuvre à travers ces agents, ministères, services, agences et entreprises (*officials, subdivisions, agencies and instrumentalities*).

L'Ayatollah Ali HOSSEINI-KHAMENEI et Ali Akbar HASHEMI RAFSANJANI (*Proposed findings of fact*, §§ 6 à 20 ; *Findings of fact*, §§ 6 à 20), respectivement chef suprême depuis 1989 et homme politique influant sont décrits comme rouages essentiels de la REPUBLIQUE

---

- Inversion des §§ 273 et 274 avec les §§ 275 et 276 dans les *Findings of facts* (par rapport aux §§ 222 et 223 d'une part et les §§ 224 et 225 d'autre part des *Proposed findings of facts*)
- Omission dans les *Conclusions of law* des §§ 12 à 14 des *Proposed conclusions of law*
- Omission dans les *Conclusions of law* des §§ 39 à 46 des *Proposed conclusions of law*

Ces différences ne portent pas à conséquence sur l'issue du litige.

ISLAMIQUE D'IRAN. Aucun fait concret en relation avec les attentats du 11 septembre 2001 n'est énoncé à leur encontre.

Le MINISTERE IRANIEN DE L'INFORMATION ET DE LA SECURITE, l'ORGANISATION ISLAMIQUE CORPS DES GARDES REVOLUTIONNAIRES, le MINISTERE IRANIEN DU PETROLE, le MINISTERE IRANIEN DES AFFAIRES ECONOMIQUES ET DES FINANCES, le MINISTERE IRANIEN DU COMMERCE et le MINISTERE IRANIEN DE LA DEFENSE ET DE LA LOGISTIQUE DES FORCES ARMEES (*Proposed findings of fact*, §§ 21 à 43 ; *Findings of fact*, §§ 6 à 20) sont décrits comme des entités de la REPUBLIQUE ISLAMIQUE D'IRAN remplissant des fonctions gouvernementales essentielles. A des degrés divers, ces entités contrôlent une importante activité économique et coopèrent avec des organisations terroristes étrangères. Aucun fait concret en relation avec les attentats du 11 septembre 2001 n'est énoncé à leur encontre.

Dans la mesure où les faits du 11 septembre 2001 sont attribués d'un point de vue organisationnel à l'organisation AL QUAIDA, les documents expliquent (section *Bridging of the Sunni-Shia Divide* ; *Proposed findings of fact*, §§ 65 à 88 ; *Findings of fact*, §§ 66 à 89) les raisons et les mesures mises en œuvre pour réaliser une coopération entre l'organisation sunnite qu'est l'organisation AL QUAIDA et l'Etat d'obédience shiite qu'est la REPUBLIQUE ISLAMIQUE D'IRAN. Ces développements ne sont pas mis en relation avec les faits du 11 septembre 2001.

Le document décrit ensuite (section *Terrorist Attacks By the Iran-Hizbollah-al Queda Terrorist Alliance* ; *Proposed findings of fact*, §§ 89 à 114 ; *Findings of fact*, §§ 90 à 115) un certain nombre d'attaques terroristes attribuées à la coopération entre les organisations AL QUAIDA et HEZBOLLAH, à l'exclusion des faits du 11 septembre 2001. Ce n'est qu'au point 114 des *Proposed findings of fact*, respectivement au point 115 des *Findings of fact*, qu'il est sommairement retenu que les autorités iraniennes ont facilité les voyages de membres de l'organisation AL QUAIDA, dont certains des auteurs des faits du 11 septembre 2001, pour transiter à travers l'Iran à destination et au retour de l'Afghanistan où se sont trouvés des camps d'entraînement.

A la suite des points 114 respectivement 115, les documents expliquent ensuite (section *Iran and Terrorist Travel* ; *Proposed findings of fact*, §§ 115 à 145 ; *Findings of fact*, §§ 116 à 146) plus en détail la question des voyages à travers l'Iran vers l'Afghanistan pour expliquer que au moins 8,

76

respectivement entre 8 et 10, des 19 membres des commandos terroristes du 11 septembre 2001 ont ainsi transité à travers l'Iran. Le document retient d'une part que les voyages vers ces camps d'entraînement étaient indispensables pour préparer les attaques terroristes du 11 septembre 2001. Il explique ensuite que les autorités de la REPUBLIQUE ISLAMIQUE D'IRAN ont délibérément omis de tamponner les passeports de ces personnes afin d'empêcher tout Etat ou service étranger de pouvoir retracer les déplacements de ces personnes, sous peine de se rendre suspectes, alors qu'il était connu que des camps d'entraînement pour terroristes se situaient en Afghanistan. Le document explique ensuite que des hauts responsables de l'organisation HEZBOLLAH ont organisé et participé à certains voyages préparatoires de plusieurs des membres des commandos terroristes du 11 septembre 2001 entre des villes du Proche et du Moyen Orient et qu'ils ont aidé ces terroristes à se procurer des passeports et/ou des visas pour entrer aux Etats-Unis d'Amérique.

Seul le document émanant du juge George B. Daniels retrace ensuite (section *Testimony of Abolghasem Mesbahi ; Findings of fact*, §§ 147 à 197) la biographie d'un témoin et son implication d'abord dans la mise en place des activités de soutien au terrorisme de la REPUBLIQUE ISLAMIQUE D'IRAN et ensuite dans la révélation de ces activités comme témoin. Le premier volet de ces explications (§§ 147 à 168) est sans rapport avec les faits du 11 septembre 2001. Dans le deuxième volet (§§ 169 à 180), il est expliqué que ce témoin a été averti au courant de l'été 2001 par des contacts qu'il avait encore au sein du gouvernement iranien qu'un plan d'attaque contre les Etats-Unis d'Amérique a été activé. En voyant les informations sur les attaques du 11 septembre 2001, il a réalisé qu'il avait été averti de celles-ci. Les explications subséquentes (§§ 174 à 190) selon lesquelles aucune des autorités occidentales contactées par ce témoin ne l'ont pris au sérieux est sans rapport avec les faits du 11 septembre 2001. Le même témoin indique encore (§§ 191 à 197) que la REPUBLIQUE ISLAMIQUE D'IRAN avait acheté en secret un simulateur de vol pour le genre d'avions qui ont été détournés pour commettre les attentats du 11 septembre 2001. Ce simulateur a été installé près de Téhéran et a probablement été utilisé pour l'entraînement des terroristes. Au moins l'un d'eux a séjourné en Iran avant les attaques.

Le document explique ensuite (section *Iran's Provision of Save Haven to al Queda ; Proposed findings of fact, §§ 146 à 153 ; Findings of fact*, §§ 198 à 205) le support apporté par la REPUBLIQUE ISLAMIQUE D'IRAN pour évacuer les responsables et les combattants de l'organisation AL QUAIDA d'Afghanistan après que ce pays a été attaqué par une coalition

77

internationale suite aux attentats du 11 septembre 2001. Ces éléments sont postérieurs aux attentats du 11 septembre 2001, de sorte qu'ils sont sans pertinence sur les responsabilités à leur égard.

Au titre d'autres éléments (section *Other findings* ; *Proposed findings of fact*, §§ 154 à 158 ; *Findings of fact*, §§ 206 à 209), seul le document *Proposed findings of fact* souligne que l'affirmation d'une personne impliquée selon laquelle l'organisation AL QUAIDA n'aurait pas eu besoin d'aide pour perpétrer les attentats du 11 septembre 2001 ne serait pas crédible (§154). Les deux documents poursuivent en relevant encore une fois la volonté de la REPUBLIQUE ISLAMIQUE D'IRAN et de ses dirigeants de nuire aux Etats-Unis d'Amérique (§ 155, respectivement § 206). Cet élément est sans rapport avec les faits du 11 septembre 2001. Ils indiquent ensuite le support fourni par la REPUBLIQUE ISLAMIQUE D'IRAN à l'exécution des attentats en assistant à l'assassinat d'une personne en Afghanistan qui aurait supporté des mesures de représailles en Afghanistan après l'exécution des attentats (§ 156, respectivement § 207) et en assurant le transport de terroristes et de fonds monétaires à travers son territoire (§§ 157 à 158, respectivement §§ 208 à 209).

Le document passe ensuite en revue les dépositions de 8 témoins (*Proposed findings of fact*, §§ 159 à 225 ; *Findings of fact*, §§ 210 à 276).

D'après le premier témoin (Dietrich L. Snell ; §§ 159 à 162, respectivement §§ 210 à 213), un nombre substantiel des membres des commandos du 11 septembre 2001 ont traversé l'Iran pour se rendre en Afghanistan et au Pakistan et les autorités de la REPUBLIQUE ISLAMIQUE D'IRAN se sont abstenues de tamponner leurs passeports. L'Iran a joué un rôle important pour faciliter les attaques du 11 septembre 2001.

Pour le deuxième témoin (Dr. Daniel L. Byman ; §§ 163 à 172, respectivement §§ 214 à 223), l'assistance apportée par la REPUBLIQUE ISLAMIQUE D'IRAN anticipait les attaques du 11 septembre 2001 à travers les facilités de voyage, l'offre de refuge et l'entraînement. La REPUBLIQUE ISLAMIQUE D'IRAN a offert des facilités de voyage aux auteurs des attentats. Pour le reste, ce témoin n'aborde pas la question spécifique des attentats du 11 septembre 2001.

Pour le troisième témoin (Janice L. Kephart, §§ 173 à 186, respectivement §§ 224 à 237), la REPUBLIQUE ISLAMIQUE D'IRAN a permis aux auteurs des attentats du 11 septembre 2001 de voyager à travers son territoire au cours de la préparation des attentats pour rejoindre

78

l'Afghanistan ou le Pakistan, s'est abstenue de tamponner leurs passeports à ces occasions et a fourni son support logistique pour organiser des voyages internationaux.

Le quatrième témoin (Dr. Patrick Clawson ; §§ 187 à 191, respectivement § 238 à 242) reprend en termes généraux que la REPUBLIQUE ISLAMIQUE D'IRAN a supporté l'organisation AL QUAIDA et met les faits du 11 septembre 2001 en rapport avec les facilités de voyage et l'octroi d'un refuge. Pour le reste, ce témoin n'aborde pas la question spécifique des attentats du 11 septembre 2001.

Pour les cinquième et sixième témoins (Claire M. Lopez et Dr. Bruce D. Tefft ; §§ 192 à 201, respectivement §§ 243 à 252), la REPUBLIQUE ISLAMIQUE D'IRAN a permis de 8 à 14 des auteurs des faits du 11 septembre 2001 d'obtenir des passeports et des visas pour les Etats-Unis d'Amérique. Ils disent que l'information des mois d'été 2001 sur l'imminence d'une attaque d'envergure émanait des autorités iraniennes et que le MINISTERE IRANIEN DE L'INFORMATION ET DE LA SECURITE avait acquis un simulateur de vol en vue de préparer les attaques du 11 septembre 2001.

Le septième témoin (Dr. Ronen Berman, §§ 202 à 220, respectivement §§ 253 à 271) discute pour l'essentiel le rôle général joué par la REPUBLIQUE ISLAMIQUE D'IRAN en rapport avec le développement du terrorisme. Ce n'est qu'à la fin qu'il met ses connaissances en lien avec les attentats du 11 septembre 2001 pour dire que la REPUBLIQUE ISLAMIQUE D'IRAN a fourni des facilités de voyage, des moyens pour obtenir des passeports, visas et autres documents de transport afin de permettre l'entrée aux Etats-Unis d'Amérique en vue de la perpétration des attentats.

Le huitième témoin (Kenneth Timmerman ; §§ 221 à 225, respectivement §§ 272 à 276) s'explique d'une façon générale sur l'évolution historique des liens entre la REPUBLIQUE ISLAMIQUE D'IRAN et différentes organisations et explique d'une façon générale que les agents de la REPUBLIQUE ISLAMIQUE D'IRAN permettaient le voyage de membres de l'organisation AL QUAIDA à travers l'Iran sans tamponner leurs passeports, mais sans mettre ces faits en lien direct avec les auteurs des attentats. Il reprend les explications selon lesquelles un haut responsable de l'organisation HEZBOLLAH a accompagné différents membres des commandos du 11 septembre 2001 lors de voyages entre le Proche et le Moyen Orient. Pour le reste, ce témoin n'aborde pas la question spécifique des attentats du 11 septembre 2001.

79

Les documents s'attachent enfin aux conclusions en droit (*Proposed Conclusions of Law,* §§ 1 à 46 ; *Conclusions of Law*, §§ 1 à 35).

Ils règlent dans un premier temps les questions de compétence (section *The Court has Jurisdiction Over All Defendants and All Claims* ; §§ 2 à 16, respectivement §§ 2 à 11). Le document *Proposed Conclusions of Law Conclusions of Law* propose de retenir la compétence du tribunal américain au profit des citoyens américains sur base de la règle de droit américain visant les Etats sponsorisant le terrorisme issue du *Foreign Sovereign Immunities Act* (règle 28 U.S. Code §1605A(a)), en raison d'actes de meurtres extrajudiciaires et/ou la fourniture de support matériel à ces fins et au profit des citoyens non-américains sur base des règles de droit américain issue du *Alien Tort Claims Act* (règle 28 U.S. Code §1350) et de la *Non Commercial Tort Exception* résultant du *Foreign Sovereign Immunities Act* (règle 28 U.S. Code §1605(a)(5)) (§§ 2 à 14). Le document *Conclusions of Law* ne retient que la compétence du tribunal américain au profit des citoyens américains sur base de la règle 28 U.S. Code §1605A(a) (§§ 2 à 11).

Les documents règlent ensuite une question de procédure (§§ 15 à 16, respectivement, §§ 12 à 13) qui est sans incidence sur la question à régler.

Au titre de la question des responsabilités (section *Defendants Are Liable for Damages to U.S. National Plaintiffs Under FISA § 1605A* ; §§ 17 à 38, respectivement §§ 14 à 35), les documents rappellent les exigences légales en droit américain (§§ 17 à 20, respectivement §§ 14 à 17) et décrivent ensuite quels faits à charge de la REPUBLIQUE ISLAMIQUE D'IRAN (§§ 21 à 23, respectivement §§ 18 à 20) et de l'organisation HEZBOLLAH (§§ 24 à 27, respectivement §§ 21 à 24) équivalent à un support matériel au sens de la loi : organisation, financement, facilitation des voyages et de l'entraînement des auteurs des attentats, logistique consistant en la fourniture de services, d'argent, de logement, d'entraînement, d'avis ou d'assistance d'experts, de refuges, de faux documents ou pièces d'identité et/ou de facilités de transport. Aux §§ 28 à 32, respectivement aux §§ 25 à 29, les documents reprennent des faits postérieurs aux attentats du 11 septembre 2001 qui doivent aux yeux du tribunal de céans être considérés comme étant sans lien causal avec ces derniers. Les §§ 33 et 34, respectivement les §§ 30 et 31 démontrent ensuite le lien causal entre les faits retenus contre les parties défenderesses et les dommages subis tel que requis par le droit américain. Ces conclusions s'attachent finalement à retenir la responsabilité 1/ des cinq ministères et de l'ORGANISATION ISLAMIQUE CORPS DES GARDES REVOLUTIONNAIRES comme

80

subdivisions politiques de la REPUBLIQUE ISLAMIQUE D'IRAN et s'identifiant légalement à celle-ci au sens de la législation FSIA (§ 35, respectivement § 32), 2/ de l'organisation HEZBOLLAH, des quatre organismes publics, de l'entreprise commerciale et de la BANQUE CENTRALE comme ayant agi en tant qu'agents ou outils de la REPUBLIQUE ISLAMIQUE D'IRAN (*agents or instrumentalities*) et responsables à ce titre en tant qu'agents au sens de la législation FSIA ou comme coconspirateurs, aidants ou assistants au sens de la législation ATCA (§ 36, respectivement, § 33), 3/ des deux défendeurs personnes physiques (l'Ayatollah Ali HOSSEINI-KHAMENEI et Ali Akbar HASHEMI RAFSANJANI) comme étant des officiels de la REPUBLIQUE ISLAMIQUE D'IRAN ayant agi dans les limites de leurs missions et s'identifiant à ce titre légalement à la REPUBLIQUE ISLAMIQUE D'IRAN de sorte à être responsables en tant qu'agents au sens de la législation FSIA ou en tant que coconspirateurs, aidants ou assistants au sens de la législation ATCA (§ 37, respectivement § 34) et de la REPUBLIQUE ISLAMIQUE D'IRAN (§ 38, respectivement § 35).

Le document *Proposed Conclusions of Law Conclusions of Law* contient encore une partie consacrée à la responsabilité des parties défenderesses sur base de la législation du *Alien Tort Claims Act* à l'égard des personnes qui ne sont pas citoyen(ne)s américain(e)s (§§ 39 à 46). Ce passage est sans intérêt pour le présent litige.

En résumé, il faut retenir de ces développements que la responsabilité des PARTIES ETATIQUES IRANIENNES est recherchée pour des événements dommageables commis sur le territoire des Etats-Unis d'Amérique (étant précisé que tant les actes reprochés aux auteurs directs du dommage qui sont tiers à la présente procédure que le dommage lui-même sont localisés aux Etats-Unis d'Amérique). Les documents retiennent

- la responsabilité de la REPUBLIQUE ISLAMIQUE D'IRAN pour avoir mis en place, dans le cadre général d'activités terroristes et dans le cadre particulier des faits du 11 septembre 2001, une structure transnationale servant à la commission d'actes de terrorisme et pour avoir permis l'organisation de voyages de terroristes, l'occultation des voyages de terroristes vers et depuis l'Afghanistan et le Pakistan où se trouvaient des camps d'entrainement, l'organisation de camps d'entraînement de terroristes, la fourniture d'explosifs et des transferts d'argent ayant profité en fin de compte à des activités terroristes

- la responsabilité des autres PARTIES ETATIQUES IRANIENNES pour avoir contribué en tant qu'organes de l'Etat à la mise en œuvre des activités retenues au titre de fautes dans le chef de la REPUBLIQUE ISLAMIQUE D'IRAN.

Le tribunal note qu'il n'est ni allégué ni établi qu'un seul de ces actes reprochés aux PARTIES ETATIQUES IRANIENNES ait été accompli sur le territoire des Etats-Unis d'Amérique.

### 2.1.2.2.2.3. Dérogation à l'immunité de juridiction pour les actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées ?

Les PARTIES DEMANDERESSES font valoir que la coutume de l'immunité de juridiction des Etats aurait évolué en ce sens qu'elle ne s'appliquerait pas aux actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées en dehors du contexte d'un conflit armé international.

Le tribunal retient à titre liminaire que les PARTIES DEMANDERESSES ajoutent à bon escient la précision qu'il s'agit des actes accomplis « en dehors du contexte d'un conflit armé international », mais que cette précision n'apporte rien dans le cadre du présent litige. La précision est ajoutée à bon escient alors que la Cour internationale de justice a estimé dans son arrêt du 3 février 2012, Immunités juridictionnelles de l'Etat, « que le droit international coutumier impose toujours de reconnaitre l'immunité à l'Etat dont les forces armées ou d'autres organes sont accusés d'avoir commis sur le territoire d'un autre Etat des actes dommageables au cours d'un conflit armé » (N° 78). La précision n'apporte cependant rien au débat alors que dans le cadre de la présente procédure, ce ne sont pas des actes de forces armées ou plus généralement des faits liés à un conflit armé entre Etats qui sont en cause.

Le tribunal précise à ce stade qu'il est constant en cause qu'il y a eu en l'espèce en date du 11 septembre 2001 des actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées.

La question à laquelle il importe de répondre est celle de savoir si le droit international public coutumier reflète l'existence de la dérogation alléguée par les PARTIES DEMANDERESSES et dans l'affirmative si les conditions de cette dérogation à l'immunité juridictionnelle des Etats sont remplies en l'espèce.

82

Sur l'existence de principe de la dérogation à l'immunité juridictionnelle des Etats tirée de l'existence d'actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées, il n'y a pas de divergence entre les parties. Les PARTIES ETATIQUES IRANIENNES admettent que le droit international public coutumier recèle une telle dérogation, attestée par les deux codifications de la matière des immunités d'Etat et la jurisprudence des juridictions internationales et nationales.

Les parties discutent les conditions et la réalisation des conditions propres à cette dérogation.

Pour situer cette discussion, le tribunal tient à titre liminaire à citer les dispositions consacrées à cette dérogation par les deux codifications du droit des immunités d'Etat :

- Article 11 de la convention de 1972 : « *Un Etat contractant ne peut invoquer l'immunité de juridiction devant un tribunal d'un autre Etat contractant lorsque la procédure a trait à la réparation d'un préjudice corporel ou matériel résultant d'un fait survenu sur le territoire de l'Etat du for et que l'auteur du dommage y était présent au moment où ce fait est survenu* »

- Article 13 de la convention de 2004 : « *… un Etat ne peut invoquer l'immunité de juridiction devant un tribunal d'un autre Etat, compétent en l'espèce, dans une procédure se rapportant à une action en réparation pécuniaire en cas de décès ou d'atteinte à l'intégrité physique d'une personne, ou en cas de dommage ou de perte d'un bien corporel, dus à un acte ou à une omission prétendument attribuables à l'Etat, si cet acte ou cette omission se sont produits, en totalité ou en partie, sur le territoire de cet autre Etat et si l'auteur de l'acte ou de l'omission était présent sur ce territoire au moment de l'acte ou de l'omission* ».

Bien qu'aucune de ces deux conventions ne soit en vigueur à l'état actuel, le tribunal estime qu'au regard de leur procédure d'adoption, qui fait qu'elles ont été approuvées par un nombre considérable d'Etats sans qu'il n'y ait eu d'objections spécifiques aux dispositions visées, elles revêtent une importance considérable, surtout au regard des règles qui s'y retrouvent à l'identique à 30 années d'intervalle, et sont de nature à démontrer l'*opinio iuris* sur le contenu de ces règles. Le tribunal décide encore à cet égard que les règles conventionnelles telles que citées ci-dessus constituent nécessairement un ensemble global qui réalise un certain équilibre entre différentes considérations, de sorte que sauf circonstances particulières, elles doivent être considérées en leur

83

ensemble, sans pouvoir être décortiquées pour en appliquer certains aspects en dehors des autres, sous peine de porter atteinte audit équilibre.

- Est-ce que la dérogation s'applique uniquement aux actes *jure gestionis*, ou indistinctement aux actes *jure gestionis* et *jure imperii* ?

Les PARTIES DEMANDERESSES soutiennent que la dérogation à l'immunité de juridiction par elles invoquée s'appliquerait aux deux catégories d'actes, de sorte qu'il n'y aurait pas lieu de s'interroger sur la question de savoir de quelle catégorie relèveraient les faits reprochés aux PARTIES ETATIQUES IRANIENNES.

Les PARTIES ETATIQUES IRANIENNES pour leur part soutiennent que la distinction devrait être opérée dans la mesure où la dérogation ne jouerait que pour les actes *jure gestionis*, et que les faits qui leur sont reprochés ne relèveraient pas de cette catégorie. Les faits leur reprochés se situeraient nécessairement dans une sphère de souveraineté étatique impliquant leur qualification en tant qu'actes *jure imperii* excluant de la sorte toute dérogation à l'immunité de juridiction.

La question de la distinction entre les deux catégories d'actes avait été abordée par la Cour internationale de justice dans l'affaire des Immunités juridictionnelles de l'Etat. Dans son arrêt du 3 décembre 2012, la Cour n'y répond cependant pas directement, alors qu'elle écrit que « *La Cour estime qu'elle n'est pas, en l'espèce, appelée à trancher la question de savoir s'il existe, en droit international coutumier, une « exception territoriale » à l'immunité de l'Etat applicable aux actes jure imperii en général. Il lui faut seulement se prononcer sur les actes commis, sur le territoire de l'Etat du for, par les forces armées d'un Etat étranger et d'autres organes de celui-ci agissant en coopération avec lesdites forces dans le cadre d'un conflit armé* » (N° 65). Hazel FOX y voit une indication implicite que l'exception couvre les deux catégories d'actes (op. cit., page 478). Edward Chukwuemeke OKEKE considère aussi que l'exception ne distingue pas entre les deux catégories d'actes (op. cit, page 123). Les deux codifications du droit des immunités d'Etat (article 11 de la convention de 1972 et l'article 12 de la convention de 2004) ne comprennent pas de limitation de la dérogation aux seuls actes *jure gestionis*. Une étude consacrée à la convention de 2004 retient aussi que l'intention lors de la rédaction de la disposition afférente était de lui conférer un champ d'application large et d'y inclure les deux catégories d'actes (La convention des Nations Unies sur les immunités juridictionnelles des États et de leurs biens, Gerhard Hafner et Léonore Lange, Annuaire français de droit international, 2004, pages 66 et suivants).

En l'absence d'éléments allant en sens contraire, le tribunal estime établi que la dérogation s'applique à toutes catégories d'actes des Etats.

- Est-ce que le jeu de la dérogation requiert que le fait dommageable ait été commis sur le territoire de l'Etat du for ?

Les PARTIES ETATIQUES IRANIENNES affirment l'existence de cette condition en droit international public coutumier et soutiennent qu'elle ne serait pas remplie devant le juge luxembourgeois actuellement saisi, dès lors que le fait dommageable a eu lieu aux Etats-Unis d'Amérique. En ce sens, la dérogation à l'immunité juridictionnelle ouvrirait l'accès au for du lieu d'accomplissement de l'acte dommageable, mais ne pourrait plus jouer devant le juge de l'exequatur.

Les PARTIES DEMANDERESSES y opposent que cette condition ne saurait valoir que dans l'Etat du for saisi du fond du litige, mais qu'elle ne saurait trouver à s'appliquer par rapport au territoire de l'Etat du juge de l'exequatur, puisque celui-ci devrait statuer comme s'il était le juge du fond. Le juge de l'exequatur devrait donc statuer comme s'il était le juge américain et constater que la condition tenant au lieu d'accomplissement de l'acte dommageable sur son territoire est remplie.

Aucune des parties ne conteste en principe l'existence de cette condition qui est destinée, à l'instar de celle examinée au point suivant, à assurer un lien étroit entre l'Etat du for et l'action dommageable. Il importe toutefois d'en préciser la portée quant à la question de savoir quel acte, action ou activité doit être pris en considération pour examiner si cette condition est remplie. Il existe en effet une différence fondamentale entre la prise en compte de l'acte de l'auteur direct du dommage lorsque celui-ci n'est pas le bénéficiaire potentiel de l'immunité de juridiction et l'acte du bénéficiaire potentiel de l'immunité de juridiction lorsqu'il n'est pas l'auteur direct du fait dommageable. S'il se peut que tant l'auteur direct du fait dommageable que le bénéficiaire potentiel de l'immunité de juridiction aient agi sur le territoire de l'Etat du for, il est tout aussi bien possible que les lieux de réalisation des deux actions se différencient, soit que l'auteur direct ait agi sur le territoire de l'Etat du for et le bénéficiaire de l'immunité de juridiction en dehors de ce territoire, soit à l'inverse que le bénéficiaire potentiel de l'immunité ait agi sur le territoire de l'Etat du for mais que l'auteur direct du dommage ait agi en dehors de ce territoire.

Or, dans la mesure où la condition sous examen trouve sa justification dans l'établissement d'un lien étroit entre le territoire de l'Etat du for et l'activité de l'Etat invoquant l'immunité de juridiction, la condition ne saurait être interprétée autrement que comme requérant que l'activité du bénéficiaire potentiel de l'immunité de juridiction puisse être localisée sur le territoire de l'Etat du for pour que la dérogation à l'immunité de juridiction puisse jouer.

Toutefois, et sous peine de priver cette condition de tout effet utile, elle ne saurait être appliquée tel que le soutiennent les PARTIES ETATIQUES IRANIENNES comme requérant qu'il existe un lien entre le territoire de l'Etat du juge de l'exequatur et le lieu de l'acte à prendre en considération, en ce que ce dernier devrait avoir été commis sur le territoire de l'Etat du juge de l'exequatur. Une telle solution reviendrait à priver de toute circulation internationale les décisions rendues à l'encontre d'un Etat sur base de la dérogation sous examen, alors que l'acte ne peut en principe être localisé qu'en un seul endroit.

La condition ne saurait cependant pas non plus être appliquée, tel que le soutiennent les PARTIES DEMANDERESSES, devant le seul juge saisi du fond, à l'exclusion du juge de l'exequatur, sous peine de la priver de toute portée dans le cadre d'une demande en exequatur. Aucun élément avancé par les parties ne permet d'opérer à son égard une distinction entre le juge du fond et le juge de l'exequatur.

Ce dilemme ne peut être résolu qu'en retenant que le juge de l'exequatur statue « comme si » il était juge du fond et vérifie, afin de statuer sur le bénéfice de l'immunité de juridiction dans son for, si le fait à prendre en considération a été commis sur le territoire de l'Etat du juge du fond.

En l'espèce, il ne fait pas de doute que le fait dommageable, i.e. les attentats du 11 septembre 2001, a été commis sur le territoire des Etats-Unis d'Amérique. Toutefois, la procédure devant le tribunal américain ne tendait pas à mettre en cause la responsabilité des auteurs directs de ces attentats, mais la responsabilité des PARTIES ETATIQUES IRANIENNES en ce que celles-ci auraient facilité par leurs actes et/ou abstentions l'exécution de ces attentats. Or, la description des faits fournis dans le cadre de la procédure judiciaire devant le tribunal américain ne fait ressortir aucune activité des PARTIES ETATIQUES IRANIENNES sur le territoire des Etats-Unis d'Amérique, ni surtout une activité des PARTIES ETATIQUES IRANIENNES sur le territoire des Etats-Unis d'Amérique qui ait pu contribuer à rendre les attentats possibles ou plus faciles à réaliser.

La condition n'est partant pas remplie.

- Est-ce que le jeu de la dérogation requiert que l'Etat défendeur dont la responsabilité est recherchée, respectivement ses agents auxquels sont imputés les faits litigieux, doit avoir été présent sur le territoire de l'Etat du for ?

Les PARTIES ETATIQUES IRANIENNES soutiennent qu'elles n'ont pas été présentes sur le territoire des Etats-Unis d'Amérique et ne pouvaient donc y poser aucun des actes de soutien qui leur sont reprochés sur le territoire des Etats-Unis d'Amérique et que les auteurs ayant perpétré les attentats du 11 septembre 2001 ne sauraient être qualifiés comme étant leurs agents.

Les PARTIES DEMANDERESSES pour leur part plaident que cette condition n'est pas comprise dans le droit international public coutumier. Il suffirait de constater que le fait dommageable a été commis sur le territoire de l'Etat du for pour que la dérogation puisse jouer. Par ailleurs, si une telle condition devait exister, elle ne pourrait trouver à s'appliquer que devant le juge du fond, et non pas devant le juge de l'exequatur. La condition serait en tout état de cause remplie compte tenu de la présence de la représentation permanente de la REPUBLIQUE ISLAMIQUE D'IRAN auprès des Nations Unies à New York et d'un bureau de la REPUBLIQUE ISLAMIQUE D'IRAN à Washington, D.C..

Les deux codifications du droit des immunités d'Etat retiennent à l'identique la condition d'une présence de l'Etat défendeur sur le territoire de l'Etat du for au moment de l'acte dommageable.

Les PARTIES DEMANDERESSES y opposent les législations de neuf Etats qui ne renfermeraient pas pareille condition. Le tribunal note cependant d'une part qu'il s'agit là d'une infime minorité des presque 200 Etats existants à l'heure actuelle sur le globe terrestre et que seules deux de ces législations (Israël et Japon) sont postérieures à la convention des Nations Unies de 2004, alors que les autres y sont antérieures (Etats-Unis d'Amérique, Argentine, Australie, Canada, Royaume Uni, Afrique du Sud, Singapour). La portée de ces législations nationales est par ailleurs réduite par le constat que le Japon a ratifié la convention de 2004 et que le Royaume Uni y participe, mettant ainsi en doute la pertinence de leurs législations nationales au regard tant du contenu de la coutume internationale que de l'*opinio iuris* qui délimiterait la coutume internationale en faisant abstraction de cette condition.

Le tribunal note encore que la Cour européenne des droits de l'homme a admis que cette condition faisait partie du droit international public coutumier (Arrêt du 21 novembre 2001, Al-Adsani/Royaume-Uni, N° 35763/97, CEDH 2001-XI).

Les nécessités tenant à une application restrictive des exceptions au principe de l'immunité juridictionnelle et à une application coordonnée de l'exception telle que figurant dans les deux conventions appellent à devoir inclure cette condition dans le droit international public coutumier. Par ailleurs, elle doit être appliquée comme requérant la présence de l'Etat ou de ses agents sur le territoire de l'Etat du for à l'époque du fait dommageable et en rapport avec l'accomplissement du fait dommageable.

En l'espèce, il n'est allégué d'aucune présence des PARTIES ETATIQUES IRANIENNES sur le territoire des Etats-Unis d'Amérique en tant qu'Etat du for qui puisse être mise en relation avec les faits dommageables. Il ne suffit pas aux demandeurs de faire état d'une présence générale de la REPUBLIQUE ISLAMIQUE D'IRAN pour que cette condition soit remplie.

La condition n'est partant pas remplie.

Il résulte de ce qui précède que les PARTIES DEMANDERESSES ne peuvent pas faire état à leur profit de l'exception à l'immunité de juridiction tirée de l'existence d'actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées.

### 2.1.2.2.2.4.Dérogation à l'immunité de juridiction pour les actes de terrorisme et pour les actes violant une norme de *jus cogens* ?

Les PARTIES DEMANDERESSES font valoir que des actes de terrorisme constitueraient des actes graves qui seraient unanimement condamnés à travers le monde, et qu'ils constitueraient des actes *jure gestionis*. De tels actes engageraient la responsabilité internationale de l'Etat les ayant commis ou y ayant contribué et il serait de la responsabilité de tous les Etats de combattre le terrorisme. Le droit international public serait favorable à la levée de l'immunité juridictionnelle à l'encontre des Etats qui ont participé à de tels actes. Les législations des Etats-Unis d'Amérique et du Canada couleraient dans le droit écrit cette approche du droit international public en privant de leur immunité les Etats qui ont sponsorisé le terrorisme. L'état du droit internationale public, tant en ce qui concerne la notion d'acte de terrorisme qu'en ce qui concerne la notion d'actes

commis en violation du *jus cogens*, n'interdirait pas aux juridictions de déroger à la règle de l'immunité juridictionnelle au détriment des Etats qui se seraient rendus responsables de tels actes.

Les PARTIES ETATIQUES IRANIENNES contestent l'existence de la dérogation invoquée par les PARTIES DEMANDERESSES. Elles développent que la jurisprudence constante tant de la Cour internationale de justice que de la Cour européenne des droits de l'homme maintiendrait l'immunité de juridiction dans les affaires mettant en cause des actes de terrorisme ou des violations du *jus cogens*. La gravité de l'acte reproché à l'Etat défendeur n'aurait aucune incidence sur l'application de l'immunité juridictionnelle.

Par leur moyen, les PARTIES DEMANDERESSES font valoir l'existence d'une exception au principe de l'immunité de juridiction des Etats qui tiendrait à l'exécution d'actes dommageables d'une particulière gravité au regard de leur motivation sous-jacente lorsque celle-ci tiendrait à un dessein terroriste, respectivement au regard de la norme enfreinte lorsque l'acte dommageable porterait atteinte à un droit supérieur ressortant du *jus cogens*. Pour prospérer dans leur argumentaire, il ne leur suffit cependant pas d'établir que le droit international public n'interdirait pas l'octroi de l'immunité juridictionnelle dans de tels cas de figure. Il lui appartient au contraire d'établir positivement que le droit international public coutumier a consacré une telle dérogation. Cette preuve n'est pas rapportée.

Les PARTIES DEMANDERESSES ne démontrent en effet aucune pratique internationale qui ferait application d'une dérogation à l'immunité juridictionnelle en ce qui concerne les actes de terrorisme, à l'exception de la législation des Etats-Unis d'Amérique (qui a dû être amendée à plusieurs reprises pour la rendre opérationnelle ; voy, Edward Chukwuemeke Okeke, Jurisdictional Immunities of States and International Organizations, Oxford University Press, 2018, pages 144 et ss.) et du Canada. La doctrine qualifie cette exception comme étant controversée (voy. Okeke, op. cit., page 143) et parle de « anomalie américaine » (« *American Anomaly* », voy. Okeke, op. cit., 148).

A l'inverse, la Cour internationale de justice nie l'existence d'une dérogation à l'immunité de juridiction en raison de la gravité de l'acte (Cour internationale de justice, 3 février 2012, Immunités juridictionnelles de l'Etat, Allemagne c. Italie, Grèce (intervenant), N° 91 : « *La Cour conclut que, en l'état actuel du droit international coutumier, un Etat n'est pas privé de l'immunité pour la seule raison qu'il est accusé de violations graves du droit international, des droits de*

89

*l'homme ou du droit international des conflits armés* »). Cette conclusion vaut aussi pour les actes qualifiés de terroristes.

Pour les besoins de l'examen du moyen de défense tiré de l'immunité de juridiction, de tels actes ne sont à considérer que sous la seule qualification d'actes ayant causé le décès, le dommage corporel ou un préjudice matériel à des personnes privées tels qu'envisagés ci-dessus et au regard desquels le tribunal a décidé que les conditions de la dérogation au principe de l'immunité juridictionnelle ne sont pas remplies.

Pour ce qui concerne les actes constitutifs de la violation de normes supérieures issues du *jus cogens*, c'est à bon droit que les PARTIES ETATIQUES IRANIENNES soulignent que la jurisprudence des juridictions internationales nie l'existence d'une dérogation à la règle de l'immunité juridictionnelle (Cour internationale de justice, 3 février 2012, Immunités juridictionnelles de l'Etat, Allemagne c. Italie, Grèce (intervenant), N° 97 : « *En conséquence, la Cour conclut que, même en admettant que les actions intentées devant les juridictions italiennes mettaient en cause des violations de règles de* jus cogens, *l'application du droit international coutumier relatif à l'immunité des Etats ne s'en trouvait pas affectée* »).

Il résulte de ce qui précède que les PARTIES DEMANDERESSES ne peuvent pas faire état à leur profit de l'exception à l'immunité de juridiction tirée de l'accomplissement d'actes de terrorisme ou d'actes violant une norme de *jus cogens*.

### 2.1.2.2.3.   Incidence de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales

L'efficacité de l'immunité de juridiction est confrontée à un principe général du droit consacré par la Convention de sauvegarde des droits de l'homme et des libertés fondamentales du 4 novembre 1950, entrée en vigueur le 3 septembre 1953, et à ce jour en vigueur entre les 47 Etats membres du Conseil de l'Europe, dont le Luxembourg. L'article 6 de cette Convention consacre dans le droit positif supranational le droit au procès équitable, incluant le droit pour tout individu d'avoir accès à un tribunal pour voir statuer sur les contestations sur ses droits et obligations de caractère civil (Jacques Velu et Rusen Ergec, Convention européenne des droits de l'homme, Bruylant, 2ᵉ édition, 2014, N° 449 et suivants).

La circonstance que ni la REPUBLIQUE ISLAMIQUE D'IRAN, ni les ETATS-UNIS D'AMERIQUE en tant qu'Etat du for au fond et d'Etat de la résidence et/ou de la nationalité des PARTIES DEMANDERESSES ne soient parties à cette convention n'impacte pas sur l'applicabilité et l'application de ces principes devant le présent tribunal saisi de la demande en exequatur, dès lors qu'il s'agit de principes d'application universelle qu'il appartient aux organes des Etats membres à ladite convention de respecter et de faire respecter en tout état de cause.

Le tribunal constate que l'interaction entre la règle de droit international public coutumière de l'immunité de juridiction protectrice des Etats et des relations internationales et la règle de droit positif du droit d'accès au tribunal protectrice des droits des particuliers n'est pas ou peu thématisée dans les cénacles du droit international public. Ainsi, la décision phare en matière d'immunités juridictionnelles adoptée par la Cour internationale de justice, à laquelle se réfèrent les deux parties (arrêt du 3 février 2012, Immunités juridictionnelles de l'Etat, Allemagne c. Italie, Grèce (intervenant)), n'aborde pas la question. Seules certaines opinions individuelles ou dissidentes en traitent (voy. de façon limitée l'opinion individuelle de M. le juge Bennouna et l'opinion dissidente de M. le juge ad hoc Gaja et de façon plus extensive l'opinion dissidente de M. le juge Cancado Trindade et l'opinion dissidente de M. le juge Yusuf ; ces opinions opèrent en règle générale un lien avec la gravité de la violation de la règle de droit induisant le cas échéant la responsabilité de l'Etat concerné ; M. le juge Cancado Trindade a repris ses développements in The Primacy of the Right of Access to Justice over the Undue Invocation of State Immunities in Face of International Crimes, *Liber amoricum* Dean Spielmann, Mélanges en l'honneur de/Essays in Honour of Dean Spielmann, pages 65).

La Cour européenne des droits de l'homme a été amenée à examiner le lien entre les deux règles pour faire prévaloir en règle générale la règle de l'immunité de juridiction (voy. notamment Arrêts du 21 novembre 2001, Al-Adsani/Royaume-Uni, N° 35763/97, CEDH 2001-XI, Fogarty/Royaume-Uni, N° 37112/97, CEDH 2001-XI et McElhinney/Irlande, N° 31253/96, CEDH 2001-XI en matière d'immunité des Etats ; Arrêts du 18 février 1999 Waite et Kennedy/Allemagne, N° 26083/94, CEDH 1999-I et Beer et Regan/Allemagne, N° 28934/95, 18 février 1999 en matière d'immunité des organisations internationales ; pour une présentation doctrinale, voy. Droit des immunités et exigences du procès équitable, Actes du colloque du 30

avril 2004, contribution de F. Sudre, La jurisprudence de la Cour européenne des droits de l'homme, pages 21 à 24).

En doctrine, les auteurs ressortant du domaine du droit international public n'abordent en règle générale pas la question (voy. notamment Hazel Fox & Philippa Web, The Law of State Immunity, Oxford University Press, 3e édition ; Edward Chukwuemeke Okeke, Juridictional Immunities of States and International Organizations, Oxford University Press, 2018).

Les auteurs traitant des droits fondamentaux des personnes examinent l'interaction entre les deux règles et critiquent l'approche adoptée en ce domaine par la Cour européenne des droits de l'homme qui ne tiendrait pas suffisamment compte des exigences de protection des droits fondamentaux et des prérogatives et des droits conférés aux particuliers par la Convention de sauvegarde des droits de l'homme et des libertés fondamentales (voy. Droit des immunités et exigences du procès équitable, Actes du colloque du 30 avril 2004, contribution de F. Sudre, La jurisprudence de la Cour européenne des droits de l'homme, pages 24 à 31 ; Mirjam Baldegger, Das Spannungsverhältnis zwischen Staatenimmunität, diplomatischer Immunität und Menschenrechten, Helbing Lichtenhahn Verlag Nomos Verlag, pages 145 et suivantes ; Burkhard Hess, The Private-Public Divide in International Dispute Resolution, Pocketbook of The Hague Academy of International Law, N° 216 et suivants ; Sally El Sawah, Les immunités des Etats et des organisations internationales, Immunités et procès inéquitable, Larcier, 2012 ; Catherine Kessedjian, Immunités, in Encyclopédie Dalloz Procédure civile, N° 116 et ss, qui estime, par rapport à la question des violations du *jus cogens*, que « L'opinion dissidente commune des juges Rozakis et Caflisch à laquelle se sont ralliés quatre autres juges [dans l'affaire Al-Adsani/Royaume-Uni jugée par la Cour européenne des droits de l'homme], montre la voie à suivre »).

La règle écrite de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales garantissant l'accès à la justice et la règle coutumière de l'immunité de juridiction des Etats constituent deux règles d'égale valeur dans l'agencement juridique international. Ces deux règles entrent en conflit en ce que le droit d'accès à la justice reconnu au profit des particuliers constitue une limite à l'invocation de l'immunité juridictionnelle au profit des Etats, et en sens inverse en ce que le droit à l'immunité juridictionnelle reconnu au profit des Etats constitue une limite à l'exercice du droit d'accès à la justice profitant aux particuliers. En tant que normes

92

conflictuelles, il convient de les interpréter et de les appliquer de façon à les concilier autant que faire se peut afin de préserver à chacune d'elles ses fondements et ses objectifs (qui sont la prééminence du droit pour le droit d'accès au tribunal et le respect du droit international afin de favoriser la courtoisie et les bonnes relations entre États, grâce au respect de la souveraineté d'un autre État, pour l'immunité juridictionnelle), notamment au stade de la délimitation de leurs champs d'application respectifs (voy. en ce sens l'opinion dissidente du juge Loucaides dans l'affaire Al-Adsani jugée par la Cour européenne des droits de l'homme : « Toute forme d'immunité générale, qu'elle repose sur le droit international ou le droit national, qu'un tribunal applique afin de faire totalement barrage à une décision judiciaire sur un droit de caractère civil sans mettre en balance les intérêts concurrents, à savoir ceux que protège l'immunité dont il s'agit et ceux tenant à la nature de la demande spécifique qui est l'objet de la procédure pertinente, s'analyse en une limitation disproportionnée à l'article 6 § 1 de la Convention que, par ce motif, elle enfreint. Les tribunaux devraient pouvoir mesurer les intérêts concurrents qu'il y a à accorder une immunité ou à permettre une décision judiciaire sur un droit de caractère civil, après examen de l'objet de la procédure. … D'après moi, il y a incompatibilité dans tous les cas où l'application de ces immunités est automatique sans la mise en balance des intérêts concurrents que j'ai évoquée plus haut » ; voy. aussi Mirjam Baldegger, Das Spannungsverhältnis zwischen Staatenimmunität, diplomatischer Immunität und Menschenrechten, Helbing Lichtenhahn Verlag Nomos Verlag, pages 260 et suivantes).

Dans le cadre de cette mise en balance des intérêts légaux respectifs, le tribunal est amené à tenir compte, outre des raisons qui fondent l'existence des deux principes en conflit, des circonstances particulières de l'espèce telles que décrites ci-dessus, et plus particulièrement du critère juridique retenu par le tribunal américain pour écarter l'immunité de juridiction et pour fonder sa compétence internationale.

Ce critère réside dans une règle issue du *Foreign Sovereign Immunities Act*, inscrite à la règle 28 U.S. Code §1605A(a), généralement qualifiée de *Terrorist Exception*, rédigée comme suit :

    *(a) In General*

        *(1) No immunity*

        *A foreign state shall not be immune from the jurisdiction of courts of the United States or of*
        *the States in any case not otherwise covered by this chapter in which money damages are*

93

*sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.*

*(2) Claim heard - The court shall hear a claim under this section if*

   *(A)*

      *(i)*

         *(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or*

         *(II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) was filed;*

      *(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred*

         *(I) a national of the United States;*

         *(II) a member of the armed forces; or*

         *(III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and*

      *(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity*

> *to arbitrate the claim in accordance with the accepted international rules of arbitration; or*
>
> *(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.*

Le tribunal constate qu'il s'agit là d'une règle de droit national exorbitante du droit international qui justifie tant la compétence internationale des tribunaux américains que la dérogation à l'immunité de juridiction sur base de la qualification de l'Etat défendeur comme étant un Etat sponsorisant le terrorisme par acte du pouvoir exécutif sans requérir la commission spécifique d'actes dommageables sur le territoire des Etats-Unis d'Amérique et/ou la présence de cet Etat sur le territoire des Etats-Unis d'Amérique. Or, si la Convention de sauvegarde des droits de l'homme et des libertés fondamentales requiert de garantir l'accès à la justice, elle requiert tout autant que les droits procéduraux fondamentaux de chacune des parties soient respectés.

La mise en balance de l'ensemble des intérêts en présence amène dès lors à considérer que l'atteinte au droit d'accès au tribunal des PARTIES DEMANDERESSES par l'admission de l'immunité de juridiction par le juge de l'exequatur au profit des PARTIES ETATIQUES IRANIENNES n'est pas disproportionnée.

Il y a partant lieu de dire la demande irrecevable pour autant que dirigée contre les PARTIES ETATIQUES IRANIENNES.

### 2.2. Conditions de l'exequatur

Eu égard à la décision prise au titre de l'immunité de juridiction, l'examen des conditions juridiques posées à l'exequatur des décisions américaines devient sans objet.

### 3. La demande en tant que dirigée contre les ORGANISMES PUBLICS IRANIENS

Pour les besoins des développements, la SOCIETE NATIONALE IRANIENNE DE PETROLE, la SOCIETE NATIONALE DE GAZ IRANIEN, la COMPAGNIE AERIENNE D'IRAN et la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE sont ici collectivement désignées par les ORGANISMES PUBLICS IRANIENS.

Dans leurs conclusions, les ORGANISMES PUBLICS IRANIENS contestent que les conditions soient réunies pour que l'exequatur des décisions américaines puisse être accordé.

95

### 3.1.Positions des parties

### 3.1.1.  Les ORGANISMES PUBLICS IRANIENS

Les ORGANISMES PUBLICS IRANIENS font valoir que les conditions de l'exequatur ne seraient pas remplies sur quatre points.

### 3.1.1.1.Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique

Les ORGANISMES PUBLICS IRANIENS affirment que les PARTIES DEMANDERESSES ne rapporteraient la preuve du caractère exécutoire d'aucun des jugements dont l'exequatur est sollicité :

- le jugement du 22 décembre 2011 ne contiendrait aucune condamnation susceptible d'exécution et ne ferait pas partie des jugements pouvant être revêtus de l'exequatur
- le jugement du 3 octobre 2012 ne serait pas visé par le jugement du 12 septembre 2013 rendant exécutoire des décisions antérieures et ne serait de ce fait pas exécutoire
- le jugement du 12 octobre 2012,
    o bien que visé par le jugement du 12 septembre 2013 rendant exécutoire des décisions antérieures, serait dépendant du jugement du 3 octobre 2012 dans la mesure où il répartirait entre les victimes les montants retenus par le jugement du 3 octobre 2012, et ne serait dès lors pas exécutoire à défaut pour le jugement du 3 octobre 2012 d'être exécutoire
    o aurait aux termes de son contenu dû être signifié ensemble avec
        ▪ un document *Report and recommandation to the Honorable George B. Daniels* du 30 juillet 2012, mais que ce document n'aurait pas été joint à la demande de signification
        ▪ le jugement du 3 octobre 2012, mais que seule une copie signée ni par le juge ni par le greffier aurait été jointe à la demande de signification
    de sorte que les conditions de régularité de la signification ne seraient pas remplies, affectant de ce fait le caractère exécutoire du jugement
- les jugements des 22 décembre 2011, 3 octobre 2012 et 12 octobre 2012 n'auraient pas fait l'objet d'une signification régulière, alors qu'aucune des procédures entamées à ces fins n'aurait abouti (envoi par DHL au Ministère des affaires étrangères iranien infructueuse ;

96

transmission par le Département d'Etat américain refusée par ce dernier pour ne pas concerner un Etat étranger ou ses émanations ; transmission par le Département Fédéral suisse ne mentionnant pas les ORGANISMES PUBLICS IRANIENS)

- le jugement du 12 septembre 2013 n'aurait fait l'objet d'aucune procédure de signification aux ORGANISMES PUBLICS IRANIENS et ne serait de ce fait pas exécutoire.

Les ORGANISMES PUBLICS IRANIENS écrivent encore que pour pouvoir recevoir l'exequatur, le jugement étranger devrait contenir une condamnation susceptible d'exécution, pour ensuite souligner que seul le jugement du 3 octobre 2012 pourrait être considéré comme constituant le jugement final emportant condamnation à charge des parties défenderesses. Le jugement du 12 octobre 2012 se référerait expressément à celui du 3 octobre 2012. Par ailleurs, ce serait le jugement du 22 décembre 2011 qui retiendrait le principe de leur responsabilité. Les trois jugements seraient partant intimement liés, et faute d'être tous les trois exécutoires, aucun d'eux ne pourrait recevoir exécution. Or, le jugement du 3 octobre 2012 emportant condamnation ne serait pas exécutoire.

La SOCIETE NATIONALE IRANIENNE DE PETROLE relève encore qu'elle ne serait pas visée dans le jugement du 22 décembre 2011 retenant le principe de la responsabilité, de sorte qu'aucune condamnation susceptible d'exécution n'aurait été prononcée à son encontre.

### 3.1.1.2. Absence de compétence internationale du tribunal américain

Les ORGANISMES PUBLICS IRANIENS plaident que les jugements ne sauraient être revêtus de l'exequatur que pour autant que la juridiction américaine d'origine ait été internationalement compétente en vertu des règles de conflits luxembourgeoises pour statuer à leur égard. Tel ne serait pas le cas en l'espèce. Les ORGANISMES PUBLICS IRANIENS expliquent que la juridiction américaine aurait reconnu sa compétence en écartant l'immunité de juridiction au profit de la REPUBLIQUE ISLAMIQUE D'IRAN sur base d'une disposition légale spécifique au droit des Etats-Unis d'Amérique, dérogatoire à tous les principes admis en droit international public, permettant aux tribunaux américains de juger les Etats étrangers lorsqu'ils sont qualifiés par acte du gouvernement comme étant un Etat sponsorisant le terrorisme (*state sponsor of terrorism*) (règle 28 U.S. Code §1605A). Les Etats spécifiquement visés par la réglementation FSIA seraient non seulement privés de leur droit d'invoquer l'immunité de juridiction, mais seraient encore soumis à toutes les règles de droit américain, dont les procédures d'investigation intrusives du

*discovery*, portant là encore atteinte à l'immunité des Etats au stade de l'instruction judiciaire de l'instance.

En l'espèce, le tribunal américain d'origine aurait fait application de ces règles à la REPUBLIQUE ISLAMIQUE D'IRAN et aux ORGANISMES PUBLICS IRANIENS en les qualifiant sans justification aucune, à tort et abusivement d'émanations de la REPUBLIQUE ISLAMIQUE D'IRAN auxquelles s'appliqueraient les mêmes règles. Ce faisant, le tribunal américain aurait encore violé un traité d'amitié conclu entre la REPUBLIQUE ISLAMIQUE D'IRAN et les Etats-Unis d'Amérique en 1955 assurant à leurs ressortissants un traitement équitable et juste sur base d'un principe de réciprocité.

Dans la mesure où ils ne seraient pas des émanations de la REPUBLIQUE ISLAMIQUE D'IRAN, mais des organismes publics autonomes, le tribunal américain n'aurait pas pu retenir sa compétence à leur égard, de sorte que le juge luxembourgeois de l'exequatur devrait refuser l'exequatur des jugements rendus en violation des règles sur la compétence internationale.

### 3.1.1.3. Irrégularité de la procédure

Les ORGANISMES PUBLICS IRANIENS soutiennent que la procédure qui s'est déroulée devant la juridiction américaine aurait été irrégulière à trois égards.

### 3.1.1.3.1.  Violation du principe du contradictoire et des droits de la défense

Les ORGANISMES PUBLICS IRANIENS exposent qu'ils ne se seraient jamais vus signifier un acte introductif d'une instance devant le juge américain.

Dans ce cadre, ils n'abordent pas la question des deux premiers actes introductifs (*Class action* et *First Amended Complaint*).

Ils expliquent que le troisième acte introductif (*Second Amended Complaint*) ne leur aurait été adressé que par un service de courrier international (DHL). Il ne serait cependant pas établi que ces courriers internationaux leurs seraient parvenus :

-   le bordereau de délivrance du courrier destiné à la SOCIETE NATIONALE IRANIENNE DE PETROLE ne porterait pas de mention des expéditeurs et destinataires, ni de signature accusant réception

- le courrier destiné à la SOCIETE NATIONALE DE GAZ IRANIEN aurait été envoyé à une fausse adresse, et il ne pourrait pas être établi avec certitude que la personne ayant signé le bordereau de délivrance en ait été un employé
- le bordereau de délivrance du courrier destiné à la COMPAGNIE AERIENNE D'IRAN ne porterait pas de mention des expéditeurs et destinataires, ni de signature accusant réception
- le courrier destiné à la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE aurait été envoyé à une fausse adresse. Le bordereau de délivrance du courrier ne porterait pas de mention des expéditeurs et destinataires, ni de signature lisible accusant réception.

Il ne suffirait pas aux PARTIES DEMANDERESSES d'expliquer que les lacunes dans la lisibilité des documents ou les absences de mentions seraient le résultat d'une mauvaise qualité des scans.

Ils relèvent ensuite que le quatrième acte introductif (*Third Amended Complaint*) ne leur aurait jamais été notifié, alors que les PARTIES DEMANDERESSES auraient jouit d'une dispense de ce faire. Une telle dérogation à l'obligation de signifier l'acte introductif d'instance serait contraire au droit luxembourgeois.

Ils relèvent enfin que d'après les explications des PARTIES DEMANDERESSES, des jugements rendus par le tribunal américain en dates des 23 décembre 2002 et 8 août 2008 auraient déclaré les parties défenderesses défaillantes, mais que les PARTIES DEMANDERESSES ne verseraient aux débats ni ces jugements ni leur notification aux parties défenderesses.

D'une façon générale, il ne suffirait pas que les PARTIES DEMANDERESSES renvoient de façon abstraite à des dispositions légales américaines, mais il leur appartiendrait de prouver concrètement que les actes introductifs d'instance ont été notifiés aux parties défenderesses.

Le défaut de notification des actes introductifs à leur égard violerait leurs droits de la défense et expliquerait pourquoi ils n'ont pas comparu dans la procédure américaine, ayant été dans l'ignorance de son existence.

### 3.1.1.3.2.  Violation du droit d'accès au juge

Les ORGANISMES PUBLICS IRANIENS font valoir que le système mis en place par la règle 28 U.S. Code §1605A sur lequel la procédure menée à leur encontre aux Etats-Unis d'Amérique a pris appui priverait tout Etat désigné par le gouvernement américain comme Etat sponsorisant le

99

terrorisme, y compris ses ministères et autres émanations désignées comme telles (à tort en ce qui les concerne), de l'accès à un juge tel que garanti par l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales alors qu'il y aurait violation de l'égalité des armes (l'Etat étranger n'aurait pas la possibilité de présenter sa cause dans des conditions qui ne le placent pas en désavantage par rapport à son adversaire), violation du principe d'indépendance des juges (le pouvoir exécutif interviendrait dans le déroulement des procédures judiciaires à travers la désignation des Etats sponsorisant le terrorisme) et violation du principe d'impartialité des juges (les juges américains auraient un préjugé lorsqu'ils sont saisis d'une affaire prenant appui sur la règle 28 U.S. Code §1605A).

Les PARTIES DEMANDERESSES feraient valoir à tort que les ORGANISMES PUBLICS IRANIENS auraient pu apparaître devant le juge américain pour défendre leur cause, alors que l'existence de la règle 28 U.S. Code §1605A, sa teneur et l'application qu'en feraient les tribunaux américains (perte de l'immunité de juridiction découlant de la désignation comme Etat sponsorisant le terrorisme, impossibilité par l'Etat désigné de remettre en cause la désignation comme Etat sponsorisant le terrorisme, refus par les juges américains de remettre en cause la désignation comme Etat sponsorisant le terrorisme, interprétation large par les tribunaux américains des actes visés par la règle 28 U.S. Code §1605A, application d'une causalité approximative lors de l'application par les juges américains de la règle 28 U.S. Code §1605A, rejet systématique par les tribunaux américains de tout argument basant sur la violation du principe de la séparation des pouvoirs et de la violation du droit international) rendraient illusoire toute défense de la part d'un Etat, respectivement de ses émanations, désigné par le gouvernement américain comme Etat sponsorisant le terrorisme.

Les exemples jurisprudentiels versés aux débats par les PARTIES DEMANDERESSES pour établir les réelles possibilités des parties défenderesses d'assurer leur défense dans le cadre d'un procès prenant appui sur cette base seraient sans pertinence, alors que ces actions auraient été rejetées pour des raisons autres que l'application de la règle 28 U.S. Code §1605A.

Seule la désignation de la REPUBLIQUE ISLAMIQUE D'IRAN comme Etat sponsorisant le terrorisme et la qualification fausse d'émanation de la REPUBLIQUE ISLAMIQUE D'IRAN à leur égard auraient déterminé les condamnations intervenues. Dès lors que cette désignation ne

reposerait sur aucun critère objectif mais uniquement sur des considérations politiques, il y aurait inégalité des armes, dépendance des juges américains et partialité des juges américains.

### 3.1.1.3.3.  Violation de l'obligation de motiver les jugements

Les ORGANISMES PUBLICS IRANIENS relèvent que l'obligation de motivation des jugements serait une exigence essentielle pour protéger le justiciable de l'arbitraire et pour expliquer aux parties les fondements de la décision. Cette obligation découlerait de l'article 89 de la Constitution luxembourgeoise, de l'article 249 du Nouveau Code de Procédure Civile et de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales. Cette motivation devrait se trouver dans le jugement même, et non pas dans un document séparé qui ne formerait même pas partie intégrante du jugement. Le droit américain serait conçu de telle façon à ce qu'il n'exigerait pas que les jugements rendus par les tribunaux américains doivent être motivés. Si les procédures soumises à la réglementation anti-terroriste exigeaient que le demandeur doive établir la compétence du tribunal américain et démontrer l'existence de preuves satisfaisantes, le standard appliqué à cet égard serait toutefois minimal et ne permettrait pas de caractériser une réelle exigence de motivation.

Dans le cas d'espèce, aucun des jugements soumis à la procédure d'exequatur ne ferait l'objet d'une motivation. La SOCIETE NATIONALE IRANIENNE DE PETROLE ne serait même pas visée par le jugement du 22 décembre 2011. Ces lacunes ne pourraient pas être comblées par d'autres éléments.

Le document *Findings of Fact and Conclusions of Law* du 22 décembre 2011 qui comprendrait selon les PARTIES DEMANDERESSES la motivation afférente au jugement du même jour ne saurait être pris en considération à cet égard, dès lors que le jugement du 22 décembre 2011 n'y ferait même pas référence.

Le document *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 qui comprendrait selon les PARTIES DEMANDERESSES la motivation à l'appui du jugement du 3 octobre 2012 ne saurait être pris en considération à défaut d'avoir été notifié aux ORGANISMES PUBLICS IRANIENS, alors même que le jugement du 12 octobre 2012 aurait ordonné que ce *Report and Recommandation to the Honorable George B. DANIELS* soit notifié ensemble avec les jugements des 3 octobre 2012 et 12 octobre 2012. Même à admettre que le

101

*Report and Recommandation to the Honorable George B. DANIELS* vaille motivation du jugement du 3 octobre 2012, il faudrait constater que cette motivation ne leur aurait jamais été notifiée.

Aucun des trois jugements dont l'exéquatur est sollicité ni aucun des deux documents cités (*Findings of Fact and Conclusions of Law, Report and Recommandation to the Honorable George B. DANIELS*) n'auraient fait l'objet d'une signification régulière à leur égard. Les ORGANISMES PUBLICS IRANIENS renvoient sur ce point à leurs développements concernant les défaillances dans les procédures de notification des jugements et les incidences de celles-ci sur le caractère exécutoire des jugements.

Analysant l'argumentaire proposé par les PARTIES DEMANDERESSES devant le tribunal américain, les ORGANISMES PUBLICS IRANIENS relèvent que la condamnation reposerait essentiellement sur leur qualité de supposées émanations de la REPUBLIQUE ISLAMIQUE D'IRAN comme étant responsables à ce titre des actes de cette dernière, sans qu'un fait concret ne leur soit reproché. La *Third Amended Complaint* se limiterait à affirmer qu'ils fourniraient des fonds à la REPUBLIQUE ISLAMIQUE D'IRAN tout en sachant que ces fonds pourraient aider la REPUBLIQUE ISLAMIQUE D'IRAN à soutenir le terrorisme. Pour la COMPAGNIE AERIENNE D'IRAN, il serait seulement rajouté qu'elle aiderait la REPUBLIQUE ISLAMIQUE D'IRAN en transportant des terroristes. Les §§ 44 à 54 des *Proposed findings of fact and conclusions of law*, correspondant aux §§ 44 à 54 des *Findings of fact and conclusions of law*, ne permettraient pas de retenir des actes engageant leur responsabilité personnelle dans l'exécution des attentats du 11 septembre 2001. Par ailleurs, tous les éléments retenus à leur encontre reposeraient sur de simples témoignages, pour partie anonymes, sans être étayés par des éléments de preuve concrets.

Les jugements américains ne motiveraient pas non plus l'existence du contrôle exercé par la REPUBLIQUE ISLAMIQUE D'IRAN à leur encontre de nature à pouvoir justifier la qualification d'émanation de cet Etat à leur encontre.

### 3.1.1.4. Violation de l'ordre public luxembourgeois par les jugements américains

Après avoir développé que l'ordre public international à préserver tiendrait aux conceptions fondamentales de l'ordre moral, social, politique et économique du pays et de son système juridique, respectivement aux principes et structures fondamentaux du droit luxembourgeois,

102

respectivement les convictions fondamentales du droit applicable aux relations internationales, et après avoir reconnu l'application de l'effet atténué de l'ordre public dans le cadre des demandes d'exequatur, les ORGANISMES PUBLICS IRANIENS soutiennent que les conditions d'une violation de l'ordre public luxembourgeois seraient remplies en ce que les jugements américains en cause violeraient le droit international tenant notamment à l'immunité des Etats, violeraient les principes fondamentaux des sociétés démocratiques tenant à la séparation des pouvoirs et à l'indépendance et à l'impartialité des juges et violeraient les garanties de procédures fondamentales tenant au droit à un procès équitable, à l'égalité des armes, au principe du contradictoire, au droit d'accès au juge et à l'obligation de motivation des décisions de justice.

Les ORGANISMES PUBLICS IRANIENS plaident encore, tout en reconnaissant que la demande d'exequatur ne porte pas sur la condamnation à des dommages-intérêts punitifs, que même une condamnation à des dommages-intérêts excessifs dépassant le préjudice réellement subi devrait être considérée comme violant l'ordre public international luxembourgeois. Les condamnations prononcées dépasseraient le quantum du préjudice réel au regard des montants alloués par les juridictions luxembourgeoises pour des préjudices comparables et constitueraient des peines privées.

Le défaut de motivation des jugements concernant les critères de fixation des montants indemnitaires et leur répartition entre les victimes rendrait encore impossible toute vérification sur le respect des principes appliqués par les juridictions luxembourgeoises en matière d'indemnisation de victimes d'actes relevant de la responsabilité civile délictuelle.

En examinant le contenu du document *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 qui aurait servi d'après les PARTIES DEMANDERESSES à la fixation des dommages-intérêts et à leur répartition entre les victimes, les ORGANISMES PUBLICS IRANIENS relèvent qu'il y est procédé par forfaits, sans individualisation et en prenant en compte des chiffres dits « raisonnables », sans s'en expliquer autrement.

### 3.1.2.   Les PARTIES DEMANDERESSES

Les PARTIES DEMANDERESSES expliquent en termes généraux que la transmission aux parties défenderesses de l'acte introductif d'instance constitué par la *Second Amended Complaint* se serait faite conformément au *Foreign Sovereign Immunities Act* et qu'après l'expiration d'un délai de

plus d'un an, le tribunal américain aurait constaté par jugement du 27 décembre 2007 le défaut de comparution des parties défenderesses. Par la suite, la procédure se serait déroulée en deux phases. La première phase aurait porté sur le principe de la responsabilité et aurait abouti, après une audience de preuve du 15 décembre 2011, au jugement du 22 décembre 2011 accompagné du *Findings of Fact and Conclusions of Law* du même jour. La deuxième phase aurait porté sur l'indemnisation et aurait abouti, après le rapport du 30 juillet 2012, au jugement du 3 octobre 2012. Le tribunal américain aurait ensuite rendu le jugement du 12 octobre 2012, intégrant toutes les décisions antérieures et constituant selon le droit américain le jugement final et exécutoire. La signification des jugements aurait ensuite été régulièrement faite sur base des dispositions du *Foreign Sovereign Immunities Act*. Aucune des parties défenderesses n'aurait exercé un recours contre ces jugements. Et par décision du 12 septembre 2013, qui ne constituerait pas un jugement au sens du droit américain, le tribunal américain aurait autorisé l'exécution du jugement du 12 octobre 2012.

Elles admettent que l'octroi de l'exequatur requiert que quatre conditions soient remplies (le caractère définitif du jugement étranger ; la compétence internationale de la juridiction d'origine ; la régularité de la procédure devant la juridiction d'origine ; la conformité du jugement étranger à l'ordre public luxembourgeois), mais soutiennent que l'office du juge de l'exequatur ne comporterait pas le contrôle de la conformité du droit américain appliqué par la juridiction d'origine avec la Constitution américaine et le droit international public.

### 3.1.2.1. Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique

Les PARTIES DEMANDERESSES expliquent que la décision du 12 octobre 2012 porterait une condamnation clairement identifiable en ce qui concerne les montants, les créanciers et les débiteurs et constituerait la décision finale de la procédure entamée aux Etats-Unis d'Amérique. L'exequatur des décisions des 22 décembre 2011 (identifiant les parties à l'instance), 3 octobre 2012 (présentant les montants indemnitaires à charge des parties défenderesses) et 12 septembre 2013 (démontrant le caractère exécutoire du jugement du 12 octobre 2012) serait demandé parce qu'elles formeraient un ensemble cohérent avec la décision du 12 octobre 2012, de sorte qu'il relèverait de la bonne administration de la justice de solliciter l'exequatur pour chacune d'elles. Les conditions de l'exequatur devraient être vérifiées par rapport à ce jugement du 12 octobre

2012, et non pas par rapport à celui du 3 octobre 2012, ni à celui du 22 décembre 2011, ni encore de la décision du 12 septembre 2013 qui ne constituerait pas un jugement et ne serait pas soumis à l'obligation de signification. D'éventuels problèmes par rapport à un de ces trois jugements et/ou décision n'invalideraient pas l'exequatur à accorder pour le jugement du 12 octobre 2012.

Le caractère définitif et exécutoire du jugement du 12 octobre 2012 serait confirmé par un avis juridique COHN versé aux débats, par le jugement du 12 septembre 2013, qui devrait obligatoirement intervenir sur base des règles du *Foreign Sovereign Immunities Act* et par lequel le tribunal américain aurait constaté la régularité et l'efficacité de la transmission des jugements aux parties défenderesses, ainsi que par un certificat émis par le tribunal américain en date du 13 janvier 2017.

Le document *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 aurait bien été signifiée ensemble avec les jugements après le prononcé du jugement du 12 octobre 2012.

En ce qui concerne la transmission des jugements aux ORGANISMES PUBLICS IRANIENS, les PARTIES DEMANDERESSES expliquent qu'il y aurait eu plusieurs tentatives :
- un premier envoi aurait été fait par DHL au Ministère des Affaires étrangères de la REPUBLIQUE ISLAMIQUE D'IRAN, mais celui-ci aurait refusé d'accepter les plis
- un deuxième envoi aurait été fait par la voie diplomatique sur base de la règle 28 U.S. Code §1608(e) et (a)(4) à travers le Département d'Etat des Etats-Unis d'Amérique après émission de commissions rogatoires par le tribunal américain. Les documents auraient alors été envoyés par le Département d'Etat des Etats-Unis d'Amérique au Département Fédéral Suisse afin que l'ambassade helvétique à Téhéran les transmette au Ministère des Affaires étrangères de la REPUBLIQUE ISLAMIQUE D'IRAN. Ce dernier aurait refusé de prendre réception des documents. Sur base de la règle 28 U.S. Code §1608(a)(4), la signification aurait alors été régulière. Il ne saurait d'ailleurs être admis qu'une partie puisse refuser de prendre réception d'un acte judiciaire pour former barrage au déroulement de l'instance, sous peine de violer le droit d'accès au juge.

Concernant la situation particulière de la SOCIETE NATIONALE IRANIENNE DE PETROLE, les PARTIES DEMANDERESSES affirment qu'il résulterait de tous les éléments du dossier

105

qu'elle était incluse comme partie dans l'instance devant le tribunal américain et que son omission dans le jugement du 22 décembre 2011 ne serait que le fruit d'une erreur purement matérielle.

### 3.1.2.2. Absence de compétence internationale du tribunal américain

Les PARTIES DEMANDERESSES affirment que le tribunal américain aurait été internationalement compétent sur base de la règle classique de droit international privé luxembourgeois accordant compétence en matière de responsabilité civile délictuelle au tribunal du lieu de réalisation du dommage. L'acte dommageable ayant été commis et le dommage ayant été subi à New York, le tribunal de ce lieu aurait été compétent.

Elles rajoutent que le tribunal de New York aurait encore été compétent sur base de la règle 28 U.S. Code §1605A, issu du *Foreign Sovereign Immunities Act*, opposable aux Etats souverains et à toutes leurs émanations. Cette règle conforme au droit coutumier serait de nature à trouver application.

Elles relèvent que les ORGANISMES PUBLICS IRANIENS ne préciseraient pas en quoi le tribunal américain d'origine aurait violé le traité d'amitié irano-américain de 1955 en reconnaissant sa compétence.

### 3.1.2.3. Irrégularité de la procédure

Le tribunal note à ce stade que les PARTIES DEMANDERESSES exposent de façon contradictoire d'une part que le respect des règles procédurales de la loi du juge d'origine est vérifié pour assurer la régularité de la procédure suivie dans le but de détecter d'éventuelles fraudes commises au détriment du défendeur, ce qui induit un contrôle sur l'application de ses règles de procédure par le juge d'origine, et d'autre part que le juge luxembourgeois n'est pas compétent pour contrôler l'application exacte du droit américain, ce qui exclut un contrôle sur l'application de ses règles de procédure par le juge d'origine. Cette contradiction sera clarifiée ci-dessous.

Les PARTIES DEMANDERESSES exposent ensuite que toutes les règles auraient été observées.

### 3.1.2.3.1.  Violation du principe du contradictoire et des droits de la défense

Les PARTIES DEMANDERESSES plaident que le tribunal américain aurait vérifié le respect des formalités de transmission des actes introductifs d'instance aux parties défenderesses. L'existence

106

et l'étendue de ce contrôle résulteraient des *Findings of fact and conclusions of law* du 22 décembre 2011 et de deux avis juridiques STEWART et COHN.

Il n'y aurait pas eu besoin de signifier la *First Amended Complaint* aux ORGANISMES PUBLICS IRANIENS, alors qu'elles n'y étaient pas visées.

Par rapport aux contestations précises émises par les ORGANISMES PUBLICS IRANIENS, les PARTIES DEMANDERESSES expliquent

- en ce qui concerne la SOCIETE NATIONALE IRANIENNE DE PETROLE
  - o que les documents DHL montreraient la remise de la *Second Amended Complaint* à cette entité le 7 janvier 2007
  - o que l'absence d'adresse sur le bordereau DHL proviendrait de ce que les scans auraient été faits à partir d'un document papier de mauvaise qualité
- en ce qui concerne la SOCIETE NATIONALE DE GAZ IRANIEN
  - o qu'elles auraient utilisé l'adresse fournie sur un site bloomberg.com à défaut d'avoir pu trouver une adresse sur le site propre de la SOCIETE NATIONALE DE GAZ IRANIEN
  - o que les documents DHL montreraient la remise de la *Second Amended Complaint* à cette entité le 20 janvier 2007
  - o que la SOCIETE NATIONALE DE GAZ IRANIEN ne prouverait pas qu'elle n'aurait pas employé une personne du nom de celle qui a signé l'accusé de réception du courrier de transmission de la *Second Amended Complaint*
- en ce qui concerne la COMPAGNIE AERIENNE D'IRAN
  - o que les documents DHL montreraient la remise de la *Second Amended Complaint* à cette entité le 20 janvier 2007
  - o que l'absence d'adresse sur le bordereau DHL proviendrait de ce que les scans auraient été faits à partir d'un document papier de mauvaise qualité
- en ce qui concerne la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE
  - o qu'elles auraient utilisé l'adresse fournie sur un site iranwatch.org à défaut d'avoir pu trouver une adresse sur le site propre de la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE

- o que les documents DHL montreraient la remise de la *Second Amended Complaint* à cette entité le 7 janvier 2007
- o que l'absence d'adresse sur le bordereau DHL proviendrait de ce que les scans auraient été faits à partir d'un document papier de mauvaise qualité.

Les ORGANISMES PUBLICS IRANIENS feraient valoir à tort avoir été abusivement qualifiés d'entités dépendant de la REPUBLIQUE ISLAMIQUE D'IRAN. Cette qualification aurait été pleinement justifiée sur base des constatations faites par le tribunal américain, et il n'appartiendrait pas au juge de l'exequatur de vérifier cette appréciation portée par le tribunal américain.

Il n'y aurait pas eu besoin de notifier la *Third Amended Complaint* aux ORGANISMES PUBLICS IRANIENS, alors que le tribunal américain avait déjà constaté leur défaut de comparution. L'article 5(a)(2) des *Federal Rules of Civil Procedure* permettrait dans ces circonstances de faire abstraction d'une nouvelle signification.

Les décisions des 23 décembre 2002 et 8 août 2008 constatant le défaut de comparution des parties défenderesses ne constitueraient pas des jugements au sens du droit américain et en application de l'article 5(a)(2) des *Federal Rules of Civil Procedure* n'auraient pas eu besoin d'être signifiées.

### 3.1.2.3.2.  Violation du droit d'accès au juge

Les PARTIES DEMANDERESSES font valoir que la qualification d'Etat sponsorisant le terrorisme ne produirait d'effets que sur la mise à l'écart de l'immunité de juridiction, et n'emporterait aucune conséquence sur l'appréciation par la juridiction américaine sur le fond du litige et sur la question des responsabilités. Il appartiendrait toujours au tribunal américain de vérifier que les conditions de la responsabilité soient remplies.

Dans le cadre de cet examen, les tribunaux américains seraient entièrement impartiaux et indépendants. Aucun élément ne permettrait d'induire une partialité ou une dépendance dans leur chef du seul fait que la partie défenderesse relèverait de la catégorie des Etats qualifiés par le pouvoir exécutif d'Etats sponsorisant le terrorisme.

### 3.1.2.3.3.  Violation de l'obligation de motiver les jugements

Les PARTIES DEMANDERESSES ne contestent pas que par principe les jugements issus des tribunaux américains doivent être motivés. Elles font valoir en l'espèce que la motivation du

jugement du 12 octobre 2012, qui dans leur présentation constitue le jugement à exécuter, résiderait dans le jugement du 22 décembre 2011, les *Findings of fact and conclusions of law* du 22 décembre 2011, le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 et le jugement du 3 octobre 2012. Il ne serait pas requis que la motivation figure dans le jugement lui-même, mais elle pourrait résulter d'actes servant d'équivalents, y compris tous actes faisant partie de la procédure judicaire d'origine. Dans les procédures judiciaires américaines, la motivation se trouverait toujours matériellement consignée dans un document autre que le jugement à proprement parler (les *Findings of fact and conclusions of law* du 22 décembre 2011 constitueraient la motivation du jugement du 22 décembre 2011 ; le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 constituerait la motivation du jugement du 3 octobre 2012).

Les PARTIES DEMANDERESSES relèvent que dans le cadre de cette motivation, le tribunal américain aurait fait application d'un standard de preuve approprié, identique à celui qui trouverait à s'appliquer en cas d'action contre les Etats-Unis d'Amérique eux-mêmes. En l'espèce, la motivation serait dense pour retenir la responsabilité des ORGANISMES PUBLICS IRANIENS, en portant une appréciation séparée sur leurs agissements. Les PARTIES DEMANDERESSES relèvent encore que les membres du gouvernement de la REPUBLIQUE ISLAMIQUE D'IRAN feraient souvent partie des organes décisionnels des ORGANISMES PUBLICS IRANIENS, de sorte qu'il ne saurait être exclu que le pouvoir politique instrumentalise ces derniers pour ses besoins politiques.

Les PARTIES DEMANDERESSES estiment en fin de compte que le tribunal américain aurait statué sur base de son intime conviction en fonction des éléments de preuve qui lui avaient été soumis, et qu'il aurait appartenu aux ORGANISMES PUBLICS IRANIENS d'exercer les voies de droit mises à disposition par le droit américain s'ils avaient été en désaccord avec la décision rendue.

### 3.1.2.4. Violation de l'ordre public luxembourgeois par les jugements américains

Les PARTIES DEMANDERESSES relèvent que le contrôle au regard de l'ordre public devrait se limiter à la question de savoir si le résultat produit par le jugement étranger en cas d'octroi de l'exequatur engendrerait des conséquences contraires à l'ordre public, et non pas si le jugement en tant que tel heurterait l'ordre public luxembourgeois. En l'espèce, il résulterait de leurs

développements consacrés aux autres moyens produits par les ORGANISMES PUBLICS IRANIENS que les décisions dont l'exequatur est sollicité ne violeraient ni les principes fondamentaux de la démocratie, ni les garanties fondamentales de procédure.

Sur la question de l'étendue des dommages-intérêts alloués, les PARTIES DEMANDERESSES rappellent qu'elles ne demandent pas à voir rendre exécutoires les décisions américaines dans la mesure où elles octroient des dommages-intérêts punitifs de sorte que cette question ne se poserait pas, mais qu'il ne serait même pas certain qu'une telle reconnaissance soit contraire à l'ordre public.

Le juge de l'exequatur ne pourrait pas non plus apprécier les montants alloués, alors qu'il s'adonnerait de ce fait à une révision au fond qui ne pourrait pas se faire dans le cadre d'une demande d'exequatur.

Les montants alloués seraient conformes à une jurisprudence constante américaine et tiendraient compte du degré de parenté entre la victime directe décédée et la victime par ricochet demanderesse à l'instance.

### 3.2. Appréciation du tribunal
### 3.2.1.   Observations générales
### 3.2.1.1. Cadre d'analyse juridique

Saisi d'une demande en exequatur d'une décision de justice émanant d'un Etat non membre de l'Union européenne et se situant partant en dehors des règlements régissant la coopération judiciaire au sein de l'Union européenne, le juge luxembourgeois est amené à vérifier la régularité internationale du jugement étranger. En adoptant le cadre d'analyse identifié par la pratique jurisprudentielle française, ce contrôle porte sur

- o la compétence internationale indirecte du juge étranger : ce critère n'appelle pas à s'interroger si le juge d'origine était compétent en vertu de ses propres règles de compétence, ni si le juge d'origine a été compétent selon les règles de compétence internationale luxembourgeoises, mais repose sur la vérification de la compétence indirecte fondée sur la vérification d'un lien de rattachement caractérisé du litige au juge d'origine
- o la conformité à l'ordre public international

110

- de fond (ordre public substantiel) : le contrôle par rapport à ce critère amène le juge luxembourgeois de l'exequatur à vérifier si la reconnaissance de la décision étrangère dans son for est de nature à porter atteinte à son ordre public substantiel, cet ordre public n'étant considéré que sous son effet atténué, tiré de ce que le jugement d'exequatur ne constitue pas de nouveaux droits, mais n'a que pour objet de donner effet au Luxembourg de droits acquis sans fraude à l'étranger. L'examen de l'atteinte portée à l'ordre public ainsi considéré se fait en fonction de la matière traitée dans l'espèce et en considération du contenu de l'ordre public du juge requis au jour où il statue

  - de procédure (ordre public procédural) : ce contrôle ne comporte pas une vérification de la bonne application de ses lois de procédure par le juge d'origine, mais la vérification que la décision a été rendue dans les conditions de loyauté et d'équité que le droit procédural luxembourgeois s'efforce de faire respecter, à travers notamment la protection des droits de la défense et la garantie d'un procès équitable : acte introductif d'instance loyal et réel, déroulement de l'instance, modes de preuve, motivation du jugement, impartialité du juge, …

o l'absence de fraude au jugement : sous ce point, le juge luxembourgeois de l'exequatur peut être amené à devoir vérifier tout un ensemble de reproches divers adressés au jugement étranger constituant autant de déloyautés diverses qui ont pu entacher l'obtention régulière du jugement d'origine (affirmations mensongères, dissimulation de pièces, corruption de témoin, …) ou si les parties ont détourné les règles normalement applicables, notamment quant à la juridiction internationalement compétente ou la loi applicable, pour obtenir indirectement à l'étranger ce qu'elles n'auraient pas obtenu directement dans l'Etat requis de la demande en exequatur dans lequel elles vivent. En ce, le contrôle de l'absence de fraude à la loi constitue un correctif à l'abandon de tout contrôle sur la compétence internationale directe et sur la compétence législative

o l'absence de contradiction entre le jugement soumis à exequatur et un jugement rendu dans le for du juge de l'exequatur.

Pour chacun de ces critères de contrôle, l'appréciation doit se faire concrètement par rapport aux éléments de l'espèce et du contenu du jugement soumis à exequatur, sans que le juge de l'exequatur ne puisse se limiter à porter une appréciation générale. Pour exercer son contrôle, le juge de

111

l'exequatur est appelé à prendre en considération non seulement le jugement soumis à exequatur lui-même, mais tous les éléments extrinsèques à ce jugement, qu'ils soient antérieurs, concomitants ou postérieurs, et ce pour en déduire le cas échéant tant la régularité que l'irrégularité du jugement étranger. Dans le cadre de son contrôle, le juge de l'exequatur ne peut réviser le fond de ce qui a été jugé par le tribunal d'origine en ce sens qu'il ne peut pas substituer ses propres appréciations à celles du juge d'origine. Mais s'il est lié par les constatations de fait opérées par le juge d'origine, le juge luxembourgeois de l'exéquatur n'est pas lié par les qualifications faites à leur égard par le juge d'origine : le juge luxembourgeois requis peut examiner les éléments de fait nécessaires à l'exercice du contrôle de régularité en leur apportant les qualifications qu'ils requièrent au regard du contrôle auquel il doit procéder par rapport à la régularité des jugements soumis à exequatur, qui est un contrôle autre que celui auquel a procédé le juge d'origine.

Le juge de l'exequatur ne vérifie ni la compétence directe du juge d'origine, ni la compétence législative, c'est-à-dire si la loi appliquée par le juge d'origine est celle désignée par la règle de conflit de lois luxembourgeoise.

(sur le mécanisme global de la demande en exequatur, voy. Bernard Audit et Louis d'Avout, Droit international privé, LGDJ, 2018, N° 557 à 574 ; Olivier Cachard, Bruylant, 6e édition, Droit international privé, N° 746 à 753 ; Yvon Loussouarn, Pierre Bourel, Pascal de Vareilles-Sommières, Droit international privé, Dalloz, 2013, N° 864 à 878 et 884 à 891 ; Pierre Mayer et Vincent Heuzé, Droit international privé, Montchrétien, 10e édition, N° 380 à 384 et 390 à 397-1 ; Marie-Laure Niboyet et Géraud de Geouffre de La Pradelle, Droit international privé, LGDJ, 6e édition, N° 797 à 809)

La question du caractère exécutoire dans son pays d'origine de la décision soumise pour exequatur ne relève pas de la vérification de la régularité internationale du jugement, mais de la recevabilité de la demande en exequatur au regard de l'intérêt à agir du demandeur en exequatur (voy. Olivier Cachard, Bruylant, 6e édition, Droit international privé, N° 710 ; Yvon Loussouarn, Pierre Bourel, Pascal de Vareilles-Sommières, Droit international privé, Dalloz, 2013, N° 902 ; Dominique Bureau et Horatia Muir-Watt, Droit international privé, tome 1, PUF, 3e édition, N° 292 ; Marie-Laure Niboyet et Géraud de Geouffre de La Pradelle, Droit international privé, LGDJ, 6e édition, N° 791).

112

Les arguments avancés par les ORGANISMES PUBLICS IRANIENS relèvent partant d'une part de la recevabilité de la demande en exequatur à travers le contrôle de l'intérêt à agir, et d'autre part de la justification au fond de la demande en exequatur à travers le contrôle des conditions de régularité de la décision d'origine. Avant d'aborder l'examen de ces moyens, il importe de présenter le contexte procédural américain.

### 3.2.1.2. Contexte procédural américain

Le 19 février 2002, les parties demanderesses enregistrent une action de groupe auprès de la *United States District Court for the District of Columbia*. Cette action était dirigée contre un certain nombre de défendeurs étrangers à la procédure d'exequatur, ainsi que contre les actuelles PARTIES ETATIQUES IRANIENNES (telles que définies ci-dessus au point 2), à l'exclusion de Ali Akbar HASHEMI RAFSANJANI, ainsi que contre l'organisation HEZBOLLAH. Les ORGANISMES PUBLICS IRANIENS n'étaient pas visés.

Le 3 mai 2002, les parties demanderesses enregistrent une version modifiée de leur action de groupe (*Amended Complaint*) auprès de la *United States District Court for the District of Columbia*. Cette action reste dirigée contre un certain nombre de défendeurs étrangers à la procédure d'exequatur ainsi que contre les actuelles PARTIES ETATIQUES IRANIENNES (telles que définies ci-dessus au point 2), à l'exclusion de Ali Akbar HASHEMI RAFSANJANI, ainsi que contre l'organisation HEZBOLLAH, sans que les ORGANISMES PUBLICS IRANIENS n'y étaient pas visés.

Dans la mesure où les ORGANISMES PUBLICS IRANIENS n'étaient pas visés par ces actes de procédure, les éléments de procédure y attenants (*Affidavit* sur la signification du 1er novembre 2002 ; constats de défaut de comparution des parties défenderesses du 23 décembre 2002) sont sans incidence dans le cadre sous examen dans la présente procédure.

Le 11 décembre 2003, l'action est transférée à la *United District Court for the Southern District of New York*.

Le 7 septembre 2006, les parties demanderesses enregistrent à la *United District Court for the Southern District of New York* une action modifiée (*Second Amended Complaint*). Cette action est dirigée contre un certain nombre de défendeurs étrangers à la procédure d'exequatur ainsi que contre toutes les parties qui sont défenderesses à la présente procédure en exequatur.

113

La signification de cette action aux parties défenderesses fait l'objet d'un *Affidavit* d'un des avocats des PARTIES DEMANDERESSES enregistré le 24 août 2007.

Le 22 décembre 2007, le greffe de la *United District Court for the Southern District of New York* délivre un certificat constatant le défaut de comparution des parties défenderesses.

Le 23 juin 2010, les parties demanderesses enregistrent à la *United District Court for the Southern District of New York* une action modifiée (*Third Amended Complaint*). Cette action est dirigée contre un certain nombre de défendeurs étrangers à la procédure d'exequatur ainsi que contre toutes les parties qui sont défenderesses à la présente procédure en exequatur.

Le 15 décembre 2011, la *United District Court for the Southern District of New York* tient une audience de preuve.

Le 22 décembre 2011, le juge George B. DANIELS de la *United District Court for the Southern District of New York* rend un jugement (*Order of Judgment*) par lequel il est fait droit à la demande (« *Plaintiffs' Motion for Judgement by Default Against Sovereign Defendants, ..., is GRANTED and final judgement on liability is entered in favor of all Plaintiffs and against all Sovereign Defendants* »). L'entête de ce jugement énumère les 16 parties qui sont parties défenderesses à la présente procédure, tandis qu'à la suite du terme « *Sovereign Defendants* » figure une énumération reprenant ces parties, à l'exclusion de la SOCIETE NATIONALE IRANIENNE DE PETROLE. Ce jugement renvoie le dossier devant le juge Frank MAAS pour résoudre les problèmes subsistant, notamment concernant les dommages-intérêts.

Le 22 décembre 2011, le juge George B. DANIELS de la *United District Court for the Southern District of New York* adopte un document sur les constats factuels et conclusions en droit (*Findings of Fact and Conclusions of Law*). Ce document vise tant dans son entête que dans ses développements toutes les parties qui sont défenderesses à la présente procédure d'exequatur.

Le 30 juillet 2012, le juge Frank MAAS de la *United District Court for the Southern District of New York* rend un rapport (*Report and Recommandation to the Honorable George B. DANIELS*) dans lequel il propose d'allouer aux parties demanderesses des dommages-intérêts à hauteur de 6.048.513.805 USD répartis comme suit :

> o   dommages-intérêts économiques (*economic damages*) : 394.277.884.- USD

- o dommages-intérêts pour douleurs endurées (*damages for pain and suffering*) :2.000.000.- USD par personne décédée, soit 94.000.000.- USD au total
- o dommages-intérêts punitifs (*punitive damages*) : 4.686.235.921.- USD
- o dommages-intérêts pour perte d'un être cher (*solatium*) : 874.000.000.- USD
- o dommages-intérêts compensatoires non-économiques avant jugement au taux de 4,96% par an à partir du 11 septembre 2001 jusqu'au jour du jugement à intervenir sur les dommages-intérêts pour douleurs endurées et les dommages-intérêts pour perte d'un être cher (soit sur le total de 968.000.000 USD).

Le 3 octobre 2012, le juge George B. DANIELS de la *United District Court for the Southern District of New York* rend un jugement (*Memorandum Decision and Order*) par lequel il adopte le rapport du juge Frank MAAS et décide que la condamnation à l'encontre des parties défenderesses souveraines (*Sovereign Defendants*) doit intervenir à concurrence des montants suivants :

- o dommages-intérêts économiques (*economic damages*) : 394.277.884.- USD
- o dommages-intérêts pour douleurs endurées (*damages for pain and suffering*) : 2.000.000.- USD par personne décédée, soit 94.000.000.- USD au total
- o dommages-intérêts punitifs (*punitive damages*) : 4.686.235.921.- USD
- o dommages-intérêts pour perte d'un être cher (*solatium*) : 874.000.000.- USD.

Ce jugement ne précise pas en détail la liste des parties défenderesses souveraines (*Sovereign Defendants*) concernées.

Le 12 octobre 2012, le juge George B. DANIELS de la *United District Court for the Southern District of New York* rend un jugement (*Order and Judgement*) par lequel, par référence au *Memorandum Decision and Order* du 3 octobre 2012, il rend un jugement en faveur de tous les demandeurs à l'encontre de toutes les parties défenderesses souveraines (*Sovereign Defendants*) à concurrence des préjudices suivants :

- o dommages-intérêts économiques (*economic damages*) : 394.277.884.- USD, en indiquant une ventilation par victime directe
- o dommages-intérêts pour douleurs endurées (*damages for pain and suffering*) : 2.000.000.- USD par personne décédée, soit 94.000.000.- USD au total
- o dommages-intérêts pour perte d'un être cher (*solatium*) : 874.000.000.- USD, en indiquant une ventilation par victime indirecte

115

o dommages-intérêts punitifs (*punitive damages*) : 4.686.235.921.- USD, en indiquant pour chacune des catégories de dommages-intérêts (dommages-intérêts économiques, dommages-intérêts pour douleurs endurées, dommages-intérêts pour perte d'un être cher) une ventilation par victime directe respectivement indirecte

o dommages-intérêts compensatoires non-économiques avant jugement sur les dommages-intérêts pour douleurs endurées et les dommages-intérêts pour perte d'un être cher (soit sur le total de 968.000.000 USD).

Le 9 avril 2013, le juge Frank MAAS de la *United District Court for the Southern District of New York* délivre une commission rogatoire afin que le jugement du 12 octobre 2012 soit signifié par la voie diplomatique aux deux parties défenderesses personnes physiques, aux ORGANISMES PUBLICS IRANIENS, à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS et à l'organisation HEZBOLLAH.

Le 12 septembre 2013, le juge George B. DANIELS de la *United District Court for the Southern District of New York* adopte un *Order* par lequel il constate qu'un temps suffisant s'est écoulé depuis le jugement du 22 décembre 2011 sur la responsabilité et le jugement du 12 octobre 2012 sur les dommages-intérêts et autorise les demandeurs, désormais créditeurs de jugement, à poursuivre l'exécution du jugement du 12 octobre 2012 à l'encontre de tous les défendeurs iraniens.

### 3.2.2. Examen des moyens
### 3.2.2.1. Recevabilité : Caractère exécutoire des jugements américains

1/ L'exequatur étant la procédure visant à permettre dans l'Etat requis l'exécution, le cas échant forcée, du jugement soumis à la procédure, seules les décisions étrangères portant une réelle condamnation peuvent en principe être revêtues de l'exequatur.

1 a/ En l'espèce, les PARTIES DEMANDERESSES sont d'accord pour dire que seul le *Order and Judgement* du 12 octobre 2012 porte réellement une condamnation à l'encontre des ORGANISMES PUBLICS IRANIENS. C'est cependant à bon droit qu'elles font valoir que cette décision forme un ensemble cohérent et indissociable avec le *Order of Judgment* du 22 décembre 2011, qui retient le principe de la responsabilité des ORGANISMES PUBLICS IRANIENS, et le *Memorandum Decision and Order* du 3 octobre 2011, qui fixe les grandes catégories de dommages

116

indemnisables devant être pris en charge par les ORGANISMES PUBLICS IRANIENS. Les PARTIES DEMANDERESSES sont partant recevables à poursuivre l'exequatur de l'ensemble de ces trois décisions. Les conditions de recevabilité au regard de la condition d'exécutabilité ne sont cependant à apprécier que par rapport au seul *Order and Judgement* du 12 octobre 2012 qui emporte condamnation à des montants précis.

La demande est partant recevable en ce qu'elle tend à voir déclarer exécutoire le *Order of Judgment* du 22 décembre 2011, le *Memorandum Decision and Order* du 3 octobre 2011 et le *Order and Judgement* du 12 octobre 2012.

**1 b/** Le même raisonnement ne saurait cependant valoir pour le *Order* du 12 septembre 2013. Cette décision s'inscrit dans la procédure postérieure à l'adoption du jugement de condamnation susceptible d'exécution et ne s'attache pas au contenu de la condamnation intervenue. Il se borne à régler un aspect de procédure tenant à l'exécution du *Order and Judgement* du 12 octobre 2012, et ne peut ni ne doit à ce titre être revêtu de l'exequatur.

Le *Order* du 12 septembre 2013 est encore en tout état de cause étranger à la présente procédure d'exequatur. Cet *Order* est pris sur base de la règle 28 U.S. Code §1610(c) qui requiert que l'exécution aux Etats-Unis d'Amérique sur des biens dévolus à une activité commerciale appartenant à un Etat étranger ou à ses agences ou instrumentalités (*agency or instrumentality*, tels que ces notions sont définies à la règle 28 U.S. Code §1603) ne peut avoir lieu que sur base d'une autorisation judiciaire sur base du constat qu'un temps raisonnable s'est écoulé depuis le prononcé du jugement et sa signification au débiteur de jugement. Il s'agit partant d'une règle purement interne aux Etats-Unis d'Amérique pour permettre l'exécution sur des biens situés aux Etats-Unis d'Amérique, dont l'exequatur au Luxembourg ne présente aucune utilité.

La demande est partant irrecevable en ce qu'elle tend à voir déclarer exécutoire le *Order* du 12 septembre 2013.

**2/** Le caractère exécutoire des décisions américaines ainsi identifiées comme s'attachant à la condamnation au fond s'apprécie en fonction de la loi de l'Etat d'origine, à l'exclusion de la loi du for du juge de l'exequatur. C'est donc en l'espèce la loi américaine qui détermine les conditions sous lesquelles les jugements actuellement soumis à exequatur sont exécutoires sur le territoire des Etats-Unis d'Amérique.

117

Les PARTIES DEMANDERESSES entendent tirer la preuve du caractère exécutoire du *Order and Judgment* du 12 octobre 2012 de ce qu'elles ont pu procéder à son exécution aux Etats-Unis d'Amérique. La réalité d'une telle exécution n'est pas expressément admise par les ORGANISMES PUBLICS IRANIENS, et elle ne résulte pas des éléments du dossier. Cette affirmation n'apporte partant pas la preuve requise.

Le tribunal constate que le *Order* du 12 septembre 2013, pris sur base de la règle 28 U.S. Code §1610(c) qui requiert que l'exécution sur des biens dévolus à une activité commerciale appartenant à un Etat étranger ou à ses agences ou instrumentalités (*agency or instrumentality*) ne peut avoir lieu que sur base d'une autorisation judiciaire sur base du constat qu'un temps raisonnable s'est écoulé depuis le prononcé du jugement et sa signification au débiteur de jugement. L'émission d'un tel *Order*, permettant de poursuivre l'exécution sur des biens de l'Etat étranger ou de ses agences ou instrumentalités situés aux Etats-Unis d'Amérique, requiert nécessairement que le jugement visé soit exécutoire par ailleurs en vertu des règles de droit commun américaines. L'adoption de cet *Order* implique partant nécessairement que le juge qui l'a adopté a opéré les vérifications afférentes et pertinentes.

Au dossier figure encore un certificat du greffe de la *United District Court for the Southern District of New York* du 13 janvier 2017 dont il résulte que le *Order and Judgment* du 12 octobre 2012 ne fait pas l'objet d'un recours spécifique propre au droit américain et qu'il ne peut plus faire l'objet d'un appel ordinaire.

Le tribunal en déduit que les PARTIES DEMANDERESSES ont établi à suffisance de droit que le *Order and Judgment* du 12 octobre 2012 est exécutoire aux Etats-Unis d'Amérique.

**3/** Le débiteur de jugement peut former obstacle à la recevabilité de la demande en exequatur pour défaut d'intérêt lorsque le jugement dont l'exequatur est sollicité a déjà reçu pleine et entière exécution, soit dans l'Etat d'origine, soit dans tout autre Etat.

En l'espèce, face à l'affirmation des PARTIES DEMANDERESSES selon laquelle il y aurait eu exécution partielle aux Etats-Unis d'Amérique, les ORGANISMES PUBLICS IRANIENS ne confirment pas que tel serait le cas, ni encore n'affirment qu'une telle exécution aurait couvert l'intégralité des condamnations prononcées. Ce point n'est partant pas non plus de nature à former obstacle à la procédure d'exequatur.

118

**4/** En ce qui concerne la situation particulière de la SOCIETE NATIONALE IRANIENNE DE PETROLE qui n'est pas visée dans les développements du *Order of Judgment* du 22 décembre 2011, le tribunal est amené à constater qu'elle figurait nommément à la procédure américaine depuis la *Second Amended Complaint,* qu'elle est visée dans l'entête du *Order of Judgment* du 22 décembre 2011, que son identité et son intervention sont identifiées dans les *Findings of Fact and Conclusions of Law* du même 22 décembre 2011 et qu'il ne résulte d'aucun élément du dossier ni d'aucun argumentaire présenté par la SOCIETE NATIONALE IRANIENNE DE PETROLE que la demande à son égard aurait été à un quelconque moment de la procédure retirée ou rejetée. Le tribunal retient ainsi que l'omission de la SOCIETE NATIONALE IRANIENNE DE PETROLE dans les développements du *Order of Judgment* du 22 décembre 2011 n'a pas eu pour effet de l'enlever de la procédure et que partant le *Order and Judgment* du 12 octobre 2012 la vise également de façon à prononcer une condamnation à son encontre.

**5/** La question de savoir si le *Order of Judgment* du 22 décembre 2011, le *Memorandum Decision and Order* du 3 octobre 2011 et le *Order and Judgement* du 12 octobre 2012 ont fait l'objet d'une signification régulière aux ORGANISMES PUBLICS IRANIENS fait appel à la question de savoir si les ORGANISMES PUBLICS IRANIENS en ont été dûment informés pour leur permettre de faire valoir leurs droits de la défense à travers l'exercice des voies de recours disponibles sous l'empire du droit américain. Cette question relève partant des conditions de régularité des décisions au regard de l'ordre public procédural et sera examinée à ce titre.

### 3.2.2.2.Fond : Conditions de régularité des jugements américains
### 3.2.2.2.1.   Compétence internationale du tribunal américain

Dans le cadre de la vérification de la compétence internationale du tribunal d'origine, le juge luxembourgeois de l'exequatur ne vérifie ni si le juge d'origine aurait été compétent en vertu des règles de conflit de juridiction luxembourgeoises, ni si le juge d'origine a correctement appliqué ses propres règles de conflit de juridiction. Dans le cadre de ce contrôle, il est dès lors sans incidence que le juge d'origine ait fait application d'une règle de droit interne qui pourrait être considérée comme extensive du droit international public coutumier ou encore contraire au droit international public coutumier. Il est de même sans incidence que le juge d'origine ait dans ce cadre opéré une qualification au détriment des ORGANISMES PUBLICS IRANIENS qui aurait permis de leur faire application de la règle ainsi dénoncée par eux.

Le contrôle exercé par le juge requis est celui de la vérification de la compétence internationale indirecte, qui requiert le constat d'un lien de rattachement caractérisé entre le territoire du juge d'origine et le litige.

En l'espèce, il est constant en cause pour résulter des éléments du dossier que le tribunal américain ne retient à l'encontre des ORGANISMES PUBLICS IRANIENS aucun fait qui aurait été commis par eux sur le territoire américain. Il est cependant tout autant constant que les faits délictueux commis par les auteurs directs des attentats ont été commis sur le territoire des Etats-Unis d'Amérique, tout comme il est constant que le préjudice a été subi par les différentes victimes directes et indirectes sur le territoire des Etats-Unis d'Amérique. Or, le lien qui rattache le for d'origine au lieu où s'est produit le fait dommageable, peu importe à ce stade si ce fait peut ou non être attribué directement à la partie défenderesse considérée, et au lieu où s'est produit le dommage, considéré comme étant soit le lieu où le dommage est survenu soit le lieu de l'événement causal, doit être considéré comme étant suffisamment caractérisé pour justifier en l'espèce de la compétence internationale indirecte du tribunal américain.

### 3.2.2.2.2.   Ordre public procédural : Irrégularités de la procédure

Le tribunal examine successivement les différents arguments soulevés, en suivant l'ordre logique dans lequel ils se présentent au cours du déroulement de la procédure devant le juge d'origine.

### 3.2.2.2.2.1.Signification de l'acte introductif d'instance

L'information donnée à la partie défenderesse sur l'existence d'une action en justice dirigée à son encontre et sur les éléments essentiels de cette action en justice au regard de son objet et de sa cause constitue un élément incontournable du principe du contradictoire et des droits de la défense, essentiels à la préservation du procès équitable. Face aux contestations afférentes des ORGANISMES PUBLICS IRANIENS, il convient partant de vérifier concrètement si les actes introductifs d'instance leur ont été régulièrement signifiés. Pour ce faire, il ne suffit pas de s'attacher aux affirmations factuelles fournies par le tribunal d'origine, mais dans la mesure où il revient au juge requis de faire observer son propre ordre public tel que conçu dans son système juridique, il lui appartient de vérifier concrètement si les diligences accomplies dans le cadre de la procédure d'origine ont permis d'atteindre le résultat tel que son système juridique le conçoit.

1/ Il est constant que les ORGANISMES PUBLICS IRANIENS n'étaient pas visés par l'action de groupe originairement déposée le 19 février 2002, ni par la *Amended Complaint* déposée le 3 mai 2002. La vérification d'une signification régulière de ces demandes à leur égard ne se pose partant pas.

2/ Les ORGANISMES PUBLICS IRANIENS ont été visés pour la première fois par la *Second Amended Complaint* du 7 septembre 2006.

Dans un *Affidavit du 24 aout 2007*, un des avocats des parties demanderesses à la procédure américaine explique avoir envoyé à chaque fois une copie en langue anglaise et en langue farsi

- à la SOCIETE NATIONALE IRANIENNE DE PETROLE par courrier DHL N° 830 8376 964 du 28 décembre 2006, et que ce courrier a été délivré le 7 janvier 2007 à 14.45 heures.

  Ces éléments résultent du dossier. S'il est exact que la fiche de remise ne mentionne ni expéditeur ni destinataire, la concordance entre les numéros DHL figurant sur les différents documents permet de retenir que ce courrier a été envoyé par l'étude d'avocats Mellon Webster & Shelly à la SOCIETE NATIONALE IRANIENNE DE PETROLE.

  Le tribunal identifie encore des traces d'écritures sous la rubrique destinée à la signature du destinataire sur le bordereau de remise. Si ces traces ne sont certes pas lisibles, leur présence permet au contraire de constater qu'au lieu de délivrance se trouvait une personne qui était habilitée à prendre réception d'un courrier adressé à la SOCIETE NATIONALE IRANIENNE DE PETROLE et à signer le bordereau.

- à la SOCIETE NATIONALE DE GAZ IRANIEN par courrier DHL N° 830 8199 701 du 28 décembre 2006 et que ce courrier a été retourné, et par courrier DHL N° 830 8199 200 et que ce courrier a été délivré le 20 janvier 2007 à 11.09 heures.

  Ces éléments résultent du dossier.

  L'adresse utilisée pour cet envoi correspond à une adresse publiquement accessible sur un site internet bloomberg.com et la SOCIETE NATIONALE DE GAZ IRANIEN n'apporte aucun élément à l'appui de son affirmation que cette adresse aurait été erronée.

  Il y a encore lieu de rejeter la contestation de la SOCIETE NATIONALE DE GAZ IRANIEN tenant à la qualité d'employé du signataire du bordereau de remise de l'envoi, alors que la présence de cette signature permet de constater qu'au lieu de délivrance se

121

trouvait une personne qui était habilitée à prendre réception d'un courrier adressé à la SOCIETE NATIONALE DE GAZ IRANIEN et qu'il appartient à cette dernière de combattre positivement cette apparence en démontrant que le signataire ne faisait pas partie de son personnel.

- la COMPAGNIE AERIENNE D'IRAN par courrier DHL N° 830 8199 664 du 28 décembre 2006 et que ce courrier a été retourné, et par courrier DHL N° 830 8199 196 et que ce courrier a été délivré le 20 janvier 2007 à 13.28 heures.

Ces éléments résultent du dossier.

Il en résulte encore que le bordereau de délivrance correspondant à l'envoi DHL N° 830 8199 196 renseigne clairement les adresses des expéditeur et destinataire, ainsi que la signature de la personne ayant réceptionné l'envoi.

- la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE par courrier DHL N° 830 8376 672 du 28 décembre 2006, et que ce courrier a été délivré le 8 janvier 2007 à 9.32 heures.

Ces éléments résultent du dossier. S'il est exact que le bordereau de délivrance ne mentionne ni expéditeur ni destinataire, la concordance entre les numéros DHL figurant sur les différents documents permet de retenir que ce courrier a été envoyé par l'étude d'avocats Mellon Webster & Shelly à la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE.

L'adresse utilisée pour cet envoi correspond à une adresse publiquement accessible sur un site internet iranwatch.org et la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE n'apporte aucun élément à l'appui de son affirmation que cette adresse aurait été erronée.

Le bordereau de délivrance contient finalement une signature, qui n'est certes pas lisible, mais ce qui est monnaie courante pour une signature. La présence de cette signature permet au contraire de constater qu'au lieu de délivrance se trouvait une personne qui était habilitée à prendre réception d'un courrier adressé à la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE.

Pour être complet, le tribunal retient encore qu'il n'existe aucune raison pour retenir comme étant un mode de transmission inadmissible ou même prohibé l'envoi de courriers internationaux par le service de messagerie privé DHL.

Le tribunal retient sur base de ce qui précède que la *Second Amended Complaint* du 7 septembre 2006 a été régulièrement portée à la connaissance des quatre ORGANISMES PUBLICS IRANIENS.

**3/** Il est constant que la *Third Amended Complaint* du 23 juin 2010 n'a à aucun moment fait l'objet d'une signification à l'attention des ORGANISMES PUBLICS IRANIENS.

L'article 5(a)(2) des *Federal Rules of Civil Procedure* invoqué par les PARTIES DEMANDERESSES pour faire valoir l'absence de nécessité de signifier la *Third Amended Complaint* aux ORGANISMES PUBLICS IRANIENS est rédigé comme suit : « *No service is required on a party who is in default for failing to appear. But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4* ». Tout en constatant que la dispense de signification n'est pas absolue, mais ne joue que si les nouvelles plaidoiries ne comportent pas de nouvelle demande (*a new claim for relief*), le tribunal saisi de la demande en exequatur rappelle que la vérification de la régularité internationale du jugement dont l'exequatur est sollicité par rapport à l'ordre public procédural n'opère pas en fonction du contenu du droit national du juge d'origine, mais en fonction des conceptions fondamentales de l'ordre moral, social, politique et économique du pays et du système juridique du juge requis. Or, les exigences du procès équitable doivent amener à requérir la communication de tout acte de procédure qui non seulement comporte une demande nouvelle, mais encore qui comporte un argumentaire juridique ou une base légale nouvelle qui sont de nature à influer sur les conditions de responsabilité des parties défenderesses.

Pour opérer ce contrôle, il convient de présenter comparativement les actions contenues dans la *Second Amended Complaint et la Third Amended Complaint.*

A leur lecture, le tribunal constate que les présentations des questions de compétence, d'identification des parties et de faits (§§ 1 à 374) sont identiques dans les deux documents. Le défaut de signification de la *Third Amended Complaint* ne préjudicie ainsi pas aux ORGANISMES PUBLICS IRANIENS par rapport à ces points.

Les deux documents sont encore identiques dans la présentation de certaines des demandes au sens du but poursuivi et de la base légale : *Count three* à *Count seven* de la *Second Amended Complaint* et *Count two* à *Count six* de la *Third Amended Complaint* qui concernent *Alien Tort Claims Act,*

*Wrongfull Death, Survival, Negligent and/or Intentional Infliction of Emotional Distress, Conspiracy.* Du fait de cette identité, le défaut de signification de la *Third Amended Complaint* ne préjudicie pas non plus sur ces points aux ORGANISMES PUBLICS IRANIENS.

La *Third Amended Complaint* ne comprend plus les volets deux, huit, neuf et dix (*Count two, Torture Victim Protection Act ; Count eight, Treble Damages for U.S. Nationals ; Count nine, Punitive Damages ; Count ten, Punitive Damages-The Foreign State Defendants and their Agencies and Instrumentalities*) qui figuraient dans la *Second Amended Complaint*. Considéré sous l'angle d'une modification de la portée de la demande dans le sens d'une réduction des causes de la demande subséquente à cette suppression, le défaut de signification de la *Third Amended Complaint* ne préjudicie pas aux ORGANISMES PUBLICS IRANIENS.

La *Second Amended Complaint* invoquait dans son premier volet (*Count one*) la règle 28 U.S. Code §1605(a)(7) issue du *Foreign Sovereign Immunities Act*, tandis que la *Third Amended Complaint* se basait dans son premier volet sur la règle 28 U.S. Code §1605A inscrite au *Foreign Sovereign Immunities* en 2008. La question qui se pose dès lors est celle de savoir si cette modification de la base légale a eu pour conséquence d'aggraver la situation procédurale des ORGANISMES PUBLICS IRANIENS de façon à requérir dans une perspective de protection des droits de la défense à ce que la *Third Amended Complaint* ait dû leur être signifiée.

L'historique des règles américaines sur l'immunité des Etats révèle que l'exception à cette immunité tirée des actes de sponsoring du terrorisme a été introduite pour la première fois en 1976 dans la règle 28 U.S. Code §1605(a)(7). La jurisprudence américaine refusait cependant de reconnaître sur base de cette règle un droit d'action devant les cours fédérales, mais n'y voyait qu'une règle de compétence juridictionnelle qui permettait aux victimes d'agir devant les cours fédérales sur base du droit des Etats fédérés. Le législateur a modifié la règle en 2006 afin de conférer à la règle le statut d'un droit d'action. Une partie de la jurisprudence n'y reconnaissait cependant toujours qu'un droit d'action devant les cours fédérales à l'égard de défendeurs particuliers, à l'exclusion des Etats. Par une nouvelle intervention en 2008, le législateur américain a alors abrogé la règle 28 U.S. Code §1605(a)(7) pour introduire la règle 28 U.S. Code §1605A de façon à asseoir définitivement par voie législative que l'exception à l'immunité des Etats tirée du sponsoring du terrorisme puisse constituer la cause d'une action devant les cours fédérales tant à l'égard des Etats que de leurs agents, officiels et employés (David P. Stewart, The Foreign

124

Sovereign Immunuties Act : A Guide for Judges, Federal Judicial Center, 2013, page 83 et ss ; Edward Chukwuemeke Okeke, Juridictional Immunities of States and International Organizations, Oxford University Press, 2018, pages 143 et ss.). L'existence d'un effet créatif d'un droit d'action fédéral par l'introduction de la règle 28 U.S. Code §1605A en 2008 est partagée par les PARTIES DEMANDERESSES lorsqu'elles écrivent au point 377 de la *Third Amended Complaint* que « *The new Section 1605A unequivocally creates a federal private right of actin against the foreign state sponsors of terrorism* ». Dans le même sens, dans le cadre de l'évaluation des dommages-intérêts, le juge Frank MAAS écrit dans son *Report and Recommandation to the Honorable George B. DANIELS* que « *Section 1605A effected a 'sea change' in suits against state sponsors of terrorism. .... Previously, to recover damages against such defendants [i.e. foreign states that had been designed as state sponsors of terrorism], plaintiffs had to demonstrate their entitlement under state or foreign law. ... Now, such claims are subject to a 'uniform federal standard'* ».

Le tribunal en déduit que cette levée de l'insécurité juridique quant au droit d'action qui fondait la demande devant la juridiction américaine a conduit les PARTIES DEMANDERESSES à omettre dans la *Third Amended Complaint* le *Count two*, c'est-à-dire la base légale tirée du *Torture Victim Protection Act*, pour fonder désormais leurs prétentions sur la règle du *State Sponsored Terrorism* inscrite au *Foreign Sovereign Immunities Act* en 2008.

La question qui se pose dès lors est celle de savoir si cette modification de la base légale de l'action des PARTIES DEMANDERESSES a modifié la situation juridique des parties défenderesses à l'instance américaine, et notamment celle des ORGANISMES PUBLICS IRANIENS, de façon à ce que les exigences du procès équitable et de la protection des droits de la défense requérait que la demande modifiée leur soit signifiée.

Le *Torture Victim Protection Act* dispose que

> « *Liability. – An individual who, under actual or apparent authority, or color of law, of any foreign nation (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death* »

L'action privée inscrite à la règle 28 U.S. Code §1605A(c) se lit comme suit

125

*(c) PRIVATE RIGHT OF ACTION. - A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to*

*(1) a national of the United States,*

*(2) a member of the armed forces,*

*(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or*

*(4) the legal representative of a person described in paragraph (1), (2), or (3),*

*for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages.*

*In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.*

Les actes couverts par cette disposition sont décrits au point (a)(1) :

*"(a) IN GENERAL. - (1) NO IMMUNITY. - A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.*

Le tribunal constate que la base légale de l'action nouvellement introduite par la *Third Amended Complaint* diverge de façon considérable de celle invoquée dans la *Second Amended Complaint*. Si le *Torture Victim Protection Act* ne décrète une responsabilité que pour les actes de torture (*torture*) et de meurtre extra-judiciaire (*extrajudicial killing*), la règle 28 U.S. Code §1605A y ajoute le sabotage d'aéronef (*aircraft sabotage*), la prise d'otages (*hostage taking*) ainsi que d'une

façon générale la fourniture d'un soutien matériel ou en ressources en vue de l'exécution de tels actes (*the provision of material support or resources for such an act*). De ce fait, les conditions de mise en cause de la responsabilité des ORGANISMES PUBLICS IRANIENS ont été modifiées profondément, requérant à ce qu'ils puissent disposer d'une chance réelle d'avoir connaissance de ce nouveau fondement de l'action dirigée à leur encontre et d'y défendre. A défaut de signification de la *Third Amended Complaint* à leur encontre, la procédure suivie devant la juridiction américaine ne remplit dès lors pas le standard requis par les exigences de la protection des droits de la défense et du droit au procès équitable tel que conçu par les conceptions fondamentales du droit judiciaire privé luxembourgeois. La procédure d'élaboration des jugements soumis à exequatur viole dès lors l'ordre public procédural, formant ainsi obstacle à leur mise à exécution au Luxembourg.

### 3.2.2.2.2.2.Droit d'accès au juge

Il résulte de ce qui précède que la règle 28 U.S. Code §1605A qui a servi en fin de compte de support à l'action devant la juridiction américaine comporte deux volets distincts : la levée de l'immunité juridictionnelle de l'Etat qui a été désigné par le pouvoir exécutif américain comme étant un Etat sponsorisant le terrorisme et une règle fondant le droit d'action individuel des personnes qui se prétendent être les victimes des actes d'un Etat ainsi désigné. L'ensemble des reproches formulés par les ORGANISMES PUBLICS IRANIENS sous la référence au droit d'accès au juge tiennent aux conditions dans lesquelles le droit américain règle ces deux volets, que les ORGANISMES PUBLICS IRANIENS considèrent comme étant excessives, sinon exorbitantes du droit commun. Par aucun de leurs arguments, les ORGANISMES PUBLICS IRANIENS ne mettent cependant en cause les caractéristiques organiques principales qui doivent caractériser la juridiction saisie au fond pour que la condition de l'accès au juge soit respectée, et qui tiennent à l'indépendance et à l'impartialité du tribunal américain ayant statué en l'espèce.

La circonstance que les tribunaux américains d'une façon générale exercent un contrôle limité sur les conditions d'application de la règle 28 U.S. Code §1605A, respectivement qu'ils en fassent une application extensive au détriment des parties défenderesses poursuivies sur cette base, ne permet pas nécessairement de conclure que le juge saisi en l'espèce en aurait fait de même. Et même à admettre que le juge saisi en l'espèce ait fait application de ces règles dans le sens dénoncé par les ORGANISMES PUBLICS IRANIENS, il resterait toujours qu'il ne ferait dans ce cadre qu'exercer

127

son office de juge dans le cadre de sa mission d'application et d'interprétation de la loi et dans les limites de son pouvoir d'appréciation, sans qu'on puisse en déduire un manque d'impartialité ou d'indépendance dans son chef. S'agissant d'une question d'application de la loi américaine de fond par le juge saisi du fond, il aurait appartenu aux ORGANISMES PUBLICS IRANIENS (sous réserve de ce qui a été dit au point précédent concernant leur habilité concrète à avoir connaissance des éléments de la demande dirigée à leur encontre) d'assurer leur défense dans le cadre de la procédure américaine, sans qu'ils ne puissent discuter devant le juge de l'exequatur la teneur et l'application de la loi américaine de fond.

### 3.2.2.2.2.3.Motivation des jugements

**1/** L'existence d'une motivation est consubstantielle à la régularité de tout jugement. Il n'est cependant pas requis que cette motivation figure dans le même document que celui qui prononce la condamnation. La condition de motivation peut être remplie par la production de documents pouvant servir d'équivalents. Le juge luxembourgeois de l'exequatur est nécessairement amené dans ce cadre à faire abstraction de ses propres règles et pratiques et de tenir compte de ce que la procédure et les modalités judiciaires puissent être réglées différemment dans d'autres Etats, pourvu que le résultat recherché, à savoir l'existence d'une motivation à l'appui de la teneur de la décision prise à l'égard de la partie défenderesse, soit établie.

En l'espèce, il est exact que les *instrumentums* servant de support aux trois décisions soumises à exequatur ne comportent pas de motivation. Chacune d'elles peut cependant se prévaloir d'un complément que le juge luxembourgeois de l'exequatur peut prendre en considération afin de constater positivement l'existence d'une motivation :

- le *Order of Judgment* du 22 décembre 2011 est supporté par les *Findings of Fact and Conclusions of Law* du même jour. Les deux documents se réfèrent à une audience de preuve du 15 décembre 2011
- le *Memorandum Decision and Order* du 3 octobre 2012 est supporté par le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 auquel il renvoie explicitement
- le *Order and Judgement* du 12 octobre 2012 est supporté tant par le *Memorandum Decision and Order* du 3 octobre 2012, qui y est visé directement et expressément, que par voie de

128

conséquence par le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012.

Tous ces documents portent la même référence de dossier 03 MDL 1570.

Le tribunal est partant amené à constater que les trois décisions sont motivées.

**2/** Les ORGANISMES PUBLICS IRANIENS discutent ensuite dans ce cadre la question de la régularité de la transmission des décisions à leur attention, en soutenant en substance qu'à défaut de signification régulière de tous les documents, ceux-ci ne sauraient être retenus à titre d'équivalents dans le cadre de l'appréciation de l'existence d'une motivation.

La question de l'existence d'une motivation est cependant indépendante de la question de savoir si elle a été portée à la connaissance des ORGANISMES PUBLICS IRANIENS. Cette question de l'identification des documents pertinents qui devaient être signifiés aux ORGANISMES PUBLICS IRANIENS et la question subséquente si tous les documents pertinents ainsi identifiés ont effectivement été signifiés relève de la vérification de la procédure de signification par rapport à la question de savoir si les ORGANISMES PUBLICS IRANIENS ont été mis en mesure d'exercer leur droit à un recours juridictionnel. Elles sont examinées ci-dessous.

**3/** Pour le surplus, les ORGANISMES PUBLICS IRANIENS contestent le contenu de la motivation en soutenant qu'elle serait incorrecte, inappropriée, lacuneuse, injustifiée et/ou manquant de pertinence en ce qui concerne les faits retenus à leur charge, le lien causal entre ces faits et l'acte dommageable, le montant des dommages-intérêts alloués et l'existence d'un contrôle exercé par la REPUBLIQUE ISLAMIQUE D'IRAN sur eux.

Le tribunal retient cependant que ni les raisonnements menés par le juge américain, ni les résultats auxquels il aboutit ne heurtent en tant que tels l'ordre public luxembourgeois. Par leurs arguments, les ORGANISMES PUBLICS IRANIENS mettent en cause non pas l'existence d'une motivation, mais le contenu de celle qui a été retenue à l'appui de la condamnation prononcée à leur encontre. Ce faisant, les ORGANISMES PUBLICS IRANIENS demandent au juge luxembourgeois de l'exequatur de porter une appréciation sur le fond du litige et de procéder *in fine* à une révision au fond des décisions prises. Pareille démarche ne relève cependant pas des missions et pouvoirs du juge de l'exequatur.

**4/** En ce qui concerne la situation particulière de la SOCIETE NATIONALE IRANIENNE DE PETROLE qui n'est pas visée dans les développements du *Order of Judgment* du 22 décembre 2011, le tribunal est amené à constater qu'elle figurait nommément à la procédure américaine depuis la *Second Amended Complaint*, qu'elle est visée dans l'entête du *Order of Judgment* du 22 décembre 2011, que son rôle est abordé dans les *Findings of Fact and Conclusions of Law* du même 22 décembre 2011 et qu'il ne résulte d'aucun élément du dossier ni d'aucun argumentaire présenté par la SOCIETE NATIONALE IRANIENNE DE PETROLE que la demande à son égard aurait été à un quelconque moment de la procédure retirée ou rejetée. Le tribunal retient ainsi que l'omission de la SOCIETE NATIONALE IRANIENNE DE PETROLE dans les développements du *Order of Judgment* du 22 décembre 2011 ne constitue pas un manque de motivation à son égard.

### 3.2.2.2.2.4.Signification des jugements

Dans le cadre de la procédure de mise à exécution dont la demande en exequatur est un préalable, la vérification de l'existence d'une signification régulière du jugement de condamnation est requise pour apprécier dans le chef de la partie défenderesse à la procédure d'origine si elle a été mise en mesure de prendre effectivement connaissance des éléments essentiels de la décision. Pareille signification doit partant s'entendre comme couvrant non seulement l'élément de procédure qui porte condamnation à charge de la partie défenderesse, mais également tous les éléments servant de support à cette condamnation, à savoir la motivation.

En outre, pareille signification doit porter sur tous les éléments décisionnels de la procédure originaire, incluant tant les questions de principe de responsabilité que les questions d'indemnisation et portant pour ces deux volets aussi bien sur la disposition judiciaire finale que sur la motivation y attenante.

Ce n'est que si les parties défenderesses à la procédure originaire disposent de l'intégralité de ces éléments qu'elles peuvent apprécier en connaissance de cause la nécessité et les chances d'introduire un recours devant la juridiction d'origine et que partant leurs droits procéduraux sont préservés à suffisance de droit.

Il en résulte que la signification doit inclure en l'espèce

- pour la question de la responsabilité

130

  o  le *Order of Judgment* du 22 décembre 2011, valant décision sur le principe de la responsabilité
  o  les *Findings of Fact and Conclusions of Law* du 22 décembre 2011, valant motivation à l'appui du *Order of Judgment*
- pour la question de l'évaluation des dommages
  o  le *Memorandum Decision and Order* du 3 octobre 2012, valant décision sur le montant global
  o  le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012, valant motivation à l'appui du *Memorandum Decision and Order*
- pour la question de la fixation individuelle des dommages-intérêts et de la condamnation
  o  le *Order and Judgement* du 12 octobre 2012 prononçant la condamnation concrète au profit des parties demanderesses et à charge des parties défenderesses.
     Ce *Order and Judgement* ordonne pertinemment *in fine* qu'il doit être signifié aux défendeurs ensemble avec le *Memorandum Decision and Order* du 3 octobre 2012 et le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012, qui valent motivation à son appui.

Ces cinq documents forment à cet égard un ensemble unique et indissociable dont la connaissance intégrale est indispensable à la compréhension de la procédure américaine de nature à préserver les droits des parties défenderesses.

Or, le tribunal constate qu'il résulte des pièces versées aux débats en rapport avec la preuve de la signification des jugements que celle-ci portait, outre certains documents inopérants pour les besoins de la question sous examen, sur

- le *Order of Judgment* du 22 décembre 2011
- le *Memorandum Decision and Order* du 3 octobre 2012
- le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012
- le *Order and Judgement* du 12 octobre 2012.

Cette procédure n'incluait pas les *Findings of Fact and Conclusions of Law* du 22 décembre 2011. De ce fait, la procédure n'était *ab inito* pas apte à remplir les exigences posées par l'ordre public procédural luxembourgeois au regard d'une information complète des parties défenderesses,

131

excluant que l'exequatur puisse être accordé, nonobstant la question de savoir si la signification a été fructueuse.

### 3.2.2.2.3.   Ordre public substantiel : Dommages-intérêts punitifs

Les développements des ORGANISMES PUBLICS IRANIENS concernant l'ampleur des dommages-intérêts alloués dans le cadre de la procédure américaine doivent être examinés au regard de l'ordre public substantiel, en ce que ces arguments questionnent la conformité de dommages-intérêts fixés à un montant important aux règles de fixation des dommages-intérêts présidant à la matière de la responsabilité civile délictuelle au Luxembourg.

Le tribunal rappelle dans un premier temps que les PARTIES DEMANDERESSES ont délibérément et de façon expresse exclu de leur demande en exequatur les volets des jugements américains qui leur ont alloué des dommages-intérêts qualifiés de punitifs, ne sollicitant partant d'elles-mêmes qu'un exequatur partiel. Il n'y a partant pas lieu d'examiner ce volet des dommages-intérêts punitifs qualifiés comme tels dans le jugement américain.

En faisant abstraction des dommages-intérêts punitifs que les PARTIES DEMANDERESSES ont ainsi expressément et de leur plein gré exclu de la demande en exequatur, les dommages-intérêts alloués par le *Order and Judgement* du 12 octobre 2012 sont fixés comme suit :

- dommages-intérêts économiques subis par les successions (*economic loss to estates*) : entre 1.200.501.- USD et 86.796.344.- USD.

  Ces montants ont été retenus sur base de calculs économétriques pour couvrir les pertes de revenus passées et futures, la perte de soutien familial, la perte de conseil, de guidance et d'instruction, la perte de services d'accompagnement et les intérêts avant jugement.

- dommages-intérêts pour douleurs endurées (*damages for pain and suffering*) : 2.000.000.- USD par personne décédée.

  Après avoir relevé que les victimes directes ont pu se trouver dans des conditions différentes engendrant le cas échéant des souffrances différentes (selon qu'elles se trouvaient dans l'une ou l'autre tour, auprès du Pentagone ou dans un avion et pouvaient avoir eu plus ou moins conscience de leur décès immédiat) mais en tout cas horribles (*horrific pain and suffering*), ce montant forfaitaire est retenu comme étant raisonnable.

- dommages-intérêts pour perte d'un être cher subis par les proches (*solatium*) :

  - o   4.250.000.- USD pour la perte d'un frère ou sœur

- o 8.500.000.- USD pour la perte d'un enfant
- o 8.500.000.- USD pour la perte d'un parent
- o 12.500.000.- USD pour la perte d'un conjoint

- dommages-intérêts compensatoires non-économiques avant jugement au taux de 4,96% par an à partir du 11 septembre 2001 jusqu'au jour du jugement à intervenir sur les dommages-intérêts pour douleurs endurées et les dommages-intérêts pour perte d'un être cher (soit sur le total de 968.000.000 USD).

   Le taux d'intérêt de 4,96% a été retenu comme constituant la moyenne du taux préférentiel entre le 11 septembre 2001 et le jour du rapport du juge Frank MAAS.

Ces quatre catégories de préjudice sont bien connues en droit luxembourgeois. Le simple fait qu'ils aient été retenus dans le cadre de l'indemnisation ne peut être considéré comme portant atteinte au stade de l'exécution à l'ordre public international du juge luxembourgeois requis.

Le tribunal constate que les dommages-intérêts pour perte économique et le taux pour les intérêts avant jugement procèdent de calculs mathématiques tenant compte des circonstances particulières propres aux différentes victimes, respectivement à la situation économique générale. La motivation fournie à l'appui de la fixation de ces montants ne laisse transparaître aucun élément punitif ou dissuasif.

Les dommages-intérêts pour douleurs endurées et pour perte d'un être cher sont fixés de façon forfaitaire, mais la motivation fournie à l'appui de la fixation de ces montants ne laisse transparaître aucun élément punitif ou dissuasif.

Le simple constat que les montants retenus pour ces différents chefs de préjudice dépassent, ou même dépassent largement, les montants qui auraient été alloués dans des circonstances comparables par une juridiction luxembourgeoise ne permet pas de retenir que la fixation de ces montants porterait atteinte à l'ordre public substantiel, que ce soit en raison d'un prétendu caractère excessif ou en raison de l'existence d'un motif de dissuasion ou de punition.

4. **La demande en tant que dirigée contre la SOCIETE NATIONALE IRANIENNE DES PETROLIERS**

La demande est dirigée contre la CORPORATION NATIONALE IRANIENNE DES PETROLIERS, qui est qualifiée dans l'acte d'assignation comme étant un organisme public. Il

133

résulte cependant des pièces versées aux débats par cette partie qu'il s'agit d'une société commerciale et qu'il convient de la désigner comme étant la SOCIETE NATIONALE IRANIENNE DES PETROLIERS.

Dans ses conclusions, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS conteste que les conditions soient réunies pour que l'exequatur des décisions américaines puisse être accordé.

### 4.1. Positions des parties

### 4.1.1.  La SOCIETE NATIONALE IRANIENNE DES PETROLIERS

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS fait valoir que les conditions de l'exequatur ne seraient pas remplies sur quatre points.

#### 4.1.1.1. Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS affirme que les PARTIES DEMANDERESSES ne rapporteraient la preuve du caractère exécutoire d'aucun des jugements dont l'exequatur est sollicité :

- le jugement du 22 décembre 2011 ne contiendrait aucune condamnation susceptible d'exécution et ne ferait pas partie des jugements pouvant être revêtus de l'exequatur
- le jugement du 3 octobre 2012 ne serait pas visé par le jugement du 12 septembre 2013 rendant exécutoire des décisions antérieures et ne serait de ce fait pas exécutoire
- le jugement du 12 octobre 2012,
    - o bien que visé par le jugement du 12 septembre 2013 rendant exécutoire des décisions antérieures, serait dépendant du jugement du 3 octobre 2012 dans la mesure où il répartirait entre les victimes les montants retenus par le jugement du 3 octobre 2012, et ne serait dès lors pas exécutoire à défaut pour le jugement du 3 octobre 2012 d'être exécutoire
    - o aurait aux termes de son contenu dû être signifié ensemble avec
        - un document *Report and recommandation to the Honorable George B. Daniels* du 30 juillet 2012, mais que ce document n'aurait pas été joint à la demande de signification

134

- le jugement du 3 octobre 2012, mais que seule une copie signée ni par le juge ni par le greffier aurait été jointe à la demande de signification

  de sorte que les conditions de régularité de la signification ne seraient pas remplies, affectant de ce fait le caractère exécutoire du jugement

- les jugements des 22 décembre 2011, 3 octobre 2012 et 12 octobre 2012 n'auraient pas fait l'objet d'une signification régulière, alors qu'aucune des procédures entamées à ces fins n'aurait abouti (envoi par DHL au Ministère des affaires étrangères iranien infructueuse ; transmission par le Département d'Etat américain refusée par ce dernier pour ne pas concerner un Etat étranger ou ses émanations ; transmission par le Département Fédéral suisse ne mentionnant pas la SOCIETE NATIONALE IRANIENNE DES PETROLIERS)

- le jugement du 12 septembre 2013 n'aurait fait l'objet d'aucune procédure de signification à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS et ne serait de ce fait pas exécutoire.

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS écrit encore que pour pouvoir recevoir l'exequatur, le jugement étranger devrait contenir une condamnation susceptible d'exécution, pour ensuite souligner que seul le jugement du 3 octobre 2012 pourrait être considéré comme constituant le jugement final emportant condamnation à charge des parties défenderesses. Le jugement du 12 octobre 2012 se référerait expressément à celui du 3 octobre 2012. Par ailleurs, ce serait le jugement du 22 décembre 2011 qui retiendrait le principe de leur responsabilité. Les trois jugements seraient partant intimement liés, et faute d'être tous les trois exécutoires, aucun d'eux ne pourrait recevoir exécution. Or, le jugement du 3 octobre 2012 emportant condamnation ne serait pas exécutoire.

### 4.1.1.2. Absence de compétence internationale du tribunal américain

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS plaide que les jugements ne sauraient être revêtus de l'exequatur que pour autant que la juridiction américaine d'origine ait été internationalement compétente en vertu des règles de conflits luxembourgeoises pour statuer à son égard. Tel ne serait pas le cas en l'espèce. La SOCIETE NATIONALE IRANIENNE DES PETROLIERS explique que la juridiction américaine aurait reconnu sa compétence en écartant l'immunité de juridiction au profit de la REPUBLIQUE ISLAMIQUE D'IRAN sur base d'une disposition légale spécifique au droit des Etats-Unis d'Amérique, dérogatoire à tous les principes

135

admis en droit international public, permettant aux tribunaux américains de juger les Etats étrangers lorsqu'ils sont qualifiés par acte de gouvernement comme étant un Etat sponsorisant le terrorisme (*state sponsor of terrorism*) (règle 28 U.S. Code §1605A). Les Etats spécifiquement visés par la réglementation FSIA seraient non seulement privés de leur droit d'invoquer l'immunité de juridiction, mais seraient encore soumis à toutes les règles de droit américain, dont les procédures d'investigation intrusives du *discovery*, portant là encore atteinte à l'immunité des Etats au stade de l'instruction judiciaire de l'instance.

En l'espèce, le tribunal américain d'origine aurait fait application de ces règles à la REPUBLIQUE ISLAMIQUE D'IRAN et à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS en la qualifiant sans justification aucune, à tort et abusivement d'émanation de la REPUBLIQUE ISLAMIQUE D'IRAN à laquelle s'appliqueraient les mêmes règles. Ce faisant, le tribunal américain aurait encore violé un traité d'amitié conclu entre la REPUBLIQUE ISLAMIQUE D'IRAN et les Etats-Unis d'Amérique en 1955 assurant à leurs ressortissants un traitement équitable et juste sur base d'un principe de réciprocité.

Dans la mesure où elle ne serait pas une émanation de la REPUBLIQUE ISLAMIQUE D'IRAN, mais une société commerciale autonome, le tribunal américain n'aurait pas pu retenir sa compétence à son égard, de sorte que le juge luxembourgeois de l'exequatur devrait refuser l'exequatur des jugements rendus en violation des règles sur la compétence internationale.

### 4.1.1.3.Irrégularité de la procédure

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS soutient que la procédure qui s'est déroulée devant la juridiction américaine aurait été irrégulière à trois égards.

### 4.1.1.3.1.  Violation du principe du contradictoire et des droits de la défense

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS expose qu'elle ne se serait jamais vu signifier de façon correcte un acte introductif d'une instance devant le juge américain.

Dans ce cadre, elle n'aborde pas la question des deux premiers actes introductifs (*Class action* et *First Amended Complaint*).

Elle explique que le troisième acte introductif (*Second Amended Complaint*) ne lui aurait été adressé par aucun des modes de transmission prévus par le droit américain, peu importe qu'on la

136

considère comme étant une société privée ou comme une agence de la REPUBLIQUE ISLAMIQUE D'IRAN. Le droit iranien ne permettrait pas non plus la transmission d'un acte par simple courrier. La transmission par le service de courrier international DHL ne saurait avoir eu pour effet de saisir valablement la juridiction américaine à son égard. La SOCIETE NATIONALE IRANIENNE DES PETROLIERS ne conteste pas que ce courrier lui soit parvenu.

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS relève ensuite que le quatrième acte introductif (*Third Amended Complaint*) ne lui aurait jamais été notifié, alors que les PARTIES DEMANDERESSES auraient jouit d'une dispense de ce faire. Une telle dérogation à l'obligation de signifier l'acte introductif d'instance serait contraire au droit luxembourgeois.

Elle relève enfin que d'après les explications des PARTIES DEMANDERESSES, des jugements rendus par le tribunal américain en dates des 23 décembre 2002 et 8 août 2008 l'auraient déclarée défaillante, mais que les PARTIES DEMANDERESSES ne verseraient aux débats ni ces jugements ni leur notification à son intention.

D'une façon générale, il ne suffirait pas que les PARTIES DEMANDERESSES renvoient de façon abstraite à des dispositions légales américaines, mais il leur appartiendrait de prouver concrètement que les actes introductifs d'instance lui ont été notifiés.

Le défaut de notification régulière des actes introductifs à son égard violerait ses droits de la défense et expliquerait pourquoi elle n'a pas comparu dans la procédure américaine.

### 4.1.1.3.2.   Violation du droit d'accès au juge

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS fait valoir que le système mis en place par la règle 28 U.S. Code §1605A sur lequel la procédure menée à son encontre aux Etats-Unis d'Amérique a pris appui priverait tout Etat désigné par le gouvernement américain comme Etat sponsorisant le terrorisme, y compris ses ministères et autres émanations désignées comme telles (à tort en ce qui les concerne), de l'accès à un juge tel que garanti par l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales alors qu'il y aurait violation de l'égalité des armes (l'Etat étranger n'aurait pas la possibilité de présenter sa cause dans des conditions qui ne le placent pas en désavantage par rapport à son adversaire), violation du principe d'indépendance des juges (le pouvoir exécutif interviendrait dans le déroulement des procédures judiciaires à travers la désignation des Etats sponsorisant le terrorisme) et violation du

137

principe d'impartialité des juges (les juges américains auraient un préjugé lorsqu'ils sont saisis d'une affaire prenant appui sur la règle 28 U.S. Code §1605A).

Les PARTIES DEMANDERESSES feraient valoir à tort que la SOCIETE NATIONALE IRANIENNE DES PETROLIERS aurait pu apparaître devant le juge américain pour défendre sa cause, alors que l'existence de la règle 28 U.S. Code §1605A, sa teneur et l'application qu'en feraient les tribunaux américains (perte de l'immunité de juridiction découlant de la désignation comme Etat sponsorisant le terrorisme, impossibilité par l'Etat désigné de remettre en cause la désignation comme Etat sponsorisant le terrorisme, refus par les juges américains de remettre en cause la désignation comme Etat sponsorisant le terrorisme, interprétation large par les tribunaux américains des actes visés par la règle 28 U.S. Code §1605A, application d'une causalité approximative lors de l'application par les juges américains de la règle 28 U.S. Code §1605A, rejet systématique par les tribunaux américains de tout argument basant sur la violation du principe de la séparation des pouvoirs et de la violation du droit international) rendraient illusoire toute défense de la part d'un Etat, respectivement de ses entités qualifiées d'émanations de cet Etat, désigné par le gouvernement américain comme Etat sponsorisant le terrorisme.

Les exemples jurisprudentiels versés aux débats par les PARTIES DEMANDERESSES pour établir les réelles possibilités de la partie défenderesse d'assurer sa défense dans le cadre d'un procès prenant appui sur cette base seraient sans pertinence, alors que ces actions auraient été rejetées pour des raisons autres que l'application de la règle 28 U.S. Code §1605A.

Seule la désignation de la REPUBLIQUE ISLAMIQUE D'IRAN comme Etat sponsorisant le terrorisme et la qualification fausse d'émanation de la REPUBLIQUE ISLAMIQUE D'IRAN à son égard auraient déterminé les condamnations intervenues. Dès lors que cette désignation ne reposerait sur aucun critère objectif mais uniquement sur des considérations politiques, il y aurait inégalité des armes, dépendance des juges américains et partialité des juges américains.

### 4.1.1.3.3.  Violation de l'obligation de motiver les jugements

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS relève que l'obligation de motivation des jugements serait une exigence essentielle pour protéger le justiciable de l'arbitraire et pour expliquer aux parties les fondements de la décision. Cette obligation découlerait de l'article 89 de la Constitution luxembourgeoise, de l'article 249 du Nouveau Code de Procédure Civile et

de l'article 6 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales. Cette motivation devrait se trouver dans le jugement même, et non pas dans un document séparé qui ne formerait même pas partie intégrante du jugement. Le droit américain serait conçu de telle façon à ce qu'il n'exigerait pas que les jugements rendus par les tribunaux américains doivent être motivés. Si les procédures soumises à la réglementation anti-terroriste exigeaient que le demandeur doive établir la compétence du tribunal américain et démontrer l'existence de preuves satisfaisantes, le standard appliqué à cet égard serait toutefois minimal et ne permettrait pas de caractériser une réelle exigence de motivation.

Dans le cas d'espèce, aucun des jugements soumis à la procédure d'exequatur ne ferait l'objet d'une motivation. Ces lacunes ne pourraient pas être comblées par d'autres éléments.

Le document *Findings of Fact and Conclusions of Law* du 22 décembre 2011 qui comprendrait selon les PARTIES DEMANDERESSES la motivation afférente au jugement du même jour ne saurait être pris en considération à cet égard, dès lors que le jugement du 22 décembre 2011 n'y ferait même pas référence.

Le document *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 qui comprendrait selon les PARTIES DEMANDERESSES la motivation à l'appui du jugement du 3 octobre 2012 ne saurait être pris en considération à défaut d'avoir été notifié à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, alors même que le jugement du 12 octobre 2012 aurait ordonné que ce *Report and Recommandation to the Honorable George B. DANIELS* soit notifié ensemble avec les jugements des 3 octobre 2012 et 12 octobre 2012. Même à admettre que le *Report and Recommandation to the Honorable George B. DANIELS* vaille motivation du jugement du 3 octobre 2012, il faudrait constater que cette motivation ne lui aurait jamais été notifiée.

Aucun des trois jugements dont l'exéquatur est sollicité ni aucun des deux documents cités (*Findings of Fact an Conclusions of Law*, *Report and Recommandation to the Honorable George B. DANIELS*) n'auraient fait l'objet d'une signification régulière à son égard. La SOCIETE NATIONALE IRANIENNE DES PETROLIERS renvoie sur ce point à ses développements concernant les défaillances dans les procédures de notification des jugements et les incidences de celles-ci sur le caractère exécutoire des jugements.

139

Analysant l'argumentaire proposé par les PARTIES DEMANDERESSES devant le tribunal américain, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS relève que la condamnation reposerait essentiellement sur sa qualité de supposée émanation de la REPUBLIQUE ISLAMIQUE D'IRAN comme étant responsable à ce titre des actes de cette dernière, sans qu'un fait concret ne lui soit reproché. La *Third Amended Complaint* se limiterait à affirmer qu'elle serait étroitement liée à la REPUBLIQUE ISLAMIQUE D'IRAN, sans motiver l'existence du contrôle exercé par la REPUBLIQUE ISLAMIQUE D'IRAN sur elle de nature à pouvoir justifier la qualification d'émanation de cet Etat à son encontre. Par ailleurs, tous les éléments retenus à son encontre reposeraient sur de simples témoignages, pour partie anonymes, sans être étayés par des éléments de preuve concrets.

### 4.1.1.4. Violation de l'ordre public luxembourgeois par les jugements américains

Après avoir développé que l'ordre public international à préserver tiendrait aux conceptions fondamentales de l'ordre moral, social, politique et économique du pays et de son système juridique, respectivement aux principes et structures fondamentaux du droit luxembourgeois, respectivement les convictions fondamentales du droit applicable aux relations internationales, et après avoir reconnu l'application de l'effet atténué de l'ordre public dans le cadre des demandes d'exequatur, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS soutient que les conditions d'une violation de l'ordre public luxembourgeois seraient remplies en ce que les jugements américains en cause violeraient le droit international tenant notamment à l'immunité des Etats, violeraient les principes fondamentaux des sociétés démocratiques tenant à la séparation des pouvoirs et à l'indépendance et à l'impartialité des juges et violeraient les garanties de procédures fondamentales tenant au droit à un procès équitable, à l'égalité des armes, au principe du contradictoire, au droit d'accès au juge et à l'obligation de motivation des décisions de justice.

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS plaide encore, tout en reconnaissant que la demande d'exequatur ne porte pas sur la condamnation à des dommages-intérêts punitifs, que même une condamnation à des dommages-intérêts excessifs dépassant le préjudice réellement subi devrait être considérée comme violant l'ordre public international luxembourgeois. Les condamnations prononcées dépasseraient le quantum du préjudice réel au regard des montants alloués par les juridictions luxembourgeoises pour des préjudices comparables et constitueraient des peines privées.

Le défaut de motivation des jugements concernant les critères de fixation des montants indemnitaires et leur répartition entre les victimes rendrait encore impossible toute vérification sur le respect des principes appliqués par les juridictions luxembourgeoises en matière d'indemnisation de victimes d'actes relevant de la responsabilité civile délictuelle.

En examinant le contenu du document *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 qui aurait servi d'après les PARTIES DEMANDERESSES à la fixation des dommages-intérêts et à leur répartition entre les victimes, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS relève qu'il y est procédé par forfaits, sans individualisation et en prenant en compte des chiffres dits « raisonnables », sans s'en expliquer autrement.

### 4.1.2.  Les PARTIES DEMANDERESSES

Les PARTIES DEMANDERESSES expliquent en termes généraux que la transmission à la partie défenderesse de l'acte introductif d'instance constitué par la *Second Amended Complaint* se serait faite conformément au *Foreign Sovereign Immunities Act* et qu'après l'expiration d'un délai de plus d'un an, le tribunal américain aurait constaté par jugement du 27 décembre 2007 son défaut de comparution. Par la suite, la procédure se serait déroulée en deux phases. La première phase aurait porté sur le principe de la responsabilité et aurait abouti, après une audience de preuve du 15 décembre 2011, au jugement du 22 décembre 2011 accompagné du *Findings of Fact and Conclusions of Law* du même jour. La deuxième phase aurait porté sur l'indemnisation et aurait abouti, après le rapport du 30 juillet 2012, au jugement du 3 octobre 2012. Le tribunal américain aurait ensuite rendu le jugement du 12 octobre 2012, intégrant toutes les décisions antérieures et constituant selon le droit américain le jugement final et exécutoire. La signification des jugements aurait ensuite été régulièrement faite sur base des dispositions du *Foreign Sovereign Immunities Act*. La partie défenderesse n'aurait pas exercé de recours contre ces jugements. Et par décision du 12 septembre 2013, qui ne constituerait pas un jugement au sens du droit américain, le tribunal américain aurait autorisé l'exécution du jugement du 12 octobre 2012.

Elles admettent que l'octroi de l'exequatur requiert que quatre conditions soient remplies (le caractère définitif du jugement étranger ; la compétence internationale de la juridiction d'origine ; la régularité de la procédure devant la juridiction d'origine ; la conformité du jugement étranger à l'ordre public luxembourgeois), mais soutiennent que l'office du juge de l'exequatur ne

141

comporterait pas le contrôle de la conformité du droit américain appliqué par la juridiction d'origine avec la Constitution américaine et le droit international public.

### 4.1.2.1. Absence de caractère exécutoire des décisions américaines aux Etats-Unis d'Amérique

Les PARTIES DEMANDERESSES expliquent que la décision du 12 octobre 2012 porterait une condamnation clairement identifiable en ce qui concerne les montants, les créanciers et les débiteurs et constituerait la décision finale de la procédure entamée aux Etats-Unis d'Amérique. L'exequatur des décisions des 22 décembre 2011 (identifiant les parties à l'instance), 3 octobre 2012 (présentant les montants indemnitaires à charge des parties défenderesses) et 12 septembre 2013 (démontrant le caractère exécutoire du jugement du 12 octobre 2012) serait demandé parce qu'elles formeraient un ensemble cohérent avec la décision du 12 octobre 2012, de sorte qu'il relèverait de la bonne administration de la justice de solliciter l'exequatur pour chacune d'elles. Les conditions de l'exequatur devraient être vérifiées par rapport à ce jugement du 12 octobre 2012, et non pas par rapport à celui du 3 octobre 2012, ni à celui du 22 décembre 2011, ni encore de la décision du 12 septembre 2013 qui ne constituerait pas un jugement et ne serait pas soumis à l'obligation de signification. D'éventuels problèmes par rapport à un de ces trois jugements et/ou décision n'invalideraient pas l'exequatur à accorder pour le jugement du 12 octobre 2012.

Le caractère définitif et exécutoire du jugement du 12 octobre 2012 serait confirmé par un avis juridique COHN versé aux débats, par le jugement du 12 septembre 2013, qui devrait obligatoirement intervenir sur base des règles du *Foreign Sovereign Immunities Act* et par lequel le tribunal américain aurait constaté la régularité et l'efficacité de la transmission des jugements aux parties défenderesses, ainsi que par un certificat émis par le tribunal américain en date du 13 janvier 2017.

Le document *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 aurait bien été signifié ensemble avec les jugements après le prononcé du jugement du 12 octobre 2012.

En ce qui concerne la transmission des jugements à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, les PARTIES DEMANDERESSES expliquent qu'il y aurait eu plusieurs tentatives :

- un premier envoi aurait été fait par DHL au Ministère des Affaires étrangères de la REPUBLIQUE ISLAMIQUE D'IRAN, mais celui-ci aurait refusé d'accepter les plis

- un deuxième envoi aurait été fait par la voie diplomatique sur base de la règle 28 U.S. Code §1608(e) et (a)(4) à travers le Département d'Etat des Etats-Unis d'Amérique après émission de commissions rogatoires par le tribunal américain. Les documents auraient alors été envoyés par le Département d'Etat des Etats-Unis d'Amérique au Département Fédéral Suisse afin que l'ambassade helvétique à Téhéran les transmette au Ministère des Affaires étrangères de la REPUBLIQUE ISLAMIQUE D'IRAN. Ce dernier aurait refusé de prendre réception des documents. Sur base de la règle 28 U.S. Code §1608(a)(4), la signification aurait alors été régulière. Il ne saurait d'ailleurs être admis qu'une partie puisse refuser de prendre réception d'un acte judiciaire pour former barrage au déroulement de l'instance, sous peine de violer le droit d'accès au juge.

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS aurait pu exercer un recours contre les jugements intervenus, mais ne l'aurait pas fait, ce qui démontrerait qu'elle les aurait acceptés.

### 4.1.2.2. Absence de compétence internationale du tribunal américain

Les PARTIES DEMANDERESSES affirment que le tribunal américain aurait été internationalement compétent sur base de la règle classique de droit international privé luxembourgeois accordant compétence en matière de responsabilité civile délictuelle au tribunal du lieu de réalisation du dommage. L'acte dommageable ayant été commis et le dommage ayant été subi à New York, le tribunal de ce lieu aurait été compétent.

Elles rajoutent que le tribunal de New York aurait encore été compétent sur base de la règle 28 U.S. Code §1605A, issue du *Foreign Sovereign Immunities Act*, opposable aux Etats souverains et à toutes leurs émanations. Cette règle conforme au droit coutumier serait de nature à trouver application.

Elles relèvent que la SOCIETE NATIONALE IRANIENNE DES PETROLIERS ne préciserait pas en quoi le tribunal américain d'origine aurait violé le traité d'amitié irano-américain de 1955 en reconnaissant sa compétence.

143

### 4.1.2.3.Irrégularité de la procédure

Le tribunal note à ce stade que les PARTIES DEMANDERESSES exposent de façon contradictoire d'une part que le respect des règles procédurales de la loi du juge d'origine est vérifié pour assurer la régularité de la procédure suivie dans le but de détecter d'éventuelles fraudes commises au détriment du défendeur, ce qui induit un contrôle sur l'application de ses règles de procédure par le juge d'origine, et d'autre part que le juge luxembourgeois n'est pas compétent pour contrôler l'application exacte du droit américain, ce qui exclut un contrôle sur l'application de ses règles de procédure par le juge d'origine. Cette contradiction sera clarifiée ci-dessous.

Les PARTIES DEMANDERESSES exposent ensuite que toutes les règles auraient été observées.

### 4.1.2.3.1.  Violation du principe du contradictoire et des droits de la défense

Les PARTIES DEMANDERESSES plaident que le tribunal américain aurait vérifié le respect des formalités de transmission des actes introductifs d'instance aux parties défenderesses. L'existence et l'étendue de ce contrôle résulteraient des *Findings of fact and conclusions of law* du 22 décembre 2011 et de deux avis juridiques STEWART et COHN.

Les PARTIES DEMANDERESSES expliquent que suite à la transmission de la *Second Amended Complaint*, le représentant légal de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS a adressé en date du 7 mars 2007 un courrier à leur avocat américain faisant une référence expresse à cette action et expliquant pourquoi la SOCIETE NATIONALE IRANIENNE DES PETROLIERS ne devrait pas figurer dans cette procédure.

La transmission de cette action aurait valablement pu se faire par DHL à l'initiative de leur avocat. Ce mode de transmission serait admis par le droit américain.

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS ferait valoir à tort avoir été abusivement qualifiée d'entité dépendant de la REPUBLIQUE ISLAMIQUE D'IRAN. Cette qualification aurait été pleinement justifiée sur base des constatations faites par le tribunal américain, et il n'appartiendrait pas au juge de l'exequatur de vérifier cette appréciation portée par le tribunal américain.

Il n'y aurait pas eu besoin de notifier la *Third Amended Complaint* à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, alors que le tribunal américain avait déjà constaté son défaut

144

de comparution. L'article 5(a)(2) des *Federal Rules of Civil Procedure* permettrait dans ces circonstances de faire abstraction d'une nouvelle signification.

Les décisions des 23 décembre 2002 et 8 août 2008 constatant le défaut de comparution de la partie défenderesse ne constitueraient pas des jugements au sens du droit américain et en application de l'article 5(a)(2) des *Federal Rules of Civil Procedure* n'auraient pas eu besoin d'être signifiées.

### 4.1.2.3.2.  Violation du droit d'accès au juge

Les PARTIES DEMANDERESSES font valoir que la qualification d'Etat sponsorisant le terrorisme ne produirait des effets que sur la mise à l'écart de l'immunité de juridiction, et n'emporterait aucune conséquence sur l'appréciation par la juridiction américaine sur le fond du litige et sur la question des responsabilités. Il appartiendrait toujours au tribunal américain de vérifier que les conditions de la responsabilité soient remplies.

Dans le cadre de cet examen, les tribunaux américains seraient entièrement impartiaux et indépendants. Aucun élément ne permettrait d'induire une partialité ou une dépendance dans leur chef du seul fait que la partie défenderesse relèverait de la catégorie des Etats qualifiés par le pouvoir exécutif d'Etats sponsorisant le terrorisme.

### 4.1.2.3.3.  Violation de l'obligation de motiver les jugements

Les PARTIES DEMANDERESSES ne contestent pas que par principe les jugements issus des tribunaux américains doivent être motivés. Elles font valoir en l'espèce que la motivation du jugement du 12 octobre 2012, qui dans leur présentation constitue le jugement à exécuter, résiderait dans le jugement du 22 décembre 2011, les *Findings of fact and conclusions of law* du 22 décembre 2011, le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 et le jugement du 3 octobre 2012. Il ne serait pas requis que la motivation figure dans le jugement lui-même, mais elle pourrait résulter d'actes servant d'équivalents, y compris tous actes faisant partie de la procédure judiciaire d'origine. Dans les procédures judiciaires américaines, la motivation se trouverait toujours matériellement consignée dans un document autre que le jugement à proprement parler (les *Findings of fact and conclusions of law* du 22 décembre 2011 constitueraient la motivation du jugement du 22 décembre 2011 ; le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 constituerait la motivation du jugement du 3 octobre 2012).

145

Les PARTIES DEMANDERESSES relèvent que dans le cadre de cette motivation, le tribunal américain aurait fait application d'un standard de preuve approprié, identique à celui qui trouverait à s'appliquer en cas d'action contre les Etats-Unis d'Amérique eux-mêmes. En l'espèce, la motivation serait dense pour retenir la responsabilité de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, en portant une appréciation séparée sur ses agissements.

Les PARTIES DEMANDERESSES estiment en fin de compte que le tribunal américain aurait statué sur base de son intime conviction en fonction des éléments de preuve qui lui avaient été soumis, et qu'il aurait appartenu à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS d'exercer les voies de droit mises à disposition par le droit américain si elle avait été en désaccord avec la décision rendue.

#### 4.1.2.4. Violation de l'ordre public luxembourgeois par les jugements américains

Les PARTIES DEMANDERESSES relèvent que le contrôle au regard de l'ordre public devrait se limiter à la question de savoir si le résultat produit par le jugement étranger en cas d'octroi de l'exequatur engendrerait des conséquences contraires à l'ordre public, et non pas si le jugement en tant que tel heurterait l'ordre public luxembourgeois. En l'espèce, il résulterait de leurs développements consacrés aux autres moyens produits par la SOCIETE NATIONALE IRANIENNE DES PETROLIERS que les décisions dont l'exequatur est sollicité ne violeraient ni les principes fondamentaux de la démocratie, ni les garanties fondamentales de procédure.

Sur la question de l'étendue des dommages-intérêts alloués, les PARTIES DEMANDERESSES rappellent qu'elles ne demandent pas à voir rendre exécutoires les décisions américaines dans la mesure où elles octroient des dommages-intérêts punitifs de sorte que cette question ne se poserait pas, mais qu'il ne serait même pas certain qu'une telle reconnaissance soit contraire à l'ordre public.

Le juge de l'exequatur ne pourrait pas non plus apprécier les montants alloués, alors qu'il s'adonnerait de ce fait à une révision au fond qui ne pourrait pas se faire dans le cadre d'une demande d'exequatur.

Les montants alloués seraient conformes à une jurisprudence constante américaine et tiendraient compte du degré de parenté entre la victime directe décédée et la victime par ricochet demanderesse à l'instance.

146

### 4.2. Appréciation du tribunal

### 4.2.1.   Observations générales

### 4.2.1.1. Cadre d'analyse juridique

Le tribunal renvoie sur ce point aux développements opérés ci-dessus au point 3.2.1.1.

### 4.2.1.2. Contexte procédural américain

Le tribunal renvoie sur ce point aux développements opérés ci-dessus au point 3.2.1.2.

### 4.2.2.   Examen des moyens

### 4.2.2.1. Recevabilité : Caractère exécutoire des jugements américains

1/ L'exequatur étant la procédure visant à permettre l'exécution, le cas échéant forcée, du jugement soumis à la procédure dans l'Etat requis, seules les décisions étrangères portant une réelle condamnation peuvent en principe être revêtues de l'exequatur.

1 a/ En l'espèce, les PARTIES DEMANDERESSES sont d'accord pour dire que seul le *Order and Judgement* du 12 octobre 2012 porte réellement une condamnation à l'encontre de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS. C'est cependant à bon droit qu'elles font valoir que cette décision forme un ensemble cohérent et indissociable avec le *Order of Judgment* du 22 décembre 2011, qui retient le principe de la responsabilité de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, et le *Memorandum Decision and Order* du 3 octobre 2011, qui fixe les grandes catégories de dommages indemnisables devant être pris en charge par la SOCIETE NATIONALE IRANIENNE DES PETROLIERS. Les PARTIES DEMANDERESSES sont partant recevables à poursuivre l'exequatur de l'ensemble de ces trois décisions. Les conditions de recevabilité au regard de la condition d'exécutabilité ne sont cependant à apprécier que par rapport au seul *Order and Judgement* du 12 octobre 2012 qui emporte condamnation à des montants précis.

La demande est partant recevable en ce qu'elle tend à voir déclarer exécutoire le *Order of Judgment* du 22 décembre 2011, le *Memorandum Decision and Order* du 3 octobre 2011 et le *Order and Judgement* du 12 octobre 2012.

1 b/ Le même raisonnement ne saurait cependant valoir pour le *Order* du 12 septembre 2013. Cette décision s'inscrit dans la procédure postérieure à l'adoption du jugement de condamnation

147

susceptible d'exécution et ne s'attache pas au contenu de la condamnation intervenue. Il se borne à régler un aspect de procédure tenant à l'exécution du *Order and Judgement* du 12 octobre 2012, et ne peut ni ne doit à ce titre être revêtu de l'exequatur.

Le *Order* du 12 septembre 2013 est encore en tout état de cause étranger à la présente procédure d'exequatur. Cet *Order* est pris sur base de la règle 28 U.S. Code §1610(c) qui requiert que l'exécution aux Etats-Unis d'Amérique sur des biens dévolus à une activité commerciale appartenant à un Etat étranger ou à ses agences ou instrumentalités (*agency or instrumentality*, tels que ces notions sont définies à la règle 28 U.S. Code §1603) ne peut avoir lieu que sur base d'une autorisation judiciaire sur base du constat qu'un temps raisonnable s'est écoulé depuis le prononcé du jugement et sa signification au débiteur de jugement. Il s'agit partant d'une règle purement interne aux Etats-Unis d'Amérique pour permettre l'exécution sur des biens situés aux Etats-Unis d'Amérique, dont l'exequatur au Luxembourg ne présente aucune utilité.

La demande est partant irrecevable en ce qu'elle tend à voir déclarer exécutoire le *Order* du 12 septembre 2013.

**2/** Le caractère exécutoire des décisions américaines ainsi identifiées comme s'attachant à la condamnation au fond s'apprécie en fonction de la loi de l'Etat d'origine, à l'exclusion de la loi du for du juge de l'exequatur. C'est donc en l'espèce la loi américaine qui détermine les conditions sous lesquelles les jugements actuellement soumis à exequatur sont exécutoires sur le territoire des Etats-Unis d'Amérique.

Les PARTIES DEMANDERESSES entendent tirer la preuve du caractère exécutoire du *Order and Judgment* du 12 octobre 2012 de ce qu'elles ont pu procéder à son exécution aux Etats-Unis d'Amérique. La réalité d'une telle exécution n'est pas expressément admise par la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, et elle ne résulte pas des éléments du dossier. Cette affirmation n'apporte partant pas la preuve requise.

Le tribunal constate que le *Order* du 12 septembre 2013, pris sur base de la règle 28 U.S. Code §1610(c) qui requiert que l'exécution sur des biens dévolus à une activité commerciale appartenant à un Etat étranger ou à ses agences ou instrumentalités (*agency or instrumentality*) ne peut avoir lieu que sur base d'une autorisation judiciaire sur base du constat qu'un temps raisonnable s'est écoulé depuis le prononcé du jugement et sa signification au débiteur de jugement. L'émission

148

d'un tel *Order*, permettant de poursuivre l'exécution sur des biens de l'Etat étranger ou de ses agences ou instrumentalités situés aux Etats-Unis d'Amérique, requiert nécessairement que le jugement visé soit exécutoire par ailleurs en vertu des règles de droit commun américaines. L'adoption de cet *Order* implique partant nécessairement que le juge qui l'a adopté a opéré les vérifications afférentes et pertinentes.

Au dossier figure encore un certificat du greffe de la *United District Court for the Southern District of New York* du 13 janvier 2017 dont il résulte que le *Order and Judgment* du 12 octobre 2012 ne fait pas l'objet d'un recours spécifique propre au droit américain et qu'il ne peut plus faire l'objet d'un appel ordinaire.

Le tribunal en déduit que les PARTIES DEMANDERESSES ont établi à suffisance de droit que le *Order and Judgment* du 12 octobre 2012 est exécutoire aux Etats-Unis d'Amérique.

**3/** Le débiteur de jugement peut former obstacle à la recevabilité de la demande en exequatur pour défaut d'intérêt lorsque le jugement dont l'exequatur est sollicité a déjà reçu pleine et entière exécution, soit dans l'Etat d'origine, soit dans tout autre Etat.

En l'espèce, face à l'affirmation des PARTIES DEMANDERESSES selon laquelle il y aurait eu exécution partielle aux Etats-Unis d'Amérique, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS ne confirme pas que tel serait le cas, ni encore n'affirme qu'une telle exécution aurait couvert l'intégralité des condamnations prononcées. Ce point n'est partant pas non plus de nature à former obstacle à la procédure d'exequatur.

**4/** La question de savoir si le *Order of Judgment* du 22 décembre 2011, le *Memorandum Decision and Order* du 3 octobre 2011 et le *Order and Judgement* du 12 octobre 2012 ont fait l'objet d'une signification régulière à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS fait appel à la question de savoir si la SOCIETE NATIONALE IRANIENNE DES PETROLIERS en a été dûment informée pour lui permettre de faire valoir ses droits de la défense à travers l'exercice des voies de recours disponibles sous l'empire du droit américain. Cette question relève partant des conditions de régularité des décisions au regard de l'ordre public procédural et sera examinée à ce titre.

#### 4.2.2.2. Fond : Conditions de régularité des jugements américains

#### 4.2.2.2.1. Compétence internationale du tribunal américain

Dans le cadre de la vérification de la compétence internationale du tribunal d'origine, le juge luxembourgeois de l'exequatur ne vérifie ni si le juge d'origine aurait été compétent en vertu des règles de conflit de juridiction luxembourgeoises, ni si le juge d'origine a correctement appliqué ses propres règles de conflit de juridiction. Dans le cadre de ce contrôle, il est dès lors sans incidence que le juge d'origine ait fait application d'une règle de droit interne qui pourrait être considérée comme extensive du droit international public coutumier ou encore contraire au droit international public coutumier. Il est de même sans incidence que le juge d'origine ait dans ce cadre opéré une qualification au détriment de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS qui aurait permis de lui faire application de la règle ainsi dénoncée par elle.

Le contrôle exercé par le juge requis est celui de la vérification de la compétence internationale indirecte, qui requiert le constat d'un lien de rattachement caractérisé entre le juge d'origine et le litige.

En l'espèce, il est constant en cause pour résulter des éléments du dossier que le tribunal américain ne retient à l'encontre de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS aucun fait qui aurait été commis par elle sur le territoire américain. Il est cependant tout autant constant que les faits délictueux commis par les auteurs directs des attentats ont été commis sur le territoire des Etats-Unis d'Amérique, tout comme il est constant que le préjudice a été subi par les différentes victimes directes et indirectes sur le territoire des Etats-Unis d'Amérique. Or, le lien qui rattache le for d'origine au lieu où s'est produit le fait dommageable, peu importe à ce stade si ce fait peut ou non être attribué directement à la partie défenderesse considérée, et au lieu où s'est produit le dommage, considéré comme étant soit le lieu où le dommage est survenu soit le lieu de l'événement causal, doit être considéré comme étant suffisamment caractérisé pour justifier en l'espèce de la compétence internationale indirecte du tribunal américain.

#### 4.2.2.2.2. Ordre public procédural : Irrégularités de la procédure

Le tribunal examine successivement les différents arguments soulevés, en suivant l'ordre logique dans lequel ils se présentent au cours du déroulement de la procédure devant le juge d'origine.

### 4.2.2.2.2.1. Signification de l'acte introductif d'instance

L'information donnée à la partie défenderesse sur l'existence d'une action en justice dirigée à son encontre et sur les éléments essentiels de cette action en justice au regard de son objet et de sa cause constitue un élément incontournable du principe du contradictoire et des droits de la défense, essentiels à la préservation d'un procès équitable. Face aux contestations afférentes de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, il convient partant de vérifier concrètement si les actes introductifs d'instance lui ont été régulièrement signifiés. Pour ce faire, il ne suffit pas de s'attacher aux affirmations factuelles fournies par le tribunal d'origine, mais dans la mesure où il revient au juge requis de faire observer son propre ordre public tel que conçu dans son système juridique, il lui appartient de vérifier concrètement si les diligences accomplies dans le cadre de la procédure d'origine ont permis d'atteindre le résultat tel que son système juridique le conçoit.

1/ Il est constant que la SOCIETE NATIONALE IRANIENNE DES PETROLIERS n'était pas visée par l'action de groupe originairement déposée le 19 février 2002, ni par la *Amended Complaint* déposée le 3 mai 2002. La vérification d'une signification régulière de ces demandes à son égard ne se pose partant pas.

2/ La SOCIETE NATIONALE IRANIENNE DES PETROLIERS a été visée pour la première fois par la *Second Amended Complaint* du 7 septembre 2006.

Dans un Affidavit du 24 août 2007, un des avocats des parties demanderesses à la procédure américaine explique avoir envoyé à chaque fois une copie en langue anglaise et en langue farsi à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS par courrier DHL N° 830 8199 675 du 28 décembre 2006, et que ce courrier a été délivré le 9 janvier 2007 à 8.35 heures.

Ces éléments résultent du dossier. Il résulte encore d'un courrier adressé en date du 7 mars 2007 par le représentant légal de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS que celle-ci a eu réception de ce courrier DHL.

C'est à tort que la SOCIETE NATIONALE IRANIENNE DES PETROLIERS fait valoir l'irrégularité et partant l'inefficacité de cette transmission pour ne correspondre à aucun mode de transmission admis par le droit américain et par le droit iranien. Le contrôle opéré par le juge de l'exequatur ne porte pas sur la correcte application du droit étranger, mais sur la régularité

internationale du jugement soumis à exequatur au regard de certaines exigences fondamentales, dont la transmission effective de la demande à la partie défenderesse. Une hypothétique contrariété de la procédure mise en œuvre avec les exigences de la loi du for d'origine ou de l'Etat de destination n'est pas de nature à caractériser une violation de l'ordre public international de l'Etat d'exequatur, dès lors qu'il est établi que la partie défenderesse a eu une connaissance effective de la demande. Tel est le cas en l'espèce.

Pour être complet, le tribunal retient encore qu'il n'existe aucune raison pour retenir comme étant un mode de transmission inadmissible ou même prohibé l'envoi de courriers internationaux par le service de messagerie privé DHL.

Le tribunal retient sur base de ce qui précède que la *Second Amended Complaint* du 7 septembre 2006 a été régulièrement portée à la connaissance de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS.

3/ Il est constant que la *Third Amended Complaint* du 23 juin 2010 n'a à aucun moment fait l'objet d'une signification à l'attention de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS.

L'article 5(a)(2) des *Federal Rules of Civil Procedure* invoqué par les PARTIES DEMANDERESSES pour faire valoir l'absence de nécessité de signifier la *Third Amended Complaint* à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS est rédigé comme suit : « *No service is required on a party who is in default for failing to appear. But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4* ». Tout en constatant que la dispense de signification n'est pas absolue, mais ne joue que si les nouvelles plaidoiries ne comportent pas de nouvelle demande (*a new claim for relief*), le tribunal saisi de la demande en exequatur rappelle que la vérification de la régularité internationale du jugement dont l'exequatur est sollicité par rapport à l'ordre public procédural n'opère pas en fonction du contenu du droit national du juge d'origine, mais en fonction des conceptions fondamentales de l'ordre moral, social, politique et économique du pays et du système juridique du juge requis. Or, les exigences du procès équitable doivent amener à requérir la communication de tout acte de procédure qui non seulement comporte une demande nouvelle, mais encore qui comporte un argumentaire juridique ou une base légale nouvelle qui sont de nature à influer sur les conditions de responsabilité des parties défenderesses.

Pour opérer ce contrôle, il convient de présenter comparativement les actions contenues dans la *Second Amended Complaint et la Third Amended Complaint.*

A leur lecture, le tribunal constate que les présentations des questions de compétence, d'identification des parties et de faits (§§ 1 à 374) sont identiques dans les deux documents. Le défaut de signification de la *Third Amended Complaint* ne préjudicie ainsi pas à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS par rapport à ces points.

Les deux documents sont encore identiques dans la présentation de certaines des demandes au sens du but poursuivi et de la base légale : *Count three* à *Count seven* de la *Second Amended Complaint* et *Count two* à *Count six* de la *Third Amended Complaint* qui concernent *Alien Tort Claims Act, Wrongfull Death, Survival, Negligent and/or Intentional Infliction of Emotional Distress, Conspiracy.* Du fait de cette identité, le défaut de signification de la *Third Amended Complaint* ne préjudicie pas non plus sur ces points à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS.

La *Third Amended Complaint* ne comprend plus les volets deux, huit, neuf et dix (*Count two, Torture Victim Protection Act ; Count eight, Treble Damages for U.S. Nationals ; Count nine, Punitive Damages ; Count ten, Punitive Damages-The Foreign State Defendants and their Agencies and Instrumentalities*) qui figuraient dans la *Second Amended Complaint*. Considéré sous l'angle d'une modification de la portée de la demande dans le sens d'une réduction des causes de la demande subséquente à cette suppression, le défaut de signification de la *Third Amended Complaint* ne préjudicie pas à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS.

La *Second Amended Complaint* invoquait dans son premier volet (*Count one*) la règle 28 U.S. Code §1605(a)(7) issue du *Foreign Sovereign Immunities Act*, tandis que la *Third Amended Complaint* se basait dans son premier volet sur la règle 28 U.S. Code §1605A inscrite au *Foreign Sovereign Immunities* en 2008. La question qui se pose dès lors est celle de savoir si cette modification de la base légale a eu pour conséquence d'aggraver la situation procédurale de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS de façon à requérir dans une perspective de protection des droits de la défense à ce que la *Third Amended Complaint* ait dû lui être signifiée.

L'historique des règles américaines sur l'immunité des Etats révèle que l'exception à cette immunité tirée des actes de sponsoring du terrorisme a été introduite pour la première fois en 1976 dans la règle 28 U.S. Code §1605(a)(7). La jurisprudence américaine refusait cependant de reconnaître sur base de cette règle un droit d'action devant les cours fédérales, mais n'y voyait qu'une règle de compétence juridictionnelle qui permettait aux victimes d'agir devant les cours fédérales sur base du droit des Etats fédérés. Le législateur a modifié la règle en 2006 afin de conférer à la règle le statut d'un droit d'action. Une partie de la jurisprudence n'y reconnaissait cependant toujours qu'un droit d'action devant les cours fédérales à l'égard de défendeurs particuliers, à l'exclusion des Etats. Par une nouvelle intervention en 2008, le législateur américain a alors abrogé la règle 28 U.S. Code §1605(a)(7) pour introduire la règle 28 U.S. Code §1605A de façon à asseoir définitivement par voie législative que l'exception à l'immunité des Etats tirée du sponsoring du terrorisme puisse constituer la cause d'une action devant les cours fédérales tant à l'égard des Etats que de leurs agents, officiels et employés (David P. Stewart, The Foreign Sovereign Immunuties Act : A Guide for Judges, Federal Judicial Center, 2013, page 83 et ss ; Edward Chukwuemeke Okeke, Juridictional Immunities of States and International Organizations, Oxford University Press, 2018, pages 143 et ss.). L'existence d'un effet créatif d'un droit d'action fédéral par l'introduction de la règle 28 U.S. Code §1605A en 2008 est partagée par les PARTIES DEMANDERESSES lorsqu'elles écrivent au point 377 de la *Third Amended Complaint* que « *The new Section 1605A unequivocally creates a federal private right of actin against the foreign state sponsors of terrorism* ». Dans le même sens, dans le cadre de l'évaluation des dommages-intérêts, le juge Frank MAAS écrit dans son *Report and Recommandation to the Honorable George B. DANIELS* que « *Section 1605A effected a 'sea change' in suits against state sponsors of terrorism. .... Previously, to recover damages against such defendants [i.e. foreign states that had been designed as state sponsors of terrorism], plaintiffs had to demonstrate their entitlement under state or foreign law. ... Now, such claims are subject to a 'uniform federal standard'* ».

Le tribunal en déduit que cette levée de l'insécurité juridique quant au droit d'action qui fondait la demande devant la juridiction américaine a conduit les PARTIES DEMANDERESSES à omettre dans la *Third Amended Complaint* le *Count two*, c'est-à-dire la base légale tirée du *Torture Victim Protection Act*, pour fonder désormais leurs prétentions sur la règle du *State Sponsored Terrorism* inscrite au *Foreign Sovereign Immunities Act* en 2008.

154

La question qui se pose dès lors est celle de savoir si cette modification de la base légale de l'action des PARTIES DEMANDERESSES a modifié la situation juridique des parties défenderesses à l'instance américaine, et notamment celle de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, de façon à ce que les exigences du procès équitable et de la protection des droits de la défense requérait que la demande modifiée lui soit signifiée.

Le *Torture Victim Protection Act* dispose que

> « *Liability. – An individual who, under actual or apparent authority, or color of law, of any foreign nation (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death* »

L'action privée inscrite à la règle 28 U.S. Code §1605A(c) se lit comme suit

> *(c) PRIVATE RIGHT OF ACTION. - A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to*
>
> *(1) a national of the United States,*
>
> *(2) a member of the armed forces,*
>
> *(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or*
>
> *(4) the legal representative of a person described in paragraph (1), (2), or (3),*
>
> *for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages.*
>
> *In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.*

Les actes couverts par cette disposition sont décrits au point (a)(1) :

155

*"(a) IN GENERAL. - (1) NO IMMUNITY. - A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.*

Le tribunal constate que la base légale de l'action nouvellement introduit par la *Third Amended Complaint* diverge de façon considérable de celle invoquée dans la *Second Amended Complaint*. Si le *Torture Victim Protection Act* ne décrète une responsabilité que pour les actes de torture (*torture*) et de meurtre extra-judiciaire (*extrajudicial killing*), la règle 28 U.S. Code §1605A y ajoute le sabotage d'aéronef (*aircraft sabotage*), la prise d'otages (*hostage taking*) ainsi que d'une façon générale la fourniture d'un soutien matériel ou en ressources en vue de l'exécution de tels actes (*the provision of material support or resources for such an act*). De ce fait, les conditions de mise en cause de la responsabilité de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS ont été modifiées profondément, requérant à ce qu'elle puisse disposer d'une chance réelle d'avoir connaissance de ce nouveau fondement de l'action dirigée à son encontre et d'y défendre. A défaut de signification de la *Third Amended Complaint* à son encontre, la procédure suivie devant la juridiction américaine ne remplit dès lors pas le standard requis par les exigences de la protection des droits de la défense et du droit au procès équitable tel que conçu par les conceptions fondamentales du droit judiciaire privé luxembourgeois. La procédure d'élaboration des jugements soumis à exequatur viole dès lors l'ordre public procédural, formant ainsi obstacle à leur mise à exécution au Luxembourg.

### 4.2.2.2.2.2.Droit d'accès au juge

Il résulte de ce qui précède que la règle 28 U.S. Code §1605A qui a servi en fin de compte de support à l'action devant la juridiction américaine comporte deux volets distincts : la levée de l'immunité juridictionnelle de l'Etat qui a été désigné par le pouvoir exécutif américain comme étant un Etat sponsorisant le terrorisme et une règle fondant le droit d'action individuel des personnes qui se prétendent être les victimes des actes d'un Etat ainsi désigné. L'ensemble des

reproches formulés par la SOCIETE NATIONALE IRANIENNE DES PETROLIERS sous la référence au droit d'accès au juge tiennent aux conditions dans lesquelles le droit américain règle ces deux volets, que la SOCIETE NATIONALE IRANIENNE DES PETROLIERS considère comme étant excessives, sinon exorbitantes du droit commun. Par aucun de ses arguments, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS ne met cependant en cause les caractéristiques organiques principales qui doivent caractériser la juridiction saisie au fond pour que la condition de l'accès au juge soit respectée, et qui tiennent à l'indépendance et à l'impartialité du tribunal américain ayant statué en l'espèce.

La circonstance que les tribunaux américains d'une façon générale exercent un contrôle limité sur les conditions d'application de la règle 28 U.S. Code §1605A, respectivement qu'ils en fassent une application extensive au détriment des parties défenderesses poursuivies sur cette base, ne permet pas nécessairement de conclure que le juge saisi en l'espèce en aurait fait de même. Et même à admettre que le juge saisi en l'espèce ait fait application de ces règles dans le sens dénoncé par la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, il en resterait toujours qu'il ne ferait dans ce cadre qu'exercer son office de juge dans le cadre de sa mission d'application et d'interprétation de la loi et dans les limites de son pouvoir d'appréciation, sans qu'on puisse en déduire un manque d'impartialité ou d'indépendance dans son chef. S'agissant d'une question d'application de la loi américaine de fond par le juge saisi du fond, il aurait appartenu à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS (sous réserve de ce qui a été dit au point précédent concernant son habilité concrète à avoir connaissance des éléments de la demande dirigée à son encontre) d'assurer sa défense dans le cadre de la procédure américaine, sans qu'elle ne puisse discuter devant le juge de l'exequatur la teneur et l'application de la loi américaine de fond.

### 4.2.2.2.2.3.Motivation des jugements

1/ L'existence d'une motivation est consubstantielle à la régularité de tout jugement. Il n'est cependant pas requis que cette motivation figure dans le même document que celui qui prononce la condamnation. La condition de motivation peut être remplie par la production de documents pouvant servir d'équivalents. Le juge luxembourgeois de l'exequatur est nécessairement amené dans ce cadre à faire abstraction de ses propres règles et pratiques et de tenir compte de ce que la procédure et les modalités judiciaires puissent être réglées différemment dans d'autres Etats,

157

pourvu que le résultat recherché, à savoir l'existence d'une motivation à l'appui de la teneur de la décision prise à l'égard de la partie défenderesse, soit établie.

En l'espèce, il est exact que les *instrumentums* servant de support aux trois décisions soumises à exequatur ne comportent pas de motivation. Chacune d'elles peut cependant se prévaloir d'un complément que le juge luxembourgeois de l'exequatur peut prendre en considération afin de constater positivement l'existence d'une motivation :

- le *Order of Judgment* du 22 décembre 2011 est supporté par les *Findings of Fact and Conclusions of Law* du même jour. Les deux documents se réfèrent à une audience de preuve du 15 décembre 2011
- le *Memorandum Decision and Order* du 3 octobre 2012 est supporté par le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012 auquel il renvoie explicitement
- le *Order and Judgement* du 12 octobre 2012 est supporté tant par le *Memorandum Decision and Order* du 3 octobre 2012, qui y est visé directement et expressément, que par voie de conséquence par le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012.

Tous ces documents portent la même référence de dossier 03 MDL 1570.

Le tribunal est partant amené à constater que les trois décisions sont motivées.

**2/** La SOCIETE NATIONALE IRANIENNE DES PETROLIERS discute ensuite dans ce cadre la question de la régularité de la transmission des décisions à son attention, en soutenant en substance qu'à défaut de signification régulière de tous les documents, ceux-ci ne sauraient être retenus à titre d'équivalents dans le cadre de l'appréciation de l'existence d'une motivation.

La question de l'existence d'une motivation est cependant indépendante de la question de savoir si elle a été portée à la connaissance de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS. Cette question de l'identification des documents pertinents qui devaient être signifiés à la SOCIETE NATIONALE IRANIENNE DES PETROLIERS et la question subséquente si tous les documents pertinents ainsi identifiés ont effectivement été signifiés relève de la vérification de la procédure de signification par rapport à la question de savoir si la SOCIETE

158

NATIONALE IRANIENNE DES PETROLIERS a été mise en mesure d'exercer son droit à un recours juridictionnel. Elles sont examinées ci-dessous.

3/ Pour le surplus, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS conteste le contenu de la motivation en soutenant qu'elle serait incorrecte, inappropriée, lacuneuse, injustifiée et/ou manquant de pertinence en ce qui concerne les faits retenus à sa charge, le lien causal entre ces faits et l'acte dommageable, le montant des dommages-intérêts alloués et l'existence d'un contrôle exercé par la REPUBLIQUE ISLAMIQUE D'IRAN sur elle.

Le tribunal retient cependant que ni les raisonnements menés par le juge américain, ni les résultats auxquels il aboutit ne heurtent en tant que tels l'ordre public luxembourgeois. Par ses arguments, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS met en cause non pas l'existence d'une motivation, mais le contenu de celle qui a été retenue à l'appui de la condamnation prononcée à son encontre. Ce faisant, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS demande au juge luxembourgeois de l'exequatur de porter une appréciation sur le fond du litige et de procéder *in fine* à une révision au fond des décisions prises. Pareille démarche ne relève cependant pas des missions et pouvoirs du juge de l'exequatur.

### 4.2.2.2.2.4. Signification des jugements

Dans le cadre de la procédure de mise à exécution dont la demande en exequatur est un préalable, la vérification de l'existence d'une signification régulière du jugement de condamnation est requise pour apprécier dans le chef de la partie défenderesse à la procédure d'origine si elle a été mise en mesure de prendre effectivement connaissance des éléments essentiels de la décision. Pareille signification doit partant s'entendre comme couvrant non seulement l'élément de procédure qui porte condamnation à charge de la partie défenderesse, mais également tous les éléments servant de support à cette condamnation, à savoir la motivation.

En outre, pareille signification doit porter sur tous les éléments décisionnels de la procédure originaire, incluant tant les questions de principe de responsabilité que les questions d'indemnisation et portant pour ces deux volets aussi bien sur la disposition judiciaire finale que sur la motivation y attenante.

Ce n'est que si les parties défenderesses à la procédure originaire disposent de l'intégralité de ces éléments qu'elles peuvent apprécier en connaissance de cause la nécessité et les chances

159

d'introduire un recours devant la juridiction d'origine et que partant leurs droits procéduraux sont préservés à suffisance de droit.

Il en résulte que la signification doit inclure en l'espèce

- pour la question de la responsabilité
  - o le *Order of Judgment* du 22 décembre 2011, valant décision sur le principe de la responsabilité
  - o les *Findings of Fact and Conclusions of Law* du 22 décembre 2011, valant motivation à l'appui du *Order of Judgment*
- pour la question de l'évaluation des dommages
  - o le *Memorandum Decision and Order* du 3 octobre 2012, valant décision sur le montant global
  - o le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012, valant motivation à l'appui du *Memorandum Decision and Order*
- pour la question de la fixation individuelle des dommages-intérêts et de la condamnation
  - o le *Order and Judgement* du 12 octobre 2012 prononçant la condamnation concrète au profit des parties demanderesse et à charge des parties défenderesses.
    Ce *Order and Judgement* ordonne pertinemment *in fine* qu'il doit être signifié aux défendeurs ensemble avec le *Memorandum Decision and Order* du 3 octobre 2012 et le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012, qui valent motivation à son appui.

Ces cinq documents forment à cet égard un ensemble unique et indissociable dont la connaissance intégrale est indispensable à la compréhension de la procédure américaine de nature à préserver les droits des parties défenderesses.

Or, le tribunal constate qu'il résulte des pièces versées aux débats en rapport avec la preuve de la signification des jugements que celle-ci portait, outre certains documents inopérants pour les besoins de la question sous examen, sur

- le *Order of Judgment* du 22 décembre 2011
- le *Memorandum Decision and Order* du 3 octobre 2012
- le *Report and Recommandation to the Honorable George B. DANIELS* du 30 juillet 2012
- le *Order and Judgement* du 12 octobre 2012.

160

Cette procédure n'incluait pas les *Findings of Fact and Conclusions of Law* du 22 décembre 2011. De ce fait, la procédure n'était *ab inito* pas apte à remplir les exigences posées par l'ordre public procédural luxembourgeois au regard d'une information complète de la partie défenderesse, excluant que l'exequatur puisse être accordé, nonobstant la question de savoir si la signification a été fructueuse.

### 4.2.2.2.3.   Ordre public substantiel : Dommages-intérêts punitifs

Les développements de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS concernant l'ampleur des dommages-intérêts alloués dans le cadre de la procédure américaine doivent être examinés au regard de l'ordre public substantiel, en ce que ces arguments questionnent la conformité de dommages-intérêts fixés à un montant important aux règles de fixation des dommages-intérêts présidant à la matière de la responsabilité civile délictuelle au Luxembourg.

Le tribunal rappelle dans un premier temps que les PARTIES DEMANDERESSES ont délibérément et de façon expresse exclu de leur demande en exequatur les volets des jugements américains qui leur ont alloué des dommages-intérêts qualifiés de punitifs, ne sollicitant partant d'elles-mêmes qu'un exequatur partiel. Il n'y a partant pas lieu d'examiner ce volet.

En faisant abstraction des dommages-intérêts punitifs que les PARTIES DEMANDERESSES ont ainsi expressément et de leur plein gré exclu de la demande en exequatur, les dommages-intérêts alloués par le *Order and Judgement* du 12 octobre 2012 sont fixés comme suit :

- dommages-intérêts économiques subis par les successions (*economic loss to estates*) : entre 1.200.501.- USD et 86.796.344.- USD.

  Ces montants ont été retenus sur base de calculs économétriques pour couvrir les pertes de revenus passées et futures, la perte de soutien familial, la perte de conseil, de guidance et d'instruction, la perte de services d'accompagnement et les intérêts avant jugement.

- dommages-intérêts pour douleurs endurées (*damages for pain and suffering*) : 2.000.000.- USD par personne décédée

  Après avoir relevé que les victimes directes ont pu se trouver dans des conditions différentes engendrant le cas échéant des souffrances différentes (selon qu'elles se trouvaient dans l'une ou l'autre tour, auprès du Pentagone ou dans un avion et pouvaient avoir eu plus ou moins conscience de leur décès immédiat) mais en tout cas horribles (*horrific pain and suffering*), ce montant forfaitaire est retenu comme étant raisonnable.

- dommages-intérêts pour perte d'un être cher subis par les proches (*solatium*) :
    - o 4.250.000.- USD pour la perte d'un frère ou sœur
    - o 8.500.000.- USD pour la perte d'un enfant
    - o 8.500.000.- USD pour la perte d'un parent
    - o 12.500.000.- USD pour la perte d'un conjoint
- dommages-intérêts compensatoires non-économiques avant jugement au taux de 4,96% par an à partir du 11 septembre 2001 jusqu'au jour du jugement à intervenir sur les dommages-intérêts pour douleurs endurées et les dommages-intérêts pour perte d'un être cher (soit sur le total de 968.000.000 USD).

    Le taux d'intérêt de 4,96% a été retenu comme constituant la moyenne du taux préférentiel entre le 11 septembre 2001 et le jour du rapport du juge Frank MAAS.

Ces quatre catégories de préjudice sont bien connues en droit luxembourgeois. Le simple fait qu'ils aient été retenus dans le cadre de l'indemnisation ne peut être considéré comme portant atteinte au stade de l'exécution à l'ordre public international du juge requis.

Le tribunal constate que les dommages-intérêts pour perte économique et le taux pour les intérêts avant jugement procèdent de calculs mathématiques tenant compte des circonstances particulières propres aux différentes victimes, respectivement à la situation économique générale. La motivation fournie à l'appui de la fixation de ces montants ne laisse transparaître aucun élément punitif ou dissuasif.

Les dommages-intérêts pour douleurs endurées et pour perte d'un être cher sont fixés de façon forfaitaire, mais la motivation fournie à l'appui de la fixation de ces montants ne laisse transparaître aucun élément punitif ou dissuasif.

Le simple constat que les montants retenus pour ces différents chefs de préjudice dépassent, ou même dépassent largement, les montants qui auraient été alloués dans des circonstances comparables par une juridiction luxembourgeoise ne permet pas de retenir que la fixation de ces montants porterait atteinte à l'ordre public substantiel, que ce soit en raison d'un prétendu caractère excessif ou en raison de l'existence d'un motif de dissuasion ou de punition.

**5.   La demande en tant que dirigée contre l'organisation HEZBOLLAH**

1/ L'organisation HEZBOLLAH n'a constitué avocat à la Cour ni après l'assignation initiale du 22 mars 2016, ni après la réassignation basée sur l'article 84 du Nouveau Code de Procédure Civile du 25 juillet 2016.

Il résulte des pièces de procédure soumises au tribunal que l'assignation du 22 mars 2016 dirigée contre l'organisation HEZBOLLAH lui a été envoyée directement par courrier recommandé du 22 mars 2016 à l'adresse du Ministère des Affaires étrangères de la République islamique d'Iran et que ce courrier a été refusé.

La même assignation a encore été transmise par la voie diplomatique en date du 7 avril 2016 par le Ministère des Affaires étrangères et européennes du Luxembourg au Ministère des Affaires étrangères de la République islamique d'Iran. Cette missive a été retournée au Ministère des Affaires étrangères et européennes.

Il résulte encore des pièces de procédure soumises au tribunal que la réassignation du 25 juillet 2016 dirigée contre l'organisation HEZBOLLAH lui a été envoyée directement par courrier recommandé du 25 juillet 2016 à l'adresse du Ministère des Affaires étrangères de la République islamique d'Iran et que ce courrier a été refusé.

Bien que sur l'original de cet exploit d'assignation, l'huissier instrumentaire renseigne qu'il l'a en outre adressé au Ministère des Affaires étrangères et européennes du Luxembourg pour être transmis par la voie diplomatique au Ministère des Affaires étrangères de la République islamique d'Iran, ces éléments de procédure ne figurent pas au dossier remis au tribunal.

Aux termes de l'article 156, paragraphe 1er du Nouveau Code de Procédure Civile, « *A l'égard des personnes domiciliées ou résidant à l'étranger, la signification est faite dans les formes de transmission convenues entre le Luxembourg et le pays du domicile ou de la résidence du destinataire. A défaut d'une autre procédure de transmission prévue par une convention internationale, l'huissier de justice adresse, par lettre recommandée avec avis de réception, une copie de l'acte au domicile ou à la résidence du destinataire à l'étranger. Si l'Etat étranger n'admet pas la transmission par voie postale d'actes judiciaires à des personnes établies sur son territoire, l'huissier de justice adresse la copie de l'acte par lettre recommandée avec avis de*

*réception au Ministère des Affaires étrangères aux fins de signification ou de notification de l'acte à son destinataire par la voie diplomatique* ».

Le Luxembourg n'est pas lié avec la République islamique d'Iran par un instrument de droit international public gouvernant la transmission des actes à destination de ce pays, et il ne résulte d'aucune information à disposition du tribunal que la République islamique d'Iran n'admettrait pas la transmission par voie postale d'actes judiciaires à des personnes établies sur son territoire. Si ce point a été discuté dans le cadre de la demande dirigée contre la SOCIETE NATIONALE IRANIENNE DES PETROLIERS en ce que celle-ci soutenait que la *Second Amended Complaint* ne lui avait pas été signifiée régulièrement, notamment en raison du fait que le droit iranien ne permettrait pas la transmission par voie postale à des personnes vivant sur le territoire de la REPUBLIQUE ISLAMIQUE D'IRAN, il ne résulte d'aucun argument développé dans ce cadre qu'une telle interdiction serait internationalement opposable aux autorités diplomatiques ou judiciaires des autres Etats. Il en résulte que nonobstant la carence de la preuve d'une transmission par voie diplomatique, la procédure de signification de la réassignation doit être considérée comme étant régulière.

La procédure de l'article 84 du Nouveau Code de Procédure Civile ayant été régulièrement suivie à l'encontre de l'organisation HEZBOLLAH, le présent jugement sera rendu contradictoirement à son égard.

**2/** Il ne résulte d'aucun élément du dossier que l'organisation HEZBOLLAH pourrait invoquer à son profit une immunité de juridiction propres aux Etats souverains ou à leurs émanations. La demande est partant recevable à son encontre sous cet égard.

**3/** Par référence aux développements consacrés à la demande en tant que dirigée contre les ORGANISMES PUBLICS IRANIENS et la SOCIETE NATIONALE IRANIENNE DES PETROLIERS, la demande en tant que dirigée contre l'organisation HEZBOLLAH doit également être déclarée irrecevable en tant qu'elle concerne le *Order* du 12 septembre 2013 et être rejetée en tant qu'elle concerne le *Order of Judgment* du 22 décembre 2011, le *Memorandum Decision and Order* du 3 octobre 2011 et le *Order and Judgement* du 12 octobre 2012.

164

**6. Les demandes reconventionnelles des ORGANISMES PUBLICS IRANIENS et de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS**

Pour l'hypothèse dans laquelle le bénéfice de l'immunité juridictionnelle ne leur serait pas reconnue, les PARTIES ETATIQUES IRANIENNES ont présenté une demande reconventionnelle en dommages-intérêts sur base des articles 6-1, 1382 et 1383 du Code civil en arguant que « les parties demanderesses font un usage abusif de leur droit de recours ». Elles font valoir que les PARTIES DEMANDERESSES auraient agi avec légèreté blâmable alors qu'elles ne disposeraient pas d'un compte auprès de la S.A. CLEARSTREAM et qu'elles n'auraient aucun actif au Luxembourg. Leur dommage résiderait dans le dommage réputationnel subi du fait du « recours » exercé et des frais d'instance engendrés par « les (trop) nombreuses procédures » introduites à leur encontre. Les PARTIES ETATIQUES IRANIENNES demandent à se voir allouer la somme de 100.000.- euros.

Sur base de la même motivation mais en tout état de cause, les ORGANISMES PUBLICS IRANIENS demandent chacun à se voir allouer des dommages-intérêts à hauteur de 25.000.- euros, tandis que la SOCIETE NATIONALE IRANIENNE DES PETROLIERS demande à se voir allouer à ce titre la somme de 100.000.- euros.

Le présent jugement retenant le bénéfice de l'immunité juridictionnelle au profit des PARTIES ETATIQUES IRANIENNES, il n'y a pas lieu de statuer sur leur demande reconventionnelle en dommages-intérêts.

Les PARTIES DEMANDERESSES opposent aux demandes des ORGANISMES PUBLICS IRANIENS et de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS que l'obtention de l'exequatur leur permettrait de poursuivre l'exécution de leurs créances sur tout avoir des parties défenderesses localisé au Luxembourg, et non pas seulement auprès de la S.A. CLEARSTREAM. Concernant le dommage allégué, les PARTIES DEMANDERESSES qualifient d'obscure la demande en ce qu'elle fait référence aux frais « engendrés par les (trop) nombreuses procédures introduites par les PARTIES DEMANDERESSES » et estiment que le dommage réputationnel ne serait pas établi, alors que l'instance n'aurait pas révélé de faits qui n'auraient pas déjà été connus du grand public.

165

Il est de principe que l'exercice d'une action en justice ne dégénère en faute que si elle constitue un acte de malice ou de mauvaise foi ou au moins une erreur grossière équipollente au dol ou si le demandeur a agi avec une légèreté blâmable. Ces conditions ne sont pas remplies en l'espèce, alors que les PARTIES DEMANDERESSES ont pu, sans commettre de faute, solliciter au Luxembourg l'exequatur des jugements obtenus à l'étranger afin de les y exécuter sur tout actif actuel ou futur, identifié ou non-identifié, des parties défenderesses. Il n'y a pas lieu dans ce cadre de se focaliser sur la seule procédure d'exécution forcée actuellement entamée par voie de saisie-arrêt auprès de la S.A. CLEARSTREAM. La circonstance que cette demande soit rejetée en ce qui concerne les parties demanderesses sur reconvention en raison de l'absence de régularité internationale des jugements soumis à exequatur ne saurait les constituer en faute.

Au-delà du constat d'absence de faute dans le chef des PARTIES DEMANDERESSES, le tribunal relève encore avec celles-ci que les parties demanderesses sur reconvention n'ont pas justifié du préjudice qu'elles affirment avoir subi, dès lors que les frais engendrés par d'autres procédures ne sauraient donner lieu à indemnisation dans le cadre de la présente procédure et que les parties demanderesses sur reconvention restent en défaut de substantifier le dommage réputationnel allégué.

Les demandes reconventionnelles sont partant à rejeter.

### 7.  Indemnités de procédure

Les PARTIES DEMANDERESSES demandent à se voir allouer une indemnité de procédure à concurrence de 5.000.- euros de la part de la BANQUE CENTRALE, de 5.000.- euros de la part des PARTIES ETATIQUES IRANIENNES, de 5.000.- euros de la part des ORGANISMES PUBLICS IRANIENS et de 5.000.- euros de la part de la SOCIETE NATIONALE IRANIENNE DES PETROLIERS

La BANQUE CENTRALE demande à se voir allouer une indemnité de procédure de 25.000.- euros.

Les PARTIES ETATIQUES IRANIENNES demandent à se voir allouer globalement une indemnité de procédure de 25.000.- euros.

166

Les ORGANISMES PUBLICS IRANIENS demandent chacun à se voir allouer une indemnité de procédure de 5.000.- euros.

La SOCIETE NATIONALE IRANIENNE DES PETROLIERS demande à se voir allouer une indemnité de procédure de 5.000.- euros.

L'indemnité de procédure ne peut être allouée à la partie succombante. Pour le surplus, l'application de l'article 240 du Nouveau Code de Procédure Civile relève du pouvoir discrétionnaire du juge (Cour de cassation 2 juillet 2015, Arrêt N° 60/15, JTL 2015, N° 42, page 166).

Les PARTIES DEMANDERESSES doivent partant être déboutées de toutes leurs demandes, dès lors qu'elles succombent à l'égard de toutes les parties défenderesses dans leurs prétentions.

Les parties défenderesses ne justifient pas de l'iniquité qui commanderait l'application de l'article 240 du Nouveau Code de Procédure Civile à leur profit. Leurs demandes doivent être rejetées.

## Par ces motifs:

le Tribunal d'arrondissement de et à Luxembourg, première chambre, siégeant en matière civile, statuant contradictoirement, sur le rapport du juge rapporteur, le Ministère public entendu en ses conclusions,

dit irrecevable la demande en exequatur en tant que dirigée contre la BANQUE CENTRALE DE LA REPUBLIQUE ISLAMIQUE D'IRAN, la REPUBLIQUE ISLAMIQUE D'IRAN, l'Ayatollah Ali HOSSEINI-KHAMENEI, Ali Akbar HASHEMI RAFSANJANI, le MINISTERE IRANIEN DE L'INFORMATION ET DE LA SECURITE, l'ORGANISATION ISLAMIQUE CORPS DES GARDES REVOLUTIONNAIRES, le MINISTERE IRANIEN DU PETROLE, le MINISTERE IRANIEN DES AFFAIRES ECONOMIQUES ET DES FINANCES, le MINISTERE IRANIEN DU COMMERCE et le MINISTERE IRANIEN DE LA DEFENSE ET DE LA LOGISTIQUE DES FORCES ARMEES,

167

dit irrecevable la demande en exequatur dirigée contre la SOCIETE NATIONALE IRANIENNE DE PETROLE, la SOCIETE NATIONALE DE GAZ IRANIEN, la COMPAGNIE AERIENNE D'IRAN, la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS et l'organisation HEZBOLLAH en tant qu'elle porte sur le *Order* du 12 septembre 2013,

dit non fondée la demande en exequatur dirigée contre la SOCIETE NATIONALE IRANIENNE DE PETROLE, la SOCIETE NATIONALE DE GAZ IRANIEN, la COMPAGNIE AERIENNE D'IRAN, la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE, la SOCIETE NATIONALE IRANIENNE DES PETROLIERS et l'organisation HEZBOLLAH en tant qu'elle porte sur le *Order of Judgment* du 22 décembre 2011, le *Memorandum Decision and Order* du 3 octobre 2011 et le *Order and Judgement* du 12 octobre 2012,

déboute la SOCIETE NATIONALE IRANIENNE DE PETROLE, la SOCIETE NATIONALE DE GAZ IRANIEN, la COMPAGNIE AERIENNE D'IRAN, la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE et la SOCIETE NATIONALE IRANIENNE DES PETROLIERS de leurs demandes reconventionnelles,

déboute les PARTIES DEMANDERESSES telles qu'identifiées dans les qualités du présent jugement de leurs demandes basées sur l'article 240 du Nouveau Code de Procédure Civile,

déboute la BANQUE CENTRALE DE LA REPUBLIQUE ISLAMIQUE D'IRAN, la REPUBLIQUE ISLAMIQUE D'IRAN, l'Ayatollah Ali HOSSEINI-KHAMENEI, Ali Akbar HASHEMI RAFSANJANI, le MINISTERE IRANIEN DE L'INFORMATION ET DE LA SECURITE, l'ORGANISATION ISLAMIQUE CORPS DES GARDES REVOLUTIONNAIRES, le MINISTERE IRANIEN DU PETROLE, le MINISTERE IRANIEN DES AFFAIRES ECONOMIQUES ET DES FINANCES, le MINISTERE IRANIEN DU COMMERCE et le MINISTERE IRANIEN DE LA DEFENSE ET DE LA LOGISTIQUE DES FORCES ARMEES, la SOCIETE NATIONALE IRANIENNE DE PETROLE, la SOCIETE NATIONALE DE GAZ IRANIEN, la COMPAGNIE AERIENNE D'IRAN, la COMPAGNIE NATIONALE IRANIENNE PETROCHIMIQUE et la SOCIETE NATIONALE IRANIENNE DES PETROLIERS de leurs demandes basées sur l'article 240 du Nouveau Code de Procédure Civile,

168

condamne les PARTIES DEMANDERESSES telles qu'identifiées dans les qualités du présent jugement aux frais et dépens de l'instance.

signé : HOSCHEIT, WEBER

Ainsi fait, jugé et prononcé par le tribunal d'arrondissement de et à Luxembourg, première chambre siégeant en matière **civile**, à l'audience publique du vingt-sept mars deux mille dix-neuf

où étaient présents :

Thierry HOSCHEIT, premier vice-président,
Vanessa WERCOLLIER, premier juge,
Séverine LETTNER, juge,
Luc WEBER, greffier.

signé : HOSCHEIT, WEBER

---

Ordonnons à tous huissiers, sur ce requis, de mettre le présent jugement à exécution.

A Notre Procureur Général d'Etat et à Nos Procureurs d'Etat près les tribunaux d'arrondissement d'y tenir la main.

Et à tous commandants et officiers de la force publique de prêter main-forte, lorsqu'ils en seront légalement requis.

En foi de quoi le présent jugement a été signé et scellé du sceau du tribunal.

Pour première grosse, délivrée sur demande à Maître Fabio TREVISAN, avocat à la Cour, mandataire des parties sub. 1-5 et sub. 7-16.

Luxembourg, le 28 mars 2019.

Le greffier en chef du tribunal, p.d.

