# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, Personal Representative of the Estate of James C. Knipple (Dec.), *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN; BANK MARKAZI a/k/a CENTRAL BANK OF IRAN; BANCA UBAE SpA; CLEARSTREAM BANKING, S.A.; and JP MORGAN CHASE BANK, N.A., <br><br> Defendants. | 13-cv-9195 (LAP) |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW
ON REPLY IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR,
IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION, AND
IN OPPOSITION TO BANK MARKAZI AND CLEARSTREAM BANKING, S.A. MOTIONS TO DISMISS**

SALON MARROW DYCKMAN NEWMAN
  & BROUDY LLC
Liviu Vogel (lvogel@salonmarrow.com)
10 East 40th Street
New York, New York 10016
(646) 843-1909

FLEISCHMAN BONNER & ROCCO LLP
James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
81 Main Street, Suite 515
White Plains, New York 10601
(914) 278-5100

*Counsel for Plaintiff*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

PRELIMINARY STATEMENT ......................................................................1

ARGUMENT ..........................................................................................2

I.   THE COURT HAS SUBJECT MATTER JURISDICTION
     OVER PLAINTIFFS' § 8772 CLAIM AGAINST MARKAZI .....................................2

II.  THE COURT MAY EXERCISE PERSONAL JURISDICTION
     OVER CLEARSTREAM AND MARKAZI ...................................................4

     A.   The Court Has Personal Jurisdiction Over Clearstream .........................4

          1.   Clearstream Tries to Ignore Its Extensive
               New York Business Activities and Their
               Substantial Relationship to Plaintiffs' § 8772 Claim......................4

          2.   Section 8772(a)(1) Preempts New York's Long-Arm
               Statute and any Other Inconsistent Federal or State Law...............7

          3.   Clearstream's Many Significant New York-Based
               Business Transactions Relating to the Bonds and
               Bond Proceeds Subject It to Personal Jurisdiction
               Pursuant to Federal Due Process.....................................8

               a.   Clearstream Is Purposefully Availing
                    Itself of Conducting Business in New York ...........................9

               b.   Plaintiffs' §8772 Claims Arise Out of or Relate
                    to Clearstream's New York Business Activities....................9

          4.   Exercising Jurisdiction Over Clearstream
               Is Reasonable Under the Circumstances.......................................10

               a.   Defending Itself in the Southern District of
                    New York Will Not Impose a Burden on Clearstream .........11

       b.    Section 8772 Establishes the United States
            Has an Overriding Interest to Resolve this Case...................11

       c.    Plaintiffs' Interests in a Convenient
            Forum and Effective Relief .....................................................11

       d.    International Judicial System Has
            No Interest in the Matter .........................................................12

       e.    The Procedural and Substantive
            Policies of Luxembourg ...........................................................12

    5.    Clearstream's Many Significant New York-Based
        Business Transactions Relating to the Bonds
        and Bond Proceeds Subject It to Personal Jurisdiction
        Pursuant to Fed. R. Civ. P. 4(k)(2)..................................................12

    6.    Clearstream's Many Significant New York-Based
        Business Transactions Relating to the Bonds
        and Bond Proceeds Subject It to Personal Jurisdiction
        Under CPLR § 302(a)(1)..................................................................13

  B.    The FSIA Provides the Court with
      Personal Jurisdiction Over Markazi........................................................14

    1.    The Same Ancillary Jurisdiction Principles Applicable
        to Claims Against Iran Apply to Markazi.......................................14

    2.    Even if Markazi Possessed Jurisdictional Due Process
        Rights, the Extensive Actions That Markazi Orchestrated
        in New York Would Provide a Basis for Personal Jurisdiction.....16

       a.    Markazi's Contacts With the U.S. Satisfy
            the Due Process Minimum Contacts Test .............................16

       b.    The Due Process Reasonableness Factors Strongly
            Support Exercising Personal Jurisdiction Over Markazi .......22

    3.    For Purposes of Its Motion to Dismiss,
        Markazi Possesses No Due Process Rights ...................................23

III.    MARKAZI IS NOT A REQUIRED PARTY UNDER RULE 19 .................................26

IV.    NO MATERIAL ISSUE OF FACT OR DISPUTED QUESTION OF LAW
       EXISTS WITH RESPECT TO ANY ELEMENT OF PLAINTIFFS' §8772 CLAIM
       BECAUSE MARKAZI IS THE BENEFICIAL OWNER OF THE BOND PROCEEDS .....29

       A.    Under Controlling American Law, Markazi
             is the Bond Proceeds' Beneficial Owner ...............................................29

       B.    Even if Luxembourg Law Applied Here,
             It Would Not Change the Determination That
             Markazi is the Beneficial Owner of the Bond Proceeds........................31

       C.    Defendants Have Repeatedly Admitted
             That Markazi Owns the Bond Proceeds ................................................33

V.     THE PURPORTED EXTRA-TERRITORIAL APPLICATION
       OF § 8772 DOES NOT VIOLATE DUE PROCESS PRINCIPLES ............................34

VI.    SECTION 8772 DOES NOT UNCONSTITUTIONALLY
       DEPRIVE MARKAZI OF A NEUTRAL ARBITER ..................................................37

VII.   SECTION 8772 DOES NOT VIOLATE CLEARSTREAM'S
       FIFTH AMENDMENT EQUAL PROTECTION RIGHTS...........................................39

VIII.  MARKAZI'S EFFORTS TO EVADE THE COURT'S
       AUTHORITY TO ADJUDICATE THIS ACTION JUSTIFY
       THE INJUNCTIVE RELIEF PLAINTIFFS SEEK .......................................................43

       A.    As in *Peterson I*, the Court Can Adjudicate
             Markazi's Immunity Defenses Simultaneously
             With Plaintiffs' Summary Judgment Motion ........................................43

       B.    Markazi's Collateral Attack on This Court's
             Authority to Adjudicate Plaintiffs' Claims Threatens
             Them With Irreparable Injury................................................................44

       C.    Plaintiffs Have Demonstrated the Likelihood
             of Success Required to Obtain Injunctive Relief...................................46

       D.    Public Interest Factors Also Fully
             Support Granting Injunctive Relief........................................................49

CONCLUSION ........................................................................................................50

# TABLE OF AUTHORITIES

**Cases**     **Page(s)**

*Allstate Ins. Co. v. Hague*,
   449 U.S. 302 (1981) ............................................................. 35, 36

*American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cnty.*,
   221 F.3d 1211 (11th Cir. 2000) ................................................. 35

*Analytical Diagnostic Labs, Inc. v. Kusel*,
   626 F.3d 135 (2d Cir. 2010) ..................................................... 40

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   171 F.3d 779 (2d Cir. 1999) ..................................................... 13

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   305 F.3d 120 (2d Cir. 2002) ..................................................... 11

*Bank Markazi v. Peterson*,
   136 S. Ct. 1310 (2016) ............................... 4, 6, 11, 23, 29, 37, 38

*Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*,
   821 F.3d 297 (2d Cir. 2016) ............................................. 16, 18, 19

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007) ..................................................... 6, 9

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*,
   137 S. Ct. 1312 (2017) ........................................................... 44

*Burger King v. Rudzewicz*,
   471 U.S. 462 (1985) ............................................................... 22

*Cacchillo v. Insmed, Inc.*,
   638 F.3d 401 (2d Cir. 2011) ..................................................... 48

*Calcote v. Tex. Pac. Coal & Oil Co.*,
   157 F.2d 216 (5th Cir. 1946) ................................................... 27

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868 (2009) ............................................................... 38

*Casciani v. Nesbitt*,
   659 F. Supp. 2d 427 (W.D.N.Y. 2009) ....................................... 40

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018) ................................................. 17, 19

*Chevron Corp. v. Donziger*,
   833 F.3d 74 (2d Cir. 2016) ..................................................... 38

*Cisneros v. Alpine Ridge Grp.*,
   508 U.S. 10 (1993) ............................................................... 3, 7

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ............................................................... 39

iv

*Cleveland v. Caplaw Enters.*,
    448 F.3d 518 (2d Cir. 2006) ........................................................................ 16, 18

*Contant v. Bank of Am. Corp.*,
    2018 U.S. Dist. LEXIS 42870 (S.D.N.Y. Mar. 15, 2018) ........................... 37

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*
    *(In re Petroleos de Venezuela, S.A.)*, 932 F.3d 126 (3d Cir. 2019) .................... 3, 15, 25

*CutCo Indus. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986) ........................................................................ 16, 17

*D.C. Fed. of Civic Ass'ns v. Volpe*,
    459 F.2d 1231 (D.C. Cir. 1971) ....................................................................... 38

*DCP Farms v. Yeutter*,
    957 F.2d 1183 (5th Cir. 1992) ..................................................................... 37-38

*Dekalb County Pension Fund v Transocean, Ltd.*,
    817 F.3d 393 (2d Cir. 2016) ............................................................................. 8

*E. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ....................................................................................... 39

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ....................................................................................... 41

*First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ............................................................. 15, 23, 24, 25, 26

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998) ........................................................................ 22

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) ....................................................................... 24

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005) ........................................................................... 45

*Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*,
    582 F.3d 393 (2d Cir. 2009) ..................................................................... 23, 28

*Gater Assets Ltd. v. AO Gazsnabtranzit*,
    413 F. Supp. 3d 304 (S.D.N.Y. 2019) ........................................................... 25

*Gen. Dynamics U.K. v. Libya*,
    2017 U.S. Dist. LEXIS 36685 (S.D.N.Y. Feb. 27, 2017) ............................. 46

*Giannullo v. City of N.Y.*,
    322 F.3d 139 (2d Cir. 2003) ........................................................................... 17

*Giordano v. City of New York*,
    274 F.3d 740 (2d Cir. 2001) ........................................................................... 40

*Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*
    18 N.Y.2d 722 (2012) .................................................................................... 30

*Green v. H & R Block, Inc.*,
    735 A.2d 1039 (Md. 1999) ............................................................................. 19

v

*Grove Press, Inc. v. Angleton*,
    649 F.2d 121 (2d Cir. 1981) ......................................................................... 16

*Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*,
    292 U.S. 143 (1934) ...................................................................................... 37

*Hausler v. JP Morgan Chase Bank, N.A.*,
    740 F. Supp. 2d. 525 (S.D.N.Y. 2010) ........................................................... 7

*Havlish v. Royal Dutch Shell PLC*,
    2014 U.S. Dist. LEXIS 138835 (S.D.N.Y. Sept. 24, 2014) ...................... 43

*Hellenic Lines Ltd. v. Rhoditis*,
    398 U.S. 306 (1970) ...................................................................................... 35

*Heller v. Doe*,
    509 U.S. 312 (1993) ...................................................................................... 34

*In re Banco Santander Sec.-Optimal Litig.*,
    732 F. Supp. 2d 1305 (S.D. Fla. 2010) ....................................................... 22

*In re FCC*,
    217 F.3d 125 (2d Cir. 2000) ......................................................................... 46

*In re Feit & Drexler, Inc.*,
    760 F.2d 406 (2d Cir. 1985) .................................................................. 46, 47

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    2019 U.S. Dist. LEXIS 49700 (S.D.N.Y. Mar. 25, 2019) ....................... 19

*In re Prudential Sec. Ltd. P'shps Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ................................................................. 3

*In re Shulman Transp. Enters., Inc.*,
    744 F.2d 293 (2d Cir. 1984) ......................................................................... 18

*John Labatt Ltd. v. Onex Corp.*,
    890 F. Supp. 235 (S.D.N.Y. 1995) ............................................................... 50

*Keeton v. Hustler Mag., Inc.*,
    465 U.S. 770 (1984) ...................................................................................... 21

*Khodeir v. Sayyed*,
    348 F. Supp. 3d 330 (S.D.N.Y. 2018) ......................................................... 18

*Kirschenbaum v. 650 Fifth Ave.*,
    830 F.3d 107 (2d Cir. 2016) ......................................................................... 21

*Kirschenbaum v. Assa Corp.*,
    934 F.3d 191 (2d Cir. 2019) ......................................................................... 24

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ................................................................................... 16

*Koehler v. Bank of Bermuda Ltd.*,
    12 N.Y.3d 533 (2009) ............................................................................ 44, 48

*Koniag, Inc., Uyak v. Andrus*,
    580 F.2d 601 (D.C. Cir. 1978) ..................................................................... 38

*Lauritzen v. Larsen*,
   345 U.S. 571 (1953) ................................................................................ 37

*Lawrence v. Wilder Richman Sec. Corp.*,
   417 F. App'x 11 (2d Cir. 2010) ............................................................... 45

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ............................................... 9, 10, 13, 21, 36

*Licci v. Lebanese Canadian Bank, SAL*,
   20 N.Y.3d 327, 984 N.E.2d 893 (N.Y. 2012) .......................................... 13

*Mariash v. Morrill*,
   496 F.2d 1138 (2d Cir. 1974) ..................................................................... 8

*Mastrio v. Sebelius*,
   768 F.3d 116 (2d Cir. 2014) ..................................................................... 47

*Mathews v. Kidder, Peabody & Co.*,
   260 F.3d 239 (3d Cir. 2001) ..................................................................... 20

*McNary v. Haitian Refugee Ctr., Inc.*,
   498 U.S. 479 (1991) ................................................................................... 8

*Miles v. Apex Marine Corp.*,
   498 U.S. 19 (1990) ..................................................................................... 8

*Morrow v. Winslow*,
   94 F.3d 1386 (10th Cir. 1996) ................................................................. 46

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018) ................................................................. 47, 48

*N.Y. Marine & Gen. Ins. Co. v. Tradeline* (L.L.C.),
   266 F.3d 112 (2d Cir. 2001) ................................................................. 16, 19

*Neilson v. D'Angelis*,
   409 F.3d 100 (2d Cir. 2005) ..................................................................... 40

*Pascarella v. Sandals Resort Int'l, Ltd.*,
   2020 U.S. Dist. LEXIS 37879 (S.D.N.Y. Mar. 4, 2020) ......................... 19

*Peacock v. Thomas*,
   516 U.S. 349 (1996) ................................................................................. 15

*Peterson v. Islamic Republic of Iran*,
   627 F.3d 1117 (9th Cir. 2010) ................................................................. 43

*Peterson v. Islamic Republic of Iran*,
   2013 U.S. Dist. LEXIS 40470 (S.D.N.Y. March 13, 2013) ......... 7, 17, 29, 40

*Peterson v. Islamic Republic of Iran*,
   876 F.3d 63 (2d Cir. 2017) ................................................................. 14, 49

*Peterson v. Islamic Republic of Iran*,
   963 F.3d 192 (2d Cir. 2020) ..................................................................... 14

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ............................................................................. 36, 37

*Pillsbury Co. v. Fed. Trade Comm'n*,
    354 F.2d 952 (5th Cir. 1966) ............................................................ 38

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    244 F. Supp. 2d 289 (S.D.N.Y. 2003) ............................................. 26

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
    390 U.S. 102 (1968) ........................................................................ 29

*Psihoyos v. John Wiley & Sons, Inc.*,
    2011 U.S. Dist. LEXIS 115835 (S.D.N.Y. Oct. 3, 2011) .............. 45

*Pullman Co. v. Knott*,
    235 U.S. 23 (1914) .......................................................................... 36

*Raia v. Pompeo*,
    2020 U.S. Dist. LEXIS 70137 (E.D.N.Y. Apr. 21, 2020) ............ 50

*Red Pocket, Inc. v. Interactive Communs. Int'l, Inc.*,
    2020 U.S. Dist. LEXIS 29109 (S.D.N.Y. 2020) ........................... 17

*Republic of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014) ........................................................................ 43

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008) ............................................................. 27, 28, 29

*EM Ltd. v. Banco Cent. de la República Arg.*,
    800 F.3d 78 (2d Cir. 2015) .............................................................. 24

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018) .................................................................. 2, 23

*Ruston v. Town Bd. for Town of Skaneateles*,
    610 F.3d 55 (2d Cir. 2010) ........................................................ 40, 42

*Soo Line R.R. Co. v. Overton*,
    992 F.2d 640 (7th Cir. 1993) .......................................................... 37

*Stephens v. Nat'l Distillers & Chem. Corp.*,
    69 F.3d 1226 (2d Cir. 1995) ........................................................... 46

*Tamam v. Fransabank SAL*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010) ........................................... 22

*Temple v. Synthes Corp.*,
    498 U.S. 5 (1990) ........................................................................... 26

*TMR Energy Ltd. v. State Prop. Fund of Ukr.*,
    411 F.3d 296 (D.C. Cir. 2005) ....................................................... 25

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ........................................................... 47-48

*U.S. Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*,
    916 F.3d 143 (2d Cir. 2019) ............................................................. 9

*United States v. Epskamp*,
    832 F.3d 154 (2d Cir. 2016) ........................................................... 34

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ................................................................ 35

*Vasquez v. H.K. & Shanghai Banking Corp.*,
    2020 U.S. Dist. LEXIS 142607 (S.D.N.Y. Aug. 10, 2020) ................ 20, 21

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000) ......................................................................... 40

*Ward v. Monroeville*,
    409 U.S. 57 (1972) ........................................................................... 38

*Weinstein v. Islamic Republic of Iran*,
    609 F.3d 43 (2d Cir. 2010) .......................................................... 3, 14, 15

*Wells Fargo Bank, N.A. v. Moore*,
    599 F. App'x 600 (7th Cir. 2015) ..................................................... 26

*Zilich v. Longo*,
    34 F.3d 359 (6th Cir. 1994) ............................................................. 39

## Statutes & Regulations

22 U.S.C. § 8772 ...................................................................................... *passim*

28 U.S.C. § 1330 ..................................................................................... 4

28 U.S.C. § 1330(a) ................................................................................ 3

28 U.S.C. § 1330(b) ............................................................................... 15

28 U.S.C. § 1610(a)(7) ........................................................................... 43

28 U.S.C. § 1610(g) ................................................................................ 2

28 U.S.C. § 1963 ..................................................................................... 3

Terrorism Risk Insurance Act of 2001,
    Pub. L. No. 107-297 (H.R. 3210) § 201
    (codified as 28 U.S.C. § 1610 (note)) ........................................ 3, 15, 21

N.Y. CPLR § 302(a)(1) ..................................................................... 5, 13, 14, 20

N.Y. CPLR § 5209 .................................................................................. 42

N.Y. CPLR § 5225 ............................................................................... 26, 27

N.Y. UCC § 8-102(a)(17) ....................................................................... 31

N.Y. UCC § 8-102(a)(9) ......................................................................... 31

N.Y. UCC § 8-503(a) .............................................................................. 30

N.Y. UCC § 8-505 .............................................................................. 17, 31

31 C.F.R. § 560.204 ............................................................................... 42

## Rules

Fed. R. Civ. P. 4(k)(2) ......................................................................... 5, 12

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 24

Fed. R. Civ. P. 19 ........................................................................................... 27, 28, 29

Fed. R. Civ. P. 56 ............................................................................................... 17, 46

Fed. R. Civ. P. 69 ........................................................................................................ 26

## Other

Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality
    and Fifth Amendment Due Process,* 105 Harv. L. Rev. 1217 (1992) ........................................... 35

*Restatement (Third) of Agency*, § 1.01 ............................................... 19

*Restatement (Second) of Agency* § 14 ............................................. 17, 18

Plaintiffs Deborah Peterson et al. respectfully submit this reply memorandum of law in further support of their motions for summary judgment, or, in the alternative, for a preliminary injunction requiring defendants Bank Markazi and Clearstream Banking, S.A. to return to New York the roughly $1.68 billion in Markazi-owned Bond Proceeds that Plaintiffs seek to collect to prevent the dissipation of those assets during this action's pendency.  This memorandum also opposes the motions to dismiss filed by Markazi and Clearstream.[1]

### PRELIMINARY STATEMENT

Defendants' briefs take lengthy tours through failed arguments recycled from *Peterson I*, with the occasional twist of a new, but equally wanting, contention.  Markazi argues that subject matter jurisdiction is lacking although Supreme Court precedent eliminates that defense where statutes, like § 8772, contain broad "notwithstanding" clauses that wipe away immunities.  It dusts off a constitutional argument based on the same flawed premise the Supreme Court flatly rejected—the idea that Congress "decided" this case when it amended § 8772.  It advances yet another due process argument that even its own authorities say no court has ever accepted.

From Clearstream, we hear (again) that Markazi does not own the Bond Proceeds although three courts in *Peterson I* rejected that contention and, to say the least, it is obvious that Markazi is the only beneficial owner of interest and principal on its bonds.  Even Markazi and UBAE agree.  Not to be outdone by Markazi, Clearstream invents its own "class of one" equal protection argument although § 8772 does not discriminate against Clearstream and patently rational bases exist for the policy choices that Congress made in adopting the statute.

---

[1] To avoid repetition, Plaintiffs incorporate by reference the arguments made in their moving papers in response to Defendants' motions.  Plaintiffs also employ the same abbreviations they utilized in their moving papers.

Both Defendants also argue that claims based on a statute that includes among its elements Clearstream's operation of its business in New York do not have even a "minimum contact" with the United States.  They advance that claim although Plaintiffs endeavor to collect the same $1.68 billion that Clearstream collected in a New York account for Markazi through dozens of transactions conducted over the course of four years.  In spinning that argument, Defendants also ignore that a fundamental basis, if not the most important element, of their entire relationship was Clearstream's ability to pass USD through New York for Markazi.

In light of those facts, this case easily satisfies the minimal burden the due process minimum contacts requirement imposes with respect to the exercise of personal jurisdiction. Furthermore, if ever there were a case to require a lesser level of contacts because the exercise of jurisdiction is particularly reasonable, this is the one.  Iran murdered innocent peacekeepers.  It has defied the U.S. courts for decades by evading judgments with the assistance of its financial enablers, including Clearstream.  As a result, the Due Process Clause poses no obstacle to this Court's power to adjudicate Plaintiffs' claim.

## ARGUMENT

## I.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' § 8772 CLAIM AGAINST MARKAZI

In *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018), the Court held that 28 U.S.C. § 1610(g) did not provide a sovereign immunity exception because it "conspicuously lacks the textual markers, 'shall not be immune' or '*notwithstanding any other provision of law*,' that would have shown that it serves as an independent avenue for abrogation of immunity." (Emphasis added).  Because § 8772 contains the latter "marker," it provides a basis for subject matter jurisdiction here.  *See* 22 U.S.C. § 8772(a)(1).

2

The Second Circuit's decision in *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) supports the same conclusion.  Relying on the notwithstanding clause in TRIA § 201(a) (codified at 28 U.S.C. § 1610 (note)), *Weinstein* held that the statute provided an "an independent grant of jurisdiction" in an action to collect a terrorism-related judgment against Iran from the assets of another Iranian bank, Bank Melli.  609 F.3d at 449.  As a result, the *Weinstein* court concluded that it could exercise jurisdiction over Bank Melli pursuant to the same ancillary jurisdiction principles applicable to any judgment enforcement action.  609 F.3d at 47.[2]  Thus, as in the underlying actions Plaintiffs brought against Iran pursuant to the FSIA's terrorism-related exceptions to sovereign immunity, 28 U.S.C. § 1330(a) provides for subject matter jurisdiction here.

Markazi again ignores § 8772's "notwithstanding" clause when it advances the illogical argument that § 8772 cannot serve as a basis for jurisdiction because Plaintiffs failed to reference it in the Amended Complaint they filed long before Congress amended the statute.  That clause nullifies "any other provision of law" that would impede Plaintiffs' ability to collect the Bond Proceeds, including the inapposite doctrine Markazi cites.  *See, e.g., Cisneros v. Alpine Ridge Grp.,* 508 U.S. 10, 18 (1993) ("[T]he Courts of Appeals generally have interpreted similar 'notwithstanding' language . . . to supersede all other laws, stating that [a] clearer statement is difficult to imagine.") (internal quotations omitted).

---

[2] *See, e.g., Crystallex Int'l Corp. v. Bolivarian Republic of Venez. (In re Petroleos de Venezuela, S.A.)*, 932 F.3d 126, 137 (3d Cir. 2019) ("[A]ncillary enforcement jurisdiction—or its functional equivalent—has been routinely applied to post-judgment enforcement proceedings against a foreign sovereign.  In other words, when a party establishes that an exception to sovereign immunity applies in a merits action that results in a federal judgment[,] … that party does not need to establish yet another exception when it registers the judgment in another district court under 28 U.S.C. § 1963 and seeks enforcement in that court.").

The cases Markazi cites also lack relevance because none involved a newly adopted statute.  "Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1325 (2016).  In any event, while § 8772 defeats Markazi's sovereign immunity, 28 U.S.C. § 1330, which Plaintiffs cited in the Amended Complaint (¶ 16), provides the statutory basis for jurisdiction here.

## II.   THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER CLEARSTREAM AND MARKAZI

### A.  The Court Has Personal Jurisdiction Over Clearstream

Recognizing that it cannot deny the reality of its decades-long history of purposefully transacting business in New York, Clearstream attempts to evade personal jurisdiction by arguing Plaintiffs' claims are not related to its New York business activities.  Clearstream asserts Plaintiffs' claims relate instead only to a "right to payment" in Luxembourg, Cl. Br. at 20, 24, and it contends that "no element" of Plaintiffs' claims for turnover involve its New York conduct.  *Id*. at 23, 25.  Clearstream's arguments fail because Plaintiffs' Section 8772 claim is inextricably intertwined with the extensive actions Clearstream took in New York over the course of many years in its role as a securities intermediary in connection with the Markazi's bonds, as well as the right to payment in Luxembourg.  Further, Clearstream's New York actions are part of the essential elements Plaintiffs must prove in order to obtain an order "directing that the asset be brought to" New York.  22 U.S.C. § 8772(a)(1)(A) and (C).

#### 1.  Clearstream Tries to Ignore Its Extensive New York Business Activities and Their Substantial Relationship to Plaintiffs' § 8772 Claim

Clearstream ignores that § 8772 defines the elements of Plaintiffs' claim and, thus, the type of conduct that subjects Clearstream to personal jurisdiction in connection with that claim.  *See* Pl. Br. at 10-11.  Clearstream's deliberate decision to ignore the elements that entitle

4

Plaintiffs to relief and the totality of circumstances relating to its provision of services as a

securities intermediary undermines every aspect of its contention that it is not subject to personal

jurisdiction, whether based on CPLR 302(a)(1), federal due process, or Fed. R. Civ. P. 4(k)(2).

For instance, Clearstream's role "as a foreign securities intermediary" is an essential

element of Plaintiffs § 8772 claim.  22 U.S.C. § 8772(a)(1)(A).  Yet, Clearstream never

addresses its New York conduct in connection with that role.  Contrary to its contention,

Clearstream is not being "targeted" just for "doing business in the United States."  Cl. Br. at 25-

26.  Clearstream is being subjected to personal jurisdiction because Plaintiffs' § 8772 claim

arises from the extensive actions Clearstream took in New York related to fulfilling its securities

intermediary role with respect to the Markazi's bonds and Bond Proceeds.

Clearstream does not address: (a) its New York conduct relating to the investments it

made in multiple bonds for the benefit of Markazi—bonds that were USD-denominated and that

contractually obligated Clearstream to receive payments of principle and interest in US dollars in

New York (Cl. Resp. SMF ¶¶ 65, 70); (b) its regular receipt and processing of Bond Proceeds

through its NY Account and through the New York banking system over the course of many

years (*id*. ¶¶  35-36); (c) the connection between the deposit of Bond Proceeds in its NY Account

and the book entries it made in Luxembourg (*id*. ¶¶ 70-74, 78, 81); (d) the relationship of

Plaintiffs' claims to its New York business practice of sweeping the Bond Proceeds out of its NY

Account and into its global securities clearing system (*id*. at ¶¶ 68-69, 75-76); and (e) its use of

New York-based staff and New York physical resources to provide services for Markazi in New

York.[3]  Pl. Br. at 15.  Yet, Clearstream has been providing services in New York integral to its

---

[3] Clearstream merely responded that its New York staff and resources are only relevant to a
"loose and spurious form of general jurisdiction." Cl. Br. at 28.

role as a securities intermediary since 1996. *Id.* at 14. Any assessment of Clearstream's New York activities must take into account the "totality of circumstances" as well as the nature of Plaintiffs' § 8772 claim. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007).

Instead of addressing the relationship between its New York conduct and Plaintiffs' Section 8772 claim, Clearstream continuously repeats a refrain that the right to payment is in Luxembourg, that the right to payment has never been in New York, that no element of Plaintiffs' claim arises from its New York conduct, and that any account relationship is in Luxembourg. *E.g.*, Cl. Br. at 20-25. But, none of Clearstream's bald assertions challenge the reality that Clearstream's New York activities were necessary to create and maintain the right of payment in Luxembourg, nor undermine Plaintiffs' extensive evidence establishing that the essential elements of their § 8772 claim are inextricably intertwined with the New York activities that Clearstream undertook relating to the Bonds and the Bond Proceeds.

Clearstream ignores the fact that § 8772(a)(1) preempts any securities or banking laws that might otherwise have provided it with a substantive defense to returning the financial asset to the United States, including any defenses to personal jurisdiction predicated on those laws. *Bank Markazi,* 136 S. Ct. at 1310 (interpreting a version of Section 8772 that addressed a different set of financial assets held by Clearstream for Markazi's benefit).

Clearstream fails to realize it is not shielded from personal jurisdiction in New York under § 8772 merely because its correspondent account at JPMorgan Chase Bank, N.A. ("JPMorgan") was a deposit account held in its name only. Cl. Br. at 5-7, 24. Clearstream's legal title to the NY Account is not relevant to personal jurisdiction. What is relevant is that Clearstream used the NY Account continually to receive the Bond Proceeds and then sweep those funds out of the account. The right to payment in Luxembourg would not exist without the

6

transactions Clearstream conducted in New York for Markazi's benefit.  That right to payment is also an essential element of Plaintiffs' claim.  22 U.S.C. § 8772(a)(1)(C) (§ 8772 entitles Plaintiffs to relief with respect to "a financial asset of Iran" that Clearstream "holds abroad").

Under Plaintiffs' § 8772 claim, the very nature of Clearstream's role as a "securities intermediary doing business in the United States," together with the extensive history of actions it took in New York with respect to the Bonds and Bond Proceeds, creates a substantial relationship between Plaintiffs' claim and Clearstream's New York conduct.   Clearstream's New York conduct is thus sufficient to establish personal jurisdiction.

### 2.   Section 8772(a)(1) Preempts New York's Long Arm Statute and Any Other Inconsistent Federal or State Law

 Clearstream's claim that Plaintiffs must satisfy New York's long-arm statute is wrong, and its argument that Plaintiffs are somehow asserting a right to nationwide service of process ignores Plaintiffs' straightforward interpretation of § 8772's words. Cl. Br. at 20-21.  Beginning with the phrase "notwithstanding any other provision of law" and then, more specifically, expressly "preempting any inconsistent provision of State law," the pre-emptive language Congress chose for § 8772 is clear and all-encompassing.  Courts routinely interpret "notwithstanding" clauses to "supersede all other laws."  *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 531 (S.D.N.Y. 2010).  "[A] clearer statement is difficult to imagine." *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993)(quotation omitted); *Peterson v. Islamic Republic of Iran*, 2013 U.S. Dist. LEXIS 40470, at *109 (S.D.N.Y. March 13, 2013).

Clearstream does not identify any limitations to the scope of Section 8772's preemption clause.  Indeed, Congress is presumed to be "aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990); *Dekalb Cnty. Pension Fund v Transocean, Ltd.*, 817 F.3d 393, 409 (2d Cir. 2016).  This includes how courts traditionally interpret

7

"notwithstanding" clauses in other statutes.  *Cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) ("It is presumable that Congress legislates with knowledge of our basic rules of statutory construction.").  Given the very basic principles governing state long-arm statutes and federal due process principles, Congress was undoubtedly aware that § 8772(a)(1) would preempt New York's long-arm statutes.

Contrary to Clearstream's assertion, Plaintiffs have not suggested that Congress' decision to preempt New York's long-arm statute "constitutes "a nationwide service of process provision."  Cl. Br. at 21.  In cases based on federal causes of action, such provisions permit courts to exercise personal jurisdiction over defendants based on their minimum contacts with the United States as a whole without regard to whether the defendants have minimum contacts with the forum state.  *See, e.g.*, *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974).  Unlike a nationwide service of process statute, § 8772(a)(1) simply preempts New York's long-arm statute, thereby authorizing the court to determine whether it may exercise jurisdiction exclusively by analyzing due process issues.

### 3. Clearstream's Many Significant New York-Based Business Transactions Relating to the Bonds and Bond Proceeds Subject It to Personal Jurisdiction Pursuant to Federal Due Process

The Court has personal jurisdiction over Clearstream because the following three conditions have been met: (1) Clearstream purposefully availed itself of conducting activities in New York; (2) Plaintiffs' § 8772 claim arises out of or relates to Clearstream's New York activities; and (3) the exercise of jurisdiction is reasonable under the circumstances.  *United States Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*, 916 F.3d 143, 150 (2d Cir. 2019).

#### a. Clearstream Is Purposefully Availing Itself of Conducting Business in New York

To conduct its securities intermediary business, Clearstream purposefully avails itself of

New York's financial markets, its banking system, and the United States dollar.  Cl. Resp. SMF at ¶¶ 34-51.  As part of its business dealings in New York, Clearstream provided extensive services to Markazi with respect to the Bond Proceeds.  Given its extensive New York business dealings, Clearstream concedes that it is purposefully availing itself of the protections of New York law.

### b.  Plaintiffs' § 8772 Claims Arise Out of or Relate to Clearstream's New York Business Activities

To determine whether Plaintiffs' § 8772 claim arises out of Clearstream's New York securities intermediary services, the Court "evaluates the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test."  *Best Van Lines*, 490 F.3d at 242 (citation omitted).  Clearstream's New York activities will qualify as sufficient minimum contacts if it "purposefully availed itself of the privilege of doing business in" New York and "could foresee being haled into court" here.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci III*").  The due process analysis also considers the nature of the claims and their jurisdictional nexus with Clearstream's New York conduct.  *Id.* at 170-71.

Despite providing extensive services to Markazi in New York with respect to the Bond Proceeds, Clearstream contends that Plaintiffs' § 8772 claims do not arise out of or relate to Clearstream's New York activities.  Cl. Br. at 27-28.  That argument suffers two fatal defects.  First, Clearstream ignores § 8772 and the elements of Plaintiffs' claims.  Second, it ignores the totality of circumstances relating to its provision of services to Markazi in New York.

The jurisdictional nexus for Plaintiffs' § 8772 claim is Clearstream's business operations and provision of services for Markazi in New York.  Clearstream's provision of those services is an essential element of Plaintiffs' § 8772 claim and gives rise to the right for relief in the form of

9

an order compelling Clearstream to return the Bond Proceeds to the United States for execution. 22 U.S.C. § 8772(a).  Thus, Clearstream's provision of services in New York is, itself, a sufficient jurisdictional basis.  Clearstream's continued focus on the right to payment in Luxembourg does not change that fact.

Clearstream also misunderstands the nature of this proceeding.  This is not a plenary proceeding to hold Clearstream liable for its own wrongdoing.  Cl. Br. at 29-30.  This is a judgment-enforcement proceeding that seeks to compel Clearstream, in its capacity as a garnishee, to turnover funds it holds on behalf of Markazi, the judgment debtor.

The totality of circumstances relating to Clearstream's provision of securities intermediary services to Markazi includes a regular, sustained course of dealing involving the USD-denominated bonds, receiving the Bond Proceeds into its NY Account, processing them through the New York banking system, transferring them out of the NY Account, and registering book entries relating to receipt of the Bond Proceeds.  Pl. Br. at 24-33.  Even standing alone, Clearstream's repeated, deliberate use of its NY Account and the New York banking system to provide financial services to Markazki satisfies the minimum contacts requirement.  *Licci III*, 732 F.3d at 170.  Given the nature and extent of Clearstream's claim-related New York contacts, it could have foreseen being haled into court in New York.

### 4.  Exercising Jurisdiction over Clearstream Is Reasonable Under the Circumstances

Courts assessing whether exercising personal jurisdiction over a non-resident is reasonable under the circumstances balance five factors.  All five demonstrate exercising personal jurisdiction is reasonable in this case.

### a.  Defending Itself in the Southern District of New York Will Not Impose a Burden on Clearstream

10

Clearstream claims the burden of defending this case in New York will be unreasonable. The facts belie that assertion for several reasons.  First, Clearstream is a wealthy corporation with offices all over the world, including a representative office in this District.  Given modern communications and travel capabilities, neither the fact of litigating in this District nor the periodic need to travel between New York and its Luxembourg headquarters will pose any significant burden on Clearstream.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-30 (2d Cir. 2002) ("[T]he conveniences of modern communication and transportation ease what would have been a serious burden a few decades ago.") (quotation omitted).  Second, this is not a new matter.  Clearstream has been litigating various aspects of this enforcement proceeding in the United States since June 2008.  Third, Clearstream contends that being required to defend this litigation would subject it to a potential double recovery.  Cl. Br. at 32.  Yet, it does not explain how it might be required to pay twice.  Indeed, such a double recovery is unlikely.  *See* argument at p. 49, *infra*.

### b.  Section 8772 Establishes the United States Has an Overriding Interest to Resolve this Case

Section 8772 establishes the United States' overriding interest in resolving this dispute. This current round of the enforcement proceeding was the natural consequence of its enactment. Congress expressly stated that it was enacting § 8772 to "ensure Iran is held accountable for paying the judgments" against it.  22 U.S.C. § 8772(2); *Bank Markazi,* 136 S. Ct. at 1317-19. This factor weighs predominantly in favor of exercising jurisdiction.

### c.  Plaintiffs' Interest in a Convenient Forum and Effective Relief

This Court provides Plaintiffs with a convenient forum and the opportunity for effective relief under the FSIA, § 8772, TRIA, and other remedies afforded victims of state sponsored terrorism.  Luxembourg, on the other hand, does not provide similar remedies.  This factor also

11

weighs heavily in favor of exercising jurisdiction.

### d.  The International Judicial System Has No Interest in the Matter

Clearstream's suggestion that this Court should dismiss it from the case so Plaintiffs could "try to obtain recognition and enforcement of the U.S. judgment" in Luxembourg is disingenuous at best.  Clearstream knows that Luxembourg has thus far refused to domesticate U.S. judgments entered in favor of victims of 9/11 and that one court has ruled Iran is entitled to immunity from jurisdiction.  Clearstream also knows that Luxembourg courts are interpreting certain statutes to operate as a complete prohibition against executing on assets held at Clearstream.  Under the current state of the law in Luxembourg, Plaintiffs would have little hope of enforcing their judgments against Markazi's assets at Clearstream.  This factor also weighs in favor of exercising jurisdiction.

### e.  The Procedural and Substantive Policies of Luxembourg

Finally, Clearstream suggests weight should be given to the procedural and substantive policies of Luxembourg.  However, as set forth above, Luxembourg does not currently provide any remedies to victims of terrorism.  Accordingly, this factor also weighs heavily in favor of exercising jurisdiction over Clearstream.

### 5.  Clearstream's Many Significant New York-Based Business Transactions Relating to the Bonds and Bond Proceeds Subject It to Personal Jurisdiction Pursuant to Fed. R. Civ. P. 4(k)(2)

Clearstream is also wrong when it contends Fed. R. Civ. P. 4(k)(2) would not provide an alternative basis for personal jurisdiction because its "contacts with New York are no different that its contacts with the United States as a whole."  Cl. Br. at 21-22, n. 15.  To the extent the Court concluded that Plaintiffs had to satisfy New York's long-arm statute, but did not, Rule 4(k)(2) would provide an alternative basis for jurisdiction.

### 6.  Clearstream's Many Significant New York-Based Business

**Transactions Relating to the Bonds and Bond Proceeds**
**Subject It to Personal Jurisdiction Under CPLR 302(a)(1)**

Even though Plaintiffs need not establish personal jurisdiction over Clearstream under CPLR § 302(a)(1), the § 8772 claim would satisfy the long-arm statute's requirements.  Federal due process and § 302(a)(1) standards are so similar that it would be "rare" and "unusual" for a defendant like Clearstream to be subject to personal jurisdiction under one, but not the other. *Licci III,* 732 F.3d at 170.  Clearstream's contention that Plaintiffs cannot meet § 302(a)(1)'s "arising from" prong is wrong for two reasons.

First, Plaintiffs' § 8772 claim arises from the services Clearstream provided for Markazi in New York and Clearstream's operation of its business there.  The "arising from prong" of CPLR 302(a)(1) "is relatively permissive."  *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339-40 (2012) (*"Licci II"*).  It "does not require a causal link between the defendant's New York business activity and a plaintiff's injury."  *Licci III,* 732 F.3d at 168-69.  It only requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former."  *Id*.; *Licci II,* 20 N.Y.3d at 339-40 (claims must have an "articulable nexus" or "substantial relationship" to the transactions, or be "in some way arguably connected to the transaction").  An "arising from" analysis depends on "the nature and elements of the particular" claim for relief, *Licci II,* 20 N.Y.3d at 339-40, and must take into account the "totality of the circumstances." *Bank Brussels,* 171 F.3d at 787.  The requirement is satisfied where "at least one element" of a claim arises from the defendant's New York contacts.  *Licci III,* 732 F.3d at 168-69.

Clearstream's attempt to limit the jurisdictional analysis to the "account relationship" and the "right of payment" in Luxembourg ignores the totality of circumstances relating to its role as a securities intermediary with respect to Markazi's bonds and the Bond Proceeds.  As explained

13

above, Clearstream's New York activities and business transactions create an articulable nexus

and a substantial relationship with Plaintiffs' § 8772 claim.  They are also essential elements of

the § 8772 claim itself.   Pl. Br. at 24-33.

Second, Clearstream's reliance on *Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d

Cir. 2017) ("*Peterson II*") is misplaced.  That decision was entered *before* § 8772's enactment.

Therefore, *Peterson II* did not consider either the claim before the Court now, the impact of

§ 8772 on the jurisdictional analysis, or § 8772's preemption of inconsistent law.  In fact, the

Second Circuit remanded the case to this Court for the express purpose of considering Plaintiffs'

§ 8772 claim because it was a new claim.  *Peterson v. Islamic Republic of Iran*, 963 F.3d 192,

195-96 (2d Cir. 2020) ("*Peterson III*").

Consequently, for purposes of CPLR 302(a)(1), Plaintiffs' Section 8772 claim arises

from Clearstream's operation of its business in New York, particularly its collection of the Bond

Proceeds for Markazi in the NY Account.

### B.   The FSIA Provides the Court with Personal Jurisdiction Over Markazi

#### 1.  The Same Ancillary Jurisdiction Principles Applicable to Claims Against Iran Apply to Markazi

As Markazi acknowledges, ancillary jurisdiction principles render judgment debtors

subject to personal jurisdiction in judgment enforcement proceedings.  *See* Markazi Br. at 27-28

n.3.  Moreover, as Plaintiffs demonstrate in Point I, the Second Circuit has ruled in the analogous

context of the TRIA statute that ancillary jurisdiction principles apply to agencies and

instrumentalities statutorily liable for judgments entered against terrorist states to the same extent

those principles apply to the sovereign judgment debtor.  *Weinstein,* 609 F.3d at 50.

Section 8772 provides an even more compelling basis for applying ancillary jurisdiction

principles here than does the TRIA statute *Weinstein* considered.  Under § 8772(d)(3), the Court

14

must treat Markazi as Iran for purposes of this proceeding.  In contrast, TRIA simply makes the "assets of" agencies and instrumentalities subject to execution.  *See Weinstein*, 609 F.3d at 49; 28 U.S.C. § 1610 (note).  Moreover, both statutes contain broad "notwithstanding" clauses that demonstrate Congress' intention to eliminate obstacles to judgment creditors' collection efforts. *Compare* 22 U.S.C. § 8772(a)(1) *with* 28 U.S.C. § 1610 (note).

Accordingly, where—as is true here—an agency or instrumentality is statutorily treated as the sovereign's alter ego, 28 U.S.C. § 1330(b) provides for exercising personal jurisdiction over that entity in judgment enforcement proceedings.  *See, e.g., Crystallex*, 932 F.3d at 138-39. Moreover, as *Crystallex* demonstrates, the same conclusion applies for purposes of Markazi's motion to dismiss for the additional reason that Plaintiffs demonstrate in Point II.B.3, *infra,* that Markazi is Iran's alter ego under *First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 628-34 (1983) ("*Bancec*")*.*  932 F.3d at 139.[4]

Given the joint nature of the payment obligation that Markazi and Iran share, *Peacock v. Thomas*, 516 U.S. 349 (1996), poses no obstacle to exercising personal jurisdiction over Markazi.  In contrast to *Peacock*, this case does not involve an effort to impose liability on a person not already liable for the judgment.  Rather, by virtue of § 8772, Markazi's liability for Plaintiffs' judgments is already fixed and entirely coextensive with Iran's.

---

[4] The motions to dismiss are governed by their own pleading rules.  Where, as here, the movants rely on matters outside the pleadings, the Court should hold an evidentiary hearing to "resolve disputed issues of credibility or material facts."  *E.g., Leighton Techs. LLC v. Oberthur Card Sys.,* 2007 U.S. Dist. LEXIS 57873, at *15 (S.D.N.Y. July 11, 2007); *accord, e.g., Gill v. Arab Bank, PLC,* 891 F. Supp. 2d 335, 349 (E.D.N.Y. 2012) ("When no evidentiary hearing regarding the court's subject  matter jurisdiction has been held, all material facts alleged in the complaint are accepted as true; all reasonable inferences are drawn in the plaintiffs favor.") (citing *Sharkey v.Quarantillo,* 541 F.3d 75, 83 (2d Cir. 2008)).  Plaintiffs are also entitled to reasonable discovery regarding those disputed issues.  *See* p. 24, *infra.*

### 2. Even if Markazi Possessed Jurisdictional Due Process Rights, the Extensive Actions That Markazi Orchestrated in New York Would Provide a Basis for Personal Jurisdiction

#### a. Markazi's Contacts With the U.S. Satisfy the Due Process Minimum Contacts Test

Markazi's minimum contacts analysis hinges on the mistaken premise that Clearstream did not operate in New York as Markazi's agent.  "New York common law provides that an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'"  *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (citation omitted).  When those requirements exist, the knowledge that the agent acquires and the conduct it undertakes while acting within the scope of its agency relationship are fully attributable to the principal.  *See, e.g., Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 318 (2d Cir. 2016) ("'a fundamental principle that has informed the law of agency and corporations for centuries' is that 'the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals'") (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010)).

Agency law does not demand that principals exert absolute control over agents.  Rather, the principals need only exercise "'some control.'"  *CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).  As occurred here, the requisite control is frequently established at the outset of the parties' relationship when they define their rights and responsibilities.  *See, e.g., Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) ("It is clear that 'the right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts…'")

16

(quoting *Restatement (Second) of Agency* § 14 cmt. a); *CutCo,* 806 F.3d at 366 ("Under traditional agency law, joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others.").

The record belies Markazi's contention that Clearstream did not function as Markazi's agent with respect to the Bond Proceeds. *See Peterson,* 2013 U.S. Dist. LEXIS 40470, at *122 ("Clearstream's only role with regard to the [*Peterson I*] Assets is as the agent of Bank Markazi."). Markazi has admitted that Clearstream—acting on Markazi's behalf, for its benefit, and with its consent—collected $1.68 billion of Bond Proceeds in the NY Account. *See* Markazi Resp. SMF ¶¶ 30, 63-66, 68, 70, 71, 74, 76, 78, 79, 82; Plaintiffs' Response to Markazi SMF ("Pl. RSMF") ¶¶ 6-12.[5]  Clearstream undertook those efforts pursuant to authority it possessed by contract and statute. *See* Markazi Resp. SMF ¶¶ 30; UCC § 8-505.

Those admissions, which satisfy the common law agency elements, negate Markazi's claim that Clearstream's actions are not attributable to Markazi for jurisdictional purposes. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) ("[W]here we have found personal jurisdiction based on an agent's contacts, we have never suggested that due process requires something more than New York law."). Thus, Clearstream's collection of the Bond Proceeds in the NY Account and all of the knowledge that Clearstream acquired while performing that duty are attributable to Markazi. *E.g., Bank of N.Y. Mellon,* 821 F.3d at 318.

---

[5]  *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); *Red Pocket, Inc. v. Interactive Communs. Int'l, Inc.*, 2020 U.S. Dist. LEXIS 29109, at *1 n.1 (S.D.N.Y. 2020) (purported factual disputes based upon "semantic objections" or "irrelevant facts" that "do not actually challenge the factual substance described in the relevant paragraphs" do not create actual disputes of fact).

Markazi overstates the nature of the control required to create an agency relationship when it argues that—despite these admissions—Clearstream did not function as Markazi's agent. Markazi controlled the opening of its account at Clearstream, what bonds it would buy and hold in that account, and whether to continue to own those bonds after U.S. sanctions made it illegal for Clearstream to continue processing payments on the bonds for Markazi's benefit. Markazi also controlled Clearstream's transfer of the bonds to the UBAE/Markazi account. Those facts belie Markazi's claim that Clearstream held Markazi's bonds as an agent, but did not act in that capacity when performing its statutory and contractual duty to collect payments on behalf of Markazi. See Markazi Br. at 20 (citing *In re Shulman Transp. Enters., Inc*., 744 F.2d 293, 296 (2d Cir. 1984) (requirement that freight forwarder remit the transportation charges it received to an airline would have constituted an indicia of an agency relationship)).

Ignoring these facts, Markazi focuses upon the supposed absence of evidence that it directed Clearstream to collect the Bond Proceeds in a particular manner through a specified account. But the law does not limit agency relationships to circumstances where principals direct the minutia of agents' conduct. To the contrary, the control the principal exerts may be quite attenuated, and agents may enjoy substantial discretion regarding how they fulfill their responsibilities. *See, e.g., Cleveland,* 448 F.3d at 522 ("[T]he control asserted need not 'include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.'") (quoting *Restatement (Second) of Agency* § 14 cmt. a).[6]

---

[6] *See also, e.g., Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 345 (S.D.N.Y. 2018) (it is irrelevant to the existence of an agency relationship that the principal "claims he gave no direction to [the agent]" because "'[t]o the extent the parties have created a relationship of agency . . . the principal has a power of control even if the principal has previously agreed with the agent that the principal will not give interim instructions to the agent or will not otherwise interfere in the agent's exercise of discretion'") (quoting *Restatement (Third) of Agency* § 1.01, cmt. f)); *Green*

18

None of the "control" cases Markazi cites question this blackletter principle.[7]

Markazi also has the law backwards when it claims that its purported ignorance of particular facts establishes that Clearstream did not function as Markazi's agent. Agency relationships require the principal to know that the agent is acting for the principal. *N.Y. Marine*, 266 F.3d at 122 (the principal must give consent for the agent to act on the principal's behalf). Once the principal delivers that consent, attribution of knowledge flows from the agent to the principal. *E.g., Bank of N.Y. Mellon,* 821 F.3d at 318. Clearly, Clearstream knew it was acting in New York when it collected the Bond Proceeds in the NY Account. Because those actions fell squarely within the scope of Clearstream's duties as Markazi's agent, New York law attributes those acts, and the knowledge associated with them, to Markazi. *E.g., id.*

In any event, Markazi cannot legitimately claim ignorance and indifference concerning where and how Clearstream processed USD-denominated transactions on its behalf. *See* Markazi Statement of Additional Material Facts ¶¶ 13-16 (citing Massoumi Supp. Dec. at ¶¶ 4-

---

*v. H & R Block, Inc.*, 735 A.2d 1039, 1051 (Md. 1999) ("the control a principal exercises over its agent is not defined rigidly to mean control over the minutia of the agent's actions" and the "control may be very attenuated with respect to the details"); *Restatement 3d of Agency*, § 1.01 ("a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment").

[7] *See Charles Schwab*, 883 F.3d at 85 (a bald allegation that subsidiaries acted for the benefit of and at the direction of parent companies failed to establish agency relationships, but remanding to determine whether the plaintiffs could allege that the agent acted "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal"); *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2019 U.S. Dist. LEXIS 49700, at *22 (S.D.N.Y. Mar. 25, 2019) (subsidiary would qualify as the agent of the parent if the parent "directed" the subsidiary's relevant activities); *Pascarella v. Sandals Resort Int'l, Ltd.*, 2020 U.S. Dist. LEXIS 37879, at *11 (S.D.N.Y. Mar. 4, 2020) (Markazi miscites *Pascarella* as holding that the alleged principal must be "the 'primary actor'" although the case merely holds that the principal must be "*a* primary actor in the matter in question") (emphasis added). Markazi is the primary actor; it purchased and owned the bonds.

5).  Before ignorance served Markazi's litigation purposes, its Head of Foreign Exchange

Negotiable Securities exhibited detailed understanding concerning Clearstream's "efficient

services" using "U.S. banks" to process USD-denominated transactions for Markazi.  *See* Pl.

RSMF ¶¶ 14, 16-19.  In his 2010 affidavit in *Peterson I*, Mr. Massoumi explained that the

UBAE/Markazi Account was created to enable Clearstream to continue the "efficient"

processing of USD payments on Markazi's Eurodollar bonds through U.S. banks without

detection by OFAC.  *See* Vogel Ex. 45 ¶¶ 12-22; Vogel Reply Decl. ¶ 2.  In light of this

evidence, Mr. Massoumi cannot manufacture a factual dispute by speculating that Clearstream

could, in theory, have collected $1.68 billion in Bond Proceeds through an account outside the

U.S.[8]  Markazi understood the actual money flow.  *See* Pl. RMSF ¶¶ 14, 16-19.

Markazi's remaining personal jurisdiction arguments also provide no basis for concluding

that it lacks the requisite minimum contacts.  Markazi misplaces its heavy reliance upon *Vasquez*

*v. H.K. & Shanghai Banking Corp.*, 2020 U.S. Dist. LEXIS 142607 (S.D.N.Y. Aug. 10, 2020),

which does not even address due process or agency issues.  *Vasquez* found personal jurisdiction

lacking under CPLR 302(a)(1) because three isolated transfers totaling $104,000 did not

evidence purposeful availment of the protections of New York law.  The transfers at issue here

---

[8]  Markazi claims that its bond prospectuses "only" state that the issuers would make payments
from a U.S. bank.  In fact, they stated that, unless Clearstream elected to receive payments by
check (a singularly unlikely scenario), the "payee" would receive payments "by transfer to a U.S.
dollar account maintained by the payee with a bank in New York City."  *See* RMSAMF ¶ 19.  In
context, no doubt exists that the "payee" is Clearstream because the prospectuses stated that
beneficial owners of the bonds would be reflected only on "records maintained in book-entry
form by Euroclear, Clearstream, Luxembourg or DTC."  *See id.*  Markazi is charged with
knowledge of that information.  *See, e.g., Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252
(3d Cir. 2001).  Clearstream's website also informed Markazi that Clearstream only maintained
USD correspondent accounts in New York.  *See* Pl. RSMF ¶ 17; Vogel Reply Decl. ¶¶3-4; Vogel
Exs. 64, 65, 82.

were many times more numerous and over *16,000 times* that amount.

Once the agency relationship between Markazi and Clearstream is considered, the distinctions that Markazi attempts to draw between this case and *Licci III* are unpersuasive. Markazi's purported distinctions rely upon the false assumption that it remained unaware of, and unconnected to, the Bond Proceed payments in the NY Account.  This case also involves significant contacts absent in *Licci III*, including the statutory requirement that Clearstream be doing business in the U.S.  22 U.S.C. § 8772(a)(1)(A).

Markazi's observation that Clearstream may not qualify as Markazi's agent for all purposes also does not undermine the conclusion that the minimum contacts requirement is satisfied here.  The relevant conduct—collecting and processing the Bond Proceeds payments in the NY Account—fell squarely within the scope of Clearstream's agency.

The connections between the Bond Proceeds and Luxembourg that Markazi highlights also do not suggest an absence of minimum contacts.  The *minimum* contacts test does not require that the forum have the *greatest* connection to a claim.  Indeed, out-of-forum contacts can predominate.  *See, e.g., Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 780-81 (1984).

Markazi also challenges jurisdiction based on the mistaken assertion that only contacts related to Iran's 1983 bombing of the Beirut Marine Barracks have any jurisdictional significance.  The Second Circuit has flatly rejected this contention.  *Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 132 (2d Cir. 2016) ("Section 201(a) of the TRIA confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment.").  Markazi's argument also again ignores that, under § 8772(d)(3), it stands in the same position as Iran.

21

Other arguments Markazi advances proceed from the false assumption that the movement of the Bond Proceeds through New York has nothing to do with this action or Plaintiffs' claim. But § 8772 is irreconcilable with that contention.  The statute imposes liability when the Bond Proceeds are held in the hands of a securities intermediary "doing business in the United States." 22 U.S.C. § 8772(a)(1)(A).  It also governs the parties' rights to specific assets, *i.e.,* the Bond Proceeds, that Clearstream came to hold by virtue of services that it provided for Markazi in New York.  22 U.S.C. § 8772; *see* Markazi Resp. SMF ¶¶ 70, 71, 74, 76, 78, 80, 82; Pl. RSMF ¶¶ 7-12.

Moreover, Clearstream's ability to operate in New York constituted an essential element of the Markazi-Clearstream relationship.  So much so that Markazi designed a scheme to maintain Clearstream's role as the intermediary that collected Markazi's Bond Proceed payments in New York even after OFAC pressured Clearstream to terminate its relationship with Markazi. *See* Markazi Resp. SMF at ¶¶ 57, 59-66, 68-71.  These facts find no parallels in the decisions Markazi cites.[9]

### b.   The Due Process Reasonableness Factors Strongly Support Exercising Personal Jurisdiction Over Markazi

Neither Markazi nor Clearstream challenges the principle that cases where the due process reasonableness factors strongly favor exercising jurisdiction demand a lesser showing with respect to the minimum contacts prong.  *E.g., Burger King v. Rudzewicz*, 471 U.S. 462, 477

---

[9] *See Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010) (pre-*Licci* decision finding no personal jurisdiction where plaintiffs identified no connection between their claim and transfers through a correspondent account); *In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1324 (S.D. Fla. 2010) (no jurisdiction in securities fraud action where defendant lacked any connection to the correspondent account another party utilized to make payments with no connection to the fraud).

(1985).  In light of the nature of the claims at issue and Iran's persistent judgment evasion, this action presents a particularly compelling case for exercising jurisdiction.  *See, e.g., Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 22 (D.D.C. 1998) (citing *Burger King* in noting that, in the terrorism context, a lower showing of minimum contacts may be required because of the nature of the offense and because "some areas were so committed to the political branches, such as foreign policy, that a statute implementing that policy could significantly lower the threshold of constitutional requirements, so long as there existed other processes to protect the defendant's interests"); *see also, e.g., Bank Markazi*, 136 S. Ct. at 1328-29 (emphasizing the broad discretion that Congress possesses when exercising "authority regarding foreign affairs" and the importance of providing deference to Congress in that sphere).

### 3. For Purposes of Its Motion to Dismiss, Markazi Possesses No Due Process Rights

For purposes of Markazi's motion to dismiss, Plaintiffs' allegations and proof raise a material question of fact regarding whether Markazi qualifies as Iran's alter ego under *Bancec*, 462 U.S. at 628-34.  The alter ego issue is significant because sovereigns and their alter egos, unlike independent agencies and instrumentalities, possess no due process rights.  *Frontera Res. Azer. Corp. v. State Oil Co. of the Azer. Republic*, 582 F.3d 393, 399-400 (2d Cir. 2009).

Deeming an agency an alter ego under *Bancec* is "warranted … 'where a corporate entity is so extensively controlled by [the state] that a relationship of principal and agent is created,' or where recognizing the state and its agency or instrumentality as distinct entities 'would work fraud or injustice.'"  *Rubin*, 138 S. Ct. at 823 (quoting *Bancec*, 462 U.S. at 629, 630).  *Bancec* also emphasized that "the Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies."  462 U.S. at 630.  *Rubin* highlighted the following factors relevant to the *Bancec* inquiry:

> "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations."

138 S. Ct. at 822-23 (paragraph breaks omitted) (citation omitted).[10]

Precedent negates Markazi's claims that Plaintiffs must *prove*—as opposed to allege—sufficient facts to invoke *Bancec* pre-discovery. Here, *Bancec* rebuts three *constitutional* defenses—two arguments specific to § 8772 and Markazi's due process personal jurisdiction defense. The § 8772-specific defenses require consideration only if a basis for exercising jurisdiction over Markazi exists. Thus, Rule 12(b)(6)'s pleading rules govern those defenses. Even to the extent that the standards for *jurisdictional* motions govern, the Court maintains substantial discretion regarding how to assess the fact-intensive *Bancec* issue. *E.g., EM Ltd. v. Banco Cent. de la República Arg.,* 800 F.3d 78, 95 (2d Cir. 2015) (assuming the veracity of the plaintiffs' *Bancec* allegations); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (granting focused jurisdictional discovery).

Plaintiffs' allegations (Amended Complaint at ¶¶ 29-31, 102-124) and the expert declaration of Dr. Patrick Clawson show that Markazi qualifies as Iran's alter ego. The Iranian government, Markazi's sole shareholder, receives 100% of the Bank's profits. *See* Vogel Ex. 96 at ¶¶ 18, 25. Iranian government ministers, their appointees, and other government officials

---

[10] *Accord, e.g., Kirschenbaum*, 934 F.3d at 197-98 (2d Cir. 2019) (*Bancec* factors include "'whether the sovereign nation: (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state'") (citation omitted).

dominate Markazi's management.  *Id.* ¶¶ 19-22.  Markazi's former Governors and Deputy

Governors and former Iranian government ministers have acknowledged the bank's lack of

independence.  *Id*. ¶¶ 33-34, 38.  Indeed, in 2010, then Iranian President Ahmadinejad publicly

expressed derision for the very concept of an independent central bank.  *Id.* ¶ 32.

Iranian Presidents and their cabinets also routinely dictate Markazi's monetary policy,

including interest rates.  *Id.* ¶¶ 31, 35-38.  Those political figures order the Bank to make specific

loans.  *Id*. ¶¶ 30, 46.  If met with resistance, the political figures simply replace insufficiently

obedient Governors before their terms expire.  *Id.* ¶¶ 21, 29, 35.

Economists and the International Monetary Fund have recognized that Markazi has

forsaken its statutory obligation "'to maintain the value of the [Iranian] currency'" in favor of

financing excessive Iranian government spending that has produced runaway inflation.  *Id*.

¶¶ 40-46.  Markazi has also acted contrary to its interests and statutory obligations, by supporting

Iran's sponsorship of terrorism, resulting in unprecedented sanctions.  *Id*. ¶¶ 40, 47-65.

These facts and the Clawson Declaration's more detailed findings demonstrate that

Markazi is Iran's alter ego.  Courts, including this Court, have found *Bancec* satisfied in similar

circumstances.[11]  Moreover, given § 8772's terms, recognizing Markazi as distinct from Iran

---

[11] *See, e.g., Crystallex,* 932 F.3d at 146-49 (state-owned oil company (PDVSA) was alter ego
where Venezuela controlled the price of PDVSA oil sales, determined how it used its assets,
received all profits as the 100% shareholder, appointed PDVSA senior management, exercised
its power to fire staff, and extracted political value from PDVSA's sale of oil to allies on
preferential terms); *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 301-302 (D.C.
Cir. 2005) (State Property Fund was alter ego of Ukrainian government where the Fund was
statutorily "'subordinated and accountable to'" Ukraine's legislature, Ukraine's President and
legislature could appoint and discharge the Fund's Chairman and appoint the Fund's board, and
the Ukrainian government financed the Fund's budget); *Gater Assets Ltd. v. AO Gazsnabtranzit*,
413 F. Supp. 3d 304, 309 (S.D.N.Y. 2019) (Preska, J.) (oil company in which Moldova owned a
*minority* stake was an alter ego where Moldova determined the company's pricing and priorities,
appointed state representative to assist in managing and supervising the company, intertwined its

"would work fraud or injustice" and "defeat legislative policies." *Bancec*, 462 U.S. at 629, 630.

### III.    MARKAZI IS NOT A REQUIRED PARTY UNDER RULE 19

Iran and Markazi share joint liability for Plaintiffs' judgments.  28 U.S.C.

§ 8772(a)(1)(C) (including "an asset of the central bank or monetary authority of the

Government of Iran" among those subject to execution to satisfy terrorism judgments against

Iran).  They also share the same joint interest in the Bond Proceeds.  22 U.S.C. § 8772(d)(3)

(defining "Iran" as "the Government of Iran, including [its] central bank or monetary authority").

As Iran's co-debtor, Markazi is not a necessary party under Rule 19; where multiple

parties share joint liability, they need not all be joined in liability litigation *or* judgment-

enforcement proceedings.[12]  In fact, under applicable New York collections law, judgment

debtors need only receive notice of a turnover proceeding against a garnishee like Clearstream.

*See* Fed. R. Civ. P. 69(a)(1); CPLR § 5225(b).

Accordingly, Markazi is not "necessary" under Rule 19(a)(1)(A) because the court can

"accord complete relief among existing parties" in its absence.  Nor does Markazi qualify as

necessary under Rule 19(a)(1)(B)(i) because disposing of the matter in Markazi's absence will

not "as a practical matter impair or impede [Markazi's] ability to protect the interest" that it

asserts in the Bond Proceeds.  In short, Markazi has no independent interest to protect.

---

finances with those of the company, required government approval of significant company
decisions, and effectively fired a senior employee for failing to implement government policy).

[12] *E.g., Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not
necessary for all joint tortfeasors to be named as defendants in a single lawsuit" and Rule 19 has
not "changed that principle."); *Wells Fargo Bank, N.A. v. Moore*, 599 F. App'x 600, 601 (7th
Cir. 2015) (because "a creditor can collect a joint-and-several debt from any obligor in any ratio
it chooses," other parties allegedly liable for the debts the defendant guaranteed were not
necessary parties in an action to collect on the guarantees); *Presbyterian Church of Sudan v.
Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 351 (S.D.N.Y. 2003) (sovereign was not a
necessary party where it was merely a joint tortfeasor with oil producer).

While Clearstream suggests that it could incur double liability if the Court enters judgment in Plaintiffs' favor, Clearstream never explains why a Luxembourg court would not respect and enforce a final judgment of this Court. As a result, Markazi asserts no interest that could "leave an existing party [*i.e.,* Clearstream] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(B)(ii).

Contrary to Markazi's suggestion, *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), does not support deeming Markazi a necessary party. *Pimentel* involved an interpleader action brought to establish the rightful owner of assets Ferdinand Marcos had plundered from the Philippines. *Id.* at 855-56. Two Philippine government entities and private judgment creditors of Marcos were adverse claimants to that property. *Id.* at 858. When the Philippine entities established their entitlement to sovereign immunity (a defense unavailable to Markazi here), the Supreme Court held that Rule 19 required dismissal of the interpleader action. *Id.* at 872.

*Pimentel* is this case's polar opposite.[13] The Philippine government entities were not liable on the judgment against Marcos, and, if their litigation position succeeded, they would have prevented the judgment creditors from enforcing their judgment against the relevant property. Here, by contrast, Iran has no defense to execution and nothing Markazi can do could prevent Plaintiffs from collecting the Bond Proceeds. Furthermore, under § 8772 Markazi enjoys no sovereign immunity. Even if, hypothetically, Markazi were not subject to personal jurisdiction, its *election* not to assert its supposed rights in this action (something CPLR § 5225 contemplates) would not impede the Court's ability to adjudicate Plaintiffs' claims.

---

[13] *See also Calcote v. Tex. Pac. Coal & Oil Co.*, 157 F.2d 216, 220-21 (5th Cir. 1946) (case could not proceed in the absence of parties holding undivided interests in royalties derived from mineral lease where action determined the validity of that lease and thus the absent parties' property rights) (cited in Markazi Br. at 30).

27

Even if Markazi were a necessary party, Rule 19(b) would require the Court to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Each of the four non-inclusive factors that Rule 19(b) outlines to guide that determination favors proceeding without Markazi, particularly because it enjoys no immunity.  *See Pimentel,* 553 U.S. at 863 (courts must also consider the interests of "the judicial system and its interest in the integrity of its processes and the respect accorded to its decrees[;] and … society and its concern for the fair and prompt resolution of disputes").

A judgment rendered in Markazi's absence will not impose any actual "prejudice" upon Markazi because Plaintiffs would prevail on their § 8772 claim against Iran even if Markazi possessed an absolute defense.[14]  *See* Fed. R. Civ. P. 19(b)(1) (the Court must consider "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties"); *see also Pimentel*, 553 U.S. at 868 (this factor may weigh against a sovereign where "the claims presented and the interests likely to be asserted both by the joined parties and the absent entities or persons" demonstrate the absence of prejudice).  Clearstream also cannot show that a Luxembourg court would refuse to recognize and enforce this Court's judgment.  The final judgment also can protect Clearstream by reciting Iran's liability and declaring that Clearstream complied with its obligations.  Fed. R. Civ. P. 19(b)(2) (the Court must consider "the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures").  For the same reasons, "a judgment rendered in [Markazi's] absence would be adequate."  Fed. R. Civ. P. 19(b)(3).  *See Pimentel*,

---

[14] Iran cannot challenge § 8772 on the due process grounds Markazi advances.  *Frontera,* 582 F.3d at 400.  Furthermore, ancillary jurisdiction principles provide the Court with personal and subject matter jurisdiction over Iran for the purpose of enforcing Plaintiffs' judgments.  *See* note 2, *supra.*

28

553 U.S. at 870 (judgment is "adequate" where it resolves the parties' entire dispute).

Plaintiffs' thirteen years of enforcement efforts evidence that they would not "have an adequate remedy if the action were dismissed for nonjoinder."  Fed. R. Civ. P. 19(b)(4).[15] Finally, the interests of the judicial system and society that *Pimentel* highlighted strongly favor enforcing Plaintiffs' judgments, thereby deterring future terrorism.  *See* 553 U.S. at 863.

IV.   **NO MATERIAL ISSUE OF FACT OR DISPUTED QUESTION OF LAW EXISTS WITH RESPECT TO ANY ELEMENT OF PLAINTIFFS' § 8772 CLAIM BECAUSE MARKAZI IS THE BENEFICIAL OWNER OF THE BOND PROCEEDS**

   **A.  Under Controlling American Law, Markazi Is the Bond Proceeds' Beneficial Owner**

In *Peterson I*, this Court, the Second Circuit and the Supreme Court recognized that Markazi was the sole beneficial owner of financial assets in the UBAE/Markazi Account. *Peterson*, 2013 U.S. Dist. LEXIS 40470, at *118 ("No rational juror could find that any person or entity—other than Bank Markazi—has a constitutional, beneficial or equitable interest in the Blocked Assets … [Clearstream and UBAE] are both merely account holders without authority to move or use the assets in the absence of direction.  They simply . . . maintain that account on behalf of another, Bank Markazi."), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1325, n. 20 (2016) (highlighting Markazi's beneficial ownership of the proceeds of its bonds).  Clearstream nonetheless makes a series of meritless arguments that Markazi does not own the Bond Proceeds, which are indistinguishable from the

---

[15] Markazi falsely suggests that *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 123 (1968) holds that Rule 19 focuses upon protecting "constitutional" rights of necessary parties.  *Provident* actually emphasizes that the inability to join a necessary party does not compel dismissal.  *Id.* at 125 (permitting a personal injury action arising from a car accident to proceed in the absence of the owner of a vehicle although the litigation focused on whether the owner gave permission for a driver involved in the accident to use the car).

29

assets at issue in *Peterson I*.[16]

*Peterson I's* conclusion regarding Markazi's beneficial ownership applies here because American law, including the UCC and federal law regarding what constitutes a "beneficial ownership" interest, determines the Bond Proceeds' owner.  Citing *Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (2012) for the proposition that there is a presumption against extraterritorial application of New York law, Clearstream mistakenly contends that the New York UCC does not apply for purposes of determining the nature of Markazi's interest in the Bond Proceeds.

But that presumption has no applicability here, where Congress invested § 8772 with extraterritorial reach by empowering the Court to issue an order affecting assets held abroad by a foreign securities intermediary.  Congress also dispelled any doubt that the UCC determines beneficial ownership under § 8772 by: (a) incorporating the UCC's definitions of "securities intermediary" and "financial asset" in § 8772(d)(2); (b) dictating that any analysis regarding who holds an equitable or beneficial ownership interest in the assets must exclude the custodial interests of securities intermediaries (*see* § 8772(a)(2)(A)); and (c) stating that, "[n]othing in this section shall be construed . . . to preempt State law, including the Uniform Commercial Code, except as expressly provided in subsection (a)(1)."  22 U.S.C. § 8772(c)(2).  Moreover, to the extent any provision of Luxembourg law would prevent execution by Plaintiffs, that term is preempted by § 8772(a)(1)'s broad "notwithstanding" clause.

Thus, as Plaintiffs demonstrated in their moving papers, Markazi has all of the beneficial

---

[16] Clearstream's claim that UBAE has a supposed "constitutionally protected interest" in the Bond Proceeds has no basis in fact.  Cl. Br., p. 38, n. 27.  UBAE itself has admitted that Markazi is the beneficial owner (Vogel Dec. ¶ 93, Ex. 69), and UBAE has claimed no rights to the Bond Proceeds in this action.  ECF 246.

ownership rights afforded to financial assets by UCC §§ 8-505 through 8-508.  Pl. Br. at 11-13.

In contrast, intermediaries like Clearstream and UBAE hold assets solely as custodians for

ultimate owners like Markazi.  *See id.*; UCC § 8-503(a).

      Clearstream disputes that the bond proceeds now held in blocked account no. 13675 are

"financial assets" (Cl. Br. at 37, n. 26), claiming incorrectly that UCC § 8-505 distinguishes

between a "financial asset" and payments and distributions made by the issuer of a financial

asset.  However, the UCC defines a "financial asset" to include a "securities entitlement," which

in turn necessarily includes the right to payments and distributions on the underlying securities.

UCC § 8-102(a)(9).  "A 'security entitlement' is the rights and property interest of an entitlement

holder with respect to a financial asset specified in Part 5" of Article 8 (UCC 8-102(a)(17)),

including the right under UCC § 8-505 to receive payments or distributions made by the issuer of

that financial asset that are received by a securities intermediary.  *See* UCC § 8-505.

      Clearstream's reliance on UCC provisions that prevent investors from asserting rights

directly against upper-tier intermediaries and creditors from reaching investors' assets at upper-

tier intermediaries (Cl. Br. at 36-37) is misplaced because those provisions are preempted by

§ 8772.  Section 8772(a)(1) authorizes execution "notwithstanding any other provision of law"

and "preempt[s] any inconsistent provision of State law."  Section 8772(a)(2)(A) specifically

authorizes execution against financial assets even if they are held by upper-tier intermediaries, as

long as the Court determines that Markazi has a beneficial interest therein.

   **B.  Even if Luxembourg Law Applied Here, It Would Not Change the
       Determination That Markazi is the Beneficial Owner of the Bond Proceeds**

Even if Luxembourg law applied here despite § 8772's preemptive provisions,

31

Clearstream has not shown that Luxembourg law differs from the UCC in any material respect.[17] In particular, Clearstream's Luxembourg attorney, Marie Paule Gillen, concludes that, "under Luxembourg law, Bank Markazi would be deemed to hold a 'beneficial interest' in the Sundry Blocked Account."  Vogel Ex. 92, ¶ 7.  That "beneficial interest" suffices to trigger § 8772's execution remedies.  *See* 22 U.S.C. § 8772(a)(2).

The terms of Clearstream's agreement with its customers (the General Terms and Conditions ("GTC")) are consistent with the rights and obligations of securities intermediaries and securities entitlement holders under Article 8 of the UCC.  Article 3 of the GTC requires Clearstream's customers (like UBAE) to keep assets held for third party beneficial owners such as Markazi separate from the customer's proprietary assets and to inform Clearstream about the beneficial owners.  *See* Kaminetzky Ex. E, Article 3(2)-(3).  Here, UBAE satisfied its safekeeping obligation by depositing Markazi's bonds in the UBAE/Markazi Account (No. 13061) at Clearstream, which was designated a "customer account."  Vogel Ex. 50; *see also* Vogel Ex. 46, p.32:15-19 and p.33:9-14 (testimony of Clearstream officer that "customer accounts" like the UBAE/Markazi Account are "designed to hold interest of third parties" and differentiating that account from UBAE's proprietary account).

Article 1 of the GTC contains a definition that uses the phrase, "beneficial owner of a

---

[17] The opinion of Plaintiffs' Luxembourg counsel confirms that, under Luxembourg law, an account holder possesses all of the meaningful rights of ownership.  Those rights include: (a) a right of co-ownership in securities that are sub-deposited with an upper-tier intermediary (Vogel Ex. 91, ¶4.1, Ex. 92, ¶31.); and (b) the right to payment of interest and principal attached to bonds (Ex. 91, ¶4.3.1, Ex. 92, ¶31).  Furthermore, securities deposited with Clearstream and cash proceeds of such securities are "segregated . . . [and] separate from [Clearstream's] ordinary estate.  Only the depositor is entitled to such asset mass and such entitlement is an *in rem* right."  Ex. 89, ¶¶7, 8, Ex. 90, Ex. 92 ¶¶29, 30, 32.  Clearstream's Luxembourg law expert concedes that Luxembourg case law considers proceeds of securities held in a securities account as non-fungible goods in which the account holder retains ownership.  Kaminetzky Ex. C, ¶14.

Covered Asset" and defines a "Covered Asset" as "[s]ecurities, ***cash*** or precious metals held by CBL or any Sub-custodian on behalf of a Customer."  Kaminetzky Ex. E, Art. 1 (emphasis added).[18]  Article 11 of the GTC recognizes the rights of third-party beneficial owners of securities, like Markazi, to control the use of securities, whether they are in the hands of Clearstream or a Clearstream customer.  *See* Kaminetzky Ex. E, Article 11.

As is true under the UCC, Article 17 of the GTC requires Clearstream to "collect cash amounts distributable or payable in respect of the principal of  . . . or interest on, or dividends or other amounts in respect of securities deposited by the Customer with [Clearstream]" and to credit any such distribution to the relevant customer account.  *See* Kaminetzky Ex. E, p.9.  UBAE is in turn obligated under the same GTC provision in its agreement with Markazi to collect such payments through Clearstream and credit the amounts to Markazi's account at UBAE.

Given these rights and responsibilities, even to the extent Luxembourg law is relevant here, the ultimate issue of whether Markazi holds "equitable title to, or the beneficial interest in" the Bond Proceeds does not change.  22 U.S.C. § 8772(a)(2); *see* Pl. Br. at 20-21 (federal law determines the meaning of beneficial ownership under § 8772(a)(2)).  Clearstream's effort to invoke Luxembourg law therefore provides no defense to Plaintiffs' claim.

### C.  Defendants Have Repeatedly Admitted That Markazi Owns the Bond Proceeds

Defendants own words confirm Markazi's status as the sole beneficial owner of the Bond Proceeds.  Clearstream and UBAE both repeatedly referred to Markazi as the "beneficial owner"

---

[18] Clearstream uses the phrase "beneficial owner" 26 times in its Customer Handbook, which forms a part of the Governing Documents incorporated into its GTC.  *See* Kaminetzky Ex. E, Arts. 1 and 3(2); Vogel Ex. 83.

of those assets in correspondence exchanged shortly after the Plaintiffs in *Peterson I* restrained

Markazi's bonds in 2008.  *See* Vogel Exs. 51, 52, 55, 84, 85 and 86.  Clearstream's settlement

agreement with the U.S. Department of Treasury also indicates that the free of payment transfer

of securities entitlements from Markazi's account at Clearstream to the UBAE/Markazi Account

in 2008 did not change Marakazi's beneficial ownership; it only buried Markazi's interest "one

layer deeper in the custodian chain."  *See* Vogel Ex. 61, p.2, ¶ 8.[19]  Markazi has also repeatedly

admitted that it is the exclusive beneficial owner of the Bond Proceeds.  *See* Vogel Decl., ¶ 93, n.

6, Ex. 45, ¶ 30.

## V.    THE PURPORTED EXTRA-TERRITORIAL APPLICATION OF § 8772 DOES NOT VIOLATE DUE PROCESS PRINCIPLES

To establish that § 8772 violates the Due Process Clause, Markazi must overcome the

strong presumption of constitutionality all statutes enjoy.  *E.g., Heller v. Doe*, 509 U.S. 312, 320

(1993).  That burden is further enhanced when arguing that a statute Congress intended to have

extraterritorial effect—such as § 8772—violates due process as a result of the purported absence

of contacts between a defendant and the U.S.  *E.g., U.S. v. Epskamp*, 832 F.3d 154, 168 (2d Cir.

2016) ("Where Congress expressly intends for a statute to apply extraterritorially, as we

conclude it did here, the 'burden is a heavy one' for a defendant seeking to show that

extraterritorial application of the statute violates due process.") (citation omitted).

Given that heavy burden, it is hardly surprising that Markazi cites *no decision* declaring a

statute unconstitutional on "extraterritoriality" grounds.[20]  Indeed, the one terrorism-related case

---

[19] Although the settlement agreement only refers to the transfer of 26 securities in February 2008 (which were the subject of *Peterson I*), documents show that 47 bonds were transferred including the bonds at issue here.  See Vogel Decl. ¶ 70 and Exs. 45, 47 and 48.

[20] Contrary to Markazi's contention, the Eleventh Circuit found no due process violation in *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cnty.*, 221 F.3d

Markazi cites upholds imposing criminal liability on foreign nationals for efforts undertaken solely in Asia in relation to a plot to bomb U.S. airliners there. *Yousef*, 327 F.3d at 170-71.

Moreover, Markazi effectively concedes that, if exercising personal jurisdiction over Markazi satisfies the minimum contacts test, its due process "extra-territoriality" argument (Markazi Br. at 14-20) also fails. *See* Markazi Br. at 15 (the issues "'are often closely related and to a substantial degree depend upon similar considerations'") (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 317 n.23 (1981)); *accord, e.g., Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 314 n.2 (1970) ("There must be at least *some minimal contact* between a State and the regulated subject before it can, consistently with the requirements of due process, exercise legislative jurisdiction.") (emphasis added).  Thus, because Plaintiffs show that the Court can exercise personal jurisdiction over Markazi, § 8772 suffers no due process infirmity.

Markazi's own authorities reinforce that even tenuous connections to a forum defeat due process challenges.  In *Allstate*, 449 U.S.at 312-13, the Court upheld applying Minnesota insurance law to a policy delivered in Wisconsin to a Wisconsin resident who died in a Wisconsin automobile accident involving another Wisconsin resident.  The Court concluded that due process was satisfied by three contacts Minnesota had with the case and the parties: (1) the decedent's daily commute to Minnesota and his membership in that state's workforce before his

---

1211, 1217 (11th Cir. 2000) (rejecting a due process challenge to a county ordinance, but noting that a statute might violate due process where the plaintiff had only "[a]n abstract, indirect, and unaimed level of involvement with the County").  Even the law review article Markazi cites undermines its position.  As the Second Circuit emphasized in *U.S. v. Yousef*, 327 F.3d 56, 111 n.45 (2d Cir. 2003), "[t]wo commentators observed a decade ago that 'few cases seriously discuss the constitutional question, and none invalidate application of federal law on these grounds.'"  (quoting Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L. Rev. 1217, 1263 n.12 (1992)) (cited in Markazi Br. at 15).

death; (2) Allstate's general business presence in Minnesota; and (3) the Minnesota residence of

the decedent's wife (the plaintiff), which she established only after the relevant events.  *Id.* at

313-20.  In contrast to this case, none of the relevant contacts *Allstate* cited involved any suit-

related conduct undertaken by the defendant, or on its behalf, in the forum.

 *Allstate* therefore demonstrates that "the Due Process Clause … provide[s] modest

restrictions on the application of forum law."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797,

818-19 (1985).  As with personal jurisdiction, even a single connection between the forum and

the litigation can defeat a due process challenge.  *See, e.g., id.* at 802, 811-12.

 Markazi's conjuring of hypotheticals where Clearstream's presence in New York lacked

any connection to imaginary claims (Markazi Br. at 16) cannot justify a finding that § 8772

violates any due process rights Markazi possesses.  The statute applies only to the Bond

Proceeds.  22 U.S.C. § 8772(b)(2).  In any event, the Court must consider the constitutionality of

§ 8772 in this instance, not in Markazi's law school hypothetical.  *See, e.g., Pullman Co. v.

Knott*, 235 U.S. 23, 26 (1914) (rejecting Fourteenth Amendment challenge based on imagined

scenarios because a statute "is not to be upset upon hypothetical and unreal possibilities, if it

would be good upon the facts as they are").

 Similarly, no constitutional significance attaches to the fact that one element of § 8772 is

satisfied if the Bond Proceeds would be blocked were they present in the U.S.  The Constitution

demands only that Plaintiffs' claim have minimum contacts with the U.S., not that it relate

exclusively to domestic conduct and circumstances.  *E.g., Licci III,* 732 F.3d at 173-74.

 The few cases finding due process violations that Markazi cites bear no similarities to this

action.  Most considered whether a state could apply its law where the state had a negligible

connection, if any, to the relevant facts.[21]  Other decisions Markazi cites merely considered choice-of-law, not constitutional, questions.  *E.g.*, *Lauritzen v. Larsen*, 345 U.S. 571, 591 (1953).

Needless to say, none of Markazi's authorities invalidated a statute, like § 8772, satisfied only if a defendant engaged in specified conduct in the forum.  For these reasons, and those addressed in demonstrating that the Court may exercise personal jurisdiction over Markazi, the extraterritoriality argument fails to establish a due process violation.

## VI.   SECTION 8772 DOES NOT UNCONSTITUTIONALLY DEPRIVE MARKAZI OF A NEUTRAL ARBITER

The Supreme Court has already rejected the premise underlying Markazi's recycled constitutional argument that § 8772 deprives Markazi of a neutral decision-maker—Markazi's claim that Congress "decided" this case when adopting § 8772.  *Compare Bank Markazi,* 136 S. Ct. at 1325 (rejecting contentions "that §8772 did not simply amend pre-existing law" and that "[b]ecause the judicial findings contemplated by §8772 were 'foregone conclusions,' … the statute 'effectively' directed certain factfindings and specified the outcome under the amended law") *with* Markazi Br. at 20-21 (advancing the same arguments).  The Supreme Court also

---

[21] *See Shutts*, 472 U.S. at 823 (court could not apply Kansas law to all claims asserted by out-of-state plaintiffs in a class action where neither the plaintiffs nor their claims had any connection to Kansas); *Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 150 (1934) (Mississippi could not invalidate an essential term of a lawful contract negotiated in Tennessee because a state cannot "ignore a right which has lawfully vested elsewhere, if, as here, the interest of the forum has but slight connection with the substance of the contract obligations"); *Soo Line R.R. Co. v. Overton*, 992 F.2d 640, 645 (7th Cir. 1993) (Minnesota law could not apply where the state had only "casual and insignificant" contacts with the action); *Contant v. Bank of Am. Corp.*, 2018 U.S. Dist. LEXIS 42870, at *25 (S.D.N.Y. Mar. 15, 2018) (plaintiffs could not bring state-law antitrust claims "because the Complaint fails to allege any nexus between those states and the parties and events in this case, apart from a plaintiff's domicile"); *In re Prudential Sec. Ltd. Pshps. Litig.*, 930 F. Supp. 68, 83 (S.D.N.Y. 1996) ("The application of [a New Jersey] statute to alleged wrongful conduct occurring outside New Jersey involving plaintiffs who were not residents of New Jersey at the time of their purchases would violate due process.").

rebuffed Markazi's renewed contention that applying § 8772 to particular assets involved in cases bearing specified docket numbers suggests a constitutional infirmity. *Compare Bank Markazi*, 136 S. Ct. at 1327 (quoting Markazi brief) *with* Markazi Br. at 20-21 (repeating same argument). Clearstream's challenges to two of § 8772's elements also undermine Markazi's assertion that those requirements constitute mere "makeweights." *See* Point IV, *supra.*

No case Markazi cites declared a statute unconstitutional, much less in circumstances comparable to these. Instead, Markazi's decisions involved improper efforts to influence ultimate *judicial* decision-makers that find no parallels here.[22] Even when courts found that judges or administrative officers performing judicial functions had been subjected to improper influence, the courts merely adopted the procedure already applicable here—assigning the case for consideration by a neutral arbiter.[23] Tellingly, where outsiders sought to influence outcomes without pressuring judicial officers, courts found no due process violations. *E.g., DCP Farms v.*

---

[22] *See Chevron Corp. v. Donziger,* 833 F.3d 74, 126 (2d Cir. 2016) (highlighting "a parade of corrupt actions by the [plaintiffs'] legal team, including coercion, fraud, and bribery, culminating in the promise to Judge Zambrano of $500,000 from a judgment in favor of the [plaintiffs]"); *D.C. Fed. of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1245-49 (D.C. Cir. 1971) (making no mention of a constitutional violation in ruling that Congress could not withhold mass transit spending until agency approved bridge project).

[23] *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 878 (2009) (massive contribution to judge's election campaign immediately before court heard appeal of contributor's company required a remand to state Supreme Court); *Pillsbury Co. v. Fed. Trade Comm'n*, 354 F.2d 952, 955-56, 965 (5th Cir. 1966) (subjecting FTC decision-makers performing a "judicial function" to invasive Senate hearing questioning that suggested the result the FTC should reach and criticized the decision-makers' preliminary ruling required a remand so that different FTC officials could adjudicate the case); *Koniag, Inc., Uyak v. Andrus,* 580 F.2d 601, 610 (D.C. Cir. 1978) (even where Congressman wrote Secretary of the Interior regarding the Congressman's preferred result in an administrative proceeding two days before the Secretary ruled, appropriate remedy was to remand the case for decision by the Secretary's successor); *see also Ward v. Monroeville*, 409 U.S. 57, 61 (1972) (due process considerations prohibited a mayor from adjudicating cases that provided him with a personal inventive to fine parties).

*Yeutter*, 957 F.2d 1183, 1187-88 (5th Cir. 1992) (no due process violation where Congressman apprised an agency concerning the preferred outcome of an administrative review because, at that time, the agency was not performing a judicial function) (*cited in* Markazi Br. at 21).

Markazi's recycled speculation regarding Plaintiffs' counsel's participation in lobbying regarding § 8772 falls well short of establishing a constitutional violation.[24]  That lobbying was not unusual, much less unconstitutional.  *See, e.g., Zilich v. Longo*, 34 F.3d 359, 363 (6th Cir. 1994) (while legislators often vote for or against legislation based upon what "members of the general public say," courts cannot review legislators' motives).  Markazi's argument also runs afoul of the First Amendment protection of citizens' right to lobby their legislators.[25]

## VII.   SECTION 8772 DOES NOT VIOLATE CLEARSTREAM'S FIFTH AMENDMENT EQUAL PROTECTION RIGHTS

In *Peterson I*, Clearstream argued that § 8772 violated its equal protection rights by targeting only that case, thereby singling out Clearstream arbitrarily.  *See* Vogel Reply Dec., ¶ 9, Exhibit 87, pp. 22-24.  This Court (Forrest, J.) rejected Clearstream's arguments:

> Clearstream's argument that turnover would violate Equal Protection also fails. The law is clear that legislation is presumed valid and will be upheld so long as it is reasonably related to a legitimate state interest.  *See City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 440 (1985).  There can be no serious dispute that § 8772 furthers the United States' legitimate interest in furthering its foreign policy with respect to Iran. Clearstream's argument that § 8772 unjustly discriminates against foreign intermediaries fails.  The legislation is presumed valid—foreign intermediaries are entitled to no special treatment.

---

[24] Contrary to Markazi's contentions, the precise complaints it makes here regarding Plaintiffs' counsel's lobbying played a prominent role in Markazi's *Peterson I* briefing.  *See, e.g.,* Brief of Appellant Bank Markazi in *Bank Markazi v. Peterson,* No 14-770, 2015 U.S. S. Ct. Briefs LEXIS 4161, at *28-30, *83 (Nov. 16, 2015).

[25] *See, e.g., E. R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 139 (1961) (holding that "[t]he right of petition is one of the freedoms protected by the Bill of Rights" and that "[i]t is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors").

*Peterson,* 2013 WL 1155576, at *33.

Clearstream repackages that failed argument to claim that § 8772's newest provisions violate Clearstream's equal protection rights because they improperly target Clearstream as a "class of one." Clearstream fails, however, to meet the exacting requirements for "class of one" equal protection violations. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

Class of one violations exist only where a party "'has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.'" *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Olech*, 528 U.S. at 564). A party can establish "'intentional disparate treatment'" only where "'the decisionmakers were aware that there were other similarly-situated individuals who were treated differently.'" *Analytical Diagnostic*, 626 F.3d at 143 (quoting *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001)).

Furthermore, to prove unconstitutionally disparate treatment, "'[c]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 59-60 (2d Cir. 2010) (citation omitted). "Indeed, the plaintiff and his comparators must be '*prima facie* identical in all relevant respects.'" *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 456 (W.D.N.Y. 2009) (quoting *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds, Appel v. Spiridon,* 531 F.3d 138 (2d Cir. 2008) (citation and quotation marks omitted)).

"[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the

classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). "On rational-basis

review, a classification in a statute . . . bear[s] a strong presumption of validity, and those

attacking the rationality of the legislative classification have the burden 'to negative every

conceivable basis which might support it." *Id.* at 314–15. Because courts "never require a

legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional

purposes whether the conceived reason for the challenged distinction actually motivated the

legislature." *Id.* at 315.

Clearstream fails to carry this weighty burden in multiple respects. Clearstream's

argument that it alone is singled out by §8772 is baseless. Section 8772 does not identify

Clearstream by name. It allows execution against Iranian assets held abroad by *any* foreign

securities intermediary doing business in the United States. Although §8772 identifies the assets

by reference to this case, it does not target any particular securities intermediary. It is

conceivable that Clearstream could have transferred the relevant assets to another foreign

securities intermediary that would then be subject to a turnover order issued under §8772.

Clearstream concedes that § 8772's stated purposes of "ensur[ing] Iran is held

accountable for paying [Plaintiffs'] judgments" and "sanction[ing] Iran" are legitimate

governmental interests. It is conceivable that Congress targeted the Bond Proceeds in this case

in order to sanction Iran by destabilizing its markets.[26] Because the global market for Eurodollar

bonds is dominated by Clearstream and Euroclear, there is a rational basis for limiting the effects

of § 8772 by targeting only the assets identified in this case rather than creating a generalized

---

[26] Markazi used Eurodollar Bonds to invest its U.S. dollar reserves "to instill market confidence,
and promote [Markazi's] primary objective of price stability." Vogel Dec., Ex. 45, ¶11.
Clearstream and Euroclear dominate the management, custody and settlement of "Eurodollar
Bonds." *Id.*, Ex. 45, ¶17.

remedy that could have adverse effects on the global market for Eurodollar bonds and other intermediated securities.

Congress also may have concluded that a statute providing for enforcement against all upper-tier intermediaries would have imposed undue burden and record-keeping expenses upon financial institutions related to tracing the beneficial ownership of financial assets held through chains of intermediaries.  Thus, Congress could rationally conclude that limiting the effects of § 8772 to particular cases would avoid putting undue burden on the financial industry, while still furthering the goal of sanctioning Iran's unlawful conduct.

Moreover, the terms of the bonds that Markazi purchased provide that they can only be acquired through accounts held directly or indirectly at Clearstream, Euroclear or the Depository Trust Company ("DTC").  Vogel Dec., ¶ 89, Exhibits 64, 65.  That restriction leaves the potential group of comparators quite small.  Clearstream has not shown that Euroclear or the Depository Trust Company is similarly in possession of Eurodollar bonds beneficially owned by Markazi. Thus, neither party is the required comparator with an "extremely high degree of similarity" to Clearstream.  *Ruston*, 610 F.3d at 59-60.[27]

The foregoing conceivable reasons for Congress' amendment of § 8772 to address execution against the assets in this case are rationally related to legitimate governmental

---

[27] Other reasonable explanations for Congress' adoption of § 8772 include: (a) Clearstream knowingly caused the exportation of services from the United States to Iran by receiving payments of the Bond Proceeds through its correspondent account at JPMorgan in New York in violation of 31 C.F.R. § 560.204; (b) Congress dismissed concerns about "the increased risk of [Clearstream's] double liability" (Cl. Br. at 39) because Clearstream's obligation to Markazi would be discharged upon payment of the Bond Proceeds to the Plaintiffs (*see* CPLR § 5209; Vogel Decl., ¶10, Ex. 88, ¶ 12 (*Peterson I* Order Entering Partial Final Judgment, dated July 9, 2013, expressly discharging and releasing Clearstream from any liability to Markazi and UBAE); *see also* Kaminetzky Decl., Ex. E, ¶48(2) (Article 48(2) of GTC setting forth Clearstream's contractual defense against potential double liability)).

interests.  Moreover, the classification of foreign securities intermediaries doing business in the

United States is rationally based on a reasonably conceived state of facts.  Thus, Clearstream

cannot sustain its substantial burden of showing an equal protection violation.

Because Clearstream's only true potential comparators—DTC and Euroclear—held no

Iranian assets, Clearstream resorts to arguing incorrectly that its comparators are "entities and

institutions who have been alleged to hold assets for Iran (as defined in Section 8772) abroad."

To support that argument, Clearstream cites as examples two inapposite cases (Cl. Br. at 39,

n.39), neither of which involves a comparator remotely similar to Clearstream.  *See Havlish v.*

*Royal Dutch Shell PLC*, 2014 WL 4828654, at *1 (S.D.N.Y. Sept. 24, 2014) (dismissing suit

attempting to enforce judgment against a garnishee with no presence in, or contacts with, the

U.S. for lack of personal jurisdiction); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th

Cir. 2010) ("*9th Cir. Peterson Case*") (rejecting judgment creditors' attempt to enforce judgment

against a debt owed to Iran by a French shipping company; finding debt was immune from

attachment under 28 U.S.C. § 1610(a)(7) because it was located in France).[28]

## VIII. MARKAZI'S EFFORTS TO EVADE THE COURT'S AUTHORITY TO ADJUDICATE THIS ACTION JUSTIFY THE INJUNCTIVE RELIEF PLAINTIFFS SEEK

### A. As in *Peterson I,* the Court Can Adjudicate Markazi's Immunity Defenses Simultaneously With Plaintiffs' Summary Judgment Motion

Contrary to Markazi's contention, awarding a preliminary injunction before the Court

---

[28] Notably, the *9th Circuit Peterson Case* was erroneously decided before the Supreme Court made clear that the execution immunity provisions of the FSIA (28 U.S.C. §§ 1610 and 1611) confer no immunity from execution on sovereign property located outside the United States. *Republic of Argentina v. NML Capital, Ltd*., 573 U.S. 134, 141–42 (2014).  Moreover, the dispute involved in the 2010 *9th Cir. Peterson Case* had already become moot by the time § 8772 was enacted on August 10, 2012, so no reason existed for Congress to codify a broader remedy that would address the circumstances of that case.

considers Markazi's motion to dismiss would not infringe any immunity Markazi enjoys.  The

cases Markazi cites merely hold that courts should address immunity defenses "as near to the

outset of the case as is reasonably possible."  *Bolivarian Republic of Venez. v. Helmerich &*

*Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1314 (2017).  Assessing Markazi's immunity

arguments in connection with Plaintiffs' motions satisfies that objective.

      **B.**      **Markazi's Collateral Attack on This Court's Authority to Adjudicate Plaintiffs' Claims Threatens Them with Irreparable Injury**

      The cases Plaintiffs cited in their moving brief demonstrate that plaintiffs face irreparable

injury when defendants merely move assets overseas, thus increasing collection risks.  *See* Pl. Br.

at 38-39.  Markazi's actions pose a greater threat to Plaintiffs than those tactics.  Just as

defendants may be ordered to return assets to the U.S. pre-judgment, courts can force them to

bring assets here post-judgment to facilitate execution.  *See, e.g., Koehler v. Bank of Bermuda*

*Ltd.*, 12 N.Y.3d 533, 540-41 (2009).  If Markazi obtains the imprimatur of the Luxembourg

courts for its efforts to evade this Court's ruling, Plaintiffs will be in a considerably worse

position than a judgment creditor faced with a debtor that has moved funds overseas.  In those

circumstances, Plaintiffs would either have to convince this Court to order Clearstream to do

something Luxembourg courts have prohibited or to litigate this matter yet again, at great

expense, in a foreign country, under unfamiliar legal standards.

      Markazi's actions since Plaintiffs filed their motion reinforce the need for injunctive

relief.  Markazi has applied to the Court of Appeals in Luxembourg to reinstate an *ex parte*

preliminary order it had obtained that prohibited Clearstream from transferring the Bond

Proceeds to the U.S. pursuant to any Order this Court issues under § 8772 unless the Order has

been granted *exequatur* in Luxembourg.  While the *ex parte* order was eventually vacated on

Clearstream's motion, a hearing on the merits of Markazi's request for permanent relief is still

scheduled for November, 2020.

Unsatisfied with those efforts to interfere with this Court's powers, soon after Plaintiffs filed their motion, Markazi urged the Luxembourg Court of Appeals to schedule oral argument regarding Markazi's application for permanent relief on a date *before* this Court could act. Vogel Reply Dec., Ex. 95 ¶ 25-26.  In response to that request, the Luxembourg court held a September 30, 2020 hearing.  That court is scheduled to issue a ruling regarding Markazi's request on October 5, 2020, at noon.  *Id.* at ¶¶ 30-40, 42.  These measures demonstrate Markazi's determination to render ineffective any turnover order this Court issues pursuant to § 8772.

Markazi's efforts to negate the impact of this Court's judgment—including Markazi's latest attempt to preempt any relief this Court issues—are anything but "routine."  Markazi Br. at 35.  For that reason, the threatened injuries in the cases Markazi cites bear no resemblance to the risks Plaintiffs face.[29]  Moreover, the theoretical possibility that Plaintiffs could enforce their judgments abroad does not negate Plaintiffs' irreparable injury, particularly because Congress has specifically authorized prevailing plaintiffs under § 8772 to eliminate the risky, time-consuming, expensive and uncertain international judgment-enforcement process.

Markazi's contention that its Luxembourg litigation does not technically constitute a "collateral attack" on this Court's authority to decide this matter is both false and irrelevant. While most collateral attacks arise post-judgment, courts have recognized the impropriety of similar preemptive efforts to thwart the final resolution of pending litigation by initiating

---

[29] *See, e.g., Lawrence v. Wilder Richman Sec. Corp.,* 417 F. App'x 11, 14 (2d Cir. 2010) (requiring plaintiff who consented to arbitration to honor that commitment would not cause irreparable injury); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (cost of complying with government regulations does not constitute irreparable injury); *Psihoyos v. John Wiley & Sons, Inc.*, 2011 U.S. Dist. LEXIS 115835, at *16-17 (S.D.N.Y. Oct. 3, 2011) (denying injunction where plaintiff failed to show any injury damages could not offset).

lawsuits in other jurisdictions.[30]

Markazi's claim that granting injunctive relief here would be equivalent to awarding Plaintiffs an attachment also lacks significance.  The attachment remedy that § 8772 authorizes applies only *after* Plaintiffs obtain "an order directing that the asset be brought to the State in which the court is located."  22 U.S.C. § 8772(a)(1)(C); *see also, e.g., In re Feit & Drexler, Inc.*, 760 F.2d 406, 412 (2d Cir. 1985) (explaining that an order requiring a defendant to return assets to the U.S. "in order that they might be subjected to attachment was an injunction").[31]

Clearstream's contention that Plaintiffs face no irreparable injury because it will prevail in the Luxembourg litigation offers Plaintiffs no comfort.  *See* Cl. Br. at 45.  Neither Plaintiffs nor the Court can predict the outcome of the Luxembourg litigation with confidence.

### C.   Plaintiffs Have Demonstrated the Likelihood of Success Required to Obtain Injunctive Relief

Defendants' arguments that Plaintiffs must establish a higher likelihood of success than they have demonstrated, or even attempted to show (Markazi Br. at 34), also do not justify denying equitable relief.  Plaintiffs have argued that they satisfy the summary judgment standard, which imposes a higher burden of proof (*i.e.*, "the movant is entitled to judgment as a matter of law") than preliminary injunctions require.  Fed. R. Civ. P. 56(a).

Defendants also cannot defeat Plaintiffs' request for equitable relief by arguing that

---

[30] *E.g., In re FCC*, 217 F.3d 125, 139 (2d Cir. 2000) (equating a "collateral attack[]" upon an agency's ruling to a "'preemptive strike by seeking an injunction'") (citation omitted); *Morrow v. Winslow,* 94 F.3d 1386, 1395 (10th Cir. 1996) (father's attempt to enjoin state court adoption proceeding constituted an improper "federal collateral attack[]" on the state court action).

[31] The FSIA attachment cases Markazi cites are inapposite because they concerned the availability of an attachment remedy in the absence of a statute authorizing that relief.  *See Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1230 (2d Cir. 1995); *Gen. Dynamics U.K. v. Libya*, 2017 U.S. Dist. LEXIS 36685, at *2-4 (S.D.N.Y. Feb. 27, 2017).  Here, in contrast, § 8772 explicitly authorizes an attachment remedy.  22 U.S.C. § 8772(a)(1)(C).

motions seeking "mandatory" injunctions must satisfy a higher burden of proof than motions attempting to maintain the status quo.  In *Feit & Drexler*, 760 F.2d at 416, where the Second Circuit ordered a defendant to transfer property located in Switzerland to her attorney in the U.S. "to prevent [the defendant] from making uncollectible any judgment the Trustee may eventually obtain against her," the court measured the plaintiff's entitlement to injunctive relief against the same standard Plaintiffs quoted in their moving papers.

Defendants may seek to dismiss the *Feit & Drexler* court's analysis as an oversight, but the Second Circuit's approach there harmonizes with the decision in *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) ("*NASL*"), which Defendants cite.  *NASL* held that an injunction is mandatory when it seeks to upend the "'the last actual, peaceable uncontested status which preceded the pending controversy.'"  *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)).[32]  "Preserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action[.]"  *Mastrio*, 768 F.3d at 120-21 (order to restore government services to plaintiff maintained the status quo).

Consistent with *Mastrio*, Plaintiffs merely seek to maintain the pre-dispute status quo.  As in *Feit & Drexler*, the injunction Plaintiffs request will protect the enforceability of their judgment.  Seven years into this litigation, Markazi, not Plaintiffs, seeks to upend the status quo.

In any event, the degree of likelihood of success Plaintiffs must establish matters little here because Defendants highlight no material factual disputes that hinge on the applicable standard of review.  *See, e.g., Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 36 (2d Cir. 1995) (granting mandatory injunction because the court could resolve the meaning of the phrase

---

[32] Notably, *NASL* sets forth precisely the same test for injunctive relief that Plaintiffs quoted in their brief.  *Compare NASL*, 883 F.3d at 37 *with* Pl. Br. at 36.

"juvenile story books" as a matter of law) (*cited in* Markazi Br. at 34).  In contrast, most cases Defendants cite refused to issue injunctions because plaintiffs failed to demonstrate any factual basis for their claims.[33]

Clearstream's assertion that no cases have required garnishees to bring assets located abroad within the U.S. is false.  *See Koehler*, 12 N.Y.3d at 541 (requiring a garnishee bank to bring assets into New York from Bermuda).  Clearstream's argument also ignores that, even if the relief Plaintiffs seek were unprecedented at common law, § 8772 explicitly authorizes it.  *See* 22 U.S.C. § 8772(a)(1)(C).

The Court and the parties can also easily solve the administrative issues Clearstream raises with respect to holding the Bond Proceeds in the U.S., just as they did in *Peterson I* where the proceeds of Markazi bonds were held in trust for several years while appeals proceeded and a trustee distributed those assets.  Clearstream's argument that it cannot hold a right to payment in the United States because its representative office is not licensed to do so is no impediment to an injunction because Clearstream can easily obtain funds equivalent to the Bond Proceeds and have them credited to a New York bank or the Court's registry.[34]

The right to payment is a debt owed to UBAE and in turn to Markazi.  It originated from issuers of the bonds who were required to make payment from a New York bank to

---

[33] *See NASL,* 883 F.3d at 45 (plaintiff not entitled to an injunction in antitrust case where it failed to establish the essential elements of its claim); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (plaintiff failed to introduce any evidence that drug manufacturer agreed to support her application for a special authorization from the FDA to receive experimental drug).

[34] In an August 1, 2014 affidavit, Clearstream's Head of Operations stated, "If and when Clearstream receives an appropriate direction to pay the U.S. dollars credited to the Blocked Account, Clearstream will obtain the necessary U.S. dollars from any of several sources, including from funds that may at such time be available from the JPMorgan Account."  Vogel Ex. 29, ¶17.

Clearstream's NY Account at JPMorgan.  The GTC conditions Clearstream's obligation to make payments to the UBAE/Markazi Account upon Clearstream's receipt of payments from issuers. *See* Kaminetzky Ex. E, Article 23.  Thus, Clearstream has received the relevant funds and can easily return, or, in the Second Circuit's words, "recall" them to the U.S.  *Peterson II*, 876 F.3d at 92, 94, 95, 96.

Moreover, a preliminary injunction will not transform the nature of the asset to a right to payment in New York instead of Luxembourg.  Plaintiffs' motion indicated that they "will stipulate that the movement of the Bond Proceeds to New York is without prejudice to any defense that the Defendants may have possessed had those assets remained in Luxembourg." Plaintiffs Br. at 38, n.21.  The Court can enforce that commitment in its injunction Order. Moreover, Plaintiffs anticipate that OFAC will issue an appropriate license to aid victims of terrorism in this case, as it did in *Peterson I*.  Vogel Ex. 88.

As a result, Clearstream's list of supposed complexities learned from experience in *Peterson I* do not weigh against injunctive relief.  To the contrary, the parties' work in *Peterson I* should expedite matters here.  The details for implementation will be contained in a proposed form of Order submitted to the Court for approval.  When the injunctive relief becomes final, Clearstream will be discharged.  Armed with that Order and the contractual defenses in the GTC, Clearstream will face no risk of ruination in any Luxembourg court proceedings that Markazi initiates.  In any event, the manifestation of a risk Clearstream assumed when it undertook to collect the Bond Proceeds for Markazi in the NY Account does not weigh against awarding equitable relief.

**D.      Public Interest Factors Also Fully Support Granting Injunctive Relief**

Defendants' contentions that public interest factors weigh against injunctive relief ignore

the policies that motivated Congress to pass § 8772 and callously minimize the devastation Iran caused Plaintiffs' families.  Markazi's complaint that it will suffer injury if the Court orders Defendants to return the Bond Proceeds to New York ignores the self-imposed nature of that harm, which Markazi can avoid by ceasing its efforts to end-run the Court's judgment.

The interest Luxembourg possesses in this matter also does not justify denying injunctive relief.  Unlike the U.S., Luxembourg has escaped the direct impact of terrorism directed at its citizens and within its borders.  Fully respecting the Luxembourg courts and the nation's policies, Congress elected to include a unique provision in § 8772 that dictates that traditional comity concerns must play no role in the Court's adjudication of this matter.

The cases Defendants cite do not involve comparable statutes asserting paramount U.S. interests.[35]  In these unique circumstances, Luxembourg's interests are outweighed by the critical American policies an injunction would further.

CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs turnover and summary judgment, or, in the alternative, issue a preliminary injunction requiring Clearstream and Markazi to return the Bond Proceeds to New York to protect the Court's ability to adjudicate this action and prevent the dissipation of those assets.

---

[35] *See Raia v. Pompeo*, 2020 U.S. Dist. LEXIS 70137, at *18-19 (E.D.N.Y. Apr. 21, 2020) (father in dispute concerning whether mother properly brought child to live in Italy failed to demonstrate entitlement to obtain passport for child where he conceded that the custody issues should be resolved in a pending Hague Convention proceeding); *John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235, 249-50 (S.D.N.Y. 1995) (comity concerns weighed against injunction requiring offeror in takeover battle to take various steps in the U.S. where the plaintiff target company failed to show any basis for an injunction and the dispute related solely to Canadian parties and issues).

50

Dated:  October 2, 2020

Respectfully submitted,

___/s/ Liviu Vogel_____

Liviu Vogel (LVogel@salonmarrow.com)
Salon Marrow Dyckman Newman & Broudy LLC
10 East 40th Street
New York, New York 10016
(646) 843-1909

FLEISCHMAN BONNER & ROCCO LLP
James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
81 Main Street, Suite 515
White Plains, New York 10601
(914) 278-5100

*Counsel for Plaintiffs*

51