# EXHIBIT L

UNITED STATES  OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 110th CONGRESS

SECOND SESSION

## VOLUME 154—PART 1

JANUARY 3, 2008 TO FEBRUARY 6, 2008

(PAGES 1 TO 1537)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 2008

Our legislation will also address a major failure in Iraq—the failure to exercise control over private security contractors. It will require for the first time that private security contractors hired by the State Department and other Federal agencies to work in a war zone comply with directives and orders issued by our military commanders as well as with DOD regulations.

On December 17, 2007, we sent the defense authorization act to the President for his signature. The following weekend, the White House staff notified us that they had identified a problem with one provision that would lead the President to veto the bill. While the administration had previously expressed concerns about this provision, no administration official had ever indicated that the President would consider a veto. Quite the opposite, this provision was not on the list of potential veto-causing problems.

I remain disappointed by the administration's failure to work with us to address this provision until after the bill had passed both Houses of Congress and was sent to the President for signature. It does not serve anybody's interest when we fail to address issues like this in a timely manner. The veto of the National Defense Authorization Act sent the wrong message to our soldiers, sailors, airmen and marines at a time when many of them are risking their lives on a daily basis in Iraq, Afghanistan, and elsewhere.

I am pleased that we have been able to work out language to address the administration's concerns on a bicameral and bipartisan basis. The bill that is before us today contains modifications that have been agreed upon by the White House and by the bipartisan leadership of the House and Senate Armed Services Committee. I understand that these changes are also acceptable to Senator Lautenberg and other Members who worked with him to put together the provision in the earlier bill.

Let me briefly explain the White House's problem, and how we have addressed it.

Section 1083 of the bill clarifies the law that permits U.S. nationals and members of the U.S. Armed Forces who are victims of terrorist acts to sue state sponsors of terrorism for damages resulting from terrorist acts in the U.S. courts. The provision also strengthens mechanisms to ensure that victims of terrorism can collect on their judgments against such State sponsors of terrorism. U.S. courts have previously entered such judgments against Iran, Libya, and Saddam Hussein's Iraq.

After the bill was passed and sent to the President for signature, the administration informed us that Iraq currently has more than $25 billion of assets in this country that could be tied up in litigation if section 1083 were enacted into law and that such restrictions on Iraq's funds could take months to lift. The White House stated that restrictions on Iraqi funds would interfere with political and economic progress in Iraq and undermine our relations with Iraq.

We have addressed these concerns with new language which authorizes the President to waive the applicability of section 1083 to Iraq, if he determines that a waiver is in the national security interest of the United States; that the waiver will promote Iraqi reconstruction, the consolidation of democracy in Iraq, and U.S. relations with Iraq; and that Iraq continues to be a reliable ally of the United States and a partner in combating international terrorism.

The revised language also expresses the sense of Congress that the President, acting through the Secretary of State, should work with the Government of Iraq on a state-to-state basis to ensure compensation for any meritorious claims based on terrorist acts committed by the Saddam Hussein regime that cannot be addressed in the U.S. courts due to a Presidential waiver.

We expect that the Department of State will actively pursue such compensation from Iraq.

As one of the authors of the new section 1083, I want to assure the Senate that the new language authorizes the waiver of section 1083, only as it applies to Iraq. The new subsection (d), which we have added to the bill, specifies that the President may waive any provision of section 1083 "with respect to Iraq" and not with regard to any other country. We explicitly reaffirm in this bill that other cases against state sponsors of terrorism, including both Iran and Libya, may proceed to judgment and collection under section 1083, unaffected by any Presidential waiver.

Over the last 2 weeks, concerns have been expressed about the possible impact of this provision on innocent third parties entering joint ventures with Libya or Iran. The concern was that these companies would find their own property seized to satisfy judgments against those countries. Our language does not allow for that result, because that is not our intent. This is not a new issue: the question has been raised by the language of the Lautenberg amendment ever since it was first approved by the Senate last fall.

We specifically addressed the problem of joint ventures in our conference on the Defense authorization bill, previously approved by the Congress. We added language to the bill making it clear that the courts are authorized to compensate victim of state-sponsored terrorism out of Libya's—or other states'—assets, while separating and shielding the assets of companies engaged in joint ventures with those States. In the accompanying statement of managers, we specifically urged the courts to make use of this authority. This language was the strongest action that we could take to protect innocent third parties without also shielding the offending governments from liability for their own actions.

We have included a provision to ensure that the statement of managers on our previous conference report will apply to this new bill in this and all regards.

Outside of the modification of section 1083, the bill remains virtually unchanged. We have, however, taken steps to ensure our men and women in uniform will not lose a penny as a result of the delayed enactment of this bill. Toward that end, we have revised a number of provisions in the bill to make pay increases and bonus provisions retroactive to January 1 and avoid any gap in these authorities. These changes have been worked out with the Department of Defense and agreed to by the two Armed Services Committees on a bipartisan basis.

Other than these few changes, the bill before us today is identical to the conference report that the Senate overwhelmingly passed last month. It is my hope that the bill will receive similar support when we vote on it again later today.

NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2008

The PRESIDING OFFICER. The clerk will state the bill by title.

The legislative clerk read as follows:

A bill (H.R. 4986) to provide for the enactment of the National Defense Authorization Act for fiscal year 2008, and for other purposes.

Mr. FEINGOLD. Mr. President, I oppose the fiscal year 2008 Defense authorization bill because it authorizes $189.5 billion for the war in Iraq but does nothing to end the President's misguided, open-ended Iraq policy. That policy has overburdened our military, weakened our national security, diminished our international credibility, and cost the lives of thousands of brave American soldiers.

There are certain provisions of the bill that I support strongly, including a pay raise for military personnel, Senator WEBB's amendment creating a Commission on Wartime Contracting to examine waste, fraud, and abuse in Iraq and Afghanistan, and Senator LAUTENBERG's amendment to create a Special Investigator General for Afghanistan Reconstruction.

But on balance, I cannot vote to support a bill that defies the will of so many Wisconsinites—and so many Americans—by allowing the President to continue one of the worst foreign policy mistakes in the history of our Nation.

Mr. LAUTENBERG. Mr. President, I rise to applaud the chairman and ranking members of the Senate Armed Services Committee, Senators LEVIN and MCCAIN, respectively, on passage of the National Defense Authorization Act for fiscal year 2008.

Specifically, I would like to express my gratitude to the bill conferees for their inclusion of four amendments that I authored and which were unanimously adopted by the Senate during its initial consideration of this bill. These provisions will increase oversight of our country's economic and security assistance to Afghanistan by creating a Special Inspector General for Afghanistan Reconstruction, section 1229; help victims of state sponsored terrorism to achieve justice through the U.S. courts, section 1083; prevent military health care fees through the TRICARE program from rising, sections 701 and 702; and increase accountability and planning for safety and security at the Warren Grove Gunnery Range in New Jersey, section 359.

First, I was proud to be joined by my cosponsors, Senators COBURN, DODD, HAGEL, FEINGOLD, WEBB, and MCCASKILL, in creating a Special Inspector General for Afghanistan Reconstruction. I wrote this legislation because I believe that while a democratic, stable, and prosperous Afghanistan is important to the national security of the United States and to combating international terrorism, I am concerned that we are not achieving all of our goals there. The United States has provided Afghanistan with over $20 billion in reconstruction and security assistance. However, repeated and documented incidents of waste, fraud, and abuse in the utilization of these funds have undermined reconstruction efforts. I therefore believe that there is a critical need for vigorous oversight of spending by the United States on reconstruction programs and projects in Afghanistan.

I would like to emphasize that the Government Accountability Office and the departmental Inspectors general have provided valuable information on these activities. However, I believe that the congressional oversight process requires more timely oversight and reporting of reconstruction activities in Afghanistan. Oversight by this new Special Inspector General would encompass the activities of the Department of State, the Department of Defense, and the U.S. Agency for International Development, as well as other relevant agencies. It would highlight specific acts of waste, fraud, and abuse, as well as other managerial failures in our assistance programs that need to be addressed.

This new position will monitor U.S. assistance to Afghanistan in the civilian and security sectors, as well as in the counternarcotics arena, and will help both Congress and the American people better understand the challenges facing U.S. programs and projects in that country. I am pleased that this provision has been included in this final bill.

Second, this bill includes my legislation to provide justice for victims of state-sponsored terrorism, which has strong bipartisan support. I believe this legislation is essential to providing justice to those who have suffered at the hands of terrorists and is an important tool designed to deter future state-sponsored terrorism. The existing law passed by Congress in 1996 has been weakened by recent judicial decisions. This legislation fixes these problems.

In 1996, Congress created the "state sponsored terrorism exception" to the Foreign Sovereign Immunities Act, FSIA. This exception allows victims of terrorism to sue those nations designated as state sponsors of terrorism by the Department of State for terrorist acts they commit or for which they provide material support. Congress subsequently passed the Flatow Amendment to the FSIA, which allows victims of terrorism to seek meaningful damages, such as punitive damages, from state sponsors of terrorism for the horrific acts of terrorist murder and injury committed or supported by them.

Congress's original intent behind the 1996 legislation has been muddied by numerous court decisions. For example, the courts decided in Cicippio-Puleo v. Islamic Republic of Iran that there is no private right of action against foreign governments—as opposed to individuals—under the Flatow Amendment. Since this decision, judges have been prevented from applying a uniform damages standard to all victims in a single case because a victim's right to pursue an action against a foreign government depends upon State law. My provision in this bill fixes this problem by reaffirming the private right of action under the Flatow Amendment against the foreign state sponsors of terrorism themselves.

My provision in this bill also addresses a part of the law which until now has granted foreign states an unusual procedural advantage. As a general rule, interim court orders cannot be appealed until the court has reached a final disposition on the case as a whole. However, foreign states have abused a narrow exception to this bar on interim appeals—the collateral order doctrine—to delay justice for, and the resolution of, victim's suits. In Beecham v. Socialist People's Libyan Arab Jamahiriya, Libya has delayed the claims of dead and injured U.S. service personnel who were off duty when attacked by Libyan agents at the Labelle Discothèque in Berlin in 1986. These delays have lasted for many years, as the Libyans have taken or threatened to take frivolous collateral order doctrine appeals whenever possible. My provision will eliminate the ability of state sponsors of terrorism to utilize the collateral order doctrine. My legislation sends a clear and unequivocal message to Libya. Its refusal to act in good faith will no longer be tolerated by Congress.

Another purpose of my provision is to facilitate victims' collection of their damages from state sponsors of terrorism. The misapplication of the "Bancec doctrine," named for the Supreme Court's decision in First National City Bank v. Banco Para El Comercio Exterior de Cuba, has in the past erroneously protected the assets of terrorist states from attachment or collection. For example, in Flatow v. Bank Saderat Iran, the Flatow family attempted to attach an asset owned by Iran through the Bank Saderat Iran. Although Iran owned the Bank Saderat Iran, the court, relying on the State Department's application of the Bancec doctrine, held that the Flatows could not attach the asset because they could not show that Iran exercised day-to-day managerial control over Bank Saderat Iran. My provision will remedy this issue by allowing attachment of the assets of a state sponsor of terrorism to be made upon the satisfaction of a "simple ownership" test.

Another problem is that courts have mistakenly interpreted the statute of limitations provision that Congress created in 1996. In cases such as Vine v. Republic of Iraq and later Buonocore v. Socialist People's Libyan Arab Jamahiriya, the court interpreted the statute to begin to run at the time of the attack, contrary to our intent. It was our intent to provide a 10-year period from the date of enactment of the legislation for all acts that had occurred at anytime prior to its passage in 1996. We also intended to provide a period of 10 years from the time of any attack which might occur after 1996. My provision clarifies this intent.

My provision also addresses the problems that arose from overly mechanistic interpretations of the 1996 legislation. For example, in several cases, such as Certain Underwriters v. Socialist People's Libyan Arab Jamahiriya, courts have prevented victims from pursuing claims for collateral property damage sustained in terrorist attacks directed against U.S. citizens. My new provision fixes this problem by creating an explicit cause of action for these kinds of property owners, or their insurers, against state sponsors of terrorism.

Finally, in several cases the courts have prevented non-U.S. nationals who work for the U.S. Government and were injured in a terrorist attack during their official duties from pursuing claims for their personal injuries. My provision fixes this inequity by creating an explicit cause of action for

non-U.S. nationals who were either working as an employee of the U.S. Government or working pursuant to a U.S. Government contract.

I also want to make special mention of the inspiration for this new legislation. On October 23, 1983, the Battalion Landing Team headquarters building in the Marine Amphibious Unit compound at the Beirut International Airport was destroyed by a terrorist bomb killing 241 marines, sailors, and soldiers who were present in Lebanon on a peacekeeping mission. In a case known as Peterson v. the Islamic Republic of Iran, filed on behalf of many of the marine victims and their families, the U.S. District Court ruled in 2003 that the terrorist organization Hezbollah was funded by, directed by, and relied upon the Islamic Republic of Iran and its Ministry of Information and Security to carry out that heinous attack. The judge presiding over this case, Judge Royce Lamberth, referred to this as "the most deadly state sponsored terrorist attack made against United States citizens before September 11, 2001." In September of this year Judge Lamberth found that Iran not only is responsible for this attack but also owes the families of the victims a total of more than $2.6 billion for the attack. Congress's support of my provision will now empower these victims to pursue Iranian assets to obtain this just compensation for their suffering. This is true justice through American rule of law.

However, President Bush's veto of the initial version of the National Defense Authorization Act for fiscal year 2008, H.R. 1585, on New Year's Eve required that my provision to provide justice for victims of state-sponsored terrorism be amended. The President chose to take this extraordinary action without warning after asserting that he had not been aware of the provision's potential impact on the Government of Iraq. The President contended that this provision would hinder Iraqi reconstruction by exposing the current Iraqi government to liability for terrorist acts committed by Saddam Hussein's government and vetoed the entire Defense Authorization bill on that basis.

To address the President's concerns that the Government of Iraq could be made liable, the revised provision grants the President the authority to waive the terror victim's provision only for cases in which Iraq or its agencies, instrumentalities, or governmental actors are named defendants. The provision does not give the President the authority to waive any part of the provision for any case in which a government, its agencies, instrumentalities, or governmental actors are named defendants other than Iraq.

By insisting on being given the power to waive application of this new law to Iraq, the President seeks to prevent victims of past Iraqi terrorism—for acts committed by Saddam Hussein—from achieving the same justice as victims of other countries. Fortunately, the President will not have authority to waive the provision's application to terrorist acts committed by Iran and Libya, among others.

In addition, my new provision includes a Sense of the Congress that the Secretary of State should work with Iraq, on a state-to-state basis, to resolve the meritorious claims made against Iraq by terror victims. It is crucial that the victims of these terrorist acts be included in such discussions. Their approval of agreements made between the two governments on their behalf is critical to ensuring that justice is served.

Third, this Defense authorization bill includes my provision to prevent proposed increases in enrollment fees, premiums, and pharmacy copayments for TRICARE, the military community's health plan. The principal coauthor of this provision is Senator HAGEL.

Both career members of the uniformed services and their families endure unique and extraordinary demands and make extraordinary sacrifices over the course of 20-year to 30-year careers in protecting freedom for all Americans. I believe they deserve the best retirement benefits that a grateful nation can provide. Proposals to compare cash fees paid by retired military members and their families to fees paid by civilians fails to adequately recognize the sacrifice of military members. We must be mindful that military members prepay the equivalent of very large advance premiums for health care in retirement through their extended service and sacrifice.

The Department of Defense and our Nation have a committed obligation to provide health care benefits to Active Duty, National Guard, Reserve, and retired members of the uniformed services, their families, and survivors, that considerably exceed the obligation of corporate employers to provide health care benefits to their employees. Ultimately, the Department of Defense has options to constrain the growth of health care spending in ways that do not disadvantage current and retired members of the uniformed services, and it should pursue any and all such options as a first priority. Raising fees excessively on TRICARE beneficiaries is not the way to achieve this objective.

Finally, I thank the conferees for including my amendment to require increased oversight and accountability, as well as improved safety measures, at the Warren Grove Gunnery Range in New Jersey. I wrote this provision with Senator MENENDEZ because a number of dangerous safety incidents caused by the Air National Guard have repeatedly impacted the residents living nearby the range.

On May 15, 2007, a fire ignited during an Air National Guard practice mission at Warren Grove Gunnery Range, scorching 17,250 acres of New Jersey's Pinelands, destroying 5 houses, significantly damaging 13 others, and temporarily displacing approximately 6,000 people from their homes in sections of Ocean and Burlington Counties in New Jersey.

My provision will require that an annual report on safety measures taken at the range be produced by the Secretary of the Air Force. The first report will be due no later than March 1, 2008, and two more will be due annually thereafter. My provision will also require that a master plan for the range be drafted that includes measures to mitigate encroachment issues surrounding the range, taking into consideration military mission requirements, land use plans, the surrounding community, the economy of the region, and the protection of the environment and public health, safety, and welfare. I believe that these studies will provide the type of information that we need to ensure that there is long-term safety at the range, both for the military and the surrounding communities.

Mr. SPECTER. Mr. President, I have sought recognition to address the pay raise given to members of the U.S. military. On December 28, 2007, President Bush vetoed the National Defense Authorization Act for Fiscal Year 2008 because of a disagreement over a provision in the Justice for Victims of State Sponsored Terrorism Act of 2007.

The disagreement over language in the Justice for Victims of State Sponsored Terrorism Act has affected far more individuals than the legislation itself addresses. By holding up the signing of the National Defense Authorization Act for Fiscal Year 2008, it jeopardized the pay raise which was promised to our Nation's servicemen and servicewomen.

On January 4, 2008, the President issued Executive Order 13454, which gave all members of the military a 3-percent pay raise effective January 1, 2008. I commend the House for its January 16, 2008, decision to make retroactive to January 1, 2008, a 3.5-percent pay raise for members of the uniformed services. This was the number that the House and the Senate agreed upon before we sent the bill to President Bush in December; I think it is only fair this be the number we return to when we again submit the bill to the President. The men and women of the military should not be made to suffer for disagreements between the Congress and the White House.

Mr. REID. Mr. President, in a few minutes, I am going to ask unanimous consent to take up the authorization bill for the Department of Defense for fiscal year 2008. But before we proceed to consider and pass this important legislation, I want to take just a moment to advise my colleagues of the

Case 1:13-cv-09195-LAP   Document 281-1   Filed 10/23/20   Page 6 of 7

unfortunate and troubling path that this legislation has taken since the Senate last voted to pass it on December 14.

On December 19, the same day the other body adjourned its first session, the Congress sent to the President legislation, H.R. 1585, that was identical to the bill we are about to take up and pass, with one substantive difference regarding section 1083 and several associated technical corrections necessary due to the delay of the bill's enactment.

What I want to focus on today is the manner in which the President chose to exercise his veto prerogative. As the Chair and our colleagues are well aware, the Framers of our Constitution deliberately gave the President only a limited or qualified veto power, one that could be overridden by Congress if it could muster a two-third vote in both Houses—a formidable challenge. But President Bush was not satisfied simply to veto the bill and risk an override, as contemplated under our constitutional process.

Rather, on December 28, the President issued a memorandum of disapproval stating that, because the other body had adjourned its first session, while the Senate remained in session to protect its advise-and-consent prerogative, he considered the bill pocket vetoed, relying upon the constitutional provision that protects against the Congress's adjourning in order to prevent the President from exercising his veto power. But the President did not actually pocket the bill. Instead, using the mechanism provided in the rules of the other body for such periods as the December holidays, the White House returned the bill, with the President's veto message, to the Clerk of the House, for transmission to the full body when it reconvened last week. The President said that he was returning the bill "to avoid unnecessary litigation" and "to leave no doubt" that he was vetoing the bill.

The Constitution does not provide for double vetoes: A bill is vetoed either by being returned or, if return is prevented by Congress's adjournment, by being pocketed. Here, the President returned the bill to the other body through delivery to the Clerk. Obviously, the adjournment did not prevent the bill's return. Accordingly, the bill was not subject to a pocket veto. Had the President not returned the bill within the 10 days—excluding Sunday—prescribed by the Constitution, the bill would have become law without his signature. That fact explains why the President returned the bill.

Indeed, in 1983, President Reagan attempted to pocket veto a military aid appropriations measure during an analogous adjournment—the break between the first and second sessions of the 98th Congress. On a bipartisan basis, the Senate joined a group of Members of the other body to challenge that attempted misuse of the pocket veto in a Federal court case called Barnes v. Kline. Although the decision was subsequently vacated because the fiscal year for the military aid bill had expired in the meantime, thereby mooting the case, the Court of Appeals for the District of Columbia Circuit rejected the Executive's attempt to pocket veto the bill and held that, because it could have been returned to the House, under the Constitution the bill had become law. The court held that three factors, when taken together, establish that adjournment of the first session of a Congress does not prevent the President from returning a bill under the Constitution: First, "[t]he existence of an authorized receiver of veto messages"; second, "the rules providing for carryover of unfinished business" in the second session of a Congress; and third, "the duration of modern intersession adjournments."

In that decision, the court of appeals built upon the foundation laid by our colleague, the senior Senator from Massachusetts, who, a decade earlier personally had argued and won the case Kennedy v. Sampson in the same court, thereby establishing the President's duty to return bills to Congress, through its appointed officers, during intrasession adjournments. As the court made clear, during both types of adjournments, the application of the pocket veto clause has necessarily been guided from the beginning by its "manifest purpose." And that purpose is solely to ensure that the Congress cannot deprive the President of his right to exercise the qualified veto, not to permit the President to accomplish what the Framers of our Constitution denied him—by transforming the qualified veto into an absolute veto.

I have gone into some detail in explicating the background and history of the pocket veto controversy because of its importance to our constitutional system of separation of powers and checks and balances between the branches. The President should abandon the strange and unseemly practice of maintaining that he cannot return a bill to Congress, while simultaneously returning the bill. Such game-playing is unworthy of the Office of the President and breaks faith with the brilliant, carefully crafted system that the Founders bequeathed to us and future generations.

However, much as part of me would like to see Congress take the opportunity provided by the President's action here to establish definitively the Congress's constitutional power to override a veto exercised during its adjournment, the Nation's security and the care of our troops and wounded warriors demands that we get this bill signed into law as soon as possible. This bill provides important congressional authorizations and guidance for the Nation's defense budget, a 3.5-percent 9 pay raise and key bonuses for the troops, legislation to improve the system of care for our wounded warriors, and authorization to establish a war profiteering commission. The President's veto of this bill in December has already delayed these provisions for too long.

I also want to reiterate that it is my belief that the Government of Iraq should take responsibility for what has taken place there in years past, including the brutal torture of American POWs. Congress has gone on record repeatedly—most recently, in overwhelmingly passing section 1083 of the conference report to H.R. 1585 last year in both the House and Senate and sending it to the President—to support the efforts of these Americans who have suffered so much for their country to hold their torturers accountable. This administration has been fighting for years to oppose efforts to win compensation for these American soldiers, which is, frankly, a disgrace.

In light of the President's veto over this issue, I call on him and his administration to work with the POWs and their family members to facilitate negotiations with the Government of Iraq. It is my understanding that the administration has been working with Iraq to settle gulf war commercial debts with foreign corporations such as Mitsubishi of Japan and Hyundai of Korea through issuance of Iraqi bonds. This mechanism takes no funds from the reconstruction of Iraq. It is beyond me why the administration would refuse to do at least that for the POWs. The administration needs to make this right.

The bill (H.R. 4986) was ordered to a third reading and was read the third time.

Mr. LEVIN. Mr. President, I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second? There is a sufficient second.

The question is on passage of the bill.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from New York (Mrs. CLINTON), the Senator from New Jersey (Mr. MENENDEZ), and the Senator from Illinois (Mr. OBAMA) are necessarily absent.

I further announce that, if present and voting, the Senator from New Jersey (Mr. MENENDEZ) would vote "yea."

Mr. KYL. The following Senators are necessarily absent: the Senator from Arizona (Mr. MCCAIN), the Senator from South Dakota (Mr. THUNE), and the Senator from Virginia (Mr. WARNER).

The PRESIDING OFFICER. Are there any other Senators in the Chamber desiring to vote?

The result was announced—yeas 91, nays 3, as follows:

[Rollcall Vote No. 1 Leg.]
YEAS—91

| | | |
|---|---|---|
| Akaka | Dole | McCaskill |
| Alexander | Domenici | McConnell |
| Allard | Dorgan | Mikulski |
| Barrasso | Durbin | Murkowski |
| Baucus | Ensign | Murray |
| Bayh | Enzi | Nelson (FL) |
| Bennett | Feinstein | Nelson (NE) |
| Biden | Graham | Pryor |
| Bingaman | Grassley | Reed |
| Bond | Gregg | Reid |
| Boxer | Hagel | Roberts |
| Brown | Harkin | Rockefeller |
| Brownback | Hatch | Salazar |
| Bunning | Hutchison | Schumer |
| Burr | Inhofe | Sessions |
| Cantwell | Inouye | Shelby |
| Cardin | Isakson | Smith |
| Carper | Johnson | Snowe |
| Casey | Kennedy | Specter |
| Chambliss | Kerry | Stabenow |
| Coburn | Klobuchar | Stevens |
| Cochran | Kohl | Sununu |
| Coleman | Kyl | Tester |
| Collins | Landrieu | Vitter |
| Conrad | Lautenberg | Voinovich |
| Corker | Leahy | Webb |
| Cornyn | Levin | Whitehouse |
| Craig | Lieberman | Wicker |
| Crapo | Lincoln | Wyden |
| DeMint | Lugar | |
| Dodd | Martinez | |

NAYS—3

| | | |
|---|---|---|
| Byrd | Feingold | Sanders |

NOT VOTING—6

| | | |
|---|---|---|
| Clinton | Menendez | Thune |
| McCain | Obama | Warner |

The bill (H.R. 4986) was passed.

The PRESIDING OFFICER. The motion to reconsider is considered made and laid on the table.

The majority leader is recognized.

UNANIMOUS CONSENT REQUEST—S. 2541

Mr. REID. Mr. President, I am glad we have a large number of Senators here today. I want to go over the schedule for this week.

First of all, I am going to ask unanimous consent, and I will do that now, that the Senate proceed to the consideration of S. 2541, which is a 30-day extension of the Foreign Intelligence Surveillance Act we are going to be dealing with; that the bill be read three times, passed, the motion to reconsider be laid upon the table, with no intervening action or debate.

The reason I ask consent on this legislation is that this bill expires on February 1. The House has not acted on this bill yet, so when we pass this bill, the House has to pass their bill, and there has to be a conference. I hope we could have this extension. I need not belabor the point. I asked this consent before we left; I ask it again.

The PRESIDING OFFICER. Is there objection? The Republican leader.

Mr. McCONNELL. Mr. President, reserving the right to object, and I will be objecting, let me say, my good friend, the majority leader, and I have discussed this issue. There is a significant amount of time left this month to pass this bill in the Senate. A conference may or may not be necessary. Back in August, when we did an extension of the FISA bill, the House simply took up the Senate-passed bill and passed it, and it went down to the President for signature. So I think the discussion of extension, particularly when, hopefully, we will turn to this bill in the very near future in the Senate, is not timely and, therefore, I object.

The PRESIDING OFFICER. Objection is heard.

The majority leader.

Mr. REID. Mr. President, for all Members here, we are on the Indian health bill now. I hope we can complete that bill tomorrow. The Republicans are having a retreat. They are having theirs tomorrow; we are going to have ours in 10 days or so. There will be activities on the Senate floor tomorrow, but there will be no votes. If there are any votes tomorrow, it will be after they finish their retreat, after 6 o'clock tomorrow night.

So we hope some work can be done on this bill tomorrow. We know the Republicans will be absent, so that makes it very difficult.

We have to finish FISA this week. Everyone should be aware of that point. We have to finish it this week. I know there are important trips people want to take. We have the very important economic conference in Davos that Democrats and Republicans alike would like to go to.

I say, unless we finish the bill Thursday—and we will not be able to get to it until tomorrow night—unless we finish the bill on Thursday, then we are going to have to continue working this week until we finish this bill. We have to finish this bill. It is not fair to the House to jam them so that they have 1 day to act on this legislation. If we finish it this week, I have spoken to the Speaker today and they will work to complete this matter next week. It would be to everyone's advantage if we had more time to do this.

I respect what the Republican leader has said, but everyone here should understand all weekend activities have to be put on hold until we finish this bill. Now, it is possible we could finish it fairly quickly. We are going to work from the Intelligence bill, and if amendments are offered that people don't like, I would suggest they move to table those amendments. Because if people think they are going to talk this to death, we are going to be in here all night. This is not something we are going to have a silent filibuster on. If someone wants to filibuster this bill, they are going to do it in the openness of the Senate.

We are not going to say, well, we can't get 60 votes on this. We are going to work toward completing this bill as quickly as we can. I would rather we didn't have to do this. And maybe if we get to it on Thursday, we can finish it Thursday. If not, hopefully on Friday. But I know of no alternative. This work period is very short. We have, after this week, only 3 weeks.

I have had many meetings, and they have been bipartisan in nature, to try to come up with a stimulus package that is so important to our country. Everyone has seen what has happened to not only our own stock markets but those around the world. We may not be in a recession, but people are looking at an economic downturn as concerning to everyone, including the President. So we have a lot to do this work period. I have only mentioned a couple issues we need to work on, but there are a lot of others, of course, we need to do also.

UNANIMOUS CONSENT REQUEST—H.R. 1255

Madam President, I ask unanimous consent that the Senate proceed to consideration of Calendar No. 213, H.R. 1255, Presidential Records Act Amendments of 2007; that the amendment at the desk be considered and agreed to; the bill, as amended, be read a third time, passed, and the motion to reconsider be laid upon the table; that any statements relating thereto appear at the appropriate place in the RECORD as if given; and that there be no intervening action or debate.

The PRESIDING OFFICER. Is there objection?

Mr. SESSIONS. I object.

The PRESIDING OFFICER. Objection is heard.

Mr. McCONNELL. Mr. President, on the issue of FISA, let me second the observation of the majority leader. There is no more important issue for us to deal with in terms of protecting the homeland. I agree with his decision that we press forward on FISA and get it out of the Senate—but not just get it out of the Senate, get it out of the Senate and to the House in a form the President will sign. Nothing is more important to protecting the homeland than getting this done and getting it done properly.

I yield the floor.

The PRESIDING OFFICER (Mr. CASEY). The Senator from Vermont.

Mr. LEAHY. Mr. President, we have a number of Members who are supposed to go to the Davos economic summit tomorrow night, and I would note I have talked with Senator BENNETT of Utah, who is the senior Republican on that trip, and the trip that is set to leave tomorrow night will not. We will put it on hold until Thursday, to determine whether we can leave on Thursday.

If I could have the attention of the majority leader for a moment. I appreciate the majority leader has been very clear. I happen to concur with him that this is important and we should finish it. All we want to do is to know how it will go. There is a Judiciary Committee amendment to the bill. I would not anticipate taking a great deal of