## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN; BANK MARKAZI a/k/a CENTRAL BANK OF IRAN; BANCA UBAE SpA; CLEARSTREAM BANKING, S.A.; and JP MORGAN CHASE BANK, N.A., <br><br> Defendants. | Case No. 13-cv-9195 (LAP) |

### DECLARATION OF AMIR HOSSEIN TAYYEBI FARD

AMIR HOSSEIN TAYYEBI FARD declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am currently the Vice Governor of the Central Bank of Iran ("CBI") in Legal and Parliamentary Affairs.  I submit this declaration in response to the Declaration of Mr. Patrick L. Clawson dated October 1, 2020, concerning the legal structure of the Central Bank of Iran and the relationship between the Central Bank and the Government of Iran.

**I.      Professional Background**

2.      I graduated from the Faculty of Law and Political Science of Tehran University in 1989 with a Bachelor's degree in Law, and I received my LLM in Private Law from Azad University in 1992.  I received a Ph.D. in Public International Law from Azad University (Science and Research Branch) in 2011.  My thesis was on "The Rights and Duties of the Member States Arising Out of the Articles of Agreement of the IMF."

3.      I have extensive experience in the areas of central banking and banking law and the legal requirements of an independent central bank.  I have published a book volume and multiple articles in these fields, including the following:

- *International Monetary Law*, Vol. 1 on International Monetary Fund, 2017 (in Persian);

- *Monetary Sovereignty and the Modifications Thereto After Membership in the IMF*, Law and Politics Review of Allameh Tabatabaee University Press, Vol. 36, 2012 (in Persian);

- *Establishment and Operations of Private Banks and Credit Institutions in Iran*, Money and Economy Review, Vol. 5, No. 1, 2008 (in English);

- *Applicable Law on the Establishment and Operations of Private Banks and Credit Institutions in Iran*, Edalat Ara Legal Review, Vols. 2-3, 2006 (in Persian);

- *Combatting the Financing of Terrorism in International Instruments*, CILA Law Review, Vol. 32, 2005 (in Persian).

4.      In addition to many other specialized courses and seminars on central banking law, I attended the "Legislative Drafting Workshop for Combating the Financing of Terrorism and Other Anti-Terrorism Measures" organized by the Legal Department of the IMF in collaboration with the U.N. Office on Drugs and Crime, held in Vienna, Austria, from August 4-8, 2003, and also a course on "Central Banking and Financial Sector Legal Frameworks," organized by the IMF in Singapore from September 1-12, 2014.

*5.*      I started working in the Legal Department of the Central Bank of Iran in 1996 as a researcher in the International Litigation and Contracts Section.  Then, I continued my career as a Legal Expert in 2004, as the Director of the Parliament Affairs Department in 2015, as the Director General of the Legal General Directorate in April 2018, and as Vice Governor in November 2018.  As a project in the Library of the Central Bank, starting around 1998 to 2000, I reviewed and studied all the Minutes of the Currency and Credit Council ("CCC") and

transcribed the approvals and decisions of the Council from 1960 to 2000.  Since November 2018, I have attended meetings of the Currency and Credit Council (without voting rights).

## II.     The Legal Framework of the Central Bank of Iran as an Independent Entity

6.     The Central Bank of Iran ("CBI"), also known as Bank Markazi and officially as the Central Bank of the Islamic Republic of Iran, is Iran's central bank.  The Central Bank was established in May 27, 1960, by the Banking and Monetary Act.  This Act was then repealed and replaced by the Monetary and Banking Act of 1972.

7.     The Monetary and Banking Act has been amended several times and governs the structure, objectives, mandate, and operations of the Central Bank of Iran.  The latest version of the Act is accessible on the Central Bank's website at http://www.cbi.ir/simplelist/1457.aspx and is attached to this declaration as **Exhibit 1**.

8.     Article 10(a) of the Act states that the Central Bank "shall be responsible for the task of formulating and implementing monetary and credit policies on the basis of the general economic policy of the country." According to Article 10(b), "The objectives of CBI are to maintain the value of the currency and equilibrium in the balance of payments, to facilitate trade transactions, and to assist the economic growth of the country."

9.     Article 10(c) establishes the Central Bank's separate status and independence from the Iranian government.  That provision states that the Central Bank "enjoys legal personality and shall be subject to the rules and regulations pertaining to joint-stock companies in matters not provided for by this Act." As a result, the Central Bank's legal status and property are distinct and separate from those of the Government of Iran.  Article 10(d) adds that, "Except where expressly stipulated by Law, CBI shall not be subject to the general laws and regulations relating to ministries, government companies and governmental and government-affiliated institutions, nor to the provisions of the banking part set forth in this Act."

10.     Unlike all ministries and governmental organizations, the Central Bank of Iran has the capacity to own property, whether movable or immovable, in its own name and not in the name of the government.  For example, **Exhibits 2 and 3** are extracted copies of two real estate properties owned by the Central Bank.  By contrast, properties held by ministries and government organizations are owned in the name of the government.  See, for example, the Approval of the Board of Ministers No. 82400 dated October 11, 2020, attached as **Exhibit 4**. That difference provides clear evidence of the Central Bank's separate status.

11.     Article 16 of the Monetary and Banking Act provides that the Central Bank is composed of the following five organs:

### A.     The General Meeting

12.     Article 17 of the Monetary and Banking Act establishes the Central Bank's General Meeting.  Under Article 19 of the Act on Permanent Rules for National Development Plans (2017), the Central Bank's General Meeting is currently composed of the President (as the Chairman), the Minster of Economic Affairs and Finance, the Head of the Planning and Budget Organization, and two ministers appointed by the Council of Ministers (the Iranian cabinet).

13.     Article 17(c) of the Monetary and Banking Act lists the functions of the General Meeting as follows:

- To consider and approve the Balance Sheet of CBI;
- To consider reports submitted by the Supervisory Board and to make final decisions in respect therein;
- To consider the recommended appropriation of the net profit and decide on it;
- To elect the members of the Supervisory Board upon the recommendation of the Minister of Economic Affairs and Finance;
- To fulfill other functions entrusted to the General Meeting under the provisions of this Act.

14.     From that list of functions, it is clear that the General Meeting has no role or influence on the daily business operations of the Central Bank.  The General Meeting's powers do not include defining the manner in which the Central Bank carries out its work.  Instead, the General Meeting has only narrow, high-level oversight responsibilities, such as electing members of the Supervisory Board (a mere accounting and auditing organ) and approving the Central Bank's balance sheet based on reports prepared by that Supervisory Board.  Because the General Meeting has only those limited high-level responsibilities, the presence of government officials as members of the General Meeting does not give the government any influence over the daily business or tasks of the Central Bank.

15.     In practice, during the sixty years since the Central Bank was established, the General Meeting has never objected to the Central Bank's balance sheet.  Rather, approval of the balance sheet – the key function of the General Meeting – is a mere legal formality.  That history confirms that the presence of government officials as members of the General Meeting does not give the government any power over the Central Bank's policymaking or management.

**B.     The Currency and Credit Council**

16.     The Currency and Credit Council ("CCC") is the Central Bank's key policy-making organ.  Article 18(a) of the Monetary and Banking Act defines the Council's duties as follows:

- Examine and approve the organization, budget, employment code and internal regulations of CBI;
- Review and comment on the Balance Sheet of CBI in order to be propounded in the General Meeting;
- Review and approve the regulations mentioned in this Act;
- Comment on the banking, monetary and credit issues of the country as well as bills concerning loans, credit guarantees, and on any other issues to be referred to the Council by the Government;

- Give consultative views and advice to the Government on banking, monetary and credit issues which, in the Council's opinion, may bear upon the economic conditions and especially the credit policy of the country;

- Comment on any other issues to be referred to it within the framework of this Act by the Governor of CBI.

The Currency and Credit Council thus has broad authority over the Central Bank's budget, organization, employment code, and internal regulations.

17.     According to Article 15 of the Sixth Five-Year Development Plan (2017), the eleven members of the Currency and Credit Council who have voting power are:

- The Governor of the Central Bank (as Chairman of the Council);

- The Minister of Economic Affairs and Finance or his deputy;

- The Head of the Planning and Budget Organization or his assistant;

- The Minister of Industry, Mines, and Commerce;

- Two ministers appointed by the Council of Ministers;

- Two experts in monetary and banking recommended by the Central Bank's Governor and confirmed by the President;

- The Prosecutor General or his assistant (a judicial officer);

- The Chairman of the Chamber of Commerce, Industries, and Mines (a private entity);

- The Chairman of the Chamber of the Cooperatives (a private entity).

18.     The composition of the Currency and Credit Council provides solid grounds for the Central Bank's independence.  Six of the Council's eleven members – a majority – are independent from the government's executive branch: the Central Bank Governor (as Chairman of the Council), the Prosecutor General, the two monetary and banking experts, and the two chairmen of private chambers.  That composition permits the Central Bank to conduct its important policymaking functions independent from the government's control.

19.     Since the Currency and Credit Council was formed, the Council has increased the Central Bank's independence even further by delegating certain functions to the Central Bank's

Governor.  In its 1113th session dated May 10, 2010, the Council delegated its powers over the amendment of the Central Bank's internal regulations to the Governor.

20.     The Currency and Credit Council holds meetings every other week in the year and approves regulations and makes decisions on the Iranian banking system.  The following are examples of such regulations and decisions:

- Determining the profit rate of governmental and non-governmental bank deposit accounts and the minimum rate of expected profit of participation contracts (extracted from the Minute dated June 15, 2007 as quoted in Circular No. 1189, dated June 22, 2007) (**Exhibit 5**);

- Issuing the Directive on the Establishment and Operations of Usury-Free Banks and the Supervision Thereof (extracted from the Minute dated Aug. 17, 2007 as quoted in Circular No. 2263, dated Aug. 25, 2007) (**Exhibit 6**);

- Determining the on-account profit rate of bank deposits and the profit rate of facilities granted in free zones and the mainland (extracted from the Minute dated Jan. 30, 2012 as quoted in Circular No. 90/280562, dated Feb. 11, 2012) (**Exhibit 7**);

- Delegating the authority of the Currency and Credit Council to the Governor as to limiting the activities of banks to one or more specific operations, temporarily or permanently (extracted from the Minute dated Jan. 30, 2012 as quoted in Circular No. 90/300228, dated Mar. 1, 2012) (**Exhibit 8**);

- Approving the Regulations on the Foreign Currencies Market in Iran and the Directive on the Profit of Iranian Rial Deposit Accounts on the Basis of the Value of Foreign Currencies (published on the Central Bank's website, referring to the Minute dated Jan. 7, 2019) (**Exhibit 9**);

- Determining the on-account profit rate of bank deposits (extracted from the Minute dated July 14, 2020 as quoted in Circular No. 99/126642, dated July 18, 2020) (**Exhibit 10**).

**C.     The Executive Board**

21.     Under Article 19 of the Monetary and Banking Act, the Executive Board consists of the Central Bank's Governor, Deputy Governor, Secretary General, and three Vice Governors. The Executive Board is responsible for almost all the duties of the Central Bank.

22.     According to Article 19(b), the Governor, as the highest executive and administrative authority, is in charge of all the affairs of the Central Bank, except those specifically entrusted to other organs.  The Governor is also responsible for the proper conduct of the Central Bank's affairs and the implementation of the Act and the relevant regulations.  The Governor represents the Central Bank before all official bodies, whether local or foreign.

23.     As I know and have personally witnessed, the Governor has authority to purchase, sell, and lease goods for the Central Bank within the framework of the Bank's budget.  He can bring any action against any person or entity in any judicial, arbitral or administrative forum, and he can respond to any claim against the Central Bank.  He can exercise all those powers without any permission from the government.

24.     All the Central Bank's staff, including the other Executive Board members, derive their power to act or sign documents from the Governor.   The Central Bank recruits staff according to its own internal regulations within the limits of its budget.

25.     All the day-to-day affairs and business of the Central Bank are carried out by the Executive Board.  All the strategies, decisions, and policymaking for the Iranian banking system are made first by the Executive Board and then proposed to the Currency and Credit Council for approval, if necessary.

26.     According to Article 20 of the Monetary and Banking Act, all Executive Board members, including the Governor, are considered staff of the Central Bank and receive their salaries, bonuses, and benefits out of the Central Bank's budget.  The General Meeting determines the salary and benefits of the Executive Board members.

27.     According to the Directive on the Management of the Central Bank of Iran, ratified by the State Expediency Council on November 15, 2014, the Governor of the Central Bank is appointed for a 5-year term by decree of the President upon the recommendation of the

Minister of Economic Affairs and Finance and the approval of the Council of Ministers.  The required qualifications are as follows:

- Scientific competence: Having PhD in economic, monetary and financial fields;
- Experimental competence: Having seven years of experience at policy making and management levels in economic, monetary and financial spheres, or five years of management experience in specialized areas of Bank Markazi (at the level of Director General and higher);
- Having a good reputation and the ability to perform tasks;
- Having no record of effective criminal convictions;
- Having no major financial offences.

28.     According to the same 2014 Directive, the Governor may be removed from office only for "(1) The loss of one or more of the conditions mentioned and/or the absence, from the beginning, of one or more of the qualifying conditions," or "(2) The inability or failure to perform legal duties, or to accomplish the objectives of [the Central Bank]."  The Governor may only be removed "by the decree of the President upon the recommendation of the President and after the approval of two-thirds of the members of the Council of Ministers."[1]

29.     Under Article 19, note 1, of the Act on Permanent Rules of National Development Plans (2017), the Central Bank's Deputy Governor is "appointed by Presidential decree and after approval of the General Meeting . . . from among reputable experienced monetary, banking and economic experts with a minimum of ten years of work experience and minimum Master Degree in related disciplines."  Under Articles 19(d) and (e) of the Monetary and Banking Act, the

---

[1] The 2014 Directive was ratified by the State Expediency Council.  According to Article 112 of the Iranian Constitution, the State Expediency Council has the power to resolve disagreements between the Parliament and the Guardian Council over a proposed bill which the latter considers to be against the principles of Sharia or the Constitution.  The Guardian Council has exclusive authority to interpret the Constitution.  According to the Council's Interpretative Opinion No. 5318 dated October 15, 1993, "No legislative authority is allowed to overrule the laws ratified by the State Expediency Council."

Secretary General is appointed "upon the recommendation of the Governor of CBI and the approval of the General Meeting," while the three Vice Governors are all "appointed by the Governor of CBI."  These Executive Board members are therefore appointed or recommended by the Central Bank's Governor himself, further protecting the Central Bank's independence.

### D.    The Note Reserve Control Board

30.    Under Article 21 of the Monetary and Banking Act, the Note Reserve Control Board is composed of two Parliament members, the Central Bank's Governor (or Vice Governor), the Prosecutor General (or his assistant), the Treasurer, the Head of the Government Audit Court, and the Chairman of the Central Bank's Supervisory Board.  This Board is in charge of supervising the proper implementation of Article 5 of the Act, *i.e.*, taking delivery of and safeguarding newly-printed bank notes and maintaining inventories for the national jewels.

### E.    The Supervisory Board

31.    Under Article 22 of the Monetary and Banking Act, the Supervisory Board is responsible for auditing the accounts and commitments of the Central Bank and expressing its opinion as to their accuracy.  Its duties are as follows:

- To audit the annual Balance Sheet of CBI and to prepare a report thereon for the Annual General Meeting;
- To audit the detailed lists of assets and liabilities of the Bank and to audit and certify for publication the summary of its accounts;
- To inspect the operations of the Bank in order to verify that they conform to legal requirements.

32.    The Supervisory Board is composed of a Chairman and four members selected from amongst qualified auditors or persons well versed in accountancy or banking with at least 10 years of experience, appointed for a term of two years on the recommendation of the Minister of Economic Affairs and Finance and the approval of the General Meeting.  The Board may

submit its views to the Governor of the Central Bank within the scope of its duties, without interfering in the Bank's current affairs.

### III.    Responses to Mr. Clawson's Assertions

33.    Given the above analysis of the Central Bank's legal structure and independence, as well as my own experience at the Central Bank, I do not agree with Mr. Clawson's conclusion that the Central Bank is dominated by government officials or operates under the control of the government.  In this section, I respond to Mr. Clawson's specific assertions.

#### A.    Level of Economic Control by the Government

34.    At paragraphs 16 to 23 of his declaration, Mr. Clawson discusses the Central Bank's "legal structure" and concludes that it "demonstrates that Iranian government officials completely dominate Bank Markazi's decision-making bodies and therefore direct its operations."  Mr. Clawson's analysis is flawed for several reasons.

35.    First, Mr. Clawson's discussion of the Central Bank's legal structure contains many mistakes.  For example, in paragraph 19, Mr. Clawson states that "The MBL specifies that the voting members of the General Meetings shall consist of the Bank Markazi Governor, the Minister of Finance and Economic Affairs, and one other minister appointed by the Council of Ministers."  Mr. Clawson fails to note that this provision was amended by Article 19 of the Act on Permanent Rules of National Development Plans (2017), which modified the composition of the General Meeting.  See Exhibit 1 at page 9, note 1.

36.    Similarly, in paragraph 21, Mr. Clawson quotes outdated provisions concerning the appointment of the Central Bank's Governor and Deputy Governor.  He overlooks that those procedures were amended by the Iran Expediency Council's Directive on the Management of the Central Bank of Iran, ratified on November 15, 2014, and the Act on Permanent Rules of National Development Plans (2017).  See Exhibit 1 at pages 12-13, notes 4-5.

37.     Once again, in paragraph 22, Mr. Clawson describes the composition of the Currency and Credit Council under the original Monetary and Banking Act.  But he ignores that the Council's composition was modified by Article 15 of the Sixth Five-Year Development Plan (2017).  See Exhibit 1 at page 10, note 2.

38.     In other respects, Mr. Clawson's description of the Central Bank's structure is misleading.   For example, at paragraph 19, Mr. Clawson emphasizes the membership of government officials on the Central Bank's General Meeting, but he fails to note that the General Meeting has only narrow, high-level functions and plays no role in managing the Central Bank's day-to-day business.   Similarly, in paragraph 22, Mr. Clawson emphasizes the presence of certain government officials on the Currency and Credit Council, but he fails to mention that a majority of the Council consists of *private* representatives or individuals not connected to the executive branch.

39.     Mr. Clawson's inaccurate review of the Central Bank's legal structure also fails to support his conclusion that "Iranian government officials completely dominate Bank Markazi's decision-making bodies and therefore direct its operations."   As explained above, the Central Bank's day-to-day operations are managed by the Bank's Governor, its Deputy Governor, and other members of its Executive Board.   While the President appoints the Bank's Governor and Deputy Governor, those appointees are bank employees, not government officials.   Those appointments do not mean the government "dominate[s]" the Central Bank's decision-making or "directs its operations."   Under the clear terms of the Monetary and Banking Act, and in my own personal experience at the Central Bank, the Bank's day-to-day operations are directed by the Bank's own employees, not by government officials.

**B.      Whether the Entity's Profits Go to the Government**

40.      At paragraphs 24-25, Mr. Clawson claims that the Central Bank is an alter ego of the Iranian government because the government receives all the Bank's profits after provision for a contingency reserve.  That is not a correct conclusion.

41.      Article 25 of the Monetary and Banking Act does state that the balance of net profit, after income taxes and various reserves, "shall belong to the Government."  Under Article 10(e), however, the Central Bank's capital is "wholly owned by the Government."  The government's entitlement to the Central Bank's profits is therefore a normal consequence of its status as the Bank's sole shareholder.  It does not show that the government dominates the Central Bank's operations or directs the Bank's day-to-day business activities.

42.      In any case, the amount of the Central Bank's profits is negligible.  The Central Bank's objective is not to make a profit, and the government definitely is not seeking to make a profit from the Central Bank.  Like any other central bank, the Central Bank of Iran is mainly assigned important sovereign functions for which the level of profits is immaterial.

**C.      Whether Government Officials Manage the Entity or Have a Hand in Its Daily Affairs**

43.      At paragraph 28, Mr. Clawson asserts that additional government ministers have sometimes attended the General Meeting, and that two legislative deputies have sometimes attended meetings of the Currency and Credit Council in a "non-voting" capacity.  The Monetary and Banking Act, however, does not contain any provision prohibiting additional persons from attending meetings in a non-voting capacity if the organs consider such attendance appropriate.  In fact, Article 17(b) contemplates attendance of non-voting observers by stating that "Members of the other organs of the Bank shall attend the General Meeting and participate in the discussions without a right to vote."  All the Executive Board members attend the General

Meetings.  The Executive Board members are also allowed and/or instructed by the Governor (depending on the agenda) to attend the Currency and Credit Council sessions, without having voting power.  Mr. Clawson does not show that the additional attendees have ever tried to vote or exercise any control over the decision-making of these organs.  As far as I have witnessed in the General Meetings and the Currency and Credit Council sessions, no one except the statutory members has ever attempted to vote in those sessions.

44.    At paragraph 29, Mr. Clawson claims that the Central Bank's Governor "serves at the pleasure of the President of Iran" and cites two instances during President Ahmadinejad's administration in 2007 and 2008 where Governors left their positions.  I can confirm, without any doubt, that no Governor of the Central Bank has ever served at the pleasure of the Head of State of Iran.  Even before the revolution of 1979, no Governor served at the pleasure of the Shah.  Of course, during some periods, there has been tension or disagreement between the Central Bank's Governor and the President.  This is no different from the United States, where disagreements exist between President Trump and the Federal Reserve.  But this does not mean that the Central Bank's Governor has ever owed the President any duty of obedience.

45.    At the time of the 2007 and 2008 departures that Mr. Clawson discusses, the Monetary and Banking Act did not include any provisions expressly prohibiting the President from removing a Central Bank Governor for cause, or defining the grounds or procedures for removing a Governor.  In any case, the two former Governors that Mr. Clawson mentions in paragraph 29 were not removed from office.  They both resigned for different reasons. Resignation is a voluntary choice and differs from dismissal.

46.    The pressures that Mr. Ahmadinejad attempted to exert on the Central Bank during the 2007 to 2008 era were highly atypical in the Bank's history.  This is confirmed by the fact that, after Mr. Ahmadinejad left office, the State Expediency Council amended the Monetary

and Banking Act in 2014 to add express provisions designed to restore and protect the Bank's traditional independence and to prevent politicians from removing the Central Bank's Governor over policy disagreements.  As explained above, the 2014 Directive defines specific grounds for removal and requires the President to obtain approval of two-thirds of the Council of Ministers. See Exhibit 1 at pages 12-13, note 4.

47.     At paragraph 30, Mr. Clawson asserts that the government cabinet regularly votes to order the Central Bank to extend loans for specific purposes such as housing and education, without following the procedures required by the Act.  That statement is not correct.

48.     Under Article 13 of the Monetary and Banking Act, one of the Central Bank's basic powers is "Granting loans and credits to ministries and governmental entities, subject to legal authorization," and "Guaranteeing commitments made by the Government, ministries or governmental entities, subject to legal authorization."  Thus, there is nothing improper or unusual about the Iranian Council of Ministers (the government cabinet) ordering loans for particular sectors or purposes, or with the Central Bank providing the financing for those loans, provided that the necessary "legal authorization" exists and the proper procedures are followed.  Issuing loans to promote government priorities such as housing and education are typical fiscal policies pursued in many countries and are not unique to Iran.  Implementation of those decrees, however, depends on the approval of the Currency and Credit Council.

49.     When the Council of Ministers makes a decision regarding a loan, the decision is not enforced automatically.  First, it must be approved in Parliament by the Examiner Committee, which verifies that the order complies with the applicable laws.  The decision is then referred to and discussed in the Central Bank's Currency and Credit Council.  For a cabinet decision to be approved by the Council, it must have been issued in accordance with governing

laws and must not have an adverse effect on the stability and soundness of the banking system and monetary policies of the Central Bank.  Otherwise, the Council will reject the decision.

50.     There have been cases in which the Currency and Credit Council has disagreed with and rejected the cabinet's proposal.  For example, on April 3, 2017, the Council rejected a request from Parliament to alter a particular loan type from project loan to leasing.  This decision is reflected in paragraph 6 of the 1227th session of the Currency and Credit Council dated April 3, 2017, attached as **Exhibit 11**.  In many cases, of course, the Council has approved the cabinet's proposal.  But the fact that the Council sometimes agrees with the cabinet does not mean it exercises no independence in decision-making.

51.     Mr. Clawson asserts that the cabinet has ordered loans "without following the procedures required by the MBL."  But he cites only two loans, and even for those, he provides no explanation or details about why the loans were not properly approved or what required procedures were not properly followed.  As explained above, the Monetary and Banking Act expressly stipulates in Article 13 that no loan may be granted and no commitment undertaken for the government absent the necessary legal authorization – *i.e.*, some grounding in an act of Parliament.  In my experience, this requirement is strictly observed in practice.

52.     At paragraph 31, Mr. Clawson claims that President Ahmadinejad made decisions about monetary policy without consulting the Currency and Credit Council and even disbanded the Council for two years from 2007 to 2009.  That is not correct.  Article 1 of the Third Five-Year Development Plan (2000) authorized the Administrative High Council (composed of the President and certain ministers) to merge certain councils to improve efficiency of operations. The government at the time did not use that power during the period of that plan, but the provision was then renewed in Article 154 of the Fourth Five-Year Development Plan (2004).  In 2007, Mr. Ahmadinejad invoked that authority to merge the Currency and Credit Council with

certain other economic councils, a decision the Administrative High Council approved that year. Actually, Mr. Ahmadinejad misunderstood and misinterpreted Article 1 of the Third Five-Year Development Plan, because Article 1 did not expressly mention the Currency and Credit Council, and according to Article 10(d) of the Monetary and Banking Act, the Central Bank is not subject to the general laws and regulations relating to ministries, government companies, and government institutions, unless expressly stipulated by law. Because the Parliament had not actually intended to authorize the President to dissolve the Currency and Credit Council, in 2008, the Parliament enacted a new statute, the Law on the High Councils, that revived the Council.

53.     At paragraphs 32 to 38, Mr. Clawson refers to public debates over the degree of independence the Central Bank should have from the Iranian government. Mr. Clawson first refers to a press conference at which Mr. Ahmadinejad criticized the Central Bank's independence. In fact, that quotation confirms that the Central Bank was acting independently and was not succumbing to the government's demands. Even in the era of Mr. Ahmadinejad, the Governors of the Central Bank did their best to apply the Central Bank's own expert views. The Central Bank's Governor was not the only one who resisted government interference: The Central Bank's entire bureaucratic structure did so too.

54.     The other quotations from former Central Bank Governors and other officials regarding the degree of the Central Bank's independence confirm that the Central Bank acts independently. The subject of those debates was the appropriate degree of alignment of monetary policies of the Central Bank and the government. In Iran, there are various factions and points of view on those issues, and constant friction between the Central Bank and the government. Even statements by former Central Bank officials reflect their own personal views and are highly debated. The same kind of debates exist between President Trump and the

Federal Reserve in the United States.  The public debate over those issues is itself evidence of the Central Bank's independence – otherwise Mr. Clawson could not have heard any news.

55.     Mr. Clawson asserts that, even during the past seven years of the Presidency of Dr. Rouhani, the Central Bank has merely implemented the President's monetary policies.  That is not true.  President Rouhani has exerted only very limited influence on the affairs of the Central Bank, for example, through the annual budget bills submitted to the Iranian Parliament. The Minister of Economic Affairs and other ministers who might be regarded as potential consumers of the Central Bank's assets and liquidity have not been allowed any access to the property of the Central Bank.  This situation reflects the current President's respect for the Central Bank's independence, as well as the authority of the present Central Bank Governor, who majored in and is a professor of macroeconomics and is fully aware of the critical consequences of maintaining the Central Bank's independence.  It is noteworthy that, even in the present situation of Iran, in which the United States is exerting maximum pressure through unprecedented economic and monetary sanctions, the government has respected the Central Bank's independence.

### D.     Whether the Government Is the Real Beneficiary of the Entity's Conduct

56.     At paragraphs 41 to 46, Mr. Clawson argues that the Central Bank has "subordinated its statutory objectives to benefit the Iranian government" by financing large fiscal deficits while permitting excessive inflation.  That argument is incorrect for several reasons.

57.     First, while Mr. Clawson quotes the language of Article 10(b) of the Monetary and Banking Act, he ignores that "maintain[ing] the value of the currency" is only one of several statutory objectives listed.  Others are "to maintain . . . equilibrium in the balance of payments," "to facilitate trade transactions," and "to assist the economic growth of the country."  Article 13, moreover, recognizes that one way the Central Bank may accomplish its objectives is by

"Granting loans and credits to ministries and governmental entities, subject to legal authorization," and "Guaranteeing commitments made by the Government, ministries or governmental entities, subject to legal authorization."  Mr. Clawson's complaint therefore is not that the Central Bank has "subordinated its statutory objectives," but that Mr. Clawson does not agree with how the Central Bank has prioritized several competing statutory objectives.

58.     Second, while Mr. Clawson complains that the Central Bank has allowed too much inflation in some recent years, he ignores that the current economic situation in Iran is a result of the unprecedented U.S. sanctions that have disrupted the export of Iranian goods and transfers of foreign exchange reserves.  Due to Iran's inability to access foreign reserves, the Iranian Rial suffered severe devaluation against foreign currencies. As a result, liquidity decreased, and inflation increased substantially.  In reaction to the resulting recession, the Central Bank, as the lender of last resort, was obligated to support Iranian banks to ensure they survived the recession.  The high inflation was thus a direct consequences of the extraordinary sanctions Iran faced.  Mr. Clawson should not judge the Central Bank's monetary policies from the perspective of countries that do not face those unusually challenging circumstances.

59.     Third, even if Mr. Clawson were correct that the Central Bank should have done more to control inflation in recent years, that would not mean the Iranian government is the "real beneficiary" of the Central Bank's conduct.  How to balance the objectives of price stability and economic growth are constant topics of discussion and debate among economists and policy-makers in many countries, in the United States just like in Iran.

60.     Mr. Clawson claims at paragraph 43 that the Central Bank "lend[s] to the state-owned banks which in turn lend to the government, as a means to evade the legal restrictions on how much the CBI can lend to the government."  That is not true.  The note to Article 117(c) of the Fifth Five-Year Development Plan (2010) explicitly prohibits the government from financing

its budget deficit by borrowing from the Central Bank or the banking system.  While commercial banks may choose to lend to government entities, they do so pursuant to their own lending policies, not as a means to evade restrictions on borrowing from the Central Bank.  Commercial banks lend money to both private and state-owned companies pursuant to the same risk assessment procedures, contracts, and security.  A state-owned company is treated in the same manner as a private borrower.[2]

61.     Finally, at paragraphs 47 to 65, Mr. Clawson quotes a series of inflammatory and baseless accusations that the Central Bank supposedly finances terrorism by providing banking services to other financial institutions and government entities in Iran.  The Central Bank disagrees strongly with those allegations and does not consider that it ever had a fair opportunity to dispute those findings, which were made by U.S. government agencies through an essentially political process.

62.     In any case, Mr. Clawson never explains why those allegations are relevant to the Central Bank's independence from the Iranian government.  The fact that the Central Bank provides routine banking services to other financial institutions and government entities in Iran, many of which have also been the target of U.S. sanctions, does not show that the Iranian government is the "real beneficiary" of the Bank's conduct.  This entire section of Mr. Clawson's report appears to be more an effort to disparage Bank Markazi with inflammatory accusations of terrorist financing than to address the issues of Central Bank independence on which Mr. Clawson claims to be an expert.

---

[2] In paragraph 46, Mr. Clawson repeats his claim that the Iranian cabinet improperly directed the Central Bank to lend to specific sectors of the economy.  That is the same point Mr. Clawson made in paragraph 30, to which I responded above.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on:   October 21st, 2020
Tehran, Iran

Amir Hossein Tayyebi Fard