UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, *et al.*, <br><br> *Defendants*. | Case No. 13-CIV-9195 |

## DECLARATION OF MAURIZIO VALFRÈ

Maurizio Valfrè affirms and states as follows:

1. I am the General Manager of Banca UBAE, S.p.A. ("UBAE"), and I have been employed or affiliated with UBAE since July 2020. I submit this Declaration in support of UBAE's motion to dismiss for lack of personal jurisdiction. This Declaration is based on my personal experience in the international banking industry for the past 20 years; review of documents and records maintained in the ordinary course of UBAE's business; the Declaration of Mario Sabato, the former General Manager of UBAE, dated 17 July 2014; the *Peterson II* Amended Complaint; and the *Peterson II* plaintiffs' opposition to UBAE's motion to dismiss.

2. In January/February 2008, the Central Bank of Iran ("Bank Markazi") directed Clearstream Banking, S.A. ("Clearstream") to transfer approximately USD$4 billion of its assets—which were previously held in a Bank Markazi account at Clearstream Luxembourg—to an UBAE customer account set up in Clearstream Luxembourg ("Account 13061"). I understand that in July 2013, Bank Markazi was required to turn over to the *Peterson* plaintiffs approximately USD$1.9 billion (the "2013 Assets"). I further understand that this action concerns a different set of assets that are currently blocked in a sundry account created, maintained, and solely controlled

1



by Clearstream in Luxembourg (the "Sundry Account"). Clearstream has had exclusive control of the Sundry Account since June/July 2008.

3. UBAE never entered into any written agreement with Clearstream regarding the opening of the Sundry Account. Based on my many years of experience in the international banking industry, bank accounts are always governed by written agreements between the bank and the client. Because there was no such written agreement with respect to the Sundry Account, Clearstream acted unilaterally, and without UBAE's consent, in opening and operating the Sundry Account for purposes of maintaining the assets of Bank Markazi. As such, any actions taken by Clearstream related to the Sundry Account were taken by Clearstream and Clearstream alone without any input or direction from UBAE.

4. The Sundry Account contains USD$1.68 billion that is beneficially owned by Bank Markazi (the "Markazi Luxembourg Assets"). As I understand it, the *Peterson II* plaintiffs in this action are seeking turnover of the Markazi Luxembourg Assets from Bank Markazi and Clearstream, but not UBAE. The *Peterson II* plaintiffs seek turnover of the Markazi Luxembourg Assets pursuant to the National Defense Authorization Act ("NDAA").

5. Despite not bringing any turnover claim against UBAE pursuant to the NDAA, the *Peterson II*'s Amended Complaint continues to assert claims against UBAE for fraudulent conveyance, turnover, and equitable relief pursuant to New York and federal common law. The *Peterson II* claims against UBAE involve only the Markazi Luxembourg Assets and not the 2013 Assets.

6. The *Peterson II* plaintiffs repeatedly state that, between July 2008 and October 2012, UBAE instructed or directed Clearstream to take actions in the United States financial markets—specifically in New York—related to the Markazi Luxembourg Assets. This assertion



is false because, as I have stated, there was no written agreement between UBAE and Clearstream regarding the opening of the Sundry Account. In addition, I have reviewed the relevant documents and bank records during the time period referenced by the *Peterson II* plaintiffs. In my many years of experience in international banking, banks may only follow the written instructions or directives of their customers when it comes to managing the customers' assets. Between July 2008 and October 2012, UBAE issued no written instruction or directive to Clearstream to take any action in New York or the United States with respect to the Markazi Luxembourg Assets. As stated, Clearstream maintained sole and exclusive control of the Sundry Account beginning in June/July 2008. Thus, any actions after June/July 2008 regarding the Markazi Luxembourg Assets were unilaterally taken by Clearstream without direction or instruction from UBAE.

7. Until September 25, 2009, UBAE maintained a correspondent bank account at HSBC in New York. The *Peterson II* plaintiffs claim that this Court has jurisdiction over UBAE because, between July 2008 and October 2012, 62 payments over four years (totaling USD$1.68 billion) were made into the Sundry Account. Based on my review of the relevant documents and bank records during this time period, I have found no written evidence that UBAE's HSBC account was ever used in connection with these 62 payments.

8. The *Peterson II* plaintiffs also repeatedly state that UBAE supposedly participated in some "scheme" with Clearstream and Bank Markazi to allegedly hide the identity of Bank Markazi and therefore prevent the *Peterson II* plaintiffs from enforcing their judgments against the Islamic Republic of Iran. This, too, is a false statement. All of the interactions between UBAE, Bank Markazi, and Clearstream were arm's-length and governed by written terms and conditions that the *Peterson II* plaintiffs concede were followed. Moreover, my review of UBAE's documents and bank records during the period December 2007 through February 2008 reveals no



written communication between UBAE, Bank Markazi, and/or Clearstream related to any judgments against Iran in the United States or New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed 26 October 2020

_____
Maurizio Valfrè