```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DEBORAH D. PETERSON, et al.,

                Plaintiffs,

         v.                              13 CV 9195 (LAP)

ISLAMIC REPUBLIC OF IRAN, et
al.,

                Defendants.              Oral Argument
                                         (via Skype)
------------------------------x

FIONA HAVLISH, et al.,

                Plaintiffs.

         v.                              16 CV 8075 (LAP)

CLEARSTREAM BANKING S.A.,
Et al.,

                Defendants.
------------------------------x


                                         New York, N.Y.
                                         March 4, 2021
                                         10:05 a.m.

Before:

                    HON. LORETTA A. PRESKA,

                                         District Judge
```

1                                    APPEARANCES

2    FLEISCHMAN BONNER & ROCCO LLP
          Attorneys for Peterson Plaintiffs
3    BY:   JAMES P. BONNER

4    JENNER & BLOCK LLP
          Attorneys for Havlish Plaintiffs
5    BY:   DOUGLASS A. MITCHELL

6    DAVIS POLK & WARDWELL LLP
          Attorneys for Defendant Clearstream Banking S.A.
7    BY:   BENJAMIN S. KAMINETZKY

8    MOLO LAMKEN LLP
          Attorneys for Defendant Bank Markazi
9    BY:   ROBERT K. KRY

10   COLELLA ZEFUTIE LLC
          Attorneys for Defendant Banca UBAE S.p.A.
11   BY:   UGO COLELLA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Case called)

2                    THE COURT:  Counsel for Peterson, please, the Peterson

3     plaintiffs.

4                    MR. BONNER:  Good morning, your Honor, my name is Jim

5     Bonner.

6                    THE COURT:  Good morning.

7                    Counsel for the Havlish plaintiffs.

8                    MR. MITCHELL:  Good morning, your Honor, my name is

9     Doug Mitchell.

10                   THE COURT:  Good morning, Mr. Mitchell.

11                   Counsel for Clearstream, who has just joined us?

12                   MR. KAMINETZKY:  Good morning, your Honor, Benjamin

13    Kaminetzky of Davis Polk for Clearstream Banking.

14                   THE COURT:  Counsel for Bank Markazi.

15                   MR. KRY:  Good morning, your Honor, Robert Kry with

16    MoloLamken.

17                   THE COURT:  Good morning.

18                   Counsel for Ubae.

19                   MR. COLELLA:  Your Honor Ugo Colella.

20                   THE COURT:  Good morning, counsel.  Thank you for

21    being present.  I think we are going to have a lot of fun.

22                   I know you thought about dividing it up, but I

23    wondered if I might ask you some questions first and then see

24    what, if anything, you want to add after that.  Is that all

25    right with you?

1          MR. BONNER:  Of course, your Honor.

2          THE COURT:  Mr. Bonner, if I could start with you, and

3    let's talk a little bit about the notwithstanding clause in

4    Section 8772.  You say that because of that class you are not

5    required to show personal jurisdiction is proper as to

6    Clearstream, under New York's long arm statute.

7          First, how can you read the notwithstanding clause as

8    saying that?  It's in a paragraph that's entitled interests in

9    blocked assets.  We know that Congress knows how to write a

10   nationwide service-of-process statute.  This ain't it, I don't

11   think.

12         And the question is, why do you think that the

13   notwithstanding language in Section 8772 relieves you of any

14   obligation to show proper jurisdiction under the New York long

15   arm statute?

16         MR. BONNER:  In the *Rubin* decision, your Honor, from

17   the Supreme Court in 2018, the Court also interpreted a

18   notwithstanding clause.  And what it said was that 28 U.S.C.

19   1610, which is another provision of the FSIA, didn't provide a

20   sovereign immunity exception because it lacked what the Court

21   called a textual marker, notwithstanding any other provision of

22   law.

23         So here we have the same language, notwithstanding any

24   other provision of law, and what the Court said was that if a

25   statute had such language in it that that would do away with

1    the need to provide for any immunity -- that it would provide a

2    sovereign immunity exception.  So the courts have said, very

3    broadly, that if you have a notwithstanding clause in a

4    statute, that that eliminates sovereign immunity.

5                Our argument on that, your Honor --

6                THE COURT:  How does that translate into not having to

7    show amenability under the New York long arm statute?

8                MR. BONNER:  Because by the same logic, your Honor,

9    the Court says that you don't have to show another basis for

10   subject matter jurisdiction.  No one has given any reason why

11   that same language doesn't apply --

12               THE COURT:  The long arm statute doesn't talk about

13   subject matter jurisdiction.  It talks about personal

14   jurisdiction.

15               MR. BONNER:  Yes, your Honor.  But the language is

16   quite broad.  It says:  Notwithstanding any other provision of

17   law.  The Court says:  That's a basis for subject matter

18   jurisdiction.  There is no reason why it also doesn't apply to

19   personal jurisdiction.

20               The Second Circuit in *Weinstein* reached the same

21   conclusion, that the language notwithstanding any other

22   provision of law provides an independent basis for

23   jurisdiction.  Again, that's *Weinstein*, the Second Circuit from

24   2010.

25               THE COURT:  Right.  But wasn't that original

L3GBBEI3

1  jurisdiction suits in that case?

2         MR. BONNER:  No.  Those were TRIA actions.  Under 1610

3  there is a footnote in TRIA which has a provision which applies

4  to collecting the assets of the agencies or of a foreign

5  sovereign that has been found liable under the terrorism

6  exception to the Foreign Sovereign Immunities Act.

7         In any event, your Honor, I think that this question

8  is one that's much ado about nothing with respect to

9  Clearstream because nobody has contended that if we satisfy the

10 requirements for due process, the minimum contacts test and the

11 reasonableness test, that we also would not satisfy the

12 requirements for personal jurisdiction under New York law,

13 under 302 of the CPLR.

14        The cases that we cited in our opening brief made that

15 point.  It's basically the same test, your Honor, and the

16 Second Circuit has noted that there has never been a case, as

17 far as it can tell, where someone satisfies due process but

18 does not satisfy the requirements of the CPLR.

19        At the end of the day, your Honor, this is not an

20 issue that I think should trouble the Court.

21        THE COURT:  I just question your suggestion that we

22 should skip over that depth.  Again, is there any case that has

23 just skipped over that step?

24        MR. BONNER:  Of course, your Honor, it's a statute

25 onto itself.  It is a one off statute.  So there is nothing

1    interpreting this statute per se.

2          But, again, both the Supreme Court and the Second

3    Circuit have said that this notwithstanding language provides a

4    basis by itself for subject matter jurisdiction, and I don't

5    see any reason why that wouldn't apply with equal logic to the

6    personal jurisdiction standard.

7          THE COURT:  They didn't say that.

8          Mr. Kaminetzky, what do you say on that issue?

9          MR. KAMINETZKY:  Thank you, your Honor.

10         This will be the last time, I'm sure, I will agree

11   with Mr. Bonner.

12         I obviously agree with your Honor that the Court

13   shouldn't skip over the CPLR and that there is absolutely no

14   authority to say that the notwithstanding language in the 2772

15   statute somehow does away with the New York long arm statute.

16         That being said, courts have recognized that there is

17   quote/unquote a striking similarity between the New York and

18   due process standards.  So I do agree with Mr. Bonner, to the

19   extent that we will show the Court that two out of the three

20   elements of personal jurisdiction here, specific personal

21   jurisdiction, the arising-out-of prong, as well as the

22   reasonableness prong, that, under those two standards,

23   Clearstream is not subject to specific jurisdiction under the

24   due process standard, and, of course, they are also not subject

25   to jurisdiction under the long arm statute.

1          If you will, your Honor, I kind of agree that because

2     we are not subject to jurisdiction under either test, it may

3     not make sense for the Court to spend much more time on this

4     issue, although it's obviously correct.

5          THE COURT:  I am going to have some more questions for

6     you on this in just a minute, but I want to continue to bother

7     Mr. Bonner, if you don't mind.

8          Mr. Bonner, in talking about whether or not the

9     Markazi bank is the beneficial owner of the right to payment,

10    the Court of Appeals has told us very clearly that the asset

11    you are seeking to have turned over is a right to payment

12    located in Luxembourg.

13         My question to you, sir, is why are we looking to New

14    York law to figure out who is the beneficial owner of that

15    asset?  Shouldn't we be looking at Luxembourg law, where the

16    asset is located?

17         MR. BONNER:  I think typically, your Honor, what

18    courts do is that they apply their own local law, unless there

19    has been a conflict that has been opposed.  Here we don't have

20    any information from Luxembourg that shows that there is any

21    difference in the law in Luxembourg as opposed to New York.

22         I think the really salient important point here, your

23    Honor, in determining who is the owner of this asset is, what

24    are the rights and the responsibilities that the various

25    parties have in these assets.

1           So what we know is that Markazi has all of the

2      economic rights to these assets.  It has the right to the

3      proceeds of these bonds.  It has the right to sell the bonds,

4      if it wants to.  It has the right to control what's done with

5      those bonds.

6           And what the Second Circuit has said is, in the *Asia*

7      *Pulp* case, that when we look to state or foreign law to

8      determine whether a federal statute has been satisfied, we look

9      to the state or the foreign law only to determine what the

10     various rights and responsibilities are of the parties in those

11     assets.

12          So here, under either New York law -- and when we look

13     to the contractual obligations that are set forth in the

14     Clearstream customer agreement, or even when we look to

15     Luxembourg law, it doesn't make any difference here, your

16     Honor, because under all of those standards, all of the

17     economic rights belong to Bank Markazi, not to Ubae, which is

18     only a custodian of those assets.  That's what the Court found

19     in Peterson 1.

20          Then the second step of the analysis under *Asia Pulp*,

21     your Honor, turns us back to federal law, and the standard here

22     is who is the beneficial owner of these assets.  That's the

23     standard that's set forth in the statute.  So the only answer

24     to that question, because of the fact that Markazi owns all of

25     the economic rights in the assets, is the beneficial owner is

1    Bank Markazi, as the Court found in Peterson 1.

2          Again, your Honor, I think that this choice of law

3    issue is not something that is of any great importance here

4    because all of the various sources of law, whether we look at

5    the contract that the parties signed, whether we look to New

6    York law, or whether we look to Luxembourg law, they are all

7    uniform in that all of the actual economic rights in this asset

8    belong to Bank Markazi, not to Ubae, a mere custodian.

9          THE COURT:  Let me ask you a little bit more about

10   Bank Markazi's arguments.  What do you make of its argument

11   that your people have not put forward any admissible evidence

12   showing that Markazi is Iran's alterego?  They acknowledge that

13   you have alleged some facts in the complaint, but then they say

14   they have put in admissible evidence to the contrary.

15         What do you say to that?

16         MR. BONNER:  That issue, your Honor, is only relevant

17   with respect to the narrow issue on the motion to dismiss,

18   whether Bank Markazi is entitled to any constitutional rights

19   whatsoever.  In connection with our summary judgment motion, we

20   didn't make the alterego argument under *Bancec*, although the

21   statute, for certain purposes, makes Markazi the alterego of

22   Iran.

23         Here is what I say, your Honor, and I think that

24   procedurally we have a real problem here from Bank Markazi's

25   perspective.  We had allegations in our complaint that Markazi

1  was Iran's alterego.  We mentioned that in our moving papers on

2  summary judgment, although we said we are not going to rely

3  upon those allegations for the purposes of the summary judgment

4  motion.  Bank Markazi files a motion to dismiss.  It says

5  nothing whatsoever about the alterego issue.  And only on the

6  reply do we get an affidavit from one of its employees talking

7  about all of these facts.  So we have not had the opportunity,

8  your Honor, to write about that issue at all, and I think what

9  courts have done in these circumstances, two things, your

10  Honor.

11      Either, A, they have accepted the plaintiffs'

12  allegations for jurisdictional purposes at the

13  motion-to-dismiss stage and allow discovery to proceed, or the

14  courts have allowed the parties to conduct some discovery about

15  this issue so that the conflicting allegations backwards and

16  forwards from our expert, Dr. Clausen, and from their employee

17  can be tested.

18      And I think that that's particularly important here,

19  your Honor, because we have a bank that's been designated as a

20  money launderer by the United States Government, the only one

21  in history that's suffered that sanction.

22      We have had some evidence here that has shown that

23  Markazi's witnesses have a bit of a flexible relationship with

24  the truth, your Honor.  I think it's very important that we

25  don't decide at the motion-to-dismiss stage this issue without

1    providing the plaintiffs with an opportunity to rebut the

2    evidence that has been submitted by Markazi and to test that

3    evidence, your Honor, given the fact that we haven't received

4    any discovery to date from Bank Markazi.

5              THE COURT:  One more question.  Assuming for a moment

6    the due process protections do apply to Bank Markazi, what

7    contacts do you rely on that you say the bank has in the United

8    States to support jurisdiction?  Now, the bank says that it

9    exercised no control whatsoever over Clearstream's

10   correspondent banking activities in the United States.  It says

11   we have no contacts.  What do you say?

12             MR. BONNER:  We say, your Honor, that all of the

13   contacts that Clearstream had, which were enormous with the

14   United States, were passed in 62 separate transactions over the

15   course of over four years, $1.68 billion through the United

16   States banking system for Bank Markazi.  The proceeds of its

17   bonds were collected here and this entire relationship was

18   built on the fact that Clearstream would be able to provide

19   that service for Bank Markazi, putting its money through the

20   United States banking system so that Markazi could enjoy the

21   fruits of its bonds and get the economic benefits of those

22   bonds.

23             Their argument, as I said, your Honor, is they

24   asserted no control --

25             THE COURT:  Let me just interrupt you for a minute.

1          I thought your argument was that because of the agency

2    relationship, all of Clearstream's activities, the 62 payments

3    and all that other stuff, were attributable to Bank Markazi.

4          MR. BONNER:  That's correct, your Honor.  And I was

5    perhaps a little bit too long winded, but I was getting to that

6    point.  I should have been more succinct.

7          The control argument ignores the principle that the

8    principal only needs some control over the activities of the

9    agent, and the Second Circuit has made that clear.  There is a

10   *Cutco* case and there are other cases.  But that's a

11   well-established principle of law.  And the courts have also

12   recognized that that level of control is often established at

13   the very outset of the parties' relationship.

14         What happened here was, the parties established a

15   contractual relationship, your Honor, which mandated that

16   Clearstream follow the directions that Markazi gave to it

17   regarding its bonds, and that's the same under the Luxembourg

18   law.  It's the same under the UCC.  When the owner of the bond

19   says collect my proceeds, you have to go out and collect those

20   proceeds.

21         Here we have the principal, Bank Markazi, directing

22   its agent, Clearstream, collect my proceeds.  And we also have

23   bond prospectuses which say that those proceeds can only be

24   collected in New York.

25         So Markazi, the investor, gets a prospectus.  It says,

1    here are the bonds.  You can only collect those proceeds in New

2    York.  And, on top of that, you can only collect them through

3    three entities:  Clearstream, Euroclear, or the DTC.

4         So the control here, your Honor, was established right

5    at the outset of this relationship where Bank Markazi

6    authorized and assigned Clearstream the task of collecting

7    these proceeds for it in New York.

8         Again, the courts have said that the amount of control

9    that's required doesn't have to be about the nitty gritty of

10   what the agent is going to do.  According to the courts, it can

11   be quite -- what's the language that they utilize.  In any

12   event -- I'm sorry, your Honor?

13        THE COURT:  For lack of a better word, quite loose.

14        MR. BONNER:  It can be quite loose control, your

15   Honor.

16        Here we have a contractual obligation that they had to

17   go and collect these assets and, as a result, the contacts, the

18   very extensive contacts that Clearstream had with New York, are

19   attributable to Markazi.

20        We have cases, your Honor, that are about collection

21   of assets on behalf of investors, including a Supreme Court

22   case, *Pearson*, from 1939.  And there a trust company acted as

23   an investor's agent in collecting principal and income, and the

24   Court said, that's a principal/agent relationship.

25        As a result of that, I think the control point, it

1    doesn't really work for Markazi because the salient point here

2    is that the account agreement and all applicable law required

3    Clearstream to take these actions, give it no discretion with

4    respect to collecting these assets for Bank Markazi, and they

5    had to do it in New York.  Markazi says, we don't know who

6    their correspondent banking accounts are with, and we don't

7    tell them who to handle their corresponding banking

8    relationships with.  But that, your Honor, is well beyond the

9    level of control that courts have required in order to have a

10   principal agency relationship.

11            THE COURT:  That's the nitty gritty argument.

12            Mr. Kry, is counsel not correct on this?

13            MR. KRY:  For a couple of reasons, your Honor.

14            First, although it's true that New York doesn't

15   require absolute control over the agent's functions, it does

16   require some control, and that just doesn't exist here.  You

17   can look at the documents that Mr. Bonner cited, the bond

18   prospectuses and the general terms and conditions, and there is

19   nothing in there that gives Bank Markazi any control over how

20   Clearstream collects bond payments.

21            THE COURT:  Why does it have to?  It is clear that it

22   has to be done in New York and it is clear that Clearstream is

23   one of the three entities that can do it.  Why is it not

24   sufficient that the agreement says we will collect your

25   proceeds?

1             MR. KRY:  Respectfully, your Honor, that's not what

2      the documents say.  The bond prospectuses, these are at

3      Exhibits 64 and 65 of Mr. Vogel's original declaration.  They

4      do not say that proceeds must be received in New York.  All

5      they say is that they will be paid.

6             THE COURT:  The prospectus says that they are going to

7      be paid in New York.

8             MR. KRY:  No, your Honor.  It says they will be drawn

9      from a New York account.  You can look at those bond

10     prospectuses.  They do not say they must be received in New

11     York.  They say they will be drawn from a New York account.

12            THE COURT:  It's possible to get those proceeds

13     without doing anything in New York?

14            MR. KRY:  Well, the payer, the issuer of the bond,

15     will issue those payments from New York.  But the correspondent

16     account that the recipient has does not need to be maintained

17     in New York.  There is nothing in the prospectuses that says

18     that, your Honor.

19            THE COURT:  Let me interrupt you for a minute and go

20     back to Mr. Bonner and see what he says about that.

21            Mr. Bonner.

22            MR. BONNER:  That's incorrect, your Honor.  The

23     prospectuses say that the payments -- either they are going to

24     be made by check, which is singularly unlikely, or that the

25     receiver is going to accept them at a bank account in New York.

1          But irrespective of that, your Honor, Markazi well

2     knew that Clearstream was performing this function in New York.

3     There is no doubt about that here.  And it doesn't matter.

4     They told him to go out and collect it.

5          The manner in which Clearstream carries out its

6     day-to-day responsibilities, that's not the level of control

7     that's required here.  They are assigned by Markazi to go out

8     and collect those bond proceeds, which, again, could only be

9     paid in New York, and everyone knew that Clearstream was

10    collecting them in New York.  That's why the defendants went

11    into this machination of trying to put Ubae into this as an

12    intermediary.

13         THE COURT:  Let me go back to Mr. Kry and see what

14    else he wants to say on this.

15         MR. KRY:  Your Honor, the only point I have is, it's

16    not a knowledge standard, it is a control standard, so there

17    needs to be some level of control over the specific function at

18    issue.

19         If I can give an example, your Honor, if we have a law

20    firm that represents clients in court, of course that law firm

21    is acting as an agent when it makes arguments on behalf of its

22    clients in court because the client has some level of control

23    over that.

24         But if that law firm then turns around and deals with

25    suppliers and vendors for its paper, for its electricity, for

1  its IT infrastructure, all the things it does to run its

2  business, it is not acting as an agent with respect to those

3  functions because the client doesn't have any control over

4  them, and this is no different.

5          THE COURT:  Of course, there is no argument here that

6  I've seen that Clearstream was acting beyond the scope of its

7  agency.

8          MR. KRY:  That is our argument, your Honor.  Our

9  argument is that the scope of Clearstream's agency was that

10  Clearstream held Bank Markazi's bonds and proceeds in its

11  account in Luxembourg.  What Clearstream may have done with its

12  own vendors and suppliers who run that business, the

13  correspondent accounts it may have relied on in other

14  countries, that was entirely up to Clearstream's discretion.

15  The evidence before the Court --

16          THE COURT:  Isn't that the point, counsel?  Within the

17  scope of the relationship those nitty gritty details were up to

18  Clearstream.

19          MR. KRY:  Those were not within the scope of the

20  relationship, your Honor.  It's like the law firm that has to

21  buy computer equipment.  The agency doesn't have anything to do

22  with that.

23          THE COURT:  Markazi says to Clearstream, collect my

24  proceeds.  Markazi doesn't tell them how to do it.  Clearstream

25  does it in the manner that it does it, right?  How can that be

wrong?

MR. KRY:  Because Markazi has no right to demand that Clearstream do that in any particular way.  It doesn't have the absolute right.  It doesn't have any right.  There is no control over that function.  And the declaration that Mr. Massoumi put in about that relationship is very clear on that.  There is no control on the part of Bank Markazi over how Clearstream performs those functions.

THE COURT:  Why does there have to be control at that nitty gritty level for there to be an agency relationship?

MR. KRY:  Because it's not a matter of a nitty gritty or a broader level, your Honor.  It's a matter of, what does the agency relationship extend to?  How broad is it?  There is no question clear that Clearstream was Bank Markazi's agent for holding bonds and proceeds in Luxembourg.

It's a very different question about whether Clearstream was acting as Bank Markazi's agent when it dealt with its own suppliers, its own vendors to do the various things it needed to do to run its business.  At the very least, your Honor, there is a genuine dispute of fact.  This is not a summary judgment issue.

Mr. Massoumi's declaration on this point, which is undisputed, by itself is sufficient to create a genuine disputed fact over whether those activities were within the scope of the agency relationship.

1         So it's not a question of nitty gritty versus broad

2    strokes.  It's a question about what is within the scope of the

3    agency relationship and what falls outside it because it is

4    simply a matter of --

5         THE COURT:  Mr. Bonner, quick question.  What do you

6    say to counsel's argument about disputed issue of fact?

7         MR. BONNER:  I just think that that's absolutely

8    incorrect, your Honor.

9         The point here is that there is a contract that says

10   you go out and collect my assets.  The comparison that's being

11   made, my law firm goes out and buys paper, my client has no

12   issue or control or any desire, even, to have anything to do

13   with me buying paper.

14        Here, the entire basis of the Markazi/Clearstream

15   relationship is that Clearstream is going is to go out and

16   collect these bond proceeds, the principal and the interest on

17   these bonds.  It's the most essential thing that Clearstream is

18   doing.  It can't decide it's not going to do that, so there is

19   no issue of fact here.  Mr. Massoumi wants to say, I didn't

20   know, how can I possibly know, which is incorrect.  It's also

21   contrary to what he said back in 2008, when he submitted an

22   affidavit and said that one of the reasons why --

23        THE COURT:  He used Clearstream because they provided

24   efficient bond collection services.

25        MR. BONNER:  Exactly, your Honor.

1              Even then, we have now a sham affidavit that's

2     contrary to what was said more contemporaneously.

3              In any event, that's not the real issue here, your

4     Honor.  It's the my-law-firm-buying-paper issue.  That's not

5     the level of control that's required here.  It's the assignment

6     that's made in this party's contractual relationship that

7     establishes the agency and, as you said or suggested, that's

8     well within the scope of Clearstream's agency.

9              MR. KRY:  Your Honor, can I just take exception to

10    that comment there, that this was a sham affidavit.  To be

11    perfectly clear, Ms. Massoumi's affidavit now and the one he

12    did before are absolutely consistent.  He has never denied that

13    Bank Markazi had knowledge of Clearstream's correspondent

14    account or the fact that Clearstream would potentially use that

15    correspondent account in its business.  The issue is control

16    and that's the topic his affidavit addresses now.  It's

17    absolutely consistent with the prior one, and there is simply

18    no basis for that kind of aspersion.

19              THE COURT:  Stop.

20              Mr. Bonner, one more question on this, please.

21              Mr. Bonner, Markazi argues that Clearstream's

22    establishment of the blocked account was on its own hook.

23    Markazi didn't tell it to do that.  No other principal told it

24    to do that.  That's all on Clearstream's head and, therefore,

25    the blocked account can't be considered part of the agency

1   relationship.

2          MR. BONNER:  Your Honor, that is not really a very

3   important issue to me in the case.

4          What happened was, there were sanctions that were

5   imposed by the U.S. Government and by European authorities, as

6   well as the fact that the plaintiffs obtained a restraining

7   notice which prevented Clearstream from handing money over to

8   Bank Markazi.

9          Clearstream didn't want to subject itself to sanctions

10  by the U.S. Government, by the EU, and potentially a violation

11  of the plaintiffs' restraining notice, so it put the money into

12  a blocked account, which it had to do by law.

13         The fact that it wasn't brave enough to go ahead and

14  hand the money over to Bank Markazi doesn't, for jurisdictional

15  purposes, somehow nullify the fact that these assets were

16  collected in New York and all of the other contacts that we

17  have spoken about.

18         Yes, it's true, neither Banca Ubae nor Markazi are

19  happy with the fact that this blocked account has been created

20  and the money has been put in there, but that doesn't defeat

21  all of this activity that was going on in New York in order to

22  collect these assets at the direction of Bank Markazi and Ubae.

23         THE COURT:  Mr. Kry, do you have any comment on that,

24  sir?

25         MR. KRY:  Our understanding of the personal

 1   jurisdiction theory is their agency theory.  If there is no

 2   agency relationship with respect to the collection of those

 3   proceeds, it seems conceded there is no jurisdiction over Bank

 4   Markazi.

 5        Whether there was personal jurisdiction over

 6   Clearstream is a separate question.  If your Honor doesn't

 7   think there was personal jurisdiction over Clearstream, then

 8   necessarily we can't be hauled in on an agency relationship,

 9   but on that separate question I would just defer to

10   Clearstream's counsel.

11        THE COURT:  Thank you.

12        Mr. Bonner, if I can continue to bother you, on your

13   request for a preliminary injunction, certainly you have a

14   higher standard here because you are not preserving the status

15   quo, but you are looking to upset the status quo and to get,

16   you say, the bond proceeds transferred back.

17        First of all, is a preliminary injunction really

18   necessary here?  And why is plaintiffs' interest in changing

19   the status quo greater than Clearstream's where, for example,

20   it argues that it might be subject to double liability here.

21   Why the need for a preliminary injunction?

22        MR. BONNER:  The need for a preliminary injunction has

23   arisen, your Honor, because Markazi has gone to the courts of

24   Luxembourg and it's attempting now to put an additional hurdle

25   up for the plaintiffs to satisfy.

1          Even if this Court orders by summary judgment that

2    these assets be surrendered to the plaintiffs, what Markazi is

3    trying to do and Luxembourg right now is to force the

4    plaintiffs to then go overseas and to obtain an order from the

5    Luxembourg courts to allow those assets to be paid to the

6    plaintiffs.  That's creating the irreparable injury that we

7    talk about, your Honor.

8          As opposed to the question of the relative burdens on

9    Clearstream versus the plaintiffs, we have been trying for 13

10   years to collect these assets, your Honor.  We have gone all

11   over the world to try to do that, different countries here in

12   the United States, obviously, as well.  So there has been a

13   tremendous amount of burden that's been imposed upon the

14   plaintiffs for the past 13 years.

15         There is a good deal of woe is me in the Clearstream

16   briefs.  I think objectively it's hard to generate a lot of

17   sympathy for Clearstream, which came to the U.S., set up its

18   operations in the financial capital of the world to provide

19   services to its clients in the banking community and then

20   decided that it would provide services to a U.S. Government

21   designated money launderer and a state that has been designated

22   as a terrorist entity since 1983.  When we consider the

23   relative burdens, I think that those are factors that the Court

24   needs to take into consideration.

25         But, more importantly, Bank Markazi, after seven

years, is the party that's really trying to upset the apple

card here, your Honor.  This litigation has been pending for

seven years and it hasn't been until the last six months or so

that Markazi has gone to the courts of Luxembourg and tried to

essentially set it up as an appellate court for this Court's

decision making.

That's the reason why we think to preserve the status

quo, your Honor, rather than to change it, we should bring

these assets here to the United States where if the Court

decides that we are entitled to collect them, we will be able

to collect them.  If this Court decides that we are not

entitled to collect them, they can go back to Bank Markazi and

to Clearstream.  But it's unfair to the plaintiffs to allow

this litigation collaterally to proceed in Luxembourg, where

it's attacking the ability of this Court to implement its

judgment at the end of the day, should the Court award

plaintiffs summary judgment or judgment in any way, shape, or

form.

THE COURT:  Let me ask you a follow-up on that.  The

preliminary injunction that you seek is an order requiring the

bond proceeds to be returned to New York.  Doesn't the Court of

Appeals tell us that the right to payment has only ever existed

in Luxembourg?  Does that make a difference?

MR. BONNER:  No, your Honor.  I think that Clearstream

could simply reverse the transaction by which it debited the

account in New York and credit it to the account in Luxembourg,
and that would accomplish what the plaintiffs have requested
here, your Honor.  So all they need to do is to reverse that
transaction.

I would also note that in the last case there was the
same situation, your Honor, where Clearstream was arguing that
the asset only existed in Luxembourg.  Different situation.
There was money that had been set aside by Citibank here in New
York.  But all of these mechanical difficulties that
Clearstream is trying to conjure, if they don't want to hold
the right to payment when it comes back to the United States,
we will find another financial institution that will hold that
asset.  But all they have to do is to reverse that transaction
where they credited Luxembourg.  The asset will be back here in
the United States, and that way the court's jurisdiction will
be protected.  There won't be this artificial Luxembourg
appellate court to decide whether the plaintiffs or the
defendants win this case.

THE COURT:  Thank you.

Mr. Kaminetzky, can I bother you for a while?

MR. KAMINETZKY:  Please.

THE COURT:  May I ask you, sir, why is it that you
contend that all of Clearstream's activities in New York are
totally irrelevant?  We know that the bonds were denominated in
U.S. dollars.  Clearstream was responsible, through its

1    relationship with JPM, for facilitating the receipt of those

2    payments and on and on and on.

3           How do you say that those are in any way irrelevant to

4    the proposition of personal jurisdiction?

5           MR. KAMINETZKY:  Thank you, your Honor.

6           Let me start, actually, where the last dialogue with

7    Mr. Bonner ended.

8           So point one.  And what I'm particularly picking up on

9    is what Mr. Bonner said about reversing the transaction.

10          What he just said was rejected by Judge Forrest once

11   and the Second Circuit twice.  There was no transaction.  There

12   was no transfer of money between New York and Luxembourg.  I

13   don't know how many different courts need to say that.  But

14   that is now a matter of fact that has been established by the

15   Second Circuit.  So there is no transaction to reverse.

16          This property that's subject to this turnover action

17   has always been in Luxembourg, has never been in New York, and

18   legally could never be in New York because Clearstream is not

19   allowed to hold deposits in New York.  What we are talking

20   about is a turnover action for property that has always been in

21   Luxembourg.

22          And the reason why it's important for your Honor to

23   remember --

24          THE COURT:  Let me interrupt you and ask you this.

25          How did it come to pass that the bond proceeds, which

1    are payable in dollars in New York, made their way to

2    Luxembourg?

3          MR. KAMINETZKY:  Those bond proceeds never made their

4    way to Luxembourg, and that is such an important factor.

5    Mr. Bonner just won't accept that the Second Circuit has ruled

6    now twice.

7          What happened was, the money was put in Clearstream's

8    correspondent account in JP Morgan.  That is 100 percent

9    Clearstream's money.  That night, and many times since then,

10   Clearstream had emptied that account and used that money for

11   whatever purposes it wanted.

12         What happened in Luxembourg is simply an account entry

13   on the books and records in Luxembourg that now there is a

14   debit or now there is a credit to the Ubae account in

15   Luxembourg.  There is never a transfer.  The JP Morgan money

16   stayed at JP Morgan for Clearstream and Clearstream used that

17   to pay whatever dollar obligations it had.

18         Going back --

19         THE COURT:  Is that a distinction without a

20   difference?  Clearly, there is money to be paid.

21         MR. KAMINETZKY:  But it's extraordinarily -- going

22   back to your question, we are talking about personal

23   jurisdiction here.  And for specific personal jurisdiction you

24   need three things, but two of which is it has to arise -- the

25   claim -- there has to be a strong connection, and I'm basically

quoting the Supreme Court -- between the claim and the activity
in question.  Here, your Honor -- this is what's key.  A
turnover action, what is it?  Basically, turnover actions, as
your Honor knows, it's that we are holding money and rather
than give it to the person to whom we are holding money for,
give it to someone else.

What is the act of Clearstream in a turnover case?
It's the act of possessing property.  This is very important
because Mr. Bonner's client, plaintiffs here, are only allowed
to assert a turnover claim against Clearstream.  Pursuant to
the Peterson 1 settlement agreement, they released every other
claim.  The only thing they are allowed to do is sue us as a
garnishee and holding money for someone else.  So the act that
makes us a garnishee is possessing property, they allege, of
Bank Markazi.  That possession always occurred in Luxembourg,
could not have occurred in New York by law, so that the claim
arises from our conduct solely in Luxembourg.

THE COURT:  Counsel, I am having a great deal of
difficulty with that concept.  Let me try a different way.

What if the bonds were payable in euros and
Clearstream took whatever -- you don't want me to use the word
took payment -- received the proceeds, but received the
proceeds in London or France.  Let's just say France.  The fact
that Clearstream has all of these activities in New York would
be wholly irrelevant to that, right?  Because the activity,

1  which is the basis of the claim, would relate to those bonds,

2  the proceeds of which were payable in euros, in pounds.  It has

3  nothing to do with New York.  That's easy for you, right?

4  That's easy for me, right?

5          MR. KAMINETZKY:  Yes.

6          THE COURT:  That's not the case here.  The proceeds

7  were payable in New York and New York only.

8          MR. KAMINETZKY:  They were payable to Clearstream in

9  New York and that money could be used by law and was used for

10 anything Clearstream wanted to use it for.  What happened in

11 Luxembourg --

12         THE COURT:  It had to cough up the money to Markazi.

13         MR. KAMINETZKY:  Your Honor, that's not just the

14 way -- the Second Circuit found that what happens in Luxembourg

15 is a book entry, and that's the only -- and that book entry is

16 what makes Clearstream liable or responsible to Ubae/Bank

17 Markazi, according to the allegations.  That's just -- again,

18 the possession here of the property always took place in

19 Luxembourg.

20         THE COURT:  But didn't the right to payment, which is

21 situated in Luxembourg, as the Court of Appeals has told us, a

22 direct result of the bond proceeds being deposited into

23 Clearstream's New York-based JP Morgan account?  It's a direct

24 result.

25         MR. KAMINETZKY:  I'm sorry?  I didn't hear the last

1   thing your Honor said.

2            THE COURT:  Let me start again.  The right to payment,

3   which is situated in Luxembourg, is a direct result of the bond

4   proceeds being placed in Clearstream's JPM account here in New

5   York, right?

6            MR. KAMINETZKY:  Correct.  When money --

7            THE COURT:  The book entry that you are talking about

8   could not have occurred without Clearstream's activity in New

9   York.

10           MR. KAMINETZKY:  Without Clearstream receiving money

11  its own money in the JP Morgan account, it would not have or it

12  would have reversed a book entry in Luxembourg.  That is

13  factually correct.  But, again, not dispositive because there

14  has to be, again, under the Supreme Court's jurisprudence, a

15  substantial connection between the claim and the activity.

16           THE COURT:  Well, the activity is Clearstream

17  receiving the proceeds of the bond in its New York JPM account

18  and then doing whatever bookkeeping it does to create the right

19  to payment to Markazi.  These proceeds are the ones that

20  plaintiff wants.  How can you say that the proceeds don't arise

21  out of that transaction in New York?

22           MR. KAMINETZKY:  Because the claim here is turnover.

23  We are being sued as a garnishee.  We are being sued saying

24  Clearstream -- we agree, it's not our money, right.  We are

25  literally caught in the middle here.  This is the kind of case

1     that's screaming for something called like an international

2     interpleader.  We, Clearstream, have absolutely no interest in

3     holding onto this money at all.  Our only interest -- and

4     Mr. Bonner dismissed this, and I want to come back to it, we

5     are facing literally catastrophic double liability because the

6     rules of the game have been changed for this specific case.

7            As garnishee, the only act that makes you a garnishee

8     is possessing property.  We are possessing -- the property that

9     we possess has always been in Luxembourg, was never in New

10    York.

11           The proceeds your Honor keeps going to that were put

12    in the JP Morgan account are gone.  And as Judge Forrest found

13    and the Second Circuit, they were gone 13 years ago.  That

14    money has been -- was spent that night.  What's in Luxembourg,

15    what's always been in Luxembourg is the book entry and that

16    property is in Luxembourg and it's always been Luxembourg.  And

17    the claim arises out of our act of possessing Markazi's

18    property or allegedly Markazi's property in Luxembourg alone.

19    That's why this claim doesn't arise from our New York activity.

20    The New York activity was over 13 years ago.

21           THE COURT:  So what?  But it was necessary for you to

22    have that right to payment in Luxembourg.

23           MR. KAMINETZKY:  Correct.  But that is not enough of a

24    substantial connection, your Honor, and that's our argument, is

25    that because this is a turnover claim and not something else --

1    the only thing that makes you liable as a garnishee is

2    possessing.  That possessing always happened in Luxembourg.  It

3    could not have happened in New York.

4              THE COURT:  Mr. Bonner, do you have a comment on this?

5              MR. BONNER:  I think just very briefly, your Honor.

6              What the case law says with respect to minimum

7    contacts is that the claim has to arise out of or lead to

8    conduct in the forum.

9              Here, all of the things that we have just been talking

10   about make it quite clear that this claim does relate to

11   conduct that Clearstream undertook in the New York forum.  Over

12   the course of many years it collected a huge amount of memory

13   and there would be no asset in Luxembourg but for the fact that

14   that New York activity was undertaken.  It's a bit of a

15   magical-thinking argument to try to eliminate all of that

16   activity that preceded the credit appearing in Luxembourg and

17   saying that that has nothing to do with the plaintiffs' claim.

18             I think the other element that's important to think

19   about, your Honor, when we talk about whether this claim arises

20   out of Clearstream's New York activity is that one of the

21   elements of the statute is that we have to show that

22   Clearstream is doing business in New York.  That's a statutory

23   element of our claim.  Of course, there is an enormous amount

24   of activity that Clearstream undertakes and undertook here in

25   New York that relate directly to our $1.68 billion in Bank

1    Markazi bonds, but also other activity that Clearstream

2    undertakes in New York.  And nobody, nobody has suggested

3    anywhere that there is a case that says that when an element of

4    a claim is satisfied by in-forum activity, such as Clearstream

5    undertaking its business operations here in New York, that that

6    doesn't satisfy the minimum contacts test.

7              THE COURT:  Mr. Kaminetzky, why is that not right?

8              MR. KAMINETZKY:  Your Honor, two things, or several

9    things.

10             No. 1 is 8772 is not a cause of action.  8772 takes

11   the cause of action and changes the rules and lowers the

12   standard and targets --

13             THE COURT:  Speak to your Congress.

14             MR. KAMINETZKY:  I understand.  It's still a turnover

15   claim.  Mr. Bonner can't say that because an element of a

16   statute says that Clearstream has to be doing business in the

17   United States, that changes the specific jurisdiction under the

18   due process clause.  Mr. Bonner is certainly entitled to his --

19   not certainly.  He is entitled to his own statute, but not his

20   own Constitution.

21             THE COURT:  That's good.  That's really good.

22             MR. KAMINETZKY:  The statute can't mean that if you

23   are just doing business in New York, i.e., the general

24   jurisdiction standard, by the way, you are subject to specific

25   jurisdiction.  If that remains that this is -- the bases for

1    jurisdiction here is specific jurisdiction and, therefore, it

2    must arise from.

3         Mr. Bonner talked about a but-for causation and that's

4    a very hot topic now.  But at the end of the day there has to

5    be a substantial connection.

6         Your Honor, the fact that we receive bond proceeds

7    into the JP Morgan account, you know, that is a fact.  Of

8    course, we did.  That's what we do for a living.  We receive

9    bond proceeds and we are a securities intermediary.

10        But the issue here is, where is the property?  And the

11   property has always been in Luxembourg.

12        THE COURT:  I am not sure how we are pronouncing it,

13   but I thought that the New York Court of Appeals in the *Licci*

14   case seems to have been pretty clear that CPLR 302(a)(1) in

15   doesn't require that every element of the cause of action

16   pleaded must relate to New York contacts.  But if at least one

17   is, then that is sufficient.

18        Why is that not right, Mr. Kaminetzky?

19        MR. KAMINETZKY:  It is exactly right, but, again, it's

20   a very simple -- coming back, I keep on saying it, this is

21   simply a turnover action.  That's all it is.  We are a

22   garnishee.  We are saying, you had property at Markazi, turn it

23   over.  The only element of a garnishee action or a turnover

24   action is, you possess property, full stop.

25        There is only one element and that element is

1    possessing property and that possessing and that property was

2    always in one place and that's Luxembourg.  So that's the

3    answer.

4                THE COURT:  The requirement for the substance of the

5    action, as opposed to personal jurisdiction.  If you are doing

6    business, you said a minute ago that in 8772 Congress lowered

7    the standard and it made doing business in New York an element.

8    It's entitled to do that.  And under 302(a)(1), if one of those

9    elements is present, then we have personal jurisdiction.  Why

10   is that not right?

11               MR. KAMINETZKY:  Because 8772 is not a claim.  We are

12   not being sued under 8772.  Mr. Bonner didn't amend the

13   complaint after 8772 was passed.  Before 8772, this was a

14   turnover claim.  After 8772, this was a turnover claim.  What

15   8772 does is it strips defenses from us.  It says, you used to

16   have a comity defense.  You don't anymore.

17               THE COURT:  Right.

18               MR. KAMINETZKY:  If you change the rules of the game,

19   but the claim is still the claim is still the claim, and that's

20   just a turnover claim of property in our possession.  Again,

21   the only element of a turnover claim is you possess property.

22   And if that's the only element, where did that occur?  That

23   only occurred in Luxembourg.

24               THE COURT:  One more question, please.

25               Both Markazi and Ubae argue that Markazi is the

1    beneficial owner of the right to payment.  Indeed, the Peterson

2    1 court thought so.  You don't think that.  Why is that?  Are

3    your cocounsel wrong?

4          MR. KAMINETZKY:  They are certainly not my cocounsel.

5    Codefendant.

6          As you heard, your Honor, we are in ferocious,

7    fight-for-your-life-for-survival litigation with Bank Markazi

8    in Luxembourg that will literally -- that could literally, in

9    addition to what's happening here, bankrupt our company.  We

10   are fierce, fierce opponents, our codefendant in this case.

11         Here is the answer.  The assets, as we talked about,

12   are in Luxembourg.  Even if New York law applies, which means

13   that the UCC applies, article 8 of the UCC says very clearly in

14   the choice-of-law provision that the law of the location of the

15   securities intermediary applies, which is Luxembourg law.

16         So even if Mr. Bonner is right that New York law

17   applies, it still takes you to article 8 that says, under New

18   York law, Luxembourg law applies.  And we set this out in our

19   brief.

20         Under Luxembourg law, as set forth in the expert

21   opinion or in the memorandum, which is Exhibit L to my

22   declaration, there is no concept of beneficial ownership under

23   Luxembourg law.  Under Luxembourg law -- and, quite frankly,

24   your Honor, Mr. Bonner had his own expert.  If you read that

25   expert report very carefully, she agrees that there is no

1     technical legal concept of beneficial or equitable ownership

2     under Luxembourg law.  Under Luxembourg law, the only entity

3     that has a right to the assets sitting in that blocked account,

4     13675, is Ubae, not Bank Markazi.  Therefore, under 8772, which

5     instructs this Court:  Shall determine whether Iran holds

6     equitable title to or the beneficial interest in the assets.

7     The answer is no under Luxembourg law.

8            Let me take it one step further, your Honor.  Even if

9     you ignore the UCC's choice of law.  It says, under article 8

10    of the UCC -- what the whole purpose of article 8 of the UCC is

11    to set up this whole system of intermediaries, And article 8,

12    the entire point of it is that you only have a right to make a

13    claim against the intermediary on top of you.  That means only

14    Ubae has a right to assert against Clearstream.  Markazi has a

15    right against Ubae that it could pursue wherever and whenever

16    it wants, and Ubae has a right against Clearstream.  You can't

17    skip and sue a securities intermediary two steps ahead of you.

18    We set out chapter and verse.  I could read it to you.  It's

19    chapter and verse in our brief.

20           THE COURT:  Let me ask you this.  Why is the Court not

21    able to take into account the contractual relationship between

22    Markazi and Ubae?

23           MR. KAMINETZKY:  I think that there is a contractual

24    relationship between Markazi and Ubae that kind of proves the

25    point because what you have to determine is whether the

1   money -- again, we are talking about -- it's not really

2   money -- the property in account 13675, who is the beneficial

3   owner of that.  The answer is Ubae.

4        That Ubae might have a separate contract that Markazi

5   could enforce against Ubae and say, listen, if you get that

6   money, you have to turn it over to us, that's fine.

7        But, again, the fact that they had to enter into a

8   separate contract proves that the only account holder of 13675,

9   the only one with rights, ownership of account 13675 can be

10  Ubae, which was with whom we were in privity with.

11       THE COURT:  Again, why can the Court not take into

12  account that relationship?

13       MR. KAMINETZKY:  Because that doesn't answer -- I am

14  not sure what you mean by take into account because that

15  relationship can't define, first of all, who is the owner of

16  the Clearstream account or the blocked account.  Because the

17  only owner could be determined by -- whether it's Luxembourg

18  law, or the UCC, is Ubae, the account holder.

19       Your Honor, for example, let me just make a very kind

20  of simple example.  I have an account in Bank of America.  It

21  has a thousand dollars in it.  It's in my name.  But I owe

22  Mr. Bonner a thousand dollars and I say, Mr. Bonner, you know,

23  that money in the account, that's really yours.  Mr. Bonner, if

24  he shows up to Bank of America and says, Kaminetzky said it's

25  my money, they would laugh him out of the bank, right?

1          THE COURT:  I'll betcha Markazi and Ubae have more

2     than an oral, the money is yours.

3          MR. KAMINETZKY:  Sure.  Let's say they have a written

4     contract.  But if the account is in my name, let's say I have a

5     written contract with Mr. Bonner, they are still not going to

6     turn the money over to Mr. Bonner because the account is in my

7     name.  I only have to deal with my account holder and that's

8     the whole article 8 of the UCC.

9          THE COURT:  I've got it.

10          Mr. Bonner, what do you say to that?

11          MR. BONNER:  I'm glad Mr. Kaminetzky is using examples

12     where he owes me a thousand dollars.

13          Your Honor, this gets back to a point that we

14     discussed at the very beginning of our discussion this morning.

15     The Second Circuit has said that if we are going to determine

16     who the beneficial owner of the asset is, we go to the state or

17     the international law to determine what the rights and the

18     responsibilities are.  That's the *Asia Pulp* case.

19          So the rights and responsibilities here, as your Honor

20     has suggested, you have to take into account what the

21     practicalities are of that situation.  And here every single

22     economic right and benefit is owned by Bank Markazi at the end

23     of the day.  Under federal law, it's the beneficial owner of

24     those assets.

25          Mr. Kaminetzky is trying to confuse things here with

1  talking about whether the concept of beneficial owner exists

2  under Luxembourg law.  That's totally irrelevant under *Asia*

3  *Pulp*.  The standard is the federal standard.  Who is the

4  beneficial owner of these assets?  When we take into

5  consideration the various rights and responsibilities, there is

6  only one answer to that question, your Honor.  It's Markazi at

7  the end of the day.  They are the only ones who have that

8  right.

9          THE COURT:  Counsel, I know that because we see that

10  Markazi is the owner of the bond.  How do I know that?

11          MR. BONNER:  Yes, they are the owner of the bonds,

12  your Honor, and they are the ones that have the right.  If this

13  litigation and all of the sanctions that are imposed upon Iran

14  were to go away tomorrow, who would end up with this money?

15  That's the question here, really, at a practical level.  At the

16  end of the day, who is going to end up with this money?  It's

17  not Banca Ubae.  Ubae is not getting $1.68 billion put to the

18  bottom line on its financial statements.  Bank Markazi is.

19          As a result of that, they are what the statute says,

20  the beneficial owner of these proceeds, the right to payment,

21  whatever you want to term it, that's the bottom-line here and

22  that's the only way that the Second Circuit has told us that we

23  have to look at this.

24          THE COURT:  One more quick question, please, for Mr.

25  Kaminetzky.

1          You aren't relying in any way on the separate-entity

2     rule here, are you, sir?

3          MR. KAMINETZKY:  No, your Honor.

4          THE COURT:  I knew that would be a short answer, but I

5     wanted to be sure.  Thank you.

6          Mr. Kry, may I ask you about your argument that

7     Congress has, I think you said, robbed Markazi of a neutral

8     decision maker by amending Section 8772.  You argue in your

9     brief that the statute singles out this case by name and docket

10    number and the assets that are at issue here and eliminates

11    some of Markazi's defenses.  But the Supreme Court considered

12    all those arguments and found there was nothing wrong, right?

13         Why is that not the end of the discussion?

14         MR. KRY:  Your Honor, I think there are two important

15    differences between this case and the one the Supreme Court

16    considered.  The first one is that the legal claim was very

17    different.  The prior Supreme Court case was a

18    separation-of-powers challenge.  The due process rights with a

19    neutral decision maker simply wasn't at issue or argued at all

20    in that case.

21         The second point is that the relevant facts or at

22    least the focus of the facts is also quite different.  In a

23    separation-of-powers context, the Supreme Court was only

24    examining what Congress did and the fact that Congress singled

25    out one particular case.

1            Here, in the due process context, it's similar to the

2   *Caperton* case where what the Court is examining is that one

3   party to litigation is manipulating the judicial process to get

4   a desired result, and so the focus is very much on plaintiffs

5   and their role in drafting this legislation, aggressively

6   lobbying Congress to enact it, and procuring the results that

7   as a litigant to the case.  That's also a very different

8   factual focus.

9            THE COURT:  Two issues.

10           Number one, you say manipulating the judicial process.

11  They are not manipulating the judicial process.  They are

12  worked with the legislative process.  And the question is, so

13  what?  People do that every day of the week.  That's why all

14  those lobbyists in Washington are paid all that money.

15           What's wrong with that?  Where has the Supreme Court

16  ever said, just because you lobby for a statute it's unfair?

17           MR. KRY:  What's quite unusual about this case is it's

18  not a situation where a party is lobbying because it wants a

19  general change in the law.  It is a party to a specific pending

20  case that convinced and pressured Congress to enact a statute

21  that does nothing more than tell this Court how to rule on that

22  one specific case.  So this is not ordinary-course lobbying.

23  It's quite different from that, your Honor.

24           THE COURT:  How do we draw the line?

25           MR. KRY:  I think it is the confluence of the facts

1    that, on the one hand, this wasn't something Congress enacted

2    on its own initiative.  One of the parties to the --

3            THE COURT:  Who cares?

4            MR. KRY:  Under *Caperton*, your Honor, the due process

5    claim arises because one of the parties to the lawsuit is going

6    about and taking extraordinary steps to change the result in

7    the case.  So that's not an extraneous fact.  That's an

8    important ingredient to the due-process claim.  Also, it's not

9    like lobbying for some general change in the law that's going

10   to --

11           THE COURT:  What about the very weighty interest of

12   the United States in seeing that Iran pays for the injuries

13   that its terrorism has caused?  How do we weigh that?  It's not

14   a private interest at stake here.

15           MR. KRY:  Your Honor, I don't think it figures into

16   the due-process claim because Congress can enact statutes of

17   general application.  Those are not bound up with this

18   due-process claim.

19           What makes this claim problematic from a due-process

20   perspective is, you have one of the litigants to the case

21   writing the law, aggressively lobbying Congress to enact it,

22   and the law does nothing more than tell the Court how to

23   resolve this one case.  This is not normal lobbying and it's

24   not normal legislation.

25           THE COURT:  You are telling me that the law tells the

1    Court how to decide the case and, indeed, you've argued

2    findings that the Court is required to make are really nothing

3    of the sort, they are just make ways, whether Markazi has a

4    beneficial interest and nobody else does.  Yet, here you are

5    scrapping about whether or not Markazi had a beneficial

6    interest.  That's not a foregone conclusion, or at least you

7    people don't think it is.

8         MR. KRY:  Clearstream had a different view, but we

9    believe it's a foregone conclusion.  We have been telling the

10   New York courts for I don't know how many years.  We have been

11   telling the Luxembourg courts for many, many years now that

12   Bank Markazi is the beneficial interest holder of these assets,

13   and Congress and plaintiffs were well aware that that has been

14   Bank Markazi's position all along.  And so to say that that's

15   not a foregone conclusion, I just think, disregards that

16   reality, your Honor.

17        THE COURT:  The reality I have to deal with is that

18   you people are fighting about it.

19        Mr. Bonner, do you want to add anything to this?

20        MR. BONNER:  I think, your Honor, as you suggested,

21   the Court in Bank Markazi decided this issue.  It's the very

22   same premise that Bank Markazi is now advancing that it was

23   advancing in the last case.  That's that this has been decided.

24        As your Honor just suggested, there are open issues

25   here.  There are certain elements of the claim that we have to

1    prove.  As a result, the previous Bank Markazi litigation from

2    the Supreme Court disposes of this argument.

3         I think also, just to follow up on some comments that

4    were made by your Honor, there is absolutely nothing wrong or

5    unusual about lobbying at all.  In fact, the Supreme Court in

6    the case that we cited, the *Eastern Railroad Conference* case,

7    made this very point, that parties often go to Congress and try

8    to lobby in favor of legislation that hurts them and harms

9    their opponents, and the Court said, there is absolutely

10   nothing wrong with that.  In fact, it's well within people's

11   First Amendment right to go to Congress and to lobby about

12   those types of issues.

13        To me, this case has nothing to do even remotely

14   similar to the *Caperton* case that Bank Markazi cites.  There

15   was $3 million, I believe, paid to a judge right before a

16   decision was made.  Here we have a mutual arbiter, your Honor,

17   to make the decisions about whether we satisfy the various

18   elements of the statute.  So this argument is certainly not

19   something that should trouble the Court at all.

20        THE COURT:  Mr. Kry, can I just ask you again, is

21   there anything else you want to say about the idea that Markazi

22   is the beneficial owner?  You heard what Mr. Kaminetzky said.

23   Do you have anything else to say on that?

24        MR. KRY:  Only that we disagree with him, your Honor,

25   that under Luxembourg law, under United States law, Bank

1    Markazi has been telling the courts here and there for many

2    years now that Bank Markazi is the ultimate beneficial interest

3    holder in these assets, so we just respectfully disagree with

4    Clearstream on that position.

5         THE COURT:  Do you agree with Mr. Bonner that the

6    reason we know that is that Markazi is the owner of the bonds?

7         MR. KRY:  Well, not quite, your Honor, because I

8    believe Ubae is maybe the legal titleholder of the bonds.

9         THE COURT:  That's my question.  You heard what Mr.

10   Kaminetzky said about Ubae being the account holder.  How do

11   you get around that to say that Markazi is the beneficial

12   owner?

13        MR. KRY:  That's the distinction between beneficial

14   ownership and legal ownership.  The concept is that we are the

15   economic beneficiary of the relationship amongst Clearstream,

16   Ubae, and Bank Markazi here, but we are a beneficial interest

17   holder because the result of that structure is that we have the

18   beneficial economic interest in the ownership.

19        THE COURT:  Again, tell me precisely how I know that

20   for purposes of our motions.

21        MR. KRY:  I think the clearest point of reference for

22   that is simply what the Court held the last time around.  This

23   same issue was litigated all the way up in the Peterson 1 case,

24   and the result of the determination there was that this

25   statutory element was satisfied, and there is simply, in our

1    view, not a basis for a different result here, whether you look

2    at it under Luxembourg law or under New York law and the UCC.

3    The economic benefits of this ownership are ultimately vested

4    in Bank Markazi, even though Ubae may be the legal titleholder

5    of the bond, and I'm sure Bank Markazi's Luxembourg counsel can

6    give a much longer explanation about why that's also correct

7    under Luxembourg law, but I will just say now that that

8    argument has been made consistently there.

9            THE COURT:  Let me ask you this.  If Ubae is the owner

10   of the bonds, how can Clearstream say it could do whatever it

11   wanted to with the proceeds from the JPM account?   Remember

12   counsel kept saying, Clearstream took its money.  How can that

13   be if Ubae is the owner of the bonds?

14           MR. KRY:  In terms of the bonds that are held in

15   Luxembourg, Ubae is the legal owner of those and we are the

16   beneficial interest holder in those.  To the extent the

17   relationships among the parties impose obligations of control

18   or agency that may restrict the parties' rights to do things

19   amongst themselves, that's a separate question.

20           But I think for beneficial interest, which is the only

21   standard Section 8772 imposes, our view is that that statutory

22   standard is clearly met.  It was designed to be met.

23   Plaintiffs wrote the statute so it would be met because there

24   is simply no genuine dispute that at the end of the day the

25   economic benefits of these bonds, by design, flow to Bank

1   Markazi.  That's what the courts held all the way up to the

2   Supreme Court in the Peterson 1 litigation, and there is just

3   no reason to reach a different result here.  We have

4   consistently taken the position here and in Luxembourg that

5   Bank Markazi is the beneficial interest owner in these assets.

6          THE COURT:  Mr. Kaminetzky, I suspect you disagree, is

7   that right?

8          MR. KAMINETZKY:  Indeed, I do disagree.

9          First of all, Peterson 1 and Peterson 2, which we are

10  Peterson 2., Peterson 1, as your Honor knows, there is an

11  extraordinarily important difference.  There, the Court found

12  that there was a pot of money sitting in New York in a city

13  account.  Here, the Court has held exactly the opposite, it's

14  sitting in Luxembourg.  Again, it just goes back -- it goes

15  back to the difference between when people talk loosely and a

16  legal finding.

17         Back to my example of owing Mr. Bonner money,

18  Mr. Bonner might say, that thousand dollars in Kaminetzky's

19  account, I own it, I'm the beneficial owner of it because he

20  owes me a thousand bucks.  That's fine to talk about it in that

21  way, but you have to determine -- under 8772, your Honor has to

22  make a legal finding who is the beneficial owner of the

23  entitlements in 13675.  The answer there is only Ubae.  That

24  Ubae might then, in turn, owe some obligation or deobligation

25  to Bank Markazi is just simply not relevant to the legal

1    question of who is the beneficial owner of 13675.

2            THE COURT:  But you just heard Mr. Kry say to me that

3    I have to take into account the totality of the circumstances

4    and all of the relationships, including the relationship

5    between Ubae and Markazi.  Why is he wrong?

6            MR. KAMINETZKY:  Because he just made that up.

7    Because at the end of the day -- again, imagine if you had come

8    to Bank of America or Mr. Bonner would come to Bank of America

9    and say, Bank of America, I know this account says Kaminetzky

10   on it.  But Bank of America, you should take into account the

11   totality of the circumstances, that Kaminetzky owes me a

12   thousand dollars and, please, I'm the beneficial owner, so I

13   have some rights.

14           My point is, Mr. Bonner -- the day I owed a thousand

15   dollars to Mr. Bonner didn't change anything about the nature

16   of the property sitting in my account.  The day before I owed

17   him a thousand dollars, it was mine.  The day after, it's mine.

18   That Mr. Bonner now has -- that I now have a separate

19   obligation that corresponds to this money just simply doesn't

20   change the property nature of the accounts in Bank of America.

21           THE COURT:  I get your point on the proceeds of the

22   blocked account.  That's easy.  How can we ignore the reality

23   that Markazi is the owner of the bonds?

24           MR. KAMINETZKY:  There are no bonds, your Honor.

25           THE COURT:  The owner of the proceeds.

1          MR. KAMINETZKY:  Again, the proceeds are only as a

2     result.  Many, many years ago there were bonds.  Those bonds,

3     they spin off interest payments and matured.  That turned into

4     money that went into the JP Morgan account.  And then that

5     money was used for whatever purpose Clearstream used it, and

6     then there were book entries in Luxembourg.  There are no

7     bonds.  The bonds were gone 13 years ago.

8          THE COURT:  I don't think anyone disputes that Markazi

9     was the owner of the bonds and, thus, ultimately entitled to

10    receive the proceeds.  The allegation is, in the conspiracy

11    theory, that Markazi and Ubae decided that they would add an

12    extra level so that Clearstream could hide to whom the proceeds

13    were going.  How can that be ignored in determining who is the

14    beneficial owner?

15         MR. KAMINETZKY:  Because stakeholder of the bond is a

16    bit loose.

17         What we have here is securities entitlements.  No one

18    really owns bonds anymore.  There is like a global note held

19    somewhere.

20         What the story of this case is is that Markazi had an

21    account with Clearstream that held various securities

22    entitlements.  Clearstream then decided, on its own, pursuant

23    to, you wanted to make the U.S. happy, and decided to kick

24    Markazi out of the bank and said take your stuff, we don't want

25    you as a company anymore.

1          So Markazi, according to the story, what they did is,

2     Ubae agreed to what they call nest the assets, take them under

3     their name.  And they then withhold them for Markazi, as you

4     say, like to shield.  On our books and records it was a Ubae

5     account.  The bonds -- as you would call it, the bonds, the

6     securities entitlements were transferred from Markazi's account

7     to Ubae's account.  At that point they were no longer -- as to

8     Clearstream, they were no longer Markazi's bonds, if you will.

9     They were Ubae, the holder of the account.  We had an account.

10    Then later on we understood, we were told, we got wind of what

11    happened, that although the account says Ubae, it's really Bank

12    Markazi.  We then blocked the account.

13         Again, the point here is that it transferred.  There

14    was a transfer of assets from Markazi to Ubae.  They had a side

15    deal going on.  But in terms of us, in terms of Clearstream,

16    including the account holder, again, Mr. Bonner holds an

17    account in Bank of America and then he transfers the money to

18    me and now it's the Kaminetzky account, right?  Vis-a-vis Bank

19    of America, it's now my money.  Mr. Bonner no longer has any --

20         THE COURT:  Isn't it different here because, as you

21    put it, the story of the case informs us that at the end of the

22    day it's Markazi who is going to get the dough if and when

23    released?

24         MR. KAMINETZKY:  That's pursuant to an agreement.

25    That has nothing to do with who is the -- your Honor, the

1    word --

2          THE COURT:  Clearstream must have had some inkling of

3    that when it up and blocked the account.  If it thought that,

4    oh, my goodness, I guess they sold these security entitlements

5    to Ubae, nothing would have happened.  But even Clearstream was

6    recognizing what Mr. Bonner says is the reality of the

7    situation.

8          MR. KAMINETZKY:  What we recognize, your Honor, it's

9    two completely separate things.  We recognize -- we blocked the

10   account because we recognize that something shady went on and

11   that this is still Markazi's money.  We don't want to do

12   something that benefits Markazi because we don't want to

13   provide a service, which is like what the sanctions say to

14   Markazi is a completely different question than whose property

15   it belongs to from whose property it is.  It's two different

16   questions.

17         We understood that Markazi was behind this or that

18   Ubae schemed with Markazi.  We blocked the asset.  Not because

19   it changed who is the owner of the property.  It's still a Ubae

20   account.  It's just that we don't appreciate when people do

21   things like nest assets because, again, sanctions law has

22   nothing to do with property law.  If you provide a service to

23   Iran, if you do help Iran, you are in violation of sanctions.

24   That's a completely different question than your Honor has to

25   answer of whose property is sitting in 13675.

1          THE COURT:  Thank you.

2          Mr. Bonner, what do you say?

3          MR. BONNER:  I think the best answer to this issue is

4    something that Mr. Kaminetzky just said.  He said something

5    shady went on and this is still Markazi's money.  That's a

6    quote.  I wrote that one down.  That's exactly what happened

7    here.  The beneficial owner is Bank Markazi.

8          I think what Mr. Kry was talking about earlier is the

9    difference between title ownership and beneficial ownership.

10   Mr. Kaminetzky wants to talk to us about title, title, title,

11   title, title.  That doesn't matter here.  What matters is what

12   the statute says, and the statute says beneficial ownership is

13   what matters.  It's quite clear that these assets belong to

14   Bank Markazi, so that answers the question, your Honor.

15         THE COURT:  I will apologize if I've asked you this

16   five times already.  How do I know that?

17         MR. BONNER:  You know that because all of the rights

18   to these assets belong to Bank Markazi.  And then the second

19   step of the analysis, we go back to the federal law and we say,

20   look at all these rights.  And what Mr. Kaminetzky just

21   admitted, it's Markazi's money, so those are the rights.

22   Markazi has all the rights to the money to collect the bond

23   proceeds, to use them as they want.  Then the federal statute,

24   8772, says, under federal law, does that constitute beneficial

25   ownership.

1          THE COURT:  How do I know that?  How do I know that

2    Markazi has the rights to the proceeds, etc., etc.?

3          MR. BONNER:  There is a contract between Bank Markazi

4    and Ubae.  Ubae agreed to adhere to all of the requirements of

5    the initial Bank Markazi/Clearstream account agreement.  And so

6    these assets are being held in an account right now in the name

7    of Ubae, and Ubae has an obligation to pay everything over to

8    Bank Markazi.  So that's how we know that, your Honor.

9          THE COURT:  Thank you.

10          Mr. Colella, can it be your turn now.

11          MR. COLELLA:  Sure, your Honor.

12          THE COURT:  You've argued about the various time

13    periods here, about when Ubae took certain actions, when the

14    plaintiffs obtained their judgments and registered their

15    judgments and everything.

16          What do you make of the plaintiffs' arguments that

17    CPLR 276 is applicable to the judgment holder claims and

18    provides that "every conveyance made" with intent to "hinder,

19    delay, or defraud either present or future creditors is

20    fraudulent as to both present and future creditors."

21          Why are not plaintiffs those future creditors?

22          MR. COLELLA:  Your Honor, they could be future

23    creditors.  But the issue here is not whether they stated a

24    claim under 276(a).  The issue here is personal jurisdiction,

25    and that's the big difference.

1              When you are looking at this from the concept of

2      personal jurisdiction, as we pointed out, there has to be harm

3      in the forum at the time Ubae took action.  And there are two

4      sets of actions here that the plaintiffs have identified.

5              The first set was from January to March of '08, when

6      the bonds were transferred from Markazi's account into Ubae's

7      customer account on which we were holding them for Bank

8      Markazi.  At that time there could never have been harm in New

9      York, there could never have been purposely directed activity

10     in New York because there were no judgments in New York.

11             THE COURT:  Where is it written that there is some

12     requirement of contemporaneousness?  And doesn't 276

13     specifically address that by talking about future creditors?

14             MR. COLELLA:  276 is not the long arm statute and it's

15     not a personal jurisdiction statute.  And we are relying on the

16     Supreme Court's decision in *Bristol*, which required injury in

17     the forum.

18             THE COURT:  I have seen cases requiring that for

19     specific jurisdiction.  And what do you say about the agency

20     argument made by the Peterson plaintiffs?

21             MR. COLELLA:  Your Honor, I want to return to that

22     because you mentioned it.  The agency argument is -- it

23     addresses really the second set of conduct, which is what you

24     all spent a lot of time talking about.  Those are the transfers

25     from July '08 to October 2012, which involved the sundry

57

account.  There has been a lot said about the sundry account,
and I think you said it, and we would agree with you.

         The sundry account was not opened by Ubae.  The sundry
account is a different account number, as Mr. Kaminetzky has
pointed out.  It's 13675.  Ubae's account is 13061, the
customer account.  That money is not in the customer account.
I think it's undisputed that Clearstream opened that account
solely on its own.  How in the world is that an agency
situation?

         And I will say, one of the things we haven't talked
about is the Second Circuit's holding twice that confirms the
point.  And the Second Circuit said that -- I'm just reading
it.  Neither Markazi nor Ubae possesses any assets subject to
turnover because the asset at issue is in fact held by
Clearstream and represented as a positive account balance in
the sundry blocked account to which neither Markazi nor Ubae
has access.  If we don't have access to the account, how can we
possibly have control over Clearstream with respect to that
account.

         That's why the plaintiffs, neither Havlish nor
Peterson 2, argue that we did anything directly in the United
States.  Their entire theory, I think as you are pointing out,
is agency or conspiracy.

         THE COURT:  Absolutely.  But the point is that in
establishing the banking relationship and executing the various

1   agreements with Clearstream, you authorized Clearstream to do

2   what they had to do in order to collect these proceeds.  And

3   I'll bet -- I haven't yet gone back to look, but I'll bet that

4   they get to do whatever they are supposed to do, according to

5   law.  And you heard Mr. Kaminetzky argue that the reason they

6   set up the blocked account was because the law required them to

7   do that.  They don't need you to tell them they can do that,

8   right?

9          MR. COLELLA:  That's correct.  And that's actually our

10  point.  The terms and conditions refer to account No. 13061.

11  There are no terms and conditions with respect to 13675.

12  That's exactly our point.  Clearstream took action unilaterally

13  and on it's own and has controlled the accounts to this day.

14          THE COURT:  As required by law.

15          MR. COLELLA:  That doesn't connect -- I'm sorry, your

16  Honor.  Go ahead.

17          THE COURT:  They don't need your permission to do what

18  they are required to do by law.  But the way the entitlements

19  got there in the first place was through the terms and

20  conditions and, therefore, they are your agent and everything

21  they did in New York you did in New York.

22          MR. COLELLA:  But agency requires control.  And even

23  if you accept Mr. Bonner's argument, a little bit of control,

24  we had none.  The Second Circuit said it twice and it's never

25  been challenged.  So that's where their argument fails, in our

1   opinion, on agency and on conspiracy.  We need some control.

2   We never had it.

3         THE COURT:  On conspiracy, though, the allegations in

4   the complaint are that you made these agreements with

5   Clearstream and Markazi in order, essentially, to defraud the

6   plaintiffs.  Why isn't that sufficient?

7         MR. COLELLA:  Because control is an element, and we

8   pointed this out in one of the cases that we cited.  But we

9   also disputed factually whether we knew about the judgments.

10  That's an essential element.  If we didn't know anything about

11  the judgments, then there couldn't have been a conspiracy to

12  hide assets from the plaintiffs.

13        Again, this conspiracy supposedly happened in January

14  to March of 2008, so there were no judgments in New York.  So

15  how can that activity had been directed at New York?  The

16  Peterson plaintiffs had a judgment in D.C. in September 2007.

17  If there was a conspiracy in March 2008, one could argue that

18  it was directed at D.C., which is where they had the judgment.

19  The due-process clause doesn't require clairvoyance.

20        THE COURT:  Also, the whole idea of the effort to hide

21  the payments doesn't really necessitate there being a judgment,

22  does it?

23        MR. COLELLA:  The time period you are talking about,

24  your Honor, the payments were from July of '08 to October of

25  2012.  There was no hiding.  They were under lockdown pursuant

1    to court order.

2            Ubae did nothing at all, period, from June 2008

3    forward, and so that's our principal argument.  Again, there

4    was nothing hidden because they were -- there was a court order

5    locking them down in the U.S.

6            THE COURT:  I thought that the plaintiffs' argument is

7    that your agent, Clearstream, did, took actions?

8            MR. COLELLA:  Well, they took actions to lock the

9    account without our knowledge or consent until after it

10   happened.  That's the bottom line.

11           THE COURT:  I am going to ask Mr. Bonner in a minute

12   what he thinks, but I wanted to ask you one more thing on the

13   harm in the forum.

14           What do you make to plaintiffs' allegations that New

15   York plaintiffs were injured in their complaint?  Why is that

16   not sufficient?

17           MR. COLELLA:  This isn't a personal injury action.

18   Unlike *Bristol*, where it's easy to say, well, you took a drug

19   and you got hurt somewhere, that's not the case here.  This is

20   a judgment collection action and that's why it's unique, your

21   Honor.  It's a unique issue.

22           Because the injury -- again, to repeat, the injury can

23   only occur when you have standing as a judgment creditor, and

24   they didn't have that in New York until March 24, 2008, at the

25   earliest.

1          I'll also say, there is no evidence in the record

2    about -- there is a lot of groups of plaintiffs about who

3    actually was a resident of New York.  But, again, that doesn't

4    matter.  It wouldn't matter because they weren't judgment

5    holders at the time.

6          THE COURT:  Mr. Bonner, what do you say?

7          MR. BONNER:  I think, first of all, most importantly,

8    your Honor, this idea that Bristol-Myers sets up a requirement

9    that there be an injury that's suffered in the forum is totally

10   incorrect.  There is nothing in the opinion that says that.

11   It's contrary to any number of cases which have held that only

12   one element of your claim has to be tied to the in-forum

13   conduct in order for there to be a basis for minimum contacts

14   jurisdiction.

15         We take, for example, the *Licci* case, which your Honor

16   referred to earlier.  Money passed through the United States,

17   went overseas to Lebanon.  Bombs were then flown over the

18   Lebanese border to Israel.  The plaintiffs were injured in

19   Israel.  But the Court found that there was personal

20   jurisdiction in those circumstances.

21         What the court said in *Bristol-Myers* was that if there

22   is no injury in the forum and there is no in-forum conduct that

23   is taken, then you don't have minimum contacts, you don't have

24   personal jurisdiction.  But this purported requirement under

25   *Bristol-Myers* that there be an injury in the forum, it's just

1  made up out of whole clothe and it's totally consistent with

2  cases like *Licci* that the Second Circuit and other courts

3  continue to cite as a leading personal jurisdiction case.

4           THE COURT:  Let me ask Mr. Mitchell.  I take it you

5  agree with Mr. Bonner on this?

6           MR. MITCHELL:  We do.  And we also agree with your

7  earlier comments, your Honor, that CPLR 276 makes it pretty

8  clear that future creditors have status to claim harm from a

9  fraudulent transfer, even before they have a judgment.  I think

10  we have cited a number of cases from New York courts affirming

11  that principle.

12           THE COURT:  Let me ask you this.  How do we know that

13  there are New York resident plaintiffs, and how many?  Can you

14  give me any more information on that, please.

15           MR. MITCHELL:  I would have to calculate that for you.

16  I know we have more than 10 or 20 who are New York resident

17  plaintiffs since most of the claimants who make up the Havlish

18  and Hoagland plaintiffs were killed in the Twin Towers attacks

19  on 9/11.  So the majority of people will at the time have been

20  New York residents.

21           But I think also it's important to remember, they were

22  pursuing claims in a New York court that was going to result in

23  a New York judgment.  If we look at the law governing the situs

24  of injury, then what we have is, we have a situs of injury in

25  New York because as New York law suggests, that when a debtor

1    takes action or a third party takes action to impede the

2    collection of the New York judgment, then for purposes of

3    personal jurisdiction that is sufficient to confer jurisdiction

4    under 302(a)(3) and it also satisfies the due process concerns.

5          THE COURT:  What do you make of the argument that Ubae

6    took steps to prevent the plaintiffs from enforcing their

7    judgment?  Let me do it a different way.  How did Ubae take

8    steps to prevent the plaintiff from enforcing their judgments

9    in 2008 when they didn't receive the judgment until later?  Is

10   that a 276 answer, or what?

11         MR. MITCHELL:  I think it's a 276 answer from a legal

12   framework.  If we turn back to the factual framework, we could

13   just repeat all of the discussion we have been having about

14   Ubae's participation and conspiracy.

15         The fact that we have alleged very directly that Ubae

16   entered into that conspiracy, with the purpose of helping

17   Markazi conceal these assets from judgment holders in New York

18   and, in our case, those that were coming and who would have

19   judgments, and they did it so that those New York judgment

20   holders would be impeded in their ability to enforce their

21   judgments.

22         THE COURT:  They have them yet.

23         MR. MITCHELL:  They didn't have them yet, but Section

24   276 gives them that claim and it gives them that right to

25   pursue those assets.

1          THE COURT:  What do you say about counsel's argument

2     that the statute doesn't require them to be clairvoyant and to

3     know the judgments would be entered years later?

4          MR. MITCHELL:  First of all, I think we can say that

5     these claims were pending at the time that the transfers were

6     made.  We have laid out in our brief and in the complaint a

7     number of factors that demonstrate the urgency that Markazi had

8     to conceal its ownership of the assets, everything from

9     judgment creditors who are already pursuing Markazi's assets,

10    to OFAC, which was working with Clearstream to cut off

11    Markazi's assets to the U.S. financial and banking system.

12          And it specifically, because of the services that

13    Clearstream was providing to Markazi with respect to these

14    bonds, the fact that the FSIA was in the process of being

15    amended and in fact had been approved by Congress and then

16    signed by the president in the immediate timeframe of these

17    transfers, that that amendment to the FSIA made it more

18    possible and easier and more direct for judgment holders to

19    pursue those assets.

20          The fact that the Havlish plaintiffs had a default

21    entered against Markazi prior to those transfers, and as the

22    legislation was being enacted by Congress and the president,

23    and the fact that the transfers -- what they ended up doing and

24    what Ubae's role was was to, as has been discussed, to step

25    into the chain of ownership between Clearstream and Markazi to

1    create an additional layer so that as these 62 payments

2    Mr. Bonner spoke of worked through the U.S. and New York

3    banking systems, Markazi's ownership of those assets would not

4    be identified.  Instead, they would appear to be related to

5    Ubae.

6              THE COURT:  Who wants to comment on that?

7              MR. COLELLA:  Your Honor, just a couple of points.

8              The Hoagland plaintiffs hadn't filed a lawsuit at the

9    time that these transfers occurred in 2008.  One of the things

10   that we are trying to convey to the Court here is this idea

11   that there is personal jurisdiction in New York because of some

12   hypothetical future event would take due process beyond all

13   recognizability.

14             THE COURT:  In light of 276 and, I think, Mr.

15   Kaminetzky's words, that this was something shady.

16             MR. COLELLA:  Whether it's shady or not, we obviously

17   fundamentally disagree with that.  The Clearstream settlement

18   with OFAC tells the story that they knew everything was going

19   on.  That's a side point.  We would disagree with that.

20             The fact of the matter is, the transfers happened and

21   there could have been no purposely directed activity in New

22   York at the time.  It's only hypothetical.

23             276, again, is not a personal jurisdiction statute,

24   and it is state law and it's certainly subject to federal due

25   process.  That's our point, that you need harm in the forum

1          Just to address Mr. Bonner's point, we are not making

2    it up.  We have quoted *Bristol* all through our briefs.  You can

3    see for yourself that injury is a requirement.  *Bristol*

4    postdates *Licci*, so to the extent *Licci* says anything

5    inconsistent, we would say that it's no longer good law, in

6    light of *Bristol*.

7          THE COURT:  Why do you say *Licci* is no longer good

8    law?

9          MR. COLELLA:  On this issue of injury and forum.

10         THE COURT:  Like I said, I don't believe there is any

11   case that says that.

12         MR. COLELLA:  Because it probably hasn't come up.

13   *Bristol* was decided in '17, so it's fairly recent.

14         THE COURT:  Anybody else want to comment?

15         MR. MITCHELL:  Your Honor, if I could respond to

16   Mr. Colella's assertions concerning the Hoagland plaintiffs.

17         It is true, they had not filed their complaint in

18   2008.  However, when you look, as we have discussed, at Section

19   276, applying to future creditors, and you look at the law that

20   has interpreted that statute, you only need the third party and

21   the debtor only need to be generally available of a class of

22   plaintiffs who could make a claim.  The 9/11 --

23         THE COURT:  Generally aware of a class of plaintiffs?

24         MR. MITCHELL:  Yes.  They don't have to be

25   specifically aware.  They just have to know claims are coming.

1          THE COURT:  The only reason I say that, counsel, I

2     think you misspoke.  I think you said they have to be generally

3     available of claims.

4          MR. MITCHELL:  No.  Excuse me.  I meant to say

5     generally aware.

6          The 9/11 multidistrict litigation in New York had been

7     pending since 2002 or 2003.  It was very, very clear to Markazi

8     in 2008, it was very, very clear to Ubae in 2008, and it was

9     very, very clear to Clearstream in 2008 that there were many,

10    many plaintiffs who would be filing claims against Markazi and

11    Iran for their role in 9/11 and who would be pursuing

12    enforcement of any judgments in New York.

13         So the Hoagland plaintiffs easily fall within that

14    class of plaintiffs who had claims against Iran that would be

15    within the scope of Section 276.

16         THE COURT:  Yes, sir.

17         Anybody else?

18         MR. COLELLA:  Last thing, your Honor.  There is a

19    dispute on whether we knew about the litigation.  We said we

20    didn't know about the litigation.  If that's an issue, that

21    would be subject to jurisdictional discovery.  Again, I'll

22    reiterate, the jurisdictional theory that Mr. Mitchell is

23    promoting is breathtakingly limitless.

24         THE COURT:  For today's purposes, though, is it not

25    sufficient to rely on what he says in the complaint?

1          MR. COLELLA:  Well, in terms of what he says about our

2    knowledge, he just says defendants know.  There is no specific

3    allegation as to Ubae, and that's improper pleading.

4          MR. MITCHELL:  Your Honor, if I might, if you look at

5    paragraph 73 of our complaint, where we lay out in some detail

6    Ubae's knowledge, we are not alleging defendants in general.

7    We specifically speak to Ubae's knowledge, intent, and purpose.

8    And then in other parts of the complaint we also refer to

9    Ubae's participation in the conspiracy, specifically for the

10   purpose of concealing these assets.

11         THE COURT:  Counsel, have we exhausted ourselves?

12         MR. KRY:  Your Honor, if the Court will indulge me,

13   there is an issue of subject matter jurisdiction that hasn't

14   come up at all today, but I do think it is a quite substantial

15   issue.  If you permit a few minutes' argument on that, I think

16   it is something that needs to be covered.

17         THE COURT:  Go ahead.

18         MR. KRY:  The plaintiffs in our case are making two

19   different requests.  One is to seize Bank Markazi's property in

20   Luxembourg, but they also have a demand for an order against

21   Bank Markazi directing Bank Markazi to transfer those assets.

22   And that order and that request implicates an entirely

23   different immunity, which is Bank Markazi's jurisdictional

24   immunity, so they need a separate basis for doing that.

25         Section 1330 doesn't create jurisdiction to do that

because that provision only applies when there is an immunity

exception under Section 1605 to Section 1607.

        And Section 8772 doesn't create that jurisdiction

either because that statute is entirely about property.  When

you read that statute it says that property shall be subject to

execution, attachment, or transfer orders, notwithstanding

sovereign immunity.  It does not say one word about ordering

the sovereign itself to move its property around.

        Finally, ancillary jurisdiction doesn't apply here

either because the Supreme Court has been clear that ancillary

jurisdiction let's you go after the defendants' property.  It

does not let you assert new claims against different

defendants.  And Bank Markazi was not a party to this judgment.

        *Weinstein* is the case that the plaintiffs primarily

rely on here, but it's fundamentally different.  That was about

real estate, that the district court had appointed a receiver

to distribute real estate in New York.  Nobody was trying to

order the sovereign to transfer property or do anything else in

that case, so *Weinstein* simply doesn't reach that far.  You

need separate jurisdiction if you are going to enter an *in

personam* order against a foreign sovereign, and that hasn't

been shown here.

        Your Honor, I would also, just to clarify the record

on this, although Havlish counsel is here, I don't represent

Bank Markazi in the Havlish case.  I understand the Court

1    combined the two hearings just because there was a motion

2    brought by Ubae.  But I didn't want any silence on my part to

3    be held against Bank Markazi, and my client reserves all of its

4    rights in connection with that case.

5               THE COURT:  Thank you.

6               Mr. Bonner, do you want to talk about *Weinstein*?

7               MR. BONNER:  Yes, your Honor.  Just generally about

8    this issue about subject matter jurisdiction over Bank Markazi.

9               Again, the *Rubin* and *Weinstein* both say that a

10   notwithstanding clause that's as broad as the one that we have

11   in this case creates an independent basis for subject matter

12   jurisdiction.  If we look at Weinstein, I know it's very boring

13   to have something read here, but it's really on point, your

14   Honor.

15              It rejected the argument that Bank Melli, which is

16   another instrumentality of Iran named in that case -- it

17   said -- it rejected the argument that TRIA does not provide an

18   independent basis for jurisdiction over an instrumentality of a

19   sovereign state when the instrumentality was not itself a party

20   to the underlying tort action.

21              They don't need to have been a party to the underlying

22   tort action.  There is subject matter jurisdiction over this

23   case.  The arguments that Mr. Kry is making have to do with *in*

24   *personam* jurisdiction, has nothing at all whatsoever to do with

25   subject matter jurisdiction, which the Court obviously has here

1    by virtue of that notwithstanding clause.

2              THE COURT:  Mr. Kry.

3              MR. KRY:  The notwithstanding clause says that the

4    Court can order execution attachments or transfer against the

5    property, notwithstanding sovereign immunity.  It doesn't say

6    one thing about ordering the sovereign entity itself to take

7    some action.  Those are completely different questions and

8    *Weinstein* just didn't address this issue at all because that

9    case was only about operating against the property.  It was in

10   rem jurisdiction over real estate in New York that the Court

11   wanted to appoint --

12             THE COURT:  Got it.

13             MR. KRY:  Fundamentally different issue, your Honor.

14             THE COURT:  I think Mr. Bonner is asking for the

15   transfers.  I don't think it's asking the sovereign to bring

16   its property back but wanting to, for example, order

17   Clearstream to do it.

18             MR. KRY:  That's a separate question.  But I believe

19   in the complaint they had asked for relief against Bank Markazi

20   *in personam*.  My point is *Weinstein* doesn't authorize that.

21             THE COURT:  Anybody else?

22             MR. KAMINETZKY:  Your Honor, if I can make two very

23   brief points that we didn't touch on yet.

24             No. 1 is, there is a third due process requirement for

25   finding specific jurisdiction and that's the exercise of

1    jurisdiction is not reasonable under the circumstance.

2          Your Honor, it's hard to think of a more textbook case

3    of how unreasonable personal jurisdiction or specific personal

4    jurisdiction would be in this case vis-a-vis Clearstream.

5    Literally -- I could go through the factors, but Mr. Bonner

6    talked about this and poo-pooed it before.

7          But we, Clearstream, are a Luxembourgish company.

8    This is a case that has to do with Luxembourgish assets held by

9    a foreign client.  The exercise of jurisdiction here could not

10   be more unreasonable, as we are facing literally catastrophic

11   double liability.  As you heard --

12         THE COURT:  That doesn't have anything to do with it.

13   The point is, you have an office in New York.  You received the

14   62, or whatever the heck it was, number of payments in New

15   York.  There is no reason you would be -- it would not be

16   unreasonable for Clearstream to think it might be hailed into

17   court in New York based on those activities.

18         MR. KAMINETZKY:  Not in this case because what we have

19   here is property in a foreign country held by a foreign

20   intermediary.  What you have here is the normal rules -- under

21   8772, the normal rules don't apply.  Generally, if you have a

22   judgment here and you want to enforce it overseas, you start an

23   enforcement action overseas.

24         What's happened here is that's kind of turned the

25   entire situation on its head.  And what that has led to is

1    because we don't have, like I said, an international

2    interpleader, you have Clearstream sitting in the middle,

3    subject to liability in its home country and liability here.

4          Let me put a very fine point on it.  Right now, this

5    moment, as I sit here before you, Clearstream is under an

6    order, thanks to Bank Markazi, that says you may not comply

7    with an order by Judge Preska to transfer funds into the United

8    States.  We are a Luxembourgish financial institution.  Our

9    court in Luxembourg has said, you may not comply with an order

10   of the New York court.  We are fighting tooth and nail for that

11   and there is a hearing on that, on the underlying action, on

12   April 2, which is an extraordinarily important date.

13         But think about what happens.  If that injunction is

14   maintained in Luxembourg, and your Honor goes the other way and

15   somehow finds, a Luxembourgish institution will be faced with

16   being in contempt of one court or the other, paying twice,

17   which would lead immediately to bankruptcy.

18         This is what happens, your Honor, when politically

19   connected plaintiffs say, we want a specific result in one

20   case.  Your Honor, I'm a big boy.  I understand that's fine.

21   But that is why there is the third prong of the due process, is

22   jurisdiction reasonable under the circumstances.  As your Honor

23   has said in other cases, you have to look at a couple of

24   things.  Judicial efficiency as it applies in the international

25   realm.  That's one of the factors.

1          Here, the normal rule is, you go to Luxembourg to

2     enforce the U.S. judgment.  How do I know that?  I know that

3     because many of the same plaintiffs are now in Luxembourg

4     trying to enforce the judgment.

5          What you have here is one of the more important

6     Luxembourg institutions being threatened with literal ruin and

7     bankruptcy if you would exercise jurisdiction in a case that

8     has nothing to do with property in the United States.  I think

9     the reasonableness prong here is extraordinarily important and

10    you just can't skirt over it.

11         The final point I want to make, your Honor, is that if

12    the Court would somehow conclude, notwithstanding all that we

13    discussed, that summary judgment in favor of the plaintiffs was

14    appropriate, the parties are going to need sufficient time to

15    negotiate and obtain the Court's input on any sort of turnover

16    order.  As you have been hearing, there are many complexities

17    here, including regulatory licenses, the setting up of a

18    qualified settlement fund.

19         THE COURT:  It will take you past April 2, right?

20         MR. KAMINETZKY:  Just to give you an idea, the

21    Peterson 1 case, which in a lot of ways was much simpler, it

22    took four and a half months to negotiate between the parties.

23    I'm sure it will take less time here, but this is not a simple,

24    as you could explain -- we also have the idea, is there

25    anything that we could do to mitigate catastrophe and

1    double-liability risk.

2           If your Honor gets it wrong and grants the summary

3    judgment, this is going to be a very complex situation that's

4    going to need some thought on how to get it done.  I don't

5    think anyone here would dispute that.

6           THE COURT:  I don't think they would.

7           Anybody else want to be heard, or are we exhausted?  I

8    know I am.

9           MR. COLELLA:  Thank you, your Honor.

10          MR. BONNER:  Thank you, your Honor.

11          THE COURT:  Counsel, thank you for your wonderful

12   arguments and your wonderful papers.

13          The Court reserves.  Thank you.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25