UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEBORAH D. PETERSON, et al.,

                Plaintiffs,

-against-

ISLAMIC REPUBLIC OF IRAN; BANK
MARKAZI, a/k/a CENTRAL BANK OF
IRAN; BANCA UBAE SpA;
CLEARSTREAM BANKING, S.A.; and
JP MORGAN CHASE BANK, N.A.,

                Defendants.

13 Civ. 9195 (LAP)

OPINION & ORDER

---

LORETTA A. PRESKA, Senior United States District Judge:

    Plaintiffs, who are victims or family members of victims of
the 1983 bombing of the U.S. Marine Barracks in Beirut, Lebanon,
commenced this action in 2013 against the Islamic Republic of
Iran ("Iran"), Bank Markazi a/k/a Central Bank of Iran ("Bank
Markazi" or "Markazi"), Banca UBAE S.p.A. ("UBAE"), Clearstream
Banking, S.A. ("Clearstream"), and JP Morgan Chase Bank, N.A.
("JPM").  Before initiating the instant lawsuit, Plaintiffs
secured judgments against Iran and the Iranian Ministry of
Information and Security.  They now seek to collect upon those
judgments.

    In their Amended Complaint,[1] Plaintiffs asserted claims for
(1) a declaratory judgment against Bank Markazi; (2) recission
of allegedly fraudulent conveyances; (3) turnover; and (4)

---

[1] Amended Complaint, dated Apr. 25, 2014 [dkt. no. 104].

equitable relief.  On February 20, 2015, the Hon. Katherine B. Forrest granted each Defendant's motion to dismiss Plaintiffs' claims, holding that Plaintiffs had released their claims against Clearstream and UBAE as a result of a prior settlement agreement; that there was nothing left in the Clearstream account at JPM for JPM to "turn over;" and that the Court lacked subject matter jurisdiction over Bank Markazi as to assets located abroad.  See generally Peterson v. Islamic Republic of Iran, No. 13-CV-9195 KBF, 2015 WL 731221 (S.D.N.Y. Feb. 20, 2015).

The Court of Appeals affirmed the Court's dismissal in part and vacated it in part.  See Peterson v. Islamic Republic of Iran, 876 F.3d 63 (2d Cir. 2017).  It affirmed the Court's conclusion that the Clearstream settlement agreement released Plaintiffs' non-turnover claims brought against Clearstream; that the asset for which Plaintiffs seek turnover is a right to payment held by Clearstream in Luxembourg; and that the Court properly dismissed JPM as a result.  However, it found that the Court erred in dismissing claims brought by Plaintiffs who were not parties to the earlier litigation, Peterson I; that Plaintiffs' settlement agreement with UBAE was unclear as to whether it released Plaintiffs' non-turnover claims against UBAE; and that the UBAE settlement agreement did not release Plaintiffs' non-turnover claims brought against Markazi.  The

2

Court of Appeals further held that this Court prematurely
dismissed the Amended Complaint for lack of subject-matter
jurisdiction.

Bank Markazi and Clearstream thereafter petitioned for
certiorari.  After Congress signed into law the National Defense
Authorization Act ("2020 NDAA") for Fiscal Year 2020, which,
among other things, amended 22 U.S.C. section 8772, the Supreme
Court granted certiorari, vacated the Court of Appeals'
decision, and remanded the case to the Court of Appeals.  See
Bank Markazi v. Peterson, 140 S. Ct. 813 (2020) (Mem.);
Clearstream Banking S.A. v. Peterson, 140 S. Ct. 813 (2020)
(Mem.).  On remand, the Court of Appeals largely readopted its
prior opinion and remanded the case specifically for this Court
to address the issues before it pertaining to the 2020 NDAA and
personal jurisdiction.  See generally Peterson v. Islamic
Republic of Iran, 963 F.3d 192 (2d Cir. 2020).

Plaintiffs now move for summary judgment pursuant to 22
U.S.C. section 8772 against Bank Markazi and Clearstream (the
"Turnover Defendants") and for an order directing those
defendants to turn over the financial assets identified in 22
U.S.C. section 8772(b)(2) that are currently represented in the
records of Clearstream as a positive account balance of not less
than $1.68 billion in a "sundry blocked account" number 13675
or, in the alternative, or a preliminary injunction requiring

the Turnover Defendants to "return" these assets to the United

States during the pendency of this action.[2]  Clearstream and Bank

Markazi each oppose Plaintiffs' motion, and also have moved to

dismiss Plaintiffs' claims for lack of personal jurisdiction and

for failure to state a claim principally due to the alleged

unconstitutionality of Section 8772.[3]  Bank Markazi additionally

---

[2] (See Plaintiffs' Notice of Motion for Summary Judgment or, in
the Alternative, for a Preliminary Injunction, dated Aug. 12,
2020 [dkt. no. 225]; see also Plaintiffs' Memorandum of Law in
Support of Motion for Summary Judgment or, in the Alternative, a
Preliminary Injunction ("Pls.' Mot."), dated Aug. 26, 2020 [dkt.
no. 231]; Plaintiffs' Local Rule 56.1 Statement of Material
Facts in Support of Motion for Summary Judgment ("Pls.' 56.1"),
dated August 12, 2020 [dkt. no. 232]; Declaration of Liviu Vogel
("Vogel Declaration"), dated Aug. 26, 2020 [dkt. no. 233];
Plaintiffs' Erratum to Their Local Rule 56.1 Statement of
Material Facts and Response to Bank Markazi's Local Rule 56.1
Statement of Additional Facts ("Pls.' Resp. to Markazi 56.1
Counter"), dated Oct. 2, 2020 [dkt. no. 262]; Plaintiffs'
Consolidated Memorandum of Law on Reply in Further Support of
Motion for Summary Judgment or, in the Alternative, a
Preliminary Injunction, and in Opposition to Bank Markazi and
Clearstream Banking, S.A. Motions to Dismiss ("Pls.' Opp. &
Reply"), dated Oct. 2, 2020 [dkt. no. 263].)

[3] (See Notice of Clearstream Banking S.A.'s Motion to Dismiss,
dated Sept. 11, 2020 [dkt. no. 251]; Consolidated Memorandum of
Law in Support of Motion to Dismiss and Opposition to
Plaintiffs' Motion for Summary Judgment or, in the Alternative,
a Preliminary Injunction, of Clearstream Banking S.A.
("Clearstream Mot."), dated Sept. 11, 2020 [dkt. no. 252];
Response of Clearstream Bankings S.A. to Plaintiff's Local Rule
56.1 Statement of Undisputed Facts ("Clearstream 56.1 Counter"),
dated Sept. 11. 2020 [dkt no. 256]; Declaration of Benjamin S.
Kaminetzky in Support of Motion to Dismiss and Opposition to
Plaintiffs' Motion for Summary Judgment or, in the Alternative,
A Preliminary Injunction, of Clearstream Banking S.A.
("Kaminetzky Declaration"), dated Sept. 11, 2020 [dkt. no. 253];
Reply Memorandum of Law in Further Support (footnote continued)

moves to dismiss on the basis that the Court lacks subject
matter jurisdiction over it.  UBAE separately moved to dismiss
the Amended Complaint.[4]

For the reasons stated below, Markazi's, Clearstream's, and
UBAE's motions to dismiss are denied, and Plaintiffs' motion for
summary judgment as to the Turnover Defendants is granted.

## I.   Background

### A.   <u>Facts</u>

The Court assumes familiarity with this dispute, the facts
of which have been set out at length in the prior opinions of

---

(footnote continued) of Motion to Dismiss of Clearstream Banking
S.A. ("Clearstream Reply"), dated Oct. 23, 2020 [dkt. no. 283];
<u>see also</u> Bank Markazi's Notice of Motion to Dismiss, dated Sept.
11, 2020 [dkt. no. 238]; <u>see also</u> Bank Markazi's Memorandum of
Law in Support of its Motion to Dismiss and in Opposition to
Plaintiff's Motion for Summary Judgment and a Preliminary
Injunction ("Markazi Mot."), dated Sept. 11, 2020 [dkt. no.
239]; Bank Markazi's Response to Plaintiff's Local Rule 56.1
Statement of Material Facts and Statement of Additional Facts
("Markazi 56.1 Counter"), dated Sept. 11, 2020 [dkt. no. 245];
Bank Markazi's Reply in Support of its Motion to Dismiss
("Markazi Reply"), dated Oct. 23, 2020 [dkt. no. 280].)

[4] (<u>See</u> Banca UBAE's Notice of Motion to Dismiss the Amended
Complaint, dated Sept. 11, 2020 [dkt. no. 247]; Memorandum of
Law in Support of Defendant Banca UBAE S.p.A.'s Motion to
Dismiss the Amended Complaint ("UBAE Mot."), dated Sept. 11,
2020 [dkt. no. 247]; Reply Memorandum of Law in Further Support
of Defendant Banca UBAE S.p.A.'s Motion to Dismiss the Amended
Complaint ("UBAE Reply"), dated Oct. 27, 2020 [dkt. no. 290];
<u>see also</u> (Plaintiffs' Memorandum of Law in Opposition to Banca
UBAE S.p.A.'s Motion to Dismiss ("Pls.' Opp. to UBAE Mot."),
dated Oct. 13, 2020 [dkt. no. 273].)

this Court and the Court of Appeals.  Unless otherwise noted, the facts recounted herein are undisputed.

### 1.   The Parties

Plaintiffs are the representatives of 241 American servicemen killed in the Iran-sponsored 1983 bombing of the Marine Barracks in Beirut, Lebanon, the survivors of that attack, and the family members of the killed and injured servicemen.  (Pls.' 56.1 ¶ 14.)  Plaintiffs were awarded judgments against Iran and the Iranian Ministry of Information and Security totaling in excess of $3.845 billion in compensatory damages pursuant to two FSIA provisions that authorize claims against state sponsors of terrorism, 28 U.S.C. §§ 1605(a)(7) (repealed 2008) and 1605A.  (Pls.' 56.1 ¶ 15.)

Clearstream is a société anonyme (analogous to a public limited liability company) formed under Luxembourg law with its registered office in Luxembourg.   (Pls.' 56.1 ¶¶ 27-28.) Clearstream is one of the world's largest securities depositories and settlement firms, processing 170 million settlement transactions annually.  (Pls.' 56.1 ¶¶ 31-32.) Clearstream dominates the market for the so-called "Eurodollar" bonds--debt instruments issued by foreign sovereigns or other entities that have no seat in the United States but which are denominated in U.S. dollars--that are at issue in this case. (Markazi 56.1 Counter ¶¶ 8-9.)

Clearstream acts as a securities intermediary for its customers in Luxembourg.  (Clearstream 56.1 Counter ¶ 29; Vogel Declaration, Ex. 29 (Papenfuß Decl.) at ¶ 2.)  To effect securities transactions on behalf of its clients where payment is tendered in U.S. dollars, Clearstream maintains two U.S. dollar cash correspondent accounts in New York:  one at JPM[5] and one at Citibank, N.A.  (Pls.' 56.1 ¶ 34.)  Clearstream sends and receives hundreds of bond-related payments each day, typically totaling many billions of dollars.  (Clearstream 56.1 Counter ¶ 36.)  As of 2014, each business day, approximately $7-9 billion flows into the JPMorgan Account, and each business day a roughly equivalent sum flows out.  (Clearstream 56.1 Counter ¶ 37; Vogel Declaration, Ex. 29 (Papenfuß Decl.) at ¶ 5.)  The Citibank account is an omnibus depository account at Citibank, N.A. in New York that holds the assets of thousands of Clearstream's customers.  (Pls.' 56.1 ¶ 38.)[6]

Since 1996, Clearstream and its predecessor Cedel Bank S.A. have maintained a representative office in New York.  (Pls.'

---

[5] Clearstream has maintained its U.S. dollar cash correspondent account at JPMorgan in New York for more than twenty-five years.  (Pls.' 56.1 ¶ 35.)

[6] Clearstream disputes that this omnibus account "holds the assets" of Clearstream's customers.  Clearstream maintains that as a matter of law Clearstream holds the ownership rights of the property held in its omnibus account at Citibank.  (Clearstream 56.1 Counter ¶ 38.)

56.1 ¶ 40.)  Clearstream currently maintains its New York office
at 1155 Avenue of the Americas, 19th Floor, New York, New York.[7]
(Pls.' 56.1 ¶ 41.)  In 2009, Clearstream's New York office had
thirteen employees, each of whom had a separate 212 area code
telephone number and fax number, and an email address with the
domain name "@clearstream.com."  (Pls.' 56.1 ¶ 48.)
Clearstream's New York Representative Office has an operating
expense account locally with Citibank that is used for vendor
payments and local bills.  It also has a payroll account with
Citibank that is controlled by the main office in Luxembourg.
(Clearstream 56.1 Counter ¶ 39; Vogel Declaration, Ex. 33
(Barrett Decl.) at ¶ 6.)  Clearstream is licensed by the New
York Department of Financial Services to "establish, maintain or
use a representative office" in New York, which license "is not
a license to engage in the business of banking in the State of
New York."  (Clearstream 56.1 Counter ¶ 44; Vogel Declaration,
Ex. 33 (Barrett Decl.) at ¶ 2 and Barrett Ex. 2.)

Markazi is Iran's central bank, incorporated under Iranian
law.  (Pls.' 56.1 ¶ 23; Pls.' Resp. to Markazi 56.1 Counter
¶ 1.)  Bank Markazi can exercise the usual powers associated
with corporations, including the ability to own and sell

---

[7] Clearstream previously maintained offices at (a) One World
Trade Center, New York, New York; (b) 55 Broad Street, New York,
New York; and (c) 350 Madison Avenue, New York, New York.
(Pls.' 56.1 ¶ 42.)

property in its own name, establish and maintain bank accounts in its own name, and sue and be sued in its own name.  (Markazi 56.1 Counter ¶ 4.)  Bank Markazi is managed by an Executive Board, a Supervisory Board, and other management organs constituted pursuant to Iranian law.  (Markazi 56.1 Counter ¶ 5.)

Bank Markazi often invests in bonds issued by foreign sovereigns or supranational entities.  (Markazi 56.1 Counter ¶ 6.)  In 1994, Bank Markazi opened an account with Clearstream Banking, N.A., in Luxembourg.  (Markazi 56.1 Counter ¶ 7.) Between December 1994 and early 2008, Markazi maintained a custody account with Clearstream in which it held Eurodollar bonds[8] it had purchased for its own account with Iran's foreign currency reserves.  (Pls.' 56.1 ¶ 55.)  To maintain the value of its reserves, the Bond Section of Markazi has only invested in bonds issued by supranationals and top-rated sovereigns or explicitly guaranteed by such sovereigns.  (Pls.' 56.1 ¶ 56; Clearstream 56.1 Counter ¶ 56.)

In 2007, Clearstream informed Markazi that it was being pressured by the Office of Foreign Assets Control ("OFAC") of

---

[8] According to Clearstream, Clearstream's customers hold securities entitlements, not bonds, in their accounts with Clearstream in Luxembourg.  (Clearstream 56.1 Counter ¶ 55; Kaminetzky Declaration, Exhibit C, Arendt July 2014 Mem. ¶ 8.)

the U.S. Department of the Treasury to not do business of any kind with Markazi.  (Pls.' 56.1 ¶ 57; Vogel Declaration ¶ 67 and Ex. 45 (Massoumi Aff.) at ¶¶ 20-22.)  On January 17, 2008, Markazi contacted UBAE to open an account at Clearstream "for the primary purpose of investing and holding in custody" bonds denominated in several currencies, including U.S. Dollars.  (Pls.' 56.1 ¶ 59; Clearstream 56.1 Counter ¶ 59; Vogel Declaration, Ex. 45 (Massoumi Aff.) at ¶¶ 18, 22-23.)  At the time, "Libyan Foreign Bank, Tripoli" was a 49.93% shareholder of UBAE, according to UBAE's 2007 Annual Report.  (Pls.' 56.1 ¶ 60; Clearstream 56.1 Counter ¶ 60; Vogel Declaration, Ex. 80.)

In January 2008, UBAE opened accounts on its books for Markazi including a USD account and a custody account.  (Pls.' 56.1 ¶ 61; Vogel Declaration, ¶ 68 and Ex. 45 (Massoumi Aff.) at ¶¶ 23-25, Ex. 50.)  That same month, UBAE opened account 13061 at Clearstream, named "UBAE SPA-Customers," ("Account 13061") which was governed by Clearstream's Terms and Conditions.[9]  (Pls.' 56.1 ¶ 62; Clearstream 56.1 Counter ¶ 62.)  In February 2008, Clearstream made entries on its books transferring all of Markazi's USD-denominated securities entitlements as Account

---

[9] UBAE stated on its application that "[w]e hereby expressly accept Articles 4, 9, 11, 13, 14, 16, 17, 18, 21, 35, 36, 37, 38, 40, 48, 51, 52, 55, 56, and 61 of Cedelbank's General Terms and Conditions." (Markazi 56.1 Counter ¶ 63 (citing Vogel Declaration, Ex. 50 at 2, 3).)

13061.  (Clearstream 56.1 Counter ¶ 65.)  The approximately

$1.75 billion that Citibank, N.A. turned over to plaintiffs in

the Peterson I litigation corresponded to securities

entitlements that UBAE maintained in Account 13061.[10]  See

Peterson v. Islamic Republic of Iran, No. 10 CIV. 4518 KBF, 2013

WL 1155576, at *4 (S.D.N.Y. Mar. 13, 2013), aff'd, 758 F.3d 185

(2d Cir. 2014), aff'd sub nom. Bank Markazi v. Peterson, 578

U.S. 212 (2016).  The assets at issue in this case also

correspond to securities entitlements that UBAE maintained in

Account 13061.[11]  (See Vogel Declaration, Ex. 29 (Papenfuß Decl.)

at ¶¶ 12-16.)

---

[10] "[T]he securities entitlements that generated the Peterson I
Assets were sub-custodized in Clearstream's custodial account at
Citibank, N.A. in New York."  (Clearstream 56.1 Counter ¶ 69.)

[11] Prior to the transfer of Markazi's security entitlements to
Account 13061, the day before Clearstream received a payment in
the JPMorgan Account, Clearstream would credit Markazi's account
to the extent that Markazi held an entitlement against
Clearstream relating to that security (as it would credit the
accounts of all of Clearstream's customers in Luxembourg that
hold entitlements against Clearstream relating to that
security).  (Clearstream 56.1 ¶ 71; Kaminetzky Declaration,
Exhibit C, Arendt July 2014 Mem. ¶¶ 33-34; Vogel Declaration,
Ex. 29 (Papenfuß Decl.) at ¶ 6; Kaminetzky Declaration, Exhibit
E, Art. 22.)  After the transfer of Markazi's security
entitlements to Account 13061 but before Account 13061 was
blocked in July 2008, Clearstream would undertake the same steps
with respect to Account 13061 to the extent that account held
such a security entitlement.  (See Kaminetzky Declaration,
Exhibit C, Arendt July 2014 Mem. ¶¶ 33-34; Vogel Declaration,
Ex. 29 (Papenfuß Decl.) at ¶ 6; Kaminetzky Declaration, Exhibit
E, Art. 22.)

###### 2.   The Instant Dispute

On June 11, 2008, in response to a subpoena served by certain Plaintiffs, OFAC disclosed that Clearstream has had an Iranian governmental client that had a beneficial ownership interest in assets custodized in the United States. (Pls.' 56.1 ¶ 17; Clearstream 56.1 Counter ¶ 17.)  On June 16, 2008 and June 23, 2008, certain of the Plaintiffs caused a Restraining Notice and an Amended Restraining Notice, respectively, (the "Restraints") to be served on Clearstream in New York.  (Pls.' 56.1 ¶ 18.)[12]  In June and July 2008, when Clearstream learned of allegations that UBAE held security entitlements in its custodial account for Bank Markazi, Clearstream blocked the UBAE account.  (Clearstream 56.1 Counter ¶ 78; Vogel Declaration, Ex. 29 (Papenfuß Decl.) at ¶¶ 13-14.)  U.S. dollar interest and redemption payments continued to be made to Clearstream in connection with the bonds that corresponded, in part, to the entitlements that UBAE maintained in its custodial account in Luxembourg.  (Clearstream 56.1 Counter ¶ 78; Vogel Declaration, Ex. 29 (Papenfuß Decl.) at ¶¶ 13-14.)  These payments were made to Clearstream's JPMorgan Account.  Because Clearstream had

---

[12] Clearstream does not dispute the facts set forth in the foregoing, except to state that the determination of whether Clearstream was properly served is an issue of law. (Clearstream 56.1 Counter ¶ 18.)

blocked the UBAE account, Clearstream opened a sundry blocked
account in Luxembourg, account number 13675, to which it
credited interest and redemption payments related to these
security entitlements UBAE held against Clearstream.
(Clearstream 56.1 Counter ¶ 78; Amended Complaint ¶ 61;
Kaminetzky Declaration, Exhibit C, Arendt July 2014 Mem. ¶¶ 33-
34; Vogel Declaration, Ex. 29 (Papenfuß Decl.) at ¶ 14.)
Between July 8, 2008 and October 15, 2012, Clearstream credited
62 payments to sundry blocked account 13675, totaling $1.68
billion.  (Clearstream 56.1 Counter ¶ 78; Vogel Declaration,
Exs. 56, 66.)  As of May 31, 2013, Clearstream had credited bond
proceeds totaling $1,683,184,679 to the Blocked Account. (Pls.'
56.1 ¶ 82.)

On February 27, 2012, certain of the Plaintiffs obtained a
writ of execution as to the bond proceeds, which writ was levied
upon by the U.S. Marshal at Clearstream's office at 55 Broad
Street, New York, New York on March 2, 2012.  (Pls.' 56.1 ¶
21.)[13]

Plaintiffs commenced this action on December 30, 2013,
filing their operative Amended Complaint under seal on April 25,

---

[13] Clearstream does not dispute the facts set forth in the
foregoing, except to state that the determination of whether the
writ was properly levied and the effect of such writ is a
question of law.  (Clearstream 56.1 Counter ¶ 21.)

2014.  (See Amended Complaint, dated Apr. 25, 2015, [dkt. no. 104]; Pls.' 56.1 ¶¶ 1-2.).  Plaintiffs alleged that Clearstream was in possession of assets valued at over $1.6 billion, representing proceeds of bonds beneficially owned by Bank Markazi and credited to the sundry blocked account. (See Amended Complaint ¶ 3.)  Plaintiffs claimed that JPMorgan in New York received the bond proceeds into one of its accounts, and these proceeds legally remained on deposit with JPMorgan and are therefore subject to turnover.

### B.   Procedural History

#### 1.   U.S. Proceedings

After Clearstream, Bank Markazi, UBAE, and JPMorgan moved to dismiss the complaint, the Court dismissed this action in its entirety.  The Court held that Plaintiffs had released the instant claims against Clearstream and UBAE, that there was nothing left in the Clearstream account at JPMorgan for JPMorgan to "turn over," and that this Court lacked subject-matter jurisdiction over Bank Markazi because the asset for which Plaintiffs sought turnover was located abroad.  Peterson v. Islamic Republic of Iran, No. 13-CV-9195 KBF, 2015 WL 731221 (S.D.N.Y. Feb. 20, 2015).

The Court of Appeals affirmed in part and vacated in part this Court's order.  Peterson v. Islamic Republic of Iran, 876 F.3d 63 (2d Cir. 2017).  The Court of Appeals:

14

1. Vacated the part of this Court's order applying the Clearstream settlement agreement to the Plaintiffs who were not also plaintiffs in Peterson I;

2. Affirmed this Court's order granting Clearstream's motion to dismiss Plaintiffs' non-turnover claims brought against Clearstream;

3. Vacated this Court's order granting UBAE's motion for partial summary judgment with respect to the Plaintiffs' non-turnover claims brought against UBAE;

4. Vacated this Court's order holding that the UBAE settlement agreement released Plaintiffs' non-turnover claims against Markazi;

5. Affirmed this Court's holding that the assets at issue are represented by a right to payment in the possession of Clearstream located in Luxembourg and thus that JPMorgan's motion for partial summary judgment was properly granted because JPMorgan was not in possession of any assets subject to turnover; and

6. Vacated this Court's holding that it lacked jurisdiction to order turnover because the principal asset at issue—a right to payment recorded and held in Luxembourg—is located outside the United States and, therefore, absolutely immune from execution under the FSIA; and remanded the case for this Court to determine in the first instance whether it has personal jurisdiction over Clearstream, and, if it does, whether a barrier exists to an exercise of in personam jurisdiction to recall to New York State the right to payment held by Clearstream in Luxembourg.

Id.

After the Court of Appeals denied the motions of Clearstream and UBAE for rehearing and rehearing en banc, Defendants filed petitions for certiorari. (Pls.' 56.1 ¶ 4.) Clearstream and Markazi obtained a stay of the Second Circuit's mandate pending determination of their petitions for certiorari. (Pls.' 56.1 ¶ 5.)  On October 1, 2018, the U.S. Supreme Court

invited the Solicitor General of the United States to file a brief expressing the views of the United States on the issues raised in Markazi's and Clearstream's certiorari petitions. (Pls.' 56.1 ¶ 10.)  On December 9, 2019, the Solicitor General filed an amicus brief that ultimately recommended that the petitions for certiorari filed by Clearstream and Bank Markazi be denied.  In that brief, the Solicitor General characterized the Second Circuit's November 2017 decision as "flawed" and stated that the questions presented by the certiorari petitions would warrant review "in an appropriate case at an appropriate time."  However, the Solicitor General observed that there were a number of significant legal questions that remained to be resolved-- including those related to jurisdiction--that, when coupled with the then-pending legislation ultimately enacted as part of the 2020 NDAA, could "bear on the practical significance" of the Second Circuit's holding.  Accordingly, the Solicitor General recommended that the petitions for certiorari be denied "at this time."  (Clearstream 56.1 Counter ¶ 11.)

After Congress passed amendments to 22 U.S.C. section 8772 as part of the National Defense Authorization Act of 2020, Pub. L. No. 116-120 (S.1790), the President signed them into law on. (165 Cong. Rec. H12213, H12288 (2019); Clearstream 56.1 Counter ¶ 11.)  The Solicitor General then filed a supplemental amicus brief opining that Markazi's and Clearstream's certiorari

petitions should be granted, the Second Circuit's judgment vacated, and the case remanded "for further consideration in light of the [2020 NDAA]."  (Pls.' 56.1 ¶ 13; Vogel Declaration, ¶ 24 and Ex. 20 at 2.)  On January 13, 2020, the Supreme Court granted the pending petitions for certiorari, vacated the Court of Appeals' decision, and remanded the matter to the Court of Appeals "for further consideration in light of the [2020 NDAA]." See generally Bank Markazi v. Peterson, 140 S. Ct. 813 (2020) (Mem.); Clearstream Banking S.A. v. Peterson, 140 S. Ct. 813 (2020) (Mem.).

On remand, the Court of Appeals reinstated its earlier opinion, except with respect to its "Jurisdiction for Execution" discussion, for the Court stated:

> We now reinstate only our judgment that the district court prematurely dismissed the amended complaint for lack of subject-matter jurisdiction and remand for the district court to reconsider that question.  We do not, at this time, reinstate our analysis as to whether the common law and Koehler provide the district court with jurisdiction over the extraterritorial asset.  Based on the enactment of the [2020] NDAA, and the language employed by the Supreme Court in vacating and remanding this matter to this Court, however, we respectfully direct the district court, on remand, to address the issues before it pertaining to the [2020] NDAA, personal jurisdiction, and, consistent with this opinion, any other matters necessary to the resolution of the case.

<u>Peterson v. Islamic Republic of Iran</u>, 963 F.3d 192, 196 (2d Cir. 2020).

### 2.  **Luxembourg Proceedings**

On March 12, 2020, Bank Markazi filed a declaratory judgment action in Luxembourg seeking a declaration that Clearstream cannot comply with a U.S. court order in this case pursuant to the 2020 NDAA to turn over any assets held by Clearstream and allegedly owned by Bank Markazi without first obtaining recognition of such an order by a Luxembourg court. On June 9, 2020, Bank Markazi commenced a second declaratory judgment action seeking an order that Clearstream may not comply with an order from a U.S. court--in proceedings besides this one pending before this Court--pursuant to U.S. law to turn over any assets held by Clearstream and allegedly owned by Bank Markazi without first obtaining recognition of such an order by a Luxembourg court.  (Clearstream 56.1 Counter ¶ 8; <u>see</u> Declaration of Phillippe Dupont ("Sept. 2020 Dupont Decl."), dated Sept. 11, 2020 [dkt. no. 254] ¶¶ 17-18.)

A Luxembourg court heard oral arguments with respect to Markazi's declaratory judgment actions on November 26, 2020.  On November 25, 2020, the Luxembourg appellate court entered a decision and order prohibiting Clearstream from transferring the right of payment at issue here to the United States until the Luxembourg District Court renders a decision with respect to

Bank Markazi's March 2020 declaratory judgment action.  (Letter
from Benjamin S. Kaminetzky, dated Nov. 25, 2020 [dkt. no.
294].)  On April 30, 2021, the Luxembourg District Court granted
Bank Markazi's requests and declared that Clearstream is
prohibited from complying with a U.S. court order in this case,
based directly or indirectly on the 2020 NDAA that directs
Clearstream to transfer the right to payment at issue to the
United States, without first obtaining recognition of such court
order in Luxembourg.  (Letter from Benjamin S. Kamientzky, dated
May 3, 2021 [dkt. no. 302].)  Clearstream has appealed that
decision, which remains pending.

## II.  Legal Standards

### A.  <u>Summary Judgment</u>

Summary judgment is required where "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  The movant bears the burden to show the absence
of a dispute as to a material fact.  See <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 323 (1986).  Where the non-moving party
bears the burden of proof at trial, the moving party may
discharge its summary judgment burden in "two ways: (1) by
submitting evidence that negates an essential element of the
non-moving party's claim, or (2) by demonstrating that the non-
moving party's evidence is insufficient to establish an

essential element of the non-moving party's claim." <u>Nick's Garage, Inc. v. Progressive Cas. Ins. Co.</u>, 875 F.3d 107, 114 (2d Cir. 2017).  In assessing the record, the Court "must view the evidence in the light most favorable to the [non-moving] party," <u>Tolan v. Cotton</u>, 572 U.S. 650, 657 (2014) (internal quotation marks omitted), and "resolve all ambiguities and draw all reasonable inferences against the movant," <u>Caronia v. Philip Morris USA, Inc.</u>, 715 F.3d 417, 427 (2d Cir. 2013).  At the same time, "the mere existence of some alleged factual dispute" is not enough to prevent summary judgment--the dispute must be material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  A fact is "material" only if it "might affect the outcome of the suit under the governing law." <u>Id.</u> at 248. Finally, "conclusory statements or mere allegations are not sufficient to defeat a summary judgment motion." <u>Johnson v. Killian</u>, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (alterations omitted).

**B.    <u>12(b)(1)</u>**

A Rule 12(b)(1) motion requires the court to determine if it has subject matter jurisdiction over a plaintiff's claim. Fed. R. Civ. P. 12(b)(1).  A motion to dismiss under Rule 12(b)(1) may be granted only if the plaintiff fails to prove by a preponderance of evidence that subject matter jurisdiction

exists over her complaint.  <u>Makarova v. United States</u>, 201 F.3d
110, 113 (2d Cir. 2000).

C.   <u>12(b)(2)</u>

"A plaintiff bears the burden of demonstrating personal
jurisdiction over a person or entity against whom it seeks to
bring suit."  <u>Troma Entm't, Inc. v. Centennial Pictures Inc.</u>,
729 F.3d 215, 217 (2d Cir. 2013).  "In order to survive a motion
to dismiss for lack of personal jurisdiction, a plaintiff must
make a prima facie showing that jurisdiction exists."  <u>Eades v.
Kennedy, PC Law Offices</u>, 799 F.3d 161, 167-68 (2d Cir. 2015).
"Th[at] prima facie showing must include an averment of facts
that, if credited by the ultimate trier of fact, would suffice
to establish jurisdiction over the defendant."  <u>O'Neill v. Asat
Tr. Reg. (In re Terrorist Attacks on Sept. 11, 2001)</u>, 714 F.3d
659, 673 (2d Cir. 2013) (quotation marks omitted).  "In
evaluating whether the requisite showing has been made," the
Court must "construe the pleadings and any supporting materials
in the light most favorable to the plaintiffs."[14]  The Court will
not, however, "draw argumentative inferences in the plaintiff's

---

[14] <u>Licci ex rel. Licci v. Lebanese Canadian Bank, SAL</u>, 732 F.3d
161, 167 (2d Cir. 2013).  "[C]ourts may rely on . . . materials
outside the pleading[s] when ruling on 12(b)(2) motions."  <u>Mount
Whitney Invs., LLLP v. Goldman Morgenstern & Partners
Consulting, LLC</u>, No. 15 Civ. 4479 (ER), 2017 WL 1102669, at *3
(S.D.N.Y. Mar. 23, 2017).

favor" or "accept as true a legal conclusion couched as a factual allegation." O'Neill, 714 F.3d at 673.

### D.    12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  That "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Palin v. New York Times Co., 940 F.3d 804, 810 (2d Cir. 2019).  Evaluating "whether a complaint states a plausible claim for relief" is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

When considering a motion to dismiss, the Court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences." Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020).  It is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." Id. (ellipsis omitted).  "Accordingly, threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."

Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (cleaned up).

"While legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations."

Iqbal, 556 U.S. at 679.

### III. Discussion

Section 8772, titled "Interests in certain financial assets

as Iran," provides:

> **(a) Interests in blocked assets**
> **(1) In general**
> Subject to paragraph (2), notwithstanding any other provision of law, including any provision of law relating to sovereign immunity, and preempting any inconsistent provision of State law, a financial asset that is--
> **(A)** held by or for a foreign securities intermediary doing business in the United States;
> **(B)** a blocked asset (whether or not subsequently unblocked), or an asset that would be blocked if the asset were located in the United States, that is property described in subsection (b); and
> **(C)** equal in value to a financial asset of Iran, including an asset of the central bank or monetary authority of the Government of Iran or any agency or instrumentality of that Government, that such foreign securities intermediary or a related intermediary holds abroad,
> shall be subject to execution or attachment in aid of execution, or to an order directing that the asset be brought to the State in which the court is located and subsequently to execution or attachment in aid of execution, in order to satisfy any judgment to the extent

of any compensatory damages awarded against
Iran for damages for personal injury or death
caused by an act of torture, extrajudicial
killing, aircraft sabotage, or hostage-
taking, or the provision of material support
or resources for such an act, without regard
to concerns relating to international comity.

**(2) Court determination required**

In order to ensure that Iran is held
accountable for paying the judgments described
in paragraph (1) and in furtherance of the
broader goals of this Act to sanction Iran,
prior to an award turning over any asset
pursuant to execution or attachment in aid of
execution with respect to any judgments
against Iran described in paragraph (1), the
court shall determine whether Iran holds
equitable title to, or the beneficial interest
in, the assets described in subsection (b) and
that no other person possesses a
constitutionally protected interest in the
assets described in subsection (b) under the
Fifth Amendment to the Constitution of the
United States. To the extent the court
determines that a person other than Iran
holds--

**(A)** equitable title to, or a beneficial
interest in, the assets described in
subsection (b) (excluding a custodial interest
of a foreign securities intermediary or a
related intermediary that holds the assets
abroad for the benefit of Iran); or

**(B)** a constitutionally protected interest in
the assets described in subsection (b),
such assets shall be available only for
execution or attachment in aid of execution to
the extent of Iran's equitable title or
beneficial interest therein and to the extent
such execution or attachment does not infringe
upon such constitutionally protected
interest.

**(b) Financial assets described**

The financial assets described in this section
are the financial assets that are--

24

> **(1)** identified in and the subject of
> proceedings in the United States District
> Court for the Southern District of New York in
> Peterson et al. v. Islamic Republic of Iran et
> al., Case No. 10 Civ. 4518 (BSJ) (GWG), that
> were restrained by restraining notices and
> levies secured by the plaintiffs in those
> proceedings, as modified by court order dated
> June 27, 2008, and extended by court orders
> dated June 23, 2009, May 10, 2010, and June
> 11, 2010, so long as such assets remain
> restrained by court order; and
> **(2)** identified in and the subject of
> proceedings in the United States District
> Court for the Southern District of New York in
> Peterson et al. v. Islamic Republic of Iran et
> al., Case No. 13 Civ. 9195 (LAP).

22 U.S.C. § 8772.

The Court first considers Clearstream's and Bank Markazi's challenges to the Court's jurisdiction and to the constitutionality of 22 U.S.C. section 8772 before turning to the Plaintiffs' entitlement to turnover under that statute and UBAE's motion to dismiss.

### A.   Clearstream's Motion to Dismiss

#### 1.   Personal Jurisdiction

Clearstream contends that the Court lacks personal jurisdiction over it because Plaintiffs' request for turnover does not arise from or relate to Clearstream's conduct in New York.  According to Clearstream, the asset that Plaintiffs seek for turnover is a "right to payment" that never existed in New York and has only existed in Luxembourg.  (Clearstream Mot. at

20.)  Plaintiffs counter that Clearstream's New York contacts are sufficient to confer specific jurisdiction and that its Section 8772 turnover claim has a sufficient relationship to this activity.[15]

"Personal jurisdiction over a foreign defendant . . . requires a two-step inquiry."  Shovah v. Roman Catholic Diocese of Albany, N.Y., Inc. (In re Roman Catholic Diocese of Albany, N.Y., Inc.), 745 F.3d 30, 37 (2d Cir. 2014).  First, the Court "appl[ies] the forum state's long-arm statute" to determine whether jurisdiction is legislatively authorized.  Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010).  Second, if jurisdiction lies, the Court turns to "whether the exercise of personal jurisdiction . . . comports with the Due Process Clause."  Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d 221, 224 (2d Cir. 2014) (per curiam).

### i.    Section 8772 Does Not Excuse Plaintiffs from Compliance with New York's Long-Arm Statute

As an initial matter, Plaintiffs contend that they need not demonstrate that the exercise of personal jurisdiction is authorized by New York's long-arm statute.  (Pls.' Mot. at 24-25.)  They claim this is so because (1) Section 8772 broadly

---

[15] Plaintiffs do not argue, and the Court therefore does not consider, whether Clearstream is subject to general jurisdiction.  (Pls.' Mot. at 25 ("For purposes of this motion, the Court need only consider whether it may exercise 'specific' personal jurisdiction over Clearstream.").)

preempts any state law that would impede Plaintiffs' recovery and (2) even absent Section 8772(a)(1)'s preemptive effect, personal jurisdiction here would extend to the Due Process Clause's limits under Federal Rule of Civil Procedure 4(k)(2). (Id.)

These arguments against applying New York's long-arm statute are unavailing.  First, the language in Section 8772 that Plaintiffs point to--"notwithstanding any other provision of law, including any provision of law relating to sovereign immunity, and preempting any inconsistent provision of State law"--precedes a checklist of requirements that render an asset "subject to execution or attachment in aid of execution" or to turnover.  22 U.S.C. § 8772(a)(1).  The statute does not purport to preempt every state statute that, as Plaintiffs put it, "would impede Plaintiffs' recovery."  Moreover, in this Circuit, "[i]n a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules 'if the federal statute does not specifically provide for national service of process.'"  In re Amaranth Nat. Gas Commodities Litig., 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008), aff'd, 730 F.3d 170 (2d Cir. 2013) (quoting PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997)).  Section 8772 lacks any provisions authorizing nationwide service of process.  Because "Congress knows how to authorize nationwide

service of process when it wants to provide for it," Omni Cap. Int'l, Ltd. V. Rudolf Wolff & Co., 484 U.S. 97, 106 (1987), but did not do so here, the Court will not read such a provision into Section 8772 to allow Plaintiffs to sidestep New York's long-arm statute.

Similarly, Rule 4(k)(2) does not relieve Plaintiffs of their obligation to comply with the jurisdictional requirements of state law.  Rule 4(k)(2) is applicable where a

> defendant [is] a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but [with] insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction.

Fed. R. Civ. P. 4(k)(2); Porina v. Marward Shipping Co., 521 F.3d 122, 126 (2d Cir. 2008).  Because Clearstream's New York contacts are co-extensive with its United States contacts, Rule 4(k)(2) does not excuse application of New York's long-arm statute.

### ii.     The Exercise of Specific Jurisdiction Is Proper Under New York's Long Arm Statute

Accordingly, the Court first must assess whether jurisdiction is proper under state law.  New York's long-arm statute "does not extend in all respects to the constitutional limits established by International Shoe . . . and its progeny,"

so the "state statutory and federal constitutional standards are
. . . not co extensive." <u>Licci ex rel. Licci v. Lebanese
Canadian Bank, SAL</u>, 673 F.3d 50, 60-61 (2nd Cir. 2012) (citation
omitted).[16]  New York's long-arm statute enumerates specific acts
for which jurisdiction is authorized.  That statute provides, in
relevant part, that

> [a]s to a cause of action arising from any of
> the acts enumerated in this section, a court
> may exercise personal jurisdiction over any
> non-domiciliary . . . who in person or through
> an agent . . . transacts any business within
> the state or contracts anywhere to supply
> goods or services in the state.

N.Y. C.P.L.R. § 302(a)(1).  "In determining the strength of the
contacts" under that provision, federal courts "look to the
totality of Defendants' contacts with the forum state." <u>Chloe</u>,
616 F.3d at 164.  "New York courts evaluating specific
jurisdiction under section 302(a)(1) look to both the language
of the statute and the relation between the alleged conduct and
the cause of action." <u>Best Van Lines, Inc. v. Walker</u>, 490 F.3d
239, 246 (2d Cir. 2007).  To determine whether Section 302(a)(1)
authorizes jurisdiction, "a court must decide (1) whether the
defendant transacts any business in New York and, if so,

---

[16] It will be the "rare" case, however, where New York's long-arm
statute permits jurisdiction but the Due Process Clause does
not.  <u>D&R Glob. Selections, S.L. v. Bodega Olegario Falcon
Pineiro</u>, 78 N.E.3d 1172, 1177 (N.Y. 2017).

(2) whether this cause of action arises from such a business transaction." Licci, 673 F.3d at 60 (cleaned up).

When applying Section 302(a)(1), courts "first determine if [the] defendant purposefully availed itself of the privilege of conducting activities in the state by transacting business in New York." D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro, 78 N.E.3d 1172, 1175 (N.Y. 2017) (quotation marks omitted).[17]  "A non-domiciliary defendant transacts business in New York when on his or her own initiative, the non-domiciliary projects himself or herself into this state to engage in a sustained and substantial transaction of business." Id. (brackets omitted).  In other words, "where the non-domiciliary seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship, a non-domiciliary can be said to transact business within the meaning of [Section] 302(a)(1)." Paterno v. Laser Spine Inst., 23 N.E.3d 988, 993 (N.Y. 2014).

Clearstream does not dispute that it transacted business within the meaning of Section 302(a)(1), but it vigorously

---

[17] "This 'purposeful availment' language defining 'transacting business' has been adopted by the New York Court of Appeals from Supreme Court cases analyzing the constitutional limitations on a state's power to assert personal jurisdiction over a non-domiciliary defendant."  Best Van Lines, 490 F.3d at 247 (cleaned up) (citing Kreutter v. McFadden Oil Corp., 522 N.E.2d 40, 43 (N.Y. 1988)).

disputes whether Plaintiffs' claims arise from that business activity.  "In addition" to transacting business in New York, "the plaintiff's cause of action must have an 'articulable nexus' or 'substantial relationship' with the defendant's transaction of business" in the state.  D&R Glob. Selections, 78 N.E.3d at 1176 (quoting Licci v. Lebanese Canadian Bank, 984 N.E.2d 893, 900 (N.Y. 2012)).  That standard is "relatively permissive," requiring, "[a]t the very least, [that] there must be a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former."  Id. at 1176 (quotation marks omitted).  But "[j]urisdiction is not justified . . . where the relationship between the claim and transaction is too attenuated, and a connection that is 'merely coincidental' is insufficient to support jurisdiction."  Licci, 673 F.3d at 66 (cleaned up).

First, Clearstream contends that Plaintiff's claims do not arise from Clearstream's connections to New York and thus do not meet CPLR section 302(a)(1)'s second requirement, because no element of Plaintiff's claim arises from Clearstream's New York contacts.  In Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327 (2012), the New York Court of Appeals addressed the question, certified to it by the Court of Appeals for the Second Circuit, whether plaintiffs' claims under the Anti-Terrorism Act arose from Defendant Lebanese Canadian Bank's conduct related to that

Defendant's transaction of business in New York, which consisted
of the maintenance of a correspondent bank account at a
financial institution in New York and use of that account to
effect dozens of wire transfers on behalf of a foreign client.[18]
Id. at 340.  In answering the certified question in the
affirmative, the court explained that "CPLR 302(a)(1) does not
require that every element of the cause of action pleaded must
be related to the New York contacts; rather, <u>where at least one
element arises from the New York contacts</u>, the relationship
between the business transaction and the claim asserted supports
specific jurisdiction under the statute."  Id. (emphasis added).

Clearstream argues that because the asset for which
Plaintiffs seeks turnover is "Markazi's right to payment in
possession of Clearstream located in Luxembourg" and Clearstream
"did not move[] the bond proceeds to Luxembourg" (Clearstream
Mot. at 24 (citing Peterson, 876 F.3d at 87)), "no elements of

---

[18] The New York Court of Appeals answered the first
certification--whether under CPLR section 302(a)(1) a foreign
bank's maintenance and use of a correspondent account amounts to
doing business within the meaning of CPLR section 302(a)--as
follows: ["C]omplaints alleging a foreign bank's repeated use of
a correspondent account in New York on behalf of a client—in
effect, a 'course of dealing,'—show purposeful availment of New
York's dependable and transparent banking system, the dollar as
a stable and fungible currency, and the predictable
jurisdictional and commercial law of New York and the United
States."  Licci, 20 N.Y.3d at 339 (internal citation omitted).
As noted above, Clearstream does not contest that it transacts
business in New York within the meaning of CPLR section 302(a).

Plaintiffs' turnover claims can be fairly said to 'arise' from Clearstream's New York activity" (id. at 25).  As Plaintiffs point out, however, 22 U.S.C section 8772 requires, among other things, that the "foreign securities intermediary [is] doing business in the United States."  22 U.S.C. § 8772.  This is decidedly an element that Plaintiffs must prove to subject the asset at issue to execution, attachment, or to an order directing that the asset be transferred to New York under 22 U.S.C. section 8772.  Id.  Thus at least one element of the cause of action under 22 U.S.C. section 8772--the doing business requirement--arises from (and, in fact, is coextensive with) Clearstream's New York contacts.  Clearstream is therefore subject to specific jurisdiction under New York's long-arm statute.[19]

---

[19] Clearstream argues that a finding of specific jurisdiction on this basis invites a doomsday scenario wherein "Congress could amend every single federal statute to add a similar requirement that the targeted entity be 'doing business' in the United States," effectively subjecting the targeted entity to general jurisdiction in the forum in violation of Supreme Court precedent, especially Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty., 137 S. Ct. 1773, 1780-81 (2017). (Clearstream Mot. at 26.)  The Court does not share this concern.  First, under New York's long-arm statute, for example, a plaintiff must establish that a defendant's contacts with New York were sufficient under CPLR section 302(a)(1) and that those specific contacts fulfilled the "doing business in the United States" element of the statutory claim.  Moreover, as discussed infra, a plaintiff still must establish that the Due Process Clause permits the exercise of jurisdiction.

### iii.    The Exercise of Specific Jurisdiction Over Clearstream Comports with Due Process

Even where "personal jurisdiction is proper under § 302(a)(1) of the New York long-arm statute, this Court must make the ultimate determination whether this jurisdiction satisfies constitutional due process." Ehrenfeld v. Mahfouz, 489 F.3d 542, 547 (2d Cir. 2007). "The Supreme Court has set out three conditions for the exercise of specific jurisdiction over a nonresident defendant." U.S. Bank Nat'l Ass'n v. Bank of Am. N.A., 916 F.3d 143, 150 (2d Cir. 2019). "First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State." Id. (quoting Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1785 (2017)). "Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct." Id. "Finally, the exercise of jurisdiction must be reasonable under the circumstances." Id.

Clearstream does not contest that it purposefully availed itself of the privilege of conducting business in New York but argues that the exercise of personal jurisdiction is improper under the latter two requirements.

A plaintiff's claim must arise out of or relate to the defendant's forum conduct. A claim "arises out of forum

34

contacts when defendant's allegedly culpable conduct involves at
least in part financial transactions that touch the forum."
U.S. Bank Nat'l Ass'n, 916 F.3d at 150 (citing Licci ex rel.
Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 171 (2d Cir.
2013)).  There is no dispute that the financial transactions
here--the receipt of principal and interest payments that
created the right to payment for which Plaintiffs seek turnover-
-occurred in New York.  Accordingly, Plaintiffs' claim under 22
U.S.C section 8772 relates to Clearstream's forum conduct.

As to the final requirement of reasonableness, that is,
whether the exercise of jurisdiction would comport with "fair
play and substantial justice," courts consider:  (1) the burden
that the exercise of jurisdiction will impose on the defendant;
(2) the interests of the forum state in adjudicating the case;
(3) the plaintiffs' interest in obtaining convenient and
effective relief; (4) the interstate judicial system's interest
in obtaining the most efficient resolution of the controversy;
and (5) the shared interest of the states in furthering
substantive social policies.  See Metro. Life Ins. Co. v.
Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996).

The balance of these considerations weighs in favor of the
exercise of jurisdiction over Clearstream.  Clearstream and its
predecessor, Cedel Bank S.A., have maintained a representative
office in New York for over twenty-five years (Pls.' 56.1 ¶ 40),

and Clearstream has been litigating this case here, with the benefit of experienced and capable counsel, for nearly ten years.  In enacting Section 8772, Congress provided that the express interest of the United States was to "ensure Iran is held accountable for paying the judgments" against it.  Indeed, Congress has acted repeatedly to allow victims such as the Plaintiffs to recover for their loss, which underscores the strong public policy that favors the exercise of personal jurisdiction here.  See 28 U.S.C. § 1605(a)(7) (repealed and replaced by 28 U.S.C. § 1605A); 28 U.S.C. § 1610 (note) (TRIA); 22 U.S.C. § 8772.  And New York undoubtedly has a strong interest in preserving its banking system and in facilitating the collection of terrorism-related judgements for U.S. citizens.

There is no dispute that New York provides a convenient forum for Plaintiffs to secure the judgments they are owed.  New York also is able to provide effective relief, even if attachment ultimately must be confirmed by a Court in Luxembourg.  And there is a strong, shared substantive social policy of preventing the financing of terrorist activities.  See Licci III, 732 F.3d at 173-74 ("[A]lthough not controlling, weighed in the balance is the United States' and New York's interest in monitoring banks and banking activity to ensure that

its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends.").

Accordingly, this Court's assertion of personal jurisdiction over Clearstream does not offend Due Process, and Clearstream's motion to dismiss pursuant to 12(b)(2) is denied.

## 2. Constitutional Challenges to Section 8772

Clearstream asserts that 22 U.S.C. section 8772, as amended by the 2020 NDAA, violates the Equal Protection component of the Due Process Clause of the Fifth Amendment by targeting Clearstream and the right to payment held abroad in this case specifically. (Clearstream Mot. at 38.)

Legislation is presumed valid and will be upheld so long as it is reasonably related to a legitimate state interest. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). However, the Supreme Court has recognized successful equal protection claims brought by a "class of one" where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See Bank Markazi v. Petersen, 575 U.S. 212, 234 n.27 (2016) ("Laws narrow in scope, including 'class of one' legislation, may violate the Equal Protection Clause if arbitrary or inadequately justified."). "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the

State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (quoting Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923)).  In this Circuit, to succeed on a class-of-one claim, a plaintiff must establish that:  (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the government acted on the basis of a mistake.  Analytical Diagnostic Labs, Inc. v. Kusel, 626 F.3d 135, 140 (2d Cir. 2010) (citing Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir.2005)), abrogated on other grounds, Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008). "[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).

In Peterson I, the Court found that Clearstream's Equal Protection challenge to Section 8772 was without merit.  See

Peterson v. Islamic Republic of Iran, No. 10 CIV. 4518 KBF, 2013
WL 1155576, at *33 (S.D.N.Y. Mar. 13, 2013) ("There can be no
serious dispute that § 8772 furthers the United States'
legitimate interest in furthering its foreign policy with
respect to Iran.  Clearstream's argument that § 8772 unjustly
discriminates against foreign intermediaries fails.  The
legislation is presumed valid—foreign intermediaries are
entitled to no special treatment."), aff'd, 758 F.3d 185 (2d
Cir. 2014), aff'd sub nom. Bank Markazi v. Peterson, 578 U.S.
212 (2016).  The Court likewise finds that Section 8772, as
amended, furthers the United States' interest in carrying out
its policies with respect to Iran.  Clearstream does not
challenge that Section 8772's stated purposes of ensuring that
Iran is "held accountable for paying Plaintiffs' judgments and
sanctioning Iran" are legitimate governmental interests; it
instead argues that what matters is whether there is a
"legitimate factor that could explain [Section 8772's] disparate
treatment" of Clearstream.  (Clearstream Mot. at 39 (cleaned
up).)  But Section 8772 does not single out Clearstream.  By its
terms, it allows execution against Iranian assets held abroad by
any foreign securities intermediary doing business in the United
States and applies to any securities intermediary holding the
assets at issue in this case.  Were Clearstream to transfer the
assets at issue in this case to a different securities

intermediary, that securities intermediary would similarly be subject to Section 8772.  Clearstream has not met its burden of establishing that there is no reasonably conceivable state of facts that could provide a rational basis for the classification in Section 8772.  Thus, the Court concludes that Section 8772 is supported by a rational basis, and Clearsteam's motion to dismiss on the basis that Section 8772 violates due process is denied.

B.   **Markazi's Motion to Dismiss**

1.   **Subject-Matter Jurisdiction**

Markazi argues that this Court lacks subject matter jurisdiction over it because Section 8772 does not provide an independent grant of jurisdiction over it and the jurisdiction-conferring portion of the FSIA--28 U.S.C. section 1330(a)--does not otherwise apply.  (Markazi Mot. at 23-24; Markazi Reply at 1-3.)  Plaintiffs respond that Section 8772 and its expansive "notwithstanding any other provision of law" language abrogates any sovereign immunity that Markazi otherwise might enjoy and provides an independent grant of subject-matter jurisdiction over Markazi.  (Pls.' Opp. & Reply at 2-3.)  The Court concludes that Section 8772 provides an independent grant of jurisdiction.

In Weinstein v. Islamic Republic of Iran, 609 F.3d 43 (2d Cir. 2010), the Court of Appeals considered whether the Terrorism Risk Insurance Act (TRIA), codified at 28 U.S.C.

§ 1610 note, provided jurisdiction over Bank Melli Iran ("Bank Melli") in attachment proceedings where Bank Melli was not subject to the Court's jurisdiction in the underlying liability proceedings.  The Court of Appeals reasoned that Bank Melli was an "agency or instrumentality of" Iran within the meaning of Section 201(a) of the TRIA, and because "the operative language begins with the phrase 'notwithstanding any other provision of law,' . . . the force of the section extends everywhere."  Id. at 49.

The Supreme Court's decision in Rubin v. Islamic Republic of Iran, 138 S. Ct. 816 (2018), is also instructive.  There, the Supreme Court held that a provision of the U.S. Code did not provide a sovereign immunity exception because it "consciously lacks the textual markers, 'shall not be immune' or 'notwithstanding any other provisions of law.'"  Id. at 824.

Section 8772(a)(1) provides that certain financial assets "shall be subject to execution or attachment in aid of execution, or to an order directing that the assets be brought to the State in which the court is located," "notwithstanding any other provision or law, including any provision of law relating to sovereign immunity."  In keeping with Rubin and Weinstein, the Court concludes that the sweeping "notwithstanding" language adopted by Congress, which is broader than the language from the TRIA at issue in Weinstein in that it

expressly sets aside any conflicting provision of the FSIA, provides "an independent grant of jurisdiction" over Markazi with respect to the assets at issue here.  Weinstein, 609 F.3d at 49.  Moreover, Section 8772 permits not only orders of execution or attachment in aid of execution but also "order[s] directing that the assets be brought to the State in which the court is located."  Because Markazi is the beneficial owner of the assets at issue, it may be subject to an order pursuant to Section 8772 directing it to bring those assets into New York.

Markazi also argues that since Section 8772 was not pleaded in the complaint, it cannot form the basis of jurisdiction.  The Court disagrees.  Although plaintiffs generally may not "amend a complaint so as to produce jurisdiction where none actually existed before," Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 831 (1989), "Congress may . . . direct courts to apply newly enacted, outcome-altering legislation in pending civil cases," Bank Markazi v. Peterson, 136 S. Ct. 1310, 1325 (2016). That is what happened here.  The Court is satisfied that it has subject matter jurisdiction over Markazi for the purposes of these proceedings.

### 2.   **Personal Jurisdiction**

Markazi argues that the Court lacks personal jurisdiction over it because (1) the Court lacks subject-matter jurisdiction under Section 8772 and (2) "asserting personal jurisdiction over

Bank Markazi would violate due process."  (Markazi Mot. at 25-26.)

The Court has personal jurisdiction over Markazi.  Where an exception to sovereign immunity exists, "the FSIA provides subject-matter jurisdiction in federal courts" under 28 U.S.C. section 1330(a) and "personal jurisdiction where service has been made under [28 U.S.C.] § 1608" under 28 U.S.C § 1330(b).  Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1053-54 (2019) (cleaned up)).  As the Court held above, Section 8772 specifically strips Markazi of sovereign immunity in this action, and thus the Court has subject-matter jurisdiction under Section 1330(a).  Markazi is a "foreign state" as that phrase is used in Section 1330(a) because (1) it meets the definition of an "agency or instrumentality of a foreign state" as used in Section 1330(a) and defined in 28 U.S.C. section 1603(b) and (2) pursuant to Section 8772(d)(3), Iran means "the Government of Iran, including the central bank or monetary authority of that Government."  See, e.g., Crystallex, 932 F.3d at 138-39; cf. Weinstein, 609 F.3d at 50.  And Plaintiffs served Markazi in compliance with 28 U.S.C. section 1608.  (Pls.' 56.1 ¶ 3.) Hence, the Court has personal jurisdiction over Markazi under Section 1330(b).

As to the due process argument, the Court finds that Clearstream acted on Markazi's behalf, for its benefit, and with

its consent when it collected the $1.68 billion in bond proceeds in the New York account.  For example, Markazi concedes in its statement of material facts that "[i]n February 2008, at Markazi's instruction, Clearstream made entries on its books transferring . . . substantially all of Markazi's Eurodollar bonds from Markazi's custody account at Clearstream into the UBAE/Markazi Account . . . .  (Markazi 56.1 Counter ¶ 65 (emphasis added).)  And as this Court has previously observed, "Clearstream's only role with regard to the [Peterson I] Assets is as the agent of Bank Markazi."  Peterson, 2013 U.S. Dist. LEXIS 40470, at *122 (emphasis added).  Markazi has presented no reason why this finding should be disturbed here.  See Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 85 (2d Cir. 2018) ("[W]here we have found personal jurisdiction based on an agent's contacts, we have never suggested that due process requires something more than New York law.").

Accordingly, personal jurisdiction over Markazi is proper, and Markazi's motion to dismiss pursuant to 12(b)(2) is denied.

### 3.  Constitutional Challenges to Section 8772

Markazi asserts that Section 8772 "is unconstitutional because it violated Bank Markazi's due process rights in multiple respects" (Markazi Mot. at 12), namely, it "purports to authorize the seizure of assets in which Bank Markazi has an interest without any meaningful connection to the United States"

44

(id. at 14), and it "violates Bank Markazi's due process right to a neutral decisionmaker" (id. at 20).  The first argument fails for the same reasons as the argument against the assertion of personal jurisdiction addressed above.

The second argument fails as well.  Bank Markazi argues that its due process rights were violated because Plaintiffs "drafted and lobbied Congress to enact legislation that instructed this Court to rule in their favor."  (Markazi Reply at 18.)  In other words, that Congress decided the case. However, in Peterson I, the Supreme Court held that "Congress . . . may amend the law and make the change applicable to pending cases, even when the amendment is outcome determinative" and that "a statute does not impinge on judicial power when it directs courts to apply a new legal standard to undisputed facts."  Bank Markazi v. Peterson, 578 U.S. 212, 215, 230 (2016).  If Congress has not "impinged on judicial power" by passing an "outcome determinative" law, it follows that Congress does not step into the judicial role when it does so and does not make itself the decisionmaker.  If it did, there would be a separation of powers issue, which the Supreme Court already found Section 8772 did not create.  Furthermore, as set forth below, at least two elements of Section 8772 are in dispute, (i) whether Bank Markazi has a beneficial interest in the assets and (ii) whether anyone else has a non-custodial or constitutionally

45

protected interest.  Because the Court must decide these issues, Congress did not predetermine the result.  The Court is therefore the decisionmaker and, as there is no claim that the Court is not neutral, Bank Markazi has a neutral decisionmaker.

Bank Markazi's argument fails for another reason as well. Even assuming that Congress is the decisionmaker, the Court declines to extend the "principles of judicial impartiality" to the "quite different context" of Congressional legislation. See Nev. Comm'n on Ethics v. Carrigan, 564 U.S. 117, 132 (2011) (Kennedy, J., concurring).  Although "due process may require recusal in the context of certain judicial determinations," there are "differences between the role of political bodies in formulating and enforcing public policy . . . and the role of courts in adjudicating individual disputes according to law" that "may call for a different understanding . . . of the legitimate restrictions that may be imposed upon them."  Id. Though Bank Markazi presents its argument within the due process framework applicable to judicial decisionmakers, what it advocates is a new constitutional limit on Congress' power to

legislate.[20]   Under Bank Markazi's theory, no court in the United States could apply Section 8772.  Bank Markazi's complaint is thus not that the Court lacks neutrality but that Congress does.

The Court rejects Bank Markazi's invitation to find a novel constitutional restriction on Congress' power to legislate via the due process right to a neutral decisionmaker.  Courts may be subject to an "objective standard that requires recusal when the likelihood of bias on the part of the judge 'is too high to be constitutionally tolerable'" Williams v. Pennsylvania, 579 U.S. 1, 4, 136 S. Ct. 1899, 1903 (2016) (quoting Caperton v. A. T. Massey Coal Co., 556 U. S. 868, 872 (2009)), but "[t]he decisions of th[e] [Supreme C]ourt from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power" by Congress based "on the assumption that a wrongful purpose or motive has caused the power to be exerted."  United States v. O'Brien, 391 U.S. 367, 383 (1968).  The neutral decisionmaker due process analysis turns on the likelihood of bias on the part of the decisionmaker, Caperton, 556 U.S. at 872, but "[i]nquiries into

---

[20] The reason is clear.  Bank Markazi has already failed to overturn Section 8772 based on established constitutional restrictions on Congressional power.  Bank Markazi v. Peterson, 578 U.S. 212, 224 n.14 (2016) (noting that Bank Markazi and Clearstream already attempted arguments based on the following constitutional grounds: the Bill of Attainder, Ex Post Facto, Equal Protection, and Takings Clauses).

congressional motives or purposes are a hazardous matter."
O'Brien, 391 U.S. at 383; Church of Lukumi Babalu Aye, Inc. v.
City of Hialeah, 508 U.S. 520, 558 (1993) (Scalia, J.,
concurring in part and concurring in the judgment) ("[I]t is
virtually impossible to determine the singular 'motive' of a
collective legislative body . . . ."). Equally hazardous is an
attempt to evaluate whether the collective Congress is
objectively likely to be biased beyond the "constitutionally
tolerable," Caperton, 556 U. S. at 872, based on otherwise
lawful citizen lobbying. More perilous still would be the
creation of an amorphous constitutional limit on legislative
power and, by implication, on citizens' First Amendment right to
lobby their lawmakers, based on a "virtually impossible," Church
of Lukumi, 508 U.S. at 558, attempt to determine when that
lobbying has created an objective risk that Congress, as a
whole, is likely to be biased. The Court cannot conceive of a
principled way to articulate or apply such a limit and declines

to do so.[21]  Congress lawfully exercised its power in enacting

Section 8772, and it is not for the Court to "restrain th[at]

exercise of lawful power" based on impossible speculation about

Congress' likelihood of bias.  Cf. O'Brien, 391 U.S. at 383.

   Section 8772 is not unconstitutional on its face or as

applied to Bank Markazi.

### C.   Plaintiffs' Motion for Summary Judgment under Section 8772

   Plaintiffs move for summary judgment pursuant to 22 U.S.C.

section 8772 against Bank Markazi and Clearstream and for an

---

[21]  As Chief Justice Marshall observed:

> If the principle be conceded, that an act of
> the supreme sovereign power might be
> declared null by a court, in consequence of
> the means which procured it, still would
> there be much difficulty in saying to what
> extent those means must be applied to
> produce this effect.  Must it be direct
> corruption, or would interest or undue
> influence of any kind be sufficient?  Must
> the vitiating cause operate on a majority,
> or on what number of the members?  Would the
> act be null, whatever might be the wish of
> the nation, or would its obligation or
> nullity depend upon the public sentiment?
>
> If the majority of the legislature be
> corrupted, it may well be doubted, whether
> it be within the province of the judiciary
> to control their conduct, and, if less than
> a majority act from impure motives, the
> principle by which judicial interference
> would be regulated, is not clearly
> discerned.

Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 130 (1810).

order directing those defendants to turn over the financial assets identified in 22 U.S.C. section 8772(b)(2) that are currently represented in the records of Clearstream as a positive account balance of not less than $1.68 billion in a "sundry blocked account" number 13675.

To recall the bond proceeds to New York pursuant to Section 8772 and then execute against those assets, Plaintiffs must prove that:

(1)   They hold terrorism-related judgments against Iran (§ 8772(a)(1)(C));

(2)   Clearstream is a "foreign securities intermediary doing business in the United States" (§ 8772(a)(1)(A));

(3)   the bond proceeds are the "financial assets" at issue in this litigation (§ 8772(b)(2));

(4)   Clearstream is holding those financial assets (§ 8772(a)(1)(A));

(5)   Markazi holds "equitable title to, or a beneficial interest in" the bond proceeds (§ 8772(a)(2));

(6)   The bond proceeds are "equal in value to a financial asset of" Markazi that Clearstream or UBAE is holding abroad (§ 8772(a)(1)(C));

(7)   The bond proceeds would be blocked assets if Clearstream were holding them in the U.S. (§ 8772(a)(1)(B)); and

(8)   No other entity holds a constitutionally protected interest in the bond proceeds (§ 8772(a)(2)).

The parties do not dispute that Plaintiffs have shown elements (1), (2), (3), (4), (6) and (7).  As to (1), all Plaintiffs hold unsatisfied compensatory damages judgments

against Iran that they secured under the FSIA's terrorism exceptions to sovereign immunity (28 U.S.C. §§ 1605(a)(7) (repealed) and 1605A).  (See Pls.' 56.1 ¶ 15.)  As to (2), Clearstream served as Markazi's securities intermediary with respect to the right to payment at issue, (id. at ¶ 90), and, as discussed above, it is doing business in the United States.

As to (3), the right to payment totals $1.68 billion and qualifies as a financial asset under Section 8772.  Though Clearstream disputes that, in the abstract, proceeds of bonds are financial assets under the Uniform Commercial Code ("UCC"), it does not dispute that the specific right to payment at issue here qualifies as a financial asset under Section 8772. (Clearstream Mot. 37 n.26.)  The right to payment is the right to payment of principal and interest credited to sundry account 13675.  This right to payment derives from Clearstream's "U.S. dollar obligations to its customers in Luxembourg," including its obligations to Bank Markazi, and are "U.S. dollar interest and redemption payments."  (Id. at 6-8; Kaminetzky Declaration, Exhibit C, Arendt July 2014 Mem. ¶¶ 34, 137; Vogel Declaration, Ex. 29 (Papenfuß Decl.) ¶¶ 7, 12-14.)  The right to payment is, in Clearstream's words, a "deposit-like obligation[]" (Clearstream Mot. 37 n.26) and Clearstream created sundry account 13675 as a place to "keep the cash amount related" to Bank Markazi's bond proceeds to avoid making unlawful "[c]ash

transfers." (Vogel Declaration, Ex. 55; Clearstream 56.1 Counter ¶ 91.) Regardless of whether proceeds of bonds are financial assets under the UCC in the normal course, the principal and interest on the bonds at issue here has long been paid out and at this stage is simply cash credited to an account. Consequently, the right to payment is a financial asset as defined in Section 8772.

As to (4), Clearstream holds the right to payment in the Blocked Account. (See Clearstream 56.1 Counter ¶ 82.) As to (7), the right to payment would be blocked if Clearstream held it in the United States. See 22 U.S.C. § 8772(a)(1)(B); EO-13599 (blocking "[a]ll property and interests in property of . . . [Markazi] that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch").

As Bank Markazi observes, the only elements in serious dispute are (5) and (8): whether "Markazi has a beneficial interest in the assets and [whether] no one else has a non-custodial or constitutionally protected interest." (Markazi Mot. at 21.)

A beneficial interest is "[a] right or expectancy in something . . . as opposed to legal title to that thing." Interest, Black's Law Dictionary (9th ed. 2009). The key factor

is whether "the property benefitted [the beneficial owner] as if
he had received the property directly."  See Exp.-Imp. Bank of
U.S. v. Asia Pulp & Paper Co., Ltd., 609 F.3d 111, 120 (2d
Cir. 2010) (citing United States v. Coluccio, 51 F.3d 337, 341
(2d Cir. 1995)).  Clearstream does not allege—and puts forward
no facts—that it has legal title or the right to acquire that
title for the blocked assets.

Instead, Clearstream asserts that only UBAE holds legal
title to the blocked assets and that Markazi has no beneficial
interest in them.  Clearstream argues that Luxembourg law
governs Clearstream's obligations and UBAE's rights with respect
to the right to payment at issue, and that under Luxembourg Law,
(1) Bank Markazi has no rights to or cognizable interest in the
right to payment credited to UBAE sundry account 13675—only UBAE
does, (2) only UBAE can exercise rights in relation to accounts
in its name; Bank Markazi cannot, (3) UBAE is the only entity
entitled to instruct Clearstream with respect to the operation
of the account and, in particular, the disposition of the funds
credited to the account, and (4) the fact that UBAE owes an
equivalent sum to Bank Markazi is of no moment because in
Luxembourg the concept of a "beneficial owner" has no private
law effects.  (Clearstream Mot. at 35 (citing Kaminetzky
Declaration, Ex. L (Arendt Sept. 2020 Mem. ¶¶ 23-38)).)

Section 8772(a)(1)'s broad "notwithstanding" clause plainly preempts any provision of Luxembourg law here.  Moreover, UBAE itself has admitted that Markazi is the beneficial owner of these assets (Vogel Declaration ¶ 93 and Ex. 69), and UBAE has claimed no rights to the right to payment in this action. Indeed, as Bank Markazi makes clear, "there is no dispute that Bank Markazi has at least a beneficial interest in the assets at issue – plaintiffs claim that Bank Markazi is the ***owner*** of the assets."  (Markazi Mot. at 11 (citing Pls.' 56.1 ¶¶ 85-89); <u>see also</u> Markazi Mot. at 4 ("UBAE became the legal owner, although Bank Markazi retained an indirect beneficial interest through its own account at UBAE.").)  Moreover, Bank Markazi's arguments that it is immune from pre- or post-judgment attachment depend upon preempted provisions of the FSIA.  <u>See</u> 22 U.S.C. § 8772(a).

Most tellingly, in <u>Peterson I</u>, this Court, as affirmed by the Court of Appeals, recognized that Markazi was the sole beneficial owner of financial assets in the UBAE/Markazi Account.  <u>Peterson</u>, 2013 U.S. Dist. LEXIS 40470, at *118 ("No rational juror could find that any person or entity—other than Bank Markazi—has a constitutional, beneficial or equitable interest in the Blocked Assets . . . [Clearstream and UBAE] are both merely account holders without authority to move or use the assets in the absence of direction.  They simply . . . maintain that account on behalf of another, Bank Markazi."), <u>aff'd</u>, 758

F.3d 185 (2d Cir. 2014), <u>aff'd sub nom.</u> <u>Bank Markazi v.</u>
<u>Peterson</u>, 136 S. Ct. 1310, 1325 n.20 (2016) (highlighting
Markazi's beneficial ownership of the proceeds of its bonds).

Accordingly, there are no other possible owners of the
interests here other than Bank Markazi, those assets are not
immune from execution, and there is no triable issue of fact.
The Court therefore grants Plaintiffs' motion for summary
judgment pursuant to 22 U.S.C. section 8772 as to Bank Markazi
and Clearstream.

**D.   UBAE's Motion to Dismiss**

UBAE argues that the Court lacks personal jurisdiction over
it because it did not injure Plaintiffs in New York.  UBAE
asserts that Plaintiffs had to register their judgments in New
York before they could be injured in New York and that therefore
only UBAE's post registration conduct is relevant to the
jurisdictional analysis.  (UBAE Mot. at 9.)  UBAE asserts that
UBAE's establishment of its relationship with Clearstream
occurred in Luxembourg prior to any of Plaintiffs' judgments
being registered in New York, and there are no allegations
showing that UBAE took any actions after the judgments were
registered.  (UBAE Mot. at 1, 8-16.)  In UBAE's view, its agency
relationship with Clearstream was severed once the sundry
blocked account was opened in June 2008 and, because it
allegedly did nothing and did not control the sundry blocked

account after that occurred, it argues that Clearstream's post registration conduct cannot be attributed to it.  (Id.)

The Court rejects UBAE's argument that personal jurisdiction is inadequately alleged.  As set forth above, a claim "arises out of forum contacts when defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum."  U.S. Bank Nat'l Ass'n, 916 F.3d at 150 (citing Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 171 (2d Cir. 2013)).  Plaintiffs have adequately alleged that the transfer at issue was fraudulent and that Clearstream acted on UBAE's behalf, for its benefit, and with its consent when it collected the $1.68 billion in bond proceeds in New York as a result of that transfer.  Plaintiffs allege that UBAE consented by means of the UBAE/Markazi Account Agreement and by operation of law to have Clearstream act on behalf of UBAE by collecting the $1.68 billion in Bond Proceeds in the NY Account.  (Id. ¶¶ 62, 64-66, 141-43.)  Both the UBAE/Markazi Account Agreement and the provisions of the UCC and Luxembourg law mandated that Clearstream follow UBAE's payment instructions concerning those assets.  (Vogel Declaration, Ex. 81 at Arts. 20, 21; UCC §§ 8-505-8-508.)  In addition, the terms of the UBAE/Markazi Account Agreement, the relevant provisions of the UCC and Luxembourg law, and Clearstream's adherence to the payment instructions UBAE delivered on behalf of Markazi all

evidence Clearstream's consent to act on UBAE's behalf in New York. (Amended Complaint ¶¶ 141, 168-83; Vogel Declaration, Exs. 47, 48.) That UBAE did not have access to the funds in the blocked sundry account does not mean that Clearstream was not acting pursuant to UBAE's direction in collecting the Bond Proceeds in New York. This relationship, and the transfer that precipitated it, was allegedly intended to facilitate Bank Markazi's access to the Bond Proceeds while shielding it from sanctions and creditors, including Plaintiffs. (Amended Complaint ¶¶ 232-49, 251-58, 289.) These facts and allegations are sufficient to find that Clearstream acted as UBAE's agent in New York and to attribute its actions to UBAE at this stage. See N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 122 (2d Cir. 2001).[22] Because the Court has personal jurisdiction over Clearstream, and Clearstream was allegedly acting as UBAE's agent to allow UBAE to collect the Bond Proceeds, the Court has personal jurisdiction over UBAE. See Charles Schwab Corp., 883 F.3d at 85.

Furthermore, UBAE's attempt to render registration, or even a judgment, the bright line for jurisdictional purposes is not

---

[22] UBAE's assertion that Plaintiffs are somehow foreclosed from arguing that Clearstream was UBAE's agent because Plaintiffs argued that Clearstream was Bank Markazi's agent is misplaced. (UBAE Reply at 6 n. 4.) Many agents have more than one principal.

persuasive.  New York law does not require the existence of a judgment against the transferor, much less registration, in order to render a transfer fraudulent.  N.Y. Debtor & Creditor Law §§ 273-a, 276.  CPLR §270 defines "creditor" as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent" against the transferor.  U.S. v. Watts, 786 F.3d 152, 162 (2d Cir. 2015).  As such, a person "who has a right to maintain a tort but has not recovered a judgment at the time of the transfer is a creditor."  Drenis v. Haligianis, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006).

Thus, whether the exercise of personal jurisdiction is appropriate turns not on the formality of registration or the existence of a judgment but on whether the transferee knew or reasonably could have expected that the transfer would create an injury in New York because it would shield the assets of a debtor or potential debtor.  Universitas Educ., LLC v. Nova Grp., Inc., No. 11CV1590-LTS-HBP, 2014 WL 3883371, at *6 (S.D.N.Y. Aug. 7, 2014) ("conveyances were accomplished at a time when [transferee] knew that Petitioner was asserting a right to the proceeds of the insurance policies and was considering litigation" and thus transferee "should reasonably have expected their actions to create an injury in New York" and could "reasonably have anticipated being haled into court

here"); <u>Bank of Commc'ns v. Ocean Dev. Am., Inc.</u>, No. 07 CIV.
4628 (TPG), 2010 WL 768881, at *3 (S.D.N.Y. Mar. 8, 2010
(exercising personal jurisdiction over defendant, in fraudulent
conveyance action, that purchased without fair consideration
California warehouse from debtor during pendency of New York
litigation).  UBAE allegedly knew that the Bond Proceeds were to
be paid in New York.  (<u>Id.</u> ¶¶ 62, 64-66, 141-43.)  UBAE is also
alleged to have engaged in a scheme to hide Bank Markazi's
ownership of the Bond Proceeds and stymie creditors from
collecting those New York-connected assets.  (<u>Id.</u> ¶¶ 232-49,
251-58, 289.)[23]  It was thus reasonably foreseeable that UBAE's
conduct would cause injury in New York and that it would be
"haled into court" to surrender the assets of the state sponsor
of terrorism that it allegedly assisted to evade terrorism-
related judgments when UBAE utilized Clearstream's services to
pass $1.68 billion through the New York banking system.  <u>See</u>
<u>Licci III</u>, 732 F.3d at 170; <u>Charles Schwab</u>, 883 F.3d at 82.

Accordingly, personal jurisdiction over UBAE is proper, and
UBAE's motion to dismiss pursuant to 12(b)(2) is denied.

---

[23] To be sure, UBAE denies knowledge that specific Plaintiffs
secured a judgment against Iran (UBAE Mot. at 10-11, n.4), but
this is a very narrow denial of knowledge that says nothing of
its knowledge about Plaintiffs' potential judgments against Iran
or that Iran had committed numerous torts for which it could be
held liable in New York.

### E.   <u>Plaintiffs' Motion for a Preliminary Injunction</u>

In the event Plaintiffs did not prevail on their motion for summary judgment, Plaintiffs sought a preliminary injunction requiring Markazi and Clearstream to return the bond proceeds to New York.  (Pls.' Mot. at 36-40.)  Because the Court grants Plaintiffs' motion for summary judgment in full, the motion for a preliminary injunction is denied as moot.

## IV. Conclusion

In sum, Markazi's motion to dismiss (dkt. no. 238), Clearstream's motion to dismiss (dkt. no. 251), and UBAE's motion to dismiss (dkt. no. 246) are DENIED, and Plaintiffs' motion for summary judgment (dkt. no. 225) is GRANTED.

Markazi and Clearstream shall turn over to Plaintiffs the financial assets identified in 22 U.S.C. section 8772(b)(2) and represented in Clearstream's records as a positive account balance of not less than $1.68 billion in sundry blocked account number 13675.

The Clerk of the Court shall close the open motions at dkt. nos. 225, 238, 246, and 251.

**SO ORDERED.**

Dated:   New York, New York
         March 22, 2023

_Loretta A. Preska_
LORETTA A. PRESKA
Senior United States District Judge

60