UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH D. PETERSON, et al.,<br><br>                Plaintiffs,<br><br>-against-<br><br>ISLAMIC REPUBLIC OF IRAN, et al.,<br><br>                Defendants. | 13-CV-09195 (LAP)<br><br>OPINION AND ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

On October 23, 1983, a truck laden with 12,000 pounds of explosives detonated at the United States Marine Barracks at Beirut International Airport.  Minutes later, a second truck bomb struck a nearby garrison of French Chasseurs Parachutistes.  The bombings claimed the lives of 241 U.S. servicemembers, six Lebanese civilians, and 58 paratroopers of America's oldest ally.  And the aftershocks continue to be felt by the injured troops who survived and the families of those who did not.

A federal court later found that the Beirut attacks had been sponsored and approved by the highest levels of government of the Islamic Republic of Iran.  Armed with those findings, countless victims and family members went on to win judgments against Iran for billions of dollars in compensatory damages.  Yet collecting these judgments proved far more difficult.  Iran refused to appear, refused to pay, and shielded its assets behind layers of foreign

1

intermediaries that it believed to be beyond the reach of American courts.

In 2012, Congress intervened.  Through the Iran Threat Reduction and Syria Human Rights Act, 22 U.S.C. § 8772, Congress singled out assets identified in this action and held by Iran's central bank, Bank Markazi ("Markazi"), as available for attachment and execution to satisfy the victims' judgments.  Seven years later, Congress strengthened the statute, authorizing courts to compel certain financial institutions to bring Markazi's frozen assets into the United States and facilitate execution.  Through this litigation, the victims now seek to satisfy their judgments with Markazi's frozen assets.

Once again, the case returns to this Court on remand from the Court of Appeals.  Peterson v. Bank Markazi, 121 F.4th 983 (2d Cir. 2024) ("Peterson 2024").  The Court of Appeals directed this Court to resolve two discrete issues: whether the litigation can proceed in the absence of Markazi and whether Markazi is in fact the beneficial owner of the bond proceeds held by Clearstream Banking, S.A. ("Clearstream"), a Luxembourg-based securities intermediary.  Clearstream and Markazi have since moved to dismiss the action for failure to join Markazi.  Plaintiffs refiled for summary judgment on their turnover claims, and Clearstream cross-moved for summary judgment in its favor.

2

For the reasons that follow, Clearstream and Markazi's motions to dismiss are <u>DENIED</u>. Plaintiffs' motion for summary judgment is <u>GRANTED</u>, and Clearstream's cross-motion for summary judgment is <u>DENIED</u>.[1]

## I.    Background

The history of this litigation spans twelve years, three trips to the Court of Appeals, and one decision from the Supreme Court. All of these decisions set out the procedural history and facts of this case at length. Accordingly, the Court recounts only those relevant to resolving these motions.

### A. Plaintiffs' Judgments

Plaintiffs are representatives of the 241 American servicemembers killed in the Beirut bombing. In 2003, a federal court in the District of Columbia found that the bombing was committed by agents of Iran, including the Iranian foreign

---

[1] The following submissions were filed in connection with the pending motions. In support of Plaintiffs' motion for summary judgment: Plaintiffs' Amended Memorandum of Law in Support (Dkt. 371) ("Pls.' Mem."); Plaintiffs' Rule 56.1 Statement (Dkt. 367) ("Pls.' 56.1"); the Declaration of Liviu Vogel (Dkt. 370) ("Vogel Decl."); the Supplemental Declaration of Liviu Vogel (Dkt. 389); and the Declaration of Dr. Laurent Heisten (Dkt. 390) ("Heisten Supp. Decl."). In support of Markazi's motion to dismiss: Markazi's Memorandum of Law in Support (Dkt. 378) ("Markazi Mem."); the Declaration of Robert K. Kry in Support (Dkt. 379) ("Kry Decl."); and Markazi's Counter-Statement to Plaintiffs' Rule 56.1 Statement (Dkt. 381) ("Markazi Counter 56.1"). In support of Clearstream's cross-motion for summary judgment and motion to dismiss: Clearstream's Memorandum of Law in Support (Dkt. 384) ("Clearstream Mem."); the Declaration of Benjamin S. Kaminetzky in Support (Dkt. 385) ("Kaminetzky Decl."); Clearstream's Rule 56.1 Statement (Dkt. 386) ("Clearstream 56.1"); Clearstream's Memorandum of Law in Opposition to Plaintiffs' Motion (Dkt. 380); Clearstream's Reply Memorandum (Dkt. 399) ("Clearstream Reply"); and the Supplemental Declaration of Benjamin S. Kaminetzky (Dkt. 400).

intelligence agency and its Hezbollah proxies.  See Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 54-61 (D.D.C. 2003). Among other evidence, the court credited an intelligence intercept of a message from Tehran to Iran's ambassador to Syria in September of 1983.  The message instructed Iranian proxies to instigate attacks on the joint American, British, French, and Italian peacekeeping coalition stationed in Lebanon and specifically to "take a spectacular action against the United States Marines." Id.  The court further found that the attack could not have proceeded absent the express approval of the highest levels of Iran's government, including the Ayatollah himself.

Since the 2003 finding, the victims and their families have obtained compensatory judgments totaling approximately $3.845 billion across various litigations.  (Clearstream 56.1 ¶¶ 14-16.) The validity of these judgments is not disputed.  To date, Iran has neither appeared nor voluntarily paid any portion of the judgments.

**B. The Clearstream Assets**

The asset at the heart of this litigation is a $1.68 billion right to payment held by Clearstream in sundry blocked account 13675 in Luxembourg (the "Blocked Account"), representing principal and interest on Eurodollar bonds (the "Bond Proceeds") that Markazi purchased through Clearstream.  (Clearstream 56.1 ¶¶ 63, 67.)

Clearstream is a Luxembourg-based securities intermediary. As a securities intermediary, Clearstream holds securities on behalf of and for the benefit of its clients. (Clearstream 56.1 ¶ 29.) At all relevant times, Clearstream maintained its sole U.S. dollar cash correspondent account at JPMorgan Chase Bank, N.A. in New York (the "New York Account"), through which approximately $7-9 billion flowed every business day. (Clearstream 56.1 ¶¶ 34-39.) All U.S. dollar payments on the bonds at issue in this case passed through the New York Account before being credited to Clearstream's Luxembourg accounts. (Clearstream 56.1 ¶ 57.)

From 1994 until 2008, Markazi held the bonds in its own account at Clearstream. A Markazi officer, Ali Asghar Massoumi, testified in a sworn affidavit that Markazi had previously conducted these transactions directly with Clearstream via so-called "U-Turn" transactions, in which banks subject to U.S. regulation could indirectly process transactions involving Iran if they began and ended with a non-Iranian bank. (Massoumi Aff. ¶ 20.)[2] U-Turn transactions were not explicitly prohibited by the U.S. Office of Foreign Assets ("OFAC") until November 2008. However, before OFAC closed the U-Turn loophole, Massoumi testified that Clearstream warned Markazi "that [Clearstream] was

---

[2] The Massoumi Affidavit is appended as Exhibit 45 to the Vogel Declaration. (See Dkt. 370-41).

being pressured not to do business of any kind with Markazi." (Massoumi Aff. ¶ 22.)  Accordingly, in Massoumi's words, "Bank Markazi had a very short period of time . . . to shift the Restricted Securities away from Clearstream and to another custodial agent."  (Id.)

With OFAC zeroing in on Clearstream, Markazi sought the services of Unione delle Banche Arabe ed Europe, s.p.a. ("UBAE"), a small Italian bank focused on transactions between Europe, North Africa, and the Middle East.  The record indicates that, as of 2008, UBAE was at least partially owned by the national bank of Libya, (Clearstream 56.1 ¶ 47), which at the time was controlled by the regime of Muammar Qaddafi.  Plaintiffs therefore argue that UBAE was, at the time, "controlled by Libya's corrupt Qaddafi regime" and, along with other Libyan banks, "collected lucrative fees by helping Iran launder huge sums of money . . . in violation of international sanctions on Tehran."  (Vogel Decl. ¶ 46 & Ex. 80.)  Although Defendants dispute the extent of Libya's ownership and control over UBAE, the record indicates that Libya was, as of 2008, far and away UBAE's largest shareholder.  (Vogel Decl. Ex. 80.)

Using UBAE, Markazi engineered a structure that would allow it to use Clearstream's services indirectly.  Markazi opened an account at UBAE, and UBAE opened an additional account with Clearstream.  Massoumi testified that in February 2008 Markazi

6

transferred its Eurodollar bonds from Markazi's account at Clearstream (Account 80726) to UBAE's newly opened account at Clearstream (Account 13061). (Massoumi Aff. ¶ 26.) Although nominally held in the name of UBAE, both Clearstream and UBAE structured Account 13061 as a "customer account" that, in the words of one of Clearstream executive, was "designed to hold [sic] interest of third parties, that is to say, of the customers of our customer who are using our bank . . . as their custodian." (June 27, 2008 Testimony of Mark Gem ("Gem Test.") at 33:9-13.)[3]

After UBAE opened Account 13061, Markazi requested that Clearstream internally transfer all of the bonds in Markazi's account to the newly-opened Account 13061. The bond transfers were made "free of payment," meaning that there was no corresponding incoming payment instruction or indication of consideration. (See, e.g. Vogel Decl. Ex. 47 at 1):

_____

[3] The Gem Testimony is attached as Exhibit 46 to the Vogel Declaration. (See Dkt. 370-42.)

The total face value of the bonds nominally transferred from Markazi to UBAE's new Clearstream customer account exceeded $4.6 billion.  (Vogel Decl. ¶ 53 & Exs. 47–48.)  Following the internal transfer at Clearstream to Account 13061, UBAE credited Markazi's own Rome-based UBAE account with the transferred bonds.  (Massoumi Aff. ¶¶ 25–26.)  As a result of these transfers, according to OFAC, "the record of ownership on Clearstream's books changed, but the beneficial ownership did not, resulting in [Markazi's] interest being buried one layer deeper in the custodian chain."  (Vogel Decl. Ex. 61 ¶ 8.)

Thus, following February 2008, the formal chain of custody ran from Markazi's account at UBAE, through UBAE's account at Clearstream (Account 13061), up to the ultimate depositaries or paying agents of the bond issuers.  (Vogel Decl. ¶¶ 53–54.)  But, according to Plaintiffs, nothing about the economic substance changed: Markazi remained, in its own words, the "sole beneficial owner" of the bonds and their proceeds.  (Massoumi Aff. ¶¶ 7, 30.)  UBAE confirmed as much in an October 26, 2009 letter to Clearstream, stating that the securities "were administered by Clearstream for the same beneficial owner"—i.e., Markazi—both before and after the transfers.  (Vogel Decl. ¶ 57 & Ex. 52.)  And the OFAC settlement later confirmed that "Clearstream employees . . . including at least one supervisor and one senior executive— knew or should have known that the beneficial ownership of the

securities entitlements would not change with their [free-of-payment] transfer" from one Clearstream account to another. (Vogel Decl. ¶ 67 & Ex. 61 at ¶¶ 7–8.)

The bonds that Clearstream internally transferred from Account 80726 to Account 13061 included two distinct pools of assets. The first consisted of bonds that were sub-custodied by Clearstream at Citibank in New York, meaning the underlying securities entitlements were physically held within the territorial United States. (Pls.' 56.1 ¶¶ 55–56; Vogel Decl. ¶¶ 47, 63 & Ex. 44 at ¶ 2.)[4] The second pool of bonds was held abroad and not sub-custodied in the United States (the "Remaining Bonds"). Like all the bonds in the portfolio, the Remaining Bonds were denominated in U.S. dollars, and investors received interest and redemption payments through the New York Account. (Vogel Decl. ¶ 72.)[5]

The Remaining Bonds and their proceeds precipitated this action. On June 11, 2008, in response to a subpoena served by

---

[4] These bonds generated the approximately $1.75 billion in assets that became the subject of the separate Peterson I litigation. See Peterson v. Islamic Republic of Iran, No. 10 Civ. 4518, 2013 WL 1155576, at *4 (S.D.N.Y. Mar. 13, 2013), aff'd, 758 F.3d 185 (2d Cir. 2014), aff'd sub nom. Bank Markazi v. Peterson, 578 U.S. 212 (2016). Because those assets were physically located in the United States, the Peterson I court was able to order Citibank to turn them over directly. The Supreme Court affirmed, and the Peterson I Assets were distributed to the plaintiffs. (Vogel Decl. ¶¶ 64–66.)

[5] A Clearstream executive confirmed that all U.S. dollar payments would have necessarily flowed through the New York account. See Vogel Decl. Ex. 29 (Papenfuß Declaration) ¶ 2 ("Clearstream uses its cash correspondent account at JP Morgan as a deposit account type for . . . the deposit of U.S. dollar payments on the security entitlements at issue in this litigation which were held by Clearstream outside the United States.")

9

certain Plaintiffs, OFAC disclosed that Clearstream had "an Iranian governmental client" with "a beneficial ownership interest" in assets held at Clearstream. (Vogel Decl. ¶ 48 & Ex. 44 at ¶¶ 1, 3, 5.) On June 16 and June 23, 2008, Plaintiffs served restraining notices on Clearstream in New York, barring Clearstream from making any transfer of property in which Markazi held an interest. (Vogel Decl. ¶ 58.) Following Plaintiffs' notice to Clearstream, Clearstream blocked Account 13061 in July of 2008 "in order to ensure compliance with possible applicable sanctions laws, because the security entitlements reflected in the account were alleged to be held by UBAE for Bank Markazi." (Papenfuß Declaration at ¶¶ 12–13.)

Because the account was now blocked, Clearstream could no longer credit incoming bond payments to Account 13061. Clearstream therefore opened the Blocked Account in Luxembourg (Account 13675) to collect and hold any further payments that would ordinarily have flowed to Account 13061. (Clearstream 56.1 ¶ 63.) At present, neither UBAE nor Markazi may access the Bond Proceeds in the Blocked Account. Peterson 2024, 121 F.4th at 991.[6]

---

[6] Between July 8, 2008 and October 15, 2012, Clearstream received 62 interest and principal payments into the New York account at JP Morgan, totaling $1.68 billion. (Clearstream 56.1 Counter ¶ 67.) Each time Clearstream received such a payment in New York, it credited the Blocked Account in Luxembourg with a right to payment for the same dollar amount. Peterson 2024, 121 F.4th at 991–92. As of May 31, 2013, the Blocked Account reflected a balance of $1,683,184,679. (Pls.' 56.1 ¶ 71; Vogel Decl. ¶ 61 & Ex. 56.) UBAE, in turn, recorded equivalent credits to Markazi's account on its own books and reported the payments to Markazi by Telex. (Pls.' 56.1 ¶ 68; Vogel Decl. ¶ 61 & Exs. 57–58.)

10

On February 6, 2012, President Obama issued Executive Order 13599, which blocked all property and interests in property of Markazi "that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch."  (Clearstream 56.1 ¶ 69.)  After the issuance of EO-13599, Clearstream collected an additional $104.25 million of Bond Proceeds through the New York Account.  (Pls.' 56.1 ¶ 70; Vogel Decl. ¶¶ 78, 87 & Exs. 66, 75.)[7]

On February 27, 2012, Plaintiffs obtained a writ of execution as to the Bond Proceeds, which was levied by the U.S. Marshal at Clearstream's office at 55 Broad Street, New York. (Pls.' 56.1 ¶ 21.)

**C. Procedural History**

After obtaining their writ of execution, Plaintiffs commenced this action on December 30, 2013.  In 2015, this Court dismissed the action, holding that the assets were located abroad and that it lacked subject-matter jurisdiction over Markazi because the FSIA does not permit attachment of property outside the United

---

[7] In January 2014, the U.S. Department of Treasury assessed a $152 million fine against Clearstream for its participation in concealing Markazi's beneficial ownership of the assets in the UBAE/Markazi Account in violation of U.S. sanctions.  (Vogel Decl. ¶¶ 67-68 & Exs. 61, 103.)  The settlement agreement recited OFAC's findings that, "[a]s a result of the transfers, the record ownership on Clearstream's books changed, but the beneficial ownership did not, resulting in [Markazi's] interest being buried one layer deeper in the custodian chain."  (Vogel Decl. ¶ 67 & Ex. 61 at ¶ 7.)

States.  Peterson v. Islamic Republic of Iran, No. 13-CV-9195, 2015 WL 731221 at *10 (S.D.N.Y. Feb. 20, 2015).  The Court of Appeals affirmed in part but vacated this Court's jurisdictional holding, finding that the Foreign Sovereign Immunities Act ("FSIA") "does not by its terms provide execution immunity to a foreign sovereign's extraterritorial assets." Peterson v. Islamic Republic of Iran, 876 F.3d 63, 90–91 (2d Cir. 2017).

Before Clearstream and Markazi's certiorari petitions could be resolved, Congress amended 22 U.S.C. § 8772 through the National Defense Authorization Act of 2020, broadening the statute to authorize courts to order qualifying assets held abroad by a foreign securities intermediary doing business in the United States to be "brought to the State in which the court is located." 22 U.S.C. § 8772(a)(1).  On remand, the Court subsequently granted Plaintiffs' motion for summary judgment and denied the motions to dismiss by Clearstream and Markazi, ordering turnover of the $1.68 billion in Bond Proceeds.  Peterson v. Islamic Republic of Iran, No. 13 Civ. 9195, 2023 WL 2601265 (S.D.N.Y. Mar. 22, 2023).

On its most recent review, the Court of Appeals (1) held that this Court lacks jurisdiction over Markazi; (2) affirmed personal jurisdiction over Clearstream; (3) rejected Clearstream's equal protection challenge; and (4) vacated summary judgment on the basis that state law governs ownership interests over the Bond Proceeds under Section 8772.  The Court of Appeals remanded for the Rule 19

analysis and the ownership determination.  Peterson 2024, 121 F.4th at 1011.

### D. The Luxembourg Proceedings

Markazi has filed a restitution action against Clearstream in Luxembourg seeking approximately $4.9 billion. (Kry Decl. Ex. 5 ¶ 11.)  UBAE has filed a separate indemnification action. (Kaminetzky Decl. Ex. B ¶¶ 31-33.)  A Luxembourg district court has prohibited Clearstream from complying with any U.S. turnover order without first obtaining recognition in Luxembourg. (Pls.' 56.1 ¶ 9.)  At the same time, multiple other groups of terrorism judgment creditors have sought to attach the same assets in Luxembourg, without success.  (Kry Decl. Ex. 5 ¶¶ 2-6.)

## II. Rule 12(b)(7) Motions

### A. Legal Standard

Under Rule 12(b)(7), a party may move to dismiss an action for failure to join a required party under Rule 19.  Fed. R. Civ. Pro. 12(b)(7).  "Federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result."  Am. Trucking Ass'n, Inc. v. New York State Thruway Auth., 795 F.3d 351, 357 (2d Cir. 2015). Defendants, as the moving party, bear the burden of showing that joinder is necessary, and the Court is permitted to consider

13

materials beyond the pleadings in evaluating the motion. Kasselakis v. Tiptree, Inc., No. 1:23-CV-2756-GHW, 2024 WL 3252632, at *13 (S.D.N.Y. July 1, 2024); see also Joseph S. v. Hogan, 561 F. Supp. 2d 280, 311 (E.D.N.Y. 2008) (collecting cases).

Rule 19, in turn, establishes a two-step framework. Under Rule 19(a), the Court determines first whether the absent party is "required." Fed. R. Civ. P. 19(a). If a required party cannot be joined, Rule 19(b) directs the court to determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). The relevant factors include: (1) prejudice to the absent party or existing parties; (2) whether protective provisions could lessen that prejudice; (3) whether a judgment in the party's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed. (Id.)

At bottom, the Rule 19(b) inquiry "will turn upon factors that are case specific," reflecting the fact that Rule 19(b) is "a rule based on equitable considerations." Republic of the Philippines v. Pimentel, 553 U.S. 851, 862–63 (2008).

14

**B. Discussion**

Markazi unequivocally claims an interest in the Bond Proceeds as their sole beneficial owner—a characterization Plaintiffs, unsurprisingly, are happy to endorse. (Pls.' Mem. at 2.) Markazi's claimed interest is clearly non-frivolous. In the interests of brevity, the Court assumes without deciding that Markazi is a required party under Rule 19(a) and focuses its analysis on the heart of the single issue presented for remand: "whether Bank Markazi is an indispensable party under Federal Rule of Civil Procedure 19 such that the litigation cannot proceed in its absence." Peterson 2024, 121 F.4th at 1011 (emphasis added).

In this regard, the Court finds Judge Lohier's thoughtful concurrence persuasive. The Court generally adopts Judge Lohier's framework under Rule 19(b) but makes several additional factual findings based on the record before it.[8]

i. **Prejudice to the Absent Party and Existing Parties**

The first factor asks the Court to assess the extent to which a judgment rendered in Markazi's absence might prejudice Markazi

---

[8] Clearstream also moved to dismiss under Rule 19 on the ground that UBAE is also a required party whose absence warrants dismissal. (Clearstream Mem. at 11–22.) The mandate did not invite Clearstream, which did not raise Rule 19 on appeal, to assert UBAE's indispensability as a separate basis for dismissal. Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp., 671 F.3d 261, 271 (2d Cir. 2012) ("It is not reasonable to construe the mandate as allowing alternative, dispositive bases . . . to be raised for the first time on remand, particularly when the cases have been pending for years and had already been the subject of an appeal.")

or the existing parties.  As Judge Lohier correctly noted, the "prejudice inquiry . . . pivots entirely on Bank Markazi's sovereign immunity."  Peterson 2024, 121 F.4th at 1012 (Lohier, J., concurring).

Markazi urges that the prejudice inquiry—and indeed, the entire Rule 19(b) analysis at large—is controlled by Pimentel, which was decided prior to Section 8772's enactment.  In Pimentel, the Supreme Court observed that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign."  Pimentel, 553 U.S. at 867.  But the Court also acknowledged that "the balance of equities may change in due course."  Id. at 873.  For several reasons, the Court finds that Pimentel does not control and that the balance of equities favor retention of the case.

First, Section 8772 sequesters this turnover case from the contrary holding in Pimentel.  Congress has plainly authorized that the assets at issue "shall be subject to execution or attachment . . . without regard to concerns relating to international comity."  22 U.S.C. § 8772(a)(1) (emphasis added).  And comity was the foundation on which Pimentel stands.  Compare § 8772(a)(1), with 553 U.S. at 866 ("Giving full effect to sovereign immunity promotes the comity interests that have contributed to the development of the immunity doctrine."); id. at

16

866 ("Comity and dignity interests take concrete form in this case . . . [because] [t]here is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so."); id. at 869 (noting "the important comity concerns implicated . . . in asserting foreign sovereign immunity" and that the courts below "did not accord proper weight to the compelling claim of sovereign immunity").  If the Supreme Court had disregarded comity concerns entirely, as the political branches have now specifically asked this Court to, it is hardly likely that Pimentel would have produced the same holding.

Even setting comity aside, Pimentel is readily distinguishable.  Pimentel involved competing ownership claims among private parties and a sovereign.  See 553 U.S. at 858–59.  Here, no party disputes that the assets sought by Plaintiffs ultimately belong to Iran.  The dispute is merely over the formal intermediary structure through which Iran holds the assets.  And Pimentel highlighted a sovereign's dignitary interest in litigating in its own courts, id. at 866, but that concern has little application here: the "choice" Markazi faces "is between litigating in the United States or Luxembourg, not Iran." Peterson 2024, 121 F.4th at 1013 (Lohier, J., concurring).

Finally, the Court of Appeals has already held that turnover can proceed "by exercising jurisdiction only over a garnishee custodian." Peterson 2024, 121 F.4th at 996 (citing Koehler v.

17

Bank of Bermuda Ltd., 12 N.Y.3d 533, 540 (2009)).  If the Court can order turnover by exercising jurisdiction against Clearstream "only," id., it would surely be strange to dismiss the case on the basis that Markazi is indispensable.  The garnishee framework itself mitigates the prejudice to the absent sovereign, because the Court need only determine whether the garnishee holds assets that belong to the judgment debtor—a question that can be resolved without Markazi at the table.  Accordingly, this factor counsels against dismissal.

### ii.  Protective Provisions

The second factor asks the Court to consider the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, by shaping the relief, or by other measures.

Here, the Court finds several mitigating features.  A statutory discharge[9] under CPLR § 5209 and Article 48 of Clearstream's General Terms and Conditions ("GTC")[10] provide potential protection to Clearstream against the Luxembourg claims.

---

[9] CPLR § 5209 provides, in relevant part, that a garnishee who "pays or delivers to the judgment creditor or a sheriff or receiver, money or other personal property in which a judgment debtor has or will have an interest, or so pays a debt he owes the judgment debtor, is discharged from his obligation to the judgment debtor to the extent of the payment or delivery."  NY CPLR § 5209.

[10] Article 48 provides that Clearstream "shall not be liable for any action taken . . . caused by events beyond [Clearstream's] control," including any "reversal order, law, judicial process, decree, regulation, or other action of any government, authority, court, self-regulatory organisation, government agency, or instrumentality of government."  (Vogel. Decl. Ex. 108 at 14.)

Although the practical effect of these provisions is disputed, the mere risk that they will prove ineffective does not compel dismissal under Rule 19(b). Moreover, Defendants have already used the Luxembourg courts to erect protective provisions of their own; indeed, a Luxembourg court has prohibited Clearstream from complying with any turnover order from this Court until the order is first recognized in Luxembourg. The Court could, in theory, stay its turnover order or take other measures to avoid conflicting judgments while Plaintiffs seek recognition. In any event, all litigants have a panoply of measures that can be deployed in both fora to mitigate any prejudice.

### iii. Whether a Judgment Rendered in the Person's Absence Would Be Adequate

The third factor asks whether a judgment rendered in Markazi's absence would be adequate. The Court acknowledges that a judgment will not bind Markazi in its own right. But the core dispute is between Plaintiffs and the garnishee, Clearstream, and the Court of Appeals has endorsed proceeding through a garnishee action directed at Clearstream without requiring jurisdiction over Markazi. Peterson 2024, 121 F.4th at 996, 1013 (Lohier, J., concurring); see also Koehler, 12 N.Y.3d at 541 ("[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property regardless of whether the defendant is a judgment debtor or a garnishee.").

19

A judgment in this case will resolve the turnover claim against Clearstream that is actually before the Court.  The fact that Markazi may separately contest in Luxembourg whether Clearstream may comply with such an order reflects the reality of parallel litigation in multiple jurisdictions, which is hardly unusual in cross-border asset recovery.  On balance, this factor weighs against dismissal.

### iv.    **Whether the Plaintiff Would Have an Adequate Remedy if the Action Were Dismissed**

The fourth factor cuts decisively against dismissal. Five groups of terrorism judgment creditors (Havlish, Hoglan, Flatow, Duker, and Eisenfeld) have pursued attachment of the same assets in Luxembourg over nearly ten years, without success. (Kry Decl. Ex. 5 ¶¶ 2–6.)[11]   Markazi argues these courts gave "full and fair consideration" to those claims.  (Markazi Reply at 11.)  But five failures strongly indicate that Luxembourg provides no adequate forum for victims of terrorism seeking to execute on these assets. And it is beyond dispute that Plaintiffs will have no adequate remedy from Iran itself.

---

[11] Clearstream argues that Plaintiffs have an adequate alternative forum in Italy.  Plaintiffs' Italian law expert has observed, however, that enforcement in Italy is not possible because the attacks occurred outside the United States. (Vogel Decl. Ex. 139 at 7-8.)  In any event, there is no indication that Italian courts have the power to compel Clearstream—a Luxembourg entity—to turn over assets held in Luxembourg, and the Italian proceedings cited by  Clearstream concern only the recognition of judgments, not execution against specific assets held by third-party custodians outside of Italy.

At bottom, the balancing of equities commanded by Rule 19(b) does not occur in a vacuum.  It must account for the political branches' clear and expressed intent in enacting Section 8772, which reflects a considered judgment that these particular assets should be made available, subject to certain conditions, to satisfy Iran's liability for terrorism judgments—notwithstanding the risks to international comity that cross-border enforcement could pose. It is the political branches that are responsible for making these cost-benefit analyses in the foreign policy arena, not this Court. "And when the Executive and Congress have spoken with one voice in that sphere, their coordinate action is 'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" Fuld v. Palestine Liberation Org., 606 U.S. 1, 19 (2025) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

Dismissal at this stage would end Plaintiffs' "painstaking and decades-long efforts to enforce their judgment as Congress appears to have wanted." Peterson 2024, 121 F.4th at 1013 (Lohier, J., concurring).  That is not the equity that Rule 19(b) seeks.

21

Accordingly, the motions to dismiss are DENIED. It is therefore unnecessary to reach Plaintiffs' alternative theory of jurisdiction under the TRIA.[12]

### III. Summary Judgment

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Green v. Town of East Haven, 952 F.3d 394, 406 (2d Cir. 2020).

On remand, the issues before the Court are narrow. The Court previously determined, as confirmed by the Court of Appeals, that Plaintiffs satisfy six of the eight requirements to recall the Bond Proceeds to New York.[13] Only two elements remain: whether Markazi "holds equitable title to, or the beneficial interest in" the Bond Proceeds, and whether "no other person possesses a constitutionally protected interest" in the Bond Proceeds "under the Fifth Amendment." 22 U.S.C. § 8772(a)(2). In both cases, the Court of Appeals instructed this Court to undertake two tasks:

---

[12]  Plaintiffs offer the Terrorism Risk Insurance Act ("TRIA") as an alternative basis for jurisdiction over Bank Markazi. (Pls.' Mem. at 30–40.)  It is not necessary to reach the TRIA issue in light of the Court's findings that Rule 19(b) does not compel dismissal.

[13] Peterson 2024, 121 F.4th at 1009 n.12 (noting that "Clearstream contends that a triable issue of fact remains on two of these [eight] elements").

first, "apply state law to determine the extent of the parties' interests in the Asset[s]," and second, "apply Section 8772 to determine whether turnover is permitted in light of those interests." Peterson 2024, 121 F.4th at 1011.

The parties have raised a panoply of arguments that range well beyond these issues and are therefore barred by the mandate rule. The Court cannot and will not address each one. Instead, the Court's analysis is limited to the contested issues of ownership and any remaining constitutionally protected interests cognizable under the Fifth Amendment.

### A. Markazi's Beneficial Ownership of the Bond Proceeds

In determining whether Markazi is a beneficial owner or holds equitable title to the Bond Proceeds nominally held by Clearstream, the Court of Appeals directed this Court to undertake the traditional Asia Pulp two-step analysis for determining ownership under § 8772. At step one, the Court looks to "state law to determine what rights [a party] has in the property." Export-Import Bank of U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 117 (2d Cir. 2010) (quoting United States v. Craft, 535 U.S. 274, 278 (2002)). At step two, the Court applies "federal law to determine whether the [party's] state-delineated rights . . . trigger application of" the consequences set forth in Section 8772. Id (internal citation omitted). The Court addresses each step in turn.

23

i. **Asia Pulp Step One: State-Delineated Rights under Luxembourg Law**

The Court of Appeals declined to take a position on the state law that governs Asia Pulp step one.  Clearstream contends that Luxembourg law governs.  Plaintiffs argue for New York law.  The Court concludes that the choice-of-law issue is ultimately moot because, even accepting Clearstream's position that Luxembourg law entirely governs step one, there is no genuine dispute that Markazi's ownership interests are sufficient under Luxembourg law to permit turnover under Section 8772.[14]

a) Applicable Luxembourg Law

Under Federal Rule of Civil Procedure 44.1, issues of foreign law are treated as questions of law.  Fed. R. Civ. Pro. 44.1.  The Court may consult any resource in determining foreign law.  To that end, the parties have submitted expert declarations opining on the extent to which Luxembourg law recognizes third-party ownership interests comparable to the familiar notions of beneficial ownership and equitable title.  The Court is mindful that Luxembourg's civil law traditions will not necessarily map on

---

[14] The Court would reach the same result under New York law and its familiar tests for beneficial ownership and equitable title.  The Court also notes for the record that, to the extent that a conflict between New York and Luxembourg law were ever identified, New York law would arguably prevail under the "interest analysis" test that the New York Court of Appeals has applied to turnover claims.  Istim Inc. v. Chem. Bank, 78 N.Y.2d 342, 347-48 (1991). Ultimately, the Court need not engage in a conflicts analysis because, even under the Luxembourg law that Defendants urge the Court to apply, summary judgment remains warranted.

24

to the Anglo-American common-law understanding of beneficial ownership and equitable title. Nonetheless, after carefully considering the parties' submissions and conducting its own review of Luxembourg law,[15] the Court concludes that Luxembourg law recognizes sufficiently analogous forms of third-party ownership rights.[16]

As a starting point, the Court agrees with Plaintiffs that Luxembourg law recognizes that ownership rights of assets held by a Luxembourg financial institution are not necessarily limited to those who nominally hold an account at the institution. Luxembourg property law recognizes a concept of démembrement, which divides property into so-called "bare ownership" and "usufruct ownership." Usufruct ownership confers on a third-party the right to enjoy and profit from property nominally owned by another. (Heisten Supp. Decl. ¶¶ 51–52, citing Civil Code Art. 578.)[17]

---

[15] Plaintiffs submitted declarations from multiple Luxembourg law experts: Alex Schmitt, a senior partner specializing in Luxembourg securities law and a lecturer at the University of Luxembourg (Vogel Decl. Exs. 89 ("Schmitt Decl."), 90 ("Schmitt Supp. Decl.")); Marie Paule Gillen of DSM Avocats (Vogel Decl. Ex. 92 ("Gillen Decl.")); the Vilret-Avocats firm (Vogel Decl. Ex. 91 ("Vilret-Avocats Op.")); and Dr. Laurent Heisten (Vogel Decl. Ex. 127 ("Heisten Decl.")). Dr. Heisten provided an additional declaration in response to Clearstream's Motion. (Dkt. 390 ("Heisten Supp. Decl.").)

[16] Clearstream's Luxembourg law experts argue that Luxembourg law does not recognize the concepts of "equitable title" or "beneficial interest" and that those terms have no private law impact in a civil-law jurisdiction. (See, e.g. Kaminetzsky Decl. Ex. D (Prüm Decl.) ¶ 35.) Whether Luxembourg law formally recognizes these common-law concepts is irrelevant. "In looking to state law, we must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them." Craft, 535 U.S. at 279 (emphasis added).

[17] The Court recognizes that civil-law usufruct ownership is not a perfect analogue for common-law equitable ownership. Historically, most civil-law jurisdictions did not recognize the traditional common-law division (cont'd)

25

Luxembourg's Civil Code's deposit provisions (Articles 1915–1948) also provide that where property is transferred as part of a deposit, the depository relationship does not transfer ownership rights.  Separately, the Law of August 1, 2001 on the Circulation of Securities (the "2001 Law") creates a specialized regime for book-entry securities, granting the "account holder" an intangible right in rem while preserving the depositor's underlying rights.

Under the Luxembourg Civil Code's deposit provisions, a deposit "may only be duly made by the owner of the thing deposited, or with his express or tacit consent," and the depository is obligated to safeguard and return the deposited property in kind. (Heisten Decl. ¶¶ 30–34, citing Arts. 1915–1948, 1922.)  As Dr. Heisten persuasively explains, "[b]y its very nature, a deposit agreement does not entail a transfer of ownership" and "[t]he depositor retains title to the deposited property." (Heisten Supp. Decl. ¶ 34.)  The 2001 Law specifically extends this principle to securities, stating that "[t]he depositor has the same rights as if the securities and other financial instruments had remained

---

(cont'd) between legal and equitable ownership necessary to hold assets in trust.  However, as Plaintiffs point out, Luxembourg has now ratified the applicable Hague convention recognizing the existence of trusts. See Convention of 1 July 1985 on the Law Applicable to Trusts and Recognition, https://www.hcch.net/en/instruments/conventions/full-text/ ("The term 'trust' refers to the legal relationships created - inter vivos or on death - by a person, the settlor, when assets have been placed under the control of a trustee for the benefit of a beneficiary or for a specified purpose.")  Following these more recent developments, there appears to be growing consensus that civil-law jurisdictions recognize that financial intermediaries do not necessarily have beneficial ownership over the assets they nominally hold.  See Steven L. Schwarcz, Intermediary Risk in A Global Economy, 50 DUKE L.J. 1541, 1569 (2001).

with it" and confers on the depositor "a right in rem of intangible nature" over the deposited securities. (Vilret-Avocats Op. § 4.1, quoting 2001 Law art. 6.)

Luxembourg courts have also held that neither deposited securities nor the cash proceeds received on those securities become part of the depository's own estate in the event of bankruptcy. Instead, these assets constitute a patrimoine d'affectation (a "segregated asset mass") to which only the depositor is entitled. (Schmitt Decl. ¶¶ 15, 18, citing Trib. arr. Luxembourg, Oct. 29, 2008, Nos. 1314/08 & 1315/08; Gillen Decl. ¶ 29.) Although the Bond Proceeds at issue here are technically cash proceeds arising from the original bonds, the 2001 Law "repeats the rule of segregation regarding interest payments and repayments of principal," insulating such cash proceeds from the depository's creditors. (Schmitt Decl. ¶ 13; Gillen Decl. ¶ 29.)

Moreover, the 2001 Law applicable to securities also contemplates that "account holders" may in turn hold assets on behalf of third parties. Article 2 defines an "account holder" as a person acting "for its own account or for others," and Article 7(1) requires the account keeper to follow instructions not only of the account holder but also of "third parties that have an interest in the securities." (Heisten Decl. ¶¶ 28–29 (quoting 2001 Law art. 2 & 7).) Article 3 of the 2001 Law also expressly

27

provides that "[s]ecurities recorded in an account may be subject to division of ownership (<u>démembrement</u>) in the same way as property rights.")  (Heisten Supp. Decl. ¶ 50 (quoting 2001 Law art. 3).) As Dr. Heisten notes, this provision recognizes the possibility that a third party may hold usufruct rights in the securities and that, correspondingly, "the account holder may not hold proprietary rights over the securities credited to a settlement account." (Heisten Supp. Decl. ¶ 51.)

Clearstream's own GTCs, which are governed by Luxembourg law, likewise confirm that Clearstream may custody assets held by customers who in turn hold those assets on behalf of third parties. Notably, the GTCs require Clearstream customers like UBAE to "segregate proprietary assets from <u>non-proprietary assets.</u>" (Vogel Decl. Ex. 108 at 13) (emphasis added).  The GTCs also prohibit Clearstream from exercising any right of set-off against assets held on behalf of third parties (GTC Art. 46).  And the GTCs contain numerous references to "beneficial owners" for the purposes of anti-money laundering compliance.

In sum, the fact that Markazi is not formally identified as an account holder at Clearstream clearly does not foreclose Markazi from having an ownership interest in the Bond Proceeds under Luxembourg law.

28

b) <u>Undisputed Evidence of Markazi's Ownership Interest Under Luxembourg Law</u>

Applying Luxembourg law, the evidence of Markazi's ownership rights in the Bond Proceeds is overwhelming.[18]

It is undisputed that Markazi alone funded the bond purchases that underlie the proceeds in Clearstream's possession.  It is also undisputed that Markazi alone was entitled to every dollar of interest and principal paid on the bonds.[19]  And it is undisputed that, even after UBAE entered the picture, the assets that Clearstream held were clearly segregated by UBAE for Markazi's benefit.  Most notably, when UBAE opened the account to receive Markazi's bonds (Account 13061) at Clearstream, UBAE asked Clearstream to designate the account as a "customer account" used for the benefit of third parties, as opposed to a proprietary account for UBAE's own benefit.  As Clearstream's own executive previously conceded, this distinction is critical:

---

[18] The Court of Appeals has instructed that its earlier decision in <u>Peterson I</u> "addressed a different set of assets located in an account at a different bank in a different country than the assets at issue in this case" and that its "discussion of ownership therefore has no relevance to the ownership of the assets at issue here."  <u>Peterson 2024</u>, 121 F.4th at 1010 n.14. The Court's determination is made independently on the evidentiary record before it in this case.

[19] The Court agrees with Dr. Heisten's conclusion that, as a matter of Luxembourg law, Markazi controlled the disposition of the bonds and was entitled to all principal and interest prior to the asset freeze.  The Court also agrees with Dr. Heisten that if the Bond Proceeds were unblocked by Clearstream, Markazi would ultimately be entitled to the proceeds of the Blocked Account.  (Heisten Decl. ¶¶ 11, 15, 18, 19, 21.)

> A proprietary account by definition should include holdings which are beneficially owned by the customer itself . . . a custody account or what we would call a customer account, 13061 [which] was opened in January [by UBAE] is different in the sense that <u>it is designed to hold interest of third parties</u>, that is to say, of <u>the customers of our customer who are using our bank</u> . . . as their custodian.

(Gem Test. 32:24-33:13) (emphasis added).    This testimony is corroborated by contemporaneous records showing that UBAE requested in January of 2008 that Clearstream immediately open an "additional account" for "UBAE SPA-CUSTOMERS," belying any notion that UBAE held the bonds for its own benefit.    (Vogel Decl. Ex. 51):



Following UBAE's request, Clearstream responded that it had opened Account 13061 with the name "UBAE SPA-CUSTOMERS," which would be subject to Clearstream's own GTCs.    (Id.)    The current GTCs, in turn, likewise differentiate between "proprietary" and "non-proprietary" assets, requiring that such assets be segregated accordingly.    (Vogel Decl. Ex. 108 at 13 ("The Customer must segregate proprietary assets from non-proprietary assets and notify CBL if Securities [or] cash . . . are deposited in an account in CBL in which the Customer holds on behalf of its clients . . . .").)

30

After UBAE opened this segregated customer account at Clearstream, Markazi transferred all of the assets at issue to the segregated account in a gratuitous free-of-payment transfer, which Clearstream's own executive admitted "may mean . . . that the delivery has been made without the change of beneficial ownership of the customer."  (Gem Test. 15:13-15.)[20]  From that point on, UBAE held the segregated assets for Markazi, whether as a depository, fiduciary, or other trust-like device recognized by Luxembourg law.  The Bond Proceeds thus "represent a segregated asset mass" that belong to Markazi, not UBAE, under Luxembourg law.  (Schmitt Decl. ¶ 8.)

Indeed, the contemporaneous correspondence between Clearstream and UBAE exposes the facade of Clearstream's current litigation position.  In an October 26, 2009 letter, UBAE responded to Clearstream's decision to block the Markazi assets due to OFAC's investigation.  UBAE observed that, despite Clearstream's professed surprise at discovering the true owner of the funds, Clearstream "has always known the identity of the beneficial owner [Markazi] of the assets."  (Vogel Decl. Ex. 52 at 2) (emphasis added).  In its response, Clearstream acknowledged "that the current beneficial owner [of the new UBAE account] is the same as

---

[20] At the time of Gem's June 27, 2008 testimony, Clearstream's position was that it was not entirely clear whether the beneficial ownership had changed.  (Vogel Decl. Ex. 52 at 2 ("Clearstream [sic] position is that that we have no written evidence that there is an Iranian beneficial ownership on the above mentioned assets in relation to your account 13061.").

31

the holder of [old] account [number] 80726 [Markazi]."    (Vogel Decl. Ex. 51 at 2):

> Third, as to the beneficial owner of the securities held in your customer account with us and which you state are subject to OFAC "scrutiny," we only learned through your letter of October 26, 2009 that the current beneficial owner is the same as the holder of account n° 80726 in our books. Indeed, we asked you for this information as early as our e-mail communication of June 16, 2008, to which you never responded. Clearstream is not required under the Luxembourg laws implementing the EU Directives on the combat against money laundering and terrorism financing to know the beneficial ownership of non-proprietary account assets deposited by a credit institution authorised in a EU Member State with Clearstream.

At no point in these contemporaneous communications with UBAE did Clearstream ever challenge the notion that the assets in question ultimately belonged to Markazi.   Instead, Clearstream continued to treat UBAE as a mere intermediary for its now-sanctioned former client.   OFAC reached the same conclusion when it assessed a $152 million fine against Clearstream for concealing Markazi's beneficial ownership, finding that "the record of ownership on Clearstream's books changed, but the beneficial ownership did not, resulting in [Markazi's] interest being buried one layer deeper in the custodian chain."    (Vogel Decl. Ex. 61 ¶ 8.)

Finally, although UBAE's own admissions are not, per the Court of Appeals' instruction, dispositive in and of themselves, it is not lost on the Court that UBAE has itself repeatedly admitted that the Bond Proceeds are "beneficially owned by Bank Markazi" and that UBAE "does not have possession, custody, or control of—

or any right, title, or interest in" the assets.  (Vogel Decl. Exs. 105 at 3, 106 ¶ 4.)  And Markazi, too, has repeatedly stated that it is the sole beneficial owner of the Bond Proceeds.  Indeed, Markazi itself has sued in Luxembourg to claim an interest in these very assets, obtaining an injunction prohibiting Clearstream from transferring them without prior recognition proceedings. (Clearstream 56.1 ¶ 9.)  In that same litigation, the Luxembourg district court opined that Markazi's ultimate ownership of the assets under Luxembourg law is "neither contested nor contestable." (Heisten Supp. Decl. ¶ 83 (quoting BQUE.1 v. BQUE.2, et al., TAL-2020-02660, TAL-2020-04402, Judgement, 27-34 (Lux. Dist. Ct, 2d Chamber, Apr. 30, 2021) (emphasis added).)  In a separate ruling, another Luxembourg district court observed that "[i]t is not disputed that the funds seized from Clearstream on account no. UBAE 13061 belong to the seized debtor Bank Markazi and not to Banca UBAE." (Heisten Supp. Decl. ¶ 96 (quoting Persons 1-201 v. Central Bank, et al., TAL-2022-02223, Judgement (Lux. Dist. Ct. 1st Chamber, June 18, 2024) (emphasis added).)

The Court agrees with its continental counterparts. Notwithstanding Clearstream's self-serving denial of Markazi's ownership, there is no genuine dispute of fact that Markazi is the true owner of the assets held by Clearstream.[21]  Plaintiffs' experts

---

[21] Luxembourg law also offers an independent basis for looking past the Markazi-UBAE sham intermediary structure.  According to Plaintiffs' experts, (cont'd)

are therefore correct that the "creation of a screen between Bank Markazi's creditors and Bank Markazi . . . cannot tarnish the right of such creditors to claim their property" under Luxembourg law. (Gillen Decl. ¶ 18.)   Under Luxembourg law, Markazi holds substantive ownership rights over the Bond Proceeds.

### ii.    Asia Pulp Step Two: Application of Federal Law to the Parties' State-Delineated Rights

Having identified Markazi's ownership rights under state law, the Court turns to the second step of the Asia Pulp analysis: whether Markazi's state-delineated rights constitute "equitable title" or a "beneficial interest" within the meaning of § 8772.

The common-law concepts of equitable title and beneficial ownership are well-understood.   A "beneficial owner" is "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else," including "one for whom property is held in trust." Owner, BLACK'S LAW DICTIONARY (12th ed. 2024).   Equitable title,

---

(cont'd) Luxembourg courts have held that a beneficial owner "could perfectly well be considered a seized debtor"—i.e., treated as one with the formal account holder—in cases of "simulation, confusion, and generally a faulty attitude engaging his responsibility towards the prosecutor." (Gillen Decl. ¶ 18 (citing L. v. B.N.P., 02 December 1999, Bull. Droit et Banque, No. 30, p. 65.)); see also Strongin v. Int'l Acceptance Bank, 70 F.2d 248, 251 (2d Cir. 1934) ("[T]here is a doctrine of the civil law known as 'relative simulation,' which . . . gives rise to a situation analogous in practical effect to that of beneficial ownership in persons who are not vested with the legal title.")  The simulation doctrine is arguably applicable here, where Markazi engineered the UBAE structure for the express purpose of evading OFAC sanctions. (Massoumi Aff. ¶¶ 22–26); (Vogel Decl. ¶ 67 & Ex. 61 at ¶¶ 7–8.)  Although the Court does not base its holding on the simulation doctrine, it would independently support disregarding the formal Clearstream-UBAE intermediary structure and treating Markazi as the owner of the assets.

34

likewise, includes "[a] title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title."  Title, BLACK'S LAW DICTIONARY (12th ed. 2024).

Markazi's ownership rights under Luxembourg law satisfy such criteria.  Notwithstanding UBAE's role as a middleman, Markazi holds every substantive economic right under Luxembourg law. Markazi funded every purchase, directed every transaction, received every payment, and retains the right to demand restitution of the assets.  Clearstream holds Markazi's assets in trust in a segregated customer account that was only nominally held in the name of UBAE.  Indeed, Section 8772 specifically provides that a "custodial interest of a foreign securities intermediary or a related intermediary that holds the assets abroad for the benefit of Iran" does not qualify as an equitable or beneficial interest under the statute.  22 U.S.C. § 8772(a)(2)(A).

Accordingly, the Court concludes there is no genuine dispute of material fact that Markazi's state-delineated rights over the assets at issue, as identified at step one, constitute both "equitable title" and a "beneficial interest" in the Bond Proceeds within the meaning of § 8772(a)(2) and render the assets subject to execution.

35

**B. Whether Any Other Person Possesses a Constitutionally Protected Interest In The Bond Proceeds**

Section 8772(a)(2) also requires the Court to determine that "no other person possesses a constitutionally protected interest in the assets . . . under the Fifth Amendment." 22 U.S.C. § 8772(a)(2). Clearstream advances various arguments as to why turnover is constitutionally barred. While many of Clearstream's arguments are arguably barred by the mandate rule, they are also without merit.

First, Clearstream contends that UBAE is the "owner" of the right to payment under Luxembourg law and therefore possesses a property interest protected by the Takings Clause. (Clearstream Mem. at 36–37.) This argument is foreclosed by the Court's previous findings. UBAE has no economic stake in the Bond Proceeds. Prior to the funds' restriction in the Blocked Account, UBAE's role was limited to holding the assets in a segregated customer account for Markazi's benefit. UBAE's custodial interest does not give rise to a violation of the Takings Clause.

Second, Clearstream claims that turnover would expose it to competing claims in Luxembourg and potential double liability. As an initial matter, Clearstream's own public disclosures belie this contention. Clearstream's parent company, Deutsche Börse AG, has told its shareholders and regulators that its "executive board does not think that claims for damages raised against Clearstream

36

Banking S.A. in Luxembourg or in the U.S. will be successful." (Vogel Decl. Ex. 115 at 22.)  Moreover, to the extent Clearstream faces any residual risk from the Luxembourg proceedings, the statutory discharge mechanisms available under CPLR § 5209 and GTC Article 48 provide potential avenues of protection.  In any event, the Court of Appeals has already held that by "regularly engag[ing] in bond transactions in the United States," Clearstream assumed the risk of double liability "under well-established principles of New York law."  Peterson 2024, 121 F.4th at 1006–07.  The mere specter of double-liability, even if accepted, does not give rise to a constitutional violation.

Finally, Clearstream's substantive due process argument is unavailing.  Where, as here, an explicit constitutional provision governs a claimed interest, it displaces more generalized substantive due process protections.  Graham v. Connor, 490 U.S. 386, 395 (1989).  Because any constitutionally protected interest in the Bond Proceeds under the Fifth Amendment would arise, if at all, under the Takings Clause, Clearstream cannot repackage the same argument as a substantive due process claim.  And in any event, Section 8772 easily survives rational-basis review, as Congress had a rational basis for subjecting the assets of a state sponsor of terrorism to attachment and execution.  See Cmty. Hous. Improvement Program v. City of New York, 59 F.4th 540, 556–57 (2d Cir. 2023).

37

Ultimately, Clearstream's various constitutional arguments would arguably make it impossible for judgment creditors to seize judgment debtors' assets that are held in trust by a third party. Such arguments, if accepted, would pervert the Fifth Amendment into a tool for money laundering and judgment evasion.[22]  That is not the result that the Framers intended, and it is not one the Court will accept here.

Accordingly, the Court finds that no other person possesses a constitutionally protected interest in the Bond Proceeds under the Fifth Amendment, rendering them subject to execution under § 8772(a)(2).

## Conclusion

For the foregoing reasons, the Court <u>ORDERS</u> as follows:

- Plaintiffs' motion for summary judgment (Dkt. 365) is <u>GRANTED</u>.

- Markazi's motion to dismiss (Dkt. 377) is <u>DENIED</u>.

- Clearstream's motion to dismiss is <u>DENIED</u> and its cross-motion for summary judgment (Dkt. 383) is <u>DENIED</u>.

- The Clerk of Court shall close Dkts. 365, 377, and 383.

---

[22] This is not to suggest that Clearstream or its counsel have any such ulterior motives in opposing turnover.  The Court recognizes that any financial institution has the right (and in some cases, a duty) to oppose turnover of third-party assets in its possession where non-frivolous arguments can be made.

38

- The parties shall confer and provide a joint status update by letter to the Court no later than April 15, 2026 regarding any subsequent proceedings or steps necessary to effectuate the turnover order.

**SO ORDERED.**

Dated:   New York, New York
         March 31, 2026

_____
LORETTA A. PRESKA
Senior United States District Judge